J52sMARc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   MARSH & MCLENNAN AGENCY LLC,
 4                 Plaintiff,
 5           v.                          19 Civ. 3837 (VSB)
 6   RICK FERGUSON,
 7                 Defendant.
 8   ------------------------------x
                                        New York, N.Y.
 9                                      May 2, 2019
                                        9:00 a.m.
10
     Before:
11
                      HON. VERNON S. BRODERICK,
12
                                        District Judge
13
                            APPEARANCES
14
     LITTLER MENDELSON. P.C.
15        Attorneys for Plaintiff
     BY:  A. MICHAEL WEBER
16        DANIELLA ADLER
17   OUTTEN & GOLDEN LLP
          Attorneys for Defendant
18   BY:  NICHOLAS H. SIKON
19
20
21
22
23
24
25
```

J52sMARc

```
 1              (Case called)

 2              THE COURT:  Counsel, please note their appearances for

 3    the record.

 4              We're here on Marsh McLennan v. Ferguson

 5              MR. WEBER:  Michael Weber and Daniella Adler, Littler

 6    Mendelson, for the plaintiff.

 7              MR. SIKON:  Good morning.  Nicholas Sikon for the

 8    defendant, Rick Ferguson.

 9              THE COURT:  Mr. Sikon, I don't know, have you had an

10    opportunity to file an appearance?

11              MR. SIKON:  I was retained last night at around 8:00

12    in the evening, so I haven't had a chance to do that.

13              THE COURT:  I figured as much.  I looked at the docket

14    after that to see whether anybody filed a notice of appearance.

15              I take it you've been in contact with the attorney who

16    is mentioned in the —— who Ms. Dupri, Mr. Dupri?

17              MR. SIKON:  Yes, your Honor.  I spoke briefly with

18    Ms. Dupri and Mr. Ferguson last night.

19              THE COURT:  All right.  You may be seated.

20              I have all the papers.  Have the parties had an

21    opportunity to discuss where things stand and what the next

22    step is?

23              Let me hear from plaintiff and then I'll hear from

24    defendant.

