JUDGE ENGELMAYER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARSH & MCLENNAN AGENCY LLC,

               Plaintiff,

      -against-

ELMER "RICK" FERGUSON,

              Defendant.

# 19 CV 03837

Case No.: _____

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**

---

A. Michael Weber
Kevin K. Yam
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Plaintiff*
*Marsh & McLennan Agency LLC*

**TABLE OF CONTENTS**

PAGE(S)

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

    A.    Background On MMA ....................................................................... 3

    B.    Ferguson's Employment with Barney & Barney and MMA's Acquisition of Barney & Barney ................................................................. 3

    C.    Ferguson's Employment with MMA .................................................. 4

    D.    Ferguson Breaches the MMA Agreement While Still Employed By MMA ........ 9

    E.    Ferguson Continues To Breach the MMA Agreement After Leaving MMA to Join Teros ...................................................................... 14

    F.    MMA's Efforts to Abate Ferguson's Breaches ..................................... 19

ARGUMENT ................................................................................................ 23

I.     VENUE IS PROPER IN THE SOUTHERN DISTRICT OF NEW YORK ............ 23

II.    MMA IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ..................................................................... 24

    A.    MMA Will Suffer Irreparable Harm Absent Injunctive Relief ................... 24

    B.    MMA Has A Likelihood Of Success On The Merits Or Can Demonstrate A Sufficiently Serious Question Going To The Merits To Make Each Of Its Claims Fair Grounds For Litigation ............................................ 27

    C.    A Balancing of the Equities Tips in Favor of Granting Preliminary Injunctive Relief ......................................................................... 39

III. MMA SHOULD NOT BE REQUIRED TO POST A BOND ............................... 40

IV. THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR EXPEDITED DISCOVERY ........................................................................................... 41

CONCLUSION ............................................................................................. 42

# TABLE OF AUTHORITIES

**PAGE(S)**

## Cases

*Andino v. Fischer,*
   555 F. Supp. 2d 418 (S.D.N.Y. 2008)..................................................................24

*Cardali v. Slater,*
   57 N.Y.S.3d 342 (N.Y. Cnty. Sup. Ct. 2017), *aff'd,* 167 A.D.3d 476, 89
   N.Y.S.3d 176 (1st Dep't 2018), *leave to appeal denied,* No. 2019-101, 2019
   WL 1460758 (N.Y. Apr. 2, 2019)...................................................................35

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.,*
   651 N.Y.S.2d 504 (1st Dep't 1996) .............................................................28, 29

*DAG Jewish Directories, Inc. v. Y & R Media, LLC,*
   No. 09 CIV. 7802 (RJH), 2010 WL 46016 (S.D.N.Y. Jan. 7, 2010).......................41

*Devos, Ltd. v. Record,*
   No. 15-CV-6916(ADS)(AYS), 2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015)......................26

*Facebook, Inc. v. ConnectU LLC,*
   489 F. Supp. 2d 1087 (N.D. Cal. 2007) .................................................................34

*Gen. Elec. Co. v. Wilkins,*
   No. 1:10-CV-00674-OWW, 2011 WL 1740420 (E.D. Cal. May 5, 2011) ............................33

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.,*
   922 F. Supp. 2d 435 (S.D.N.Y. 2013), *aff'd,* 764 F.3d 210 (2d Cir. 2014)............................24

*Hall v. Time Inc.,*
   158 Cal. App. 4th 847, 70 Cal. Rptr. 3d 466 (Ct.App.2008) .....................................32

*IDG USA, LLC v. Schupp,*
   416 F. App'x 86 (2d Cir. 2011) .............................................................................24

*Imi-Tech Corp. v. Gagliani,*
   691 F. Supp. 214 (S.D.Cal. 1986).....................................................................36, 39

*James v. Childtime Childcare Inc.,*
   2007 U.S. Dist. LEXIS 43753 (E.D. Cal June 1, 2007)...........................................31

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,*
   323 F. Supp. 2d 525 (S.D.N.Y. 2004).......................................................25, 26, 28

# TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*MAI Systems Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) ...................................................................................37, 38, 39

*Marsh USA Inc. v. Karasaki*,
   No. 08-cv-4195 (JGK), 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008).......................28, 29, 41

*Marsh USA Inc. v. Schuhreimen*,
   183 F. Supp. 3d 529 (2016) ...........................................................................................28, 31

*MasterCard Int'l Inc. v. Nike, Inc.*,
   No. 15-CV-114 (NSR), 2016 WL 797576 (S.D.N.Y. Feb. 23, 2016) ...................................27

*Morlife, Inc. v. Perry*,
   56 Cal. App. 4th 1514 (1997) ......................................................................................36, 38, 39

*Multiven, Inc. v. Cisco Sys., Inc.*,
   725 F. Supp. 2d 887 (N.D. Cal. 2010) .............................................................................34

*N. Atl. Instruments Inc. v. Haber*,
   188 F.3d 38 (2d Cir. 1999)...........................................................................................26

*Nebraskaland, Inc. v. Brody*,
   No. 09-CV-9155 (DAB), 2010 WL 157496 (S.D.N.Y. Jan. 13, 2010) ...................................41

*PLC Trenching Co., LLC v. Newton*,
   No. 6:11-CV-0515, 2011 WL 13135653 (N.D.N.Y. Dec. 12, 2011) .................................31, 32

*In re Pomona Valley Med. Group*,
   476 F.3d 665 (9th Cir.2007) ...........................................................................................32

*R.L.E. Corp. d/b/a Casa Imports v. Ferraro Foods, Inc.*,
   No. 6:15-cv-123, 2015 WL 1456178 (N.D.N.Y. March 30, 2015) .........................................40

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
   745 F. Supp. 2d 343 (S.D.N.Y. 2010)...............................................................................32

*Scutti Enters., LLC v. Park Place Entm't Corp.*,
   322 F.3d 211 (2d Cir. 2003).........................................................................................33

*Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*,
   No. 10-cv-8976 (RJH), 2011 WL 497978 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468
   F. App'x 43 (2d Cir. 2012) ...........................................................................................40

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE

*Stokes v. Dole Nut Co.*,
    41 Cal. App. 4th 285 (1995) ................................................................................31

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999)..................................................................................25

*Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*,
    73 F. Supp. 3d 209 (S.D.N.Y. 2014)....................................................25, 26, 30, 41

*USI Ins. Servs. LLC v. Miner*,
    801 F. Supp. 2d 175 (S.D.N.Y. 2011)...........................................................27, 29, 30

**Statutes**

28 U.S.C. § 1391......................................................................................................23

Cal. Bus. & Prof. Code § 17200, *et seq.* ...............................................................32

Cal. Civ. Code § 3246..................................................................................36, 38, 39

Cal. Lab. Code § 2860, 2862 ............................................................................31, 33

Cal. Penal Code § 502(c)(1)....................................................................................34

Cal. Civ. Code 3246.10............................................................................................36

Plaintiff Marsh & McLennan Agency LLC ("MMA" or the "Company") submits this memorandum of law in support of its motion for a temporary restraining order, a preliminary injunction, and expedited discovery, brought by Order to Show Cause dated April 29, 2019. MMA seeks to enjoin Defendant Elmer "Rick" Ferguson ("Ferguson"), and anyone and/or any entity acting in concert with him, under his supervision, or on his behalf, from violating the terms of his Barney & Barney/MMA Non-Solicitation and Confidentiality Agreement, dated February 1, 2014 (the "MMA Agreement"), and his Employment Agreement with Barney & Barney, LLC ("Barney & Barney"), dated February 26, 2007 (the "B & B Agreement"), that were signed during his employment with Barney & Barney and MMA, respectively, and from engaging in continued tortious conduct.

## PRELIMINARY STATEMENT

Upon his initial employment with Barney & Barney on February 26, 2007, Ferguson executed the B & B Agreement, which contained contractual restrictions on his conduct during and after his employment with Barney & Barney. When MMA acquired Barney & Barney on February 1, 2014, Ferguson signed and entered into the MMA Agreement, in which, among other things, Ferguson agreed that, during his MMA employment and thereafter, (1) he would not disclose or use MMA's "Confidential Information and Trade Secrets"[1] for any reason (other than to perform his authorized duties for MMA), (2) he would not disclose or use MMA's Confidential Information and Trade Secrets to solicit business from or perform services for MMA clients on behalf of any person or entity other than MMA, and (3) he would not retain any

---

[1] MMA's Confidential Information and Trade Secrets, which were protected from unauthorized disclosure or improper use, includes MMA's non-public client information, such as the client and prospective client identities and a confidential compilation contact information for key decision makers at MMA's clients, pricing for MMA products and services, information regarding specific client needs, requirements and/or preferences, confidential information and communications sent to or received from clients, and all other non-public MMA information that is or may be subject to restrictions on public disclosure and/or otherwise relating to MMA's clients and prospective clients, and its business, operations, and sales and marketing plans (collectively, "Confidential Information and Trade Secrets"). *See* Complaint, Ex. A, MMA Agreement, Section 1(a).

of MMA's Confidential Information and Trade Secrets after his employment with MMA ended. Moreover, under applicable law, Ferguson was prohibited from misappropriating MMA's trade secrets and unlawfully interfering with MMA's contractual and prospective economic relationships, and he was required to maintain and provide faithful, loyal service to and on behalf of MMA pursuant to his common law and statutory duties of loyalty.

