Case 1:19-cv-03837-VSB   Document 37   Filed 06/21/19   Page 1 of 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARSH & MCLENNAN AGENCY LLC,

        Plaintiff,

-against-

ELMER "RICK" FERGUSON,

        Defendant.

**19 CV 03837**

Case No.: _____

**DECLARATION OF JEFF CALDER**

JUDGE BRODERICK

**JEFF CALDER**, declares pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury that the following is true and correct:

1. I am a Principal and Managing Director at Marsh & McLennan Agency LLC ("MMA"), leading the San Francisco and Walnut Creek offices.

2. In my role, I oversee the employee health and benefits programs for a large group of clients.

3. I submit this declaration in support of MMA's Order to Show Cause seeking a temporary restraining order, a preliminary injunction, and expedited discovery. Except where otherwise stated, I make this declaration based on my personal knowledge and/or based on information in MMA's books and records.

4. I was Defendant Elmer "Rick" Ferguson's direct supervisor during his employment with MMA.

**Ferguson's Employment with Barney & Barney and MMA's Acquisition of Barney & Barney**

5. On February 22, 2007, Barney & Barney hired Ferguson as a retirement analyst.

6. On April 5, 2010, Ferguson was promoted to a Client Manager role and, in 2011, Ferguson was promoted to a Client Executive, Service position.

7. On or about August 6, 2012, Barney & Barney transferred Ferguson from its offices in San Diego, California, to its offices in San Francisco, California, and transitioned Ferguson from the Client Executive, Service position to the Client Executive, Sales position (also termed Retirement Services Client Executive).

8. In his new sales role, Ferguson went from principally providing service to clients (who mostly if not entirely were small, medium, and large employers) regarding their retirement plans (which were mostly 401(k) plans) to a sales/business

2

development/producer role where Ferguson was responsible for establishing and developing relationships with new prospective clients and maintain relationships with existing clients.

9. While employed by Barney & Barney, Ferguson signed and entered into the B & B Agreement, dated February 26, 2007, which contained restrictive covenants regarding the protection of Barney & Barney's confidential information and trade secrets during and after his employment.

10. When Ferguson joined Barney & Barney, he did not bring new clients with him.

11. Even after he transitioned into the sales position at Barney & Barney and later at MMA, Ferguson was largely dependent on Barney & Barney and later MMA to refer existing or potential new business opportunities to Ferguson.

12. On or about February 1, 2014, MMA acquired Barney & Barney and, as a result, Barney & Barney merged with and into MMA, and MMA became the surviving entity of the merger.

13. MMA took an assignment of Ferguson's B & B Agreement when it merged with Barney & Barney, and, at that time, Ferguson became an employee of MMA.

**Ferguson's Employment with MMA**

14. After Ferguson became employed by MMA, he continued in his same Client Executive, Sales position.

15. Thus, he started working at MMA in a sales position in February 2014.

16. On or about February 1, 2014, once he became employed by MMA as a result of the merger, Ferguson entered into the MMA Agreement.

17. Like at Barney & Barney, as an MMA Client Executive, Sales, Ferguson was responsible for developing and generating new client relationships on the retirement services team

(mostly if not exclusively involving qualified and non-requalified retirement plans and services) and maintaining existing client relationships.

18. In addition, given Ferguson's background on the service side of the business, Ferguson also continued to provide service to MMA retirement plan clients.

19. In or about September 2014, Ferguson told MMA that he wanted to return to work in the service side of the business and that he wanted to return to a Client Executive, Service position.

20. MMA granted Ferguson's request effective January 1, 2015, and officially returned Ferguson to a Client Executive, Service position, in which position he continued for the remainder of his MMA employment until his resignation in February 2019.

21. When Barney & Barney hired Ferguson, he had no clients and brought no business to Barney & Barney.

22. Rather, he was assigned clients and only later developed client relationships through internal referrals of clients from within Barney & Barney and later from within MMA.

23. A majority of the clients serviced by Ferguson at Barney & Barney and later at MMA were established clients of Barney & Barney and/or MMA.

24. At MMA, Ferguson relied on financial and internal resources from MMA to generate business, service clients, and manage client relationships.

25. He developed client relationships by virtue of his employment with MMA, and with the support of an experienced team of MMA employees, on whom he relied to carry out his duties.

26. He also relied on MMA's Confidential Information and Trade Secrets to perform his duties and develop and maintain client relationships.

