**OUTTEN & GOLDEN LLP**
Nicholas H. Sikon
Aliaksandra Ramanenka
685 Third Avenue, 25th Floor
New York, New York 10017
(212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARSH & MCLENNAN AGENCY LLC,

              Plaintiff,

      -against-

ELMER "RICK" FERGUSON,

              Defendant.

No. 19-cv-03837 (VSB)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

---

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    I.      Background on Rick Ferguson and His Investment Advisor Work ................................... 2

    II.     Mr. Ferguson's Employment History ............................................................................ 3

    III.    MMA Securities LLC Discriminates Against Mr. Ferguson Because he is Gay .............. 4

    IV.    MMA Securities LLC Further Discriminates Against Mr. Ferguson by Engaging in a
          Scheme to Steal his Clients .......................................................................................... 6

    V.     Jeff Calder Instructs Mr. Ferguson to Present his Clients with Two Options: (1) Stay with
          MMA Securities LLC and use Jeff Stephens as their Investment Advisor; or (2) Mr.
          Ferguson should "take them Somewhere Else" .............................................................. 9

    VI.    Mr. Ferguson Contacts His Clients Pursuant to the Instruction ..................................... 13

    VI.    Mr. Calder Abruptly Terminates Mr. Ferguson's Employment in Retaliation for Mr.
          Ferguson's Complaints ................................................................................................. 15

    VII.   Following His Termination, Mr. Ferguson is Free to Solicit His Clients Provided He
          Does Not Use the Company's Trade Secrets .................................................................. 15

LEGAL STANDARD ........................................................................................................... 17

ARGUMENT ....................................................................................................................... 18

    I.      Plaintiff Will Not Suffer Irreparable Harm Absent Injunctive Relief ............................ 18

         A.   Plaintiff's Delay in Prosecuting this Matter Evidences that the Alleged Risk of Harm
             is not Imminent ...................................................................................................... 18

         B.   Plaintiff's Harm, if any, is not Irreparable ............................................................. 20

    II.     Plaintiff has failed to show a likelihood of success on the merits or a serious question
          going to the merits to make them a fair ground for trial ................................................ 22

         A.   Plaintiff Brings Its Motion with Unclean Hands Because It Breached Its Agreement
             with Mr. Ferguson, Discriminated Against Him Because of His Sexual Orientation,
             and Instructed Him to Take Certain Customers ...................................................... 22

         B.   Plaintiff Is Equitably Estopped from Bringing These Claims Because It Instructed
             Mr. Ferguson to Contact His Clients and Take Them Elsewhere ........................... 23

         C.   Plaintiff Is Unlikely to Prevail on Any Cause of Action ........................................ 26

             i.       Breach of Contract (Claim I) ................................................................... 26

             ii.      Violation of Unif. Trade Secrets Act, Civil Code 3246-3246.10
                   (Claim X) ............................................................................................... 33

             iii.     Breach of Duty of Loyalty (Claim II) ...................................................... 36

             iv.     Tortious Interference (Claim III) ............................................................. 38

v.  Unfair Competition (Claim IV); Violation of California Business and Professions Code Section 17200 (Claim V); and Misappropriation of Confidential Information (Claim VI) ...................................................... 39

vi.  Violation of California Labor Code Sections 2860 and 2862 (Claim VII) ............................................................................................ 40

vii.  Violation of California Penal Code Section 502 (Claim VIII) ............... 40

viii.  Defamation (Claim IX) ............................................................................ 41

III.  The Balance of Equities Favors Defendant and the Public Interest Weighs Against Granting an Injunction ..................................................................................... 42

CONCLUSION ....................................................................................................................... 43

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                  **Page(s)**

*Advantacare Health Partners v. Access IV, Inc.*,
  2003 U.S. Dist. LEXIS 26093, at *6 (N.D. Cal. Oct. 24, 2003) ................................................ 35

*Aerotek, Inc. v. Johnson Grp. Staffing Co., Inc.*,
  No. C067652, 2013 WL 3947750 (Cal. Ct. App. July 30, 2013) ................................................ 37

*Aetna Bldg. Maint. Co. v. West*,
  39 Cal. 2d 198 (1952) ........................................................................................ 30, 37

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*,
  28 Cal. App. 5th 923 (Ct. App. 2018) ............................................................................. *passim*

*Arthur J. Gallagher & Co. v. Marchese*,
  36 Misc. 3d 1219(A) (N.Y.Sup. 2011) .................................................................................... 32

*Baker's Aid v. Hussmann Foodservice Co.*,
  730 F. Supp. 1209 (E.D.N.Y. 1990) ...................................................................................... 30

*Barbagallo v. Marcum LLP*,
  925 F. Supp. 2d 275 (E.D.N.Y. Jan. 10, 2013) ....................................................................... 31

*BDO Seidman v. Hirshberg*,
  93 N.Y.2d 382 (1999) .................................................................................................. 31, 32

*Bijan Designer for Men, Inc. v. Katzman*,
  No. 96 CIV. 7345 (BSJ), 1997 WL 65717, n.9 (S.D.N.Y. Feb. 7, 1997) ................................... 32

*BNSF Ry. Co. v. San Joaquin Valley R. Co.*,
  No. 1:08-CV-01086-AWI-SMS, 2011 WL 3328398 (E.D. Cal. Aug. 2, 2011) ....................... 36

*Business Networks of N.Y. Inc. v. Complete Network Solution*,
  265 A.D.2d 194 (1st Dept. 1999) .......................................................................................... 31

*Camp v. Jeffer, Mangels, Butler & Marmaro*,
  35 Cal. App. 4th 620 (1995) ................................................................................................. 22

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985) ................................................................................................. 19

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*,
  42 N.Y.2d 496 (1977) .............................................................................................. 29, 30, 32

*Della Penna v. Toyota Motor Sales, U.S.A.*, Inc.,
  11 Cal.4th 376 (1995) .......................................................................................................... 38

*Devos, Ltd. v. United Returns, Inc.*,
  57 Misc. 3d 1211(A) (N.Y.Sup. 2017) ............................................................................. 29, 30

*Dickson, Carlson & Campillo v. Pole*,
  83 Cal.App.4th 436 (2000) ................................................................................................... 22

*Digital Envoy, Inc. v. Google, Inc.*,
  370 F.Supp.2d 1025 (N.D.C.A. 2005) .................................................................................. 33

*Dowell v. Biosense Webster, Inc.*,
  179 Cal. App. 4th 564 (2009) ................................................................. 28

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.*,
  30 Cal. App. 4th 54 (1994) ............................................................ 23, 24, 26

*Edgeworth Food Corp. v. Stephenson*,
  53 A.D.2d 588 (1st Dept. 1976) ........................................................... 42

*Edwards v. Arthur Andersen LLP*,
  44 Cal. 4th 937 (2008) ............................................................ 27, 29, 38, 42

*Erlich v. Menezes*,
  21 Cal. 4th 545 (1999) ......................................................................... 36

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009) .................................................................. 20

*In re Faiveley Transp. Malmo AB*,
  No. 08 Civ. 3330 (JSR), 2009 WL 3270854 (S.D.N.Y. Oct. 7, 2009) ................... 21

*First Empire Sec., Inc. v. Miele*,
  17 Misc. 3d 1108(A) (N.Y.Sup. 2007) .................................................... 32

*Forms Mfg., Inc. v. Edwards*,
  705 S.W.2d 67 (Mo. Ct. App. 1985) ...................................................... 23

*Forsher v. Bugliosi*,
  26 Cal. 3d 792 (1980) .......................................................................... 41

*Gabriel Tech. Corp. v. Qualcomm Inc.*,
  No. 08 CV 1992, 2010 WL 3718848 (S.D.Cal. Sept. 20, 2010) ......................... 33

*Garrett v. Music Publ'g Co. of Am., LLC*,
  740 F.Supp.2d 457 (S.D.N.Y.2010) ...................................................... 24

*Geritrex Corp. v. Dermarite Indus., LLC*,
  910 F. Supp. 955 (S.D.N.Y. 1996) ........................................................ 20

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
  13 F. Supp. 2d 417 (S.D.N.Y. 1998) ...................................................... 19

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) ................................................................... 18

*Hessel v. Christie's Inc.*,
  399 F. Supp. 2d 506 (S.D.N.Y. 2005) .................................................... 20

*Hilb, Rogal & Hamilton Ins. Servs. v. Robb*,
  33 Cal. App. 4th 1812 (1995) ............................................................... 35

*IKON Office Sols., Inc. v. Am. Office Prod., Inc.*,
  178 F. Supp. 2d 1154 (D. Or. 2001) ...................................................... 26

*Ikon Office Sols., Inc. v. Rezente*,
  No. 2:10-1704 WBS KJM, 2010 WL 5129293 (E.D. Cal. Dec. 9, 2010) ................. 33

*Imax Corp. v. Cinema Tech., Inc.*,
  152 F.3d 1161 (9th Cir.1998) ............................................................... 34

*Impax Media Inc. v. Ne. Advert. Corp.*,
   No. 17 CIV. 8272, 2018 WL 358284 (S.D.N.Y. Jan. 10, 2018) ........................................ 20, 21
*JSG Trading Corp. v. Tray-Wrap, Inc.*,
   917 F.2d 75 (2d Cir. 1990) ................................................................................................. 18
*K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*,
   171 CA4th 939 (2009) ......................................................................................................... 33
*Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*,
   8 Misc. 3d 412 (N.Y.Sup. 2005) ................................................................................... 32, 42
*Kendall–Jackson Winery, Ltd. v. Superior Court*,
   76 Cal.App.4th 970 (1999) .................................................................................................. 22
*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal.4th 1134 (2003) ........................................................................................................ 38
*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001) .......................................................................................... 24, 25
*Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*,
   No. 99 Civ. 2213, 1999 WL 123501 (S.D.N.Y. Mar. 2, 1999) ............................................ 20
*LG Capital Funding, LLC v. Vape Holdings, Inc.*,
   No. 16 Civ. 2217 (CBA) (LB), 2016 WL 3129185 (E.D.N.Y. June 2, 2016) ....................... 21
*Marietta Corp. v. Fairhurst*,
   301 A.D.2d 734 (N.Y. 3d Dept. 2003) ................................................................................. 30
*Medina v. Hunt*,
   No. 9:05-CV-1460, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008) ...................................... 30
*Metro. Taxicab Bd. of Trade v. City of New York*,
   615 F.3d 152 (2d Cir. 2010) ................................................................................................ 17
*Natural Organics, Inc. v. Kirkendall*,
   52 AD3d 488 (N.Y. 2d Dept. 2008) ..................................................................................... 30
*NetApp, Inc. v. Nimble Storage, Inc.*,
   41 F.Supp.3d 816 (N.D.C.A. 2014) ..................................................................................... 33
*Opperman v. Path, Inc.*,
   87 F. Supp. 3d 1018 (N.D. Cal. 2014) ................................................................................. 41
*Pencom Sys., Inc. v. Shapiro*,
   598 N.Y.S.2d 212 (1st Dep't 1993) ..................................................................................... 19
*Perkins v. LinkedIn Corp.*,
   53 F. Supp. 3d 1190 (N.D. Cal. 2014) ................................................................................. 41
*Pollara v. Radiant Logistics Inc.*,
   No. CV 12-344 GAF (JEMX), 2014 WL 12585781 (C.D. Cal. June 6, 2014)............ 27, 34, 35
*Production Resource Group, LLC v. Oberman*,
   No. 03 CIV. 5366 (JGK), 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003) ............................ 21
*Reed, Roberts Assocs. v. Strauman*,
   40 N.Y.2d 303 (1976) .......................................................................................................... 31

*Rodriguez ex rel. Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1999) ................................................................. 17

*Sasqua Grp., Inc. v. Courtney*,
   No. 10 Civ. 528 (ADS) (AKT), 2010 WL 3613855 (E.D.N.Y. Aug. 2, 2010) ........................ 20

*Snap! Mobile, Inc. v. Croghan*,
   No. 18-CV-04686-LHK, 2019 WL 884177 (N.D. Cal. Feb. 22, 2019) ................... 36

