UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARSH & MCLENNAN AGENCY LLC,

               Plaintiff,

     -against-

ELMER "RICK" FERGUSON,

              Defendant.

Case No.: 19-cv-03837-VSB

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO COMPEL
ARBITRATION, AND IN SUPPORT OF APPLYING CALIFORNIA LAW**

**LITTLER MENDELSON, P.C.**
900 Third Avenue
New York, New York 10022-4834
(212) 583-9600

*Attorneys for Plaintiff*
*MARSH & McLENNAN AGENCY LLC*

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND ................................................................................ 1

I.      PLAINTIFF'S STRUCTURE .................................................................... 1

II.     FERGUSON'S EMPLOYMENT WITH BARNEY & BARNEY ...................... 2

III.    MMA'S ACQUISITION OF AND MERGER WITH BARNEY & BARNEY ...... 3

IV.     FERGUSON'S EMPLOYMENT WITH MMA .............................................. 6

V.      CLIENT SOLICITATION ......................................................................... 6

VI.     FERGUSON CONTINUED TO BREACH THE MMA AGREEMENT ............ 7

ARGUMENT ................................................................................................... 8

I.      MMA DEMONSTRATED STANDING TO ASSERT ITS CLAIMS IN FEDERAL COURT AND
        SURVIVE A RULE 12(B)(1) MOTION TO DISMISS ................................ 8

        A.      MMA has standing to assert claims arising out of its status as Ferguson's
                employer ...................................................................... 9

        B.      MMA has standing to assert claims arising out of its contract with
                Ferguson and related causes of action ............................... 11

II.     MMA IS NOT BOUND TO ARBITRATE ITS CLAIMS AGAINST FERGUSON ........... 13

        A.      MMA is not estopped from avoiding arbitration ................... 14

        B.      MMA is not compelled to arbitrate its claims based on agency principles ........ 15

        C.      Even if MMA Were Forced to Arbitrate Its Claims, Dismissal Would be
                Unwarranted Because MMA May Seek a Preliminary Injunction in Court ....... 17

III.    THIS CASE CANNOT BE DISMISSED UNDER RULE 12(B)(7) ............... 18

        A.      MMAS Is Not a Necessary Party ....................................... 18

        B.      MMAS is not an Indispensable Party ................................. 19

IV.     NEW YORK LAW APPLIES TO THIS CASE ........................................... 21

CONCLUSION ............................................................................................... 22

TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
   170 F.3d 349 (2d Cir. 1999)........................................................................13, 14

*Am. Exp. Fin. Advisors Inc. v. Thorley*,
   147 F.3d 229 (2d Cir. 1998)................................................................................17

*Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Henderson*,
   No. 10- CV-8033 PGG, 2013 WL 1245451 (S.D.N.Y. Mar. 26, 2013) ..................14

*Astra Oil Co. v. Rover Navigation, Ltd.*,
   344 F.3d 276 (2d Cir. 2003)................................................................................17

*Ayco Co., L.P. v. Becker*,
   No. 1:10-CV-0834 GTS/RFT, 2011 WL 3651027 (N.D.N.Y. Aug. 18, 2011) .....................20

*Ayco Co., L.P. v. Feldman*,
   No. 1:10-CV-1213 GLS/DRH, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) .....................20

*Ayco Co., L.P. v. Frisch*,
   No. 1:11-CV-580 LEK/DRH, 2012 WL 42134 (N.D.N.Y. Jan. 9, 2012) ...............15

*Bank of America Corp. v. Lemgruber*,
   385 F.Supp.2d 200 (S.D.N.Y. 2005).....................................................................19

*In re Beck Indus. Inc.*,
   479 F.2d 410 (2d Cir. 1973)................................................................................13

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F.3d 887 (2d Cir. 2015)................................................................................17

*BNP Paribas v. Bank of N.Y. Trust Co., N.A.*,
   No. 11-CV-350 (PGG), 2012 WL 13059498 (S.D.N.Y. Mar. 28, 2012) .........................18, 19

*Bristol–Myers Squibb Co. v. Matrix Labs. Ltd.*,
   655 F. App'x 9 (2d Cir. 2016) .............................................................................21

*Bross Util. Serv. Corp. v. Aboubshait*,
   618 F. Supp. 1442 (S.D.N.Y. 1985).....................................................................13

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016)....................................................................................9

TABLE OF AUTHORITIES
(CONTINUED)

PAGE(S)

**Cases**

*Clarex Ltd. v. Natixis Sec. Am. LLC*,
　No. 12-CV-0722 PAE, 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) ...........................8, 9, 13

*CP Sols. PTE, Ltd. v. Gen. Elec. Co.*,
　553 F.3d 156 (2d Cir. 2009)..................................................................................................18

*Edward B. Beharry & Co. v. Bedessee Imports Inc.*,
　No. 09-CV-77 (DLI) (JMA), 2013 WL 12363612 (E.D.N.Y. June 24, 2013) ......................19

*Extra Equipamentos e Exportação Ltda. v. Case Corp.*,
　361 F.3d 359 (7th Cir. 2004) ................................................................................................20

*Fischkoff v. Iovance Biotherapeutics, Inc.*,
　No. 17-CV-5041, 2018 WL 4574890 (S.D.N.Y. July 5, 2018) ..............................................21

*Green Island Power Auth. v. F.E.R.C.*,
　577 F.3d 148 (2d. Cir. 2009)..................................................................................................13

*Hudson Optical Corp. v. Cabot Safety Corp.*,
　No. 97-CV-9046, 1998 WL 642471 (2d. Cir. Mar. 25, 1998).................................................13

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
　387 F.3d 163 (2d Cir. 2004)...................................................................................................17

*Krock v. Lipsay*,
　97 F.3d 640 (2d Cir. 1996).....................................................................................................22

*Kutluca v. PQ New York Inc.*,
　266 F. Supp. 3d 691 (S.D.N.Y. 2017)....................................................................................13

*Life Techs. Corp. v. AB Sciex Pte. Ltd.*,
　803 F. Supp. 2d 270 (S.D.N.Y. 2011)....................................................................................14

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*,
　268 F.3d 58 (2d Cir. 2001).....................................................................................................14

*Makarova v. U.S.*,
　201 F.3d 110 (2d Cir. 2000).....................................................................................................8

*Marx & Co., Inc. v. Diners' Club Inc.*,
　550 F.2d 505 (2d Cir. 1977)...................................................................................................12

TABLE OF AUTHORITIES
(CONTINUED)

