UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARSH & MCLENNAN AGENCY LLC,

Plaintiff,

-against-

ELMER "RICK" FERGUSON,

Defendant.

Case No.: 1:19-cv-03837-VSB

---

**PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT
OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

---

A. Michael Weber
Douglas A. Wickham (pro hac vice)
Kevin K. Yam
Daniella Adler
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................. 1

SUPPLEMENTAL STATEMENT OF FACTS ......................................... 4

    A.     Ferguson Retained MMA's Confidential Information and Trade Secrets............ 4

    B.     Ferguson Planned Targeted Outreach To Solicit MMA Clients Using MMA's Confidential Information and Trade Secrets............................................. 5

    C.     MMA's Confidential Information and Trade Secrets Are Not Publicly Available And Ferguson Did Not Access Them From A Public Source.............. 6

    D.     Calder Denies That He Ever Instructed Ferguson To Tell Clients To Accept Stephens As Their Advisor Or Leave MMA............................................ 7

    E.     MMA Took Action After Learning of Ferguson's Wrongdoing.......................... 7

ARGUMENT .................................................................................. 8

I.     MMA IS ENTITLED TO INJUNCTIVE RELIEF GIVEN FERGUSON'S RETENTION OF CONFIDENTIAL INFORMATION AND SOLICITATIONS ........... 9

II.     MMA IS LIKELY TO SUCCEED ON THE MERITS AGAINST FERGUSON ......... 10

    A.     The MMA Agreement Is Enforceable ................................................ 10

    B.     Ferguson has Breached the MMA Agreement and Will Continue Without Injunctive Relief............................................................................ 13

    C.     A Preliminary Injunction Will Not Cause Undue Hardship to the Public or Ferguson...................................................................................... 17

III.     MMA HAS AND WILL SUFFER IRREPARABLE HARM ........................................ 17

    A.     MMA Did Not Inexcusably Delay Filing Its Motion For A Temporary Restraining Order, A Preliminary Injunction, Or Expedited Discovery.............. 18

    B.     Ferguson Cannot Establish an Affirmative Defense of Unclean Hands.............. 20

IV.     THE REQUESTED RELIEF IS APPROPRIATELY TAILORED TO PROTECT MMA'S INTERESTS ................................................................................ 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Mercer Health & Benefits LLC v. DiGregorio*,
    307 F. Supp. 3d 326 (S.D.N.Y. 2018) ..................................................................................11

*Barbagallo v. Marcum LLP*,
    925 F. Supp. 2d 275 (E.D.N.Y. 2013) ................................................................................12

*BDO Seidman v. Hirshberg*,
    93 N.Y.2d 382 (1999) .........................................................................................................11

*In re Cohen*,
    422 B.R. 350 (E.D.N.Y. 2010) ...........................................................................................20

*Computer Assocs. Int'l, Inc. v. Bryan*,
    784 F. Supp. 982 (E.D.N.Y. 1992) .....................................................................................20

*Eastern Bus. Sys., Inc. v. Specialty Bus. Solutions, LLC*,
    292 A.D.2d 336 (2d Dep't 2002) .......................................................................................10

*Ecolab Inc. v. Paolo*,
    753 F. Supp. 1100 (E.D.N.Y. 1991) ..................................................................................12

*Ecolab, Inc. v. K.P. Laundry Mach., Inc.*,
    656 F. Supp. 894 (S.D.N.Y. 1987).....................................................................................21

*FMC Corp. v. Taiwan Tainan Giant Indus. Co. Ltd.*,
    730 F.2d 61 (2d Cir. 1984)..................................................................................................10

*Giffords Oil Co., Inc. v. Wild*,
    106 A.D.2d 610 (2d Dep't 1984) .......................................................................................10

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)......................................................................12, 13, 18

*Kanan, Corbin, Schupak & Aronow, Inc. v. FD Intl., Ltd.*,
    8 Misc. 3d. 412, 2005 NY Slip. Op. (Sup. Ct. N.Y. Cnty. 2005) ...........................................12

*Kuklachev v. Gelfman*,
    361 F. App'x 161 (2d Cir. 2009) .......................................................................................19

*Leo Silfen, Inc., v. Cream*,
    29 N.Y.2d 387 (1972)..........................................................................................................10

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

**Cases**

*Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*,
   13 F. Supp. 2d 430 (S.D.N.Y. 1998) ...................................................................20

*Marsh USA Inc. v. Karasaki*,
   No. 08-cv-4195 (JGK), 2008 WL 4778239 (Oct. 31, 2008) ...............................12, 15

*Marsh USA Inc. v. Schuhriemen*,
   183 F. Supp. 3d 529 (S.D.N.Y. 2016) .................................................................16

*Production Res. Group, LLC v. Oberman*,
   No. 03-cv-5366 (JGK), 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003) .................18

*Residential Capital, LLC v. ResCap Borrower Claims Trust*,
   No. 15-CV-5423 (AJN), 2016 WL 1192690 (S.D.N.Y. Mar. 22, 2016), *aff'd
   sub nom. In re Residential Capital, LLC*, 698 F. App'x 34 (2d Cir. 2017) ............20

*Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina*,
   9 A.D.3d 805, 806 (2004) .................................................................................13

*Specialty Minerals, Inc. v. Pluess–Staufer AG*,
   395 F. Supp. 2d 109 (S.D.N.Y. 2005) .................................................................20

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999) ................................................................................18

*Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*,
   73 F. Supp. 3d 209 (S.D.N.Y. 2014) ..................................................................18

*USI Ins. Servs. v. Miner*,
   801 F. Supp. 2d 175 (S.D.N.Y. 2011) .................................................................15

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
   423 F.3d 137 (2d Cir. 2005) ..............................................................................19