25              MR. WEBER:  Thank you, your Honor.
```

J52sMARc

1          I just met Mr. Sikon this morning.  I'm sure we'll

2     have an opportunity to work together and organize a discovery

3     schedule.

4          As you know, we're here on an application for a TRO

5     and expedited discovery.

6          THE COURT:  Yes.

7          MR. WEBER:  The facts as we have them before your

8     Honor are quite stark.  We have an individual who worked for

9     our client for a long time, signed not one by two agreements.

10    This is not a non-compete case.  He can work wherever he wants.

11    He can't solicit our clients.  He did it both before he

12    resigned and after.

13         There is a number of declarations and affidavits

14    before your Honor with exhibits that show that he has clearly

15    violated his obligations.  We are seeking this extraordinary

16    relief because he has blatantly violated those obligations.  We

17    also ask for expedited discovery.  We are prepared to take

18    depositions within the next week and to move this case along.

19         Again, I have not had an opportunity --

20         THE COURT:  Sure.  Well, let me see.

21         Mr. Sikon, am I pronouncing that correctly?

22         MR. SIKON:  Yes, you are, your Honor.

23         THE COURT:  Are you sure?

24         MR. SIKON:  Yes.

25         THE COURT:  All right.  Now, Mr. Sikon, I guess the

J52sMARc

1    question I have is, well, what is your position?

2           In other words, what is your position?

3           MR. SIKON:  Your Honor, a few things.

4           First of all, I am obviously still getting up to speed

5    on the matter.

6           THE COURT:  Yes.

7           MR. SIKON:  A few things I wanted to note to your

8    Honor this morning.

9           First, I think it is fairly evident from their own

10   submission there is no real emergency here and there is no need

11   for a TRO.  It is clear from --

12          THE COURT:  Would you agree, will your client agree he

13   will stop contacting clients that he used to service at Marsh

14   McLennan?

15          MR. SIKON:  I actually think that goes to a second

16   point.  If you look at the actual language of the agreements at

17   issue, I don't actually think he is barred from soliciting

18   those clients.  He is barred from using confidential

19   information or trade secrets to solicit clients.  He is not

20   actually barred from soliciting those clients.

21          As another issue, your Honor, I think they are

22   asking --

23          THE COURT:  While he was at Marsh McLennan?

24          In other words, while he was at Marsh McLennan, do you

25   think he would be allowed to start saying, Oh, by the way, I'm

J52sMARc

going to be leaving, going somewhere else, it is not a problem,

and my current employer actually agrees with it, which is what

some of the e-mails apparently indicate?

          I mean, I don't know.  I guess what I'm trying to say

is --

          Well, I'm sorry, go ahead.  I cut you off.

          MR. SIKON:  Your Honor, to your point, I believe that

he was well within his rights under both California and New

York law, and I also think there is another issue as to whether

or not California law is ultimately going to be the applicable

law with respect to a number of these issues.

          But I do think that he would be well within his rights

to say, I am resigning here and I am going to a new employer

and you are free to come with me if you so choose.  He is not

allowed to use confidential or trade secret information under

California law to do so, but if it is publicly available

information, absolutely.

          Now, your Honor, there is a couple other things I also

wanted to raise to your attention, which is notably absent from

any of the briefing here, is the fact that Mr. Ferguson is a

registered professional, and Marsh McLennan Agency is the

parent company of his employer, which is Marsh McLennan

Securities, LLC, which is a registered entity under FINRA.

          So we think there is a very strong likelihood, your

Honor, we are probably going to file a motion to compel

J52sMARc

 1     arbitration that these issues should all be before FINRA, as

 2     opposed to in your court.

 3             Other issues that I wanted to raise to your attention,

 4     your Honor, are in particular the fact that, again, they've

 5     been in communication with Mr. Ferguson's California counsel

 6     since February of this year, so two and a half months ago.  So

 7     I don't really understand the rush to the courthouse now on two

 8     days' notice to ask for an emergency temporary restraining

 9     order when clearly they've been aware of these issues for two

10     and a half months.  To me, that strikes me as bad faith, and