*While Ferguson was actively employed with MMA*, however, Ferguson breached the MMA Agreement and the B & B Agreement and his common law and statutory duties of loyalty by soliciting MMA clients to terminate their contractual and other relationships with MMA and to follow him to his new employer, Teros Advisors, LLC ("Teros"), a competitor of MMA. Ferguson also breached the MMA Agreement and the B & B Agreement and his common law and statutory duties by unlawfully retaining, disclosing and using MMA's Confidential Information and Trade Secrets in the service of his new employer, Teros.

Specifically, Ferguson misappropriated MMA's highly confidential Outlook contact information for key decision makers at MMA clients with whom Ferguson worked (which represented MMA's confidential compilation of contact information for key decision makers at MMA clients and included the name, business address, telephone number and email address of the key decision maker at the MMA client) and he sent that highly confidential information from MMA to his email address at Teros. Ferguson also disclosed and used that highly confidential information to solicit MMA's customers *on behalf of his new employer, Teros*. Furthermore, Ferguson made false, defamatory and/or deceptive statements to MMA clients about MMA to interfere with MMA's contractual and other relationships with clients; he used highly confidential MMA pricing information for the same purpose; and he improperly accessed and used MMA's property and equipment to carry out his unlawful activities.

Ferguson's misconduct continues to the present. Ferguson has ignored MMA's cease-and-desist letters and repeated warnings sent to him personally and to his counsel, which demonstrates that Ferguson has no intention of ceasing his unlawful conduct unless restrained by this Court.

As a result of Ferguson's breaches and tortious conduct, MMA has suffered and will continue to suffer irreparable harm in the form of lost client relationships, goodwill, and other irreparable injury for which there is no adequate remedy at law. MMA respectfully requests that this Court issue the requested temporary restraining order and preliminary injunction, and enter an order authorizing expedited discovery, to prevent future irreparable injury to MMA.

## STATEMENT OF FACTS

### A.    Background On MMA

MMA is a world leader in the benefits marketplace. *See* Jeff Calder. ¶ 3.[2]  It provides clients with a comprehensive array of benefits solutions, including managing employee benefit plans, assisting clients with choosing the right employee benefits plans to fit their needs, providing access to market experts, and advising on regulatory compliance. *Id.*

### B.    Ferguson's Employment with Barney & Barney and MMA's Acquisition of Barney & Barney

On February 22, 2007, Barney & Barney hired Ferguson as a retirement analyst.  Calder Decl. ¶ 5; Crain Decl. ¶ 5.[3]  While employed by Barney & Barney, Ferguson signed and entered into the B & B Agreement, dated February 26, 2007, which contain restrictive covenants regarding the protection of Barney & Barney's confidential information and trade secrets during and after his employment with Barney & Barney.  Calder Decl. ¶ 9; Crain Decl. ¶6, Ex. B.

---

[2] Citations to the "Calder Decl." refer to the Declaration of Jeff Calder executed on April 27, 2019.
[3] Citations to the "Crain Decl." refer to the Declaration of Mara Crain executed on April 29, 2019.

On April 5, 2010, Ferguson was promoted to a Client Manager position and, in 2011, Ferguson was promoted to a Client Executive, Service position. Calder Decl. ¶ 6. On or about August 6, 2012, Barney & Barney then transferred Ferguson from its offices in San Diego, California, to its offices in San Francisco, California, and transitioned Ferguson from the Client Executive, *Service* position to a Client Executive, *Sales* position (also termed Retirement Services Client Executive). *Id.* at ¶ 7.

In his new sales role, Ferguson went from principally providing service to clients (who mostly if not entirely were small, medium, and large employers) regarding their retirement plans (which were mostly 401(k) plans) to a sales/business development/producer role where Ferguson was responsible for establishing and developing relationships with new prospective clients and maintaining relationships with existing clients. Calder Decl. ¶ 8. When Ferguson joined Barney & Barney, he did not bring new clients with him. *Id.* ¶ 10. Even after he transitioned into the sales role at Barney & Barney and later at MMA, Ferguson was largely dependent on Barney & Barney and later MMA to refer existing or potential new business opportunities to Ferguson. *Id.* ¶ 11.

On or about February 1, 2014, MMA acquired Barney & Barney and, as a result, Barney & Barney merged with and into MMA, and MMA became the surviving entity of such merger. Calder Decl. ¶ 12. MMA took assignment of Ferguson's B & B Agreement when it merged with Barney & Barney, and, at that time, Ferguson became an employee of MMA. *Id.* ¶ 13.

### C.    Ferguson's Employment with MMA

After Ferguson became employed by MMA, he continued in his same Client Executive, Sales position. Calder Decl. ¶ 14. Thus, he started working at MMA in a sales position in February 2014. *Id.* ¶ 15. Like at Barney & Barney, as an MMA Client Executive, Sales, Ferguson was responsible for developing and generating new client relationships on the

retirement services team (mostly if not exclusively involving qualified and non-requalified retirement plans and services) and maintaining existing client relationships. *Id.* ¶ 17. In addition, however, given Ferguson's background on the service side of the business, Ferguson also continued to provide service to MMA retirement plan clients. *Id.* at ¶ 18.

In or about September 2014, however, Ferguson told MMA that he wanted to return to work in the service side of the business and that he wanted to return to a Client Executive, Service position. Calder Decl. ¶ 19. MMA granted Ferguson's request effective January 1, 2015, and officially returned Ferguson to a Client Executive, Service position, in which position he continued during the remainder of his MMA employment until his resignation in February 2019. *Id.* ¶ 20.

When Barney & Barney hired Ferguson, he had no clients and brought no business to Barney & Barney. Calder Decl. ¶ 21. Rather, he was assigned clients and only later developed client relationships through internal referrals of clients from within Barney & Barney and later from within MMA. *Id.* ¶ 22. A majority of the clients serviced by Ferguson at Barney & Barney and later at MMA were established clients of Barney & Barney and/or MMA. *Id.* ¶ 23.

At MMA, Ferguson relied on financial and internal resources from MMA to generate business, service clients, and manage client relationships. Calder Decl. ¶ 24. He developed client relationships by virtue of his employment with MMA and he enjoyed the support of an experienced team of MMA employees on whom he relied to carry out his duties. *Id.* ¶ 25. He also relied on MMA's Confidential Information and Trade Secrets to perform his duties and develop and maintain client relationships. *Id.* ¶ 26. For instance, he relied on MMA's customer and prospective customer lists and MMA's confidential compilation of client contact information

for key decision makers, which were developed through Barney & Barney's and MMA's significant expenditure of time, money, and resources over the years. *Id.* ¶ 27.

MMA further supported Ferguson's business development and servicing efforts by sponsoring client events, financing his membership in professional and networking organizations, paying for travel and expenses related to client meetings and entertainment, and investing in marketing and sales tools, all of which Ferguson used to form and strengthen client relationships for and on behalf of MMA.   Calder Decl. ¶ 33.   Given MMA's significant expenditures of time and financial resources to identify and retain the MMA clients, including all clients assigned to Ferguson, information about MMA's clients (including clients inherited through the acquisition of Barney & Barney), such as the identity of key decision-makers at MMA clients, MMA's confidential compilation of business contact information for key decision makers at MMA client, and pricing information, was not publicly available, and, in fact, represented MMA's Confidential Information and Trade Secrets. *Id.* at ¶ 34.   MMA took reasonable measures to maintain the confidential nature of its Confidential Information and Trade Secrets, including requiring employees to sign confidentiality agreements; password-protecting computers and cellular telephones, and adopting security precautions for MMA offices to secure MMA's electronic data. *See id.* ¶ 31.

Furthermore, none of the MMA clients Ferguson ultimately generated, serviced, and later solicited "belonged" to him.   Calder Decl. ¶ 36.   Rather, all such clients were clients of MMA. *Id.* ¶ 37.

On or about February 1, 2014, once he became employed by MMA as a result of the merger, Ferguson entered into the MMA Agreement.   Crain Decl. ¶ 5, Ex. A.   Under Section

1(b) of the MMA Agreement, Ferguson agreed not to disclose or use MMA's Confidential Information and Trade Secrets during his employment and thereafter:

> Employee acknowledges and agrees that the Company is engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by the Company at its great effort and expense. Employee further acknowledges and agrees that any disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company and cause it to suffer serious loss of business and pecuniary knowledge.

> *See* Crain Decl., Ex. A § 1(b).

In addition, Ferguson expressly agreed to "not use [his] . . . position, influence, [or] knowledge of Confidential Information and Trade Secrets or the Company's assets for personal gain[.]" *See* Crain Decl., Ex. A § 4. Ferguson also agreed not to "directly or indirectly use Confidential Information and Trade Secrets . . . to solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by [him] while employment by the Company." *See id.* § 2(b).

Under Section 2 of the MMA Agreement, Ferguson promised as follows:

> (a)    Employee acknowledges and agrees that solely by reason of employment by the Company, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company's clients, prospective clients and related information.
> (b)    Consequently, Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, Employee will not, for a period of twenty-four (24) months following such separation, directly or indirectly use Confidential Information and Trade Secrets or related information regarding the Company, the Company's clients and its prospective clients to solicit clients or

prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company. This restriction shall apply only to those clients or prospective clients of the Company with which Employee had contact during the last two (2) years prior to the separation of his or her employment with the Company.

*See* Crain Decl., Ex. A, § 2.

Moreover, "[i]mmediately upon the termination of employment," Ferguson was required to return to the Company "(i) any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in [Ferguson's] possession or control which contain or pertain to Confidential Information and Trade Secrets; and (ii) all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment." *See* Crain Decl., Ex. A § 1(c).