27. For instance, Ferguson relied on MMA's client and prospective client lists and MMA's confidential compilation of contact information for key decision makers at MMA's clients to carry out and perform his duties, which client and prospective client lists and the confidential compilation of contact information for key decision makers at MMA clients was confidential and was developed through Barney & Barney's and MMA's significant expenditure of time, money, and resources over the years.

28. MMA's customer lists and its confidential compilation of contact information for key decision-makers at MMA clients have been developed from lengthy, independent development efforts, marketing, advertising, and services to existing customers, as well as through mergers and acquisitions, such as MMA's acquiring of Barney & Barney in 2014.

29. While any number of business organizations are potential customers for MMA's services, MMA's customer lists and its confidential compilation of contact information for key decision-makers at MMA clients reflect proprietary, customer-specific information, which is not publicly available and is not readily ascertainable from publicly available information.

30. MMA offers its wide array of benefits services by investing large amounts of capital and resources in implementing the Company's programs, which are uniquely tailored to each client's business needs, culture, goals and environment.

31. During Ferguson's employment with MMA, MMA took reasonable measures to maintain the confidential nature of the Confidential Information and Trade Secrets, including requiring employees to sign confidentiality agreements; password-protecting computers and cellular telephones, and adopting security precautions for company to secure client files and electronic data. Thus, among other things, MMA required all MMA employees to sign confidentiality agreements; MMA limited access to its computer information to current employees; MMA protected its confidential such information from outside disclosure through the use of passwords and monitoring by MMA's information security and compliance departments; and MMA locked the doors to its offices except during working hours and during the workday only.

32. MMA's Confidential Information and Trade Secrets are not publicly known or readily ascertainable and not subject to access without a valid MMA email account and any forwarding of MMA clients' emails outside of MMA's network will trigger a security and compliance alert because of the confidential and proprietary nature of MMA's client information including its confidential compilation of contact information for key decision makers at MMA clients and its pricing information.

33. MMA supported Ferguson's business development and servicing efforts by sponsoring client events, financing his membership in professional and networking organizations, paying for travel and expenses related to client meetings and entertainment, and investing in marketing and sales tools, all of which Ferguson used to form and strengthen client relationships for and on behalf of MMA.

34. Given MMA's significant expenditures of time and financial resources to identify and retain the MMA clients, including all clients assigned to Ferguson, information about

MMA's clients (including clients inherited through the acquisition of Barney & Barney), such as the identity of key decision-makers at MMA clients, MMA's confidential compilation of contact information for key decision-makers at MMA clients, MMA's pricing information, etc., and other confidential client information, is not publicly available, and, in fact, represented part of MMA's Confidential Information and Trade Secrets.

35. Indeed, to protect its established position in the industry, MMA built substantial goodwill with its customers and clients and has developed a vast store of confidential and proprietary information.

36. Furthermore, none of the MMA clients Ferguson ultimately generated, serviced, and later solicited "belonged" to him.

37. Rather, all such clients were clients of MMA.

**Ferguson Breaches the MMA Agreement While Still Employed By MMA**

38. On or about February 12, 2019, Ferguson began soliciting MMA clients on behalf of Teros *while he was actively employed by MMA.*

39. On or about February 12, Ferguson used his Teros email account, rferguson@terosadvisors.com, to solicit an MMA client ("MMA Client Number 1") via email, using MMA's Confidential Information and Trade Secrets.

40. In this regard, Ferguson used MMA's highly confidential compilation of client contact information for key decision makers at MMA clients to send the following message to MMA Client Number 1:

> Following up from our discussion and prior email. Below is my new [Teros] email address and phone number. Attached are the forms to change our advisory to Teros Advisors. These should be dated February 16.

> Changing to Teros Advisors brings a host of benefits for you and your employees beyond the fee reduction. (Please not for efficiency and speed this paperwork keeps the current fee in place while processing then I can reduce the fee at Teros.)...
>
> This change is EASY. There is not required notice to employees or any material impact to the plan or your participants, this is administrative in nature. The RIA is in the background, responsible for compliance oversight, licensing & registration, and fee collection...

41. On or about February 13, 2019, Ferguson sent an email message to two employees of a MMA client ("MMA Client Number 2") which Ferguson serviced and he told them that:

> I've decided to change my back office affiliation from MMA Securities to Teros Advisors. **Not really a big deal** since I'll still work with MMA benefits and insurance teams to support our common clients. It's just like the change we did in July from Sagepoint Financial to MMA Securities. No employee notices, no disclosures for you to send out – just like before it's just an **administrative change** with a couple of forms to sign." (emphasis added).