*Stewart v. United States I.N.S.*,
   762 F.2d 193 (2d Cir. 1985) ................................................................. 21

*Sussman v. Crawford*,
   488 F.3d 136 (2d Cir. 2007) ................................................................. 17

*TGG Ultimate Holdings, Inc. v. Hollett*,
   No. 16 CIV. 6289 (VM), 2016 WL 8794465 (S.D.N.Y. Aug. 29, 2016) ................... 20

*The Ret. Grp. v. Galante*,
   176 Cal. App. 4th 1226 (2009) ........................................... 27, 29, 35, 39

*USA Recycling, Inc. v. Town of Babylon*,
   66 F.3d 1272 (2d Cir.1995) ................................................................. 17

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
   423 F.3d 137 (2d Cir. 2005) ................................................................. 19

## Statutes

Cal. Bus. & Prof. Code § 16600 ......................................................... 27, 28, 29, 42
Cal. Bus. & Prof. Code § 17200 ......................................................................... 39
Cal. Civ. Code § 48a (West) ......................................................................... 40, 41
Cal. Civ. Code § 3426 ......................................................................................... 33
Cal. Evid. Code § 623 ......................................................................................... 24
Cal. Lab. Code §§ 2860 and 2862 ....................................................................... 40
Cal. Penal Code § 502 ......................................................................................... 40

## Rules

C.P.L.R. 308(2) .................................................................................................... 40
Fed. R. Civ. P. 65 ................................................................................................ 17

## Other Authorities

FINRA Code of Arbitration Procedure for Industry Disputes § 13804(b) ................... 18

## PRELIMINARY STATEMENT

Defendant Elmer "Rick" Ferguson ("Defendant" or "Mr. Ferguson") respectfully submits this memorandum of law in opposition to Plaintiff Marsh & McLellan Agency LLC's ("Plaintiff" or "MMA") motion for a preliminary injunction.

Mr. Ferguson is an experienced and respected Investment Advisor for corporate retirement plans. After twelve successful years of employment, he was abruptly fired in February 2019 following his complaints about sexual orientation discrimination and other violations of law. Threatened by the prospect of legitimate competition and in retaliation for Mr. Ferguson's complaints, MMA now brings ten claims against him and seeks to restrain him from soliciting any of the clients he brought to MMA Securities LLC. However, prior to his firing, Mr. Ferguson's supervisor specifically directed him to contact his clients and give them a choice: either stay with MMA Securities LLC and utilize another Investment Advisor, or leave with Mr. Ferguson to join another firm. Plaintiff is, therefore, estopped from bringing these claims, all of which relate to the fact that Mr. Ferguson simply followed his supervisor's instruction. Moreover, the client information at issue in this matter is neither confidential nor a trade secret, and California law only bars the solicitation of clients via the use of trade secrets. The facially unreasonable restrictions MMA seeks to enforce are therefore void as a matter of California law.

MMA has compounded this error here by seeking to impose these restrains in a transparent effort to stifle competition through an unsupportable and overbroad injunction, which injures not only Mr. Ferguson but also the clients who wish to use his services, as well as the public at large. For these and the other reasons discussed herein, including that there is no risk of irreparable harm to Plaintiff, Plaintiff's request for a preliminary injunction should be denied.

## STATEMENT OF FACTS

**I.   Background on Rick Ferguson and His Investment Advisor Work**

Mr. Ferguson is a veteran of the first Gulf War and a Registered Representative ("RR") under FINRA employed with Triad Advisors LLC ("Triad").   *See* ECF No. 25, Ferguson Declaration in Support of Motion to Dismiss ("Ferguson Mtn. Decl."), ¶ 11.   Mr. Ferguson is also a Registered Investment Advisor Representative ("RIAR" or "Investment Advisor") employed with Resources Investment Advisors LLC ("Resources"), a Registered Investment Advisor ("RIA").   *Id*.   Triad and Resources are not affiliated, and Mr. Ferguson uses Teros Advisors LLC ("Teros") as the marketing entity for his investment and advisory services.   *Id*.   Prior to joining Triad and Resources, Mr. Ferguson was employed by MMA Securities LLC (the "company") as both a RR and a RIAR.   *Id*. at ¶ 12.   MMA Securities LLC is dually-registered as a RIA and a FINRA member firm and is also a subsidiary of MMA.   *Id*.

As a Registered Representative and Investor Advisor, Mr. Ferguson provides both investment broker services and investment-related fiduciary advice to companies regarding their corporate retirement plans.   *Id*. at ¶ 13.   Specifically, he advises corporate clients of all sizes with respect to ERISA-covered 401(k), 403(b), and other pension plans.   *Id*. at ¶ 14.   He helps these clients select a plan and investments, and thereafter advises them with respect to any issues that may arise.   *Id*.   In order to obtain investment brokerage services or investment advice, the clients must enter into appropriate brokerage and/or co-fiduciary investment advisory agreements with the relevant registered entity (*i.e.*, MMA Securities LLC, Triad, or Resources) as well as with a specific investment broker or Investment Advisor (*i.e.*, Mr. Ferguson).   *Id*. at ¶ 15.   Pursuant to these agreements, the clients pay the applicable FINRA or SEC-registered entity a fee in relation to the services Mr. Ferguson provides, and Mr. Ferguson owes his clients a fiduciary duty.   *Id*.

2

While he was employed with MMA Securities LLC, Mr. Ferguson's supervisors were Jeff Calder, Managing Director of the San Francisco office, and William Peartree, Director of Retirement Services in the San Diego office. *Id*. at ¶ 23.

## II.   Mr. Ferguson's Employment History

In 2007, Mr. Ferguson joined SagePoint Financial Inc. ("SagePoint") as a Registered Assistant. *Id*. at ¶ 24. He excelled at his job and, over the next few years, received multiple promotions. *See* Ferguson Declaration in Support of Opposition to Motion for Preliminary Injunction ("Ferguson Opp. Decl."), ¶ 2. Specifically, in 2010, he was promoted to the position of Client Manager, and in 2011, he was promoted to the position of Client Service Executive. *Id*. In late 2012, he transferred from the San Diego to the San Francisco office and was promoted yet again to the position of Client Sales Executive. *Id*. at ¶ 3. As a Client Sales Executive (*i.e.*, a "producer"), Mr. Ferguson served as a Registered Representative and as an Investor Advisor and was responsible for generating and maintaining corporate retirement plan business (as opposed to simply servicing it). *Id*. at ¶ 4. He was very successful in this role, generating a significant book of corporate retirement plan business.[1] *Id*. at ¶ 5. His corporate retirement plan clients entered into agreements with SagePoint, which remitted the fees it received from these entities to Barney & Barney LLC, and which in turn compensated Mr. Ferguson. *See* Ferguson Mtn. Decl., ¶ 26.

In 2014, MMA acquired Barney & Barney LLC. *See* ECF No. 1, Compl. ¶ 3. At the time, Barney & Barney LLC and MMA issued Mr. Ferguson a letter confirming he would continue to serve as a producer for SagePoint. *See* Ferguson Mtn. Decl., ¶ 27. Subsequently, his employment and registration were dually registered with SagePoint and MMC Securities LLC, and then

---

[1]    A significant number of Mr. Ferguson's clients were generated without the help of MMA or MMA Securities LLC and came to him solely because of his personal connections. These clients specifically chose to work with Mr. Ferguson, taking advantage of his expertise with respect to corporate retirement plans. *Id*. at ¶ 6.

3

transferred to MMA Securities LLC.  *Id*. at ¶¶ 31-32.  The fees from Mr. Ferguson's corporate clients were paid to MMA Securities LLC, which remitted them to MMA, and which in turn compensated Mr. Ferguson.  *Id*. at ¶¶ 19-20.  Mr. Ferguson remained employed by and registered with MMA Securities LLC until his termination on February 15, 2019.  *Id*. at ¶ 39.

## III.    MMA Securities LLC Discriminates Against Mr. Ferguson Because he is Gay

Over the course of his employment with SagePoint and MMA Securities LLC, Mr. Ferguson began to be concerned about discriminatory treatment he was experiencing because of his sexual orientation.  *See* Ferguson Opp. Decl., Ex. A (Ferguson FEHA Complaint).  He first noticed he was not receiving the same training or support as his straight coworkers.  *Id*. Specifically, while his straight coworkers received training when they were hired or promoted to the position of Client Sales Executive, Mr. Ferguson, despite his repeated requests, did not.  *Id*. His straight coworkers also received full-time servicing support while Mr. Ferguson received only temporary or sporadic support.  *Id*.  Additionally, while his straight colleagues were allowed to work solely as producers, Mr. Ferguson, upon being promoted to a producer role, was required to also continue servicing accounts.  *Id*.  These colleagues were also given client accounts to start their books of business and compensated more favorably.  *Id*.  When Mr. Ferguson complained about this discriminatory treatment to Mr. Calder and Mr. Peartree, he was told to "shut up" or he would be fired and that he did not fit the "proper" image of the company because he was gay.  *Id*.

The discrimination escalated at the end of 2014 when Mr. Calder abruptly informed Mr. Ferguson that he had not produced enough sales to justify being a Producer.  *Id*.  Mr. Ferguson responded by noting the lack of training and support, the fact that Mr. Peartree – more than a year after Mr. Ferguson's promotion – was still requiring him to service Mr. Peartree's clients (which took significant time), as well as the lack of a starting book of business.  *Id*.  Moreover, Mr. Ferguson would have made the production goal if not for Mr. Peartree's manipulation of several

clients' accounts.  *Id*.  Mr. Peartree refused to credit clients to Mr. Ferguson and withheld a large production credit (over $50,000) that Mr. Ferguson was entitled to.  *Id*.  Mr. Ferguson later received the credit but only after the company had already forced Mr. Ferguson into the servicing role based on falsely reduced numbers.  *Id*.

Despite these disadvantages, Mr. Ferguson was still very close to validating his compensation (*i.e.*, generating enough sales to support it).  *Id*.  He also noted to his supervisors that his straight coworkers were typically given three or more years to validate their compensation while he received only around a year.  *Id*.  However, Mr. Calder told Mr. Ferguson he must accept the servicing role or his employment would be terminated.  *Id*.  At this point, Mr. Peartree, who was also at the meeting, promised Mr. Ferguson that if he accepted the servicing role the company would continue to consider him a producer and let him grow his book of business (*i.e.*, he was only being demoted on paper and would continue to work as a producer).  *Id*.  Then, when his book of business was big enough, the company would officially switch him back to a producer role and assign him a servicing support person (which Mr. Ferguson's straight coworkers received but he did no).  *Id*.  This promise was memorialized in an agreement, and because Mr. Ferguson could not afford to lose his job he had no choice but to accept.[2]  *Id*.

Despite this discrimination, Mr. Ferguson excelled at the company, generating numerous new clients and growing his book of business to approximately $600,000.  *Id*.  From 2015 to 2018, he received good performance reviews as well as several significant bonuses, and he was nationally recognized by the SagePoint Achievers Council as a Top Producer.  *Id*.  Each year, he would ask Mr. Calder and Mr. Peartree to honor their agreement and officially convert him back to a

---

[2]       Despite technically being demoted from a producer to a servicer position, Mr. Ferguson still held the title of Client Executive (*i.e.*, a producer), produced corporate retirement plan business, was listed on compliance department-reviewed and approved documents as a producer, was introduced internally and externally as a producer, and was generally expected to perform all the functions of a producer.  *Id*.

producer, and each year they would reject his request saying he needed to grow his book of business just a bit larger. *Id*. Mr. Calder also bluntly stated, "there is no position here for someone like you in a sales role," in reference to Mr. Ferguson's sexual orientation. *Id*. The company reaped the benefits of the corporate retirement clients Mr. Ferguson generated but refused to honor its promise to officially return him to the role of producer. *Id*. Mr. Ferguson repeatedly complained about this discriminatory treatment and was always told by Mr. Calder and Mr. Peartree that if he pursued the matter his employment would simply be terminated. *Id*.