PAGE(S)

**Cases**

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007)........................................................................20

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*,
  337 F.3d 125 (2d Cir. 2003)........................................................................16

*Norcom Elecs. Corp. v. CIM USA Inc.*,
  104 F. Supp. 2d 198 (S.D.N.Y. 2000)..........................................................17

*Oppenheimer & Co. Inc. v. Deutsche Bank AG*,
  No. 09-CV-8154(LAP), 2010 WL 743915 (S.D.N.Y. Mar. 2, 2010)..........14, 15, 20

*Polargrid LLC v. Videsh Sanchar Nigam Ltd.*,
  No. 04- CV-9578(TPG), 2006 WL 2266351 (S.D.N.Y. Aug. 7, 2006)............18, 19

*Red Rock Commodities, Ltd. v. Standard Chartered Bank*,
  140 F.3d 420 (2d Cir. 1998)........................................................................12

*In re Salomon Inc. Shareholders' Derivative Litigation*,
  No. 91- CV-5500(RPP), 1994 WL 533595 (S.D.N.Y. Sept. 30, 1994)............16, 17

*S. Leo Harmonay, Inc. v. Binks Mfg. Co.*,
  597 F.Supp. 1014 (S.D.N.Y. 1984), *aff'd* 762 F.2d 990 (2d Cir. 1985) ................21

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
  542 F.3d 354 (2d Cir. 2008).......................................................................17

*Spano v. V & J Nat'l Enters., LLC*,
  264 F. Supp. 3d 440 (W.D.N.Y. 2017)........................................................15, 16

*Thixomat, Inc. v. Takata Physics Int'l Co., Ltd.*,
  No. 01-CV-5449 (RO), 2001 WL 863566 (S.D.N.Y. July 30, 2001)....................17

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*,
  64 F.3d 773 (2d Cir. 1995).........................................................................16

*Valentine Capital Asset Mgmt., Inc. v. Agahi*,
  174 Cal. App. 4th 606, 94 Cal. Rptr. 3d 526 (2009)........................................21

*W.P. Carey, Inc. v. Bigler*,
  No. 18- CV-585 (KPF), 2019 WL 1382898 (S.D.N.Y. Mar. 27, 2019)................15

TABLE OF AUTHORITIES
(CONTINUED)

PAGE(S)

*Westburg v. Good Life Advisors, LLC*,
No. 18- CV-248-LAB (MDD), 2018 WL 5112077 (S.D. Cal. Oct. 19, 2018).......................21

**Cases**

*WTA Tour, Inc. v. Super Slam Ltd.*,
339 F. Supp. 3d 390 (S.D.N.Y. 2018)......................................................................................17

**Other Authorities**

17 C.F.R. § 248.............................................................................................................................11

Fed. R. Civ. P. 12......................................................................................................................8, 18

Fed. R. Civ. P. 19..............................................................................................................18, 19, 20

Fed. R. Evid. § 701.......................................................................................................................12

## PRELIMINARY STATEMENT

Plaintiff Marsh & McLennan Agency LLC ("MMA" or "Plaintiff") asserts claims against former employee Elmer "Rick" Ferguson ("Defendant" or "Ferguson") arising from his solicitation of MMA's clients during his employment with MMA and thereafter in breach of contract, in violation of state law, and in tort. Ferguson attempts to divert focus from his wrongdoing and the resulting harm to MMA by filing the instant Motion to Dismiss, or in the Alternative Motion to Compel Arbitration and in Support of Applying California Law ("Motion").

In so doing, Ferguson ignores the plain facts and applicable law at every turn. Ferguson agreed to litigate in New York and under New York law, yet argues that California law applies. He insists that MMA has no standing in this action because it has no clients and did not employ him, despite citing to documentary evidence demonstrating the contrary. He argues that MMA Securities, LLC ("MMAS"), an indirect subsidiary of MMA registered with the Financial Industry Regulatory Authority ("FINRA"), is a necessary party despite having run afoul of contracts he signed with MMA.

This Court should ignore Ferguson's attempt to delay this litigation and instead, applying settled law, deny Ferguson's motion in its entirety with prejudice.

## FACTUAL BACKGROUND

### I.   Plaintiff's Structure

MMA is full-service a national insurance brokerage agency that provides clients in the middle market with a comprehensive array of commercial, employee health and benefits, and personal insurance products and services. As an employee health and benefits broker and consultant, MMA offers employee health and benefits solutions such as managing employee benefit plans, assisting clients with choosing the right employee benefits plans to fit their needs,

providing access to market experts, and advising on regulatory compliance.  Crain Supp. Decl.[1] ¶ 3; *see also* Compl. at ¶ 24; Calder Decl.[2] at ¶ 3.

MMA offers its clients multiple products in the Employee Health and Benefits segment including retirement products, which it effectuates through MMAS.  *Id.* ¶ 4. MMAS is registered as an investment advisor with the Securities and Exchange Commission and as a broker-dealer with FINRA.  *Id.* ¶ 5.

## II.     Ferguson's Employment With Barney & Barney

On February 22, 2007, Barney & Barney hired Ferguson as a retirement analyst.  Calder Decl. ¶ 5; Crain Decl. ¶ 5.[3] While employed by Barney & Barney, Ferguson signed and entered into the B & B Agreement, dated February 26, 2007, which contains restrictive covenants to protect Barney & Barney's confidential information and trade secrets during and after Ferguson's employment. Calder Decl. ¶ 9; Crain Decl. ¶ 6, Ex. B. On February 27, 2007, Ferguson signed an acknowledgement of his at-will "employment with Barney & Barney, LLC." Crain Supp. Decl. Ex. B.

Ferguson was promoted to a Client Manager position on April 5, 2010, and to a Client Executive, Service position in 2011. Calder Decl. ¶ 6. On or about August 6, 2012, Barney & Barney transferred Ferguson from its offices in San Diego, California, to its offices in San Francisco, California, and transitioned Ferguson from the Client Executive, *Service* position to a Client Executive, *Sales* position (also called Retirement Services Client Executive). *Id.* at ¶ 7. When Ferguson transferred into the Client Executive, Sales position, he signed a Producer

---

[1] "Crain Supp. Decl." shall refer to the Supplemental Declaration of Mara Crain submitted herewith in support of Plaintiff's Opposition to Defendant's Motion.

[2] "Calder Decl." refers to the Declaration of Jeff Calder submitted with Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction & Expedited Discovery filed on April 29, 2019.