## PRELIMINARY STATEMENT

In its moving brief ("MMA Mem.") (*see* Dkt. 35), Marsh & McLennan Agency LLC ("MMA") established that Elmer "Rick" Ferguson has breached his Barney & Barney/MMA Non-Solicitation and Confidentiality Agreement dated February 1, 2014 (the "MMA Agreement")[1] and his Employment Agreement with Barney & Barney, LLC ("Barney & Barney") dated February 26, 2007, causing MMA irreparable injury. Specifically: i) while employed at MMA, Ferguson gained valuable, non-public information about MMA's clients, prospects, and business strategies; and ii) before and following his February 15, 2019 departure from MMA, Ferguson took this Confidential Information and Trade Secrets[2] with him to his new employer, Teros Advisors, LLC ("Teros")[3], used it to contact MMA clients in breach of the MMA Agreement and actually persuaded at least 1̲3̲ MMA clients to take their business to Teros. *See* Calder Reply Declaration In Further Support of Motion for Preliminary Injunction dated July 10, 2019 ("Calder Reply Decl.") ¶ 5.

In Ferguson's opposition brief ("Def. Mem.") and his supporting declaration, he principally asserts that MMA has failed to identify any confidential information and that he took no confidential information from MMA because the information is publicly available. (*See* Dkts. 40-41). These assertions have proven to be disingenuous at best, and false at worst. During Ferguson's deposition, Ferguson admitted that before resigning from MMA, he emailed to his

---

[1] For the Court's convenience, terms defined in MMA's moving papers are used herein as defined therein.

[2] MMA's Confidential Information and Trade Secrets, which were protected from unauthorized disclosure or improper use, includes MMA's non-public client information, such as the client and prospective client identities and a confidential compilation contact information for key decision makers at MMA's clients, pricing for MMA products and services, information regarding specific client needs, requirements and/or preferences, confidential information and communications sent to or received from clients, and all other non-public MMA information that is or may be subject to restrictions on public disclosure and/or otherwise relating to MMA's clients and prospective clients, and its business, operations, and sales and marketing plans (collectively, "Confidential Information and Trade Secrets"). *See* Complaint, Ex. A, MMA Agreement, Section 1(a).

[3] For the purposes of the instant motion, the term Teros shall also be defined as to include entities such as Resources Investment Advisors ("RIA") and Triad Advisors ("Triad"), as Ferguson claims that RIA and Triad are his current employers and not Teros.

Teros email account (rferguson@terosadvisors.com) numerous documents containing MMA's Confidential Information and Trade Secrets: MMA's client contact information for key decision makers at MMA's clients, pricing for MMA products and services, specific client needs, requirements, and/or preferences, and confidential information and communications sent to or received from MMA clients. Ferguson also admitted that he engaged in targeted solicitations of MMA clients, including written and oral communications via email, telephone, and/or in-person with MMA clients during which he discussed Teros's (or RIA's/Triad's[4]) capabilities. Ferguson's contradictory statements in discovery show that the Court cannot simply take him at his word.  Rather, Ferguson's conduct has caused MMA irreparable harm in the form of at least 13 lost client relationships, goodwill, and other injuries for which there is no adequate remedy at law, and his now-apparent efforts to conceal this conduct should not be rewarded.

Moreover, in Ferguson's opposition to MMA's application for a preliminary injunction, Ferguson did not even attempt to argue that he has not solicited MMA clients during his employment or since his resignation. Instead, he claims that his direct supervisor at MMA, Jeff Calder, instructed him to tell MMA "clients that they must accept Jeff Stephens as their new advisor or leave MMA" with Ferguson, and if the MMA client would not accept Stephens, "they can leave MMA.  No other options." *See* Ferguson's Opposition Declaration dated June 21, 2019, Dkt. 41, ¶¶ 35-36. This representation is false and contrary to what Calder said. In response to Ferguson stating that some MMA clients would refuse Stephens as their advisor and

---

[4] Ferguson contends that he is actually "employed" by RIA/Triad.  However, MMA believes that he is actually employed by Teros because of his representations in emails to MMA clients soliciting them to join Teros. Moreover, Ferguson has a Teros email account, rferguson@terosadvisors.com that he actively used and, upon information and belief, continues to use in his current employment. Ferguson further contends that he was formerly employed by SagePoint and MMAS, not Barney & Barney and MMA. However, Ferguson never received W-2s or wage statements from SagePoint and did not have a SagePoint email address. *See* Wickham Reply Decl., Ex. A at 105-107. The same holds true with respect to MMAS.  Ferguson's contention that he was not a Barney & Barney and MMA employee is even more ludicrous considering that Ferguson admitted that he had to negotiate with Barney & Barney and MMA regarding his pay, commissions (when he was eligible as a producer), and bonus agreements, and that he was paid by Barney & Barney and MMA. *See* Wickham Reply Decl., Ex. A at 197-199, 244.

that they may leave MMA, Calder stated that is a "business risk" that "we have to take." *See* Calder Reply Decl. ¶ 6. Calder *never* instructed Ferguson to fire those clients or take them with him to a competitor, which would be a direct conflict of interest. *See* Calder Reply Decl. ¶ 7. Further, contrary to Ferguson's unsupported assertions to the Court, MMA does not instruct its supervisors/employees to inform its clients to leave MMA when MMA makes great efforts to establish and maintain the client-advisor relationship. *See* Calder Reply Decl. ¶ 8.

Significantly, Ferguson's own admissions at his deposition plainly demonstrate that he has misappropriated MMA's Confidential Information and Trade Secrets and engaged in prohibited solicitations using same. Ferguson first admitted that MMA's Chief Risk and Compliance Officer informed him on or about January 24, 2019 that "[e]-mail addresses of client which is considered confidential proprietary company information." *See* Wickham Reply Decl., Ex. A at 240. Ferguson then further admitted that he "had been sending [e]-mails to [himself] for 13 years doing service work, sales work, whatever…" *See* Wickham Reply Decl., Ex. A at 241, 267.