11     that they took their time to basically coddle together this

12     170-page brief, rush to the courthouse door to get it filed,

13     when they clearly have been on notice of these issues for as

14     long as two and a half months now.

15             Additionally, as I noted, I'm not licensed in

16     California, but I understand from some of my colleagues in

17     California that California has a very strong policy perspective

18     that when you have agreements like this that try to

19     basically -- you have an individual who is employed in

20     San Francisco, in California, you have supervisors who are in

21     California, and you have, as far as I can tell from my quick

22     read of the motion papers here, all the salient factual issues

23     are rising out of California.

24             My understanding is that California is going to take a

25     very different view of plaintiff trying to use a forum

J52sMARc

selection provision and choice of law provision to circumvent
and basically afford Mr. Ferguson less protections than what he
would be entitled to under California law with respect to these
issues.

          That is another threshold issue, along with the others
that I've already mentioned, that I think is going to need to
be decided here before we can proceed with any TRO or any
expedited discovery.

          THE COURT:  Well, I mean, the issue before me --
because I think there is substantial proof that there was
solicitation going on before he even left.  I don't know
whether what sort of fiduciary obligations he had at the time
that he was at his former employer, and while I think, yes,
there are issues about choice of law, right, there are two
issues, right?

          If the venue provision, in other words, choosing
New York is correct, do you apply California law or does the
whole thing go to arbitration or does the whole thing -- again,
I don't -- in my mind, the least likely, is it something that
should be litigated in California.

          But in any event, you're right, those are all issues
that need to be dealt with.  However, my reading of the
correspondence and the letter from Mr. Ferguson's lawyer was
that she did not directly engage the issue, or at least it
seemed to me engage the issue of the agreements, instead,

J52sMARc

1   what she raised was the possibility of filing some form of

2   discrimination suit.

3           So while I think, yes, you're right, there has been a

4   time lag, it seemed like there was a little bit -- it could be

5   interpreted that -- well, not even interpreted -- it could be

6   interpreted as a little bit of delay to actually get to the

7   issues which the plaintiff was raising.

8           There may be counterclaims.  There may be a separate

9   lawsuit related to that or somehow they are tied, and I don't

10  know if the claim is that it is retaliatory, but they didn't

11  engage on the specific issue of the confidential information,

12  at least it didn't seem to me at least in the exchange, at

13  least that initial letter that was written, that that was

14  addressed.

15          I agree there has been a lag, somewhat of a delay, but

16  are you saying that your client isn't willing at this stage to

17  meet and confer with the other side about what the parameters

18  will be going forward to maintain whether you go to arbitration

19  or whether you're going to be here and whatever law applies to

20  sort of maintain things where they are now.  In other words, so

21  let's say I say, OK, fine, we'll wait for the TRO hearing at

22  some other point in time.

23          Is your client -- let me ask, is your client going to

24  then continue to contact -- I guess the allegations are there

25  were 20 some odd people -- it may be that in the end of the

J52sMARc

1    day, that the relevant rules of FINRA that he has some ability

2    to do that under specific guidelines that FINRA provides, but I

3    guess my question is, so during that interim period, is your

4    client willing to at least figure out what the parameters are

5    going to be going forward, and also in terms of my

6    understanding there were downloads and e-mails were sent from

7    his former employer's account -- I don't know what the e-mails

8    are -- but over to his new employer.

9          So I don't know specifically what those are, but when

10   you have things that are transferred like that soon before an

11   employee leaves, that raises question about those materials,

12   including whether or not, while he may have had his own contact

13   list, electronic Rolodex, I don't know exactly whether that is

14   necessarily his.

15         While you're right, there could be public information,

16   but somehow I think the e-mails, for example, that he was