In accordance with the MMA Agreement, Ferguson was prohibited from accessing or using the Company's computer systems and protected computers, including his laptop computer and PDA, and all data contained therein, "for personal gain or to benefit third parties[,]" and he was not authorized to retain any of MMA's property, equipment or Confidential Information and Trade Secrets after his separation/termination. *See* Crain Decl., Ex. A § 1(d).

Ferguson expressly acknowledged in the MMA Agreement that a breach of his obligations under the MMA Agreement would cause MMA irreparable harm, that monetary damages would not be readily calculable and that MMA would be entitled to temporary and permanent injunctive relief, without the necessity of posting a bond, and recovery of its attorneys' fees. Specifically, Section 6 of the MMA Agreement provides:

In recognition of the fact that irreparable injury will result to the Company in the event of a breach by Employee of [his] obligations

under Section 1, 2, 3 or 4 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, Employee acknowledges, consents and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by Employee and persons acting for or in connection with Employee and (b) recovery of all reasonable sums and costs, including attorneys' fees, expert witness fees, and expenses and costs incurred by the Company in seeking to enforce the provisions of this Agreement.

See Crain Decl., Ex. A §6.

**D.      Ferguson Breaches the MMA Agreement While Still Employed By MMA**

On or about February 12, 2019, Ferguson began soliciting MMA clients on behalf of Teros *while he was actively employed by MMA*. Calder Decl. ¶ 38.

**1.      Solicitation Example # 1 While Still Employed by MMA**

On or about February 12, *while employed by MMA*, Ferguson used his Teros email account, rferguson@terosadvisors.com, to solicit an MMA client ("MMA Client Number 1") via email, using MMA's Confidential Information and Trade Secrets to do so.   In this regard, Ferguson used MMA's highly confidential compilation of client contact information for key decision makers at MMA clients to send the following message to MMA Client Number 1:

Following up from our discussion and prior email.  Below is my new [Teros] email address and phone number.  Attached are the forms to change our advisory to Teros Advisors.  These should be dated February 16.

Changing to Teros Advisors brings a host of benefits for you and your employees beyond the fee reduction. (Please not for efficiency and speed this paperwork keeps the current fee in place while processing then I can reduce the fee at Teros.)

This change is EASY.  There is not required notice to employees or any material impact to the plan or your participants, this is

administrative in nature.   The RIA is in the background, responsible for compliance oversight, licensing & registration, and fee collectio

*See* Calder Decl. ¶ 40.

### 2.   Solicitation Example # 2 While Still Employed by MMA

On or about February 13, 2019, Ferguson sent an email message to two employees of a MMA client ("MMA Client Number 2"), which Ferguson serviced, and he told them that: "I've decided to change my back office affiliation from MMA Securities to Teros Advisors. **Not really a big deal** since I'll still work with MMA benefits and insurance teams to support our common clients. It's just like the change we did in July from Sagepoint Financial to MMA Securities. No employee notices, no disclosures for you to send out – just like before it's just an **administrative change** with a couple of forms to sign." *See* Calder Decl. ¶ 41 (emphasis added).

In so doing, Ferguson used and disclosed MMA's Confidential Information and Trade Secrets (e.g., MMA's confidential compilation of client contact information for key decision makers) and he used MMA's property and equipment (e.g., his MMA laptop computer and email systems) to solicit MMA Client Number 2 on behalf of Teros *while he was still employed by MMA*.  Calder Decl. ¶ 42.  This solicitation is one of many he sent to MMA clients beginning on February 12 and continuing to the present which illustrate Ferguson's breach of the MMA Agreement, his misappropriation of trade secrets, his breach of his duties of loyalty and fiduciary duties, his unlawful interference with MMA's contractual relationships with its clients and his unfair competition. *Id.* ¶ 43.  MMA Client Number 2 later responded to Ferguson's solicitation and asked Ferguson to "supply some information of Teros Advisors" because they were "not familiar with the firm."  Calder Decl. ¶ 44.

3. **Solicitation Example # 3 While Still Employed by MMA**

Similarly, again on February 13, *while Ferguson was actively employed by MMA*, he sent

an email message to two confidential, key MMA business contacts at a MMA client ("MMA

Client Number 3") to solicit MMA Client Number 3 on behalf of Teros:

> Just a heads up on a fiduciary update. I've decided to change my
> back office affiliation from MMA Securities to Teros Advisors
> RIA. **Not too big deal since I'll still work with MMA benefits
> and insurance teams to support our common clients**. It's like
> the change we did in July from Sagepoint Financial to MMA
> Securities. Nothing changes for your 401k plan, you, or
> employees. No employee notices, no disclosures for you to send
> out — **just like before it's an administrative change with a
> couple of forms to sign. The biggest change is a new email and
> phone number for me.**

Calder Decl. ¶ 45 (emphasis added).

Again, *while Ferguson still worked for MMA*, Ferguson used and disclosed MMA's

Confidential Information and Trade Secrets (e.g. MMA's confidential compilation of contact

information for key decision makers at MMA's clients) and he used MMA's property and

equipment (e.g., his MMA computer and email server) to solicit MMA Client Number 3 *on

behalf of Teros*, which gives rise to yet another breach of contract (the MMA Agreement), trade

secret misappropriation, breach of duty of loyalty and fiduciary duty, unlawful interference with

MMA's contractual relationships, and unfair competition.  Calder Decl. ¶ 46.

Further, Ferguson's statements in his message to MMA Client Number 3 to the effect that

he "decided to change" his "back office affiliation from MMA Securities to Teros Advisors" and

that he would "still work with MMA benefits and insurance teams support our common clients"

were purposely misleading and deceptive.  Calder Decl. ¶ 47.  In truth, Ferguson was <u>not</u>

"changing his back office;" rather, Ferguson eventually resigned his employment with MMA to

go to work for a competitor, Teros, and he solicited MMA clients to follow him to his new employer, and yet he did not make this fact clear to the MMA clients he solicited. *Id.* ¶ 48.

### 4.   Solicitation Example # 4 While Still Employed by MMA

On February 13, *while an active MMA employee*, Ferguson requested a Broker-Dealer Change Form on behalf of yet another MMA client ("MMA Client Number 4") in the education industry. *See* Calder Decl. ¶ 49.  Upon information and belief, this client has since terminated its services with MMA because of Ferguson's unlawful actions and interference. *Id.* ¶ 50.

### 5.   Ferguson Solicits More Than 20 MMA Clients Using MMA's Confidential Information and Trade Secrets

In total, on February 12, 13 and 14, *while still actively employed by MMA*, Ferguson solicited at least 20 MMA clients and encouraged them to sever their contractual and business relationships with MMA and establish new business relationships with Teros and he used and disclosed MMA's Confidential Information and Trade Secrets to do so, he used MMA's property and equipment (e.g., the MMA laptop computer and/or iPhone issued to Ferguson and MMA's email server) to carry out this unlawful activity, and he made false, deceptive statements to lure MMA's clients into the mistaken belief that this change was "[n]ot really a big deal" and more of an "administrative change." *See* Calder Decl. ¶ 51.

### 6.   Ferguson Uses Company Funds to Solicit an MMA Client

Additionally, on information and belief, Ferguson planned on using previously booked air travel to Vancouver, Canada that was paid for by MMA to solicit a MMA technology client ("MMA Client Number 5") on February 15 on behalf of Teros. *See* Calder Decl. ¶ 52.  This technology client later cancelled its appointment with Ferguson shortly before the scheduled meeting, however. *Id.* ¶ 53.

**7.     Ferguson Steals MMA's Confidential Information and Trade Secrets and Sends that Information to His Teros Email Address**

Ferguson sent a large number of email messages from his MMA Outlook email account to his "terosadvisors.com" email address on or about February 13 and 14. Calder Decl. ¶ 54. The majority of those email messages contained MMA's confidential business contact information for key decision makers at MMA's clients that Ferguson had access to during his employment with MMA. *Id.* ¶ 55. Moreover, in multiple email messages Ferguson sent to his Teros email address, he attached dozens of MMA Outlook business contact cards that included MMA's confidential compilation of confidential contact information for key decision makers at MMA's clients and contact information for prospective clients and vendors (and the Outlook business contact cards for MMA clients included, among other things, the name of the MMA client, the name of the key decision maker at the MMA client and the physical address, telephone number and email address for the key decision maker). *Id.* ¶ 56.

**8.     MMA Discovers Ferguson's Unlawful Solicitation of MMA Clients**

On or about February 14, 2019, MMA discovered Ferguson's solicitation of MMA clients to join his new firm, Teros. *See* Calder Decl. ¶ 57. Thereafter, Jeff Calder, Managing Director, Principal of the Bay Area and Ferguson's direct supervisor, sent an email message to Ferguson directing him to cease soliciting MMA clients and requested that Ferguson call him immediately. *See id.* ¶ 4, 58. Calder then confronted Ferguson regarding his unlawful, unauthorized solicitations and his use of MMA's Confidential Information and Trade Secrets to do so. *Id.* ¶ 59. Calder also informed Ferguson that his office card key had been deactivated and that Ferguson needed to return his laptop and phone to MMA. *Id.* ¶ 60. Finally, Calder explained to Ferguson that he would be hearing from MMA about the legal issues concerning his unlawful actions. *Id.* ¶ 61.

On the very next day, February 15, 2019, Ferguson submitted his voluntary resignation from MMA, presumably to preempt his involuntarily termination due to misconduct.   Calder Decl ¶ 62.