42. In so doing, Ferguson used and disclosed MMA's Confidential Information and Trade Secrets and used MMA's property and equipment (e.g., his MMA laptop computer and email systems) to solicit MMA Client Number 2 on behalf of Teros while he was still employed by MMA.

43. This solicitation is one of many he sent to MMA clients beginning on February 12 and continuing to the present which illustrate Ferguson's breach of the MMA Agreement, his misappropriation of trade secrets, his breach of his duties of loyalty and fiduciary duties, his unlawful interference with MMA's contractual relationships with its clients and his unfair competition.

44. MMA Client Number 2 later responded to Ferguson's solicitation and asked Ferguson to "supply some information of Teros Advisors" because they were "not familiar with the firm."

45. Similarly, again on February 13, while Ferguson still was actively employed by MMA, he sent an email message to two confidential, key MMA business contacts at a MMA client ("MMA Client Number 3"), in order to solicit MMA Client Number 3 on behalf of Teros:

> Just a heads up on a fiduciary update. I've decided to change my back office affiliation from MMA Securities to Teros Advisors RIA. **Not too big deal since I'll still work with MMA benefits and insurance teams to support our common clients.** It's like the change we did in July from Sagepoint Financial to MMA Securities. Nothing changes for your 401k plan, you, or employees. No employee notices, no disclosures for you to send out – **just like before it's an administrative change with a couple of forms to sign. The biggest change is a new email and phone number for me.**

46. Again, Ferguson used and disclosed MMA's Confidential Information and Trade Secrets (e.g. MMA's confidential compilation of contact information for key decision makers at MMA clients) to solicit MMA Client Number 3, which gives rise to yet another breach of contract (the MMA Agreement), trade secret misappropriation, breach of duty of loyalty and fiduciary duty, unlawful interference with MMA's contractual relationships, and unfair competition.

47. Further, Ferguson's statements in this message to MMA Client Number 3 to the effect that he "decided to change" his "back office affiliation from MMA Securities to Teros Advisors" and that he would "still work with MMA benefits and insurance teams support our common clients" are misleading and deceptive.

48. In truth, Ferguson was <u>not</u> "changing his back office;" rather, Ferguson eventually resigned his employment with MMA to go to work for a competitor, Teros, and he solicited MMA clients to follow him to his new employer, and yet he did not make this fact clear to the MMA clients he solicited.

9

49. On February 13, Ferguson also requested a Broker-Dealer Change Form on behalf of yet another MMA client ("MMA Client Number 4") in the education industry.

50. Upon information and belief, MMA Client Number 4 has since terminated its services with MMA because of Ferguson's unlawful actions and interference.

51. In total, on February 12, 13 and 14, Ferguson solicited at least 20 MMA clients and encouraged them to sever their contractual and business relationships with MMA and establish new business relationships with Teros while Ferguson was still employed by MMA, while using and disclosing MMA's Confidential Information and Trade Secrets (e.g., MMA's confidential compilation of contact information for key client decision makers), while using MMA's property and equipment (e.g., the MMA laptop computer and/or iPhone issued to Ferguson and MMA's email server), and while making false, deceptive statements to lure MMA's clients into the mistaken belief that this change was "[n]ot really a big deal" and more of an "administrative change."

52. Additionally, on information and belief, Ferguson planned on using previously booked air travel to Vancouver, Canada that was paid for by MMA to solicit a MMA technology client ("MMA Client Number 5") on February 15 on behalf of Teros.

53. This client later cancelled its appointment with Ferguson shortly before the scheduled meeting, however.

54. Ferguson sent a large number of email messages from his MMA Outlook email account to his "terosadvisors.com" email address on or about February 13 and 14.

55. The majority of those email messages contained confidential business contact information for MMA's clients that Ferguson had access to during his employment with

MMA (and which apparently included information from MMA's confidential compilation of contact information for key decision makers at MMA's clients).

56. Moreover, in multiple email messages Ferguson sent to his Teros email address, he attached dozens of MMA Outlook business contact cards that included MMA's confidential compilation of contact information for, among others, key decision makers at MMA's clients and contact information for prospective clients and vendors (and the business contact cards for MMA clients included, among other things, the name of the MMA client, the name of the key decision maker at the MMA client and the physical address, telephone number and email address for the key decision maker).