## IV.   MMA Securities LLC Further Discriminates Against Mr. Ferguson by Engaging in a Scheme to Steal his Clients

In the second half of 2018, things took a sharp turn for the worse. Around this time, the company was finalizing the transfer of corporate retirement plan clients from SagePoint/MMC Securities LLC to MMA Securities LLC. *Id*. The company emailed notices to this effect to all the corporate retirement plan clients including those of Mr. Ferguson. *Id*. In these notices, the company downplayed the significance of the change, stating it was a:

> natural part of the acquisition [by MMA] and something we have anticipated for quite some time. There will be no notice to employees required or any material impact to the plan or your participants, this is only administrative in nature. **Nothing about our team or the service you have come to expect from us will be changing. . . . The services we provide to [client's name] will remain the same** and the new agreement is very similar in scope to our previous agreement.

*Id*.; *see also* Ferguson Opp. Decl., Ex. B (June 13, 2018 Email). Accordingly, the company represented to Mr. Ferguson and his approximately 55 clients that nothing about the "team" or the service it provided would change, indicating that Mr. Ferguson would remain the Investment Advisor with respect to his corporate retirement plan clients.[3] *See* Ferguson Opp. Decl., ¶ 12.

---

[3]   Numerous communications to this effect were sent around the same time. *See* Ferguson Opp. Decl., ¶ 11.

However, in August 2018, Mr. Ferguson discovered that this representation was patently false.  *See* Ferguson Opp. Decl., Ex. A.  Specifically, on or about August 23, 2018, he learned that unlike other producers, his clients were not transferred to MMA Securities LLC in his own name but, instead, were assigned to "house accounts" to then be assigned to another producer.[4]  *Id*.  That producer, Jeff Stephens, was straight, had been recruited by Mr. Ferguson, and had a smaller book of business ($300,000 as opposed to the approximately $600,000 of Mr. Ferguson's).  *Id*.  The company had essentially concocted a scheme whereby it could defraud Mr. Ferguson of his clients and give them to his straight, less successful coworker, all the while stating that nothing would change.  *Id*.  When Mr. Ferguson later confronted Mr. Peartree about the stealing of his clients, Mr. Peartree acknowledged it, and also told Mr. Ferguson that his clients had been reassigned to Mr. Stephens because Mr. Stephens "**better represented the image the company would like to promote**."  *Id*.  In other words, the company preferred that Mr. Stephens interact with Mr. Ferguson's clients because he was not gay.  *Id*.

On August 23, 2018, Mr. Ferguson wrote to Mariane Liebowitz, Chief Compliance Officer for MMA Securities LLC to complain about the deception and the stealing of his clients:

> I need clarification on something.  In all the discussions we've had around transferring my book of business from Sagepoint to MMA I was told my book was transferring to MMA just like Bill and Ryan's – in my name.  The first time I saw "house account" mentioned I reached out via email to inquire and make sure all my accounts were still under my name for book and for commissions – and everyone involved promised that that [sic] my book . . . was still my book under my name with all commissions coded to me.
>
> **I've been informed this week that I was lied to and all my accounts were taken from me, coded as house accounts, so that someone else can get the benefit of the book I built.**
>
> Is this true?  Did everyone lie to me and my book of business has been stolen from me?

---

[4]      Mr. Ferguson was suspicious that something had occurred in July 2018 when he noticed he was no longer receiving updates on his book of business and he was being referred to differently.  *See* Ferguson Opp. Decl., ¶ 14.  However, his suspicions were not confirmed until on or about August 23, 2018.  *Id*.

*See* Ferguson Opp. Decl., Ex. C (August 23, 2018 Email).  Ms. Liebowitz failed to investigate the issue, so Mr. Ferguson continued raising his concerns about discrimination and the stealing of his clients to his supervisors and others.  *See* Ferguson Opp. Decl., ¶ 16.

On September 11, 2018, Mr. Ferguson met with Mr. Peartree, Mr. Calder (by phone), and CFO Hal Dunning in San Diego regarding the issue.  *Id*. at ¶ 17.  He once again complained about the disparate treatment to which he had been subjected including the scheme to defraud him of his clients.  *Id*. at ¶ 18.  Mr. Peartree, Mr. Calder, and Mr. Dunning ignored Mr. Ferguson's complaints and informed him they were going to remove any mention of "sales" with respect to his position, assign all his clients to Mr. Stephens, and give Mr. Stephens the lead sales position they had previously promised Mr. Ferguson.  *Id*. at ¶ 19.  They told Mr. Ferguson that despite his success they had never considered him a producer, and that if he did not accept a servicing position his employment would be terminated.  *Id*. at ¶ 20.  Mr. Ferguson responded that this was "probably illegal" and they agreed to come up with an offer to try to "make it worth his while" to stay.  *Id*. at ¶ 21.  Mr. Calder emailed Mr. Ferguson that proposal on September 12, 2018 and Mr. Ferguson responded that he would need some time to consider it.  *Id*. at ¶ 22.  Mr. Ferguson was not inclined to accept the discriminatory and retaliatory demotion, so he began to actively explore alternative employment including a role with Triad and Resources.  *Id*. at ¶ 23.  He also started clearing out his office, which Mr. Calder and Mr. Peartree observed.  *Id*. at ¶ 24.

On October 31, 2018, Mr. Ferguson was issued a new compensation agreement.  *See* Ferguson Opp. Decl., Ex. D (October 2018 Compensation Agreement).  That agreement provided, that he would continue to receive a 25% sales referral bonus as well as a 12% service bonus.  *Id*.  Pursuant to the agreement, for 2018, Mr. Ferguson was entitled to 25% of the business he referred to the company via Mr. Stephens (*i.e.*, $75,000), as well as 12% of the corporate retirement plan

fees he generated (*i.e.*, approximately $70,800), or approximately $146,000 in total.  *See Ferguson Opp. Decl.*, ¶ 26.  Mr. Ferguson queried multiple times when he would receive this bonus compensation, but Mr. Calder and Mr. Peartree consistently refused to pay it.  *Id*. at ¶ 27.  The company therefore breached its compensation agreement with Mr. Ferguson, failed to pay him wages, and further discriminated against him on account of his sexual orientation.

**V.    Jeff Calder Instructs Mr. Ferguson to Present his Clients with Two Options: (1) Stay with MMA Securities LLC and use Jeff Stephens as their Investment Advisor; or (2) Mr. Ferguson should "take them Somewhere Else"**

Following his discovery of the scheme to steal his clients, Mr. Ferguson began raising concerns about potential violations of law.  *Id*. at ¶ 28.  He disclosed that the company, in lying to his clients about who their Investment Advisor would be, had breached its fiduciary obligation to them and also potentially violated various statutes and regulations.  *Id*. at ¶ 29.  Specifically, by making false statements to his clients and/or omitting material facts, the company potentially violated, among other statutes and regulations, the Investment Advisors Act of 1940, the Employee Retirement Income Security Act of 1974, and FINRA Rules adopted by the SEC.  *Id*. at ¶ 30.  Mr. Ferguson relayed these concerns to Kim Blackmore, Chief Compliance Officer and Kevin Boller, Assistant Compliance Officer, as well as to Mr. Peartree.   *Id*. at ¶ 31.  Mr. Peartree ignored Mr. Ferguson's complaint and Ms. Blackmore conducted a cursory investigation without speaking to numerous critical witnesses.  *Id*. at ¶ 32.  Eventually, when the company could no longer stand Mr. Ferguson's complaints, it scheduled a meeting for December 20, 2018.

At the December 20, 2018 meeting, Mr. Calder, Mr. Peartree, and Mara Crain, Human Resources, told Mr. Ferguson that the company was very unhappy with his disclosures about clients being lied to and wanted to fire him.[5]  *See Ferguson Opp. Decl., Ex. E (Mr. Ferguson's

---

[5]        Mr. Ferguson emailed himself after the meeting to document the discussion. *See Ferguson Opp. Decl, Ex. E.

December 20, 2018 Notes).  Mr. Ferguson responded that his clients and he had, in fact, been lied to and the company had forgotten one important step: it couldn't move Mr. Ferguson's book of business without notifying and getting sign off from his clients.  *Id*.  Mr. Peartree then acknowledged he had lied to Mr. Ferguson and his clients and that it had been his intent all along to remove Mr. Ferguson as his clients' Investment Advisor and replace him with Mr. Stephens. *Id*.  Mr. Ferguson, as well as the others in the room, were shocked by Mr. Peartree's admission. *Id*.  Ms. Crain commented that, if Mr. Peartree had in fact lied to clients, "it was a violation of company policy and probably broke financial, employment, and other regulations."  *Id*.  Mr. Peartree then asked Mr. Ferguson to "craft a story" to tell his clients to make it seem as though Mr. Peartree and the company had not lied to them.  *Id*.  Ms. Crain was clearly uncomfortable with Mr. Peartree's instruction and attempted to backpedal, saying Mr. Peartree had not meant it and Mr. Ferguson should try and put things in a "proper perspective" for his clients.  *Id*.  In response, Mr. Ferguson pointed out that some of the clients had already fired Mr. Stephens and others had stated to him that they would leave if Mr. Ferguson was no longer their Investment Advisor.  *Id*.

At this point, Mr. Calder stated that he was okay "losing the clients if they don't want Jeff [Stephens] as their advisor."  *Id*.  He instructed Mr. Ferguson to tell  his "clients that they must accept Jeff Stephens as their new advisor or leave MMA" with Mr. Ferguson.  *Id*; *see also* Ferguson Opp. Decl., ¶ 35.  Mr. Ferguson asked if they were serious, pointing out that the employee benefits or commercial risk advisors who shared those clients might not be happy if they left.  *See* Ferguson Opp. Decl., Ex. E.  Mr. Calder confirmed the instruction, stating if they would not "accept Jeff Stephens they can leave MMA.  No other options."  *Id*.  If they would not agree to Mr. Stephens as their Investment Advisor, then Mr. Ferguson should "take them somewhere else."  *Id*; *see also* Ferguson Opp. Decl., ¶ 36.  Accordingly, Mr. Ferguson left the December 20,

2018 meeting understanding he had been instructed to present his clients with two options: (1) they could stick with the company and use Jeff Stephens as their Investment Advisor; or (2) he should take them elsewhere to another firm.  *Id*. at ¶ 37.  That same day, he emailed multiple people and confirmed his concerns regarding potential regulatory violations, said he could not stay with the company as the clients' named fiduciary advisor, and indicated he was going to start contacting clients to present the two options that same week:

> can you please send me the letter or verbiage you prepared for **telling my affected clients that Jeff Stephens is their new named fiduciary advisor and whatever final forms are needed to complete this takeover.  I can start contacting clients this week**.
>
> Obviously, I cannot stay the named fiduciary advisor/RIAR with all the personal liability and responsibility under ERISA and applicable regulations while Jeff collects the related income and has operational control per MMA.  No reasonable person would be comfortable in that situation.  **And I'm pretty sure it's not exactly in accordance with regulations** and definitely not with industry best practices.

*See* Ferguson Opp. Decl., Ex. F (December 20, 2018 Email).  In the weeks that followed, at no point did anyone from the company contact Mr. Ferguson and tell him he was not to speak with his clients and present these two options.  *See* Ferguson Opp. Decl., ¶ 38.

On January 3, 2019, Mr. Ferguson emailed Ms. Crain with copy to Mr. Calder and reiterated his concerns regarding potential statutory and regulatory violations and again noted he was contacting his clients regarding the two options:

> I respectfully request that you do further investigation to ascertain the correctness of the situation, of the letter, and allow me more time for my own review **given that the situation appears to possibly involve various violations of various regulations under FINRA, SEC, and ERISA**.
>
> . . .
>
> 1) In our recorded meeting on 12/20/18 Bill Peartree stated he, Kim Blackmore, and possibly others cooperated in planning and execution to have clients and myself sign certain paperwork that was designed to ultimately remove me as the named fiduciary investment advisor to my clients given that, as Bill stated in the meeting, he, Kim, and others knew that leaving me as the named fiduciary advisor with all liability and legal responsibility but having clients sign paperwork that gives all income and company instructed operational control to Jeff Stephens/someone else, is not in line with fiduciary

11

and financial regulations, thus would eventually result in removal of me as the named fiduciary advisor.  Further this was done without my or the clients specific knowledge or full understanding that this was the ultimate goal.  **Bill clearly stated in our meeting that the intent from the start was to remove me as the advisor.  You, Jeff Calder, and Bill Peartree said that I was wrong to call this collusion, and alluded that I must refer to this as 'business planning' or I will be terminated**.