[3] The "Crain Decl." shall refer to the Declaration of Mara Crain submitted with Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction & Expedited Discovery filed on April 29, 2019.

Agreement with Barney & Barney, which, among other things, confirmed his employment with Barney & Barney and the terms of his sales compensation. Crain Supp. Decl. Ex. A.

In his new sales role, Ferguson went from principally providing service to clients regarding their retirement plans (mostly 401(k) plans) to a sales/business development/producer role where he was responsible for establishing and developing relationships with new prospective clients and maintaining relationships with existing clients. Calder Decl. ¶ 8. When Ferguson joined Barney & Barney, he did not bring new clients with him. *Id.* ¶ 10. Even after he transitioned into the sales role at Barney & Barney and later at MMA, Ferguson was largely dependent on Barney & Barney and later MMA to refer existing or potential new business opportunities to Ferguson. *Id.* ¶ 11. At all times, Ferguson was employed by Barney & Barney and he was not employed by the broker dealer SagePoint Financial, Inc. ("SagePoint"); SagePoint is the entity through which any regulated transactions were placed, and with which Ferguson maintained his FINRA securities licenses, but it was not Ferguson's employer. Crain Supp. Decl. ¶ 9.

## III.   MMA's Acquisition of and Merger with Barney & Barney

On or about February 1, 2014, MMA acquired Barney & Barney and, as a result, Barney & Barney merged with and into MMA, leaving MMA as the surviving entity. Calder Decl. ¶ 12. MMA assumed Ferguson's B & B Agreement upon its acquisition of Barney & Barney, at which point Ferguson became an MMA employee. *Id.* ¶ 13.

In conjunction with the merger with Barney & Barney, MMA circulated to Barney & Barney employees an Associate Q&A ("Acquisition Q&A") containing information about the merger that was printed on letterhead which read: "Barney & Barney, A Marsh & McLennan Agency LLC Company". *See* Ferguson Decl. Ex. E at 1. The Acquisition Q&A stated that "[w]e" (referring to former Barney & Barney employees) "will now be employed by MMA, so checks will come from MMA." *See* Ferguson Decl. Ex. E. at 3. Thereafter, from the time of the merger in

2014 until Ferguson left MMA in 2019, MMA issued Ferguson's pay stubs and Form W-2s which correctly identify his employer as MMA. *See e.g.,* Crain Supp. Decl. Ex. C.

After Barney & Barney merged into MMA, Barney & Barney was treated as a "Division" of MMA, but not as a separate entity, and all of the former Barney & Barney employees became employed by MMA. *See* Crain Supp. Decl. ¶ 12.  This is confirmed in the offer letter that MMA provided to Ferguson, which he signed on February 1, 2014 ("Offer Letter"). *See* Crain Supp. Decl. Ex. C (complete, signed offer letter), Ferguson Decl. Ex. D (unsigned, incomplete offer letter); *see also* Ferguson Dep. Tr. 110:5-111:3 (admitting that Ferguson signed the Offer Letter). The Offer Letter "confirm[ed] the continuing terms of [Ferguson's] position with Barney & Barney, a Marsh & McLennan Agency LLC company."  *Id.* Along with the Offer Letter, MMA offered a retention bonus to Ferguson pursuant to which Ferguson would earn a bonus of $5,000 on July 30, 2014, conditioned upon "accepting the terms of your offer letter." *See* Crain Supp. Decl. Ex. C at 7. Ferguson signed the Offer Letter and received the $5,000 bonus. *See* Ferguson Dep. Tr.[4] 110:5-111:3; 123:16-19 ("Q: And did you know that you were eligible for and did you get paid a 2014 Barney & Barney key associate bonus? A: Yes.").

Also on February 1, 2014, Ferguson signed and entered into the Barney & Barney /MMA Non-Solicitation and Confidentiality Agreement ("MMA Agreement") with his "Employer," defined as "Barney & Barney, a Marsh & McLennan Agency LLC company and/or subsidiaries[5] thereof." *See* Crain Decl. Ex. A. At no time was Ferguson prevented from consulting legal counsel before signing the MMA Agreement. *See* Crain Supp. Decl. ¶ 15. The Offer Letter "[t]ogether with

---

[4] Relevant excerpts of Ferguson's testimony from his deposition taken on June 13, 2019 are annexed to the Declaration of Douglas Wickham submitted herewith in support of Plaintiff's Opposition.

[5] MMAS did not yet exist.

the [MMA] Agreement form[ed] the complete and exclusive statement of the terms of [Ferguson's] employment with the Company [MMA]." *See id.* Ex. A at 1.

Under Section 1(b) of the MMA Agreement, Ferguson agreed not to disclose MMA's Confidential Information and Trade Secrets during his employment and thereafter.  He also agreed not to use his "position, influence, [or] knowledge of Confidential Information and Trade Secrets or the Company's assets for personal gain" and not to "directly or indirectly use Confidential Information and Trade Secrets . . . to solicit clients or prospective clients of the Company" to "sell[] or provide[] products or services of the type sold or provided by [him] while employment by the Company." *See* Crain Decl., Ex. A §§ 2(b), 4.

The MMA Agreement also required Ferguson to "[i]mmediately upon the termination of employment," return to MMA "(i) any originals and all copies of all files, notes, documents . . . reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in [Ferguson's] possession or control which contain or pertain to Confidential Information and Trade Secrets; and (ii) all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment." *See* Crain Decl., Ex. A § 1(c).

Accordingly, the MMA Agreement prohibited Ferguson from accessing or using MMA's computer systems and protected computers, including his laptop computer and iPhone, and all the data contained therein, "for personal gain or to benefit third parties[,]" and he was not authorized to retain any of MMA's property, equipment or Confidential Information and Trade Secrets after separation of employment with MMA. *See* Crain Decl., Ex. A § 1(d).

Ferguson expressly acknowledged in the MMA Agreement that a breach of his obligations under the MMA Agreement would cause MMA irreparable harm, that monetary damages would

not be readily calculable and that MMA would be entitled to temporary and permanent injunctive relief, without the necessity of posting a bond, and recovery of its attorneys' fees. *See* Crain Decl., Ex. A §§ 6, 7.

## IV.    Ferguson's Employment with MMA

Throughout his employment with MMA, Ferguson's direct supervisor was Jeff Calder, an MMA employee who is now a Principal and Managing Director.[6] *See* Calder Decl. ¶ 1; Ferguson Decl. ¶ 23. Ferguson began working for MMA in February 2014 in the same Client Executive, Sales role that he occupied at Barney & Barney. Calder Decl. ¶ 14.