Ferguson's arguments with respect to his clear breaches of the MMA Agreement, the enforceability of the MMA Agreement and the irreparable harm MMA will suffer without an injunction, contravene New York and California law. In addition to blatantly mischaracterizing his solicitous actions using MMA's Confidential Information and Trade Secrets, Ferguson insists the restrictive covenants are overbroad and unenforceable.

Further ignoring New York and California law, Ferguson urges this Court to let him resume breaching the MMA Agreement and merely pay MMA for lost business, disregarding the well-settled principle that lost client relationships and goodwill cannot be readily quantified by monetary damages. Ferguson has not refuted, and cannot refute, the irreparable harm that MMA

will undeniably face if he is not enjoined from such conduct. Accordingly, for the reasons discussed more fully below, MMA respectfully requests that this Court grant its motion for a preliminary injunction.

## SUPPLEMENTAL STATEMENT OF FACTS[5]

### A.    Ferguson Retained MMA's Confidential Information and Trade Secrets

Ferguson boldly declares that "I did not use any confidential information or trade secrets in contacting" MMA clients and that "I had worked with my clients for years and developed relationships with them and did not need to or use any confidential information or trade secrets such as contact or pricing information in reaching out to them." *See* Dkt. 41, ¶¶ 55, 68. These statements are provably false.

At his deposition, Ferguson conceded that on February 13, 2019, *after* beginning discussions with Teros in the third or fourth quarter of 2018, and while he was still an MMA employee, he sent a large number of solicitation emails from his MMA work account to his Teros email account, rferguson@terosadvisors.com. *See* Wickham Reply Decl., Ex. A at 304-315; MMA Mem. at 9-12. These emails Ferguson sent to himself contained "MMA's confidential business contact information for key decision makers at MMA's clients that Ferguson had access to during his employment with MMA." *See* Declaration of Jeff Calder dated April 27, 2019, Dkt. 37 ("Calder Moving Decl.") ¶ 55. "Moreover, in multiple email messages Ferguson sent to his Teros email address, he attached dozens of MMA Outlook business contact cards that included MMA's confidential compilation of confidential contact information for key decision makers at MMA's clients and contact information for prospective clients and vendors (and the Outlook business contact cards for MMA clients included, among other things, the name

---

[5] Pursuant to the Court's Order, MMA deposed Ferguson on June 13, 2019. This Supplemental Statement of Facts is limited to this deposition, relevant excerpts of which are attached as Exhibit A to the accompanying Reply Declaration of Douglas A. Wickham ("Wickham Reply Decl.").

of the MMA client, the name of the key decision maker at the MMA client and the physical address, telephone number and email address for the key decision maker)." *Id.* ¶ 56.

Ferguson described why he sent himself this material: "[b]ecause it wasn't confidential information, to my understanding," and that he "was executing on Jeff Calder's instructions and Bill Peartree's. *See* Wickham Reply Decl., Ex. A at 255-56. He admitted that he told clients, "I may be transitioning to a new company, and you have a choice. Stay here or I may be transferring to a new company." *See* Wickham Reply Decl., Ex. A at 304-05. Despite Ferguson's representation that he has "deleted" the MMA Outlook contacts, it is not entirely clear whether he has deleted MMA's Confidential Information and Trade Secrets, including the email addresses of MMA's clients and pricing information, from both his personal or Teros email accounts. *See* Ferguson Opp. Decl. ¶ 56.  It should also be noted that the Temporary Restraining Order (Dkt. 14) in the instant action does not currently extend to discovery of Ferguson's Teros email account, rferguson@terosadvisors.com, and only extends to his personal email account. Accordingly, Ferguson is still in possession of MMA's Confidential Information and Trade Secrets, and MMA cannot be certain as to the veracity of such status until a full forensic examination of Ferguson's personal and Teros's computers, cellphones, tablets, electronic devices, cloud and internet based document storage, and/or email accounts are completed.

### B. Ferguson Planned Targeted Outreach To Solicit MMA Clients Using MMA's Confidential Information and Trade Secrets

Ferguson testified that he did not simply send himself his MMA Outlook contact lists and cards but rather selected at least 14 contacts to actively solicit to join him at his new employer, Teros. *See* Wickham Reply Decl., Ex. A at 260-61. Ferguson did not mail a general announcement regarding his move to Teros; instead, since February 12, 2019 through the present, Ferguson individually emailed at least 14 MMA clients, told them of his impending

move to Teros and provided his new contact information. *See* Wickham Reply Decl., Ex. A at 260-61. Following his resignation, in clear violation of the MMA Agreement, Ferguson has continued to contact MMA clients that he is prohibited from contacting per the terms of the MMA Agreement and with whom he had previously worked to talk about Teros's capabilities until as recently as June 28, 2019. *See* Calder Moving Decl. ¶¶ 38-82; Calder Reply Decl. ¶ 9.

### C.   MMA's Confidential Information and Trade Secrets Are Not Publicly Available And Ferguson Did Not Access Them From A Public Source

At Ferguson's deposition, he admitted that he was a "novice" when he transitioned into a producer role at Barney & Barney in or around August 2012 before it merged into MMA. *See* Wickham Reply Decl., Ex. A at 79-83. Ferguson stated that he was given certain clients of Bill Peartree's who allegedly fired Peartree. *See* Wickham Reply Decl., Ex. A at 80. During his deposition, Ferguson further represented that Ferguson's Alleged Preexisting Contact Number 1 and Ferguson's Alleged Preexisting Contact Number 2 are the only MMA clients that he brought into MMA "based upon relationships that preexisted" prior to his employment with Barney & Barney. *See* Wickham Reply Decl., Ex. A at 85-86.