17   sending from when he was still employed to these customers, I

18   would imagine what happened was he typed into his computer, it

19   populated because he had it in his contact list.  Now, if that

20   contact list is not really his property, but Marsh McLennan's,

21   then I think there is an issue.

22         I guess the threshold issue I'm trying to deal with is

23   getting us from here until the parties could brief whether it

24   is the arbitration issue or the other issues that I'm presented

25   with.

J52sMARc

1      I understand you're saying this is not an emergency,

2   but OK, but is your client willing to basically not continue to

3   call people to have a discussion with regard to the stuff that

4   he not use the stuff that he sent to himself from his -- again,

5   without having gone through the process where people can

6   basically determine some of the stuff is fine, like he was

7   sending, you know, personal e-mail, whatever it was, and that

8   is really what I'm asking?

9      MR. SIKON:  In short, your Honor, yes.  Absolutely.

10   I've already spoken to him, and as I understand it, he has not

11   and he will not be talking to any Marsh McLennan Agency clients

12   going forward.  While, of course, this is pending.

13      Having said that, your Honor, I did want to note that

14   if you look specifically at the language of the agreements at

15   issue, both of them that they attach to their briefing, it is

16   very specifically tailored to say, basically, that he will not

17   use any confidential information and trade secrets to solicit

18   those clients.

19      Our position is, based off of my brief conversation

20   with him, is that he hasn't.  To your Honor's point about him

21   having potentially sent himself client contact information, as

22   I understand it from him, that is all publicly available

23   information related to these clients and their 401(k) plans.

24   There is even a form, as I understand it from him, a form 5500

25   that is required to be filed --

J52sMARc

1          THE COURT:  I'm familiar with 5500s.

2          MR. SIKON:  I wasn't.  Apparently it has to be filed

3    with the Department of Labor, and it basically includes

4    information related to the contact information of these

5    particular clients.

6          As we all know, as a matter --

7          THE COURT:  But let me ask this.  There is a

8    difference, though, I think, between something that you can --

9    where he has a memory of, like, this is my client, this is

10   mine, and then he separately goes and gets the information

11   publicly, as opposed to an aggregation that has either been

12   done by him or by the company.  It not only includes 5500

13   information, but it includes other information about that

14   client, including information that -- again, this is really in

15   the weeds -- information that he was either provided when he

16   got the lead or information that he's developed over time with

17   regard to the client, idiosyncrasies, wife's name, mother's

18   name, you husband's name, kids, all of those things that I

19   don't know.  But I imagine it may have been part of all this

20   material that got shipped over.

21          While I understand that -- I think there is an issue

22   about -- I'm not sure where the law comes out on this.  In

23   other words, if you have something that is in your contact list

24   which is publicly available, does that mean that you can just

25   take the contact list if the company basically has some claim

J52sMARc

 1   to that because they provided the leads or what have you.  I

 2   don't know.

 3          I understand the issues.  Let me ask this to cut to

 4   the chase -- because I'll give the parties a few days to

 5   basically come to an agreement as to what is going to be going

 6   forward.  You're not going to be conceding anything other than

 7   saying during the time period that either this case is pending

 8   or if the parties agree that it should go to arbitration, that

 9   you're in arbitration, whatever it may be, to a document that

10   basically outlines the conduct of what both sides are going to

11   be doing.

12          You've said that he has no intention to contact any

13   of the Marsh clients or the people who were his clients and

14   however you want to phrase it.  I think there is -- the other

15   side is that sort of the confidential, allegedly confidential

16   information.  It may end up being that there is a determination

17   that some of that is not confidential under the agreements in

18   question, but it may end up that some of it is.

19          I guess what I would like the parties to do is, over

20   the next few days, or even if you're able to do it in the next