### E.      Ferguson Continues To Breach the MMA Agreement After Leaving MMA to Join Teros

Upon information and belief, Ferguson commenced his employment with Teros in mid-late February 2019. Calder Decl. ¶ 63.   Teros is in the business of selling and servicing retirement plans for employers. *Id.* ¶ 64.  As such, Teros is a direct competitor of MMA. *Id.* ¶ 65.

A few days after his resignation from MMA, Ferguson sent the following email to a select group of employees and/or principals at MMA:

> Hello Friend and Business Partner;
>
> **I'm emailing you b/c I have clients in common with you and I want to assure you I am not trying to move your business in any way.** The firm I've moved to doesn't do EHB or BI. I will partner with outside EHB and BI relationships like MMA. **It's in my best interest to keep the status quo on our current clients just like it is for you. I'm trying to avoid our clients going out to bid.**
>
> A perfect example is that a MMA benefits producer is in danger of losing a benefits client. Client told me during a review meeting recently they aren't happy with the MMA EHB team service. I'm also already engaging two producers on new lines of biz on clients of mine. I'll follow up/continue with those relationships respectively…
>
> I could go on and on, but you get the idea. I moved so I could join a more advanced team and offer more features and services.
>
> **The fact is we will have clients in common.** I know you are good at what you do. You know I am good at what I do. **If we work at cross-purposes we may both lose some - retirement compensation is much lower; I have much less to lose - and I will just look elsewhere for those relationships.**

> If you need something for one of our common clients please let me
> know. I'll do the same. (emphasis added).

*Id.* ¶ 66.

With this message, Ferguson made a not so veiled threat to his former MMA colleagues,

in which Ferguson implied that his MMA colleagues should not react harshly to his misconduct

because he might retaliate and attempt to convince their shared clients to terminate all ties to

MMA.

On or about February 15, 2019, MMA discovered that Ferguson did not properly

document a meeting with a MMA client that previously occurred on or about February 1 ("MMA

Client Number 6"), in violation of MMA's company policy. *See* Calder Decl. ¶ 67. Upon

information and belief, Ferguson was storing that information concerning this meeting with

MMA Client Number 6 somewhere offsite for Teros' and his benefit.

On or about February 19, 2019, Ferguson used MMA's Confidential Information and

Trade Secrets to send yet another email message to multiple business contacts at a MMA client

("MMA Client Number 7") and to solicit them to switch to Teros, informing the MMA Client

that he has "officially changed back-office resources." Calder Decl. ¶ 68. Ferguson also sent to

MMA Client Number 7 a "GoTo meeting" invite under his "colleague's name, Nate White" (a

principal at Teros). *Id.* ¶ 69. As such, Ferguson again used and disclosed MMA's Confidential

Information and Trade Secrets to carry out the solicitation of MMA Client Number 7 and such

actions illustrate his breach of contract (the MMA Agreement), trade secret misappropriation,

and unlawful interference with MMA's business. *Id.* ¶ 70.

When MMA Client Number 7 later cancelled the meeting and alerted MMA of

Ferguson's solicitation, Ferguson sent another email message to MMA Client Number 7 that

same day, stating:

Just left you a VM.
OK. Do you want to propose some dates/times for this discussion?
Or did someone from MMA reach out with a changed attitude? It's
ok if it is and I'm happy to answer any questions. **It's really odd
b/c I had an agreement with MMA on this change since it's
relatively minor. But apparently once I left MMA, someone
changed their minds for some clients.** But for other clients it's no
problem at all and they're already sending in signed paperwork
today to facilitate the change. I'm sorry I don't have an answer for
what's happening at MMA.
I'd welcome the chance to discuss. And showcase new retirement
plan/investment features and services available to me now which is
what I'm most excited about!

(emphasis added).

Calder Decl. ¶ 71.

This message again demonstrates Ferguson was engaged in a single-minded pursuit of

MMA clients – so much so that he was willing to resort to making false and deceptive statements

to clients about MMA's alleged "agreement" with Ferguson.  In point of fact, not only did MMA

<u>not</u> have any agreement with Ferguson regarding his solicitation of MMA clients, MMA

previously directed Ferguson to cease and desist from soliciting MMA clients as soon as his

misconduct was uncovered.  Calder Decl. ¶ 72.  In any event, at this time, Ferguson was not only

unlawfully using and disclosing MMA's Confidential Information and Trade Secrets to solicit

this MMA client, but he was also making false and deceptive statements to MMA Clients which

were defamatory and disparaging of MMA.  *Id.*

Additionally, on or about February 21, 2019, a MMA client ("MMA Client Number 8")

spoke with Robb Schiemann, a Principal in MMA's Employee Health & Benefits Division, and

this MMA client informed Schiemann that Ferguson was telling MMA's clients that **"I can now

lower your fees – I wanted to in the past but MMA wouldn't let me."** (emphasis added). See

Calder Decl. ¶ 73.  MMA Client Number 8 further stated that Ferguson was telling clients that it

was at "his discretion" to make this solicitation, which obviously shocked the client. *Id.*

Moreover, when Ferguson stated that "MMA wouldn't let" him lower the client's fees, Ferguson

wrongfully used his knowledge of MMA's confidential pricing information to solicit this client

and to attempt to persuade this client to switch to Teros by offering more favorable pricing at

Teros.

Later, on or about March 7, 2019, Ferguson used and disclosed MMA's Confidential

Information and Trade Secrets to solicit yet another MMA client ("MMA Client Number 9"):

> I hope this finds you well. By now you've heard the news that I
> have officially moved over to Teros Advisors, and probably heard
> that the transition didn't go exactly as planned. My apologies on
> behalf of all parties involved if it ended up confusing in any way. I
> had 15 great years there, love the people, and still have lots of
> common clients. And I am sorry for the delay in reaching out;
> there were some time requirements per regulations.
>
> But concentrating on the positives! Are you open to me presenting
> the new capabilities I can now bring to the table in support of you
> and the [MMA Client's] 401k plan? I'm excited because some
> things I struggled with previously are solved and there's
> just...more...
>
> Too much to list. I'd love the opportunity to answer questions and
> show you all the new things I can now offer to keep the [MMA
> Client's] 401k plan an industry leading retirement plan benefit...

Calder Decl. ¶ 76.

Again, Ferguson used MMA's Confidential Information and Trade Secrets (e.g.,

Ferguson used MMA's confidential compilation of confidential business contact information for

key decision makers at MMA clients) to solicit MMA Client Number 9, representing yet another

breach of contract, trade secret misappropriation, unlawful interference and unfair competition.

This client subsequently forwarded Ferguson's email to MMA, stating, "Just so ya know..."

signaling that the client understood that Ferguson was improperly soliciting this MMA client to join Teros.  Calder Decl. ¶ 78.

As recently as April 16, 2019, Ferguson solicited yet another MMA Client ("MMA Client Number 10") and made false and deceptive statements to that client about MMA.  Calder Decl. ¶ 79.  Specifically, on or about April 16, Ferguson sent the following message to MMA Client Number 10:

> Are you open to a capabilities presentation form me with my new team? I'd love the chance to show you why I changed my investment services to Teros RIA and all the additional things we can offer you and your people.
>
> - Ability to do 3(38) fiduciary status which puts all the investment liability on me and my team instead of your as it is under your current 3(21) arrangement.
> - Advanced investment resources with an actual investment committee lead by a Chief Economist from the London School of Economics and multiple Chartered Financial Analysts'.
> - Actual, real, forward looking guidance in our reports.  See the attached market update section from our standard review report.
> - Newsletter of important issues for you as plan sponsor – attached
> - Newsletter for participants – attached; also available in Spanish
> - Quarterly market & investment review reports even if the committee isn't meeting
> - Award winning financial wellness program, "Financial Elements" (Pensions&Investments Award) http://financial-elements.com/
> - Independent of other benefits so there's no Fiduciary conflict of interest under Fiduciary Rules (an investment Fiduciary controlled by a larger firm must do what the large firm says which could cause possible conflicts of interest)
> - And much more.
>
> I know there was some mudslinging by MMA management. I don't believe in mudslinging but will answer questions if you'd like.  Of course all those accusations turned out to be not true. All that happened is I changed investment companies to get more and better resources for my clients and that made MMA upset. Oddly, it was MMA Managements idea in the first place. They had already arranged for the [client] account to be moved to another advisor without your informed consent.  When I protested on the improper legalities, MMA offered the option of changing to a different firm for those clients that wanted to keep me as their adviser; which turned out to be the better option or me and many clients.  I think they just didn't expect so many clients to move to the better services. But in the end I still work with MMA on many mutual clients. I've even referred them new business in the last few weeks because I know the brokers there to be quality people. My apologies on behalf of everyone if this been frustrating.

> Again, would love the opportunity to show you all these great new resources so
> you can make an informed decision.
> Thank you,
> Rick Ferguson, AIF, CEBS

*Id.* ¶ 81.

Yet again, on information and belief, Ferguson used and disclosed MMA's Confidential Information and Trade Secrets to solicit MMA Client Number 10, and this episode illustrates yet another breach of contract (the MMA Agreement), trade secret misappropriation, unlawful interference, and unfair competition.  In addition, Ferguson continued to make false, deceptive and defamatory statements about MMA, stating, among other things, "Oddly, it was MMA Managements idea in the first place. They had already arranged for the [client] account to be moved to another advisor without your informed consent" (Calder Decl. ¶ 82), even though this statement was false and intended to cast MMA in a negative light.