**MMA Discovers Ferguson's Unlawful Solicitation of MMA Clients**

57. On or about February 14, 2019, I discovered Ferguson's solicitation of MMA clients to join his new firm, Teros.

58. I sent an email message to Ferguson directing him to cease soliciting MMA clients and requested that Ferguson call me immediately.

59. I confronted Ferguson regarding his unlawful, unauthorized solicitations and his use of MMA's Confidential Information and Trade Secrets to do so.

60. I also informed Ferguson that his office card key had been deactivated and that Ferguson needed to return his laptop and phone to MMA.

61. I explained to Ferguson that he would be hearing from MMA about the legal issues concerning his unlawful actions.

62. On the very next day February 15, 2019, Ferguson submitted his voluntary resignation from MMA, presumably to preempt his involuntarily termination due to misconduct.

**Ferguson Continues To Breach the MMA Agreement After Leaving MMA to Join Teros**

63. I am informed and believe that Ferguson may have begun his employment with Teros in mid-late February 2019 – while he still was employed by MMA.

64. Teros is in the business of selling and servicing retirement plans for employers.

65. As such, Teros is a direct competitor of MMA.

66. A few days after his termination from employment with MMA, Ferguson sent the following email to a select group of employees and/or principals at MMA:

> Hello Friend and Business Partner;
>
> **I'm emailing you b/c I have clients in common with you and I want to assure you I am not trying to move your business in any way.** The firm I've moved to doesn't do EHB or BI. I will partner with outside EHB and BI relationships like MMA. **It's in my best interest to keep the status quo on our current clients just like it is for you. I'm trying to avoid our clients going out to bid.**
>
> A perfect example is that a MMA benefits producer is in danger of losing a benefits client. Client told me during a review meeting recently they aren't happy with the MMA EHB team service. I'm also already engaging two producers on new lines of biz on clients of mine. I'll follow up/continue with those relationships respectively…
>
> I could go on and on, but you get the idea. I moved so I could join a more advanced team and offer more features and services.
>
> **The fact is we will have clients in common.** I know you are good at what you do. You know I am good at what I do. **If we work at cross-purposes we may both lose some - retirement compensation is much lower; I have much less to lose - and I will just look elsewhere for those relationships.**
>
> If you need something for one of our common clients please let me know. I'll do the same. (emphasis added).

67. On or about February 15, 2019, MMA discovered that Ferguson did not properly document a meeting with a MMA client that previously occurred on or about February 1 ("MMA Client Number 6"), in violation of MMA's company policy.

68. Thereafter, on or about February 19, 2019, on information and belief, Ferguson used MMA's Confidential Information and Trade Secrets to send yet another email message to multiple business contacts at a MMA client ("MMA Client Number 7") and solicited them to switch to Teros, informing the MMA Client that he has "officially changed back-office resources."

69. Ferguson also sent to MMA Client Number 7 a "GoTo meeting" invite under his "colleague's name, Nate White" (a principal at Teros).

70. As such, on information and belief, Ferguson again used and disclosed MMA's Confidential Information and Trade Secrets to solicit MMA Client Number 7.

71. When MMA Client Number 7 later cancelled the meeting and alerted MMA of Ferguson's solicitation, Ferguson sent an email message to MMA Client Number 7 that same day, stating:

> Just left you a VM.
> OK. Do you want to propose some dates/times for this discussion?
> Or did someone from MMA reach out with a changed attitude? It's ok if it is and I'm happy to answer any questions. **It's really odd b/c I had an agreement with MMA on this change since it's relatively minor. But apparently once I left MMA, someone changed their minds for some clients.** But for other clients it's no problem at all and they're already sending in signed paperwork today to facilitate the change. I'm sorry I don't have an answer for what's happening at MMA.
> I'd welcome the chance to discuss. And showcase new retirement plan/investment features and services available to me now which is what I'm most excited about!
> (emphasis added).

72. Ferguson's statements to MMA Client Number 7 were false, however. Not only did MMA <u>not</u> have any agreement with Ferguson regarding his solicitation of MMA clients, I personally directed Ferguson to cease and desist as soon as his misconduct was uncovered.

13

73. Additionally, on or about February 21, 2019, a MMA client ("MMA Client Number 8") spoke with Robb Schiemann, a Principal in MMA's Employee Health & Benefits Division, and this MMA client informed Schiemann that Ferguson was telling MMA's clients that **"I can now lower your fees – I wanted to in the past but MMA wouldn't let me."** (emphasis added).