. . .

As follow up to our meeting **you all instructed me to "craft a story" to the clients in "business planning" efforts to coincide with the original "crafted story" to get clients to sign additional paperwork removing me as their fiduciary investment advisor and naming Jeff Stephens**.  While I feel this was an inappropriate suggestion again to show good faith **per your instructions I have been reaching out to clients to tell them Jeff Stephens will be their new named fiduciary advisor due to the paperwork they signed. 100% of the clients contacted so far state this was not their understanding of what was originally told to them and presented to them when they signed the paperwork and have refused to sign additional paperwork making Jeff Stephens or anyone else their named fiduciary advisor**.  They have asked for some kind of clarification from me specifically and possible further actions including rescinding the original paperwork since they appear to have signed it under false pretenses.  They have stated that for the record they were led to believe I would remain as their named fiduciary investment advisor; the same as Bill or Ryan Stover are to their clients.

. . .

**If you feel the company would prefer to retaliate against me for being a whistleblower**, and terminate me for not signing this letter that I've clearly shown is not 100% correct, that is of course your right.

*See* Ferguson Opp. Decl., Ex. G (January 3, 2019 Email).  Thus, Mr. Ferguson once again notified Mr. Calder and Ms. Crain that he was contacting his clients to give them the two options.  *Id.*; Ferguson Opp. Decl., ¶ 40.  While he disagreed with it, he was even using the "story" the company had "crafted" in an effort to try and smooth things over with his clients and attempt to get them to stay with Mr. Stephens (as he had been instructed).  *Id.*, Ex. E.  Once again, Mr. Calder and Ms. Crain failed to tell Mr. Ferguson to cease contacting his clients.  *Id.* Ex. G.  Their subsequent emails to him discussed potential discipline – in retaliation for Mr. Ferguson's protected disclosures – but did not at any point instruct that he was to cease his communications.  *Id.* Additionally, during this time, Mr. Calder would regularly ask Mr. Ferguson how it was going with respect to giving his clients the two options and Mr. Ferguson would update him.  *See*

Ferguson Opp. Decl., ¶ 41.  Despite Mr. Ferguson openly contacting his clients and giving them the two options, nobody from the company ever instructed him to stop doing so until the day his employment was terminated.  *Id*. at ¶ 42.[6]

## VI.    Mr. Ferguson Contacts His Clients Pursuant to the Instruction

Following the December 20, 2018 meeting, Mr. Ferguson, pursuant to Mr. Calder's instruction, began contacting clients to present them with the two options.  *Id*. at ¶ 43.  He was not secretive about it, and instead did it openly, as he understood this what his supervisor, Mr. Calder had instructed him to do.  *Id*. at ¶ 44.  He presented the "business planning" narrative the company had asked him to relay in order to cover its deception and told his clients they could either stay with Mr. Stephens or leave with him to go to another firm.  *Id*. at ¶ 45.  As Mr. Ferguson is a fiduciary with respect to his clients, he could not simply leave them in the lurch and without corporate retirement plan coverage, so around this time he agreed to join, at a date to be determined, Triad and Resources as a RR/RIAR (with Teros as an outside marketing entity).  *Id*. at ¶ 46.  His plan was to resign on or about February 15, 2019.  *Id*. at ¶ 47.  He told his clients he would be moving to a new firm and that it was their choice to stay or leave with him.  *Id*. at ¶ 48.

The vast majority of his clients responded that they had no idea who Mr. Stephens was, had developed a relationship with Mr. Ferguson over the years, and wished to go with him to his new firm.  *Id*. at ¶ 49.  Mr. Ferguson communicated this in his January 3, 2019 email to Ms. Crain.  *See* Ferguson Opp. Decl., Ex. G.  Some of the clients asked Mr. Ferguson why MMA Securities LLC was forcing them to go with Mr. Stephens and Mr. Ferguson, as instructed, avoided a subject

---

[6]        Notably, two of the emails quoted by Plaintiff in the Complaint also confirm the instruction to Mr. Ferguson. Specifically, in a February 19, 2019 email following his termination, Mr. Ferguson wrote: "It's really odd b/c **I had an agreement with MMA on this change** since it's relatively minor."  *See* Compl. ¶ 67 (emphasis added).  Similarly, in an April 16, 2019 email, Mr. Ferguson wrote: "When I protested on the improper legalities, **MMA offered the option of changing to a different firm for those clients that wanted to keep as their advisor**; which turned out to be the better option for me and many clients."  *Id*. at ¶ 74.

he knew Mr. Calder and Mr. Peartree did not want discussed (the deception and the stealing of his book of business).  *See* Ferguson Opp. Decl., ¶ 50.  Some of the clients also asked Mr. Ferguson about the services his new firm could provide, and Mr. Ferguson referred them to publicly available resources and generally described the services.  *Id*. at ¶ 51.  Some of the clients also asked for additional information, which Mr. Ferguson said would be forthcoming.  *Id*. at ¶ 52.  Mr. Ferguson knew the clients/points of contact he reached out to by memory and did not in any way use or reference confidential information or trade secrets during these discussions.  *Id*. at ¶ 52.[7]

Mr. Ferguson, as instructed, also emailed some of his clients to announce his departure and schedule a time to discuss the two options.  *See* Compl., ¶¶ 51-58.  He announced his departure, asked to schedule a meeting or a call, and attempted to frame his departure and the potential change the same way the company had framed it during the summer (*i.e.*, as an easy change with "no notice to employees required or material impact to the plan or your participants").  *See* Ferguson Opp. Decl., Ex. B.  Mr. Ferguson again did not use any confidential information or trade secrets in contacting these clients.  *See* Ferguson Opp. Decl., ¶ 55.

Finally, on or about February 13, 2019, Mr. Ferguson forwarded himself his outlook contacts.  *See* Ferguson Opp. Decl., ¶ 56.  The outlook contacts were a mix of personal and business contacts, and Mr. Ferguson was not selective in choosing the contacts he forwarded to himself.  *Id*.  He was aware that MMA Securities LLC monitored his email and believed he had the right to forward them to himself pursuant to the Broker Protocol.  *Id*.  However, when he later tried to open

---

[7]        Plaintiff quotes in the Complaint from a February 12, 2019 follow-up email but omits crucial details.  *See* Compl. ¶ 50.  First, Mr. Ferguson, as instructed, spoke with this client and presented the two options, and the client told Mr. Ferguson that it wished to go with him and asked him to forward the paperwork necessary to change its advisory services.  *See* Ferguson Opp. Decl., ¶ 54.  Mr. Ferguson, in preparation for the transfer, did so and indicated the forms should be dated following his anticipated resignation date.  *Id*.  Second, the client ultimately did not go with Mr. Ferguson.  *Id*.  Third, the "fee reduction" was already in place at MMA Securities LLC and Mr. Ferguson was merely confirming the same reduced fee would be applicable at his new firm.  *Id*.  Mr. Ferguson did not offer any of his clients reduced fees.  *Id*.  Fourth, regarding benefits, Mr. Ferguson, in response to questions by some of his clients, referred them to publicly available resources and generally described the services his new firm provided.  *Id*.

the outlook contacts he was unable to do so and immediately deleted them.  *Id*.  He has never used the outlook contacts since forwarding them to himself.  *Id*.

## VI.   Mr. Calder Abruptly Terminates Mr. Ferguson's Employment in Retaliation for Mr. Ferguson's Complaints

On February 15, 2019, Mr. Calder emailed Mr. Ferguson and directed him to immediately call him.  *See* Ferguson Opp. Decl., ¶ 57.  When Mr. Ferguson did, Mr. Calder expressed his anger with respect to Mr. Ferguson's protected complaints.  *Id*. at ¶ 58.  He then abruptly terminated Mr. Ferguson's employment and told him to never again set foot on company property.  *Id*. at ¶ 59. Mr. Ferguson, in order to register with his next firm, needed written confirmation that he was no longer employed by MMA Securities LLC, so he sent a letter confirming the end of his employment that same day.  *Id*. at ¶ 60.  He was not, as Plaintiff asserts, preempting a termination – his employment had already been terminated.  He then adhered to Mr. Calder's instruction that he not set foot on company property and, when Ms. Crain instructed him to, immediately returned all company property.  *Id*. at ¶ 61.  He also followed procedures previously explained to him by Adrian Hillborne, MMA Bay Area IT Support Representative, regarding what he should do with respect to his laptop prior to returning it.  *Id*. at ¶ 62.

## VII.   Following His Termination, Mr. Ferguson is Free to Solicit His Clients Provided He Does Not Use the Company's Trade Secrets

Following his February 15, 2019 termination, Mr. Ferguson commenced employment with Triad and Resources and began reaching out to some of the clients he had not previously contacted. *Id*. at ¶ 63.  In so doing, Mr. Ferguson did not use any confidential information or trade secrets of MMA Securities LLC.[8]  *Id*. at ¶ 64.  Plaintiff repeatedly claims Mr. Ferguson used "MMA's

---

[8]   MMA does not actually have any confidential information or trade secrets.  *See* Ferguson Mtn. Decl., ¶¶ 16-18.  To the extent any such confidential information or trade secrets exist – and for the reasons discussed below they do not – they belong to MMA Securities LLC.  *Id*.

Confidential Information and Trade Secrets" to solicit these clients but, tellingly, does not actually identify the confidential information or trade secrets he supposedly used. *See, e.g.*, Compl., ¶¶ 68, 71, 75. Instead, Plaintiff makes these claims "upon information and belief." *Id*. The closest Plaintiff comes to identifying the supposedly confidential information or trade secrets is to claim Mr. Ferguson used his knowledge of "MMA's confidential pricing information" to solicit a single client *Id*. at ¶ 70. However, as discussed previously, the fee reduction with respect to this particular client was already being in place at MMA Securities LLC and the client was aware of it, rendering the pricing information neither confidential nor a trade secret. Additionally, the applicable fees in relation to corporate retirement plans are public information and the client at issue ultimately did not go with Mr. Ferguson. *Id*. at ¶¶ 54, 65.[9]

The reality of these corporate retirement plans is that information pertaining to them is readily available to the public. Not only is such information available via the Internet, companies' websites, and various publications, but every company that maintains such a plan is required to file a Form 5500 with the Department of Labor ("DOL") which is accessible to the public online at https://www.efast.dol.gov/portal/app/disseminate?execution=e1s1 (last visited June 20 2019). *Id*. at ¶ 66. A Form 5500 typically includes, among other information: the corporate entity; the type of plan; the name of the plan carrier and the plan carrier's contact information; the plan administrator's name and contact information; the plan dates; the number of plan participants; plan fees; and investment information including assets under management. *Id*. at ¶ 67. Mr. Ferguson had worked with his clients for years and developed relationships with them and he did not need

---

[9]     Mr. Ferguson did not, as Plaintiff claims, commence employment with his new firm prior to his termination. *See* Compl. ¶ 64. Preparation to compete, including but not limited to setting up an email account, is permissible under the applicable law. Additionally, Plaintiff's claim that Mr. Ferguson threatened his former colleagues is absurd. *Id*. at ¶¶ 65-66. A plain reading of Mr. Ferguson's email evidences he was merely letting his former colleagues know he had moved to a new firm and that they should work together with respect to their common clients. *Id*.

to or use any confidential information or trade secrets such as contact or pricing information in reaching out to them.  *Id*. at ¶ 68.  Even if he had, such information would in no way be confidential or a trade secret as it is publicly available.[10]

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 empowers a district court to issue a preliminary injunction on notice to the adverse party.  Fed. R. Civ. P. 65(a).  "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion."  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (emphasis in original).  "In order to justify a preliminary injunction, a movant must demonstrate 1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest weighs in favor of granting an injunction."  *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (quotation marks and internal citation omitted).