Like at Barney & Barney, as an MMA Client Executive, Sales, Ferguson was responsible for developing and generating new client relationships on the retirement services team and maintaining existing client relationships. *Id.* ¶ 17. Given Ferguson's background on the service side of the business, Ferguson also continued to service MMA retirement plan clients. *Id.* at ¶ 18.

In or about September 2014, Ferguson told MMA that he wanted to return to work in the service side of the business in a Client Executive, Service position. Calder Decl. ¶ 19. MMA granted Ferguson's request effective January 1, 2015, and officially returned Ferguson to a Client Executive, Service position, which he continued during the remainder of his MMA employment. *Id.* ¶ 20.

## V.    Client Solicitation

While employed at MMA Ferguson began soliciting MMA clients on behalf of Teros Advisors, LLC ("Teros"), a competitor of MMA. Calder Decl. ¶¶ 64-65. In the span of three days, from February 12 to 14, Ferguson solicited at least 20 MMA clients, urging them to sever their contractual and business relationships with MMA (and MMAS) and to establish new business

---

[6] Bill Peartree, Ferguson's indirect supervisor, serves as the Director of the Retirement Services Division for MMA, and, contrary to Ferguson's contention, was at all relevant times an employee of MMA. *See* Crain Supp. Decl. ¶ 13.

relationships with Teros (and its broker dealer). *See* Compl.¶ 58; *see, e.g.* Calder Decl. ¶¶ 40, 44, 45, 47. Ferguson also emailed MMA's Confidential Information and Trade Secrets to his email account with Teros. Calder Decl. ¶ 54.

On or about February 14, 2019, MMA began to uncover Ferguson's unlawful conduct including his solicitation of MMA's clients to leave MMA to join Ferguson at his new firm, Teros. Calder Decl ¶ 57. Ferguson's supervisor, Jeff Calder emailed Ferguson, instructing him to cease and desist from soliciting MMA clients and asked Ferguson to call him immediately. *Id.* ¶ 58. Calder spoke to Ferguson on the phone, informing him that his office card key was deactivated, that he should return his laptop and iPhone, and that he would be hearing from legal services shortly. *Id.* ¶ 59-61.

On February 15, 2019, Ferguson preemptively submitted his voluntary resignation from MMA before MMA was able to officially terminate his employment. Calder Decl ¶ 62.

**VI.   Ferguson Continued to Breach the MMA Agreement**

Just a few days after Ferguson resigned from MMA, Ferguson used MMA's Confidential Information and Trade Secrets to continue to solicit MMA clients to transfer their business from MMA to Teros. *See, e.g.* Calder Decl. ¶¶ 66, 68, 71. Ferguson also made false, deceptive comments about MMA. *See, e.g. id.* ¶ 81.

When Barney & Barney hired Ferguson, Ferguson had no clients and had brought none with him. Calder Decl. ¶ 21. He was assigned clients through his employment and developed client relationships through referrals from within Barney & Barney and later from within MMA. *Id.* ¶ 22. A majority of the clients that Ferguson serviced at Barney & Barney and later at MMA were established MMA or Barney & Barney clients. *Id.* ¶ 23.

At MMA, Ferguson relied on financial and internal resources from MMA to generate business, service clients, and manage client relationships. Calder Decl. ¶ 24. He developed client

relationships by virtue of his employment with MMA and he enjoyed the support of an experienced team of MMA employees on whom he relied to carry out his duties. *Id.* ¶ 25. He also relied on MMA's Confidential Information and Trade Secrets to perform his duties and develop and maintain client relationships. *Id.* ¶ 26. For instance, he relied on customer and prospective customer lists as well as confidential compilations of contact information for key client decision makers that MMA and Barney & Barney developed through significant expenditures of time, money, and resources over the years. *Id.* ¶ 27.

MMA also supported Ferguson's business development and servicing efforts by sponsoring client events, financing his membership in professional and networking organizations, paying for travel and expenses related to client meetings and entertainment, and investing in marketing and sales tools, all of which Ferguson used to form and strengthen client relationships for and on behalf of MMA. Calder Decl. ¶ 33.

None of the MMA clients Ferguson generated, serviced, and later solicited "belonged" to him, but were rather clients belonging to MMA. Calder Decl. ¶¶ 36, 37.

## ARGUMENT

### I.   MMA Demonstrated Standing to Assert Its Claims in Federal Court and Survive a Rule 12(b)(1) Motion to Dismiss

Ferguson moves to dismiss MMA's Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of standing. To establish standing to sue, MMA must show by a preponderance of the evidence that it has (a) "suffered a concrete, particularized and actual or imminent injury-in-fact," (b) "traceable to defendant's conduct" (c) that is "likely redressed by a favorable decision." *Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-CV-0722 PAE, 2012 WL 4849146, at *3 (S.D.N.Y. Oct. 12, 2012); *see Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). The Court may consider the extrinsic evidence that Ferguson submitted to challenge MMA's

standing, but the Court need not consider that information if the Court decides that it is irrelevant or immaterial to the issues. *Clarex Ltd.* 2012 WL 4849146, at *3 (S.D.N.Y. Oct. 12, 2012); *see also Carter v. HealthPort Techs., LLC,* 822 F.3d 47, 56–57 (2d Cir. 2016).

Ferguson only challenges the first element of standing, alleging that MMA has suffered no "concrete, particularized and actual or imminent injury-in-fact." *See* Def. Br. at 10.  As explained further below, Ferguson's declaration and accompanying exhibits fail to raise a factual challenge to MMA's standing, and his submissions outside of the pleadings instead *support* the finding that MMA has standing to assert its claims.

### A.    MMA has standing to assert claims arising out of its status as Ferguson's employer.

Undisputed documentary evidence contradicts Ferguson's contention that MMA never employed him and therefore lacks standing to assert certain claims (including its breach of a duty of loyalty and tortious interference claims).  Ferguson was employed by Barney & Barney, and then MMA, neither of which is regulated by FINRA, and as a condition of his employment, Ferguson was required to register with FINRA as a representative of their affiliated regulated entities in order to maintain his securities licenses. The B & B Agreement confirms that Ferguson was an "Employee" and "set forth the terms and conditions of the employment relationship." Crain Supp. Decl. Ex. B at 1.  Ferguson signed an acknowledgement of his "employment" with Barney & Barney around the same time. *See* Crain Supp. Decl. Ex. C. The B & B Agreement is labeled "Employee Agreement" in a conspicuous heading at the top of the first page.  *See* Crain Supp. Decl. Ex. B. Likewise, once Ferguson transferred into the Client Executive Sales position (in which position he provided investment advice and/or he engaged in regulated sales activities), he signed the "Producer Agreement" with Barney & Barney and confirmed that Barney & Barney (and not some other entity such as SagePoint) was his employer. *See* Crain Supp. Decl., Ex. A.