When asked how Ferguson was able to obtain certain retirement plan information, Ferguson responded that he performed internet research, including accessing Form 5500s and websites/programs such as FreeERISA, Judy Diamond, Firm, and Info Select. *See* Wickham Reply Decl., Ex. A at 97-100. However, when pressed to identify how email addresses of particular key contact person at MMA's clients are publicly found, Ferguson is not able to provide any details as to specific MMA clients and merely uses a generalized summary that the email addresses may be found on the internet.  In fact, Ferguson admitted as follows:

> Q:      Okay.  For all of the client information that you sent to yourself in February of 2019, before you sent that information to your E-mail address at

Teros Advisors, did you look up all of that information in Form 5500s, in FreeERISA, or these other publicly available sources? …

A:     No, because 95 or more percent of that was not retirement plan client related.  It was that I had by personal contacts in there.  In fact, most of it was junk accumulated over 13 years.

*See* Wickham Reply Decl., Ex. A at 290.

Accordingly, it is undisputed that Ferguson did not use publicly available information to access MMA's client's key contact's email addresses, which cannot be found on the databases Ferguson identified because those email addresses are Confidential Information and Trade Secrets of MMA that are protected and heavily guarded by MMA. *See* Calder Reply Decl. ¶ 10.

### D.     Calder Denies That He Ever Instructed Ferguson To Tell Clients To Accept Stephens As Their Advisor Or Leave MMA

As discussed briefly above, Ferguson alleges that Calder, his direct supervisor at MMA, instructed him to tell MMA "clients that they must accept Jeff Stephens as their new advisor" or they would be "fired" by MMA. Dkt. 41, ¶¶ 35-36. In direct response to Ferguson stating that some MMA clients would refuse Stephens as their advisor and that they may leave MMA, Calder merely stated that is a "business risk" that "we have to take." *See* Calder Reply Decl. ¶ 6. Calder never instructed Ferguson to fire those clients because MMA's practice to ensure that its client-advisor relationship is properly maintained to ensure a long, lasting one given that MMA invests tremendous time and resources to initiate the client-advisor relationship with its clients in the first place. *See* Calder Reply Decl. ¶¶ 7-8.

### E.     MMA Took Action After Learning of Ferguson's Wrongdoing

Within five days of learning that Ferguson solicited MMA's clients, MMA sent Ferguson a cease-and-desist letter reminding him of his obligations under the MMA and Barney & Barney Agreement. *See* Declaration of Douglas A. Wickham dated April 29, 2019, Dkt. 36 ("Wickham

Moving Decl.") ¶ 6. At the same time, MMA investigated the nature and extent of Ferguson's wrongdoing while continuing to communicate with Ferguson in an attempt to avoid litigation. *See* Wickham Moving Decl. at ¶¶ 7-13. Nevertheless, in or around early-mid April 2019, when MMA realized that Ferguson was not going to adequately respond to MMA's demands to potentially reach a mutually agreeable resolution, MMA immediately began to prepare for the filing of this action in order to enforce the contractual promises of Ferguson, to protect its customers, goodwill, and Confidential Information and Trade Secrets, and to prevent irreparable injury to its business interests by Ferguson and his new employer, Teros.

As the Court is aware, this action was filed on April 30, 2019. *See* Dkt. 1.

## ARGUMENT

Ferguson does not dispute the legal standard for granting injunctive relief. Def. Mem. at 17. Ferguson instead contends that: (1) he did not retain any confidential MMA information after resigning, (2) his supervisor Calder instructed him to reach out to MMA clients to inform that they have only two options, to use Stephens as an advisor in place of Ferguson or they would be fired as MMA clients, and (3) the MMA Agreement is overbroad and unenforceable. These assertions are untrue.

First, as described above, Ferguson retained volumes of information regarding MMA's clients, contact information of key players at MMA's clients, and pricing strategies after leaving MMA; such material was clearly protected by Ferguson's MMA Agreement and by applicable law, and MMA will suffer irreparable injury if Ferguson is not enjoined from further violations of the MMA Agreement. Second, Calder, under penalties of perjury, vehemently asserts that he never instructed Ferguson to inform MMA's clients that they are to either accept Stephens as an advisor or they must leave MMA; such an absurd suggestion by Ferguson that Calder stated such

instructions is not only defamatory but outright incredible because MMA uses significant time and money to even be able to establish each client relationship, and as such, it would in very rare circumstances fire one client, let alone multiple clients. Third, the MMA Agreement is enforceable under New York and/or California law and Ferguson has breached it.

## I.      MMA IS ENTITLED TO INJUNCTIVE RELIEF GIVEN FERGUSON'S RETENTION OF CONFIDENTIAL INFORMATION AND SOLICITATIONS

Ferguson contends that on leaving MMA, Ferguson retained only his own contact lists that he can remember based on his memory and alleges that MMA has failed to specify what confidential information is at issue. Def. Mem. at 15-16. This argument has succumbed to the barest minimum of discovery, as Ferguson concedes that he sent to himself MMA documents comprising not only lists of client and prospect names, but information concerning those entities, including pricing and other matters that MMA has made significant investments to compile and has explicitly regarded as highly confidential and not for distribution. Further, contrary to prior sworn testimony, Ferguson concedes that in his declaration, filed June 21, 2019, that he forwarded himself MMA's Confidential Information and Trade Secrets, including but not limited to MMA client's business contact information. *See* Ferguson Opp. Decl. ¶ 56.