21   day or so, to come up with something -- I have a proposed

22   order -- but to come up with something along those lines,

23   whatever language you want to use, that would just maintain

24   going forward.  If you can't reach an agreement, then I'll make

25   the ultimate decision.

J52sMARc

1          But what I would say is I'm operating under the

2     understanding that your client right now, even though there

3     isn't anything in place based upon what you've said, is that

4     he's not going to be picking up the phone today or tomorrow and

5     e-mailing and the like or any sort of communication with these

6     folks.

7          That's my proposal for the parties.  It is better --

8     because I don't know all the intricacies of what may have been

9     confidential information as alleged to have been taken as well

10    as the number of potential clients that may be at issue.

11         Let me hear from you with regard to that proposal and

12    I'll ask plaintiff's counsel, also.

13         MR. SIKON:  Yes, your Honor.  That is perfectly

14    acceptable to us.

15         The only thing I would just like to know, your Honor,

16    to your point a few minutes ago about the client contacts, my

17    understanding is it was nothing more than contact information.

18    It was literally his Outlook contacts.

19         I think it is pretty clear under New York law that you

20    are entitled to recreate that from memory and from public

21    sources.  So, again, we are, of course, going to work with

22    plaintiff here, and we are happy to see if we can reach a

23    resolution regarding a restriction that is in line with the

24    actual language of the agreement --

25         THE COURT:  Yes.

J52sMARc

1          MR. SIKON:  -- while we try to work out these issues.

2          Again, I just wanted to note that particular issue

3     with respect to that.

4          THE COURT:  I get that.  There may be, I recognize --

5     and I apologize, because I know you're just coming into this --

6     but as I said, it's been sort of percolating for a while, and I

7     think there was this strategic choice that counsel in

8     California made.  And I think she said it herself, you know, in

9     her letter, I think something along the lines of, I guess Marsh

10    is taking a view that rather than being on the defense, they

11    are going to go on the offensive, and she raised all of the

12    issues.  Strategically, that may have been the way to go.  The

13    problem is, it didn't engage on the specific issues that Marsh

14    was concerned with.

15          Let me hear from plaintiff's counsel on this.

16          MR. WEBER:  Your Honor, I respectfully agree with

17    counsel's interpretation of the law.  The information on our

18    plaintiff's contact information is ours, is more than I think

19    that someone can remember.

20          As to the delays, you can see from the correspondence,

21    we did make a good faith effort since we found out about the

22    breaches to try to work out a resolution.  We sent

23    correspondence.  We got some back.  We tried to do it before we

24    got here with respect to the delay.

25          What I would recommend to your Honor is that you sign

J52sMARc

1    a TRO for a few days.  I agree with you, I think that gives us

2    an opportunity to sit down and try to work out, one, a

3    discovery schedule -- we would like to take plaintiff's

4    deposition as soon as possible -- and see if there is some

5    confines of an agreement that we can agree to.

6            But we are not confident that the plaintiff will abide

7    by its obligations based on what we've seen so far before

8    resignation and after.  That is why we're hear to ask for some

9    court relief.

10           THE COURT:  Look, this is what we're going to do.

11   There are going to be two parts to this.  What it amounts to,

12   because I actually will have to, if you can also arrange to get

13   me a Word version of the order to show cause.

14           I would enter something for a short period of time to

15   allow the parties to negotiate their sort of own understanding

16   with regard to any expedited discovery.  I'll hold that in

17   abeyance.  I think that while I'm not saying that it isn't

18   appropriate, I don't know enough concerning whether or not

19   there is an arbitration issue or not.  If there is not, the

20   parties should talk about that initially, because if there --

21   but to be clear, with regard to whether -- so I haven't decided

22   that yet.

23           So what I would like to hear, in the same timeframe

24   that the parties attempt to negotiate something in connection

25   with the restrictions going forward, I would like to get the

J52sMARc