Finally, on information and belief, before Ferguson returned his computer to MMA, he unlawfully accessed the Confidential Information and Trade Secrets stored on that computer after his employment was terminated, even though he was <u>not</u> authorized to do so, and Ferguson appears to have deleted, destroyed and/or altered MMA Confidential Information and Trade Secrets on the computer (which has required MMA to expend significant amounts to attempt to recover that information).

Given the continuing pattern of Ferguson's misconduct, MMA respectfully submits that Ferguson will continue to breach the MMA Agreement and his statutory and common law duties to MMA unless and until injunctive relief is granted.

**F.     MMA's Efforts to Abate Ferguson's Breaches**

On or about February 19, 2019, Douglas A. Wickham, Plaintiff's counsel, sent a cease and desist letter to Ferguson via email and U.S. mail. *See* Wickham Decl. ¶ 3, Ex. A.[4]  The letter advised Ferguson that he was in breach of his post-employment obligations and that MMA would not hesitate to pursue any and all legal remedies necessary to enforce such obligations. *Id.* ¶ 4.  Nate White, Founder and President of Teros, was also copied on the cease and desist letter; thus, Teros was put on notice of Ferguson's misconduct and his breach of his contractual and statutory and common law duties. *Id.* ¶ 5.

Specifically, in the February 19 cease and desist letter, Plaintiff's counsel wrote to Ferguson as follows:

> Notwithstanding these contractual duties and obligations, the Company has obtained information indicating that you breached your contractual and common law obligations by, among other things, using and disclosing the Company's confidential information and/or trade secrets both during your employment and thereafter to solicit MMA's clients and to actively encourage such clients to terminate their relationship with MMA and to retain your new employer, Teros Advisors.  You also accessed and used the Company's confidential information and trade secrets using your Company laptop and the Company's computer systems to carry out this misconduct for your person gain and/or for the benefit of your new employer.  Furthermore, you failed to return/wrongly retained MMA's confidential information and trade secrets and its property and equipment (including the laptop computer and cell phone issued to you).
>
> You also misrepresented to MMA's clients that your move to Teros Advisors would be an "administrative change with a couple forms to sign" and that you would continue to work with MMA to "support our common clients" in an apparent effort to make it appear that MMA sanctioned or otherwise authorized your misconduct and/or that no real change would be required as a result of your departure from MMA.  It also appears that you booked air travel to Canada that was paid for by MMA to meet with an MMA client in order to solicit them on behalf of Teros

---

[4] Citations to the "Wickham Decl." refer to the Declaration of Douglas A. Wickham executed on April 29, 2019.

Advisors. You also may have engaged in other acts and omissions which violate FINRA regulations and/or state and/or federal law. You even represented to a client that MMA agreed to or authorized your misconduct here. To be clear, however, MMA has not authorized you to engage in this misconduct nor has MMA agreed to allow you to engage in this misconduct.

In sum, you have engaged in multiple, flagrant violations of your legal duties and obligations and agreements, which also give rise to actual or potential violations of state and federal law. While the Company hopes to avoid litigation, MMA will take appropriate action if required to protect its legal interests and to recover damages proximately caused by your misconduct.

*Id.* ¶ 6.

On or about February 21, 2019, Ferguson acknowledged receipt of the cease and desist letter via email (Wickham Decl. ¶ 7, Ex. B.) but he did not take steps to ensure that he was honoring his obligations to MMA, and he did not otherwise confirm that Teros would take steps to ensure Ferguson's compliance with his obligations to MMA (which is evidenced by the fact of Ferguson's continuing misconduct). *See* Calder Decl. ¶ 38-82.

Later that day, Mara Crain, a Human Resources Business Partner at MMA, contacted Ferguson to schedule the return of the MMA equipment in Ferguson's possession, including the Company laptop, the Company-provided iPhone, office key card, and keys to Ferguson's desk (collectively, the "MMA Equipment"). *See* Crain Decl. ¶ 8. After hearing no response from Ferguson, Crain followed up with him again on February 22, 2019. *Id.* ¶ 9. That afternoon, Ferguson responded by stating that he would only return the MMA Equipment if MMA provided "binding proof" that "all contents of the computer and phone will be imaged for permanent non-alterable storage for future reference" and that MMA paid him his final paycheck, "service bonus for 2018," and a "new business bonus for 2018." *Id.* ¶ 10. On or about February 25, 2019, Crain replied to Ferguson's response, stating that MMA would discuss with Ferguson about the other

matters mentioned in his February 22 email, but for the time being, he must immediately return the MMA Equipment. *Id.* ¶ 11. Later that afternoon on February 25, Ferguson finally returned the MMA Equipment to MMA's San Francisco office. *Id.* ¶ 12.

However, Ferguson still did not substantively respond to MMA's cease and desist letter for the remainder of February. Wickham Decl. ¶ 8. Then, on or about March 1, 2019, counsel for MMA received a letter from Jamie Dupree of the law firm Futterman Dupree Dodd Croley Maier LLP, which stated that Dupree was "in the process of being retained" by Ferguson. *Id.* ¶ 9, Ex. C. A week later, on or about March 7, 2019, counsel for MMA still had not heard from Ferguson's counsel, so MMA's counsel sent an email message to Ferguson's counsel, requesting that Ferguson's counsel inform MMA whether she had "been formally retained by Mr. Ferguson and/or Teros Advisors and, if so, when we should expect to receive a substantive response to the February 19, 2019 letter addressed to Mr. Ferguson." *Id.* ¶ 9. Later that afternoon on March 7, Ferguson's counsel responded by stating that she had been retained and would respond "substantively" the following week. *Id.* ¶ 10.

On or about March 8, 2019, MMA's counsel explained to Ferguson's counsel in an email that it is MMA's understanding "that Mr. Ferguson continues to retain/possess MMA's confidential information and trade secrets and he continues to engage in the misconduct described in [the] February 19, 2019 [cease and desist] letter," and urged Ferguson's counsel to promptly address those issues with Ferguson. Wickham Decl. ¶ 11. Thereafter, on or about March 13, 2019, MMA's counsel received a letter from Ferguson's counsel, which largely failed to address MMA's cease and desist letter substantively and instead absurdly alleged that Ferguson was owed "approximately $30,000" for his "2018 service bonus" and "approximately $95,000" for his "sales referral bonus." *Id.* ¶ 12, Ex. D.

On or about April 2, 2019, MMA's counsel sent another letter to Ferguson's counsel, imploring Ferguson to cooperate with MMA and to cease and desist from engaging in all improper conduct, to make his personal and work equipment available for inspection and forensic review, and to otherwise comply with his contractual obligations in the MMA Agreement. Wickham Decl. ¶ 13, Ex. E.  But, even after this letter was sent to Ferguson's counsel, Ferguson continued to solicit MMA's clients and he continues to use and disclose MMA's Confidential Information and Trade Secrets and he continued to make false and deceptive statements about MMA.  *See* Calder Decl. ¶ 79-81.

MMA originally wished to resolve Ferguson's post-employment obligations and issues with him without litigation, but MMA is now left with no choice but to file this action and to enforce the contractual promises of Ferguson, to protect its customers, goodwill, and confidential information, and to prevent irreparable injury to its business interests by Ferguson and his new employer, Teros.

## ARGUMENT

### I.   VENUE IS PROPER IN THE SOUTHERN DISTRICT OF NEW YORK

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because under the Governing Law and Choice of Forum clause ("Section 12") contained in Ferguson's MMA Agreement, this Court is the only federal venue for any action arising out of Ferguson's employment with MMA. Moreover, Section 12 of the MMA Agreement that Ferguson signed unambiguously states:

> The parties acknowledge that the Company is headquartered in New York, that senior members of the leadership team of the Company are based in New York, and that breach of this Agreement will cause injury in New York.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws provisions.  The parties, being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action

or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York and the parties agree to the jurisdiction thereof. The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the said court(s), and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum... (*See* Crain Decl. Ex. A, at Section 12.)

## II.   MMA IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

MMA has established its entitlement to a temporary restraining order and a preliminary injunction. "In the Second Circuit, a plaintiff seeking a preliminary injunction must establish: '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 922 F. Supp. 2d 435, 439 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 210 (2d Cir. 2014) (*citing Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)). The same standard applies to an application for a temporary restraining order. *See Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").

### A.   MMA Will Suffer Irreparable Harm Absent Injunctive Relief

"To establish irreparable harm, a plaintiff must establish both that an injury is likely absent the injunction and that the injury cannot be adequately remedied with money damages." *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011). There is no question that MMA will suffer irreparable harm without injunctive relief.

First, MMA is more than "likely" to be injured absent injunction relief. Ferguson has repeatedly demonstrated his willingness to breach his contractual and other legal obligations. His deceitful conduct to date supports the conclusion that his conduct has been deliberate and calculated. Specifically, Ferguson orchestrated a solicitation campaign using MMA's Confidential Information and Trade Secrets even while still employed by MMA to give himself a head start on luring MMA clients to Teros, which is a clear and willful violation of his MMA Agreement and an unmistakable breach of his common law and statutory duties. Ferguson's continued breaches, in spite of express notice from MMA informing him of his breaches and his continuing obligations, further demonstrate that Ferguson will continue to breach his obligations to MMA unless and until injunctive relief is granted.

Second, Ferguson's violations of the MMA Agreement "threaten to cause [MMA] irreparable harm by luring away the business of a number of long-term [MMA] clients." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). It is well settled that the loss of "future sales, goodwill and entire client accounts" cannot be easily quantified. *Uni-World Capital, L.P. v. Preferred Fragrance, Inc.,* 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014) (noting that the loss of client relationships and goodwill can only be remedied by monetary damages in unusual circumstances); *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999) ("It would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.").