74. MMA Client Number 8 further stated that Ferguson was telling clients that it was at "his discretion" to make this solicitation, which obviously shocked the client.

75. Moreover, when Ferguson stated that "MMA wouldn't let" him lower the client's fees, Ferguson wrongfully used his knowledge of MMA's confidential pricing information to solicit this client and to attempt to persuade this client to switch to Teros by offering more favorable pricing at Teros.

76. Later, on or about March 7, 2019, on information and belief, Ferguson used and disclosed MMA's Confidential Information and Trade Secrets to solicit yet another MMA client ("MMA Client Number 9"):

> I hope this finds you well. By now you've heard the news that I have officially moved over to Teros Advisors, and probably heard that the transition didn't go exactly as planned. My apologies on behalf of all parties involved if it ended up confusing in any way. I had 15 great years there, love the people, and still have lots of common clients. And I am sorry for the delay in reaching out; there were some time requirements per regulations.
>
> But concentrating on the positives! Are you open to me presenting the new capabilities I can now bring to the table in support of you and the [MMA Client's] 401k plan? I'm excited because some things I struggled with previously are solved and there's just...more...
>
> Too much to list. I'd love the opportunity to answer questions and show you all the new things I can now offer to keep the [MMA Client's] 401k plan an industry leading retirement plan benefit...

14

77. Again, on information and belief, Ferguson used MMA's Confidential Information and Trade Secrets to solicit MMA Client Number 9 (e.g., MMA's confidential compilation of contact information for key decision makers at MMA clients), representing yet another breach of contract, trade secret misappropriation, unlawful interference and unfair competition.

78. This client subsequently forwarded Ferguson's email to MMA, stating, "Just so ya know..." signaling that the client understood that Ferguson was improperly soliciting this MMA client to join Teros.

79. Moreover, as recently as April 16, 2019, Ferguson solicited yet another MMA Client ("MMA Client Number 10") and made false and deceptive statements about MMA to that client.

80. In fact, since Ferguson's MMA client solicitations, at least five of MMA's clients have already terminated their business relationships with MMA.

81. Specifically, on or about April 16, Ferguson sent the following message to MMA Client Number 10:

Are you open to a capabilities presentation form me with my new team? I'd love the chance to show you why I changed my investment services to Teros RIA and all the additional things we can offer you and your people.
- Ability to do 3(38) fiduciary status which puts all the investment liability on me and my team instead of your as it is under your current 3(21) arrangement.
- Advanced investment resources with an actual investment committee lead by a Chief Economist from the London School of Economics and multiple Chartered Financial Analysts'.
- Actual, real, forward looking guidance in our reports. See the attached market update section from our standard review report.
- Newsletter of important issues for you as plan sponsor – attached
- Newsletter for participants – attached; also available in Spanish
- Quarterly market & investment review reports even if the committee isn't meeting

Award winning financial wellness program, "Financial Elements" (Pensions&Investments Award) http://financial-elements.com/

- Independent of other benefits so there's no Fiduciary conflict of interest under Fiduciary Rules (an investment Fiduciary controlled by a larger firm must do what the large firm says which could cause possible conflicts of interest)
- And much more.

I know there was some mudslinging by MMA management. I don't believe in mudslinging but will answer questions if you'd like. Of course all those accusations turned out to be not true. All that happened is I changed investment companies to get more and better resources for my clients and that made MMA upset. Oddly, it was MMA Managements idea in the first place. They had already arranged for the [client] account to be moved to another advisor without your informed consent. When I protested on the improper legalities, MMA offered the option of changing to a different firm for those clients that wanted to keep me as their adviser; which turned out to be the better option or me and many clients. I think they just didn't expect so many clients to move to the better services. But in the end I still work with MMA on many mutual clients. I've even referred them new business in the last few weeks because I know the brokers there to be quality people. My apologies on behalf of everyone if this been frustrating.

Again, would love the opportunity to show you all these great new resources so you can make an informed decision.

Thank you,
Rick Ferguson, AIF, CEBS

82. However, once again, Ferguson made misrepresentations to this client and, for example, he falsely claims that it was MMA management's idea for him to solicit MMA's clients: "<u>Oddly, it was MMA Managements idea in the first place.</u> They had already arranged for the [client] account to be moved to another advisor without your informed consent." This is not true and MMA did not authorize or approve of Ferguson's solicitation of MMA clients using MMA's Confidential Information and Trade Secrets.

Dated: April 27, 2019
San Francisco, California

Jeff C____