Irreparable harm "is the single most important prerequisite" for injunctive relief, and "[i]n the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied."  *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999); *see also USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1295 (2d Cir.1995) (irreparable harm is the "sine qua non for preliminary injunctive relief.").

---

[10]     It should also be noted that, as of this date, MMA has not properly effectuated service of the Complaint upon Mr. Ferguson.  A copy of the Complaint was left at 711 Mills Avenue, San Bruno, California, 94066, but Mr. Ferguson has never resided at that address, does not know the individual the Complaint was left with, and has never received the Complaint from that person or by mail.  *See* Ferguson Opp. Decl., ¶ 69.

<u>**ARGUMENT**</u>

**I.      Plaintiff Will Not Suffer Irreparable Harm Absent Injunctive Relief**

As a preliminary matter, MMA has no standing to bring the claims alleged in the Complaint; has failed to join a necessary and indispensable party warranting dismissal; and, in the alternative, must be compelled to arbitrate this matter.[11] *See* ECF No. 24, Def.'s Mem. of Law in Supp. of Mot. to Dismiss or in the Alternative to Compel Arbitration ("Def.'s Motion to Dismiss"). But even if MMA has standing – which it does not – it cannot demonstrate that it will suffer any injury, let alone irreparable harm, without injunctive relief.

**A.      Plaintiff's Delay in Prosecuting this Matter Evidences that the Alleged Risk of Harm is not Imminent**

"To satisfy the irreparable harm requirement, [a movant] must demonstrate that absent a preliminary injunction, it will suffer an injury that is neither remote nor speculative, but actual and imminent . . . ." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation and quotation marks omitted). The mere possibility of harm is not sufficient – the harm must be imminent and the movant must show "that it is *likely* to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

Here, MMA has no injury and therefore no risk of irreparable harm. As discussed in Def.'s Motion to Dismiss, MMA does not have any corporate retirement plan clients or any confidential information or trade secrets regarding the same. Def.'s Motion to Dismiss, pp. 10-12. Its specious claim that Mr. Ferguson will continue to breach his obligations to its subsidiary is unsupported by any evidence. *See* Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction ("Pl.'s Motion"), p. 25. It speculates that "it stands to lose additional client relationships

---

[11]      Should the Court dismiss this matter and compel arbitration, a request for permanent injunctive relief must be made before a FINRA arbitration panel. FINRA Code of Arbitration Procedure for Industry Disputes § 13804(b).

and goodwill," but does not actually have any client relationships or demonstrate that any supposed harm is either actual or imminent. *Id.* at p. 26.[12]

Moreover, despite claiming a risk of irreparable harm, MMA waited nearly *three months* before bringing this action on behalf of its subsidiary. MMA learned of the alleged misconduct by Mr. Ferguson in mid-February of this year, but did not file the present lawsuit until April 30, 2019. *See* Compl. ¶ 61. The nearly three-month delay by MMA demonstrates it did not believe there to be a risk of harm or that such a risk was imminent. If it had, it would have immediately sought injunctive relief in February, March, or even early or mid-April. It did not, and instead choose to wait an additional month and a half after Mr. Ferguson's California counsel sent her March 13, 2019 correspondence. MMA cannot now suddenly claim a risk of imminent and irreparable harm when it waited so long to prosecute this matter.[13]

Courts in this Circuit "typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998); *see also Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *see also, e.g., Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (no irreparable harm where plaintiff did not seek injunction until more than ten weeks after it learned

---

[12]    Even if MMA could demonstrate irreparable harm – which it unequivocally cannot – and was entitled to some measure of relief – which it is not – its remedy should be liquidated damages. "[A] permanent injunction need not issue where the former employer may be made whole in damages." *Pencom Sys., Inc. v. Shapiro*, 598 N.Y.S.2d 212, 212-13 (1st Dep't 1993). The agreement here provides for damages in the amount "equal to three (3) times the total fees and commissions received by the Company for [the redirected] business during the 12 months prior to the breach." This remedy, as drafted by MMA, should be MMA's only recourse, should any recovery ever be warranted.

[13]    MMA's actions with respect to expedited discovery further evidence it is not overly concerned about supposed imminent harm. MMA claimed in its Motion that expected discovery was necessary to ascertain the full extent of Mr. Ferguson's supposed misconduct. *See* Pl.'s Motion, p. 42. Yet, after being granted the right to take Mr. Ferguson's deposition, it waited more than a month to do so, and it only served its discovery requests this week. MMA would have acted much more expeditiously if it truly believed there to be a risk of imminent harm.

of the violations "directly"); *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, No. 99 Civ. 2213, 1999 WL 123501, at *4 (S.D.N.Y. Mar. 2, 1999) (denying injunction in part because of the seven-week delay in filing for it); *Hessel v. Christie's Inc.*, 399 F. Supp. 2d 506, 520-21 (S.D.N.Y. 2005) (two-month delay).  Here, MMA waited nearly three months to bring this action after learning of Mr. Ferguson's supposed misconduct.  It therefore cannot show a risk of imminent harm.

### B.      Plaintiff's Harm, if any, is not Irreparable

Additionally, MMA's allegation that Mr. Ferguson misappropriated its subsidiary's trade secrets and other proprietary information does not warrant a preliminary injunction.  *See Impax Media Inc. v. Ne. Advert. Corp.,* No. 17 CIV. 8272, 2018 WL 358284, at *6 (S.D.N.Y. Jan. 10, 2018).  The Second Circuit has drawn a distinction "between an individual who uses a trade secret and an individual who *disseminates* a trade secret" in raising a presumption of irreparable harm.  *Sasqua Grp., Inc. v. Courtney*, No. 10 Civ. 528 (ADS) (AKT), 2010 WL 3613855, at *12 (E.D.N.Y. Aug. 2, 2010), *report and recommendation adopted*, No. 10 Civ. 528 (ADS) (ETB), 2010 WL 3702468 (E.D.N.Y. Sept. 7, 2010) (emphasis in the original).  "Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118–19 (2d Cir. 2009).

MMA contends that Mr. Ferguson used proprietary information to steal customers, but there has been no evidence put forward to establish that Mr. Ferguson intends to disseminate or irreparably impair that information's value.  As such, the purportedly misappropriated information cannot support a claim that Plaintiff's injury "is actual and imminent."  *TGG Ultimate Holdings, Inc. v. Hollett*, No. 16 CIV. 6289 (VM), 2016 WL 8794465, at *4 (S.D.N.Y. Aug. 29, 2016) (collecting cases); *see also Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 966

(S.D.N.Y. 1996) (denying preliminary injunction and rejecting irreparable harm because "plaintiff contends only that it will suffer injury from defendants' use of the alleged trade secrets to lure customers away" and that, "under these circumstances, the only possible injury that plaintiff may suffer is loss of sales to a competing product").

In sum, Plaintiff's claims — the alleged breach of contract, tortious interference, misappropriation of trade secrets, and unfair competition, all of which allegedly resulted in a loss of customers — are not ones where imminent and irreparable harm warrants an injunction.  It is the kind of harm regularly compensated by monetary damages.  *See Stewart v. United States I.N.S.*, 762 F.2d 193, 199 (2d Cir. 1985) ("Mere injuries, however substantial, in terms of money, time and energy . . . are not enough to justify injunctive relief.") (internal quotation marks and citation omitted); *In re Faiveley Transp. Malmo AB*, No. 08 Civ. 3330 (JSR), 2009 WL 3270854, at *5 (S.D.N.Y. Oct. 7, 2009) (no imminent and incalculable harm where plaintiff put forward only "the declaration of one of its own employees" and had not shown "risk of losing more than certain specific contracts, a loss which can be compensated by money damages"); *Production Resource Group, LLC v. Oberman*, No. 03 CIV. 5366 (JGK), 2003 WL 22350939, at *7 (S.D.N.Y. Aug. 27, 2003) (no irreparable harm because "damages could be calculated, for example, by the amount of business that PRG allegedly lost to Oberman during the period it contends Oberman was not entitled to obtain that business.").  As MMA cannot show irreparable harm, it is not entitled to injunctive relief.  *See Impax Media*, *supra*,  2018 WL 358284, at *6 (denying preliminary injunction for failure to establish irreparable harm); *see also LG Capital Funding, LLC v. Vape Holdings, Inc.*, No. 16 Civ. 2217 (CBA) (LB), 2016 WL 3129185, at *4 (E.D.N.Y. June 2, 2016) (same).

**II.   Plaintiff has failed to show a likelihood of success on the merits or a serious question going to the merits to make them a fair ground for trial**

Even if MMA could show imminent and irreparable harm, it is unlikely to succeed on the merits under the doctrines of unclean hands and equitable estoppel, and because Mr. Ferguson did not misuse any trade secrets.

**A.   Plaintiff Brings Its Motion with Unclean Hands Because It Breached Its Agreement with Mr. Ferguson, Discriminated Against Him Because of His Sexual Orientation, and Instructed Him to Take Certain Customers**

Under California law,[14] "The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy.  He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." *Kendall–Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 978 (1999).

> This maxim is far more than a mere banality.  It . . . closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant . . . In California, the doctrine of unclean hands may apply to legal as well as equitable claims . . . and to both tort and contract remedies.

*Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 638 (1995), *as modified on denial of reh'g* (June 29, 1995) (citations and quotation marks omitted). "Whether the defense applies in particular circumstances depends on the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries." *Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 447 (2000).

Here, MMA has unclean hands with respect to all of its claims against Mr. Ferguson because, as Mr. Peartree admitted, it lied to Mr. Ferguson and his clients when it told them Mr. Ferguson would be the clients' Investment Advisor while intending, from the beginning, to transfer

---

[14]      California law is the substantive law applicable to all causes of action in this matter.  *See* Def.s' Motion to Dismiss, pp. 23-25.

his accounts to Mr. Stephens.  *See* Ferguson Opp. Decl., Ex. E.  These misrepresentations, made in bad faith, caused the clients to decide to leave MMA Securities LLC (as opposed to any conduct by Mr. Ferguson).  The situation is exacerbated by the fact that Mr. Calder's and Mr. Peartree's motivations were discriminatory and rooted in Mr. Ferguson's sexual orientation.  *Id.*, Ex. A.

Moreover, MMA has unclean hands because Mr. Calder directed Mr. Ferguson to contact and prepare to take his clients that did not want to work with Mr. Stephens, but later brought this action against him for doing exactly that.  *Id.*, Ex. E.  Additionally, prior to any action by Mr. Ferguson, the company breached its compensation agreement with him and thus the corresponding non-solicitation agreement by failing to pay him earned bonuses.  *Id.*, ¶¶ 26-27.  It also transferred his accounts to Mr. Stephens and terminated his employment because he is gay and made protected complaints.  *Id.*, Ex A, E.  As such, MMA's claims against Mr. Ferguson must fail under the doctrine of unclean hands.  *See, e.g., Forms Mfg., Inc. v. Edwards*, 705 S.W.2d 67, 69–70 (Mo. Ct. App. 1985) (where the company failed to pay employee his earned commissions and established minimum contributions without his consent "the trial court reasonably could have found that company was not entitled either to an injunction or to damages for employee's alleged breach of the restrictive covenant not to compete because of its own prior breach of the employment contract [which gave it unclean hands].").

**B.      Plaintiff Is Equitably Estopped from Bringing These Claims Because It Instructed Mr. Ferguson to Contact His Clients and Take Them Elsewhere**

Under California law, "[e]stoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd*., 30 Cal. App. 4th 54, 59 (1994) (citing cases).