When MMA merged with Barney & Barney, it retained the same employment structure. MMA provided Ferguson with an Offer Letter "confirm[ed] the continuing terms of [Ferguson's] position with [MMA]" and reiterated that "we [referring to Barney & Barney and MMA] *continue* to be an at-will *employer.*" *See id.* at 1 (emphasis added). The Offer Letter and the MMA Agreement "[t]ogether with the [MMA] Agreement form[ed] the complete and exclusive statement of the terms of [Ferguson's] employment" with MMA, explicitly defined MMA as the "Employer." *See* Crain Supp. Decl. Ex. A at 1; Crain Supp. Decl. Ex. A at 1.  Ferguson signed the Offer Letter and MMA Agreement and received the $5,000 bonus conditioned on accepting their terms.  *See* Ferguson Dep. Tr. at 110:5-111:3; 123:16-19.

The Acquisition Q&A circulated around the time of the merger also stated that Ferguson, as a former Barney & Barney employee "will now be employed by MMA, so checks will come from MMA." *See* Ferguson Decl. Ex. E at 3. MMA undisputedly paid Ferguson's salary throughout his employment, and issued his pay stubs and Form W-2s. *See* Crain Supp. Decl. Ex. C.

Ferguson himself admits to facts demonstrating that MMA was his employer.  For example, Ferguson reported to FINRA that "Marsh & McLennan Agency" was his employer from "11/2014 to 2/2019," and that listing appears on the BrokerCheck Report that Ferguson attached to his Declaration in support of his Motion.  *See* Ferguson Decl. Ex. C at 2, 4.  Ferguson also admits that his direct supervisor throughout his employment, Jeff Calder, is an MMA employee. *See* Ferguson Decl. ¶ 23 ("Jeff Calder[] was an MMA employee and Managing Director of the San Francisco office . . ."); Calder Decl. at ¶¶ 1, 4 ("I was Defendant "Rick" Ferguson's direct supervisor during his employment with MMA").

In sum, undisputed evidence establishes that Ferguson was a MMA employee who maintained securities licenses with FINRA-regulated entities to facilitate the work he performed for MMA. Ferguson cannot plausibly deny his employment with MMA.

**B.    MMA has standing to assert claims arising out of its contract with Ferguson and related causes of action.**

Notwithstanding his assertions, Ferguson fundamentally fails to dispute that Ferguson and MMA are the only specifically named parties to the MMA Agreement and that MMA may sue to enforce it.  *See* Crain Supp. Decl. Ex. A at 1.

Ferguson argues that MMA lacks standing because it has not properly alleged injury-in-fact related to its breach-of-contract claim. Def. Br. at 10. However, in its Complaint, MMA asserts that it "has suffered and will continue to suffer irreparable injury, loss of goodwill, harm to its business," and "additional damages" as a result of Ferguson's wrongdoing. *See, e.g.,* Compl. at ¶¶ 102, 103, 109. Ferguson also acknowledged in the MMA Agreement itself that a breach of his obligations under the agreement would cause MMA irreparable harm, and that MMA would be entitled to temporary and permanent injunctive relief and recovery of its attorney fees. *See* Crain Supp. Decl., Ex. A §§ 6, 7.

Although his argument is difficult to follow, Ferguson seems to claim that MMA has no clients and could not have owned confidential client contact information, and that legal separateness requirements governing information sharing between MMA and MMAS means that MMA has no clients. Def. Br. at 9-11. Ferguson offers no legal or factual support for his theory. The only citation to any specific FINRA or SEC rule appears in Ferguson's Declaration, rather than in his brief, and is inapplicable.[7] *See* Ferguson Decl. at ¶ 16.

---

[7] The rule to which he cites, Rule S-P is not pertinent to this action because it does not regulate or address confidential personal information pertaining to businesses or their representatives. *See* 17 C.F.R. §§ 248.1.

Moreover, the facts, irrespective of Ferguson's speculations, confirm that MMA was and is highly interested in enforcing the MMA Agreement. Crain Supp. Decl. ¶ 6. MMA is a highly integrated business that offers multiple lines of insurance products and services to its employee benefits and commercial insurance clients. *Id* . MMA succeeds through cross-selling its products and services. *Id.* For example, employees who work on employee health benefit plans may refer clients to their counterparts in the commercial business insurance practice groups, or employees on the business insurance side may refer clients to MMA's retirement plan business unit. *Id.* As a large integrated business, all employees are required to sign a confidentiality and non-solicitation agreement similar to the MMA Agreement Ferguson signed, and that agreement allows MMA to broadly protect its client information and other confidential information across all segments of its business. Therefore, MMA has a keen and decisive interest in maintaining the confidential nature of its client and prospective client information to protect against disloyal employees, such as Ferguson, who attempt to steal MMA's confidential information and use it for personal gain at a new employer. Crain Supp. Decl. ¶ 8.

Neither Ferguson's statement of "facts" nor the case law upon which he relies support his creative but incorrect assertions. The parts of Ferguson's declaration that address the identity of his employer are based on his opinion on the legal status rather than on facts known his capacity as a witness, and this Court should therefore ignore his inadmissible legal opinion. *See* Fed. R. Evid. §§ 701; *Red Rock Commodities, Ltd. v. Standard Chartered Bank,* 140 F.3d 420, 423 (2d Cir. 1998) (holding that testimony on conclusions of law contained within affidavits are not admissible); *Marx & Co., Inc. v. Diners' Club Inc.,* 550 F.2d 505, 512 (2d Cir. 1977) (legal conclusions constitute inadmissible opinion testimony under Federal Rules of Evidence 701 and 702). Additionally, the cases Ferguson cites merely regurgitate general propositions that do not

apply here. *See e.g., Bross Util. Serv. Corp. v. Aboubshait,* 618 F. Supp. 1442, 1444 (S.D.N.Y. 1985) (holding that a parent company that was *not a party* to the relevant agreement did not have standing to assert a claim) (emphasis added); *Clarex*, 2012 WL 4849146, at *3 (finding that plaintiffs lacked standing because they had assigned away their claim).[8]

## II. MMA Is Not Bound to Arbitrate Its Claims Against Ferguson

To compel MMA to arbitrate its claims, Ferguson must show that (a) the parties "entered into a valid agreement to arbitrate" and (b) "the dispute falls within the scope of the arbitration agreement." *See Kutluca v. PQ New York Inc.,* 266 F. Supp. 3d 691, 699 (S.D.N.Y. 2017). MMA never signed an agreement to arbitrate its claims against Ferguson.