This is not a case, as Ferguson argues, in which lists of publicly available names or Outlook contacts are at issue. Rather, the emails and documents that Ferguson emailed to himself include voluminous compilations of information as well as communications in MMA's internal database, reflecting years of work and investment by his former MMA colleagues to ensure that they are properly safeguarded, protected as highly confidential, and prohibited from distribution.[6] Moreover, Ferguson could not possibly "ascertain" this information from public sources, much

---

[6] In fact, based on Ferguson's own admission at his deposition, MMA's Chief Risk and Compliance Officer personally reached out to Ferguson on January 24, 2019 to confirm with him that he understands that "[e]-mail addresses of clients [is] considered confidential proprietary company information," and Ferguson responded that "yes," he understood. *See* Wickham Reply Decl., Ex. A. at 239-40.

less his so-called "recollection" of work that he did not personally perform. Compilations of this type are properly viewed as confidential information that deserve the Court's protection. *See Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 392-93 (1972); *Eastern Bus. Sys., Inc. v. Specialty Bus. Solutions, LLC,* 292 A.D.2d 336, 337–38 (2d Dep't 2002); *Giffords Oil Co., Inc. v. Wild,* 106 A.D.2d 610 (2d Dep't 1984); *FMC Corp. v. Taiwan Tainan Giant Indus. Co. Ltd.,* 730 F.2d 61, 63 (2d Cir. 1984).

Ferguson essentially admits that his reason for emailing these documents to himself was to have access to information relative to "a mix of personal and business contacts" who may join him with his new firm when he decided to leave MMA. *See* Wickham Reply Decl., Ex. A. at 304-05; Ferguson Opp. Decl. ¶ 56. If, as Ferguson asserts, the emails and documents that Ferguson emailed to himself contain only publicly available information, Ferguson would have no need to email himself these documents for future use. Given Ferguson's admission and solicitations, the Court should not accept Ferguson's assertions that he does not plan to use MMA's Confidential Information and Trade Secrets.

## II.   MMA IS LIKELY TO SUCCEED ON THE MERITS AGAINST FERGUSON

### A.   The MMA Agreement Is Enforceable.

The crux of Ferguson's opposition is that the MMA Agreement is unenforceable because: (1) it does not carve out an exemption for clients that came to MMA solely to avail themselves of Ferguson's services and only as a result of Ferguson's own independent recruitment efforts, which MMA neither subsidized nor otherwise financially supported as part of a program of client development and (2) MMA's Confidential Information and Trade Secrets are not confidential

information and trade secrets under federal and New York law. Def. Mem. at 15-17.[7] As discussed below, Ferguson's interpretation of *BDO Seidman* is incorrect and, even if it were correct, no clients came to MMA "solely to avail themselves" of Ferguson's services or as a result of his "independent recruitment efforts." *See* Def. Mem. at 31.

In *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382 (1999), the non-solicitation provision at issue applied to the plaintiff's entire client base. Although, as written, the provision was overbroad, the New York Court of Appeals held that an "employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment*." Id.* at 392. In determining the enforceable scope of the restrictive covenant, the court excluded clients that the defendant "never acquired a relationship through the direct provision of substantive accounting services during his employment" and "personal clients of defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which BDO neither subsidized nor otherwise financially supported as part of a program of client development." *Id*. at 393.

Misapprehending this precedent entirely, Ferguson argues, incorrectly, that the "personal clients" language referenced in *BDO Seidman* must be carved out of any non-solicitation agreement, and without such a carve out, it is unenforceable as a matter of law. Def. Mem. at 31-32. However, New York federal and state courts, including this one, have often granted injunctive relief with respect to non-solicitation provisions that did not contain such language. *See, e.g., Mercer Health & Benefits LLC v. DiGregorio,* 307 F. Supp. 3d 326 (S.D.N.Y. 2018) (granting a preliminary injunction to uphold a restrictive covenant similar to the MMA

---

[7] These are the *only* aspects of the MMA Agreement that he argues is overbroad or unenforceable. Ferguson does not dispute, and therefore concedes, that the two-year temporal restriction and lack of geographic restriction are reasonable, and therefore, enforceable.

Agreement); *Marsh USA Inc. v. Karasaki,* No. 08-cv-4195 (JGK), 2008 WL 4778239 at *3 (Oct. 31, 2008) (granting preliminary injunction where non-solicitation provision that covered clients and prospects who had been solicited or serviced, directly or indirectly, by defendant in his former employment); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F. Supp. 2d 525, 529 (S.D.N.Y. 2004) (ordering injunctive relief where restrictive covenant applied to customers served or solicited directly or indirectly by defendants in their former employment); *Ecolab Inc. v. Paolo,* 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991) (enforced covenant applied to customers whose accounts were assigned to plaintiff and for which he received commissions or with whom he did business during the last twelve months of his employment). It would be illogical to mandate a "carve out" for personal clients, given that, in many scenarios, like this one, such language not apply.

Here, the lack of a "personal clients" carve-out does not render the non-solicitation provision, or the agreement, unenforceable, not only as a matter of law, but also because Ferguson had no such clients. Ferguson does not specifically identify <u>any clients</u> that allegedly fall into this category and he fails to offer any facts to support his conclusory assertion that such personal clients came to him solely to avail itself of his services <u>and</u> as a result of his own recruitment efforts, which MMA neither subsidized nor otherwise financially supported as part of a program of client development. [8] *See* Ferguson Opp. Dec., ¶ 6; Def. Mem. 31.