```
 1   parties' at least initial view about this whole -- if there is

 2   an issue related to this, whether there is arbitration or

 3   litigation.

 4          MR. WEBER:  We don't believe it is an issue at all,

 5   your Honor.

 6          THE COURT:  I understand.  I mean, I understand that

 7   there is going to be -- again, it is not something I had

 8   thought about until it was raised.  It may not be an issue.  It

 9   may be that after you meet and confer, that you agree on that.

10   It is just that I don't want to start the ball rolling on

11   expedited discovery until I get a sense of what and whether or

12   not there is an issue there.

13          Again, I'm not precluding having expedited discovery.

14   I'm also not precluding the parties from trying to, in your

15   discussions of this -- look, I don't know where the pressure

16   points necessarily are -- to try to resolve

17          this.  Look, the bottom line is, Marsh has certain

18   information they believe was taken.  The defendant may dispute

19   that, but the defendant is at a new place of employment, and I

20   can't imagine this is the best way to start wherever he is

21   starting, in particular.  And as I was reading through the

22   papers, I was wondering, you know, whether the new place of

23   employment, where they were in the picture, and whether at some

24   point are they going to be a necessary party or what is going

25   on.  I just didn't know.
```

J52sMARc

1          I guess what I'm saying is, yes, talk about all the

2    issues in the case that you believe are relevant.  I understand

3    that there is going to be a disagreement about arbitration.  I

4    may need to make a decision on that.  I will do that.

5          But if I could get a Word version of this document,

6    we'll take -- but you should know that with the exception of

7    the discovery issues, and again, that in sort of broad strokes,

8    that I'm orally imposing a restraining order with regard to

9    contacting Mr. Ferguson's Marsh's clients and from utilizing

10   the information that was transferred from either by e-mail,

11   downloads, or otherwise from Marsh.

12         Recognizing, and I'm not weighing in on whether or not

13   that material ultimately will be found to be confidential.  So

14   until I can enter the actual written order, you should let your

15   client know that I orally imposed those restrictions.

16         Then we'll get the written order either later today --

17   because I have a criminal trial that I'm doing -- either later

18   today it will hit the docket or the latest at some point

19   tomorrow, the written order.

20         MR. WEBER:  We'll have that Word document to you this

21   morning.

22         THE COURT:  Fantastic.

23         MR. SIKON:  Your Honor, if I may, two things with

24   respect to the TRO.

25         So I mentioned this a little while ago.  One, one of

J52sMARc

1    the concerns that I have is that the proposed order that they

2    had submitted, again, it does not actually reflect the language

3    within the agreement in terms of the restriction.  Again, the

4    restriction with respect to Mr. Ferguson was that he would not

5    be allowed to use confidential information or trade secrets to

6    solicit MMA clients.  There was not actually just a straight

7    bar on solicitation of MMA clients.

8            I just want to be clear, your Honor, that it is our

9    position that he is, under this agreement, allowed to solicit

10   MMA clients.  Just to the extent you're considering an order

11   with respect to that, I just wanted to flag that for your

12   attention.

13           The other thing, your Honor, if I make one more point?

14           THE COURT:  Go ahead.

15           MR. SIKON:  I believe their proposed order had

16   restrictions on soliciting MMA employees, which I agree there

17   is a restriction in here on him soliciting MMA employees, but

18   so far as I'm aware from my quick review of the papers, there

19   is no allegation that he has actually done that.

20           So, again, I would just ask your Honor, considering

21   the actual written order, that there be some consideration of

22   those two issues.

23           THE COURT:  Sure.  Look, with regard to the language,

24   let me put it this way, obviously the restrictions would be

25   based upon the contract of limitations as the relevant law

J52sMARc

applies to them.

However, assuming I take the language out of the
contract and utilize it, Mr. Ferguson might be playing with
fire to try, in other words, skate in between that, if you
understand what I'm saying.

In the sense that I understand that's your position,
and it may well prevail, but it may not.  Therefore, if he
starts doing this -- and that's why, quite frankly -- and while
it may be just staking out your legal position and it is not
that the client intends to sort of try and continue to do --
because here is an example of a problem with the way that may
happen.

There were a lot of things shifted over.  At the same
time, he still has the information.  And yes, he may have some
memory of something, he goes and Googles it.  There is going to
be a question of where that information came from.  Because now
that -- it would be one thing if he didn't take anything and he
sat down day one at his new employer and racked his brain about
all the people that he had contact with and did the public
searches.

Again, I have not, you know, delved deeply into the
law.  I think right now, because he has taken those things,
there would be a question about whether or not and where he
actually got -- putting aside, just saying assuming that -- I
understand there is an argument that you would make that the

J52sMARc

| | |
|---|---|
| 1 | information in his contact list is not confidential within the |
| 2 | meaning of the agreement. |
| 3 | So I'll consider what you said as I draft the language |
| 4 | of it, but I'll also consider whether or not, in order to |
| 5 | maintain the status quo, I understand ultimately it may be, it |
| 6 | may end up exactly where you are, but there sounds to be a fair |
| 7 | amount of dispute about some of the issues. |
| 8 | I understand what you're saying.  I'll take a look at |
| 9 | that as I draft the language. |
| 10 | All right.  I'm going to put a time period in the |
| 11 | actual order.  How much time do you think you need -- |
| 12 | obviously, I know counsel is getting up to speed -- but I |
| 13 | assume that Ms. Dupri will be involved in those discussions. |
| 14 | How much time do you think you need to work that out? |
| 15 | I was thinking at some point next week. |
| 16 | MR. WEBER:  I was going to say by end of the day |
| 17 | Tuesday, if that works for you. |
| 18 | MR. SIKON:  That does, your Honor. |
| 19 | THE COURT:  All right.  End of the day Tuesday.  I |
| 20 | think that makes sense. |
| 21 | Look, if you need some additional time, just let me |
| 22 | know.  But I'm thinking, you know, again, barring anything |
| 23 | unforeseen, the outside, next week is what I was thinking. |
| 24 | Tuesday made sense to me.  We'll make it Tuesday.  With the |
| 25 | understanding that I'm orally imposing the temporary |

J52sMARc

```
 1    restraining order.  I haven't specifically come up with the

 2    language, but I'm orally imposing that along the lines I

 3    mentioned earlier.

 4            All right.  Is there anything else that we need to

 5    deal with today?

 6            MR. WEBER:  I don't believe so, your Honor.

 7            MR. SIKON:  Nothing, your Honor.

 8            THE COURT:  Thank you very much for coming in.  I'm

 9    sorry it had to be so quick.

10            MR. WEBER:  Thank you, your Honor.  I appreciate it.

11            THE COURT:  Yes.

12            (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25
```