Ferguson directly targeted significant MMA clients, with whom he developed relationships solely by virtue of his employment with MMA. As a result of his conduct, MMA has already lost at least _five_ client relationships and the goodwill built up over the years, neither

of which can be measured with monetary damages.  MMA has also lost the benefit of the time to transition clients from Ferguson to other MMA employees without interference, which has also caused irreparable harm to its goodwill. *See, e.g. Johnson Controls*, 323 F. Supp. 2d at 532 ("the extent the purpose behind the non-compete clauses is to allow [Plaintiff] a brief period to transfer the client relationships maintained through [Ferguson] to their replacements, that benefit is inexorably lost by the failure to enforce the clauses immediately").  Most critically, MMA stands to lose additional client relationships and goodwill that would produce indeterminate revenue in the future. *See id.* There is no evidence that this is the unique case in which such harm can be measured by monetary damages.

Third, Ferguson contractually agreed that his current violations would constitute irreparable harm and that MMA would be entitled to injunctive relief in the event of his breach. *See* Crain Decl. Ex. A,  Specifically, in the MMA Agreement, Ferguson expressly acknowledged that "irreparable injury will result to [MMA] in the event of a breach by [Ferguson] of [his] obligations under [the MMA] Agreement, that monetary damages for such breach would not be readily calculable, and that [MMA] would not have an adequate remedy at law therefor" *Id.* In the Second Circuit, such contractual provisions support a finding that irreparable harm has occurred. *See, e.g., N. Atl. Instruments Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable harm and relying, in part, on the former employee's acknowledgement that a breach of his agreement would cause "irreparable injury" to the employer); *Devos, Ltd. v. Record*, No. 15-CV-6916(ADS)(AYS), 2015 WL 9593616, at *10 (E.D.N.Y. Dec. 24, 2015) (finding irreparable harm where the restrictive covenant agreement stated that a breach would result in irreparable injury, that damages would be unascertainable in monetary terms, and that the plaintiff would have no adequate remedy at law); *Uni-World Capital*, 73 F. Supp. 3d at 236-37

(any breach of the non-compete agreement "may result in irreparable harm and continuing damages to the Employer and its business and that the Employer's remedy at law for any such breach or anticipated or threatened breach will be inadequate").

**B.    MMA Has A Likelihood Of Success On The Merits Or Can Demonstrate A Sufficiently Serious Question Going To The Merits To Make Each Of Its Claims Fair Grounds For Litigation**

As set forth below, MMA is likely to succeed on the merits of its claims against Ferguson, or at the very least MMA can demonstrate a sufficiently serious question going to the merits on each of its claims.

**1.    Breach of Contract (Claim I)**

The MMA Agreement is enforceable and Ferguson breached it. New York courts apply a "three-part test to determine the reasonableness, and ultimately the enforceability, of anti-competitive employee agreements." *MasterCard Int'l Inc. v. Nike, Inc.,* No. 15-CV-114 (NSR), 2016 WL 797576, at *4 (S.D.N.Y. Feb. 23, 2016) (citing *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 388–89 (1999)).  Under that test, "[a] restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* The MMA Agreement at issue here easily meet this three-part test.

First, the restrictions imposed by the MMA Agreement are no greater than is required to protect MMA's legitimate interests. Under New York law, an employer "has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *USI Ins. Servs. LLC v. Miner,* 801 F. Supp. 2d 175, 187-88 (S.D.N.Y. 2011) (citation omitted). Here, it is undeniable that MMA has a legitimate interest in protecting its client relationships for which Ferguson was responsible in the last two years of his respective

employment, and its confidential information relating to its client relationships. Ferguson's efforts to develop, retain, service, and expand business during his employment with MMA were financed and supported by MMA, which paid, among other expenses, his salary and the salaries of the entire support team of MMA who were essential to the overall client relationships. *See Johnson Controls*, 323 F. Supp. 2d at 536 (plaintiff had a legitimate interest in protecting client relationships that were developed by individual defendants in connection with their employment and supported by efforts of other employees).

Moreover, the provisions of the MMA Agreement are narrowly tailored to cover *only* those clients and prospective clients with whom Ferguson had contact, or about whom they obtained confidential information during the last two (2) years of his respective employment, for *only* two years following Ferguson' resignations, and *only* while using or disclosing MMA's Confidential Information and Trade Secrets. New York courts have routinely upheld non-solicitation provisions with a duration of greater than one year as reasonable. *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195 (JGK), 2008 WL 4778239, at *16 (S.D.N.Y. Oct. 31, 2008) (citing *Willis of New York Inc. v. DeFelice*, 750 N.Y.S.2d 39, 41-42 (1st Dep't 2002) (finding two year duration of non-solicitation provision as reasonable)); *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 651 N.Y.S.2d 504, 505–06 (1st Dep't 1996) (finding that the duration of the non-solicitation restriction of two years is not unduly burdensome).

Importantly, this Court has twice found that the restrictions imposed by non-solicitation and confidentiality agreements involving MMA's affiliated company, Marsh USA Inc., containing similar terms, were reasonable in light of the interests they sought to protect and the limited duration of the restrictions. *See Marsh USA Inc. v. Schuhreimen*, 183 F. Supp. 3d 529, 535 (2016); *Karasaki*, 2008 WL 4778239, at * 16. For the reasons articulated in the *Karaski* and

*Schuhriemen* cases, the MMA Agreement at issue here is no greater than is required for the protection of the legitimate interest of the employer.

Second, the MMA Agreement does not impose undue hardship on Ferguson. New York courts have routinely found that an individual does not suffer undue hardship where the restrictive covenant at issue merely prohibits him from soliciting his former employer's clients for a reasonably defined period of time. *See USI Ins. Servs.*, 801 F. Supp. 2d at 190 ("USI is not seeking to preclude Miner from working as an insurance producer for IOA. USI instead seeks only to preclude Miner from soliciting or servicing former USI clients"). Here, the MMA Agreement does not prevent Ferguson from working as a sales professional or generally from servicing organizations seeking employee benefit services. Nor does the MMA Agreement restrict Ferguson from being employed by Teros, a direct competitor, or even from competing against MMA. Ferguson is only prohibited from: (1) "directly or indirectly us[ing] MMA's Confidential Information and Trade Secrets or related information regarding the Company, the Company's clients and its prospective clients to solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company" and (2) disclosing or utilizing MMA's confidential information and trade secrets. Because Ferguson is free to pursue a "wide array" of other clients on behalf of Teros, and because the non-solicitation restrictions apply for only two years, "MMA is likely to prevail on its showing that the agreements do not impose an undue hardship on [Ferguson]." *Marsh USA Inc.*, 2008 WL 4778239, at *18; *see Chernoff Diamond & Co.*, 651 N.Y.S.2d at 505–06 (finding that the duration of the non-solicitation restriction of two years is not unduly burdensome because "the covenant does not prohibit defendant from pursuing his profession" and "the only restriction imposed upon him is that he is not permitted to

deal with plaintiff's clients" as "[t]here is no reason to suppose that this limitation will prevent defendant from pursuing his livelihood…").

Third, enforcing the MMA Agreement will not harm the public, the majority of which is free to work with Ferguson. The clients Ferguson worked with in his last two years at MMA also are not harmed because they can work with Ferguson or Teros after the narrow two years restriction period expires.  In fact, "[i]f anything, the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Uni-World,* 73 F. Supp. 3d at 237.

Finally, MMA likely will be able to establish that Ferguson breached his MMA Agreement. As explained above, in total, on February 12, 13 and 14 alone, while he was actively employed by MMA, Ferguson solicited at least 20 MMA clients and encouraged them to sever their contractual and business relationships with MMA and establish a new business relationship with Teros, while using and disclosing MMA's Confidential Information and Trade Secrets, and while using MMA's property and equipment (e.g., the MMA laptop computer and/or iPhone issued to Ferguson and MMA's email server). *See* Calder Decl. ¶¶ 38-63.  Moreover, following Ferguson's departure, he continued to solicit MMA's clients to join Teros using MMA's Confidential Information and Trade Secrets.  *Id.* ¶¶ 63-82.

Ferguson's announcements of his departure and affiliation with Teros to existing MMA clients through individualized distribution and other targeted solicitations also violated the MMA Agreement. In *USI Insurance Services v. Miner,* this Court found that the defendant breached his non-solicitation agreements by sending an email that informed his former clients of his new position at a competing insurance company and touted the merits of the his new employer. *USI Ins. Servs.,* 801 F. Supp. 2d at 192-93. Likewise in *Schuhriemen,* this Court found that the

defendant's "notice announcing his employment . . . was not a general announcement," but rather a targeted solicitation likely in violation of the defendant's non-solicitation agreement. *Schuhriemen,* 183 F. Supp. 3d at 536.  The email solicitations by Ferguson here are no different.

>    **2.    Breach of Duty of Loyalty (Claim II), Unfair Competition (Claim IV and V), and Misappropriation of Confidential Information (Claim VI)**

Under New York law, employees owe their employers a common law duty of loyalty, including a duty to not use or disclose the employer's confidential information for the purpose of competing with the employer. *PLC Trenching Co., LLC v. Newton,* No. 6:11-CV-0515, 2011 WL 13135653, at *9 (N.D.N.Y. Dec. 12, 2011).  Similarly, under California law, employees owe a duty of loyalty to their employers. *See Stokes v. Dole Nut Co.,* 41 Cal. App. 4th 285, 295 (1995). As California law recognizes, "an employer has the right to expect the undivided loyalty of its employees." *Id.*  The Ninth Circuit describes the duty of loyalty as a "fiduciary-like" duty. *James v. Childtime Childcare Inc.,* 2007 U.S. Dist. LEXIS 43753, *9 (E.D. Cal. June 1, 2007) (citation omitted).  California has codified this common law duty, mandating: "Everything which an employee acquires by virtue of his employment, except the compensation . . . belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment." Cal. Lab. Code § 2860.