"Four elements must ordinarily be proved to establish an equitable estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury."  *DRG/Beverly Hills, supra,* at 59 (citation and quotation marks omitted).  The doctrine of estoppel has also been codified in California Evidence Code Section 623: "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."[15]

Here, all of MMA's claims relate to Mr. Ferguson's allegedly unlawful solicitation of his clients.  However, MMA is equitably estopped from bringing these claims as Mr. Calder instructed Mr. Ferguson to present his clients with a choice (either stay with MMA Securities LLC or leave with him to join another firm), was aware that he was doing so, and then abruptly changed its mind and terminated his employment and commenced this lawsuit.  Specifically, on December 20, 2018, Mr. Calder was clear with Mr. Ferguson that he should "craft a story" and tell his clients they could either stay with MMA Securities LLC and Mr. Stephens "or leave MMA" and Mr. Ferguson should "take them somewhere else."  *See* Ferguson Opp. Decl., Ex. E; *Id*. at ¶ 35.  Mr. Ferguson asked Mr. Calder to confirm the instruction and Mr. Calder did so.  *Id*. at ¶ 36.  Mr. Ferguson's clients either had to "accept Jeff Stephens" or "they can leave MMA.  No other options."  *Id*., Ex. E.  Mr. Ferguson confirmed this instruction via an email to himself shortly after the meeting.  *Id*.

---

[15]   Similarly, under New York law, the "doctrine of equitable estoppel can be raised 'where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.'"  *Garrett v. Music Publ'g Co. of Am., LLC*, 740 F.Supp. 2d 457, 463-64 (S.D.N.Y.2010) (quoting *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001)).

Thereafter, Mr. Ferguson repeatedly notified Mr. Calder and Mr. Peartree that he was contacting his clients and giving them this choice.  Specifically, on December 20, 2018, he emailed the individuals at the December 20, 2018 meeting and asked them for a "letter or verbiage . . . for telling my affected clients that Jeff Stephens is their new named fiduciary advisor and whatever final forms are needed to complete this takeover."  *Id*., Ex. F.  He added, "I can start contacting clients this week."  *Id*.  Then, on January 3, 2019, Mr. Ferguson emailed Ms. Crain and Mr. Calder:

> per your instructions I have been reaching out to clients to tell them Jeff Stephens will be their new named fiduciary advisor due to the paperwork they signed.  **100% of the clients contacted so far state this was not their understanding of what was originally told to them and presented to them when they signed the paperwork and have refused to sign additional paperwork making Jeff Stephens or anyone else their named fiduciary advisor**.  They have asked for some kind of clarification from me specifically and possible further actions including rescinding the original paperwork since they appear to have signed it under false pretenses.  They have stated that for the record they were led to believe I would remain as their named fiduciary investment advisor; the same as Bill or Ryan Stover are to their clients.

*Id*., Ex. G (emphasis added).  During this time, Mr. Calder also regularly asked Mr. Ferguson how it was going with respect to giving his clients this choice, and Mr. Ferguson would update him.  Indeed, multiple emails quoted by Plaintiff in the Complaint confirm Mr. Ferguson's understanding that he had been instructed to present his clients with this choice.  *See* Compl. ¶¶ 67, 74 ("It's really odd b/c I had **an agreement** with MMA on this change since it's relatively minor"; "When I protested on the improper legalities, **MMA offered the option of changing to a different firm for those clients that wanted to keep me as their advisor**") (emphasis added).

Thus, not only did Mr. Calder instruct Mr. Ferguson to present his clients with this choice and "take them somewhere else" if they would not accept Mr. Stephens, he and others were well aware that Mr. Ferguson was doing so.  Mr. Calder was Mr. Ferguson's immediate supervisor, and Mr. Ferguson risked being deemed insubordinate if he did not follow his instruction.  Accordingly, he did so, contacting his clients in January 2019 and doing so openly.  He even updated the relevant

parties, letting them know that nearly 100% of his clients were refusing to go with Mr. Stephens. It was only later, when Mr. Calder and the company grew tired of Mr. Ferguson's complaints of sexual orientation discrimination and other violations, that they performed an about-face and abruptly fired Mr. Ferguson and initiated this lawsuit.  Accordingly, Mr. Calder and MMA knew that Mr. Ferguson was presenting his clients with a choice and preparing to take them to another firm, and intended that their instruction be relied upon.  Mr. Ferguson was ignorant of their true intentions and acted upon their instruction and statements to his detriment.  MMA is therefore estopped from bringing its claims related to Mr. Ferguson allegedly unlawfully soliciting his clients.  *See IKON Office Sols., Inc. v. Am. Office Prod., Inc.*, 178 F. Supp. 2d 1154, 1161-1166 (D. Or. 2001), *aff'd*, 61 F. App'x 378 (9th Cir. 2003) (estopping plaintiff from enforcing non-competition agreements where it induced defendants to believe they were not bound by them and observing plaintiff "cannot now deny its own representations in order to recover damages for a largely self-inflicted wound."); *DRG/Beverly Hills, Ltd.*, 30 Cal. App. 4th at 59 (1994).

### C.  Plaintiff Is Unlikely to Prevail on Any Cause of Action

In addition to the grounds of unclean hands and estoppel discussed above, MMA is unlikely to succeed on the merits of its claims against Mr. Ferguson or demonstrate a serious question going to the merits of each claim for the reasons set forth below.[16]

### i.  Breach of Contract (Claim I)

MMA is unlikely to succeed on its breach of contract claim because, as discussed above, Mr. Ferguson's supervisor directed him to contact his clients and take them to another firm if they did not want to go with Mr. Stephens as their Investment Advisor.  MMA cannot argue Mr.

---

[16]     As an initial matter, Defendant notes that each of the causes of action in this case arguably belong to MMA Securities LLC and not MMA.  *See* Def.'s Motion to Dismiss, pp. 10-12.  MMA has no corporate retirement plan clients and no confidential information or trade secrets regarding the same.  As MMA has no injury-in-fact with respect to the claims, it is unlikely to prevail with respect to any of the causes of action.

Ferguson supposedly breached an agreement when, to the extent he did, it instructed him to do so. Further, MMA is unlikely to succeed on its breach of contact claim because (1) the restrictive covenant agreement at issue is void as a matter of California law; (2) a claim for breach of contract via the use of trade secrets is actually a claim for tort; (3) even if New York law is the applicable law – which it is not – MMA is still unlikely to prevail because Mr. Ferguson did not use any information that was not publicly available to allegedly solicit his clients; and (4) the restrictive covenants are unreasonable and therefore unenforceable.

First, Under California law, which applies here (*see* Def.'s Motion to Dismiss, pp. 23-25), the restrictive covenant agreement at issue is unenforceable as it is contrary to the public policy of the State of California, which "strongly favors 'open competition and employee mobility,' and protects the legal right of individuals to practice their business, profession or trade, including the right to solicit a former employer's customers[.]." *Pollara v. Radiant Logistics Inc.*, No. CV 12-344 GAF (JEMX), 2014 WL 12585781, at *1 (C.D. Cal. June 6, 2014) (quoting *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946-47 (2008)).

Cal. Bus. & Prof. Code § 16600 ("Section 16600") provides that, subject to certain statutory exceptions inapplicable here, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." This absolute bar on contractual restrictions repudiated the earlier, common law rule that allowed "[reasonable] restraints on the practice of a profession, business, or trade." *Edwards*, *supra*, at 945; *The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1235-36 (2009). "Thus, unless a contractual restraint falls into one of section 16600's three statutory exceptions [inapplicable here], it ostensibly is void." *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc*., 28 Cal. App. 5th 923, 935 (Ct. App. 2018).

Here, the restrictive covenant at issue is void under Section 16600.  Indeed, the covenant is broadly worded and prevents Mr. Ferguson, for *two years* following the separation of his employment with the company, from:

> directly or indirectly us[ing] Confidential Information and Trade Secrets or related information regarding the Company, the Company's clients and its prospective clients to solicit clients or prospective clients of the Company [with which Mr. Ferguson had contact during the last two years prior to the separation] for the purpose of selling or providing products or services of the type sold or provided by [Mr. Ferguson] while employed by the Company.

*See* Declaration of Crain in Support of Pl.'s Motion, Ex. A.

This provision clearly restrains Mr. Ferguson from practicing his chosen profession – advising corporate clients with respect to their retirement plans – because it precludes him from giving such advice to clients who choose to work with him as opposed to MMA Securities LLC. It is also vague and impermissibly broad with respect to "contact," stating "contact" means any "interaction between Employee and the client [or prospective client] which takes place to further the business relationship [or obtain the business]." *Id.*  Given this, the non-solicitation covenant is void as a matter of California law and the breach of contract claim (*see* Pl.'s Motion, p. 30) will fail as a matter of law.  *See, e.g., Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 575 (2009) (finding a broadly worded non-solicitation clause preventing employees from rendering any service to "any of the accounts, customers or clients with whom they had contact during their last 12 months of employment" void under section 16600); *AMN Healthcare, supra*, at 936 (non-solicitation provision void under Section 16600 because it prevented defendants, for a period of one year, from soliciting former employer's employees).

Further, to the extent MMA argues Mr. Ferguson breached the agreement by using its trade secrets, such a claim falls under a different cause of action and does not render the contractual non-solicitation provision enforceable.  *See AMN Healthcare, supra*, at 940 (describing the tension

between trade secrets and Section 16600 and concluding that utilizing trade secrets information is wrongful "independent of any contractual undertaking" and is not an exception to Section 16600) (citing *Galante*, *supra*, at 1238(2)).   In *Galante*, *supra*, at 1238, the court held that Section 16600 barred it from "enforcing . . . a *contractual* clause purporting to ban a former employee from soliciting former customers to transfer their business away from the former employer to the employee's new business, but a court may enjoin *tortious* conduct (as violative of either the Uniform Trade Secrets Act and/or the Unfair Competition Law)" (emphasis in the original).

The same holds true here.  MMA claims that Mr. Ferguson breached the agreement by using its confidential information and trade secrets to solicit his clients.  Pl.'s Motion, p. 30.  *AMN Healthcare* and *Galante* clearly state that such a claim is actually a claim for tort as opposed to breach of contract.  This is because, as discussed above, Section 16600 is unambiguous in its bar on restraints from engaging in a lawful profession and has no exceptions, save for the three statutory exceptions inapplicable here.  As the *Edwards* court noted: "if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect." *Edwards, supra*, at 950.

Even if New York law is the applicable law – which it is not – MMA would still be unlikely to prevail on this cause of action because Mr. Ferguson did not use any information that was not publicly available to allegedly solicit his clients.  It is well settled under New York law that "when an employer's past or prospective customers' names are readily ascertainable from sources outside its business, trade secret protection will not attach and solicitation by the employee will not be enjoined." *Devos, Ltd. v. United Returns, Inc.*, 57 Misc. 3d 1211(A) (N.Y.Sup. 2017) (citing *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.,* 42 N.Y.2d 496, 499 (1977)).