Ferguson argues that MMA should be compelled to arbitrate its claims pursuant to an arbitration clause in his Form U4 submitted to FINRA to register him as a broker-dealer representative of MMA's indirect subsidiary, MMAS. *See* Def. Br. at 14. To circumvent the fact that MMA is not a party to an arbitration agreement, Ferguson asserts two of the five potential exceptions that would allow a signatory (Ferguson) to compel a non-signatory (MMA) to arbitrate its claims: agency and estoppel.[9] As explained further below, neither exception applies here. Further, MMA cannot be compelled to arbitrate before FINRA because it is not a FINRA-regulated entity.

---

[8] *See also Hudson Optical Corp. v. Cabot Safety Corp.*, No. 97- CV-9046, 1998 WL 642471, at *3 (2d. Cir. Mar. 25, 1998) (summary order) (affirming the lower court's decision preventing a parent company from presenting evidence on harm suffered by a subsidiary); *In re Beck Indus. Inc.,* 479 F.2d 410, 418 (2d Cir. 1973) (declining to pierce the corporate veil); *Green Island Power Auth. v. F.E.R.C.,* 577 F.3d 148 (2d Cir. 2009) (dismissing case because injury was speculative, but not because it was asserted by an incorrect entity).

[9] The five available theories are: (a) incorporation by reference; (b) assumption; (c) agency; (d) piercing the corporate veil and (e) estoppel. *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999).

### A.      MMA is not estopped from avoiding arbitration.

For the estoppel exception to apply, Ferguson must show that (a) MMA "knowingly accepted the benefits[] of an agreement with an arbitration clause" and (b) the benefits "directly flow[] from the agreement" containing the arbitration clause. *See Oppenheimer & Co. Inc. v. Deutsche Bank AG,* No. 09- CV-8154(LAP), 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010). A benefit is "direct," and estoppel applies, when the relief that the plaintiff seeks depends upon the existence of the agreement containing the arbitration agreement. *Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Henderson*, No. 10- CV-8033 PGG, 2013 WL 1245451, at *4 (S.D.N.Y. Mar. 26, 2013) (citing *Tencara Shipyard S.P.A.,* 170 F.3d at 353). Benefits may also flow "directly" from the agreement containing an arbitration clause when that agreement "contemplates" a benefit to a nonsignatory—or, in other words, when a nonsignatory is essentially a third-party beneficiary of the agreement. *See Life Techs. Corp. v. AB Sciex Pte. Ltd.,* 803 F. Supp. 2d 270, 276–77 (S.D.N.Y. 2011). A benefit is "indirect," and estoppel does not apply, when "the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *See MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC,* 268 F.3d 58, 61 (2d Cir. 2001).

MMA does not assert any claims directly flowing from the Form U4. The benefit that MMA seeks—enforcement of the restrictive covenants in the MMA Agreement—does not depend on the Form U4. Merely maintaining an "affiliation with a signatory" to an arbitration clause "will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is." *MAG Portfolio,* 268 F.3d at 61; *Oppenheimer,* 2010 WL 743915, at *2.

Ferguson argues that the U4 contemplates a "direct" benefit to MMA because (a) MMA can advertise that it provides "retirement services" through MMAS; and (b) MMA indirectly earned revenue from MMAS securities sales. *See* Def. Br. at 15. Yet those exact benefits have

14

been held by federal district courts to be insufficient to compel a non-signatory, non-registered

entity to arbitration.  For example, in *Ayco Co., L.P. v. Frisch,* No. 1:11- CV-580 LEK/DRH, 2012

WL 42134, at *10 (N.D.N.Y. Jan. 9, 2012), the court declined to compel a plaintiff, a non-FINRA-

regulated entity, to arbitrate its action to enforce restrictive covenants in its employment agreement

with the defendant.  The Court held that the plaintiff entity was not estopped from avoiding the

arbitration simply because the defendant was registered as a representative of a FINRA-regulated

affiliate entity, because the "ability to sell securities [as] an additional service" to clients is not a

"benefit flowing directly from a Form U-4 agreement."  *See id.*; *Oppenheimer,* 2010 WL 743915,

at *2 (allegations that a parent company "gained financially" from its subsidiary's "activities as a

FINRA member" are insufficient to compel the parent company to arbitrate claims arising out of

securities sales.).

### B.    MMA is not compelled to arbitrate its claims based on agency principles.

Ferguson next argues that MMA should be compelled to arbitrate its claims because

MMAS had actual authority[10] as an agent to bind MMA to the arbitration provision in the Form

U4. *See* Def. Br. at 18-20. Ferguson argues that MMAS is an agent of MMA because (a) MMA

controls MMAS, (b) advertises Ferguson's services on its website, (c) supervised Ferguson, and

(d) compensated Ferguson. Def. Br. at 19.

Each of Ferguson's points fail to establish an agency relationship.  As an initial matter,

MMA "controls" MMAS because it is the indirect corporate parent of MMAS, and a corporate

affiliate relationship on its own, is "insufficient to bind a nonsignatory parent [company] under

Second Circuit law." *W.P. Carey, Inc. v. Bigler,* No. 18- CV-585 (KPF), 2019 WL 1382898, at *6

---

[10] Although Ferguson cites a case referencing apparent authority, another sort of agency relationship, he does not allege, much less show, that MMAS was "clothed in apparent authority," which requires "some misrepresentation of authority" by MMAS. *See Spano v. V & J Nat'l Enters., LLC,* 264 F. Supp. 3d 440, 450-51 (W.D.N.Y. 2017). Therefore, it is Plaintiff's understanding that Ferguson is not advancing that argument here.

(S.D.N.Y. Mar. 27, 2019); *see also Spano v. V & J Nat'l Enters., LLC*, 264 F. Supp. 3d 440, 450-51 (W.D.N.Y. 2017) (holding that a court may not compel "unwilling non-signatories to arbitrate" under an agency theory based only on "conclusory allegations of a general agency relationship between a signatory and a non-signatory").