In fact, none of the MMA clients that Ferguson serviced was a personal client of Ferguson. Clients came to MMA from professional referrals based on Ferguson's work at MMA

---

[8] The case law relied on by Ferguson is inapposite. Def. Mem. at 31-32. In *Barbagallo v. Marcum LLP,* 925 F. Supp. 2d 275, 295 (E.D.N.Y. 2013), the plaintiff had pre-existing relationships with the clients at issue, except for one that he had not worked with in the time period defined by the agreement; here, Ferguson had no pre-existing relationships with the MMA clients. *See* Calder Moving Decl. ¶¶ 21-22; Calder Reply Decl., ¶ 14. In *Kanan, Corbin, Schupak & Aronow, Inc. v. FD Intl., Ltd.,* 8 Misc. 3d 412, 2005 NY Slip. Op, 25175 (Sup. Ct. N.Y. Cnty. 2005), the plaintiff failed to demonstrated that it contributed to good will; here, there is overwhelming evidence of MMA's contributions.

or were given to him internally from other MMA producers such as Peartree. *See* Calder Reply Dec., ¶ 12.   Moreover, MMA has consistently funded Ferguson's relationship with the clients that he serviced. *See* Calder Reply Decl., ¶ 13. To be clear, *none* of the clients covered by Ferguson's MMA Agreement came to MMA solely to avail themselves of Ferguson's services or were acquired through his independent recruitment efforts without support from MMA. *See* Calder Reply Decl. ¶ 14. Accordingly, the MMA Agreement is enforceable because it only seeks to prevent "the competitive use of client relationships that the employer assisted the employee in developing through the employee's performance of services in the course of employment." *Scott, Stackrow & Co., C.P.A.'s, P.C. v. Skavina,* 9 A.D.3d 805, 806 (2004).

Even if the MMA Agreement was overbroad, which it is not, partial enforcement would be warranted. Ferguson asks the Court to invalidate the entire agreement. As discussed above, Ferguson had no "personal clients" and did not engage in "independent recruitment efforts;" it is therefore illogical to argue that such hypotheticals were so essential to the MMA Agreement that it could not be enforced without them.   In *BDO Seidman,* the New York Court of Appeals found the lower court erred by invalidating the entire restrictive covenant due to the overbreadth of the client restriction and enforced the agreement by narrowing the class of BDO clients to which the covenant applied. 93 N.Y.2d at 394-95. Federal courts have taken the same approach. *See, e.g., Johnson Controls, Inc.,* 323 F. Supp. 2d at 540.   Accordingly, the MMA Agreement is enforceable.

### B.     Ferguson has Breached the MMA Agreement and Will Continue Without Injunctive Relief.

In support of MMA's likelihood of success on the merits, Ferguson's June 21, 2019 opposition papers confirm that he breached the MMA Agreement by directly and indirectly

soliciting business from MMA clients before and after his resignation on February 15, 2019.  As mentioned above, Ferguson's efforts to mischaracterize his clear solicitations utterly fail.

With respect to the 20 or more MMA clients that Ferguson has solicited, there is, in fact, little *more* Ferguson could have done to solicit their business. For example, Ferguson did not refute the following chain of events in his declaration opposing this motion nor did he do so in his deposition on June 13, 2019:

As discussed in MMA's opening brief, on or about February 12, 2019, *while employed by MMA*, Ferguson used his Teros email account, rferguson@terosadvisors.com, to solicit an MMA client ("MMA Client Number 1") via email, using MMA's Confidential Information and Trade Secrets to do so. *See* MMA Mem. at 9. Ferguson used MMA's highly confidential compilation of client contact information for key decision makers at MMA clients to send the following message to MMA Client Number 1:

> Following up from our discussion and prior email. Below is my new [Teros] email address and phone number. Attached are the forms to change our advisory to Teros Advisors. These should be dated February 16.
>
> *See Id.*

First and foremost, based on the context of the email, Ferguson not only used his Teros email, rferguson@terosadvisors.com, to solicit MMA Client Number 1 but also had a discussion (presumably over the telephone or in-person) as well as another prior email exchange where Ferguson solicited MMA Client Number 1 to switch its service provider to Teros.

It is not surprising that Ferguson offers no legal authority to support his position that his conduct was not solicitation. He only states without support that MMA's Confidential Information and Trade Secrets are not subject to protection under the law because they are not confidential and are not trade secrets, and that the MMA Agreement is not enforceable. *See* Def.

Mem. at 39. However, this Court has found that conduct far less egregious than Ferguson's breached non-solicitation provisions that, like the MMA Agreement, barred direct and indirect solicitation. *See, e.g., Karasaki,* 2008 WL 4778239, at *20 (defendant did not initiate conduct or attend meetings with clients but nevertheless breached non-solicitation agreement by providing colleagues with contact information for former clients and playing a central role in organizing meetings).

In *Karasaki*, the Court did not find the individual defendant "actively solicited" business; rather, it was the defendant's *colleagues* who communicated his departure and engaged in direct solicitations, with the defendant acting behind the scenes, in breach of his non-solicitation agreement. *Karasaki,* 2008 WL 4778239, at *20 ("The agreements prevented him from indirectly soliciting his prior clients and that is precisely what he did. He cannot escape liability simply because another Aon executive attended the meetings for him."). Here, based on documentary *and* testimonial evidence, there is no dispute that Ferguson directly solicited and is now servicing at least 13 MMA clients. And, unlike *Karasaki*, Ferguson clearly engaged in direct solicitation by initiating contact with MMA clients, providing Teros with MMA's client contact information and, most egregiously, attending meetings and participating in written and oral communications that resulted in the transfer of MMA clients' business to Teros. *See* MMA Mem. at 9-19.