Here, as set forth above, Ferguson owed MMA a common law duty of loyalty not to disclose MMA's confidential information for the purpose of competing with MMA and not to engage in business on behalf of a competitor, Teros, while still employed by MMA.  Ferguson clearly breached his duties of loyalty—as evidenced by Ferguson's deliberate transfer of MMA's confidential compilation of contact information for key decision maker's at MMA's client by email from his MMA Outlook account to his Teros email address, which was created *before* Ferguson's resignation from MMA.  Thus, Ferguson breached his duty of loyalty by providing

information MMA treats as confidential to a competitor for purposes of attracting the business to

his new employer, Teros, and by soliciting MMA's clients to leave MMA and move to Teros

while he was still actively employed by MMA.  Based on these facts, MMA has a likelihood of

success on the merits of its breach of duty of loyalty claim under both New York and California

law.

"To state an unfair-competition claim on a theory of misappropriation under New York

common law, a plaintiff must allege that the defendant (1) misappropriated and used, (2) the

plaintiff's property, (3) to compete against the plaintiff's own use of the same property." *PLC

Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *9 (N.D.N.Y. Dec.

12, 2011).    Similarly, "[t]o state a claim for misappropriation of confidential information, a

plaintiff must allege that the defendant used the plaintiff's confidential information for the

purpose of securing a competitive advantage." *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,

745 F. Supp. 2d 343, 352 (S.D.N.Y. 2010).    In California, its "unfair competition statute

prohibits any unfair competition, which means 'any unlawful, unfair or fraudulent business act or

practice.' " *In re Pomona Valley Med. Group*, 476 F.3d 665, 674 (9th Cir. 2007) (citing Cal. Bus.

& Prof. Code § 17200, *et seq*.).  "[T]o pursue either an individual or a representative claim under

the California unfair competition law, Business and Professions Code section 17200 *et seq.*," a

plaintiff "must have suffered an 'injury in fact' and 'lost money or property as a result of such

unfair competition.' " *Hall v. Time Inc.,* 158 Cal. App. 4th 847, 849, 70 Cal. Rptr. 3d 466 (Ct.

App. 2008).

The facts stated above demonstrate that MMA has a likelihood of success on the merits

of its unfair competition claims and its misappropriation of confidential information claims

insofar as Ferguson is in possession of MMA's confidential information concerning the identity

of MMA's clients, the confidential compilation of contact information for key decision makers at MMA's clients, and pricing information, and have or will use that information to unfairly compete with MMA for business.

### 3.   Tortious Interference Claims (Claim III)

"To state a claim for tortious interference with business relations under New York law, four conditions must be met: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003). Here, MMA has business relationships with each of its clients and prospective clients. Ferguson interfered with MMA's business relationships by soliciting MMA's clients with knowledge of MMA's pricing for the purpose of undermining MMA's relationship with those clients, and converting those clients to become clients of Teros.   Five of MMA's clients have already terminated their relationships with MMA in favor of Teros based on Ferguson's tortious conduct. Calder Decl. ¶ 80 .  MMA likely will be successful on this claim.

### 4.   Violation of California Labor Code Sections 2860 and 2862 (Claim VII)

California Labor Code sections 2860 and 2862 prohibit an employee from acquiring and refusing to return, upon demand by his employer, those things which belong to his employer. *See Gen. Elec. Co. v. Wilkins*, No. 1:10-CV-00674-OWW, 2011 WL 1740420, at *10 (E.D. Cal. May 5, 2011) ("California Labor Code section 2860 embodies the universally accepted principal that work product created by an employee belongs to the employer where the employee was hired to create such work product.")  The conduct engaged in by Ferguson, as described above, was unlawful and constitutes a violation of California Labor Code Sections 2860 and 2862 because

he illegally transferred MMA's Confidential Information and Trade Secrets from MMA's Outlook account to his Teros email account while he was still employed by MMA, and then he solicited MMA's clients using that confidential information and he used MMA's property and equipment to do so. Despite MMA's demands to Ferguson to cease and desist, Ferguson has refused to do so and refused to sign an affidavit stating that he has returned all of MMA's Confidential Information and Trade Secrets and will have his electronic equipment subject to forensic testing.

### 5.      Violation of California Penal Code Section 502 (Claim VIII)

To properly assert a claim for violation of Penal Code section 502 ("Section 502"), a party must allege that the defendant knowingly accessed and without permission altered, damaged, deleted, destroyed, or otherwise used any data, computer, computer system, or computer network to either (a) devise or execute any scheme or artifice to defraud, deceive, or extort, or (b) wrongfully control or obtain money, property, or data." Cal. Penal Code § 502(c)(1); see Facebook, Inc. v. ConnectU LLC, 489 F. Supp. 2d 1087, 1091 (N.D. Cal. 2007) ("Penal Code section 502 prohibits knowing access, followed by unauthorized (i.e., 'without permission') taking, copying, or use of data."); Multiven, Inc. v. Cisco Sys., Inc., 725 F. Supp. 2d 887, 892 (N.D. Cal. 2010) ("Adekeye is a former employee of Cisco, however, there is no evidence that any privileges he had as an employee to access secure areas of the Cisco website extended beyond his employment. Cisco, however, has presented unrebutted evidence that upon leaving Cisco's employ, neither Adekeye nor Multiven had Cisco's permission or authorization to access Cisco's network. Thus, the Court finds that any access by Adekeye to secure areas of the Cisco network was without authorization.")

By virtue of California Penal Code section 502, Ferguson had a duty to, among other things, refrain from knowingly accessing and without permission altering, damaging, deleting,

destroying, or otherwise using or causing to be used any data, computer, computer system, and/or computer services developed, owned, and/or leased by MMA.

MMA is informed and believes from its review of, among other things, Ferguson' MMA Outlook email account, Ferguson breached this duty by knowingly accessing, using or causing to be used, altering, damaging, deleting, destroying and/or copying MMA's computer data, computers, computer system, computer software, supporting documentation and files in violation of California Penal Code Section 502.

### 6.      Defamation (Claim IX)

To state a claim for defamation under New York law, a party must show: the plaintiff must show: (1) a false statement that is (2) published to a third party (3) without privilege or authorization and that (4) plaintiff is caused harm, unless the statement is one of the types of publications actionable regardless of harm. *Cardali v. Slater*, 57 N.Y.S.3d 342, 346 (N.Y. Cnty. Sup. Ct. 2017), *aff'd,* 167 A.D.3d 476, 89 N.Y.S.3d 176 (1st Dep't 2018), *leave to appeal denied,* No. 2019-101, 2019 WL 1460758 (N.Y. Ct. App. Apr. 2, 2019).

Ferguson published false written statements to third parties (ie, MMA' clients) about MMA's supposed agreement permitting Ferguson to use MMA's Confidential Information and Trade Secrets to solicit business from or perform services for clients with whom Ferguson had contact with during the last two years before his separation from MMA.  For example, Ferguson stated to an MMA client: "It's really odd b/c I had an agreement with MMA on this change since it's relatively minor." Calder Decl. ¶ 71. This statement was an outright lie.  MMA *never* agreed to allow Ferguson to solicit MMA's clients using its Confidential Information and Trade Secrets.

Further, Ferguson informed many clients through his illegal solicitations that he would "still work with MMA benefits and insurance teams to support our common clients." Calder Decl. ¶ 41. This false assertion is also a blatant misrepresentation that casts MMA in a negative

light to its clients, thereby raising this defamation claim.   When Ferguson published these statements, he knew that such they were false and that he was neither privileged nor authorized to make such statements about MMA.   Accordingly, Ferguson has defamed MMA.

### 7.   Violation of Uniform Trade Secrets Act, Civil Code 3246-3246.10 (Claim X)

Even if Ferguson argues that he was not contractually obligated to safeguard and protect MMA's Confidential Information and Trade Secrets, which he cannot, his improper conduct as set forth herein would constitute misappropriation and thus would be independently actionable as a matter of law under the Uniform Trade Secrets Act, California Civil Code 3246-3246.10.

MMA can demonstrate a probability of success with respect to its misappropriation claim if it can prove the existence of (a) a legally protectable trade secret; and (b) a legal basis, either a covenant or a confidential relationship, upon which to predicate relief.   *Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 230 (S.D.Cal. 1986) (citing *Futurecraft Corp. v. Clary Corp.*, 205 Cal. App. 2d 279, 283, 23 Cal. Rptr. 198 (1962)) ("[Plaintiff] has met its burden by showing the probable existence of trade secrets, the access to or acquisition of the secrets by former employee/defendants under an obligation of confidentiality, and the use or disclosure by these employees and their present employer of the secrets, and serious and irreparable harm.").

Under the UTSA, a "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique or process" that: (1) "[d]erives independent economic value , actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use;" and (2) "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."   Cal. Civ. Code § 3246.1(d).   So long as these two elements are met, courts consistently accord trade secret protection to various types of confidential, proprietary information including customer lists.   *See*

*Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521-23 (1997) (finding that customer lists constituted trade secrets considering that the compilation of same required considerable efforts, time, and money, and that the customer information "was stored on computer with restricted access" and employees were subject to a "confidentiality provision expressly referring to its customer names and telephone numbers"); *see, e.g., MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) ("We agree that the Customer Database qualifies as a trade secret. The Customer Database has potential economic value because it allows a competitor . . . to direct its sales efforts to those potential customers that are already using the MAI computer system.")