Here, MMA does not identify the "Confidential Information and Trade Secrets" Mr. Ferguson supposedly used in soliciting his clients.  Pl.'s Motion, p. 30.  Rather, it makes its claim "upon information and belief" (Compl. ¶¶ 68, 71, 75), which, even in a verified complaint, does not constitute evidence.  *Medina v. Hunt*, No. 9:05-CV-1460, 2008 WL 4426748, at *10 (N.D.N.Y. Sept. 25, 2008).  Regardless, to the extent MMA is referring to corporate retirement plan client names, points of contact, contact information, pricing information, or investment information, such information is all publicly available via companies' websites, free publications, and the Form 5500s which are accessible to the public.  Ferguson Opp. Decl., ¶¶ 65-67; *see also Devos, supra,* 57 Misc. 3d 1211(A) (citing *Columbia Ribbon, supra* at 499).  Moreover, as a matter of law, pricing data and market strategies do not constitute trade secrets, and an employee's recollection of information pertaining to the specific needs and business habits of particular customers is not confidential.  *Devos, supra*, 57 Misc. 3d 1211(A) (citing *Marietta Corp. v. Fairhurst,* 301 A.D.2d 734, 738 (N.Y. 3d Dept. 2003); *Natural Organics, Inc. v. Kirkendall,* 52 AD3d 488, 489 (N.Y. 2d Dept. 2008)).  Mr. Ferguson has worked with his clients for years, knows their needs, primary decision makers, and business habits by memory, and did not in any way use or reference any confidential information or trade secrets in any communication.  Ferguson Opp. Decl., ¶ 68.[17]

The restrictive covenants at issue are also unreasonable and therefore unenforceable under New York law.  "Because covenants not to compete restrain trade, New York courts rigorously examine such covenants before enforcing them."  *Baker's Aid v. Hussmann Foodservice Co.,* 730

---

[17]     MMA makes much of the fact that Mr. Ferguson forwarded himself his Outlook contacts, but he was unable to access them, deleted them immediately, and has never used them.  Ferguson Opp. Decl., ¶ 56.  Similarly, MMA's argument that Mr. Ferguson breached the agreement by announcing his departure (Pl.'s Motion, p. 30) is also misplaced.  First, as noted, Mr. Ferguson was instructed to do this by Mr. Calder.  Second, he did not use confidential information or trade secrets to make these announcements and thus was not in violation of the non-solicitation covenant as defined in the agreement and pursuant to applicable law.  Finally, he is permitted to announce his departure under the law.  *See Aetna Bldg. Maint. Co. v. West*, 39 Cal. 2d 198, 203 (1952) ("[employee] had the right to advise [employer's] customers that he was severing his business relations with it and engaging in business for himself.").

F. Supp. 1209, 1213 (E.D.N.Y. 1990). The focus of this rigorous examination is "reasonableness." A restrictive covenant will be enforced only "if it: (1) is no greater than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (1999) (citing *Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 307 (1976)) (emphasis in original). The burden is on the former employer to prove all three prongs; a failure to satisfy any of the three prongs renders the covenant invalid. *Id.* at 388-389.

MMA vaguely characterizes its legitimate interest as "confidential information relating to its clients" and the goodwill it supposedly developed regarding the same. Pl.'s Motion, pp. 27-28. However, such vague assertions regarding confidential information do not suffice to establish a trade secret MMA would have a legitimate interest protecting, particularly given the evidence submitted by Mr. Ferguson showing this type of information is readily available. *Business Networks of N.Y. Inc. v. Complete Network Solution*, 265 A.D.2d 194, 194 (1st Dept. 1999).

Similarly, *BDO Seidman* establishes an exception for client goodwill with respect to clients who came to the employer solely to avail themselves of the employee's services and only as a result of his or her own independent recruitment efforts, which the employer neither subsidized nor otherwise financially supported as a part of a program of client development. 93 N.Y.2d at 391-93; *see also Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 294 (E.D.N.Y. Jan. 10, 2013) ("employees do not run afoul of a firm's non-compete clause . . . where they retained business through their own independent efforts, unassisted by the firm"). Mr. Ferguson developed clients on his own and they came to MMA Securities LLC specifically to work with him. *See* Ferguson Opp. Decl., ¶ 6. At best, MMA has made a generalized, non-client specific showing that it contributed to the maintenance of client relationships. It has made no showing that it contributed

to the creation of any particular client relationship. *BDO Seidman* requires both in order for an employer to asset a legitimate, protectable interest in preventing post-employment competition. *See, e.g., Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*, 8 Misc. 3d 412, 422 (N.Y.Sup. 2005) (denying injunction where plaintiff "failed to demonstrate that it contributed meaningfully to the generation of goodwill with respect to the disputed clients").

The restrictive covenants are also overbroad and should be voided because they exceed the scope of any legitimate interest of MMA in protecting goodwill, and the broad definition of "Confidential Information and Trade Secrets" asserted by MMA exceeds the limits of what New York courts recognize as confidential. *See*, *e.g.*, *Arthur J. Gallagher & Co. v. Marchese*, 36 Misc. 3d 1219(A) (N.Y.Sup. 2011) ("[C]ustomer lists and contact information, where, as here such information is readily obtainable, as well as an employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential . . . .") *aff'd by* 96 A.D.3d 791 (2d Dept. 2012).

Finally, the restrictive covenants do impose an undue hardship as they preclude Mr. Ferguson from soliciting any of his clients, particularly those that he developed independently and which wish to continue working with him. *See* Ferguson Opp. Decl., ¶ 6. Enforcement of the covenant would restrain the clients' freedom of choice to follow Mr. Ferguson, violating "powerful considerations of public policy" and imposing undue hardship. *Columbia Ribbon, supra*, at 499. The restrictions therefore injure the public and are unreasonable and void as against public policy. *See Bijan Designer for Men, Inc. v. Katzman*, No. 96 CIV. 7345 (BSJ), 1997 WL 65717, at *6, n.9 (S.D.N.Y. Feb. 7, 1997); *First Empire Sec., Inc. v. Miele*, 17 Misc. 3d 1108(A) (N.Y.Sup. 2007) ("to the extent that the restrictive covenant . . . attempts to prevent the Respondent from taking

orders from former clients who contact him without solicitation by the Respondent, it is not reasonable.").  For these reasons, MMA is unlikely to succeed on its breach of contract claim.

### ii.      Violation of Unif. Trade Secrets Act, Civil Code 3246-3246.10 (Claim X)[18]

Defendant next addresses Plaintiff's Trade Secrets Act claim as Plaintiff's claims essentially boil down to the allegation that Mr. Ferguson is using trade secrets to solicit his clients. Plaintiff is unlikely to succeed on this claim because it cannot show the existence of a trade secret or that Mr. Ferguson misappropriated it.  To state a claim for misappropriation of trade secrets under CUTSA, a plaintiff must allege (1) the existence of a trade secret and (2) misappropriation of the trade secret.  *Gabriel Tech. Corp. v. Qualcomm Inc.*, No. 08 CV 1992, 2010 WL 3718848, at *8 (S.D.Cal. Sept. 20, 2010).  A trade secret is:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).  A plaintiff is required to "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or

---

[18]      As an initial matter, the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426–3426.11, "provides the exclusive remedy for trade secret misappropriation under California law. . . . CUTSA therefore preempts all claims that are based on the same nucleus of facts as the misappropriation of trade secrets claim for relief."  *Ikon Office Sols., Inc. v. Rezente*, No. 2:10-1704 WBS KJM, 2010 WL 5129293, at *3 (E.D. Cal. Dec. 9, 2010); *see also K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.* 171 CA4th 939, 958 (2009) (UTSA can operate to preempt common claims such as breach of confidence, tortious interference with contract, and unfair competition); *NetApp, Inc. v. Nimble Storage, Inc.* 41 F.Supp.3d 816, 839 (N.D.C.A. 2014) (plaintiff's allegations regarding trespass to chattel and unfair competition stemmed entirely from "misappropriation of proprietary information, and are thus preempted"); *Digital Envoy, Inc. v. Google, Inc.*  370 F.Supp.2d 1025, 1034-1035 (N.D.C.A. 2005) (UTSA preempts UCL claim based on "identical nucleus of facts" alleged in UTSA trade secrets misappropriation claim); *Ikon, supra,* 2010 WL 5129293, at *3 (dismissing interference with prospective economic relations claim as preempted by CUTSA).  Therefore, Plaintiff's claims III-VII are preempted by CUTSA as these claims are based on the same nucleus of facts as the alleged misappropriation of trade secrets under CUTSA.

of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Tech., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir.1998) (internal quotation mark omitted).

MMA cannot show the existence of a trade secret or that Mr. Ferguson misappropriated it. It vaguely alleges the existence of the following trade secrets: customer lists; a compilation of contact information for clients' decision makers (including the names of clients, the names of key decision makers, the physical address, telephone number and email address for the key decision maker); and pricing information. Pl.'s Motion, pp. 13, 37-38. However, "an unadorned list of clients, even one labeled 'secret' or 'confidential,' does not constitute a protectible trade secret all on its own . . . To be protectible, the list must still offer some 'independent economic value,' which normally requires that it include important information not readily available to the public. . . . In contrast, such lists are not protectible trade secrets when they simply embody information which is readily ascertainable through public sources, such as business directories." *Pollara v. Radiant Logistics Inc.*, No. CV 12-344 GAF (JEMX), 2014 WL 12585781, at *5 (C.D. Cal. June 6, 2014) (citations and quotation marks omitted). Moreover, it is MMA's burden to "show that the list had some inherent information that converted apparently public information into a trade secret." *Id.*

MMA is also unlikely to meet its burden of showing that the alleged client lists and compilation of contact information amount to trade secrets because this information is publicly available. As noted above, not only is such information available via companies' websites and publications, but every company that maintains a plan is required to file a Form 5500 with the DOL, which is easily accessible to the public online and includes, among other information: the corporate entity; the type of plan; the name of the plan carrier and the plan carrier's contact information; the plan administrator's name and contact information; the plan dates; the number of plan participants; and investment information including assets under management. *See* Ferguson

Opp. Decl., ¶¶ 65-67; *Pollara*, 2014 WL 12585781, at *4 (customer lists not trade secrets where such lists included nothing more than customer names, physical addresses, email addresses, and phone numbers and there was no evidence that any of this information was non-public.).

With respect to pricing information, the only relevant allegation pertains to a single client and, as noted, the fee reduction with respect to this particular client was already in place at MMA Securities LLC and the client was aware of it, rendering the pricing information neither confidential nor or a trade secret.[19]  Ferguson Opp. Decl., ¶ 54.  Pricing information with respect to corporate retirement plans is also available to the public, meaning it cannot be a trade secret. *Id*. at ¶¶ 65-67.  Additionally, Mr. Ferguson's relationships with his clients do not amount to trade secrets under California law.   *See Pollara,* 2014 WL 12585781at *6 ("California law unambiguously holds that a former employee's relationships with customers are not protectible as trade secrets"); *Advantacare Health Partners v. Access IV, Inc*., 2003 U.S. Dist. LEXIS 26093, at *6 (N.D. Cal. Oct. 24, 2003) (knowledge of referral sources and relationships developed with sources are not trade secrets); *The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009) ('it is not the solicitation of the former employer's customers . . . that may be enjoined')."

Finally, the fact that Mr. Ferguson announced his departure to his clients while still employed at MMA Securities LLC does not constitute misuse of trade secrets under CUTSA.  *Hilb, Rogal & Hamilton Ins. Servs. v. Robb*, 33 Cal. App. 4th 1812, 1821 (1995) (no misuse of trade secrets where former employee informed clients of his change in employment and then complied with their instructions to move their accounts or to seek a quote on a desired product.).  For these reasons, MMA is unlikely to succeed on this claim.

---

[19]     This client also did not ultimately go with Mr. Ferguson.  Ferguson Opp. Decl., ¶ 54.

### iii.     Breach of Duty of Loyalty (Claim II)

MMA is also unlikely to succeed on its breach of the duty of loyalty claim because (1) it is precluded by the doctrine of economic loss; and (2) Mr. Ferguson was allowed to and instructed by MMA to make departure announcements to his clients.

Where, as here, plaintiff's duty of loyalty claim is based on defendant's alleged breaches of contract, the doctrine of economic loss precludes the claim.  *See, e.g., BNSF Ry. Co. v. San Joaquin Valley R. Co*., No. 1:08-CV-01086-AWI-SMS, 2011 WL 3328398, at *5 (E.D. Cal. Aug. 2, 2011) ("A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations") (citing California law); *Erlich v. Menezes*, 21 Cal. 4th 545, 552 (1999) ("[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." (citation omitted)); *Snap! Mobile, Inc. v. Croghan*, No. 18-CV-04686-LHK, 2019 WL 884177, at *9 (N.D. Cal. Feb. 22, 2019) (declining to strike economic loss doctrine defense against breach of duty of loyalty cause of action); *AMN Healthcare,* at 941 ("AMN's attempt to turn a garden-variety contract cause of action against [individual defendant] into a tort-based breach of duty of loyalty cause of action fails as a matter of law.").