The fact that MMA supervised and compensated Ferguson, an MMA employee, has no bearing on MMA's relationship with MMAS or agency principles. *See supra* at I.A. (discussing MMA's employment relationship with Ferguson). Consequently, Ferguson's only remaining allegation to support his agency theory is that MMA advertises Ferguson's services on its website. Yet the mutual benefits derived from the affiliation of two entities, including the possibility of cross-selling and mutual advertising, are "insufficient to bind a non-signatory on agency principles to an arbitration agreement signed by an affiliate." *See Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125, 130 (2d Cir. 2003) (denying motion to compel non-signatory to arbitration on an agency theory even when non-signatory and signatory engaged in cross-selling and mutual marketing, and even though the companies "present[ed] to the public the image of a single, integrated firm).

Ferguson has proffered no evidence or legal authority to show that MMAS had actual or apparent authority to bind MMA to arbitration through agency principles. Contrary to Ferguson's assertion, *In re Salomon Inc. Shareholders' Derivative Litigation,* No. 91- CV-5500(RPP), 1994 WL 533595 (S.D.N.Y. Sept. 30, 1994) does *not* stand for the proposition that a party may compel a parent company to arbitrate its claims because it is the "sole parent" of a signatory subsidiary. Rather, indicators of an agency relationship must be present. *See Phoenix Companies, Inc. v. Abrahamsen,* No. 05- CV-4894(WHP), 2006 WL 2847812, at *5 (S.D.N.Y. Sept. 28, 2006) (explaining that the Second Circuit's holding in *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64

16

F.3d 773, 779 (2d Cir. 1995) interpreted the decision in *In re Salomon* as being consistent and coextensive with common law principles such as agency).

Ferguson also cites to a number of cases, in some cases mischaracterizing their holdings, that are not relevant to this case because they pertain only to *non-signatories* seeking to compel *signatories* to arbitrate claims, and not, as is the case here, a *signatory* (Ferguson) seeking to compel a *non-signatory* (MMA) to arbitrate its claims. *See, e.g., Sokol Holdings, Inc. v. BMB Munai, Inc.,* 542 F.3d 354, 357 (2d Cir. 2008) (explaining that when a non-signatory seeks to compel a signatory to arbitrate its claims, a different analysis applies); *Astra Oil Co. v. Rover Navigation, Ltd.,* 344 F.3d 276, 280 (2d Cir. 2003); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004); *Thixomat, Inc. v. Takata Physics Int'l Co., Ltd.,* No. 01- CV-5449 (RO), 2001 WL 863566, at *3 (S.D.N.Y. July 30, 2001); *see also WTA Tour, Inc. v. Super Slam Ltd.,* 339 F. Supp. 3d 390, 399 n.7 (S.D.N.Y. 2018) (differentiating the legal posture of a non-signatory compelling a signatory to arbitrate and a signatory compelling a non-signatory to arbitrate).

### C.    Even if MMA Were Forced to Arbitrate Its Claims, Dismissal Would be Unwarranted Because MMA May Seek a Preliminary Injunction in Court.

Even if MMA were compelled to arbitrate its claims, this Court should not dismiss this action because MMA's motion for a preliminary injunction is properly in this forum.  Courts may, even under the FAA's broad favor of arbitration, seek a preliminary injunction in a federal district court while an arbitration is pending. *See Benihana, Inc. v. Benihana of Tokyo, LLC,* 784 F.3d 887 (2d Cir. 2015); *Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 207 (S.D.N.Y. 2000); *see also Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998).

### III.    This Case Cannot Be Dismissed Under Rule 12(b)(7)

### A.    MMAS Is Not a Necessary Party

Ferguson invokes Federal Rule of Civil Procedure 19(a) to argue that MMAS is a necessary party. Rule 19(a) states that a party must be joined if (A) in the absence of that party, "the court cannot accord complete relief among existing parties," or (B) if the absent party "claims an interest relating to the subject of the action." *See* Fed. R. Civ. P. 19(a)(1). The Rule 19 inquiry is "fact-specific and practical," and it is not "based on formalistic or mechanistic grounds[,] but rather on pragmatic analysis of the effect of a potential party's absence." *BNP Paribas v. Bank of N.Y. Trust Co., N.A.,* No. 11- CV-350 (PGG), 2012 WL 13059498, at *13 (S.D.N.Y. Mar. 28, 2012); *see also CP Sols. PTE, Ltd. v. Gen. Elec. Co.,* 553 F.3d 156, 159 (2d Cir. 2009) (reversing district court's decision that party was necessary and noting that Rule 19(b) is a "flexible standard"). In that vein, the general principle that "parties to a contract sued upon are necessary under Rule 19" is not a bright-line rule. *See Polargrid LLC v. Videsh Sanchar Nigam Ltd.,* No. 04- CV-9578(TPG), 2006 WL 2266351, at *9-10 (S.D.N.Y. Aug. 7, 2006) (citations omitted). The absent potential party must still meet one of the requirements of Rule 19(a). *See id.*

Ferguson argues that this Court may not provide complete relief to MMA based on the erroneous allegations upon which he relies throughout his briefing: (a) MMAS was Ferguson's employer, (b) MMA does not have its own clients, and (c) MMAS owned "all of the alleged trade secrets and confidential information." *See* Def. Br. at 20. As explained above, MMA employed Ferguson and has relationships with clients. *See supra* Part I. As a result, MMA owned the trade secrets and confidential information at issue in this action. Therefore, this Court may accord complete relief to MMA among the existing parties.

Second, Ferguson has provided no evidence to show that MMAS is claiming "an interest relating to the subject of [this] action" and therefore MMAS is not a necessary party.  Fed. R.. Civ.

P. 19(a)(1)(B); *see also Edward B. Beharry & Co. v. Bedessee Imports Inc.,* No. 09- CV-77 (DLI) (JMA), 2013 WL 12363612, at \*5 (E.D.N.Y. June 24, 2013) (finding that Rule 19(a)(1)(B) is inapplicable in part because absent party "has not claimed an interest in the litigation").

Third, an absent non-party is not "necessary" or "indispensable" if its interests are "virtually identical" to those of another party that can represent its interests in the litigation.[11]  *See, e.g., Polargrid,* 2006 WL 2266351, at \*10 (finding that absent parties were not necessary because they "possess interests identical to [the plaintiff's]"); *Bank of America Corp. v. Lemgruber,* 385 F. Supp.2d. 200, 232-33 (S.D.N.Y. 2005) (holding that Plaintiff's affiliates were unnecessary parties because Plaintiff would adequately protect their interests)*; BNP Paribas,* 2012 WL 13059498, at \*13.