Ferguson's announcements of his departure and affiliation with Teros to existing MMA clients through individualized distribution and other targeted solicitations also violated the MMA Agreement. In *USI Ins. Servs. v. Miner*, 801 F. Supp. 2d 175, 192-93 (S.D.N.Y. 2011), this Court found that the defendant breached his non-solicitation agreements by sending an email that informed his former clients of his new position at a competing insurance company and touted the

merits of the his new employer. Likewise in *Schuhriemen,* this Court found that the defendant's "notice announcing his employment . . . was not a general announcement," but rather targeted solicitation likely in violation of the defendant's non-solicitation agreement. *Marsh USA Inc. v. Schuhriemen,* 183 F. Supp. 3d 529, 536 (S.D.N.Y. 2016). The email solicitations by Ferguson here are no different.

Ferguson's departure announcement did not merely advise MMA clients that he is leaving or left MMA; it informed them that he would be providing the same services at Teros that he offered at MMA and described Teros's qualifications and history to a pool of clients that was most likely unfamiliar with its practice. In fact, MMA an MMA client responded to Ferguson's solicitation and asked him to "supply some information of Teros Advisors" because they were "not familiar with the firm." *See* MMA Mem. at 10. Thus, Ferguson's communications were, in fact, followed by further solicitation, and clearly rise to the level of solicitation as contemplated by the MMA Agreement and applicable case law in this Circuit.

Ferguson's opposition papers and current actions further confirm that, without injunctive relief, he will continue to breach the MMA Agreement. Ferguson does not and cannot dispute that Teros hired him to assist in Teros's retirement plan services practice group by soliciting MMA clients. As recently as June 28, 2019, an MMA client reported to MMA that it was contacted by Ferguson regarding a potential solicitation. *See* Calder Reply Decl. ¶ 9.  Ferguson continues to argue that the MMA Agreement is unenforceable and that MMA's Confidential Information and Trade Secrets is not subject to protection under the law because it is publicly available information. Accordingly, Ferguson has clearly signaled that, without an injunction, he intends to solicit and service restricted MMA clients. *See* Def. Mem. at 42-43 (arguing that he will be harmed by an injunction because he would not be able to work with such clients).

**C.      A Preliminary Injunction Will Not Cause Undue Hardship to the Public or Ferguson.**

MMA will suffer immediate and irreparable harm without a preliminary injunction; Ferguson, however, will not be harmed at all. He will not, as he alleges, suffer a "significant restraint of his trade if this sweeping application is granted." *See* Def. Mem. at 42. As discussed above and in MMA's moving brief, the MMA Agreement is narrowly tailored to protect MMA's legitimate interests, covering only a specific group of MMA clients that he worked for or about which he gained confidential information within the last two years prior to his termination. This leaves countless other companies that Ferguson can solicit and service, while working for Teros, until his MMA Agreement expires.

Ferguson also argues that the public will be harmed if he is required to abide by his MMA Agreement. *See* Def. Mem. at 42. Ferguson has not identified any undue harm that would result if a client has to wait only two years[9] before Ferguson can solicit or service its business. However, Ferguson and Teros, are by no means the only legitimate alternative to MMA for 401(k) advisory services. The MMA clients can work with any other service provider of its choosing until Ferguson's non-solicitation obligations expire.

## III.      MMA HAS AND WILL SUFFER IRREPARABLE HARM

As discussed in Points I and II above, without an injunction, Ferguson will continue to breach his MMA Agreement. This is not in dispute; to the contrary, Ferguson claims he will be harmed if he is *not* allowed to breach his obligations. *See* Def. Mem. at 42.

In an effort to refute the irreparable harm MMA has and will continue to suffer as a result of Ferguson's past and future breaches, Ferguson argues – contrary to New York law – that a loss of a client relationship can be accounted for with monetary damages. *See* Def. Mem. at 20-

---

[9] Ferguson does not dispute, and therefore concedes, that the two-year temporal restriction and lack of geographic restriction are reasonable, and therefore, enforceable.

21. Ferguson claims that MMA's damages can be measured monetary terns yet fails to quantify for the Court how such damages can be calculated. *Id.* Moreover, Ferguson fails to address the contrary case law in this District that MMA cites in its opening brief. *See e.g.*, *Johnson Controls, Inc.* 323 F. Supp. 2d at 525; *see also* MMA Mem., Dkt. 35, at 25-26, 28. Specifically, Ferguson does not address and cannot refute MMA's explanation that the loss of client relationships would result in lost "indeterminate future billings" and "significant good will built up during [MMA's] long-term service of these clients." *Johnson Controls*, 323 F. Supp. 2d at 532 (plaintiffs established irreparable harm based on loss of client relationships); *see also Uni-World Capital, L.P. v. Preferred Fragrance, Inc.,* 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999).

By virtue of his employment with MMA, Ferguson was placed in the unique position to develop relationships with MMA clients, and there is therefore no way to quantify MMA's damages. *Johnson Controls,* 323 F. Supp. 2d at 532 (distinguishing *Production Res. Group, LLC v. Oberman*, No. 03-cv-5366 (JGK), 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003)). The potential loss business and good will that have and will result from Ferguson's breaches cannot be readily and adequately measured, and therefore, injunctive relief is warranted in the instant action.

### A.     MMA Did Not Inexcusably Delay Filing Its Motion For A Temporary Restraining Order, A Preliminary Injunction, Or Expedited Discovery

Ferguson argues that MMA could not have suffered irreparable harm because it "delayed" in filing its preliminary injunction motion; however, MMA did not unduly delay in bringing this preliminary injunction motion, but instead took action immediately, investigating the extent and nature of Ferguson's wrongdoing while communicating with his counsel to attempt to avoid litigation. *See* MMA Mem. at 20-23. Specifically, MMA's counsel sent a cease-

and-desist letter to Ferguson on or about February 19, 2019, advising Ferguson that he was in breach of his post-employment obligations and that MMA would not hesitate to pursue any and all legal remedies necessary to enforce such obligations. *See* MMA Mem. at 20. Between February 21, 2019 and April 2, 2019, Ferguson's and MMA's counsel exchanged letters to set forth the respective parties' positions and to discuss any potential resolution of this matter. However, after receiving no response to MMA's April 2, 2019 letter imploring Ferguson to cooperate with MMA, to cease and desist from engaging in all improper conduct, and to otherwise comply with his contractual obligations in the MMA Agreement, MMA was left with no choice but to file the instant action despite its good-faith efforts to reach a resolution with Ferguson.