In this case, to protect its established position in the industry, MMA has built substantial goodwill with its customers and clients and has developed a vast store of confidential and proprietary information. *See* Calder Decl. ¶ 35. This information qualifies as trade secrets and there is substantial evidence that Defendants have actually misappropriated them.

####  a. MMA's proprietary information is valuable because it is not generally known or readily ascertainable

MMA's Confidential Information and Trade Secrets satisfies the first element required for trade secret protection. For example, MMA's customer lists and its confidential compilation of contact information for key decision makers at MMA's clients have been developed from lengthy, independent development efforts, marketing, advertising, and services to existing customers, as well as through mergers and acquisitions, such as MMA's acquiring of Barney & Barney in 2014. Calder Decl. ¶ 28. Moreover, while any number of business organizations are potential customers for MMA's services, MMA's customer lists and its confidential compilation of contact information for key decision makers at MMA's clients reflect proprietary, customer-specific information regarding its customers or clients. *Id.* ¶ 29.

Here, the information regarding the identity of MMA's clients, MMA's confidential compilation of contact information for key decision makers at MMA's clients and the MMA pricing information misappropriated by Ferguson is exactly the type of information that would enable Ferguson and Teros to underbid and potentially steal away customers under contract with MMA. In fact, since Ferguson's illegal solicitations, at least five of MMA's clients have already terminated their business relationships with MMA. Calder Decl. ¶ 80. Moreover, MMA offers its wide array of benefits services by investing large amounts of capital and resources in implementing the Company's programs, which are uniquely tailored to each client's business needs, culture, goals and environment. *Id.* ¶ 30. Additionally, MMA's Confidential Information and Trade Secrets are not publicly known or readily ascertainable and not subject to access without a valid MMA email account and any forwarding of MMA clients' emails outside of MMA's network will trigger a security and compliance alert because of the highly confidential and proprietary nature of the identity of MMA's clients and its confidential compilation of contact information for key decision makers at MMA's clients. *Id.* ¶ 34. Based on the foregoing, this information constitutes trade secrets. *See Morlife,* 56 Cal. App. 4th at 1521-23.

> **b.     MMA Employs Reasonable Efforts to Maintain the Secrecy of Its Proprietary Information**

With regard to the second element for establishing trade secret protection, there is no doubt that MMA's Confidential Information and Trade Secrets, are "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy." Cal. Civ. Code § 3426.1(d). The efforts include, but are not limited to, the following: (1) requiring all MMA employees to sign confidentiality agreements; (2) limiting access to its computer information to current employees; (3) protecting such information from outside disclosure through the use of passwords and monitoring by MMA's information security and compliance departments; and (4) locking

the doors to its branch offices except during working hours and during the workday only. *See* Calder Decl. ¶ 31.

Based on the foregoing, the protected information satisfies the second of the two required elements of the UTSA. *See MAI Systems Corp*, 991 F.2d at 521 (requiring employees to sign confidentiality agreements is a reasonable step to ensure secrecy); *Morlife,* 56 Cal. App. 4th at 1523.   Accordingly, the MMA Confidential Information and Trade Secrets qualify for trade secret protection.

### c.       Ferguson Has Misappropriated MMA's Trade Secrets

Ferguson should be enjoined from actual or threatened trade secret misappropriation. Cal. Civ. Code § 3426.2(a); *Imi-Tech Corp.*, 691 F. Supp. at 230.   Here, Ferguson transferred information regarding the identities of MMA's clients and its confidential compilation of contact information for key decision makers at MMA clients from his MMA Outlook account to his Teros email account while he was *still employed by MMA*, which he unlawfully retained after resigning from the Company. *See* Calder Decl. ¶ 32.   It does not require a leap of faith to conclude that Ferguson stole MMA's trade secrets and is now actively using that information to develop business for his new employer, Teros.

Such misconduct easily constitutes unlawful misappropriation under the UTSA. *MAI Sys. Corp.*, 991 F.2d at 521-22 (employee's use of her knowledge of customer information to solicit customers represents misappropriation); *Morlife,* 56 Cal. App. 4th at 1523 (same). Injunctive relief clearly is warranted in such circumstances.

### C.     A Balancing of the Equities Tips in Favor of Granting Preliminary Injunctive Relief

MMA has demonstrated a likelihood of success on the merits for each of its ten claims. However, insofar as the Court finds that MMA has only raised sufficiently serious questions

going to the merits of each claim, the Court should still issue the requested temporary restraining order and preliminary injunction because a balance of the equities tips in favor of MMA.

MMA merely seeks to maintain the status quo and prevent Ferguson from breaching his contractual obligations, breaching his duties of loyalty, and engaging in tortious and unfair business practices. Ferguson's contractual obligations are reasonable and narrowly tailored. The MMA Agreement does not prevent Ferguson from working for Teros or developing business based on his current employment and resources. Nor does the MMA Agreement prevent Teros from engaging in business which fairly competes with MMA.

On the other hand, if the Court denies MMA's request for immediate equitable relief, Ferguson will be allowed to continue to unfairly compete with MMA using MMA's confidential information and undermining the investment of substantial time, resources, and goodwill that MMA made in its client relationships. Therefore, the balance of the equities decidedly weigh in favor of MMA. *See Schuhriemen,* 183 F. Supp. 3d at 536–37 (granting preliminary injunctive relief and observing with respect to the "to the balance of equities," that the individual defendant was unlikely to suffer "great hardship" if he was prevented for one year from soliciting" the plaintiffs' clients, and further observing that plaintiff could have "face[d] the prospect of losing business to a major competitor, transported by a high-level company official").

### III.   MMA SHOULD NOT BE REQUIRED TO POST A BOND.

"The language of Rule 65(c) confers broad discretion on the trial judge to set the amount of the bond, even to dispense with the bond requirement altogether." *R.L.E. Corp. d/b/a Casa Imports v. Ferraro Foods, Inc.*, No. 6:15-cv-123 (GLS/TWD), 2015 WL 1456178, at *1 (N.D.N.Y. March 30, 2015) (bond requirement was unnecessary where individual defendant failed to establish that he was likely to suffer any harm absent the posting). In this case, Ferguson cannot establish that he will be harmed if a bond is not posted. As discussed above, MMA's

requested relief will not prevent Ferguson from earning a livelihood, and will not prevent Teros from operating its business.

Moreover, Ferguson expressly agreed in the MMA Agreement that MMA would be entitled "to temporary and permanent injunctive relief *(without the necessity of posting a bond)*." (emphasis added). No bond should be required where, as here, the parties have expressly agreed otherwise. *See Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC,* No. 10-cv-8976 (RJH), 2011 WL 497978, at *12 (S.D.N.Y. Feb. 10, 2011), *aff'd,* 468 F. App'x 43 (2d Cir. 2012) (no bond required where franchisee agreed that franchisor "may have such injunction relief without necessity of posting a bond"); *Karasaki,* 2008 WL 4778239 at *21 ("the parties agreed in Section 7 of the RCA that no bond would be required for any temporary or permanent injunction, and the parties may agree to waive the bond requirement").

## IV.   THE COURT SHOULD GRANT PLAINTIFFS' REQUEST FOR EXPEDITED DISCOVERY

This Court has often granted expedited discovery in cases involving restrictive covenants. *See, e.g., Uni-World Capital,* 43 F. Supp. 3d at 241 (expedited discovery permitted in non-compete case); *Nebraskaland, Inc. v. Brody,* No. 09-CV-9155 (DAB), 2010 WL 157496, at *1 (S.D.N.Y. Jan. 13, 2010) (expedited discovery permitted in restrictive covenant case involving solicitation of customers*); DAG Jewish Directories, Inc. v. Y & R Media, LLC*, No. 09 CIV. 7802 (RJH), 2010 WL 46016, at *1 (S.D.N.Y. Jan. 7, 2010) (expedited discovery granted in conjunction with a preliminary injunction).

Here, MMA seeks the prompt deposition of Ferguson in New York, the production of documents, including all communications between Ferguson and anyone and/or any entity acting in concert with him or on his behalf, including Teros, and any MMA client with whom Ferguson worked or about whom Ferguson obtained confidential information during the last two years of

his employment, and MMA should be allowed to inspect and forensically examine Ferguson's personal computer, his computer used at Teros, his email account at Teros and his cellphone/PDA. Only Ferguson knows the full extent of his activities in violation of the MMA Agreement, and it will be impossible for MMA to ascertain the full extent of his misconduct without his sworn deposition testimony and document production and the inspection of his computers, email and cellphone.

## CONCLUSION

For the foregoing reasons, MMA respectfully requests the Court grant its motion for a temporary restraining order, a preliminary injunction, and expedited discovery. The equitable relief sought has been narrowly tailored to achieve MMA's legitimate and substantial interest in protecting itself from loss of good will, client relationships and irreparable harm. The injunctive relief would not unduly restrict Ferguson from working for his current employer performing employee benefits services outside the scope of the restraining order, and would not otherwise prevent Teros from operating its business.

Date:   April 30, 2019
         New York, New York

a. Michael Weber/gc

A. Michael Weber
Kevin K. Yam
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022.3298
212.583.9600

*Attorneys for Plaintiff*
*Marsh & McLennan Agency LLC*