Here, MMA argues Mr. Ferguson breached his duty of loyalty by "providing information MMA treats confidential to a competitor for purposes of attracting the business to his new employer, Teros, and by soliciting MMA's clients to leave MMA and move to Teros while he was still actively employed by MMA."  Pl.'s Motion, pp. 31-32.  Essentially, this is an argument that Mr. Ferguson breached Sections 1(b) and 2(b) of the contract, which prohibit him from disclosing confidential information and trade secrets and using them to solicit clients.  This is not a tort claim.

*AMN Healthcare, supra*, is instructive here.  In that case, an individual defendant, prior to resigning, e-mailed a document containing information regarding plaintiff's employees to her

personal e-mail address and, later that day, forwarded to a competitor a proprietary e-mail sent by plaintiff's senior manager containing information regarding the competitor (including a strategy for competing with that competitor). The plaintiff alleged both documents contained confidential information as defined in its confidentiality agreement, including trade secrets. *AMN Healthcare*, at 930. Based on these facts, the plaintiff claimed a breach of the duty of loyalty by the defendant. The court, however, found that this cause of action failed because the restrictive covenant was void under Section 16600, and further concluded that "to the extent [the individual defendant] owed any duty to [plaintiff] not to disclose alleged [] confidential information, that duty arose from the [confidentiality agreement] and any breach of such duty would be grounded in contract, not tort. *AMN Healthcare,* at 941. Similarly, here, Plaintiff's breach of duty of loyalty claim is unlikely to succeed because it is actually a breach of contract claim, which in turn will fail because the non-solicitation provision, as discussed above, is void under Section 16600.

Second, Mr. Ferguson was not only instructed to advise his clients that he was severing his relationship with MMA Securities LLC (*see* Ferguson Opp. Decl., Ex. E, F, G; *id.* at ¶¶ 34-37), but he had the right to do so. As a matter of law, such communications to clients do not constitute a breach of duty of loyalty. *See Aetna Bldg. Maint. Co. v. West*, 39 Cal. 2d 198, 203 (1952) ("[employee] had the right to advise [employer's] customers that he was severing his business relations with it and engaging in business for himself.").

Moreover, Mr. Ferguson was allowed to discuss his new employer's services upon request from his Clients. *Id.* at 204 ("willingness to discuss business upon invitation of another party [does not] constitute solicitation on the part of the invitee."). *See also Aerotek, Inc. v. Johnson Grp. Staffing Co., Inc.*, No. C067652, 2013 WL 3947750, at *9 (Cal. Ct. App. July 30, 2013) (applying the common law "rule for announcements" established in *Aetna, supra*, to the cause of action under

37

UTSA and holding that "[t]he fact [employee] made his announcement of new employment in person or by phone does not, by itself, establish he impermissibly asked for business of [those customers].").  Plaintiff, therefore, is unlikely to succeed on its breach of the duty of loyalty claim.

### iv.    Tortious Interference (Claim III)[20]

MMA's tortious interference claim, like it's other claims, will likely fail because Mr. Calder instructed Mr. Ferguson to contact his clients and give them the choice to either stay or leave with him and join another firm.  Moreover, to succeed on this claim under California law, MMA must prove that the "interference was wrongful, independent of its interfering character." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 944 (2008) (*citing Della Penna v. Toyota Motor Sales, U.S.A.*, Inc. 11 Cal.4th 376, 392–39 (1995) "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Id.* (quoting *Korea Supply Co. v. Lockheed Martin Corp*. 29 Cal.4th 1134, 1159 (2003)).  Here, Mr. Ferguson did not commit any wrongful act because, under Section 16600, he had the right to engage in his "lawful profession, trade, or business," including soliciting his clients.  *See AMN Healthcare, supra,* at 941–42 (granting defendant summary judgement on plaintiff's tortious interference claim).  The extent of MMA's argument on this point is to vaguely assert that Mr. Ferguson used MMA's "pricing" information.  Pl.'s Motion, p. 33. However, as discussed previously, pricing information with respect to corporate retirement plans is readily available from a number of public sources including, but not limited to, Form 5500s. *See* Ferguson Opp. Decl., ¶¶ 65-68.  As MMA is unable to demonstrate Mr. Ferguson committed a wrongful act with respect to any alleged solicitation, it is unlikely to succeed on this claim.

---

[20]    As discussed above, this claim is likely preempted by CUTSA.  *See, supra*, Section II(C)(ii).

> **v.** **Unfair Competition (Claim IV); Violation of California Business and Professions Code Section 17200 (Claim V); and Misappropriation of Confidential Information (Claim VI)[21]**

MMA's claims of unfair competition and misappropriation of confidential information are likely to fail for several reasons.  First, MMA's cause of action for misappropriation of confidential information is unlikely to succeed because Section 16600 "precludes an employer from restraining an employee from engaging in his or her 'profession, trade, or business,' *even if such an employee uses information that is confidential but not a trade secret*."  *AMN Healthcare*, at 940 (citing *The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226 (2009) (emphasis added)).  As such, MMA will be unable to show that Mr. Ferguson misappropriated confidential information in order to solicit his clients.  Second, Mr. Ferguson did not misappropriate any confidential information because all of the information at issue is publicly available and therefore neither confidential nor a trade secret. *See* Ferguson Opp. Decl., ¶¶ 65-67.  MMA vaguely asserts that Mr. Ferguson is in possession of confidential information concerning its clients, contact information, decision makers, and pricing information (Pl.'s Motion, pp. 32-33), but such information is readily ascertainable through public sources and therefore not confidential.  Ferguson Opp. Decl., ¶¶ 65-67.  Third, MMA's speculative claim that Mr. Ferguson has "or will" use this non-confidential information demonstrates that it has no evidence Mr. Ferguson has actually done so.  Pl.'s Motion, p. 33.  In fact, Mr. Ferguson avers he was unable to access and immediately deleted his Outlook contacts and has not at any point in time used any confidential information or trade secrets.  Ferguson Opp. Decl., ¶ 56.

Because MMA is unlikely to succeed on any of the claims discussed above, its derivative unfair competition claims are also likely to fail.  *See AMN Healthcare*, at 950 ("By proscribing 'any unlawful' business practice, 'section 17200 'borrows' violations of other laws and treats them

---

[21]       As discussed above, these claims are likely preempted by CUTSA.  *See, supra*, Section II(C)(ii).

as unlawful practices' that the unfair competition law makes independently actionable. . . . Thus, when the underlying legal claim fails, so too will a derivative UCL claim.") (citations omitted).

### vi.   Violation of California Labor Code Sections 2860 and 2862 (Claim VII)[22]

As an initial matter, the Complaint has no Claim VII and is missing page 35. *See* Compl., pp. 34, 36.  As such, Defendant has not been properly served[23] or given due notice of this cause of action.  Additionally, this claim appears to be largely duplicative of the other claims in that it alleges Mr. Ferguson forwarded his contact to himself and then used them to solicit his clients. Pl.'s Motion, p. 34.  For the reasons previously discussed including, but not limited to, that corporate retirement plan contacts are not confidential information and Mr. Ferguson has not used any such information to allegedly solicit his clients, this claim is also likely to fail.

### vii.   Violation of California Penal Code Section 502 (Claim VIII)

This cause of action is grossly misplaced as the purpose of Section 502 is, essentially, to prevent computer hacking – not employees sending their personal and business contacts to their private email accounts.[24]  *See* Cal. Penal Code § 502 (West) ("It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems.  The Legislature finds and declares that the

---

[22]    As discussed above, this claim is likely preempted by CUTSA.  *See, supra*, Section II(C)(ii).

[23]    Mr. Ferguson has not been properly served with either the Complaint or this Motion and does not waive service by virtue of his counsel appearing to defend this Motion.  The proof of service filed in this action (ECF No.5, Ex. B) does not comply with C.P.L.R. 308(2) as there is a mistake in the listed address and Mr. Ferguson had never been personally served or received the process of service by mail, either at his actual place of business or last known residence.  *See* Ferguson Opp. Decl., ¶ 69.

[24]    MMA does not identify the alleged violation of Cal. Penal Code § 502.  Rather, it refers to Mr. Ferguson's Outlook email account and vaguely states he used computer systems in violation of the Code.  Pl.'s Motion, p. 35.

proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.").

Moreover, MMA is unlikely to prevail on this cause of action because it fails to allege that Mr. Ferguson acted "without permission" – the key element of the claim – when he did anything with respect to his computer system including sending himself his contact list. California courts have interpreted "without permission" to mean "in a manner that circumvents technical or code based barriers in place to restrict or bar a user's access." *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1053 (N.D. Cal. 2014) (citing cases); s*ee also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1217 (N.D. Cal. 2014) (same). Plaintiff here does not, and cannot, allege that Mr. Ferguson circumvented such barriers because none were in place and his access to his contacts was not restricted. This criminal law simply addresses a different scenario not present here.

### viii.    Defamation (Claim IX)

MMA cannot prevail on this cause of action because, first, the relevant statements were true, and second, MMA does not plead how it was specifically injured by them. As noted, Mr. Calder directed Mr. Ferguson to present his clients with two options: they could either stay with MMA Securities LLC or Mr. Ferguson should take them elsewhere. *See* Ferguson Opp. Decl., Ex. E. As such, Mr. Ferguson's statement that he had an agreement with MMA Securities LLC was truthful. As for the comment that he could still work with benefits and insurance teams to support their common clients, there is nothing inherently disparaging about this comment and it is truthful.

Further, under California law, "[d]efamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof." *Forsher v. Bugliosi*, 26 Cal. 3d 792, 806 (1980). Cal. Civ. Code § 48a (West) defines "special damages" as "damages . . . suffered in respect to his or her property, business, trade, profession, or occupation . . . *as a result of the alleged libel, and no other.*"

41

(emphasis added).  Mr. Ferguson's benign and truthful statements that he "had an agreement with MMA on this change since it's relatively minor" and "would work with MMA benefits and insurance teams to support our common clients" are not libelous on their face, and MMA fails to allege how, as a result, it was damaged.  MMA is therefore unlikely to succeed on this claim.

## III.   The Balance of Equities Favors Defendant and the Public Interest Weighs Against Granting an Injunction

MMA cannot make the required showing "that the burden caused to [Defendant] through imposition of an injunction is less than the harm caused to [MMA] by [Defendant's] activities." *Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*, 8 Misc. 3d 412, 422 (N.Y.Sup. Ct. 2005) (citing *Edgeworth Food Corp. v. Stephenson*, 53 A.D.2d 588, 588 (1st Dept. 1976)).  Mr. Ferguson is an individual, whose livelihood is dependent on his ability to obtain clients for his employer. He will experience significant restraint of trade if this sweeping application is granted.  He will not be able to work with his clients, even those who came to him specifically to avail themselves of his services and wish to continue using his services (which also harms those clients).  Ferguson Opp. Decl., ¶ 70.  By contrast, any harm to MMA if the application is denied is minimal, and entirely compensable.  MMA securities LLC will not be prohibited from serving its clients if no injunction issues.  It has already had ample time to reach out to clients to minimize any losses associated with Mr. Ferguson's departure.  Finally, given California's strong policy against enforcing non-competition provisions like the one signed by Mr. Ferguson (*see* Cal. Bus. & Prof. Code § 16600; *Edwards, supra,* at 945; *AMN Healthcare, supra,* at 940), and all other reasons described above, the public interest clearly weighs in favor of denying the request for a preliminary injunction.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court deny the request for preliminary injunctive relief in its entirety, and grant such other and further relief as the Court deems just and proper.

Dated: June 21, 2019                                        Respectfully submitted,
New York, New York

                                                            */s Nicholas H. Sikon*
                                                            Nicholas H. Sikon
                                                            Aliaksandra Ramanenka
                                                            **OUTTEN & GOLDEN LLP**
                                                            685 Third Avenue, 25th Floor
                                                            New York, New York 10017
                                                            Phone: (212) 245-1000
                                                            Email: nsikon@outtengolden.com
                                                                       aramanenka@outtengolden.com

                                                            *Attorneys for Defendant*