### B.        MMAS is not an Indispensable Party

Even if this Court were to find that MMAS is "necessary" to this action, the Court may not dismiss this action because MMAS is not "indispensable." Rule 19(b) provides four factors for district courts to consider in determining whether a party is "indispensable" such that dismissal for non-joinder[12] is warranted:

> (1) the extent to which a judgement without the absent party might prejudice the absent or existing parties;
> (2) the extent to which protective provisions in the judgement or other measures could reduce prejudice to the absent party,
> (3) whether a judgement in the party's absence would be adequate, and
> (4) whether plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

---

[11] When a party-entity executes an agreement on behalf of other entities, the other entities accept the party-entity as a representative of their interests in the agreement, and "cannot [later] contest the ability of that entity to adequately litigate claims arising from an alleged breach of that agreement." *See Polargrid LLC,* 2006 WL 2266351, at \*10. MMAS is only a direct party to the MMA Agreement as a "subsidiary" of MMA and is not mentioned by name. *See* Crain Decl. Ex. B at 1. MMAS's interests are also nearly identical to those of MMA in this litigation.

[12] MMA is presuming, for this section of this <u>only</u>, that MMAS may not be joined to this action, which is not necessarily the case because even if MMAS were compelled to arbitrate its claims, it could still properly seek a preliminary injunction in court. *See supra,* Part II.C.

Fed. R. Civ. P. 19(b).

First, a judgement without the absent party would not prejudice the absent or existing parties. The identity of interests between MMA and MMAS means that a judgement in this action would not prejudice MMAS because MMA is adequately representing its interests. This is especially true if, as Ferguson posits, the absent non-party is a wholly owned subsidiary of a party to the litigation. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 180 (2d Cir. 2007) (citing *Extra Equipamentos e Exportação Ltda. v. Case Corp.,* 361 F.3d 359, 364 (7th Cir. 2004) ("[W]e have great difficulty seeing how a 100 percent subsidiary could *ever* be an indispensable party....")). Ferguson would not be prejudiced because common law estoppel principles would protect him from multiple lawsuits when, as here, the interests of MMAS and MMA are aligned.

Second, because MMA adequately represents the interests of MMAS in litigation, proceeding without MMAS poses no great risk of prejudice.

Third, this Court could award full relief to MMA, including injunctive relief and damages, so judgement would be adequate.

Fourth, if the case were dismissed for non-joinder, MMA would not have an adequate remedy available to it because a non-regulated entity cannot be compelled to arbitrate its claims before FINRA. *See Ayco Co., L.P. v. Feldman,* No. 1:10-CV-1213 GLS/DRH, 2010 WL 4286154, at *1 (N.D.N.Y. Oct. 22, 2010) (finding that FINRA rule did not apply to unregulated employer that "is not a broker dealer" but was the sole limited partner of a FINRA member); *Ayco Co., L.P. v. Becker,* No. 1:10-CV-0834 GTS/RFT, 2011 WL 3651027, at *6 (N.D.N.Y. Aug. 18, 2011) (holding similarly); *Oppenheimer,* 2010 WL 743915, at *1 ("[Plaintiff] is not a FINRA member and cannot be compelled to arbitrate under FINRA rules."); *accord Westburg v. Good Life*

*Advisors, LLC,* No. 18-CV-248-LAB (MDD), 2018 WL 5112077, at *3 (S.D. Cal. Oct. 19, 2018) (rejecting movants' "attempt to use the individual advisors' registration with [FINRA-regulated] intermediary as a hook to secure arbitration); *Valentine Capital Asset Mgmt., Inc. v. Agahi,* 174 Cal. App. 4th 606, 627, 94 Cal. Rptr. 3d 526, 543 (2009) (holding similarly that non-FINRA-member would not be compelled to FINRA arbitration).

## IV. New York Law Applies to This Case.

Ferguson's motion to apply California law to all causes of action is premature at this early stage of litigation and this Court should decline to rule on this issue. *See Bristol–Myers Squibb Co. v. Matrix Labs. Ltd.,* 655 F. App'x 9, 13 (2d Cir. 2016) (observing that federal trial courts have declined to consider choice of law at an early stage of litigation).

Should the Court consider Ferguson's argument, this Court should apply New York law. New York choice of law principles typically apply the choice of law selected by the parties pursuant to a contract. *See S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F.Supp. 1014, 1025 (S.D.N.Y. 1984), *aff'd* 762 F.2d 990 (2d Cir. 1985) (citing Restatement (Second) of Conflict of Laws § 187 (1971). As Ferguson admits, the parties have contractually agreed to apply New York law to disputes arising out of the MMA Agreement. *See* Def. Br. at 23; Crain Decl. Ex. A at 23.

The choice of law provision agreed upon by the parties will not apply in only two narrow circumstances: (a) if the selected state has "no substantial relationship to the parties," or (b) if applying that state's law would "be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." *See S. Leo Harmonay,* 597 F.Supp. at 1025 (citation omitted). Neither circumstance applies here. First, the choice-of-law provision in the MMA Agreement specifies the Agreement's substantial connections to New York: "MMA's headquarters, the location of senior members of the leadership team, and the injury caused by breach of the Agreement itself." *See* Crain Decl. Ex. A at 23. Second, California's interest in this

litigation cannot be materially greater than New York's because California does not have a public policy at odds with the public policy in New York. All of the claims MMA asserts are tied to Ferguson's use, disclosure, and misappropriation of MMA's Confidential Information and Trade Secrets, which, as Ferguson admits, is also unlawful in California. *See* Def. Br. at 25.

The choice of law provision also covers MMA's tort claims.  Under New York law, "for a choice-of-law provision to apply" to tort claims "arising incident to the contract," "the expressed language of the provision must be sufficiently broad as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir. 1996). MMA's tort claims fall within the scope of the choice-of-law clause, because it expressly encompasses "injury caused by breach of the Agreement itself," which includes injury arising from torts associated with the Agreement.  *See* Crain Decl. Ex. A at 23.

## CONCLUSION

For the reasons explained above, MMA respectfully requests that this Court deny Ferguson's motion in its entirety, with prejudice.

Date:   June 26, 2019
        New York, New York

/s/ A. Michael Weber
A. Michael Weber
Douglas Wickham
Kevin K. Yam
Daniella Adler
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022-3298
212.583.9600
*Attorneys for Plaintiff*
*MARSH & McLENNAN AGENCY LLC*