It is well settled that any delay caused by good-faith efforts to investigate unlawfully competitive activities and to attempt in good faith to resolve a dispute with a defendant does not negate a presumption of harm. *See, e.g. Kuklachev v. Gelfman,* 361 F. App'x 161, 163 (2d Cir. 2009) (affirming preliminary injunction in trademark claim because plaintiffs' 18-month delay was excusable based on the need to investigate the nature of the infringement and to explore what legal recourse was possible); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.,* 423 F.3d 137, 144–45 (2d Cir. 2005) (collecting cases holding that four-month, five-month, and seven-month delays were not unreasonable, and holding four-month delay reasonable when due to investigating the wrongdoing and contacting opposing counsel "in an attempt to resolve the situation"). Accordingly, MMA did not inexcusably delay the filing of its motion for a temporary restraining order, a preliminary injunction, and expedited discovery against Ferguson.

**B.      Ferguson Cannot Establish an Affirmative Defense of Unclean Hands**

Ferguson then argues that MMA has unclean hands and therefore cannot assert its right to a preliminary injunction. Yet Ferguson cannot and will not be able to prove an affirmative defense of unclean hands. To assert an unclean hands defense, Ferguson must prove that MMA (1) is guilty of immoral, unconscionable conduct, (2) Ferguson relied on that conduct, and (3) Ferguson was injured as a result. *See Residential Capital, LLC v. ResCap Borrower Claims Trust,* No. 15-CV-5423 (AJN), 2016 WL 1192690, at *6 (S.D.N.Y. Mar. 22, 2016), *aff'd sub nom. In re Residential Capital, LLC*, 698 F. App'x 34 (2d Cir. 2017). Further, the "immoral, unconscionable" conduct alleged must be "immediately and necessarily related" to the equity that plaintiff seeks in litigation. *See Specialty Minerals, Inc. v. Pluess–Staufer AG,* 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005). Courts "are reluctant to apply [the doctrine] in all but the most egregious situations." *See In re Cohen,* 422 B.R. 350, 381 (E.D.N.Y. 2010).

Ferguson does not allege immoral, unconscionable behavior related to acquiring or using MMA's confidential information and trade secrets, and consequently the unclean hands doctrine cannot and does not apply. *See e.g., Computer Assocs. Int'l, Inc. v. Bryan,* 784 F. Supp. 982, 998 (E.D.N.Y. 1992) (holding that in a misappropriation of trade secrets action, any alleged wrongdoing sufficient to apply the unclean hands doctrine "would have to be related to the creation or acquisition of the trade secrets themselves"), *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,* 13 F. Supp. 2d 430, 445 (S.D.N.Y. 1998) (declining to apply unclean hands in trademark action because the wrongdoing alleged did not "relate to getting or using the alleged trademark rights").

More importantly, Ferguson has not and will not be able to prove that MMA engaged in any of the wrongdoing he alleges: MMA did not lie to Ferguson or clients when it informed

clients that Ferguson would be their investment advisor, MMA did not discriminate against Ferguson on the basis of sexual orientation, his supervisor Calder did *not* direct Ferguson to "take" MMA clients that did not want to work with Stephens, and MMA paid Ferguson all compensation owed to him. *See* Calder Reply Decl. ¶ 11. Ferguson's only alleged evidence is his own complaint and an email that he sent to himself recounting similar false allegations. *See* Ferguson Decl., Exs. A, E. Therefore, Ferguson's unclean hands defense, with no evidence to support it and contradicted by credible evidence to the contrary, will fail. *See Ecolab, Inc. v. K.P. Laundry Mach., Inc.,* 656 F. Supp. 894, 899 (S.D.N.Y. 1987) (dismissing unclean hands defense because defendant "has failed to show that there is any support for it").

## IV.   THE REQUESTED RELIEF IS APPROPRIATELY TAILORED TO PROTECT MMA'S INTERESTS

Finally, the restrictions that MMA seeks to enforce are no greater than is required to protect MMA's interests. Given Ferguson's retention of the MMA client's email addresses in his rferguson@terosadvisors.com as well as his personal email accounts, he has retained knowledge of and access to numerous MMA clients and prospects whom he personally serviced while at MMA during the last two years of his employment with MMA. Contrary to Ferguson's absurd and ludicrous arguments, such highly guarded and protected contact information of MMA clients and prospects could not possibly be deemed "publicly available." Indeed, Ferguson has also confirmed and admitted that he did not and/or was not able to access the Confidential Information and Trade Secrets publicly through resources such as Form 5500s and FreeERISA. *See* Wickham Reply Decl., Ex. A at 290. Accordingly, Ferguson should be enjoined from pursuing any of the MMA clients or prospects referenced in any of the MMA Confidential Information and Trade Secrets that Ferguson retained before and after joining Teros.

## **CONCLUSION**

For the foregoing reasons, and those set forth in its moving papers, MMA respectfully requests that the Court grant its motion for injunctive relief.

Date:   July 10, 2019
         New York, New York

/s/ A. Michael Weber
_____
A. Michael Weber
Douglas A. Wickham (pro hac vice)
Kevin K. Yam
Daniella Adler
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022.3298
212.583.9600

*Attorneys for Plaintiff*
*Marsh & McLennan Agency LLC*