JA2VMARHredacted

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MARSH & MCLENNAN AGENCY LLC,

4                Plaintiff,

5           v.                          19 CV 3837 (VSB)

6  ELMER "RICK" FERGUSON,

7                Defendant.             EVIDENTIARY HEARING

8  ------------------------------x
                                       New York, N.Y.
9                                      October 2, 2019
                                       11:10 a.m.
10
   Before:
11
                     HON. VERNON S. BRODERICK,
12
                                       District Judge
13
                          APPEARANCES
14
   LITTLER MENDELSON
15      Attorneys for Plaintiff
   BY:  DOUGLAS A. WICKHAM
16       KEVIN K. YAM
         DANIELLA ADLER
17
   ELMER "RICK" FERGUSON, pro se
18
   MOUND COTTON WOLLAN & GREENGRASS
19      Attorneys for ADR Provider Teros Advisors LLC,
         Interested Parties Triad Advisors LLC,
20        and Resource Investment Advisors
   BY:  BARRY R. TEMKIN
21

22

23

24

25

JA2VMARHredacted

```
 1              (Case called)

 2              MR. WICKHAM:  Good morning, your Honor.

 3              Douglas Wickham on behalf of Littler Mendelson, for

 4    the plaintiff.

 5              THE COURT:  Good morning.

 6              MR. YAM:  Kevin Yam from Littler, on behalf of MMA.

 7              MS. ADLER:  And also Daniella Adler, also from

 8    Littler.

 9              THE COURT:  Okay.

10              MR. FERGUSON:  Rick Ferguson, your Honor, *pro se*.

11              THE COURT:  All right.  You may be seated.

12              So we're here for a hearing on the application of

13    Marsh & McLennan for a preliminary injunction.

14              I understand there will be some witnesses.  So let me

15    first ask, Mr. Wickham, how many witnesses do you have and who

16    are they?

17              MR. WICKHAM:  We only have one live witness, your

18    Honor.

19              THE COURT:  Okay.

20              MR. WICKHAM:  That is Jeff Calder.

21              We also had provided to the clerk two additional

22    affidavits for Ms. Cam and Ms. Rosen that we've handed up.

23              THE COURT:  Okay.  And I have those affidavits.  I

24    have not read them yet, so obviously I need to read them.

25              Have you provided copies of these to Mr. Ferguson?
```

JA2VMARHredacted

1            MR. WICKHAM:  We have, your Honor.

2            THE COURT:  Okay.  Was that just this morning or had

3     you provided it to him at some other point in time earlier?

4            MR. WICKHAM:  We provided them this morning.  We only

5     had them signed late last night.

6            THE COURT:  Understood.

7            Okay.  So, Mr. Ferguson, the way that we're going to

8     proceed is I'm going to first ask Mr. Wickham to call their

9     witness.  He'll have an opportunity to ask questions of

10    Mr. Calder.  You'll also have -- once the testimony is done,

11    you'll have an opportunity to put on any witnesses that you

12    might have.  Do you have witnesses?

13           MR. FERGUSON:  Your Honor, I had requested a couple,

14    but they are under the control of MMA, so I do not have any

15    live witness.

16           THE COURT:  All right.

17           Had you discussed -- are these folks who are in

18    California?

19           MR. FERGUSON:  Correct, your Honor.  But Jeff Calder

20    is here.  He is one of them.

21           THE COURT:  Okay.

22           And who are the others, just so that I know?

23           MR. FERGUSON:  Bill Peartree.

24           THE COURT:  Mr. Peartree.

25           MR. FERGUSON:  Diane Rosen.

JA2VMARHredacted

1          THE COURT:  And Ms. Rosen.

2          MR. FERGUSON:  And Mara Crain.

3          THE COURT:  All right.

4          I think that Ms. Crain has submitted an affidavit or

5     declaration.  We just received something from Ms. Rosen.  And I

6     don't believe that there -- had Mr. Peartree filed a prior

7     declaration?

8          MR. WICKHAM:  No, your Honor.

9          THE COURT:  All right.

10         There could have been a means by which -- and again,

11    I'm not opining as to whether a subpoena would have been

12    something -- I haven't given thought about the location of the

13    particular witnesses that would compel them to have to be here

14    for their testimony.  But let me hear the testimony of

15    Mr. Calder.  I may have some questions relating to the other --

16    Ms. Crain.  And again, I haven't read Ms. Rosen's deposition,

17    but I did read Ms. Crain's affidavit.

18         Let me ask, is there anything that we need to deal

19    with preliminarily from the plaintiff?  Mr. Wickham?

20         MR. WICKHAM:  Because the case involves trade secret

21    misappropriation and the abuse or misuse of confidential

22    information, necessarily some of that information makes its way

23    into exhibits, solicitation messages and things of that nature.

24    Because Mr. Ferguson is unrepresented, we couldn't -- normally

25    we would designate all of that attorneys' eyes only; but

1    because he's unrepresented, we haven't, so he's seeing it.  But

2    we don't want to be in a position of any accusation that we've

3    waived our right to claim this information.  I was thinking of

4    a couple of things on that though.

5          THE COURT:  Okay.  Let me make a proposal and see

6    whether this is consistent with what you were thinking.

7          To the extent there's testimony that you believe would

8    be -- that contains confidential information, what I typically

9    would do is give the parties a certain amount of time after the

10   transcript has been created, before it would be normally placed

11   on the docket, to review the transcript and propose redactions

12   for those things that you believe are confidential.

13         Similarly, with regard to documents that may be

14   offered or admitted, to the extent that there are portions of

15   those documents that you believe are confidential, I would also

16   similarly allow -- to the extent that you believe they are,

17   obviously indicate when they are being offered that you believe

18   it does contain confidential information.  But I would also

19   allow you the opportunity, similar to the transcript, to go

20   through those and propose redactions for those things that you

21   believe are confidential, consistent with the way typically I

22   ask parties to redact them.

23         And I guess the other thing is I would suggest -- and

24   I don't know whether one had been negotiated -- and I

25   apologize, I didn't look back at the docket -- a

JA2VMARHredacted

1     confidentiality order, a protective order, actually, in

2     connection with this.  I don't have a template on my docket.  I

3     think Judge Koeltl may have one on his, on his website.

4          MR. WICKHAM:  We have a protective order in the case,

5     your Honor.

6          THE COURT:  Okay.

7          MR. WICKHAM:  The things that you recommended are by

8     the book that have been accepted by other courts to protect

9     against that.  My only additional thought -- and I'm just

10    putting this out there -- is whether or not an exclusion order

11    should be appropriate so that third parties aren't in the

12    courtroom when that information is being shared.

13         THE COURT:  That's up to you.  I know that -- I think

14    there's -- counsel for the third parties who have been

15    subpoenaed is here.  And I apologize, your name is Mr. --

16         MR. TEMKIN:  Good morning, your Honor.

17         Barry Temkin, T-E-M-K-I-N; Mound, Cotton, Wollan &

18    Greengrass, for Triad, RIA, and Teros.

19         THE COURT:  All right.  So I don't have a problem if

20    you believe that -- because obviously -- I don't know, the

21    other folks who are here, are they with -- I apologize.

22         MR. WICKHAM:  They are with Marsh & McLennan, your

23    Honor.

24         THE COURT:  Okay.

25         So, Mr. Temkin, there may come a time, I think, and it

1     depends upon the testimony -- if you believe, Mr. Wickham, that

2     there's going to be testimony that's going to require the

3     disclosure of confidential information, Mr. Temkin, I may ask

4     you to step out for a moment and then we can do -- what I would

5     ask though, Mr. Wickham, if you could try and -- I know this is

6     not easy when you're examining a witness, but try and load that

7     into one place in the examination, and that way Mr. Wickham

8     doesn't have to keep getting up and coming in and out of the

9     courtroom.

10          MR. WICKHAM:  Absolutely, your Honor.  It's actually

11    organized in that manner.

12          THE COURT:  All right.

13          So thank you.  Is that okay, Mr. Temkin?

14          MR. TEMKIN:  That's fine.

15          And, your Honor, my clients are regulated by the

16    Securities and Exchange Commission, so I would comply with Reg.

17    S-P and all confidentiality obligations.

18          THE COURT:  Okay.  I think in some of these -- I

19    think -- as I understand it, what I think Mr. Wickham is more

20    referring to is information that's not only confidential with

21    regard to securities transactions and other things, but

22    confidential with regard to specifically his client --

23          MR. TEMKIN:  Yes.

24          THE COURT:  -- internally.

25          MR. TEMKIN:  Yes.  That's covered by SEC regs., by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA2VMARHredacted

1   Reg. S-P.  So we would maintain that and abide by your Honor's

2   rulings.

3          THE COURT:  Okay.  Oh, okay.  All right.  That's fine.

4          Thank you.

5          MR. TEMKIN:  Thank you, your Honor.

6          THE COURT:  All right.

7          So, Mr. Ferguson, what we were just talking about is

8   just, sort of, housekeeping, just to make sure that when the

9   record of this hearing is created, that only those things --

10  and again, I'm not at all ruling one way or the other whether

11  or not the materials that Mr. Wickham is going to be referring

12  to, whether they, in fact, qualify as confidential information

13  consistent with the law and the agreements.

14         But what I'm saying is I will allow Mr. Wickham to --

15  and counsel for the plaintiff to review the transcript and to

16  make recommendations to me, at least preliminarily, what things

17  that they believe should be redacted.  And again, obviously

18  that's all contingent upon the ultimate ruling on that

19  particular issue.  So some things might initially be filed

20  redacted, but later, because of a decision I reach, unredacted.

21  And I'm not saying that's going to occur, I'm just alerting you

22  that I'm not making a final ruling with regard to that.  But

23  once something is out in the public domain, once it's filed on

24  the docket publicly, it becomes harder to, sort of, as they

25  say, unring that bell.  Okay?

JA2VMARHredacted

1          MR. FERGUSON:  I understand, your Honor.

2          THE COURT:  Do you have any questions?

3          MR. FERGUSON:  Housekeeping, your Honor.

4          THE COURT:  Yes.

5          MR. FERGUSON:  The documents that I had submitted

6    previously --

7          THE COURT:  Yes.

8          MR. FERGUSON:  -- same exact documents, some of the

9    tabs were mislabeled.  I do have a corrected version, if I can

10   approach the bench.

11         THE COURT:  Sure.  You may.

12         Do you have an extra set for --

13         MR. FERGUSON:  And I've given --

14         THE COURT:  Okay.

15         MR. FERGUSON:  -- the plaintiffs an extra set.

16         THE COURT:  Okay.

17         MR. FERGUSON:  Same documents, just different tabs.

18         THE COURT:  All right.

19         Just so that we know everybody will be -- so everyone

20   will be using in connection -- if you're going to refer to any

21   of the documents that Mr. Ferguson, you'll be using the tab

22   designations from -- well, we can just take it by ear.

23         MR. FERGUSON:  Your Honor?

24         THE COURT:  Yes.

25         MR. FERGUSON:  May I approach the bench?

JA2VMARHredacted

1              THE COURT:  You may.

2              MR. FERGUSON:  My apologies.  I gave you my set.

3              THE COURT:  Oh, okay.  I don't want to -- all right.

4              MR. FERGUSON:  Thank you.

5              THE COURT:  Okay.  Anything else, Mr. Ferguson?

6              MR. FERGUSON:  No, your Honor.  Except that obviously

7    I'm not an attorney, so I apologize in advance to the Court, to

8    the plaintiff, to witnesses, if I make a mistake.

9              THE COURT:  That's fine.  It's just me; there's no

10   jury.  So in terms of leeway with regard to questioning, I'll

11   obviously take into account that you're appearing *pro se*, and

12   so that's fine.  I understand.

13             Okay.  Mr. Wickham, anything preliminarily?

14             Anything else?

15             MR. WICKHAM:  Just one last matter, your Honor.

16             THE COURT:  Yes.

17             MR. WICKHAM:  Do you have our set of the exhibit

18   binder?

19             THE COURT:  I do.  Yes, I do.

20             MR. WICKHAM:  Okay.  And I already left a copy for the

21   witness on the witness stand.

22             THE COURT:  All right.

23             Your first witness.

24             MR. WICKHAM:  Okay.

25             Do you want opening remarks of any sort?

JA2VMARHredacted                    Opening - Mr. Wickham

1         THE COURT:  If you'd like.  They should be brief.  I'm

2    not sure -- I think what may make -- why don't you go ahead.

3    If you prepared some opening remarks, that's fine.

4         MR. WICKHAM:  Just very briefly, your Honor.

5         THE COURT:  All right.

6         MR. WICKHAM:  This Court previously has visited this

7    case a few times for various discovery motions and things of

8    that nature.  But back in June, when the Court examined the

9    plaintiff's temporary restraining order papers, the Court had

10   determined that there had been sufficient information there to

11   support the existence of a restraining order pending the time

12   that the parties were able to appear and provide additional

13   evidence at this preliminary injunction hearing.

14        The materials that we have in our original complaint,

15   the materials in our brief, first of all, the evidence on there

16   is fairly substantial in terms of what we believe to be acts of

17   breach of contract, breach of duty of loyalty and things of

18   that nature, by a departing employee who, both during his

19   employment with Marsh & McLennan and afterwards, was soliciting

20   clients in order to leave Marsh & McLennan while he's subject

21   to duties of loyalty to the company, while using confidential

22   information and trade secrets.  That has not abated, even after

23   he had been sent several cease and desist letters and

24   communications to him.  We believe, even after this Court had

25   issued the restraining order, that this activity had continued.

JA2VMARHredacted                 Opening – Mr. Wickham

1          We did not file a OSC to seek to hold him in contempt.

2     We were anticipating, relatively speaking, soon to have been

3     before the Court on the preliminary injunction hearing, because

4     the most recent activity -- at least that we're aware of -- had

5     transpired in July, and we were supposed to have the hearing in

6     July.  Unfortunately, that continued and so we're here today.

7          But the scope of this really actually took a more

8     significant turn just last week, when Mr. Ferguson responded to

9     the written discovery that had been previously ordered by the

10    Court.  And the information that was revealed in documents that

11    Mr. Ferguson, to his credit, produced, shows that there was an

12    extensive plan and deliberation between Mr. Ferguson and what

13    we had believed to be his new employer, Teros, as they were

14    planning and organizing a wholesale raid of all the clients to

15    which Mr. Ferguson had a relationship, and seemingly many more.

16         Originally, in our TRO papers we had indicated that

17    we've lost five clients.  At this point in time, the number of

18    clients is about 15 or 16 that Marsh has lost.  The number of

19    clients that Mr. Ferguson took information about spans a much

20    larger subset.  So 20, 30, 40, 50 clients appear to be on his

21    potential radar.  And so for our part, the point of an

22    injunction is to maintain the status quo.

23         We want Mr. Ferguson to stop.  We don't want our

24    clients to continue to be subject to solicitation.  We don't

25    want our confidential information, trade secrets to be

JA2VMARHredacted                 Opening – Mr. Wickham

1    misappropriated.  We're more than happy and looking forward to

2    going to trial on this matter to prove those things.  But

3    between now and the trial, we do need the benefit of a

4    preliminary injunction to ensure that the status quo will not

5    be further negatively impacted by Mr. Ferguson's activities.

6              THE COURT:  Okay.

7              MR. WICKHAM:  So for our part, we're going to bring on

8    Mr. Calder.  He had signed a declaration in support of the

9    temporary restraining order.  For the most part, his testimony

10   is going to be consistent with that, but it's going to have

11   embellishments because he's going to be talking about some of

12   the actual clients that he was interacting with as he was

13   discovering live, in real time, Mr. Ferguson's activities and

14   the solicitations.

15             Mr. Calder will also be talking about the appreciation

16   and understanding of the confidentiality obligations at Marsh

17   and at its predecessor, Barney & Barney.  So Mr. Calder, who

18   was Mr. Ferguson's supervisor, should be able to bring that

19   home very clearly and for the benefit of the Court.  And

20   obviously he'll be available for what questions that the Court

21   has.

22             THE COURT:  I think I will have certain questions

23   relating to the clients that the plaintiff believes that

24   Mr. Ferguson had solicited, what products they had purchased

25   and/or were in the market for.  So I will have certain

1    questions.  It may come out during the examination, but I will

2    have some questions about that, including questions about

3    confidentiality and things like that, the materials that the

4    company views as confidential.

5            Okay.

6            MR. WICKHAM:  Thank you, your Honor.

7            THE COURT:  Mr. Ferguson, would you like to say

8    anything as preliminary remarks?

9            MR. FERGUSON:  Thank you, your Honor.

10           Obviously there are two sides to every story.  I think

11   today we'll see I was told to do these things.  And the

12   questioning of the witness, I think it will come out.

13           There's a lot of things that the plaintiff has not

14   informed the Court of, like they've already filed these claims

15   with FINRA; the exact same claims were made as a complaint to

16   FINRA.  It's still an open case.  I've been fighting this on

17   two different fronts.

18           So I think we'll see the other side of the story

19   today.

20           THE COURT:  Okay.  Let me ask, Mr. Wickham, are you

21   representing your client in the -- well, is there currently

22   something before FINRA, when was it filed, and are you

23   representing Marsh in that matter?

24           MR. WICKHAM:  As part of Mr. Ferguson's separation,

25   he's an employee of Marsh & McLennan Agency, and he has his

JA2VMARHredacted

1   license with Marsh & McLennan Securities.

2            THE COURT:  Yes.

3            MR. WICKHAM:  As part of MMAS's separation paperwork,

4   when you have an individual, a licensed individual, who is

5   leaving under circumstances involving a fairly serious matter

6   under FINRA regulations concerning misappropriation of client

7   information, it's a required disclosure.  And so in connection

8   with a required disclosure by MMAS, MMAS did submit a

9   disclosure to FINRA.

10           MMAS is not prosecuting any sort of a claim before

11  FINRA; MMAS hasn't filed an arbitration before FINRA.  The

12  thing that is going on that I believe is that FINRA is

13  conducting an independent investigation that was triggered by

14  disclosures that MMAS made to FINRA.

15           Mr. Ferguson has produced documents showing that FINRA

16  was pursuing its investigation, asked him some questions; they

17  asked MMAS some supplemental disclosures.  But there's not some

18  sort of a separate FINRA proceeding being prosecuted by MMA or

19  MMAS.

20           THE COURT:  Okay.  But I mean there's no -- I think --

21  I'm not sure with Mr. Calder, but it seems like Mr. Peartree

22  also is a registered representative.  And so I guess what my --

23  some of my questions may relate to in connection with

24  Mr. Ferguson's employ, was he basically wearing more than one

25  hat.  In other words, was he doing things that would ordinarily

JA2VMARHredacted

1    be covered by FINRA; in other words, selling products that

2    would be covered under -- understanding that someone could be

3    licensed and other things, but not necessarily doing that work

4    at his or her job.  But because of the licensure -- and I

5    assume this is what you're saying, that MMA Securities felt

6    they had to make that call.

7              But I guess the question is how -- so how did they --

8    what was Mr. Ferguson's relationship to MMA Securities.  And

9    that's the dual hat sort of thing I was talking about.

10             But I think perhaps it makes sense for Mr. Calder to,

11   sort of, speak to that and, sort of, how Marsh treats folks

12   that are in this position, understanding that, I think, right,

13   there's a cleave between the securities stuff and the other

14   work that they may do.  But are there people who actually, sort

15   of, operate or sell products that could be on both sides of

16   that.

17             MR. WICKHAM:  And we will be touching upon that.

18             Very briefly, the answer is yes, that for a period of

19   time toward the tail end of when Barney & Barney was a separate

20   entity, and during the early period of time when just after MMA

21   acquired Barney & Barney, Mr. Ferguson was a client executive

22   sales and his job was to sell, to develop business and things

23   of that nature.  In 2014, Mr. Ferguson then returned to the

24   service side of the business.

25             With investment advisers, unlike brokers and dealers

JA2VMARHredacted            Calder - direct

1   and things like that, these are not individuals who are engaged

2   on a regular basis in stock trades and things of that nature.

3   So in the investment adviser world, the idea that you can have

4   hybrid individuals is more often the case.  As a matter of

5   fact, there's a number of cases that deal with that.

6           In our situation, at all times Mr. Ferguson initially

7   was a Barney & Barney employee; and then later, after the

8   acquisition, he was an MMA employee.  And then his

9   registration, his licensure, was initially with SagePoint, and

10  then there were a few other entities, and then his final

11  licensure was with MMAS.

12          Mr. Ferguson has a different interpretation of that,

13  and will have the benefit of Mr. Calder's testimony on what, at

14  least from the company's perspective, is accurate.

15          THE COURT:  Okay.  All right.

16          All right.  You can call Mr. Calder.

17          MR. WICKHAM:  Jeff Calder.

18          THE COURT:  I think he may be -- oh, here he is.

19  JEFFREY CALDER,

20      called as a witness by the Plaintiff,

21      having been duly sworn, testified as follows:

22          THE COURT:  You may proceed.

23  DIRECT EXAMINATION

24  BY MR. WICKHAM:

25  Q.  Good morning, Mr. Calder.

1          First of all, I'd like you to get comfortable with the

2     binder of exhibits there, and maybe move your water bottle to a

3     different place so that that doesn't get knocked over.

4          THE COURT:  That's fine.

5     Q.  Okay.  Would you please state and spell your name.

6     A.  My name is Jeffrey Thomas Calder.  J-E-F-F-R-E-Y,

7     T-H-O-M-A-S, C-A-L-D-E-R.

8     Q.  And where are you currently employed?

9     A.  I am currently employed with Marsh & McLennan Agencies.

10    Q.  And geographically, where are you based?

11    A.  I'm based in the San Francisco Bay area.

12    Q.  And what's your current job title?

13    A.  I'm the managing director of the Marsh & McLennan Agency

14    operation in San Francisco and in Walnut Creek.

15    Q.  And how long have you been in that position?

16    A.  I've been in that position for -- since January of this

17    year.  Prior to that, I was the division director for employee

18    benefits in the same geography.

19    Q.  Okay.  And before you worked with Marsh & McLennan, did you

20    work for another company?

21    A.  Yes.  Prior to Marsh & McLennan, I was working for Barney &

22    Barney.  We're a regional insurance brokerage and we sold to

23    Marsh & McLennan in 2014.

24    Q.  Okay.  In connection with that acquisition, did you then

25    move from working for Barney & Barney to working for MMA?

JA2VMARHredacted                Calder - direct

1    A.  I did.

2    Q.  And then just for your reference, are you comfortable in

3    referring to Marsh & McLennan Agency as "MMA"?

4    A.  I am.

5    Q.  Okay.  Now, how do you know Rick Ferguson?

6    A.  I know Rick because he was transferred to the San Francisco

7    office to be part of the retirement services division, our

8    first employee in the retirement services division.  He came to

9    work up in San Francisco in about 2012.

10   Q.  Okay.  And did that occur when he was -- when you and he

11   were working for Barney & Barney?

12   A.  Yes.

13   Q.  Okay.  Now, and once Mr. Ferguson transferred to the San

14   Francisco Bay area, who was his supervisor?

15   A.  I was.

16   Q.  Okay.  And were you his supervisor from that time, up until

17   the time that he separated from the company?

18   A.  Yes.

19   Q.  Let me ask you to take a look at some exhibits by way of --

20   to set some background here.  If you could please look under

21   Tab No. 1.  Do you have it open?

22   A.  I do.

23   Q.  Have you seen this document before?

24   A.  I have.

25   Q.  Could you tell me what this document is?

JA2VMARHredacted                Calder - direct

1   A.   This is an employment agreement between Barney & Barney and

2   Rick Ferguson.

3   Q.   Okay.  At Barney & Barney, were you familiar with employee

4   agreements of this nature?

5   A.   I was.  I signed one as well.

6   Q.   Okay.  And so far as you know, were all Barney & Barney

7   employees required to sign employee agreements of this nature

8   when they first started with the company?

9   A.   Yes.

10  Q.   Okay.

11          THE COURT:  Just one second.

12          Mr. Ferguson, do you have a --

13          MR. FERGUSON:  No, your Honor.

14          THE COURT:  Do you have an extra set of the exhibits?

15          Thank you very much.

16          So, Mr. Ferguson, we are on Exhibit 1.

17          MR. FERGUSON:  Thank you, your Honor.

18          THE COURT:  Sorry.

19          MR. WICKHAM:  We also had sent him the exhibits as

20  well.

21          THE COURT:  No, no, I understand.  But there may have

22  been, you know, between Mr. Ferguson and his former counsel and

23  him coming here, so I understand.  I appreciate having an extra

24  copy.  Go ahead.

25          MR. WICKHAM:  Thank you, your Honor.

JA2VMARHredacted                Calder – direct

1    BY MR. WICKHAM:

2    Q.  Mr. Calder, if you could turn to paragraph 6 on the second

3    page of this document.  Do you see that there?

4    A.  I do.

5    Q.  Do you know what this paragraph is or what it does?

6    A.  This is a paragraph that talks about the confidentiality of

7    our information that we keep for our clients.  It talks about

8    what we do.  And it says that we have to protect this

9    confidential information.

10   Q.  Okay.  And so is this a broad confidentiality obligation

11   that all Barney & Barney employees were subject to during and

12   in connection with their employment?

13   A.  It is.

14   Q.  Okay.  And was this confidentiality obligation one that not

15   only applied when they worked there, but also after they left

16   Barney & Barney?

17   A.  Confidentiality agreement was enforceable for up to two

18   years after they left the company.

19   Q.  Okay.  Let me ask you to take a look at Exhibit 3.

20              THE COURT:  Let me ask a question, just a logistical

21   question, with regard to the exhibits that both sides are going

22   to show to witnesses.

23              Are the parties stipulating to their authenticity and

24   admissibility?  In other words -- and you may go document by

25   document; but, as a general matter -- obviously, Mr. Wickham,

JA2VMARHredacted              Calder - direct

 1   you've seen the documents that Mr. Ferguson may show witnesses.

 2   I'm just trying to figure out whether -- how much I need to

 3   hear from witnesses with regard to authenticating and the like.

 4            MR. WICKHAM:  Your Honor, we're fine with stipulating

 5   to authenticity and admissibility, but reserving all other

 6   objections.

 7            THE COURT:  Okay.

 8            So Mr. Ferguson, that's just so that we don't have to

 9   go through the exercise, for example, of asking Mr. Calder to

10   look at this document, look at the final page, has he seen it

11   before, how does he recognize it.  In other words, establishing

12   that it is what plaintiff's counsel is saying it purports to

13   be, and that it is an authentic document, we're reserving any

14   objections to the document, for example, if it was hearsay

15   within -- some sort of other objection within the document,

16   reserving those.  But we can go document by document.

17            First, I guess I'll ask, Mr. Ferguson, do you have an

18   objection to the Exhibit 1, which purports to be your

19   employment agreement with Barney & Barney?

20            MR. FERGUSON:  No, your Honor.

21            THE COURT:  Okay.  All right.  Go ahead.

22   BY MR. WICKHAM:

23   Q.  Mr. Calder, would you turn to Exhibit 3 and please review

24   that.  Do you recognize Exhibit 3?

25   A.  I do.

JA2VMARHredacted                    Calder - direct

1    Q.  And what is Exhibit 3?

2    A.  It is a Barney & Barney and MMA document.  It is a

3    nonsolicitation and confidentiality agreement.

4    Q.  Now, when MMA acquired Barney & Barney, were all employees

5    at Barney & Barney at that time required to sign a

6    nonsolicitation and confidentiality agreement like what you

7    have in front of you under Exhibit 3?

8    A.  Yes.

9    Q.  And this Exhibit 3, if you look at the last page, what

10   Mr. -- well, with his signature on the end --

11            THE COURT:  We can just -- Mr. Ferguson, do you object

12   to Exhibit 3 as being the employment agreement that was

13   subsequently signed between Barney & Barney and MMA?

14            MR. FERGUSON:  Your Honor, this is not the original

15   document.

16            THE COURT:  When you say it's not the original --

17   well, do you know what?  When you say it's not the original

18   document, what do you mean?

19            MR. FERGUSON:  I actually have a line of questioning

20   on that.  This is not the original document.

21            THE COURT:  Okay.  Then what I propose is -- well,

22   I'll allow you, Mr. Wickham, to ask your questions, and it will

23   be admitted subject to any examination that -- normally I would

24   allow a voir dire, but I'll wait until you want to do your

25   examination, and then until I decide whether or not I'm going

JA2VMARHredacted                    Calder – direct

1    to consider it.

2              MR. WICKHAM:  Thank you, your Honor.

3              THE COURT:  Okay?

4              MR. FERGUSON:  Thank you.

5    BY MR. WICKHAM:

6    Q.  So going back to my question, Mr. Calder, when all of the

7    Barney & Barney employees came and became MMA employees as part

8    of the acquisition, were they all required to sign

9    confidentiality agreements?

10   A.  Yes.

11   Q.  Okay.  Were they all required to sign confidentiality

12   agreements of what appears before you under Exhibit 3?

13   A.  Yes.

14   Q.  Okay.  Now, looking at Exhibit 3, starting with paragraph

15   1, do you see that there?

16   A.  I do.

17   Q.  And could you tell me what paragraph 1 covers, as far as

18   you understood?

19   A.  Paragraph 1 covers confidential information and trade

20   secrets; it talks about what that information is; it talks

21   about the fact that this is our information, and that it is to

22   be protected.

23   Q.  Okay.  And did you understand that this provision

24   prohibited employees from disclosing and using confidential

25   information in connection with their employment at Marsh &

JA2VMARHredacted              Calder - direct

1  McLennan Agency?

2  A.  Yes.

3  Q.  Okay.  And did you understand that this provision

4  prohibited employees from using and disclosing Marsh & McLennan

5  Agency information after they had left MMA?

6  A.  Yes.

7  Q.  I want to also draw your attention to the very first line

8  of the document at the top, where it says, Agreement dated as

9  of 2/1, etc., Barney & Barney, a Marsh & McLennan Agency

10  company, and subsidiaries thereof.  Do you see that there?

11  A.  I do.

12  Q.  Okay.  Did you understand that when this agreement was

13  presented to you and to others over which you've supervised,

14  that this was not limited just to MMA, it covered all of the

15  companies within the Marsh group -- family of companies?

16  A.  Yes.

17  Q.  Okay.  Did you also understand that this agreement had

18  certain limitations on the solicitation of clients?  And I'm

19  specifically referring to paragraph 2 on page 3 of this

20  document.

21  A.  Yes.

22  Q.  Okay.  And what was your understanding concerning

23  limitations on solicitation?

24  A.  Limitation on solicitation is is that we could not use

25  confidential information or trade secrets to solicit clients in

JA2VMARHredacted                Calder - direct

1   the first 24 months after termination.

2   Q.  And then also I'd like to turn your attention to paragraph

3   1 -- by the way, the limitation that you describe, is that is

4   what appears in exhibit -- paragraph 2(a) and 2(b) of the

5   agreement?

6   A.  Yes.

7   Q.  Okay.  And then finally, if you could please review

8   paragraph 1(d), as in "dog."  It's also on page 3.

9   A.  Yes.

10  Q.  What did you understand that that prohibited or what that

11  regulated?

12  A.  That regulates the use of our systems and the

13  confidentiality of the client information within our system.

14  And it talks about the fact that you may not download that --

15  you couldn't download that information; any information in the

16  system is our information; you can't use that information for

17  personal gain or to solicit clients.

18  Q.  Okay.  So, for example, if there was information on the

19  company's computer systems or an individual employee's

20  computer, would this clause, so far as you understood it,

21  prohibit the employee from using and disclosing that

22  information for their own personal gain?

23  A.  Yes.

24  Q.  Okay.  Now, there is some question about Mr. Ferguson's

25  employment status.  And I want to find out whether you have

JA2VMARHredacted                    Calder - direct

1    information on that subject.

2                First of all, from the time of the Barney & Barney

3    acquisition, up through the present, have you always been an

4    MMA employee?

5    A.  I have.

6    Q.  Okay.  From the time of the acquisition, up to the time

7    that Mr. Ferguson departed, do you have information about who

8    his employer was?

9    A.  Yes.

10   Q.  Okay.  Why do you have information about who Mr. Ferguson's

11   employer was?

12   A.  Well, Mr. Ferguson was an employee of Marsh & McLennan

13   Agency; he was paid by Marsh & McLennan Agency.  He paid taxes

14   through Marsh & McLennan Agency; we paid taxes on his behalf.

15   He was our employee.  We did employee reviews.

16   Q.  Okay.

17               THE COURT:  Did he have responsibility for selling

18   products that would typically be sold by an individual who is

19   regulated by FINRA?

20               THE WITNESS:  He did.

21               THE COURT:  So securities-type products?

22               THE WITNESS:  Yes.

23               THE COURT:  Okay.  In connection with that, are you

24   also licensed to sell securities products?

25               THE WITNESS:  I am not.  I was 30 years ago.  I don't

JA2VMARHredacted              Calder - direct

 1    think it counts.

 2              THE COURT:  No.  All right.

 3              So in connection with that, when Mr. Ferguson, let's

 4    say he was involved with a client and -- well, let me ask, did

 5    Mr. Ferguson have the ability to sell those products throughout

 6    the time period that you were supervising him?

 7              THE WITNESS:  Yes.

 8              THE COURT:  Okay.  And in connection with that, if you

 9    were to do that, would you still be his supervisor or would

10    someone else at MMA Securities or someone else have to look at

11    that particular transaction because it was securities related?

12              THE WITNESS:  I'm not an expert in the FINRA

13    regulations.

14              THE COURT:  Sure.

15              THE WITNESS:  I know that I had responsibility for

16    Rick as an employee of MMA.  I also know that MMA has their --

17    all their licensure in compliance with MMA Securities.

18              THE COURT:  Okay.  Let me ask a question just about

19    Exhibit 3.  I take it you have -- you also have a similar

20    agreement?

21              THE WITNESS:  I do.

22              THE COURT:  And in connection with that, if you look

23    at Exhibit 3, do you see at the top of page 2, it says page 2;

24    top of page 3, it says page 3; same thing on page 4.  But then

25    from 4 to page 5 through 8, the way that the page numbers are

JA2VMARHredacted                Calder - direct

1   referenced changes.  So you see it's now at the bottom, it says

2   page 5 of 9.

3              Does your agreement similarly have that change, in

4   other words, the way that the page numbers appear?

5              THE WITNESS:  I have no idea.

6              THE COURT:  Okay.

7              Do you know why there's this -- why there's this

8   change?

9              THE WITNESS:  I do not.

10             THE COURT:  In addition, on page 5 of 9, you'll see

11   that there's a footer at the bottom which says "World Class.

12   Local touch."  Do you have an understanding what that is about?

13             THE WITNESS:  Yeah.  That's kind of our motto.

14             THE COURT:  Okay.  But that motto doesn't appear on

15   pages 1 through 4; is that correct?

16             THE WITNESS:  Correct.

17             THE COURT:  Do you have an understanding why that's

18   the case?

19             THE WITNESS:  I do not.

20             THE COURT:  Okay.

21             Similarly, if you turn to page 9 of the document, the

22   signature page.

23             THE WITNESS:  Yes.

24             THE COURT:  You'll see that it returns to the

25   methodology, I guess, for lack of a better term, that appears

JA2VMARHredacted          Calder - direct

1    earlier in the document, where the page number appears at the

2    upper left, and it says page 9.

3              Do you have an understanding of why -- well,

4    actually --

5              THE WITNESS:  It goes back to --

6              THE COURT:  Yes, it went back -- actually, if you look

7    at -- only page 5 has page 5 of 9.  And then if you go to page

8    6, then it returns to the other designation; it has page 6 at

9    the top.  You don't have an understanding of why this

10   document -- how it was created?

11             THE WITNESS:  I don't.

12             THE COURT:  Okay.

13             And you don't know whether yours is similar to this,

14   in other words, similar in appearance?

15             THE WITNESS:  I don't know.

16             THE COURT:  Okay.

17             What I would ask, Mr. Wickham, at some point after the

18   conference, if you could produce Mr. Calder's version of this

19   document.  And by "this document," I'm just referring to the

20   Barney & Barney/MMA nonsolicitation and confidentiality

21   agreement.

22             MR. WICKHAM:  We will, your Honor.

23             Just by way of a clarification and not by way of

24   anything -- misrepresentation or anything like that, the copy

25   of this -- of Mr. Ferguson's MMA agreement that is in his

JA2VMARHredacted          Calder - direct

1    personnel file was missing the fill-in page here.  I think it's

2    page 5.  What appears on this -- the page 5 of this document is

3    the -- is the same provision, the same language, from the

4    firm's -- from MMA's standard form confidentiality agreement,

5    which was in Mr. Ferguson's, but it's just that we were able to

6    locate that page, put that in here for completeness' sake.

7              So that's why there is -- you see the logo at the top

8    and that the numbering is a little -- is out of sorts.

9              THE COURT:  Okay.

10             MR. WICKHAM:  But that is what the explanation is for

11   the additional -- the addition of this page.

12             THE COURT:  All right.

13             MR. WICKHAM:  But we will obtain Mr. Calder's

14   confidentiality agreement and supply that to the Court.

15             THE COURT:  Okay.  That would be great.

16             Sorry for the interruption.  Go ahead.

17             MR. WICKHAM:  One other point, your Honor.

18             THE COURT:  Sure.

19             MR. WICKHAM:  We were focusing our questions only on

20   paragraphs 1 and 2 of the agreement, which indisputably are

21   part and parcel of the original agreement.  So we weren't even

22   touching upon what is on page 5.

23             THE COURT:  Okay.  No, I understand.  But -- I

24   understand that.

25             MR. WICKHAM:  Okay.

JA2VMARHredacted          Calder - direct

BY MR. WICKHAM:

Q.  Okay.  Mr. Calder, the judge wanted some information about Mr. Ferguson's employment history.  So let me just touch upon that.

Are you familiar that when he had originally started out with Barney & Barney, that he was on the service side of the business?

A.  Yes.

Q.  Okay.  And without getting into too much technical expertise of that, could you just generally describe what the service side of the business is?

A.  Yes.  On our retirement services business, we have clients who have engaged us to provide retirement plans, be those 401(k) plans, 403(b) plans, various kinds of plans for employees to use in their retirement, to save, and for employers to use to attract employees.

So in the role of a client service executive, Mr. Ferguson would -- and all of our client service executives -- work with confidential client information to help our clients get the type of retirement plan that they would want for their employees.  Then they help communicate those plans, they help keep those plans in compliance, and they help with any service needs that employers may have.

Additionally, they hold open enrollment meetings where they go through the plan options with employees and make sure

JA2VMARHredacted                Calder – direct

1    they understand the plans they have.

2    Q.  Now, within the retirement services division in which

3    Mr. Ferguson was employed, are there also another category of

4    employees who have the title or similar title to client

5    executive sales?

6    A.  Yes.

7    Q.  Who are they?

8    A.  They are the people who are responsible for initiating a

9    claim, initiating new business.  So they're responsible for

10   working with centers of influence, entertaining, making

11   contacts within the industry, and obtaining new clients for

12   MMA.

13   Q.  Okay.

14            So the people who are client executive sales are

15   engaged in the sale of these types of retirement benefit plans;

16   is that right?

17   A.  That's correct.

18   Q.  And is that one of the reasons why they necessarily have to

19   have the security registration?

20   A.  Yes.

21   Q.  Okay.

22            Now, after Mr. Ferguson was in client executive

23   service, do you know whether or not he transitioned to client

24   executive sales?

25   A.  He did.  When he transferred to San Francisco, he

1    transferred to a client executive sales position.

2    Q.  Okay.

3           So when he was at Barney & Barney and he transitioned

4    from San Diego to the San Francisco Bay area, that also was in

5    connection with him moving into the client executive sales

6    position?

7    A.  Correct.

8    Q.  Okay.

9           Was there a point in time that Mr. Ferguson returned

10   to the client executive service position?

11   A.  There was.  In late 2014, Mr. Ferguson sent an email to

12   Bill Peartree requesting a return to the service side of our

13   business.

14          We took that into consideration.  And as of January 1,

15   2015, Rick went back in as primarily a service person.  He also

16   received compensation if he initiated a new piece of business.

17   Q.  Okay.  And from the time that he transitioned back to

18   client executive service until the time that he resigned from

19   MMA, did he remain a client executive service person throughout

20   that entire time period?

21   A.  Yes.

22   Q.  Okay.

23          So he never went back to the sales side; is that

24   right?

25   A.  No.

JA2VMARHredacted                    Calder - direct

1    Q.   Okay.

2              Now, I do understand that after he had transitioned

3    back, that he had some responsibility, continuing

4    responsibility, for clients and possibly was doing a little bit

5    of business development.  Is that also true?

6    A.   That is true.

7    Q.   Okay.

8              But his position was client executive service --

9    A.   Correct.

10   Q.   -- right?

11             And he was paid as a client executive service.  And he

12   was performing the duties of a client executive service?

13   A.   Yes.

14   Q.   Okay.

15             THE COURT:  Well, let me ask if -- are there people

16   who that all they do is client executive service?  In other

17   words, you said that Mr. Ferguson was primarily a person who

18   was involved in client executive services, but also got a

19   commission for sales.

20             THE WITNESS:  So we had a hybrid-type position

21   where -- we have a number of salespeople in the bay area; we

22   have about -- now about 19.  And when we would surface an

23   opportunity for a retirement sale, we would introduce Rick.

24   And if Rick was actively involved in the solicitation of that

25   account and the acquisition of that account, including

JA2VMARHredacted              Calder - direct

1    obtaining broker records, going through due diligence, then he

2    would be paid a bonus for doing that.

3              THE COURT:  Okay.  So that would be more on the side

4    of -- that would be more akin to what he had done, as a general

5    matter, prior to 2014, when he made the transition?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  All right.

8              Sorry.  Go ahead, Mr. Wickham.

9    BY MR. WICKHAM:

10   Q.  Now, you were talking about what client executive sales

11   individuals do.  Let's talk about that.

12             Does MMA have information concerning clients that the

13   company considers to be valuable?

14   A.  Absolutely.  We have the client list, we have a contact

15   list, we have information regarding structure of plans,

16   regarding client service needs.  All those things are

17   information that we would consider to be confidential and trade

18   secrets.

19   Q.  In terms of the order of things, how important is the

20   client information to the company and to its business?

21   A.  It's absolutely critical.  We deal in a highly competitive

22   environment.  We have a number of high-quality competitors in

23   our area.  If our competitors get our client list and

24   confidential information, they can target our clients and, you

25   know, that's a risk that we protect against.

JA2VMARHredacted              Calder - direct

1    Q.  Well, in terms of the value of this information, does the

2    company invest time and resources in developing client --

3    identifying clients and developing clients and maintaining

4    clients?

5    A.  We certainly do.  We have a sales -- sales group that is

6    paid on a commission basis to obtain the clients.

7    Additionally, we pay for any travel, entertainment, any

8    development of centers of influence.  All the activities that

9    are required to acquire a new client, we reimburse our

10   employees for doing that.

11   Q.  Okay.

12          And are individual employees encouraged to engage in

13   business development activities, like attending conferences and

14   meeting with clients and basically either attempting to

15   identify new prospective clients or maintain relationships with

16   old clients?

17   A.  Yes, they are.  And we budget about 2.5 percent of our

18   revenues every year just for that type of activity.

19   Q.  Okay.  So about 2.5 percent of the firm's revenues is

20   devoted to business development?

21   A.  Mm-hmm.

22   Q.  Okay.

23          THE COURT:  You just have to -- I apologize.  When you

24   say "mm-hmm," that's the way it comes across in the transcript.

25   So you just have to respond.

JA2VMARHredacted                    Calder – direct

1                THE WITNESS:  Yes.

2                THE COURT:   Thank you.

3   Q.  Well, based on your answer, I'm assuming that this

4   information is confidential.  But does the company consider its

5   client information confidential?  Does it consider it

6   confidential?

7   A.  Yes.

8   Q.  Okay.

9                And is it something that the company takes reasonable

10  measures in order to protect the confidential nature of that

11  information?

12  A.  We sure do.  We password-protect everything we do.  We have

13  corporate training called The Greater Good, where we talked

14  about how we treat clients' confidential information.  We

15  remind people about the confidentiality of the information they

16  have routinely.

17               We have a duty not just to make sure our confidential

18  and trade secrets aren't used outside of us, but we have to

19  make sure that we protect that information from just, kind of,

20  hackers, the general environment.  So we take it very

21  seriously.

22  Q.  Is that why the company requires all employees to sign

23  confidentiality agreements?

24  A.  That's -- yes, it is.

25  Q.  Okay.  And does the company require that access to all

JA2VMARHredacted                Calder - direct

1    computers and computer systems all are password-protected?

2    A.  Yes.

3    Q.  And does the company have in place firewalls and other

4    types of barriers in order to be able to limit access and to

5    prohibit outside access to its confidential information and its

6    computer systems?

7    A.  Yes.

8    Q.  Okay.

9            THE COURT:  Just before you go to the next -- let me

10   ask, with regard to the client list, is there a specific

11   document or database at Marsh that houses the client list and

12   client information; and if so, is there a name for it?

13           THE WITNESS:  We have client lists and client

14   information in a number of different databases.  We have it

15   in -- everybody readily has access to Outlook, so a lot of the

16   information is in Outlook.

17           THE COURT:  When you say "in Outlook," I just want

18   to -- is it sort of a global Outlook?  In other words, for all

19   the clients of Marsh would be, let's say, in the global

20   Outlook, but people could have their own, sort of, personal

21   Outlook address book?

22           THE WITNESS:  Yeah, where global information resides

23   for Marsh's sales force.  So our client lists are -- throughout

24   MMC are there.  We also keep our contact information, personal

25   contact and client information, in our own Outlook databases.

JA2VMARHredacted                Calder - direct

1          THE COURT:  Okay.  And is there -- do Marsh employees

2    have the ability to export what is on the -- I think you said

3    on the sales, the sort of the sales Outlook, into their own

4    personal Outlook, or they literally have to copy it?

5          THE WITNESS:  You literally have to copy it at this

6    point.

7          THE COURT:  Okay.

8          And did Mr. Ferguson have access to both?

9          THE WITNESS:  He did.

10         THE COURT:  And in connection with the -- you had

11   mentioned that it's password-protected.  Do you have an

12   understanding of who actually can access the client list and

13   client information, let's say the person on the sales side,

14   the, sort of, global Outlook sales folks would have.

15         THE WITNESS:  Yes.

16         THE COURT:  And who at Marsh can access that?  In

17   other words, if you're just an employee and you have your

18   credentials to access -- to access the Marsh system, do you

19   need another password in order to access these Outlook client

20   lists or client information?

21         THE WITNESS:  Yes, there are separate passwords.

22         THE COURT:  Okay.  In connection with that -- so if an

23   employee in Mr. Ferguson's position, he would have a code to

24   access generally the Marsh systems, is that an accurate

25   statement?

JA2VMARHredacted                    Calder – direct

1               THE WITNESS:  Yes.

2               THE COURT:  And would that access give him also access

3      to his own Outlook address book?

4               THE WITNESS:  I don't know.

5               THE COURT:  Okay.  But is it your understanding that

6      in order to access the other client list, in other words, I

7      guess the -- and again, if I'm mischaracterizing, you should

8      just let me know.  The global client list, that there was a

9      separate password that was needed for that.

10              THE WITNESS:  In sales force, where the global

11     information is for Marsh & McLennan, you can go in and search;

12     if you're looking for a client, you can go in and search by

13     client name, and it will come up and tell you whether or not

14     it's our client.  But I don't know whether it has the ability

15     to print a whole client list of all Marsh clients.

16              THE COURT:  Okay.  All right.

17              And is that something that you have access to?

18              THE WITNESS:  I do.

19              THE COURT:  All right.

20              I'm sorry.  Go ahead.

21     BY MR. WICKHAM:

22     Q.  In addition, does client information show up in weekly,

23     monthly, and quarterly reports?

24     A.  It does.

25     Q.  Okay.  So with Mr. Ferguson as part of the western region

JA2VMARHredacted                Calder - direct

1   retirement services division, if he might be getting reports,

2   would some of those reports potentially have information about

3   not only the clients to which he was assigned, but also clients

4   to whom other people in the retirement services division were

5   assigned?

6   A.   Yes.

7   Q.   Okay.  And for the reports that disclose financial

8   information -- I mean are there reports that disclose financial

9   information in terms of weekly, monthly, or annual revenues for

10  particular clients?

11  A.   There are.

12  Q.   And is that revenue information, is that considered

13  confidential?

14  A.   It is.

15  Q.   Okay.  Why?

16  A.   Well, the revenue information is confidential because it

17  speaks to the size of the client; it can also speak to the

18  profitability of the client.  But it is definitely confidential

19  information.

20  Q.   And it would also have the names of the clients themselves,

21  right?

22  A.   Yes.

23  Q.   Okay.

24          With regard to Outlook contact cards, either for an

25  individual or for the entire bay area, is the information in

JA2VMARHredacted                Calder - direct

1   those individual contact cards, is that confidential?

2   A.  It is.

3   Q.  Okay.

4           Now, we have heard some information about the

5   allegation is is that all of this is publicly available, so

6   there is no confidential information.

7           Is that a true statement?

8   A.  I know of no public database that you can go to and search

9   for the specific client list and contact information at each of

10  those clients.  I know of no public database where you can do

11  that.

12  Q.  Okay.  And certainly Marsh does not publish its client list

13  anywhere, right?

14  A.  We do not.

15  Q.  Okay.

16          And even with regard to contact information --

17          THE COURT:  Well, let me -- I understand you don't

18  publish the client -- are there any promotional materials or

19  other things that tout that Marsh represents X company, Y

20  company, Z company?

21          THE WITNESS:  We use a sales presentation.  We will

22  often be asked to give a client list of representative clients.

23  And when the third-party asks that, we do that.

24          THE COURT:  Okay.  Typically, is that something

25  that -- in connection with normally interacting with clients,

JA2VMARHredacted                    Calder - direct

that they agree to, or do you have to go back to those clients

and ask them separately, saying, you know, We'd like to

disclose this in limited format when we do use promotional

materials or brochures?

THE WITNESS:  If we do anything beyond, kind of, a

logo page, where we're getting contact information or phone

numbers, we go to the client and it requests permission for

that.

THE COURT:  Okay.  And when you say -- so some of

those promotional materials will have -- might have contact

information at that particular -- in other words, for the

representative clients?

THE WITNESS:  No, there would be no contact

information, just a logo.

THE COURT:  Oh, so it would just be -- so if it's

beyond that, you'd go to the client.

THE WITNESS:  Yes.

THE COURT:  So what you typically would -- for lack of

a better term, would be outward facing, would be, you know, in

a presentation, the sales force in doing a presentation,

attached is a list of our representative clients.  But am I

correct -- well, let me just ask, would that include the name

or identify the name of a contact person at that client?

THE WITNESS:  The logo sheet would not.

THE COURT:  Okay.  And if -- when you say the logo --

1    would there be anything else that would be part of that

2    presentation that would have it?

3              THE WITNESS:  No.

4              THE COURT:  Or that would have to be a specific

5    request by -- by whomever the sales force is trying to solicit

6    at the time?

7              THE WITNESS:  So typically, the sales process is kind

8    of a long process.  So if we had somebody in -- a life science

9    client or prospect wanted to be a client, we might show ten

10   life science logos of companies they would know on a sheet.  If

11   they were still interested and wanted more information, we may

12   give them name and contact information, assuming the client

13   says it's okay for us to do that.

14             THE COURT:  Okay.  All right.

15             Sorry.  Go ahead.

16   BY MR. WICKHAM:

17   Q.  So far as you know, do you have any information that any of

18   the clients that Mr. Ferguson had interaction with ever

19   appeared on one of these logo sheets?

20   A.  Not as far as I know.

21   Q.  And --

22             THE COURT:  I'm sorry.  Go ahead.  Ask the next

23   question.

24             MR. WICKHAM:  Oh, no, you go ahead, your Honor.

25             THE COURT:  No.  I'd like to get information about

JA2VMARHredacted              Calder - direct

1    those clients.  In other words, I understand that initially

2    there were 20 or so.  But what I'd like to get a sense of is

3    Mr. Ferguson's entire book of business; in other words, who, I

4    guess, Marsh would consider his clients, who among those were

5    clients that Mr. Ferguson solicited, in other words, sold

6    products that he was entitled to get a commission for.

7            In other words, in the arguable hybrid role,

8    understanding that -- well, in the hybrid role that he may have

9    had, and then among those, the total entity -- total universe

10   of those clients, how many of those folks are the clients that

11   Marsh believes that Mr. Ferguson has solicited.

12           MR. WICKHAM:  We have that in exhibits coming up, your

13   Honor.

14           THE COURT:  Okay.  All right.  Fantastic.

15   BY MR. WICKHAM:

16   Q.  But just to be clear about these logo clients, I mean, are

17   we talking about mom-and-pops and midlevel and small companies,

18   or are we talking about, you know, really the largest clients,

19   public name brands and things of that nature within a

20   particular industry segment?

21   A.  Usually we've used the name brand tag name.

22   Q.  Okay.

23           Now, at some point in time, did it come to your

24   attention in either late December of 2018 or in January of

25   2019, that Mr. Ferguson may have taken client information,

1   client confidential information, and sent that to his personal

2   email?

3   A.  It did come to my attention through Diane Rosen, who's our

4   chief compliance officer, that that had happened.

5   Q.  Okay.

6          Now, do you know -- and it's okay if you don't.  Do

7   you know Ms. Rosen's subsequent interactions with Mr. Ferguson

8   concerning him sending client confidential contact information

9   to his personal email address?

10  A.  I do.  In late January, there had been a dialogue back and

11  forth, an email dialogue, I think it's in the exhibits

12  somewhere.  In late January, Diane Rosen reminded Rick this is

13  confidential client information not to be sent to his personal

14  email address.

15  Q.  Okay.  And what was Ms. Rosen's position at that time?

16  A.  Chief compliance officer for MMA.

17  Q.  So the chief compliance officer for MMA was telling

18  Mr. Ferguson that he should not be disclosing and using client

19  information and sending it to his personal email address; is

20  that right?

21  A.  That's correct.

22         MR. WICKHAM:  Your Honor, Ms. Rosen is one of the

23  affidavits that we supplied.

24         THE COURT:  Yes.

25         MR. WICKHAM:  And she provides the background

1    concerning that particular instance.

2              THE COURT:  Okay.

3    Q.  But this is information, so as far as you knew, that

4    Mr. Ferguson was reminded of and admonished not to disclose and

5    use this information in January of 2019?

6    A.  Yes.

7    Q.  Okay.

8              THE COURT:  I guess what I would -- and I apologize

9    for not -- I hadn't thought about it earlier.  But obviously

10   with regard to the declarations of Ms. Rosen and Ms. Cam, I

11   will allow Mr. Ferguson to have an opportunity to respond in

12   whatever -- obviously they are not here as witnesses.  But to

13   the extent that he has a response to their declarations or

14   affidavits, I would allow him to submit something after this

15   hearing.

16             MR. WICKHAM:  Absolutely.  And I anticipate that

17   Mr. Ferguson may comment on Ms. Rosen's statements, because he

18   did so during his deposition.

19             THE COURT:  Okay.

20             MR. WICKHAM:  Ms. Cam's declaration was primarily for

21   authenticating email messages.  Since we've overcome that

22   hurdle, then you're welcome to it, but we had put that in the

23   completeness' sake so that we did have an authenticating

24   declaration.

25             THE COURT:  Okay.  Go ahead.

JA2VMARHredacted                    Calder - direct

```
 1   BY MR. WICKHAM:
 2   Q.  After this incident involving Mr. Ferguson sending client
 3   contact information to his personal email address -- and let me
 4   clarify that.
 5          Did you know what were the circumstances of
 6   Mr. Ferguson sending that information to his personal email
 7   address?
 8   A.  I did not know at the time what the circumstances were.
 9   However, I had read what the circumstances were.
10          THE COURT:  When you say "read" --
11          THE WITNESS:  Read some of the email from Diane back
12   and forth.
13          THE COURT:  Okay.  So the correspondence.  Okay.
14   A.  And the circumstances that I had become aware of is Rick
15   was sending publications, various information out to our
16   clients, that we all do.  So making our clients aware of new
17   regulations or publications, so sending it to his whole client
18   list and then cc'ing his personal email address.
19   Q.  Okay.  So the thing that Ms. Rosen had flagged was him even
20   cc'ing this message that was being sent to clients.  And by
21   virtue of cc'ing, then, of course, all the email addresses for
22   the clients are then going to his personal email address?
23   A.  Correct.
24   Q.  And it's that act that he was admonished that he should not
25   be doing?
```

JA2VMARHredacted                    Calder - direct

1    A.  Yes.

2    Q.  Okay.  And -- well, strike that.

3            Okay.  Now, after that in January of 2019, did you

4    become aware of Mr. Ferguson engaged in communications with

5    clients that, from your standpoint, were not authorized?

6    A.  No, not in January of 2019.

7    Q.  No, no, after January.

8    A.  Oh, after.  I'm sorry.

9            Yes.  In February, February 13th -- 14th of 2019, I

10   was --

11   Q.  Hold on a second.

12           MR. WICKHAM:  We're going to start to get into an area

13   with the disclosure of clients, your Honor, and talking about

14   it.  So we might want to ask --

15           THE COURT:  Okay.  Mr. Temkin, if I could ask you to

16   step out briefly.

17           Are you going to talk about specific clients?

18           MR. WICKHAM:  Yeah.  It will probably last about 20

19   minutes or so.

20           THE COURT:  Mr. Temkin, if I could ask -- if you could

21   step out for a moment.

22           MR. TEMKIN:  Yes, your Honor.

23           If I may be heard.  These are clients that are

24   currently clients of Triad or RIA; I would probably have access

25   to that anyway.  I can certainly agree to keep these

1   proceedings confidential.

2            THE COURT:  The problem is I don't know -- I have no

3   idea who they --

4            THE WITNESS:  I know.  They are not Triad or RIA

5   clients.

6            THE COURT:  Okay.  So Mr. Calder just said that he

7   does not believe that they are, in fact, dual clients, in other

8   words, clients of Triad and clients of Marsh.

9            MR. TEMKIN:  Okay.

10            THE COURT:  In other words, they are just Marsh

11   clients.

12            THE WITNESS:  Correct.

13            THE COURT:  Is that an accurate statement?

14            THE WITNESS:  Yes.

15            THE COURT:  Okay.

16            Ms. Williams, can we open the witness room so that

17   Mr. Temkin can sit back there?  I think the benches out

18   there -- there are chairs like that, like here, in the witness

19   room.  So you can sit there.

20            MR. TEMKIN:  Thank you, your Honor.  I appreciate

21   that.

22            THE COURT:  Sure.

23            All right.  Mr. Wickham, you may proceed.

24            MR. WICKHAM:  Thank you.

25            Your Honor, I request one indulgence.  I've got kind

1    of a bum hip.

2              THE COURT:  No, you can -- I know that I was informed

3    that Mr. Temkin had an issue.  And you should feel free, if you

4    want to be seated, to question from a seated position.  The

5    only thing I ask is that you pull the microphone closer to you

6    or -- so however you want to -- you being most comfortable is

7    fine with me.

8              MR. WICKHAM:  I do appreciate that, your Honor.

9              THE COURT:  Sure.

10             MR. WICKHAM:  I was only occasionally wincing.

11             THE COURT:  I didn't notice.

12   BY MR. WICKHAM:

13   Q.  So, Mr. Calder, we were about to ask how you first learned

14   that Mr. Ferguson was having contact or communications with

15   clients that did not seem appropriate.

16   A.  I became aware on February 14th of 2019.  I was attending a

17   lunch with a client, a lunch where we were discussing our

18   stewardship, our partnership.  And I was inquiring how were we

19   doing.  We handled their employee benefits; we also handled the

20   retirement services plan.

21             So as we were going through that, I asked specifically

22   how are things going with Rick and the retirement plan.

23             And they said, Oh, well, yeah, we got the letters and

24   we plan to sign them.

25             And I said, Excuse me, can you tell me what you're

JA2VMARHredacted                Calder - direct

1    talking about?

2            They said, Well, we got a solicitation letter from

3    Rick.  We have some paperwork we need to do.

4            Excuse me.  He didn't call it a solicitation letter.

5            We got a letter from Rick with some paperwork to do in

6    order to change -- in order to change our plan.

7            And I said, I don't know anything about that.  What

8    are you talking about?

9            And so they were, at lunch, able to show me the email

10   that Rick had sent to them from his MMA computer soliciting

11   their business from MMA to Teros, who is a competitor of ours.

12   Q.  Now, did that -- first of all, which client was this?

13   A.  ████████████████████████.

14   Q.  And ████████, did they transfer their business to Teros?

15   A.  They did not.

16   Q.  They stayed with MMA?

17   A.  They did.

18   Q.  Now, the paperwork -- well, strike that.

19           Did one of the client representatives at ████████ send

20   you the email that Mr. Ferguson had sent to them?

21   A.  They did.

22   Q.  And what was the sum total -- what were the documents that

23   Mr. Ferguson had communicated to ████████?

24   A.  I'm not quite sure, because there was a number of

25   communications; it went back and forth.  But essentially the

JA2VMARHredacted              Calder - direct

1   document was, This change is no big deal; it's not -- it's just

2   a change in my back office.  Here are a couple forms you need

3   to sign.

4   Q.  Okay.  Was one of the forms that he sent to them some sort

5   of a form that, had they signed it, whether they knew what it

6   was or not, it would have transferred their business from MMA

7   over to Teros?

8   A.  Yes.

9   Q.  When you were speaking with the representatives of ███,

10  did they indicate to you that they understood what Mr. Ferguson

11  was proposing?

12  A.  They had no idea they were moving their business from MMA

13  to Teros.

14  Q.  Okay.  And did you later make that clear to them what

15  Mr. Ferguson was proposing?

16  A.  Yes.

17  Q.  And after you made it clear to them what Mr. Ferguson was

18  proposing, did they indicate whether they planned on staying

19  with MMA?

20  A.  They did.  They stayed with us.

21  Q.  Okay.  Were you surprised by this --

22  A.  Not at all.

23  Q.  -- by Mr. Ferguson's communication?

24  A.  Oh, surprised by the communication.  I was not surprised

25  that they stayed with us.

JA2VMARHredacted                Calder - direct

1    Q.  Now, after you had this meeting with ████, did you then

2    contact Mr. Ferguson about this?

3    A.  I did.  I sent him an email --

4    Q.  One quick second.  On that date, February 14, 2019, was

5    Mr. Ferguson an MMA employee, so far as you knew?

6    A.  Yes.

7    Q.  And up until that point in time, had he remained

8    continuously employed with MMA?

9    A.  Yes.

10   Q.  Okay.

11          So after you learned of Mr. Ferguson attempting to

12   convince ████ to switch over to Teros while he's an MMA

13   employee, what did you do next?

14   A.  I sent Mr. Ferguson an email.  I said, Cease and desist.  I

15   said, You need to stop soliciting our clients.  Please call me

16   ASAP.

17   Q.  If you turn to Tab 13, do you have that in front of you?

18   A.  I do.

19   Q.  Is that the email that you sent to Mr. Ferguson?

20   A.  It is.

21   Q.  And in which you told him to stop immediately soliciting

22   our clients?

23   A.  I did.

24   Q.  Did you also tell him in that message to call you as soon

25   as possible on your cell?

JA2VMARHredacted                Calder - direct

1   A.  I did.

2   Q.  And did Mr. Ferguson respond to this and call you?

3   A.  He did.

4   Q.  And was that on that same day?

5   A.  It was on that same day.  It was later that afternoon.

6   Q.  And what do you recall of that conversation?

7   A.  I recall telling Rick that he needed to stop soliciting our

8   clients.  I told him that his access to our San Francisco

9   office had been deactivated; that his computer and phone had

10  been deactivated; and that he needed to make arrangements to

11  return to those.

12  Q.  Did you tell him he was fired at that time?

13  A.  I did not.

14  Q.  Did you have the authority to fire him at that time?

15  A.  I did not have the authority to fire Rick.

16  Q.  Okay.  So at least you've told him to cease and desist from

17  soliciting clients, but you did not fire him; is that right?

18  A.  I did not.  We have a very regimented process before we can

19  terminate an employee.  And it requires that we get HR involved

20  and also -- and HR gets legal involved.  So that is not my call

21  to make termination.

22  Q.  But did you make arrangements to terminate his access to

23  the computer systems, his email, and things of that nature?

24  A.  I did.

25  Q.  Did you also direct him to make arrangements to return his

1   laptop and his iPhone to the company?

2   A.  I did.

3   Q.  Okay.  And is that part of the information security that

4   the company maintains to --

5   A.  It is.

6   Q.  -- keep its information confidential?

7   A.  It is.

8   Q.  Okay.

9           THE COURT:  Let me ask just one question surrounding

10  the email that you sent.

11          Prior to sending the email, had you spoken to

12  Mr. Peartree?

13          THE WITNESS:  No, I had not.

14          THE COURT:  Who had you spoken to prior to sending the

15  email, other than, was it, Ms. Rose?  I'm sorry, what is it?

16          THE WITNESS:  I spoke to -- or I didn't speak to Diane

17  Rosen, but became aware of her interaction with Rick, but only

18  by reading the testimony.  I was not involved in that.

19          THE COURT:  Reading the emails?

20          THE WITNESS:  Right.

21          THE COURT:  Okay.

22          And in connection with prior to this date, February

23  14th, 2019, was there a plan to terminate Mr. Ferguson's

24  employment?

25          THE WITNESS:  There was not.

JA2VMARHredacted            Calder - direct

1          THE COURT:  So as far as you know, on February 14th,

2   he was an employee in good standing with Marsh, and there were

3   no plans to terminate his employment?

4          THE WITNESS:  He was an employee in good standing and

5   there were no plans to terminate him.

6          THE COURT:  Was there a plan to shift his

7   responsibilities at the time, in February of 2019, or shortly

8   before that?  Let's say in late 2018 to 2019, was there a plan

9   that Mr. Ferguson's responsibilities would be shifted?

10          THE WITNESS:  His responsibilities would remain the

11   same, but he's still a client service executive with a bonus

12   for sales.  So that had not changed.

13          What had changed is we were going to introduce Jeff

14   Stephens as a producer on the accounts, on the MMA accounts,

15   that Rick was the fiduciary on at that point in time.  That

16   would require a discussion with the client and then agreeing to

17   the change.

18          THE COURT:  Okay.  When did that -- when did that

19   process start, as far as you know?  In other words, when had

20   the decision been made to make that transition?

21          THE WITNESS:  I believe that decision was made

22   sometime in December 2018.

23          THE COURT:  Okay.  And who made that decision?

24          THE WITNESS:  Bill Peartree.

25          THE COURT:  Okay.  And were you part of that -- of the

JA2VMARHredacted                Calder - direct

1    discussion surrounding that?

2              THE WITNESS:  I wasn't part of the discussion

3    surrounding changing advisers, but I was aware what was going

4    on.

5              THE COURT:  Okay.  What does that -- I guess I'm not

6    sure exactly what that -- in other words, you were aware that

7    Mr. Peartree was considering various options at the time he was

8    considering it, or you became aware of it as he was -- in other

9    words, what are you saying when you --

10             THE WITNESS:  I became aware of what Bill's plans were

11   for the retirement department in San Francisco in December

12   2018.

13             THE COURT:  Okay.  And had those plans been in the

14   works prior to you becoming aware of it?

15             THE WITNESS:  I think so.

16             THE COURT:  Okay.  And do you know how -- I just don't

17   know organizationally, would that have been his call?  In other

18   words, in structuring the retirement department for San

19   Francisco, would that have been in his bailiwick?  In other

20   words, he would do that himself?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.  And he didn't need, sort of -- or

23   at least he didn't on this occasion, consult with you prior to,

24   sort of, implementing or starting that process?

25             THE WITNESS:  Well, he -- he told me what the game

JA2VMARHredacted              Calder - direct

1    plan was before he started it.

2              THE COURT:  Okay.

3              THE WITNESS:  We tend to have -- we tend to do things

4    collaboratively.  So I kind of knew the game plan before it was

5    actually implemented.

6              THE COURT:  Okay.

7              And when did you first become aware of it?

8              THE WITNESS:  I don't know for sure, but I believe in

9    December of 2018.

10             THE COURT:  Okay.  Was that done orally or did you

11   receive an email or was it some combination of the two?

12             THE WITNESS:  I think it was oral.  I don't recall

13   receiving any emails like that.

14             THE COURT:  Okay.  I guess what I would ask,

15   Mr. Wickham, if there are any emails about -- from Mr. Peartree

16   about this issue, I'd be interested in seeing those, to the

17   extent that I don't already have them.  I may have -- they may

18   not -- I'm not saying they exist, I'm just saying to the extent

19   there are, I'd like to, sort of, see them.

20             MR. WICKHAM:  Let me button this up, your Honor.

21             THE COURT:  Sure.

22             MR. WICKHAM:  Because I think it might become more

23   clear.

24   BY MR. WICKHAM:

25   Q.  After Mr. Ferguson returned to the service position in

JA2VMARHredacted               Calder – direct

1  2015, were you generally aware that there was shorthandedness

2  on the client executive sales side in the bay area office?

3  A.  Yes.

4  Q.  Okay.  And was that shorthandedness something that the

5  company institutionally was attempting to remedy for several

6  years?

7  A.  Yes.

8  Q.  Okay.  And during that time, were various candidates being

9  sought and searched for in order to be able to bring in a new

10 salesperson, a new producer?

11 A.  Over time we talked to people in the retirement services

12 production area, yes.

13 Q.  Okay.  And at some point in time, was Jeff Stephens

14 identified as a candidate to come into the bay area office to

15 fill that vacuum, if you will, on the sales side?

16 A.  He was.

17 Q.  Okay.  And did Mr. Ferguson have involvement with

18 Mr. Stephens joining the firm?

19 A.  He did.

20 Q.  What was Mr. Ferguson's involvement?

21 A.  So Jeff Stephens was identified as a prospective candidate

22 for us by Alan Ikeya.  Alan is --

23 Q.  Who was an MMA employee?

24 A.  Alan is an MMA employee; he's an employee, health and

25 benefit producer.  As part of his centers of influence, he was

JA2VMARHredacted                    Calder - direct

doing business with an accounting firm that Jeff Stephens was

affiliated with in doing retirement planning for their clients.

So we became aware that he may be -- Alan let us know that he

may be interested in coming to work for MMA.

        Once we got the process started of interviewing him,

Rick was instrumental in helping bringing him over as a new

producer.

Q.   Was Mr. Ferguson negative about bringing Mr. Stephens in or

was he positive about bringing Mr. Stephens in?

A.   He was positive about it.

Q.   Because Mr. Stephens was going to fill the vacuum in the

bay area office because he was going to be coming in as a

producer?

A.   Yes.

Q.   Okay.  Now, in bringing Mr. Stephens in, were there certain

issues concerning his compensation that the company had to meet

in order to be able to satisfy his compensation expectations

for him to join the firm?

A.   Yes.

Q.   And could you just -- without getting into any dollars,

could you generally describe what those issues were?

A.   In general, we paid production talent 50 percent of the new

business they bring in in the first year, and 20 percent of the

recurring revenue for the life of the client on a commission

basis.

JA2VMARHredacted                    Calder - direct

1           In order to meet the salary expectation that
2   Mr. Stephens had, we needed to code internally the house
3   accounts in the bay area to Mr. Stephens.
4   Q.  Okay.  Now, we've seen that from Mr. Ferguson's papers,
5   some description about him having clients stolen from him or
6   anything like that.  Did MMA steal Mr. Ferguson's clients, so
7   far as you know?
8   A.  No, the clients are MMA clients.  My clients are clients of
9   MMA, they are not mine.
10  Q.  No clients belong to an individual -- an individual, they
11  are all clients of the firm; is that right?
12  A.  That's correct.
13  Q.  Okay.
14          With regard to the clients to which Mr. Ferguson was
15  assigned, how did have interaction with Mr. Stephens coming in?
16  A.  Could you state --
17  Q.  You had mentioned that they were coded as house accounts.
18  A.  Right.
19  Q.  Is that accurate?
20  A.  Yes.
21  Q.  What did that mean as a practical matter?
22  A.  That meant -- coding to a house account are accounts that
23  are not coded to a producer.  Once they are coded to a
24  producer, that producer's compensation is paid based on the
25  coded revenue.  We do not pay client service executives

JA2VMARHredacted                Calder - direct

1    compensation for sales.  So commission is not coded to client

2    service executives.  They are paid a salary plus a bonus.

3    Q.  Okay.  So just to make it really clear, was Mr. Ferguson

4    paid on a salary plus a bonus?

5    A.  Yes.

6    Q.  As a client executive service, was he paid on commissions?

7    A.  The only time Rick would earn a commission would be if he

8    initiated a new account in the hybrid role.  And in that role

9    he would receive compensation of 25 percent of the value of the

10   account.

11   Q.  Okay.  But for --

12   A.  One time.

13   Q.  For day-to-day clients, month-to-month clients, was he

14   getting paid a commission for those clients?

15   A.  He was not.

16   Q.  And the reason why he was not was because he was getting a

17   salary?

18   A.  Correct.

19   Q.  Okay.

20          And so those accounts to which he was assigned, were

21   they designated as house accounts?

22   A.  Yes.

23   Q.  Okay.

24          THE COURT:  You mean prior to Mr. Stephens coming on

25   board?

1          MR. WICKHAM:  Right, right.

2          THE COURT:  They were house accounts prior to

3    Mr. Stephens coming on board?

4          THE WITNESS:  Yes.

5    BY MR. WICKHAM:

6    Q.  And that just simply meant that no one was designated as

7    getting a commission on them, because the person who was

8    providing the service was Mr. Ferguson, who wasn't earning a

9    commission, wasn't paid on a commission basis?

10   A.  Correct.

11   Q.  Okay.  But there was no intent of somehow to prevent him

12   from having those clients at the point in time that you were

13   bringing Mr. Stephens in; is that right?

14   A.  Right.

15   Q.  Now, at some point in time, was there some discussion about

16   Mr. Stephens transferring over -- assuming a fiduciary capacity

17   or some sort of a fiduciary role there that Mr. Ferguson had

18   some issues with?

19   A.  Yes.

20   Q.  Could you describe what that was.

21   A.  Rick said that some of the clients would not accept Jeff

22   Stephens as their adviser.  And he was adamant that he talked

23   to them, they wouldn't accept it.  And when we manage our

24   business, we manage our business to acquire and retain clients.

25   We make decisions all the time about what's the appropriate way

JA2VMARHredacted              Calder - direct

1    to service a client and manage a client.

2            I told Rick at that point in time that we understood

3    there's a business risk involved with changing advisers, but it

4    was a business risk we were willing to take.

5    Q.  Okay.  At that point in time, did you tell Mr. Ferguson

6    that if the clients didn't like it, that they would lump it and

7    they could leave the firm?

8    A.  Absolutely not.  If the clients didn't like it, we wanted

9    to present alternatives.

10           We have one specific client who had had Jeff Stephens

11   as an adviser before, and it was clear that wasn't going to

12   work.  So we brought Bill Peartree up to meet with that client

13   to try to retain that client as an alternative.

14   Q.  Okay.

15           THE COURT:  So let me just -- I'm not sure I quite

16   understand what was happening here.

17           So Mr. Stephens is being brought over.  In order to

18   meet his compensation, these things that -- so how was it

19   different?  In other words, it had been a house account, but

20   now somehow it's going to be tied to Mr. Stephens.  How is

21   that?  In other words, what does that mean?

22           THE WITNESS:  What that means is we agreed to a salary

23   for Mr. Stephens that was at the very top of what we could pay

24   him based on the book of business he brought with him.  By

25   coding the house accounts to him, we were able to put a

JA2VMARHredacted               Calder - direct

1    production -- producer on that.  He would get paid 20 percent

2    of the revenue annually on that against the salary we were

3    paying him.  It was really a draw.

4              THE COURT:  Okay.  And when you say that -- so were

5    all of the house accounts transferred in the bay area similarly

6    to be coded to Mr. Stephens to make up that part of his salary?

7              THE WITNESS:  I'm not sure if all the accounts were

8    coded and transferred over.  I don't know the details of that.

9              THE COURT:  Who would?

10             THE WITNESS:  Bill Peartree would.

11             THE COURT:  Okay.

12             Do you know -- although you don't know the details,

13   where there's certain individuals who either had the hybrid

14   role of Mr. Ferguson or who were -- had just a -- not a

15   commission role, did they retain those -- let me ask this

16   before I get to that question:  So Mr. Stephens -- so these

17   accounts were not only being, sort of, transferred from --

18   well, would Mr. Ferguson have continued in the management and

19   handling of those clients once Mr. Stephens came on board and

20   the house accounts were transferred?

21             THE WITNESS:  He certainly could have, as a client

22   service executive, handled the service on the accounts.

23             THE COURT:  Well, were these clients -- what does

24   that -- I'm not sure I understand what that means.  In other

25   words, were the clients -- what were the clients going to be

JA2VMARHredacted              Calder - direct

1   advised or were they not going to be advised at all, because

2   Mr. Ferguson was still going to maintain whatever interaction

3   he had with those clients going forward?

4              THE WITNESS:  No.  Mr. Ferguson was not going to

5   continue -- he told us he would not continue as a fiduciary on

6   those accounts.  So then we would have to switch that role to

7   Jeff Stephens going forward.

8              THE COURT:  Okay.

9              THE WITNESS:  But he could still provide the

10  day-to-day client service for that.

11             THE COURT:  Okay.  So what was the impact or what was

12  the result -- in other words, was it literally just in order to

13  meet Mr. Stephens' compensation that these things were tagged,

14  sort of, under his name so that money would flow that way; but

15  whoever had those clients before could still maintain -- I just

16  don't understand exactly.

17             So Mr. Ferguson could have maintained the fiduciary

18  relationship with these clients, but what exactly was going to

19  happen?  In other words, were the clients going to be told

20  that, Oh, by the way, Mr. Ferguson is no longer working -- what

21  would be the disclosure that would be made to the clients

22  relating to this -- to Mr. Stephens coming on board?

23             THE WITNESS:  They would have to sign paperwork for

24  him to become the new fiduciary.  We were working with Rick to

25  get him to talk with the clients about the new role Jeff was

1    taking there, so it was a collaborative effort.  It turned out

2    not to be collaborative, but that was the game plan.

3            THE COURT:  I guess my question is, so he didn't --

4    Mr. Ferguson -- or you're saying Mr. Ferguson didn't have to

5    give up the fiduciary relationship.  In other words, he could

6    have maintained that, but Mr. Stephens just would have

7    continued -- just would have gotten the 20 percent

8    compensation?

9            THE WITNESS:  Now you're kind of in an area where I'm

10   not sure of the answer to that.  I don't know the roles about

11   the fiduciary and adviser in the 401(k) or retirement arena.

12           THE COURT:  Okay.  And in that space, is that more of

13   a -- in the sale of 401(k) and those, is that something that

14   someone has to be a registered -- in other words, someone who

15   is registered to sell securities?

16           THE WITNESS:  You need to be licensed to sell

17   securities.

18           THE COURT:  And, therefore, regulated by FINRA?

19           THE WITNESS:  That's my understanding.

20           THE COURT:  Okay.

21           So at the time that this transition was going to go

22   where Mr. Stephens was coming on board, the 20 percent that was

23   generated, was that money going to someone?

24           THE WITNESS:  It was just going to MMA.

25           THE COURT:  Okay.  So it wasn't going to Mr. Ferguson.

JA2VMARHredacted              Calder - direct

1              THE WITNESS:  It was not.  There was no change in

2    Mr. Ferguson's compensation.

3              THE COURT:  Okay.

4              THE WITNESS:  In fact, it was increased.

5              THE COURT:  Okay.  Why was it increased?  In other

6    words, was it just --

7              THE WITNESS:  We talked with Rick about his

8    compensation.  Rick had concerns about his compensation.  We

9    upped his compensation and gave him the ability to still earn

10   the 25 percent on the new business that he initiated.  But the

11   fact is that his house accounts, if they had been coded to

12   Rick, he wouldn't have made any more money.  He wasn't in a

13   sales role, he was in a service role; so we don't pay him

14   commission on that.

15             THE COURT:  Okay.  Do you know -- I think in terms of

16   how -- was it Mr. Peartree who decided which of the house

17   accounts would be going to -- for lack of a better term, to

18   Mr. Stephens?

19             THE WITNESS:  Yes.

20             THE COURT:  And do you know how he -- what was -- were

21   you part of that decision-making process?

22             THE WITNESS:  No, I really wasn't.

23             THE COURT:  Do you know if any of the house accounts

24   that were transferred, whether they had -- the folks who had

25   serviced them before, whether they -- their compensation was --

JA2VMARHredacted              Calder - direct

1   in other words, whether they were getting the 20 percent?

2            THE WITNESS:  No, nobody was getting the 20 percent.

3            THE COURT:  So none of the -- as far as you know, none

4   of the house accounts that were transferred over, by the very

5   nature that they were house accounts, they wouldn't have been

6   getting any of that -- any of the 20 percent.

7            THE WITNESS:  That's correct.

8            THE COURT:  Okay.  All right.

9            Sorry.  Go ahead.

10  BY MR. WICKHAM:

11  Q.  Thank you, Mr. Calder.

12           One quick question:  Toward the end of 2018, did

13  Mr. Ferguson receive some sort of a warning or final warning?

14  A.  Yes.  Mara Crain and I met with Mr. Ferguson and addressed

15  some communications he was having with associates.  It's not

16  the first time we've had this type of communication.  It was

17  very confrontational.  It was combative.  It was demeaning.

18  And we put him on a final warning for it.

19  Q.  Okay.  And that was in late 2018?

20  A.  Yes.

21  Q.  But he wasn't fired because of that, right?

22  A.  He was not.

23  Q.  He remained an employee in I don't know good standing, but

24  regular standing?

25  A.  Yes.

JA2VMARHredacted                Calder - direct

1   Q.  Okay.  Were there plans to fire him in February of 2019 --

2   A.  There were not.

3   Q.  -- before you had learned of any of these activities?

4   A.  There were not.

5   Q.  Okay.  And ultimately, did Mr. Ferguson -- was his

6   employment involuntarily terminated or, so far as you know, did

7   he resign?

8   A.  It was not involuntarily terminated.  We received a letter

9   of resignation from Mr. Ferguson on February 15th.

10  Q.  Now, after --

11              THE COURT:  Was it going to be your recommendation

12  that his employment be terminated though?

13              THE WITNESS:  It would have been.

14              THE COURT:  In other words, because I understand that

15  you explain that there is a process that occurs.  And then who

16  would have been involved -- I think you mentioned would

17  Mr. Peartree been involved in that?

18              THE WITNESS:  Mr. Peartree would have been involved in

19  that.

20              THE COURT:  HR?

21              THE WITNESS:  Our chief human resources officer would

22  have been involved in that.

23              THE COURT:  And legal?

24              THE WITNESS:  MMA's legal counsel would have been

25  involved with that.

JA2VMARHredacted              Calder – direct

1            THE COURT:  Okay.  And in connection with the final

2    warning -- so there had been prior warnings, is that --

3            THE WITNESS:  Through the years, Rick has had a

4    history of bombastic communications with employees.  And there

5    had been written in various reviews, and we talked about it

6    quite a bit.  So he knew.

7            THE COURT:  Okay.

8            Because usually it's like everyone writes progression.

9            THE WITNESS:  Right.

10            THE COURT:  So when it's final, if there's another

11    incident, does that typically, in your experience, lead to

12    someone's employment being terminated?

13            THE WITNESS:  Yes.

14            THE COURT:  Okay.

15            All right.  Go ahead.

16    BY MR. WICKHAM:

17    Q.  Now, did you, either at the time or shortly thereafter,

18    investigate whether and to what extent Mr. Ferguson sent

19    similar communications to other MMA clients?

20    A.  Yes.  We -- I called together the producers in the office

21    who had referred accounts to Rick.

22            I said, Rick has been out soliciting our accounts.

23    Get a hold of your clients, talk to them, find out what's going

24    on.

25            And they did.

JA2VMARHredacted            Calder - direct

1          And it became clear to us that this was not an

2     isolated incident.

3     Q.   Okay.  If you could turn to Exhibit 9 --

4          THE COURT:  Let me ask, it's almost 1 o'clock.  I

5     don't know what -- how much more do you think you have?

6          MR. WICKHAM:  A while.

7          THE COURT:  Okay.

8          MR. WICKHAM:  At least 20 minutes, maybe 30 minutes.

9          THE COURT:  Okay.

10         With regard to the confidential part of your

11    examination, have you completed that or is that --

12         MR. WICKHAM:  No, we're about to go into the core of

13    that.

14         THE COURT:  Okay.  Let me ask --

15         MR. WICKHAM:  Or we're continuing to go through the

16    core of that.

17         THE COURT:  I'd like to try and finish at least the

18    direct examination of Mr. Calder.  But, I'm sorry, so you're

19    saying you have about 20 minutes or so?

20         MR. WICKHAM:  Twenty or 30 minutes, your Honor.  I've

21    got some things built in here to speed things up.

22         THE COURT:  Okay.  But why don't we -- let me go off

23    the record.

24         (Off record)

25         THE COURT:  I don't mean to obviously cut you off, but

JA2VMARHredacted          Calder - direct

1    if we could aim for 1:30.  If it turns out you still have some
2    additional questions, we can take our lunch break and come
3    back.
4              MR. WICKHAM:  Okay.  Thank you, your Honor.
5    BY MR. WICKHAM:
6    Q.  Mr. Calder, would you please turn to Exhibit 9 and go
7    there?
8    A.  Yes.
9    Q.  So what Exhibit 9 is, is a compilation of 20 some-odd
10   separate email communications that were located within MMA's
11   computer system, Ms. Cam authenticates them, and through
12   Mr. Calder, I'll be able to introduce them.
13             Mr. Calder, would you please look at the first page of
14   Exhibit 9.
15   A.  Yes.
16   Q.  Okay.  So could you tell me, is this one of the email
17   communications you found on Mr. Ferguson's MMA computer system?
18   A.  Yes.
19   Q.  And could you tell me how you interpreted this?
20   A.  I interpret this as Rick using our confidential information
21   and email system to solicit our client over to his new
22   employer, Teros.
23   Q.  Okay.  This particular client was ████████; is that right?
24   A.  The first one I have here --
25   Q.  Oh, oh, I'm sorry, ████████.

JA2VMARHredacted                    Calder - direct

1    A.  Yeah.

2    Q.  And is the information concerning the client contact

3    information, ███████████████, is that information that's

4    publicly -- that is publicly disclosed by MMA?

5    A.  No.

6    Q.  And typically, is that sort of client contact information

7    something that is easily obtained through public or readily

8    available means?

9    A.  It is not.

10   Q.  Okay.  Now, tell me about this communication.  Is this

11   similar to the communication he had sent to ████████?

12   A.  Yes.

13   Q.  Okay.  So did you think that there was a problem with this

14   communication?

15   A.  Well, first it came from our computer system while Rick is

16   an employee of ours.  And in it he says:  It's not really a big

17   deal, because I'll still work with MMA benefits insurance teams

18   to support our common clients.  Nothing changes for your 401(k)

19   plan.

20          The fundamental change that is being proposed here is

21   the client will move their business from MMA to Rick at Teros.

22   So they would be taking our client.

23          Now, some unsophisticated people who may read this

24   might just sign the paperwork, because why wouldn't you?  It

25   comes under MMA's signature, it comes under their email

JA2VMARHredacted                Calder - direct

1    address, and it's not a big deal.

2              So it is a big deal.

3    Q.  At least their service adviser was telling them it's not a

4    big deal?

5    A.  Correct.

6    Q.  Right.

7              And is this similar to the message that had been sent

8    to ████████?

9    A.  Yes.

10   Q.  Okay.  Why don't we turn to the next page on this exhibit.

11             And by the way, this is all occurring while he's an

12   employee at MMA, right?

13   A.  Correct.

14   Q.  Okay.  Let's turn to the next one, which is slightly

15   different than the other one.

16             So how did you interpret this?

17   A.  I interpreted this the same way I interpreted the first

18   email, with the exception that Rick makes commentary here that

19   he hasn't seen any of the new features or services provided by

20   MMA Securities come through, and they've announced further

21   resource cuts, which is not true.

22   Q.  So did you interpret this as Mr. Ferguson making

23   misrepresentations concerning MMA Securities?

24   A.  Yes.

25   Q.  In the preceding paragraph, where it talks about the change

JA2VMARHredacted                Calder - direct

1   from SagePoint to MMA Securities, do you see that there?

2   A.  I do.

3   Q.  Now, was what Mr. Ferguson proposing, quitting MMA and

4   going to Teros, similar to or comparable to when MMA changed

5   its broker relationship from SagePoint to MMA Securities?

6   A.  No, it's completely different.

7   Q.  Okay.  So was the statement about that this change was

8   similar to that, was that an accurate statement?

9   A.  Absolutely not.

10  Q.  Okay.  And for this client, ████, do they remain with MMA,

11  if you know?

12  A.  I don't recall if that name is on the list or not.

13  Q.  Okay.  All right.  We'll.

14          Get to the list a little bit later on.

15          I don't want to begrudge all of this, but -- I mean go

16  through all of these, but would you look through the remainder

17  of these that are under Exhibit 9 and indicate whether you are

18  seeing comments about these containing, you know, misstatements

19  and these, sort of, downplaying the nature of this change, was

20  that consistent through all the solicitations that are

21  represented under Exhibit 9?

22  A.  It is.

23  Q.  Okay.  Is it accurate that each of these were sent out from

24  Mr. Ferguson's computer at MMA using client contact information

25  that is confidential in order to facilitate these

JA2VMARHredacted                   Calder - direct

1    solicitations?

2    A.  Yes.

3    Q.  Okay.  And having seen these and received these, what was

4    your reaction to this?

5    A.  I felt like somebody stole from me.

6    Q.  Okay.

7    A.  I felt personally offended by it.  Some of these clients in

8    here are relationships of mine for 25 years plus.  And it was

9    really an embarrassment.

10   Q.  Well, we have heard things along the lines of you're

11   supposedly telling Mr. Ferguson to fire clients.  For all of

12   the communications in here, did you tell Mr. Ferguson to fire

13   any of these clients?

14   A.  Absolutely not.

15   Q.  Now, there was one client that you were aware of that did

16   not -- was not comfortable with the change from Mr. Ferguson to

17   Mr. Stephens; is that right?

18   A.  Yes.

19   Q.  Is that a brewery, ███████?

20   A.  ███████████, yes.

21   Q.  That's an affidavit that Mr. Ferguson supplied?

22   A.  Yes.

23   Q.  With regard to that, when they indicated that they weren't

24   comfortable with moving to Mr. Stephens, did MMA, in fact,

25   offer them other alternatives in order to retain them as a

JA2VMARHredacted                    Calder - direct

1   client?

2   A.  We did.  Bill Peartree came out and met with them.  And

3   that was an alternative that we offered, that Bill would handle

4   the account.  They elected to go with Mr. Ferguson.

5   Q.  Okay.  Did Mr. Ferguson identify and say to you that there

6   were any other clients that were not interested in moving from

7   Mr. Ferguson to Mr. Stephens with regard to this fiduciary

8   change?

9   A.  Rick said in our meeting that there are clients who won't

10  make this change.

11  Q.  Okay.  But did he identify another --

12  A.  He did not identify another client by name.  We asked him

13  who they were so that we could reach out to them.  He responded

14  by saying that was confidential information between him and the

15  client.

16  Q.  And had he told you who these clients were, would you have

17  done what you did with ████████ and attempt to introduce them

18  to other producers in order to be able to retain the client

19  instead of putting them at risk to leaving?

20  A.  Of course.  We work incredibly hard to acquire clients.

21  It's a competitive industry.  Clients are our lifeblood.  We

22  work hard to get them.  We retain over 94 percent of our

23  clients in our office year over year, which is really, really

24  important.  So not only do we work hard to acquire them, we

25  work very hard to keep them.

JA2VMARHredacted                Calder – direct

1   Q.  And again, had Mr. Ferguson told you if there were any

2   other clients that weren't inclined to this change, would you

3   have done something -- would you have done everything possible

4   to try and retain those clients?

5   A.  Absolutely.

6   Q.  Okay.

7           THE COURT:  You had mentioned a meeting where

8   Mr. Ferguson had indicated that there were other clients like

9   ███████████ that didn't want to make the transition to

10  Mr. Stephens.  When was that?  Was that a face-to-face meeting?

11          THE WITNESS:  Yeah, face-to-face between Rick and I,

12  with Bill on the phone, Bill Peartree on the phone.

13          THE COURT:  Okay.

14          Do you remember when approximately that was?

15          THE WITNESS:  It's in here somewhere.  I think it was

16  sometime in December of 2018.

17          THE COURT:  Okay.  Was that the same -- there's a

18  reference to a December 20th, 2018 meeting.  Is that the same

19  meeting?  That was a meeting where you attended, where

20  purportedly Mr. Peartree, Ms. Crain -- and Ms. Crain, or was

21  that a different meeting?

22          THE WITNESS:  I believe that was the final warning

23  meeting.

24          THE COURT:  Okay.  So the meeting that you're

25  referring to, did that occur prior to?

JA2VMARHredacted              Calder - direct

1              THE WITNESS:  It did, I believe.

2              THE COURT:  Okay.  And that was on the phone?

3              THE WITNESS:  It was -- I was in person, Bill Peartree

4    was on the phone.

5              THE COURT:  And was there an agenda or anything like

6    that prepared for that meeting?

7              THE WITNESS:  I don't think there was a formal agenda.

8    We wanted to talk about the change in advisers.

9              THE COURT:  Okay.  Were there emails going around

10   setting up the meeting, saying that we want to prepare to

11   discuss --

12             THE WITNESS:  I'm sure there were.

13             THE COURT:  Okay.

14             Do you know whether those are emails that are in the

15   materials that I've received, Mr. Wickham?

16             MR. WICKHAM:  Mr. Ferguson includes his summary of

17   that meeting which we vigorously dispute.  But we haven't

18   proffered any emails surrounding that meeting.  We're happy to

19   do so.

20             THE COURT:  Okay.  I actually was referring to the

21   meeting prior to the December 20th meeting.  In other words,

22   the meeting that Mr. Peartree was on the phone and you were

23   with Mr. Ferguson.

24             THE WITNESS:  The memo that you're referring to is

25   Rick's recollection of the meeting that he memorialized.  I

JA2VMARHredacted                Calder - direct

1    don't know if that was December 20th or not.

2             MR. WICKHAM:  It was the one from Mr. Ferguson.  But

3    we can attempt to locate any messages on that subject, your

4    Honor.

5             THE COURT:  I have questions about the December 20th

6    meeting also, but this is the meeting that Mr. Calder was

7    referring to where Mr. Ferguson had mentioned -- Mr. Calder

8    recalls Mr. Ferguson mentioning that there were other clients

9    similar to ████████ who had issues.  And I was wondering if

10   there are emails related to that -- that meeting.

11            MR. WICKHAM:  We'll search that out, your Honor.

12            THE COURT:  To the extent -- do you remember,

13   Mr. Calder, did you take notes during that meeting?

14            THE WITNESS:  I did not.

15            THE COURT:  Okay.  Do you know one way or the other

16   whether Mr. Peartree took notes?

17            THE WITNESS:  I don't know one way or the other.

18            THE COURT:  Okay.  All right.

19            I'm sorry.  Go ahead.

20   BY MR. WICKHAM:

21   Q.  Now, when you had discovered that Mr. Ferguson was

22   soliciting clients and actually soliciting a lot of clients,

23   and you sent him a cease and desist letter -- excuse me, a

24   cease and desist email, did you expect that he would stop?

25   A.  Yeah, I did.  I was sure he would.

JA2VMARHredacted                Calder – direct

1    Q.  Okay.  And did he stop?

2    A.  No.

3    Q.  Okay.

4            Why don't we turn to Exhibit 10.  And this is kind of

5    a lengthy email string.

6            And if you go to the very last page, at the last page

7    it starts on February 19, so it's about five days after you

8    sent him the cease and desist email.

9            Was this an email string that you had received -- that

10   you ultimately received from ████████?

11   A.  It is.

12   Q.  And when ████████ sent this to you, the entire email string,

13   why were they sharing this information with you?

14   A.  They were sharing the information with me because they

15   realized that Rick was continuing to follow up with the same

16   activity that he exhibited that I learned about at lunch.

17   Q.  Okay.  That he was continuing to solicit ████████, even

18   though they had -- they previously communicated they weren't

19   interested?

20   A.  Yes.  And I told him to cease and desist.

21   Q.  Okay.

22           And if you go to the third page of this, where it says

23   up at the top, you know, I sent out updated meeting invite for

24   a go-to meeting.  Do you see that there?

25   A.  I do.

JA2VMARHredacted              Calder – direct

1    Q.  Okay.  So did you understand that to be that Mr. Ferguson

2    was trying to schedule a meeting with the folks at ████?

3    A.  I did.

4    Q.  Okay.

5         And then the messages that follow, do they represent

6    ████  polite way of saying, We don't want to meet with you?

7    A.  Yes.

8    Q.  Okay.  Now, if you go to the third page of this, which is

9    Mr. Ferguson's email from February 19, 11:07, do you see where

10   it says:  Jeff left you a voicemail.  Do you want to propose

11   some dates and times?  Do you see that there?

12   A.  Mm-hmm.

13   Q.  Okay.  Now, beneath that, could you read that paragraph and

14   tell me what that refers to.

15   A.  Or did someone from MMA reach out with a changed attitude.

16   It's okay if it is, and I'm happy to answer any questions.

17   It's really odd, because I had an agreement with MMA on this

18   change since it's relatively minor.  But apparently, once I

19   left MMA, someone changed their minds for some clients.  But

20   for other clients, it's no problem at all.  They're already

21   sending in signed paperwork today to facilitate the change.

22   I'm sorry I don't have an answer for what's happening at MMA.

23   Q.  Did MMA have some sort of an agreement with Mr. Ferguson

24   allowing him to solicit and take away a lot of his client

25   business?

JA2VMARHredacted                Calder – direct

1   A.  We did not.

2   Q.  So this representation about an agreement that he had with

3   MMA, is this accurate or inaccurate?

4   A.  It's completely inaccurate.

5   Q.  Okay.  And when he, once again, described this change as

6   being relatively minor, was this the proposed change, to move

7   from MMA to Teros, was that a minor change or is a major change

8   in terms of the scheme of things?

9   A.  It's a major change.  It's moving an MMA client, a line of

10  our business, from MMA to a direct competitor, Teros, in the

11  retirement services phase.

12  Q.  And had you not been in ████████ offices on the 14th when

13  they saw this communication with Mr. Ferguson, and had you not

14  been able to explain to them what it was, did you understand

15  that they would have signed this not knowing exactly what was

16  going on?

17  A.  Absolutely.

18  Q.  And do you believe that that is what happened to other

19  clients, that they didn't have the benefit of sitting with you

20  or another representative of MMA; they automatically signed

21  this paperwork that was being presented to them by a trusted

22  adviser, assuming that it was no big deal and administrative

23  change, and that they all -- not "they all," that some of them

24  transferred over based upon inaccurate information?

25  A.  I think so.

JA2VMARHredacted                 Calder - direct

1  Q.  Okay.

2            THE COURT:  Well, when you say you think so, what is

3  that based upon?  Is that based upon the interaction you had

4  with ████?

5            THE WITNESS:  Not just ████.  I also made a phone

6  call that afternoon to ████████.  And ████

7  ████████ at ████████ is the VP of HR, said, Wow,

8  I'm glad you called.  We're just in the process of getting

9  those papers signed.

10           THE COURT:  Okay.

11           Are you aware of any clients who signed the papers

12  who -- in other words, has any client contacted you or someone

13  else from Marsh to say, We don't understand what's going on.

14  Why are you guys -- why isn't Marsh still our -- or why aren't

15  we still getting information from Marsh?  Why are we getting

16  stuff, you know, elsewhere?

17           THE WITNESS:  We have one client, ████████, who

18  said, What's happening?  Who's my representative at Marsh?

19  What's going on?

20           THE COURT:  Okay.

21           And when in the time frame was that correspondence

22  received?

23           MR. WICKHAM:  Your Honor, the ████████ email is

24  under Tab 12.

25           THE COURT:  Oh, okay.  All right.  So if you're going

JA2VMARHredacted              Calder - direct

1    to get to that, I apologize.  I'm jumping the gun a little bit.

2            Go ahead.

3    BY MR. WICKHAM:

4    Q.  Just one last point, Mr. Calder.  Looking at the very first

5    page of Exhibit 10, where Mr. Ferguson is again communicating

6    with  █████  and making statements about, you know, A client

7    has sent me the email MMA sent out; told me that they've been

8    saying -- what they've been saying about me and efforts to

9    force clients to use their new retirement adviser.  He says, My

10   apologies.  I find the whole situation unprofessional and won't

11   engage in mud-slinging and the like.  I think people I worked

12   with MMA are the best in the business, etc.

13           This reference to unprofessional and mud-slinging, so

14   far as you know, was MMA, while attempting to preserve its

15   client relationships, somehow engaging in mud-slinging with

16   Mr. Ferguson?

17   A.  Absolutely not.

18   Q.  Okay.

19           Why don't we turn to the  █████████  email, which

20   is under Tab 12.

21           Did this at some point come to your attention?

22   A.  It did.

23   Q.  Okay.  And just to speed things along, was the original

24   solicitation from Mr. Ferguson, is it on the first page of

25   this, and that's dated February 12th?

JA2VMARHredacted                    Calder – direct

1    A.  Yes.

2    Q.  Okay.  And this is being sent to them from his Teros

3    advisers email address; is that right?

4    A.  Yes.

5    Q.  Okay.  And on February 12th, was he still an employee of

6    MMA?

7    A.  He was.

8    Q.  So he's using his Teros email address to solicit clients to

9    go to Teros while he's an MMA employee?

10   A.  Yes.

11   Q.  Okay.

12          And then did you subsequently receive the

13   communication from ████████████ general counsel asking

14   about the situation?

15   A.  We did.

16   Q.  And that's what's represented here in the top page of

17   Exhibit 12?

18   A.  Yes.

19   Q.  Okay.

20          And did ████████████ ultimately either move to

21   Teros or did they stay with MMA?

22   A.  They did not.  They decided they didn't want to get in the

23   middle of a fight.

24   Q.  Okay.  So MMA had a client that you had a contractual

25   relationship with or an expectation of a continuing business

JA2VMARHredacted                 Calder - direct

1    relationship in the case of ███████████; is that right?

2    A.   Right.

3    Q.   And that after Mr. Ferguson sent his email communications

4    trying to get them to move to Teros, then, because of

5    Mr. Ferguson's activities, so far as you know, did they then

6    decide to go and move away from MMA and they went somewhere

7    else?

8    A.   They did.

9    Q.   Okay.  So there was an actual disruption in that

10   relationship?

11   A.   There was.

12            THE COURT:  So, I'm sorry, they went somewhere other

13   than Marsh and other than Teros?

14            THE WITNESS:  I believe they went to Morgan Stanley.

15   I'm not positive, but I know they chose another adviser.

16            THE COURT:  Okay.  But not Teros.

17            THE WITNESS:  But not Teros.

18            THE COURT:  Okay.

19            MR. WICKHAM:  This will be the last by way of

20   illustration, and there's a lot more, but if you turn to Tab

21   11.

22            THE COURT:  We were just on 11.

23            MR. WICKHAM:  No, no, we were just on 12.

24            THE COURT:  Oh, I'm sorry.  Okay.  I'm sorry.

25            MR. WICKHAM:  This is the one for ███████.

JA2VMARHredacted                Calder - direct

1           THE COURT:  Okay.  Go ahead.

2    BY MR. WICKHAM:

3    Q.  Could you turn to the second and third page of this Exhibit

4    11, Mr. Calder.  Do you see that there?

5    A.  Yes.

6    Q.  So this appears to be a March 7 email from Mr. Ferguson to

7    ██████████████ at ████████, with copying two other

8    individuals -- three other individuals at ████████.

9           Do you see all that there?

10   A.  I do.

11   Q.  Do you know whether, based on the title that Mr. Ferguson

12   put on this, Hello ████████ 401(k) plan committee, do you know

13   whether or not these four individuals were their 401(k) plan

14   committee?

15   A.  I don't know that.

16   Q.  Okay.  If this, in fact, was their 401(k) plan committee,

17   do you know whether or not that's publicly available

18   information?

19   A.  It is not.

20   Q.  Okay.  And in this, as of March 7, so far as you -- when

21   you saw this, was Mr. Ferguson continuing to solicit MMA

22   clients?

23   A.  Yes.

24   Q.  Okay.  And he had previously been told by you to cease and

25   desist on March -- excuse me, February 14, right?  Okay.

JA2VMARHredacted                 Calder - direct

1    A.   And I believe he received a follow-up communication from

2    your firm at some point.

3    Q.   Right.  And I'll be introducing that in a bit.

4              Has Mr. Ferguson continued to solicit MMA clients

5    through the present date, so far as you know?

6    A.   As far as I know, yes.

7    Q.   Okay.  When was the most recent?

8    A.   We lost an account in July.

9    Q.   Okay.  What account was that?

10   A.   That was ████████████████████.

11   Q.   Okay.  And that would have -- do you know when in July that

12   was?

13   A.   I think the effective date of the broker change was July 1.

14   Q.   Okay.  So that would have been about a month or two months

15   after the entry of the temporary restraining order.

16             Would you turn to Tab 14, Mr. Calder.

17             Can you tell me what Tab 14 is?

18   A.   This is a client list of ours of the clients that have left

19   us either to go with Rick to Teros Advisors, or to another

20   adviser.

21   Q.   And do all these clients that are listed on this, do they

22   correspond with the solicitations that Mr. Ferguson sent?

23   A.   I don't know if we have one on each of these clients in

24   your exhibits, but for the most part, yes.

25   Q.   Okay.  But I see at the bottom that ████████ is the last

JA2VMARHredacted                 Calder - direct

1   entry.

2   A.  Yes.

3   Q.  And ████████, do you know whether or not he had solicited

4   them?

5   A.  Yes.

6   Q.  Okay.

7              MR. WICKHAM:  We'll make a representation to the Court

8   that the two do match up.

9              THE COURT:  When you're saying the two do match up, I

10  apologize, let me just take a look.  So it matches up with the

11  clients who were --

12             MR. WICKHAM:  Who were solicited, your Honor.

13             THE COURT:  Being solicited.  Okay.  All right.

14  BY MR. WICKHAM:

15  Q.  Now, Mr. Calder, did you come to understand or did you come

16  to discover that Mr. Ferguson was sharing other information,

17  client information, outside of MMA?

18  A.  Yes, he was sharing the client list revenue, investment

19  fees paid.

20  Q.  Okay.  So I'll ask you to turn to Tab 25.

21             THE COURT:  Just before you -- I just have some quick

22  questions on 14.

23             Just some of the columns, they refer to -- and I

24  apologize, Mr. Wickham.  But under -- what does it mean

25  under -- it looks like it should be -- it's sort of cut off

JA2VMARHredacted            Calder - direct

from mine, but it looks like retirement advisory something, and

then there are dollar signs and figures that go down.

          Do you have an understanding of what that column --

          THE WITNESS:  Those are the fees, annual revenue on

each of those accounts.

          THE COURT:  Okay.  The money that would come into MMA.

          THE WITNESS:  MMA.

          THE COURT:  Any of these accounts, were any of these

accounts, did they generate fees that would go to Mr. Ferguson?

          THE WITNESS:  Not on an ongoing basis, no.  He may

have received a sales bonus in the first year in that hybrid

role of his.

          THE COURT:  Okay.

          THE WITNESS:  But after that, no, no recurring

revenue.

          THE COURT:  So in connection with that hybrid role, it

was only if -- in that initial year that he got a bonus, that

compensation did not continue thereafter?

          THE WITNESS:  That's correct.

          THE COURT:  Okay.  Now, in connection with the -- when

it says "employee health benefits," and then it says

"producer," and then there -- it looks like under the column

there are some names or something.  What does that mean?

          THE WITNESS:  Those are the producers who referred

Rick into the accounts.

JA2VMARHredacted          Calder - direct

1            THE COURT:  So those are the folks who -- are the

2    folks who are listed as producers, do they receive the 20

3    percent or no?

4            THE WITNESS:  No.

5            THE COURT:  So they referred it for Mr. Ferguson to

6    basically handle it from there on out.

7            THE WITNESS:  They would get a one-time referral fee

8    for doing it.

9            THE COURT:  Okay.  All right.

10           And when it says "EHB Revenue," what's that refer to?

11           THE WITNESS:  Employee health and benefit revenue.

12   That's just, sort of, if we knew how much revenue the client

13   was worth to us in general.  It's informational.

14           THE COURT:  I see.  So if Marsh has other business

15   that they are doing with the client separate and apart from the

16   retirement advisory --

17           THE WITNESS:  Right.

18           THE COURT:  -- this gives you the total --

19           THE WITNESS:  Yes.

20           THE COURT:  -- of what that business would be.  Okay.

21           And I see -- so there's a separate line item for

22   business insurance?

23           THE WITNESS:  That's correct.

24           THE COURT:  Okay.  And then what does "CSE" stand for?

25           THE WITNESS:  Client service executive.  That means

JA2VMARHredacted                Calder - direct

1    who -- at some point there may have been kind of a referral

2    from -- for example, the ▆▆▆▆▆ referral or retirement

3    advisory gate says Adam Moise and then Christiana Lu.

4    Christiana Lu is the client service executive on the employee

5    health and benefits piece.

6              THE COURT:  Okay.  And what does "CM" stand for?

7              THE WITNESS:  Client manager.

8              THE COURT:  Okay.  And so -- I see.  So the revenue

9    here on this, I guess it's sort of purple, is -- so that's

10   business insurance revenue and it indicates the revenue from

11   that.

12             THE WITNESS:  Correct.

13             THE COURT:  Okay.

14             And the notes are lost -- "RF" actually means Rick

15   Ferguson?

16             THE WITNESS:  Correct.

17             THE COURT:  And when you say loss, all of these -- is

18   it your understanding that all of these entities are now doing

19   business and they are at Teros?

20             THE WITNESS:  Yeah.  The retirement advisory business

21   has moved to Teros.

22             THE COURT:  But the other business is still retained.

23             THE WITNESS:  It is.

24             THE COURT:  To the extent there is other business,

25   it's retained by Marsh?

JA2VMARHredacted              Calder – direct

1                 THE WITNESS:  It is.  But when you lose one line of

2     business, clients become less sticky.  So for us to lose a

3     piece of business, even though we've only lost a portion of the

4     revenue, it really can put the total revenue at risk.

5                 THE COURT:  Okay.  All right.

6                 Apologize.  Go ahead.  That was all I had on 14.

7     BY MR. WICKHAM:

8     Q.  Let me ask you to turn to Tab 28, Mr. Calder.

9                 Are you there?

10    A.  I am.

11    Q.  Okay.  So in addition to discovering the solicitation

12    emails that Mr. Ferguson sent to himself, did you also

13    discover -- strike that.

14                In addition to the solicitation emails that

15    Mr. Ferguson had sent from his MMA computer to individual

16    clients, did you also discover that Mr. Ferguson had sent

17    substantial client information to his Teros email address?

18    A.  Yes.

19    Q.  Okay.  And is Exhibit 28 an example of one of those emails

20    where he sent client information to himself?

21    A.  It is.

22    Q.  Okay.  And this email, is this -- in sending this over, was

23    this attached to this email all of the client contact cards for

24    all of the client representatives that are identified where it

25    says "attachments"?

1              THE WITNESS:  Yes.

2    Q.   The reference there to BA main, do you know what the "BA"

3    stands for?

4    A.   Bay area.

5    Q.   Okay.  So do you know whether this was just the clients

6    with whom Mr. Ferguson had a relationship or did this also

7    include other MMA clients in addition to the clients with whom

8    Mr. Ferguson had relationships?

9    A.   It also included other clients.

10   Q.   Okay.  So he was -- he wasn't stopping with the clients

11   that he was working with, he was going with all the --

12   potentially with all the clients in the bay area, so far as you

13   understood it?

14   A.   All the 401(k) or retirement --

15   Q.   Right.

16              Now, the email contact cards that were attached to

17   this message, did it have the contact's name, email address,

18   telephone number, address, and things of that nature?

19              Yes?

20   A.   Yes.

21   Q.   Okay.  And did some of them have other information, such as

22   a history of a course of communications?

23   A.   Some of them did have Outlook attachments with that type of

24   information.

25   Q.   And was all of this information confidential client

1   information that was useful for MMA's business?

2   A.   Absolutely.

3   Q.   Okay.  I will be just drawing to your attention Exhibits

4   8 -- I'm sorry, 5, 6, and 7 and 8.

5          THE COURT:  Just before you -- before you move on to

6   5, 6, 7, and 8, with regard to 28, just so that I understand

7   exactly what it represents, the first page is the email from

8   Mr. Ferguson to Mr. Ferguson at Teros.  The attachments are the

9   V cards basically?

10          THE WITNESS:  Yes.

11          THE COURT:  And those V cards, although not attached,

12   the information, as you understand it, from those V cards has

13   been compiled in the spreadsheet that appears behind the email?

14          THE WITNESS:  Yes.

15          THE COURT:  Okay.

16          And do you have an understanding of the V cards that

17   are part of the attachments, whether all of those V cards came

18   from Mr. Ferguson's Outlook or whether some of them -- because

19   you had mentioned that some of them were not -- were from --

20   because it said "bay area main," which is, sort of, a

21   general -- as I understand it, more than just the clients that

22   may have been covered by Mr. Ferguson.

23          Was there a database or a particular location where

24   the bay area main clients would have been housed on Outlook for

25   MMA employees to access?

JA2VMARHredacted                Calder - direct

1                 THE WITNESS:  No, not necessarily.  So I think these

2       are all of the retirement service clients who Rick either had a

3       relationship with before or had one now.

4                 THE COURT:  Okay.

5                 THE WITNESS:  Some of those he may not have an

6       existing relationship, but he downloaded the contact

7       information anyway.

8                 THE COURT:  Okay.

9                 THE WITNESS:  I can give you an example.

10                THE COURT:  No, no, I think I understand.

11                In other words, some of them he may have -- five years

12      ago may have had a relationship with.

13                THE WITNESS:  Yes.  Right.

14                THE COURT:  But he doesn't currently.

15                THE WITNESS:  Right.

16                THE COURT:  And others he had a current relationship

17      with -- in other words, ongoing.  I mean at the time he was

18      sending this to himself, he had a relationship with them.

19                THE WITNESS:  Yes.

20                THE COURT:  Mr. Wickham, do you know, is there

21      somewhere where that is broken down in some way?

22                MR. WICKHAM:  Which, of the ones that he had current

23      relationships with and previous relationships with?

24                THE COURT:  Yes.  I understand the argument with

25      regard to the confidential material.  I'm just in my own mind

JA2VMARHredacted                    Calder - direct

1    trying to think about -- again, one of the allegations, or at

2    least my understanding from the agreements, had a provision

3    about two years and entities that -- and soliciting entities

4    that -- it was in that two-year window that I think there was a

5    prohibition, but not prior to -- I get there are separate

6    things going on here.

7          I'm just in my own mind trying to see what buckets --

8    whether there's information in the materials that you provided

9    me that indicates which buckets these might fall into, putting

10   to the side for the moment that I understand the argument is

11   all confidential and he shouldn't have been sending it to

12   himself.  I understand that that's the argument.

13         I'm just trying to figure out whether there's -- and

14   if not, I would ask if -- and this is something you can meet

15   and confer with Mr. Ferguson about, which ones did he have

16   relationships with within the past two years prior to this

17   date, on February 13 of 2019, and which had preceded it.  And

18   again, I'm putting to the side for the moment the issue of the

19   contact information itself is something that MMA is basically

20   saying that's confidential information, shouldn't have been

21   sent to his Teros email.

22         MR. WICKHAM:  We can get that information, your Honor.

23   It's basically if he had contact with them in the two previous

24   years, then they would be prohibited from the subject of

25   solicitation for 24 months after his separation.

JA2VMARHredacted                Calder - direct

1             We'll seek to get that information.

2             THE COURT:  And again, I'm not in any way making a

3   ruling; I just want to make sure I have an understanding in my

4   own mind of the landscape --

5             MR. WICKHAM:  Understood.

6             THE COURT:  -- of what we're talking about.

7             MR. WICKHAM:  Understood.  We'll get that information.

8             We understood that basically the email was -- I don't

9   want to overstate it, but that it was -- it was the active

10  clients of the firm in the bay area.  So it was all of them.

11  But we'll try to get that -- break that down.

12  BY MR. WICKHAM:

13  Q.  Just quickly, Exhibits 5, 6, 7, and 8, do you have those in

14  front of you, Mr. Calder?

15  A.  I do.

16  Q.  So if you look at Exhibit 5, is that the same thing in

17  terms of more contact information, this one being called BA

18  Seven, so -- BA Second, so a second bay area grouping of

19  emails?

20  A.  Yes.

21  Q.  Okay.

22            And then Exhibit 6 -- excuse me, yeah, Exhibit 6,

23  prospects, this is more contact information that Mr. Ferguson

24  is sending to himself; is that right?

25  A.  Yes.

JA2VMARHredacted                    Calder - direct

1    Q.  This being titled "prospects," I think in his deposition

2    Mr. Ferguson was less -- said that he was less precise about

3    that, but certainly he can share that on his examination.

4              And then Exhibit 7, it's entitled "RF client."

5              Do you see that there?

6    A.  Yes.

7    Q.  Okay.  And again, is this more contact information that

8    Mr. Ferguson is sending to himself, to his email address at

9    Teros?

10   A.  Yes.

11   Q.  Do you know what Exhibit 8 is, where it says for profit?

12   A.  I don't know why it was labeled that way, no, I don't.

13   Q.  Okay.

14   A.  But these are, again, either current clients or prospects

15   of MMA.

16   Q.  Okay.

17             Now, would you turn to Tab 21 please.

18   A.  Yes.

19   Q.  Now, Tab 21 -- and actually, many of the documents in here,

20   are documents that were produced to us just this last week from

21   Mr. Ferguson.

22             If you look at Tab 21, as well as Tab 26, do you see

23   the spreadsheet on Tab 26?

24   A.  Yes.

25   Q.  If the spreadsheet that is associated with Tab 21, where it

JA2VMARHredacted          Calder - direct

1  says, Attached is a simple spreadsheet showing current clients

2  and my expected order of transfer contract, do you see that

3  there on Tab 21?

4  A.  I do.

5  Q.  Now, looking at Tab 26, this spreadsheet --

6  A.  Yes.

7  Q.  -- do you recognize the clients on this spreadsheet?

8  A.  I do.

9  Q.  Do you recognize these as MMA clients?

10  A.  Yes.

11  Q.  Do you recognize the revenue estimates as revenue estimates

12  of MMA clients?

13  A.  Yes.

14  Q.  Okay.  Was Mr. Ferguson supposed to take this information

15  when he was working somewhere else?

16  A.  Absolutely not.  This is confidential information and trade

17  secrets.

18  Q.  And the fact that he still has this and only produced it to

19  us last week, even though there's a restraining order saying

20  that he's not supposed to be, I think, in possession or using

21  this information -- I mean to me that's troubling -- but this

22  information in here, revenue information, is that confidential?

23  A.  Absolutely.  Yes.

24  Q.  And it's useful for what purpose?

25  A.  It's useful for our business planning and tracking; it's

1   useful for deploying resources for clients.

2   Q.  And in terms of the list of clients that are listed in Tab

3   26, it looks to me that it's a larger group than the ones that

4   are of the clients that have left.

5   A.  It is.

6   Q.  So even though there has only been 15, 16 clients that have

7   left, if this represents some sort of a target list, is it your

8   surmising that he would be -- that there may be other clients

9   that he would be attempting to solicit?

10  A.  I'm very concerned about that.

11          THE COURT:  Mr. Wickham, it's a little past 1:30 right

12  now.  I'm not, again, cutting you off; we can continue and

13  conclude Mr. Calder's examination after the lunch break, which

14  will be about an hour.

15          MR. WICKHAM:  I just had one last item, your Honor, I

16  think.  And I may not even need that.

17          THE COURT:  Okay.

18  BY MR. WICKHAM:

19  Q.  Here it is.  Would you turn to Tab 15.

20  A.  Okay.

21  Q.  This is a redacted version of Mr. Ferguson's W-2s for 2015,

22  '16, '17, and '18.  Do you see all those?

23  A.  I do.

24  Q.  And do you see the listed employer?

25  A.  I do.

JA2VMARHredacted                    Calder - direct

1    Q.   Throughout that four-year period?

2    A.   Yes.

3    Q.   And his employer listed in that time period is who?

4    A.   Marsh & McLennan Agency.

5    Q.   And is that consistent with your knowledge, information, as

6    to who his employer was throughout that time period up through

7    the time of his resignation?

8    A.   Yes.

9             MR. WICKHAM:  Okay.  We have nothing further at this

10   time, your Honor.

11            THE COURT:  Okay.  All right.

12            So when we come back from the lunch break, we'll come

13   back about -- why don't we say 2:40, Mr. Ferguson, you'll have

14   an opportunity to examine Mr. Calder, and then we'll proceed

15   with the rest of the hearing, okay?

16            Is there anything we should take up right now from

17   plaintiff's counsel?

18            MR. WICKHAM:  I don't think so, your Honor.

19            THE COURT:  Mr. Ferguson?

20            MR. FERGUSON:  No.  I'm sorry, your Honor, I missed --

21   what time are we coming back?

22            THE COURT:  About 2:40.

23            MR. FERGUSON:  2:40.

24            THE COURT:  Yes.

25            MR. FERGUSON:  Thank you, your Honor.

JA2VMARHredacted               Calder - direct

1          THE COURT:  Just so the parties know, there is a

2     cafeteria in the lower lobby.  And if you go, you make a right

3     out of this door, another right, and then a right to the

4     elevators over here, you go to the lower lobby, and there's a

5     cafeteria over there.  Or you can go out obviously.

6          MR. WICKHAM:  Will the courtroom remain open during

7     the lunch hour?

8          THE COURT:  Ms. Williams?

9          We usually -- we're going to open the back room?

10    We're going to lock the courtroom, but we'll leave the witness

11    rooms open during the back where Mr. Temkin is in one of them

12    right now.

13         MR. WICKHAM:  Okay.

14         THE COURT:  And we'll advise Mr. --

15         THE DEPUTY CLERK:  We'll let him know.

16         THE COURT:  Yes, that we're going to come back after

17    lunch.  And then he can come back in after lunch.

18         MR. WICKHAM:  Thank you, your Honor.

19         THE COURT:  All right?  Okay.  Thank you very much.

20         So I guess that's by way of saying if there's anything

21    you want to look at during the lunch break, you should take it

22    with you now and put it in the witness room.

23         MR. WICKHAM:  Thank you, your Honor.

24         THE COURT:  Okay?  All right.  Thank you very much.

25         You may step down.

JA2VMARHredacted                Calder - direct

1              (Witness steps down)

2              THE COURT:  See everybody around 2:40.

3              MR. WICKHAM:  Thank you, your Honor.

4              (Luncheon recess)

5                   A F T E R N O O N   S E S S I O N

6                          2:45 P.M.

7              THE COURT:  Mr. Ferguson, are you ready to proceed?

8              MR. FERGUSON:  Yes, your Honor.  Should I stand or --

9              THE COURT:  You can either stand or you can remain

10      seated.  Again, you just need to pull the microphone close to

11      you.  And I don't know whether -- oh, sorry, Mr. Calder, could

12      you step up please?

13             And Mr. Calder, you're still under oath.

14             Sorry about that.

15             MR. FERGUSON:  Your Honor, permission to approach the

16      witness.

17             THE COURT:  Sure.  Absolutely.

18             Mr. Ferguson, you can either examine seated or

19      standing from the table; or, if you want, you can also use the

20      podium, if you want.

21             MR. FERGUSON:  Thank you, your Honor.

22             THE COURT:  It's up to you.

23             MR. FERGUSON:  As big as my binder is, I guess I'll

24      sit here.

25             THE COURT:  All right.  That's fine.

1           You may proceed.  You may ask questions.

2    JEFFREY CALDER, resumed.

3    CROSS-EXAMINATION

4    BY MR. FERGUSON:

5    Q.  Hi, Jeff.  Can you hear me okay?

6    A.  Yes.

7    Q.  Jeff, you stated earlier that you're my supervisor;

8    correct?  And you were my supervisor the whole time?

9    A.  Yes.

10   Q.  Could you please turn in that binder to Item 2, and go to

11   the last page.  Do you see there --

12           MR. WICKHAM:  Sorry, we don't have Exhibit 2 from

13   Mr. Ferguson's binder.  It's weird.  It's 1 and 3, and 4, 5, 6,

14   7, 8, but no 2.

15           THE COURT:  Okay.  I have a copy here.

16           I don't know, Mr. Ferguson, do you have an extra copy

17   or no?  Do you have an extra copy?

18           MR. FERGUSON:  I do not.  It is a client agreement.

19           THE COURT:  Yes.  No, my law clerk is handing a copy

20   to Mr. Wickham right now.

21           MR. FERGUSON:  My apologies, Mr. Wickham.

22   BY MR. FERGUSON:

23   Q.  So, Jeff, on that last page, and after the agreement on the

24   required disclosures that are required to accompany that, under

25   "Supervision," who does it state my supervisor is?

1   A.   Kevin Bowler.

2   Q.   Why would MMA Securities say I have a different supervisor

3   than what you testified to?

4   A.   This says that the supervisory principal for Elmer Richard

5   Ferguson is Kevin Bowler.  And that would be as it relates to

6   your FINRA activities under MMAS.

7   Q.   So there's separation?

8   A.   Yes.

9   Q.   Activities of MMA and activities of MMAS are separate?

10  A.   I'm not sure they are.  MMAS is MMA Securities; MMA, Marsh

11  & McLennan Agency.  I had supervisory responsibility for you as

12  an employee of MMA.

13  Q.   Mr. Calder, to be very specific here, Jeff, are you stating

14  on the record -- you've already mentioned you're

15  unregistered -- that you were supervising registered persons

16  for a registered business?

17  A.   No.

18  Q.   I must have misunderstood you.

19         Jeff, earlier you said all of the clients that I had

20  were house accounts, as far as the commission payments;

21  correct?

22  A.   No.  The accounts were coded to house.

23  Q.   Okay.  They were coded to house.  You said they'd always

24  been like that?

25  A.   No, I don't think they have always been like that.  That

JA2VMARHredacted                  Calder - cross

1   changed.

2   Q.  Okay.  I wanted to make sure we corrected that, that

3   actually they were under my name at SagePoint; correct?

4   A.  I don't know.

5   Q.  Wasn't it only after they moved from SagePoint to MMA

6   Securities, MMA Securities coded them as house accounts, and

7   that was July 1st, on or about, 2018?

8   A.  I don't know.

9   Q.  You were my supervisor?

10  A.  Yup.  For MMA.

11  Q.  On all my clients --

12          THE COURT:  Let me ask, Mr. Calder, is it your

13  understanding that at a certain point in time that the accounts

14  were not house accounts?

15          THE WITNESS:  My understanding is that at a certain

16  point in time they weren't.  When Rick was a producer, they

17  should have been coded to Rick as a producer.

18          THE COURT:  And does that mean at that time as a

19  producer he would have been getting some percentage, whether it

20  was 20 percent or something like that?

21          THE WITNESS:  Yes.

22          THE COURT:  And do you know whether or not that

23  continued?  Am I correct that SagePoint to MMA Securities, when

24  did that occur?

25          THE WITNESS:  I don't know the exact date of that.

JA2VMARHredacted                    Calder - cross

1           THE COURT:  Okay.

2           MR. FERGUSON:  Your Honor --

3           THE COURT:  When you say "exact date," is within 2018?

4           THE WITNESS:  Yes.

5           THE COURT:  Was it in connection with the shift of the

6    business -- so was that around December of 2018 or some time

7    before that?

8           THE WITNESS:  I think it would have been some time

9    before that.

10          THE COURT:  Okay.

11          And do you know with regard to the shift -- and I

12   think I may have asked this already, but do you know with

13   regard to the shift from SagePoint to MMA Securities, were any

14   other -- would the book of business for any other individuals

15   shifted from -- shifted over to house accounts?

16          THE WITNESS:  I don't have knowledge of that.

17          THE COURT:  And who would have knowledge of that?

18          THE WITNESS:  I would think Bill Peartree would.

19          THE COURT:  All right.

20          I'm sorry.  Go ahead, Mr. Ferguson.

21   BY MR. FERGUSON:

22   Q.  Moving on.  So, Jeff, earlier you testified that -- we saw

23   a spreadsheet that had compensation information from clients.

24   And you specifically stated that's confidential; it's not

25   public.  There's no way to find that, unless someone was to get

1  into records; correct?

2  A.  Yes.

3  Q.  Can you go to Tab 49.  It should be labeled "███████

4  ████████████████  401(k) Plan."

5          If we go to -- skip the first page, skip the blank

6  page.  You see we get to a 5500?

7  A.  Yup.

8  Q.  If you go to the third page of that 5500, midway through,

9  do you see halfway down the page where it says SagePoint

10  Financial?

11  A.  Yes.

12  Q.  Isn't that the broker-dealer on this plan?  Isn't that the

13  who we worked for at that time?

14  A.  I believe it was.

15  Q.  And do you see the number listed down, it says 10,915?

16  A.  I do.

17  Q.  That's the commissions paid; correct?

18  A.  That's what it says.

19  Q.  So commission information, this is a 5500, it's publicly

20  available.

21  A.  Yes, it is.  I don't know that that's the revenue that

22  flowed to MMA though.

23  Q.  MMA could change it all they wanted, correct, the money

24  amount they get?

25  A.  MMA wouldn't change it.  How would they change it?

JA2VMARHredacted                Calder - cross

1   Q.  Let's trace that money flow.

2          Is the commissions paid directly to MMA?

3   A.  Commissions are paid to SagePoint.  SagePoint, in turn,

4   paid MMA, I believe.

5   Q.  Why is that intermediary in there?

6   A.  Because the registration was with SagePoint.  So I believe

7   that they had to collect the money and disburse it to us.

8   Q.  So when the clients moved to MMA Securities, then the money

9   was paid directly to MMA; correct?

10  A.  I don't know.

11  Q.  So this is securities money, securities contracts, and it

12  was paid to MMA Securities or to MMA?

13  A.  I don't know.

14          THE COURT:  When you say you don't know, is it your

15  understanding that because of the separation, the legal

16  separation that is required in connection with an entity like

17  MMA Securities and then an entity like MMA, is it your

18  understanding that with regard to the payments that were made

19  to SagePoint, that that was done because there was a legal

20  requirement to do that?

21          THE WITNESS:  I believe so.

22          THE COURT:  And do you believe that that legal

23  requirement would have changed after the time period that -- of

24  the transition from SagePoint to MMS?

25          THE WITNESS:  I don't know, because MMA Securities is

1   part of MMA.  So I don't know if that makes any difference.

2                    THE COURT:  And by "part," you mean it's a subsidiary

3   of it?  I don't want to put words in your mouth.  What do you

4   mean by "part of"?

5                    THE WITNESS:  Well, it's Marsh & McLennan Agency's

6   security.  So it's our broker-dealer.

7                    THE COURT:  Okay.  So you just don't know whether or

8   not -- because it's your -- it's MMA's broker-dealer --

9                    THE WITNESS:  Right.

10                   THE COURT:  -- whether it would still -- the payment

11  structure would still be the same.

12                   But wasn't SagePoint the broker-dealer for MMA?

13                   THE WITNESS:  Yup, they were, yes.

14                   Oh, for the Barney & Barney portion of MMA anyway.

15                   THE COURT:  Okay.

16                   I'm sorry.  Go ahead, Mr. Ferguson.

17  BY MR. FERGUSON:

18  Q.  Jeff, to what you just said there, to the Barney & Barney

19  part of MMA, SagePoint was the broker-dealer, does that mean

20  that Barney & Barney and/or MMA own SagePoint?

21  A.  No.

22  Q.  Completely separate entity?

23  A.  Yes.

24  Q.  So up until, let's say, midway -- obviously I know the date

25  these were transferring, was around July 1st, 2018.  Until that

JA2VMARHredacted                Calder - cross

1    point, when all the clients transferred somewhere around that

2    time, the broker-dealer was completely separate, unaffiliated,

3    and all these clients had contracts with a completely separate

4    company from MMA?

5    A.  I don't have knowledge exactly of how they were contracted.

6    Q.  But you were my supervisor?

7    A.  I was your supervisor, yes.

8    Q.  Jeff, earlier, you stated that -- in the declaration you

9    said that I didn't bring any clients to MMA, MMAS; correct?

10   A.  That's correct.

11          Subsequently, Rick, we found out that you did bring

12   one.

13   Q.  Subsequent to when?

14   A.  To when the declaration was made.

15   Q.  Oh.  So we'll just take that statement back.

16          THE COURT:  Mr. Ferguson, just questions, not --

17   commentary isn't necessary.  But at a time when -- if there's

18   going to be argument at some point, that's fine for you to

19   make, commentary.  Just questions and answers here.

20          MR. FERGUSON:  I see, your Honor.

21          THE COURT:  Thank you.

22   BY MR. FERGUSON:

23   Q.  Jeff, can you please turn to Tab 12.  Should be an email

24   chain; has Bill Peartree right at the top.

25   A.  Yes.

1   Q.  Do you see, this is Bill Peartree, and then down below is

2   myself.  This is an email exchange between Bill and I.

3   A.  Yup.

4   Q.  Do you see the date there?  It's February 9th, 2017 -- or

5   2007?

6   A.  Yes.

7   Q.  Do you see what we're discussing there?  If you want to

8   take a moment just to peruse through.

9   A.  I do.

10   Q.  In there, the second paragraph at the bottom:  In the

11   meantime, I'm busy sending out notices to all my contacts,

12   clients moving to Barney & Barney.

13          And then up at the top, Bill responds:  I'm glad you

14   accepted.  Looking forward to having you join.  I was thinking

15   perhaps that we should get together and discuss some of these

16   things before the 26th.

17          Do you know why Bill and I would be discussing clients

18   and prospects of another company before I moved to Barney &

19   Barney?

20   A.  I don't.

21   Q.  Is it true that I brought ███████████ defined

22   benefit plan to, at that time, SagePoint/Barney & Barney?

23   A.  I think it is.  And I think that's the account that was

24   identified once some more review was done.

25   Q.  Did I bring ███████████ accounts over?

JA2VMARHredacted                    Calder - cross

```
 1   A.  I don't know.
 2   Q.  Within the last couple of years, did I bring ████████ to
 3   MMA?
 4   A.  I don't know the origin of ██████████.
 5   Q.  Did I label in any MMA systems that the president was my
 6   college buddy?
 7   A.  I have no idea, Rick.
 8   Q.  Can you turn to Exhibit 11 please.
 9            This is the Taleo -- I hope I'm saying that word
10   correct -- evaluation, you did of me; correct?
11   A.  Yes.
12   Q.  If we go to second-to-the-last page, at the bottom,
13   "Overall Comments."  Do you see where it says:  Rick has done a
14   great job.  I'm going to skip down.  He also has had a
15   successful year closing referred accounts and developing some
16   on his own as well.
17   A.  Yes.
18   Q.  So through the years -- I mean when I started and through
19   the years, I brought clients to MMA, Barney & Barney,
20   SagePoint, MMA Securities on my own?
21   A.  You did.
22            (Pause)
23            MR. FERGUSON:  I apologize for the delay.  I'm trying
24   to skip through questions to make this faster.
25            THE COURT:  Sure.
```

JA2VMARHredacted                    Calder - cross

1    Q.  Jeff, you stated earlier in the declaration that Barney &

2    Barney merged into MMA on February 1st, 2014; is that correct?

3    A.  We didn't merge, we were acquired.

4    Q.  Acquired.  So MMA bought all the shares of Barney & Barney?

5    A.  Correct.

6    Q.  When did the merge happen?

7    A.  What merge?

8    Q.  When was Barney & Barney merged into MMA?

9    A.  MMA acquired Barney & Barney in 2014.

10   Q.  Was Barney & Barney ever merged into MMA or is it still an

11   existing entity?

12   A.  Barney & Barney is a wholly owned piece of MMA.  We are not

13   merged.

14   Q.  Oh.  My apologies.  The Department of Corporations says

15   that it was merged on December 31st, 2014.

16        THE COURT:  Is there a document that you're referring

17   to, Mr. Ferguson?

18        MR. FERGUSON:  Actually, as soon as I said that, I

19   think that I forgot to put it in, your Honor.  So I have to

20   take that back.

21        THE COURT:  Okay.  Well, I mean what is the document

22   that you'd be referring to?

23        MR. FERGUSON:  Public website, Department of

24   Corporations.  When I looked up Barney & Barney, they showed as

25   merged into MMA, December 31st, 2014.

JA2VMARHredacted                  Calder - cross

```
 1              THE COURT:  Okay.  And it was Department of
 2   Corporations of?
 3              MR. FERGUSON:  California.
 4              THE COURT:  California.  Okay.
 5              All right.  Go ahead.
 6   BY MR. FERGUSON:
 7   Q.  Jeff, you also stated in your declaration on -- dated April
 8   27th -- and you've stated several times here today -- all of
 9   these clients, everything -- all clients I have, all clients
10   we're talking about today, were specifically clients of MMA;
11   correct?
12   A.  Can you restate that, Rick?
13   Q.  You stated -- I think it's here.  Hold on.
14              In your April declaration, and as you've been talking
15   with the counsellor today, many, many times you've stated very
16   specifically, and in your declaration you were very specific
17   that all of these clients are clients specifically of MMA; is
18   that correct?
19   A.  Yes.
20   Q.  Is ▮▮▮▮▮▮▮ a client of MMA?
21   A.  Yes.
22   Q.  What lines of business do they have?
23   A.  Retirement services.
24   Q.  So going back to what you said earlier, the retirement
25   services plan is directly with MMA?
```

1   A.  To my knowledge.

2   Q.  Can you please go to tab 2 again.

3        Do you recognize this as the client agreement between

4   MMA Securities and the client?

5   A.  I have never seen this document before.

6   Q.  Do you see at the top where it says "MMA Securities LLC"?

7   A.  I do.

8   Q.  In the very first line it says:  This advisory services

9   agreement, dated July 1st, 2018, is by and between -- and the

10  client did send this to me -- ███████████████████ and MMA

11  Securities, a federally registered broker-dealer and an

12  investment adviser.

13  A.  Yes.

14  Q.  I'll give you a moment.  Can you go through this document

15  and show me where retirement plan services were direct with

16  MMA.  Is MMA a party to this agreement anywhere?

17  A.  I don't see that.

18  Q.  Isn't this the contract that all retirement services

19  clients would have signed?

20  A.  I'm not aware of that.

21  Q.  Jeff, you were my supervisor?

22  A.  Yes.

23  Q.  If we go to the --

24          THE COURT:  Although you're not aware of every client,

25  have you ever seen a retirement services client contract

JA2VMARHredacted                    Calder - cross

1  between a client and MMA?

2              THE WITNESS:  No, I have not.  Those are handled

3  through our compliance department in San Diego.

4              THE COURT:  Okay.

5              Is it your understanding that for the type of services

6  that, let's say, you know, that ███████ was receiving, that

7  in order to obtain those types of services, they would have to

8  have signed an agreement with MMA Securities?

9              THE WITNESS:  It appears that way, yes.

10             THE COURT:  Okay.  All right.

11             Go ahead, Mr. Ferguson.

12  BY MR. FERGUSON:

13  Q.  Jeff, what lines of business -- and I apologize, because I

14  think you said this earlier.  What lines of business does MMA

15  do or are they authorized to do?

16  A.  We are a retail insurance brokerage.  We do business

17  insurance, employee health and benefits.

18  Q.  Are they authorized to do retirement plans?

19  A.  MMA does retirement services, yes.

20  Q.  Really?  I'm a little confused, because you say they do

21  retirement services, but there's -- you've just stated that

22  you've never seen a contract between a retirement services

23  client and MMA.

24  A.  So my depth of understanding of the relationship between

25  MMA Securities and MMA is not very broad.  I don't fully

JA2VMARHredacted              Calder - cross

1  understand the relationship.  But I do know that we pay our

2  producers and production staff a bonus and salary to bring in

3  new business.  Therefore, when we're paying somebody to

4  maintain that business through MMA, I consider them not a

5  client.

6  Q.  Okay.  I do understand that you consider them -- how long

7  have you been a principal at MMA and, before that, Barney &

8  Barney?

9  A.  I was a principal in 2008.

10 Q.  Quite some time, right?

11 A.  Yes.

12 Q.  You're the managing director --

13 A.  Correct.

14 Q.  -- of that area?

15 A.  Mm-hmm.

16 Q.  So you're very influential in the company.

17         THE COURT:  What does it mean to be a director?  In

18 other words, how many employees are your direct reports?

19         THE WITNESS:  I don't have a lot of direct reports.

20 I'm directly responsible for the 110 employees we have in the

21 bay area.

22         THE COURT:  So in the region.

23         THE WITNESS:  Yes.

24         THE COURT:  And does that include responsibility for

25 budgeting and other things with regard to those folks in the

JA2VMARHredacted                    Calder - cross

1    bay area?

2             THE WITNESS:  Yeah.  I'm responsible for the profit

3    and loss in the bay area.

4             THE COURT:  Okay.

5             And in connection with an employee that is a

6    registered broker, in addition to signing an agreement with

7    MMA, are you aware of whether or not an employee also has to

8    sign -- whether it's termed an employment agreement or

9    something else, but has to sign something with MMA Securities?

10            THE WITNESS:  I'm not aware of that.

11            THE COURT:  Okay.

12            Go ahead, Mr. Ferguson.

13            MR. FERGUSON:  Thank you, your Honor.

14   BY MR. FERGUSON:

15   Q.  Jeff, during the time you've known me, did I do anything

16   except retirement plans?

17   A.  No.

18   Q.  So all my clients, 100 percent investment securities

19   clients?

20   A.  I think so.

21   Q.  And because of that, none of them had direct contracts with

22   MMA for my services?

23   A.  I don't know that.

24   Q.  So it's still your understanding that MMA might have direct

25   contracts for securities clients?

JA2VMARHredacted                  Calder - cross

1   A.  I don't know.

2              THE COURT:  Why don't we do this, because I think this

3   will, I think, short-circuit some of it.

4              For the entities -- and I'm not sure if it's Exhibit

5   28, but for -- no, it's not 28.  I'm sorry.

6              But for the entities that we're talking about that are

7   Mr. Ferguson's book of business, for lack of a better term, for

8   the transition, all of the accounts that went to the house

9   accounts, I'd like to -- I don't necessarily need to get all of

10  the agreements, but I just want to know whether the agreements

11  that those entities had *vis-à-vis* their retirement plans,

12  whether those agreements were solely with either SagePoint at

13  one point or transitioned over to MMA Securities.

14             MR. WICKHAM:  We'll look into that, your Honor.  But,

15  I mean, we're talking about, to some extent, apples and

16  oranges.  You've got MMA over here; you've got MMAS over here.

17  MMAS has -- is the regulated entity, FINRA-regulated entity.

18             To the extent that retirement service planning

19  transactions involve a regulated transaction, the purchase and

20  sale of a security, then they necessarily will have an

21  agreement in place with MMAS, because that's the regulated

22  entity.

23             But to have one does not exclude the other.  You could

24  have both; and that one can be a client of MMA and have the

25  regulated entity.

JA2VMARHredacted               Calder - cross

1          THE COURT:  I understand that there may be -- and I

2     think we saw on the chart that the client may, in addition to

3     having business that are retirement related, have other

4     business with Marsh, insurance-related business.  I get that.

5          MR. WICKHAM:  Right.

6          THE COURT:  What I'm trying to get my mind around,

7     because there is the argument that's being made that Mr. -- and

8     again, I have not delved incredibly deeply into the issue of

9     whether this should be arbitrated or not under FINRA.  And I'm

10    trying to get a sense of what the business is.  And again, I

11    haven't -- as I said, I haven't gone and looked at the case law

12    on this in particular concerning that issue.  And that's really

13    where I was going.  I'm not in any way saying that you can't

14    have both, but I'm just trying to -- with regard to what

15    Mr. Ferguson was involved with, I'm trying to, sort of, figure

16    out what the landscape is.

17         MR. WICKHAM:  So maybe I can help out.

18         It just goes back to the principal dichotomy between a

19    producer, somebody who's engaged in sales, versus somebody

20    who's engaged in service.  Producers, that's what they are

21    doing, they are selling plans to clients and, therefore, you

22    know, they are engaged in the purchase and sales of securities.

23    So when Mr. Ferguson was a producer and he had his license and

24    so on and so forth, then he's at the apex of his regulated

25    activity.

JA2VMARHredacted                    Calder - cross

1           Once he moved from the producer category to the

2     service category, and he continued to maintain fiduciary

3     responsibilities for some clients that were assigned to him,

4     not his clients, then he's not selling to them.  So, you know,

5     so there's less regulated activity.  He's doing the servicing,

6     holding 401(k) meetings, and things of that sort.

7           So it's hybrid that there are activities that he is

8     engaged in as an MMA client service executive that is not

9     regulated activity.  That's not necessarily to the exclusion

10    that there might be some regulated activity that he's engaged

11    in.  So it's a hybrid situation.

12          THE COURT:  I understand that.

13          MR. WICKHAM:  And they have the contracts in place

14    from a regulated regulatory standpoint that they to have the

15    regulatory contracts with the regulated entity, because that's

16    what's required under FINRA regulations for that type of

17    business.  But, again, it's not to the exclusion of the other,

18    it's in addition to the other.

19          THE COURT:  Okay.

20          MR. FERGUSON:  Your Honor?

21          THE COURT:  Just one second.

22          Do you know, Mr. Calder, whether any of the -- over

23    the past -- since you've been with Marsh, have any -- have

24    there been any FINRA arbitrations involving employees in the

25    bay area?

JA2VMARHredacted                Calder - cross

1           THE WITNESS:  No.

2           THE COURT:  Okay.  All right.

3           Go ahead, Mr. Ferguson.

4           MR. FERGUSON:  Your Honor, pretty much everything

5   counsel just said is incorrect.  You settle -- the securities

6   does not stop -- I can't sell a plan and then go talk about

7   investments and say, Oh, that's not under securities law.

8           Anything --

9           THE COURT:  Let me ask, actually, Mr. Calder, would

10  someone who is not a registered -- who's not registered be able

11  to service a 401(k) plan?  In other words, go in and hold the

12  meetings with the employees about the plan.  Let's say new

13  employees come in, and he gives the person his task with going

14  in and explaining the plan, what the options are, does that

15  person have to be a registered broker?

16          THE WITNESS:  So I think there are certain parts of

17  that job that don't require that, if you're explaining general

18  information about the plan.  But once you get into actual

19  investment options, I believe that's regulated.

20          THE COURT:  Okay.

21          Do you know, are there any individuals in the bay area

22  who would go in and do those meetings who aren't -- who weren't

23  registered?

24          THE WITNESS:  No.

25          THE COURT:  Okay.  All right.

JA2VMARHredacted                 Calder - cross

1          Go ahead, Mr. Ferguson.

2    BY MR. FERGUSON:

3    Q.  Jeff, do you know how long I've been doing securities?

4    A.  No.

5    Q.  It's public knowledge, first registered in 1998.

6          I have my Series 24; correct?

7    A.  I don't know.

8    Q.  Do you know what a Series 24 is?

9    A.  No.

10   Q.  Could we assume I had a lot of securities registrations?

11   A.  I can't assume anything, Rick.

12   Q.  But you were my supervisor.

13   A.  Yup.

14   Q.  But you didn't know my clients, you didn't know if they

15   were securities, you didn't know my registrations?

16   A.  I knew you were registered, and I knew that you were acting

17   within the scope of your license.

18   Q.  Was any other member of MMA allowed to go out and do any

19   retirement services meetings?

20   A.  I don't know --

21          THE COURT:  Other than someone who's registered, is

22   that the question?

23          MR. FERGUSON:  Sure.  Correct.

24   Q.  Other than myself, because I was the only registered person

25   there.

JA2VMARHredacted                Calder - cross

1    A.  No.

2    Q.  So nonregistered persons, as a matter of securities rules,

3    cannot go out and talk about retirement services; they can't

4    sell it, they can't service it.  It's investment-related,

5    right, so they can't talk about it?

6    A.  I don't know.

7    Q.  The same tab, can you see page 3?

8              THE COURT:  Just before you move on, Mr. Ferguson,

9    with regard to Exhibit 2, Kevin Bowler, do you know Mr. Bowler?

10             THE WITNESS:  I know who he is.

11             THE COURT:  Okay.  Did you ever interface with

12   Mr. Bowler concerning Mr. Ferguson's employment?

13             THE WITNESS:  I did not.

14             THE COURT:  Do you know whether HR, whether they ever

15   interfaced with Mr. Bowler with regard to Mr. Ferguson's

16   employment?

17             THE WITNESS:  I don't think they did.  They interfaced

18   with Bill Peartree.

19             THE COURT:  Do you know if Mr. Peartree interfaced

20   with Mr. Bowler regarding Mr. Ferguson's employment?

21             THE WITNESS:  I don't know that.

22             THE COURT:  Okay.

23             I'm sorry.  Go ahead, Mr. Ferguson.

24             MR. FERGUSON:  Thank you, your Honor.

25   BY MR. FERGUSON:

JA2VMARHredacted                Calder - cross

1    Q.  So moving on, page 3 --

2              THE COURT:  Of?  I'm sorry.

3              MR. FERGUSON:  I'm sorry, we're still on tab 2.

4              THE COURT:  Okay.  I'm sorry.  Go ahead.

5    BY MR. FERGUSON:

6    Q.  Jeff, do you see there the section I marked "Arbitration"?

7    A.  Yup.

8    Q.  And the second paragraph:  The parties agree that any

9    dispute, claim, or controversy arising out of or relating to

10   this agreement, including breach, termination, validity of, or

11   arising out of or relating to the consulting services for the

12   plans.  And it goes on to say basically this whole thing is

13   saying anything, any disputes for any clients that are

14   securities clients must be taken to FINRA for arbitration.

15   A.  I don't know how to interpret that.  But I will say that I

16   think this relates to the relationship between MMA and

17   ███████████.  I don't think it has anything to do with

18   intellectual property and confidential assets being taken from

19   us.

20   Q.  Correct what I've just heard, you said this has to do

21   between MMA and ███████████.  Did you mean MMA Securities?

22   A.  Yes, MMA Securities, Rick.

23   Q.  So we're at least in agreement, correct, that all the

24   clients I worked with and the only services I provided under

25   the retirement plan line of business were through MMAS, because

JA2VMARHredacted                    Calder - cross

```
 1   of these agreements, they were all securities clients?
 2   A.  I don't know the full knowledge of that; I hadn't had a
 3   chance to do that.  But I would assume, Rick, that you're
 4   right.
 5   Q.  If we can turn -- staying on that same tab, turn back to --
 6   to get to the required disclosures, and there's one at the top,
 7   it's page 1.
 8   A.  I'm sorry, what page are you on?
 9   Q.  I'll count them out.  So go through the agreement.  7, 8,
10   9, 10.  The end of that agreement is page 12, then it starts
11   over on page 1.
12   A.  Okay.
13   Q.  Do you know what this document is?
14   A.  No.
15   Q.  So this is a Form ADV, part 2A and 2B.  This is a required
16   part of MMA agreement.  A securities client cannot be given an
17   agreement without these forms.
18            The first part here is the brochure that covers MMA
19   Securities, and it screws through that.  It's MMA Securities.
20   A lot of information about MMA Securities.
21            But if you go to the end of that document into the
22   next one, where it starts over again on page 1.
23   A.  Okay.
24   Q.  Do you see the top there, ADV 2B brochure supplement?
25            THE COURT:  ADV.
```

1              MR. FERGUSON:  ADV.

2              THE COURT:  I'm only doing that, Mr. Ferguson, just to

3     make sure that the court reporter has an understanding.

4              So ADV 2B, as in "boy," at the top.

5     Q.  Who is listed there as the specific adviser for this

6     client?

7     A.  Elmer Richard Ferguson.

8     Q.  Me, correct?

9     A.  Yes, you.

10    Q.  So you do see that securities clients and securities

11    agreements are required to specifically name the adviser who's

12    giving investment advice; correct?

13    A.  I don't know that.  I haven't read this agreement in total.

14    I don't know that from the knowledge I have.

15    Q.  Jeff, how long again did you work with me at MMA/Barney &

16    Barney, knowing that I worked out of retirement services,

17    knowing that I did these contracts?

18    A.  You transferred into the bay area in 2012, Rick.

19    Q.  But you've never seen an agreement between MMAS and a

20    retirement client?

21    A.  I've never seen an agreement between MMAS and a retirement

22    client.

23    Q.  Can we agree that this agreement between a client and MMAS

24    does not include MMA, and it specifically calls for me?

25    A.  I can't agree to that.  I haven't read the whole document.

JA2VMARHredacted                 Calder - cross

1    Q.  Fair enough.

2              THE COURT:  Let me ask Mr. Wickham, is there any

3    objection to this exhibit?

4              MR. WICKHAM:  No, your Honor.

5              THE COURT:  Okay.  All right.

6              Go ahead, Mr. Ferguson.

7              And Mr. Ferguson, all that means is that Mr. Wickham

8    is saying I can consider it, but he's not necessarily conceding

9    exactly what the terms in here would necessarily mean, but that

10   this is appropriately before me.

11             MR. FERGUSON:  I understand, your Honor.

12             THE COURT:  All right.

13   BY MR. FERGUSON:

14   Q.  Jeff, did I recently, to your knowledge, refer a client to

15   MMA?

16   A.  I don't have knowledge of that.

17   Q.  Do you know ███████████████████?

18   A.  I've seen the name on the list, yes.

19   Q.  They are actually on that exhibit we looked at earlier;

20   correct?

21   A.  Mm-hmm.

22   Q.  On there it said that ████████████████ was referred to

23   me by Sheman, Rob -- that means Rob Sheman; correct?

24   A.  Right.

25   Q.  Does Rob Sheman have that as a client?

JA2VMARHredacted              Calder - cross

```
1    A.  I don't know.
2    Q.  Isn't it true that just a couple of months ago -- isn't it
3    true that ███████ has been my client for years?
4    A.  I don't know that.
5    Q.  You don't know any of my clients?
6    A.  I know many of your clients.  I don't know ████████
7    ███████████.
8    Q.  But why would that be?
9    A.  I don't know every client we have in the office, Rick.
10   Q.  When we met, did we go over -- from reviews and things like
11   that, did we go over my book of business?
12   A.  No.
13           THE COURT:  And just to be clear, when you say "when
14   we met," you mean initially when you came over to the bay area?
15           MR. FERGUSON:  No, for annual reviews.
16           THE COURT:  Oh, okay.
17           MR. FERGUSON:  In annual reviews when we would meet to
18   over your clients, your prospects, how are you doing, what's
19   the income, where's everything stand.
20           THE COURT:  Okay.  So I think you mean annually.
21           THE WITNESS:  So annually you do a workbook with a
22   list of your clients, the revenues, and the expected clients
23   and revenues for the following year.  I don't recall all the
24   names in the workbook.
25   BY MR. FERGUSON:
```

JA2VMARHredacted              Calder - cross

1    Q.  About how many clients did I have, do you know?

2    A.  I think you had close to 25 clients.

3    Q.  Would it surprise you to know that I had about 50 clients?

4    A.  Yeah.

5    Q.  Okay.  When we met, did we talk about those clients?

6            THE COURT:  And again, these are meetings, the

7    annual --

8    Q.  The annual review meetings.

9    A.  Not in detail, no.

10   Q.  Did we mention them?

11   A.  No, we didn't mention clients specific in those meetings.

12   Those meetings that we did were based for budgeting purposes.

13   I looked at the workbook in total for all of our producers.

14   Q.  But I wouldn't be privy to the workbook for all of the

15   producers, would I?

16   A.  No.

17   Q.  So when we met, we looked at the workbook for me?

18   A.  We may have, but I didn't look at it client by client.

19   Q.  If we can go to Exhibit 3.  And this is Plaintiff's Exhibit

20   A from the declaration.

21           THE COURT:  From Mr. Calder's declaration?

22           MR. FERGUSON:  I believe this was from Mara Crain.

23           THE COURT:  Okay.  All right.  Oh, okay.  And I think

24   we may have talked about this exhibit earlier.

25           Go ahead.

JA2VMARHredacted                Calder - cross

1    BY MR. FERGUSON:

2    Q.  Jeff, do you see down there Item 1, "Confidential

3    Information and Trade Secrets?"

4    A.  Yes.

5    Q.  Do you see where it does call out some specifics.  And it

6    claims... such as the identity of the company client, names of

7    representatives of the company's responsible for entering into

8    contracts, amounts paid by such clients of the company, policy

9    expiration dates, policy terms and conditions, information

10   regarding the markets or sources with which insurance is

11   placed.  Do you see that?

12   A.  Yes.

13   Q.  Does this sound like securities?

14   A.  Well, a lot of this has nothing to do with securities.  But

15   information regarding our clients and the revenue has

16   everything to do with your book of business.

17   Q.  Which you didn't know what my book was; correct?

18   A.  Right.

19   Q.  So this agreement, this nonsolicitation and confidentiality

20   agreement, was mainly for insurance, because that's MMA's lines

21   of businesses; correct?

22   A.  I don't know that.

23   Q.  Do retirement plans have policy expiration dates?

24   A.  I don't know.

25   Q.  Do retirement plans have insurance markets and sources?

JA2VMARHredacted                    Calder - cross

1    A.  No.

2    Q.  Who owns MMA Securities?

3    A.  I don't know.

4    Q.  Could we go to Exhibit 4?

5          Do you see this is one of the agreements between

6    myself and, at this time, January 31st, 2014, it was being

7    prepared between myself and Barney & Barney LLC, a wholly owned

8    subsidiary of Marsh & McLennan Agency LLC; correct?

9    A.  Correct.

10         MR. WICKHAM:  Where does it say "wholly owned

11   subsidiary"?

12         THE COURT:  Let's see.  I'm not sure.

13         At the top it just says "A Marsh & McLennan Agency."

14         MR. FERGUSON:  I apologize to everyone.  Only Jeff and

15   I would know that.  That was the company name.  Going forward

16   after February 1st, 2014, the company was known as Barney &

17   Barney LLC, a wholly owned subsidiary of Marsh & McLennan

18   Agency LLC.

19         THE COURT:  Okay.  That's not in this document.

20         THE WITNESS:  And I don't believe that's true.

21         MR. WICKHAM:  And I don't believe that's -- yes, thank

22   you.

23   BY MR. FERGUSON:

24   Q.  Can you go to tab 16.

25         Do you recognize this document?

JA2VMARHredacted                    Calder - cross

1    A.  Yes.

2    Q.  Can you tell us what it is?

3    A.  It's a document that was prepared to answer frequently

4    asked questions about our acquisition by Marsh & McLennan.

5    Q.  Can you go to page 5.

6              THE COURT:  By "our acquisition," are you referring to

7    Barney & Barney acquisition?  In other words, the acquisition

8    of Barney & Barney by Marsh & McLennan?

9              THE WITNESS:  Correct.

10             THE COURT:  Okay.

11             Go ahead.  Page what?

12   Q.  So page 5, under where it says:  About our brand.  Will our

13   logo and name change?

14             Do you see there about the second -- the third

15   sentence:  Our new name is Barney & Barney, A Marsh & McLennan

16   Agency LLC company.

17   A.  Yeah.

18   Q.  So I had the terminology wrong, but Barney & Barney, A

19   Marsh & McLennan Agency LLC company; correct?

20   A.  Yes.

21   Q.  So we do agree it was not Barney & Barney, it was Barney &

22   Barney, A Marsh & McLennan Agency LLC company?

23   A.  Commonly referred to as "Barney & Barney."

24   Q.  Let's go back to Tab 4.

25             So we've seen that this is dated January 31st, 2014.

JA2VMARHredacted                    Calder - cross

1           Do you see the signature date?

2    A.  Yes.

3    Q.  So it's February 11, 2014.  So the same time we're doing

4    this.

5           Do you see on page 1, the fourth paragraph:  You agree

6    that prior to the termination of your relationship with

7    broker-dealer, you will not hold yourself out as an employee or

8    agent of the company for purposes of selling or servicing

9    broker-dealer products.  In providing such services to

10   broker-dealer, you agree that you will not make any written or

11   verbal reference to the company except as necessary to fully

12   and accurately disclose your relationship with the company.

13          Why would that be in there?

14   A.  I don't know.

15   Q.  Do you see down there, the fifth paragraph, it says:  In

16   consideration -- second sentence:  In consideration for the

17   company solely providing ministerial and administrative support

18   to you relating to the broker-dealer products, you shall pay

19   the company an annual fee, it looks like it was ▮▮▮▮▮, but

20   that was crossed out, and it was ▮▮▮▮; correct?

21   A.  Yes.

22   Q.  Jeff, isn't it true that in 2014, I told MMA the agreement

23   that they originally had us sign, that they pressured us to

24   sign prior to 2/1/2014, was not compliant with securities

25   rules?

JA2VMARHredacted                    Calder - cross

1    A.  I don't know that.

2    Q.  And isn't it true that that's what happened; we signed this

3    document because I pointed out to MMA you have to separate the

4    two companies.  MMA cannot be an unregistered broker-dealer;

5    you must separate out.  And that's why this document was

6    signed; isn't that correct?

7    A.  I don't know.

8    Q.  Who would know?

9    A.  Bill Peartree.

10   Q.  Would Paul Hering know?  He signed it.

11   A.  I don't know that he would have knowledge of that.

12   Q.  Why would Barney & Barney, an MMA company, agree to stating

13   that they're only providing ministerial and administrative

14   support to -- specifically to securities relationships?

15   A.  I don't know.

16   Q.  Could it possibly be true that all of the work I do and did

17   for MMA and Barney & Barney and all the other entities we're

18   talking about, specifically had to be under the securities

19   side; MMA is not allowed to control those clients, they are not

20   allowed to be paid that money directly, because otherwise they

21   would be an unregistered broker-dealer?

22   A.  I don't know, Rick.

23   Q.  Do you see on -- these pages aren't numbered, I'm sorry.

24        Page 2 at the bottom:  Please acknowledge your

25   acceptance of the terms stated in this letter by signing below

1   and by signing the nonsolicitation and confidentiality

2   agreement and returning all of these documents, signed

3   documents, to Kelli Clear by February 12, 2014.  We've enclosed

4   two copies of each document so that you can retain one for your

5   reference.

6   A.  Yes, I see that.

7   Q.  Where is the nonsolicitation and confidentiality agreement?

8   MMA probably has a copy, right, they just didn't produce it

9   today or --

10  A.  I don't know.

11  Q.  But it does say -- this contract says there's supposed to

12  be one as of this date; correct?

13  A.  That's right.

14  Q.  Do you see, same page --

15          THE COURT:  Well, do you have a copy of it?

16          MR. FERGUSON:  No.

17          THE COURT:  Because it says that -- that you can

18  retain one for your reference.

19          MR. FERGUSON:  No.

20          THE COURT:  Okay.

21          MR. FERGUSON:  There is one -- there is not one.  But

22  I'm not allowed to say that, right?

23          MR. WICKHAM:  Your Honor, this is the offer letter

24  that was going out to the employees of Barney & Barney when

25  Barney & Barney was being acquired by MMA.  The B&B/MMA

1     nonsolicitation and confidentiality agreement was the document

2     that was executed by all Barney & Barney employees in

3     connection with the acquisition.  So the reference in the offer

4     letter is to that agreement that we saw earlier.

5              THE COURT:  Okay.

6              MR. FERGUSON:  Counsellor, I disagree.

7              They specifically name one that goes with this for the

8     date.

9              THE COURT:  Well, what I would ask is the following:

10             Mr. Wickham, if you could specifically check with

11    regard to -- if Marsh has it, with regard to this document was

12    attached to it, or generically what was attached to it.  In

13    other words, I'm not saying that you're not accurate, I just

14    want to know and see that that document basically coincides

15    with what we were looking at earlier, the Barney & Barney

16    agreement.

17             MR. WICKHAM:  Well, number one, we'll double-check and

18    absolutely respond back to the Court.  We also will get a copy

19    of Mr. Calder's agreement.  It just so happens that were we to

20    go back and visit that other agreement, that given the recitals

21    in connection with that agreement that specifically

22    represent -- that reference the acquisition, that that is --

23    that is the form of the agreement that accompanied the offer

24    letter that was going to all the Barney & Barney employees.

25             THE COURT:  Okay.  But you referenced -- my

1    understanding of what you were saying is that that agreement

2    was something you looked at earlier.

3              MR. WICKHAM:  Yes, your Honor.

4              THE COURT:  Okay.  All right.

5              And was something that went out to, at the time --

6    let's see.  Was it exhibit --

7              MR. WICKHAM:  It's Exhibit 3 of the plaintiff's

8    exhibits.

9              THE COURT:  Okay.

10             MR. WICKHAM:  And you see on Mr. Ferguson's copy, he

11   wrote in or somebody wrote in February 1, which is two days

12   after the offer letter was issued to him, ten days earlier than

13   his signature on the offer letter.

14             THE COURT:  Yes.

15             MR. FERGUSON:  Where do you see February 1 is two days

16   after the offer letter?  What offer letter?

17             MR. WICKHAM:  The offer letter --

18             THE COURT:  No, no, just --

19             MR. WICKHAM:  The January 31 offer letter.  One day

20   after, excuse me.

21             THE COURT:  Okay.  Go ahead, Mr. Ferguson.

22             If you could just check.

23             MR. WICKHAM:  We will, your Honor.

24             THE COURT:  All right.

25   BY MR. FERGUSON:

JA2VMARHredacted                    Calder - cross

1   Q.  Jeff, isn't it true there's no known solicitation and

2   confidentiality agreements with this for the same reason:  You

3   told MMA a securities person cannot agree to an agreement that

4   specifically removes arbitration, because under FINRA law,

5   FINRA regulation, I'm required to be bound by that?

6          MR. WICKHAM:  Objection.

7          THE COURT:  Well, do you know -- I understand the

8   objection, but do you know one way or the other?

9          THE WITNESS:  I do not.

10          THE COURT:  Okay.  Go ahead.

11   BY MR. FERGUSON:

12   Q.  Jeff, okay, go back to page 2.  About halfway down it says,

13   In addition -- I'm sorry.  In consideration, for your execution

14   of this offer letter and the nonsolicitation and

15   confidentiality agreement, you will receive a retention bonus

16   in the amount of -- somebody got ███████, I got ███████.  This

17   bonus payment will be made no later than February 28, 2014.

18          In addition, you will receive additional bonus

19   payments in the amount and the date set forth in Schedule A.

20          And then down below it says:  In addition, you may

21   also be eligible for certain amounts under and subject to the

22   terms and conditions of Barney & Barney division payment plan.

23          Do you see that?

24   A.  I do.

25   Q.  I just want to make sure that we know -- so go out to the

JA2VMARHredacted                Calder - cross

1    signature page.  Do you see Schedule A?

2    A.  I do.

3    Q.  So the first payment of ███████ and the second payment was

4    due July 30th, 2014; correct?

5    A.  Yes.

6    Q.  It matches up to the other agreement; correct?

7    A.  What other agreement?

8    Q.  Sorry, the one you submitted as your exhibit -- I'll

9    retract the question; we'll come to it in a moment.

10         Can we please go to exhibit -- Tab 63.  This is a

11   thick manual, isn't it?

12         THE COURT:  I'll note for the record it's about an

13   inch or so or more.  It's several -- I don't know how many

14   pages it is, because they're not sequentially numbered, but

15   probably a couple hundred pages or so, although I'm not sure.

16         But go ahead.  It is what it is.  So it's Exhibit 63,

17   and it's a multi-page document.  Go ahead.

18   BY MR. FERGUSON:

19   Q.  Jeff, do you see the title of this on the very first page,

20   "Investment Adviser Policies and Procedures Manual, June 2017"?

21   A.  I do.

22   Q.  You see at the top there it's MMA Securities?

23   A.  Yes.

24   Q.  Why would MMA Securities have this huge policies and

25   procedures manual if they're controlled, owned, and operated by

JA2VMARHredacted                    Calder - cross

1    MMA, which has its own compliance department?

2    A.  I believe I said I wasn't sure how they were run.

3    Q.  Can you please turn to page 1 tack 1?

4    A.  1 tack 1?

5    Q.  I'm sorry, 1-1.

6           Do you see under 1, Introduction, the fourth paragraph

7    down:  IA representatives, investment adviser supervisors,

8    supervised persons, and officers and directors are all

9    considered firm personnel.

10          Why would MMA Securities consider -- I apologize,

11   Jeff.  I was an investment adviser representative; correct?

12   A.  Yes.

13   Q.  Why would MMA Securities consider me one of their firm

14   personnel?

15   A.  I don't know.

16   Q.  Did MMA Securities and MMA have different operating

17   structures, different entities?  Was anything different between

18   the two?  It seems like that's what we're seeing.  And I just

19   need clarification.

20          You stated many times in your declarations and in the

21   complaint, I was an employee of MMA and not with MMA

22   Securities.  But here, MMA Securities is kind of claiming me,

23   aren't they?

24          MR. WICKHAM:  Objection.

25   A.  I don't know.  I haven't read through this agreement.

JA2VMARHredacted                   Calder - cross

1   Q.  But you do see there where it says:  Investment adviser

2   representatives are all considered firm personnel?

3   A.  Yes.

4   Q.  Can you please turn to Tab 5.

5   A.  Okay.

6   Q.  Do you see this is an email between quite a few people,

7   myself, mainly Kim Blackmore.

8           Do you know who Kim Blackmore is, Jeff?

9   A.  I do not.

10  Q.  Do you see there she states:  Hi, Rick.  I've set up a call

11  on Monday, June 25th, 9 a.m., to address any questions.  That

12  was the soonest that you were available.  I've answered the

13  questions in red below, but it's better to go through this over

14  the phone.  And I do apologize, because the red is obviously

15  not showing up, but we can see my questions, right?

16          Number one -- and this is -- what's the date on this?

17  June 19th, 2018; correct?

18  A.  Correct.

19  Q.  What is my rep ID with MMA Securities for our vendor

20  contracts and payments?  Question.

21          So here's where her answer starts:  There are two

22  numbers, depending on what the form requires.  Your CRD number,

23  which for everyone's benefit, is FINRA number; and your

24  internal producer code with MMAS is as stated.

25          Why would someone from MMAS be telling me that I'm a

JA2VMARHredacted              Calder - cross

1    producer, when your declarations, all of the things submitted,

2    and even the testimony today, is very clear that I was not a

3    producer for any MMA reason?

4    A.  I agree.  You weren't.

5    Q.  So this person was lying?

6    A.  I'm not saying lying.  It's probably mistaken or a

7    different way to talk about coding.

8    Q.  You do agree it says here's your internal producer code,

9    and there is a code; correct?

10   A.  I see that.

11   Q.  On the second question:  How do I access the MMA Securities

12   website, i.e., run commission and income reports, client

13   management, investment product affiliations, etc.

14        MMA Securities uses the MMA systems for all

15   operational financial processing.  Benefitpoint is used to set

16   up all clients once we have received all the executed client

17   documents.  We also use that system, along with Sagitta, to

18   process invoices and all commissions and fee payments.

19   Unfortunately, we are unable to give anyone, except the

20   operations and finance teams, access to these systems since

21   there's no "view access" only.

22        Did I have access to MMA systems?

23   A.  No.

24   Q.  Do you think -- would you agree with me that it's a little

25   hard for someone to steal information when they don't even have

JA2VMARHredacted                Calder - cross

1   access to those systems where the information resides?

2   A.  I can't agree to that.

3   Q.  Can you turn to Exhibit 6 please.

4           Do you see at the top it says MMC Securities,

5   registration disclosure?

6   A.  Yes.

7   Q.  So do you remember and agree that originally myself, Bill,

8   the retirement services team, when MMA first bought Barney &

9   Barney, we were still using SagePoint Financial as our

10  broker-dealer; correct?

11  A.  Correct.

12  Q.  And then MMC companies wanted us to be duly registered with

13  MMC Securities so that our retirement plan commissions could

14  flow properly, broker-dealer to broker-dealer, free page rate

15  and up the corporate line to MMA companies; correct?

16  A.  I don't know.

17  Q.  Do you see there it says:  To:  Prospective registered

18  representatives of MMC Securities Corp.?

19  A.  I see that.

20  Q.  Subject:  Predispute arbitration clause in Form U-4.

21  A.  I see that.

22  Q.  Do you want to take a moment and read through there, or I

23  can give you a synopsis.

24          Doesn't it show --

25  A.  I'll read it.

JA2VMARHredacted            Calder - cross

1    Q.  Okay.

2            (Pause)

3    A.  Okay.

4    Q.  So right at the top there, this written disclosure is

5    provided to you, as required by the NASD -- which we now know

6    is FINRA -- Conduct Rule 3080.  Please read this disclosure

7    carefully before you sign your Form U-4.  If you have any

8    questions regarding this matter, please contact.

9            Second paragraph:  The Form U-4 contains a predispute

10   arbitration clause.  It is in Item 5, Section 15A of Form U-4.

11           So when I was first registered with any of the MMA/MMC

12   companies, I was required to have a U-4, which is appropriate

13   for somebody who's securities registered.  Why would they have

14   told me that there's an arbitration clause?

15   A.  I'm assuming that for disputes relating to securities

16   issues, you have to go to arbitration.

17   Q.  So anything regarding securities clients has to go to

18   arbitration, securities disputes?

19   A.  Which I would say investment advice, that sort of thing.  I

20   would not include trademark or copyright or stealing our

21   information.  I wouldn't think that would be covered by this

22   whatsoever.  Totally separate issue.

23   Q.  Let me know when you're done.

24   A.  I'm done.

25   Q.  Is a client's name trademarked for MMA?  Do they own it?

JA2VMARHredacted                Calder - cross

1    A.  I didn't say that.  I didn't mean trademark.

2    Q.  Can you please turn to Tab 7.  This is the amended FINRA

3    Form U-5 that allegedly MMA had MMAS file with FINRA.  Do you

4    see there at the top, "Disclosure Occurrence Composite"?

5    A.  I do.

6    Q.  Do you see that MMA Securities filed an original report

7    first reported March 13th, 2019?

8    A.  Where do I see that date?

9    Q.  Six inches down from the top, kind of in the middle, a

10   little to the right.

11           THE COURT:  I think on the left it says -- it's a

12   latest filings, and then if you go across from there.

13           THE WITNESS:  I see that.

14           THE COURT:  There's a first reporting column.

15           THE WITNESS:  Okay.  I see that.

16   Q.  So you see there that MMAS filed a report with FINRA on

17   March 13th, 2019.  And do you see there where they say the

18   event date, February 14th, 2019?

19   A.  I do.

20   Q.  If you could go down to the bottom of that page.  You see

21   where it has Part I, and it has Nos. 1, 2, and 3?

22   A.  Yup.

23   Q.  No. 3:  Describe briefly the nature of the internal review.

24   And the information must fit within the space provided.  And

25   MMA has put:  Intentional removal of company property such as

JA2VMARHredacted                    Calder - cross

1  client contact information, also solicitation of institutional

2  clients and prospective clients while licensed with MMA

3  Securities on behalf of unaffiliated third party before

4  termination.

5  A.  I see that.

6  Q.  This sounds almost exactly like what we're arguing about

7  here today, doesn't it?

8  A.  I mean as it relates to this document, I see that.  I don't

9  think that has anything to do with what's going on today, with

10  the downloading of our information from MMA systems.

11  Q.  Why would MMA Securities file these same complaints with

12  FINRA if it was agreed between the companies that these were

13  MMA clients' information?

14  A.  It's my understanding that this is a dual action.  FINRA is

15  doing an investigation, and we are taking our action.

16  Q.  Well, I guess I'm confused.  Because MMAS, MMA Securities,

17  are stating these are their clients.

18  A.  It's our information.

19  Q.  You stated MMA directly controls MMAS.

20  A.  I didn't say that.

21  Q.  You did in your declaration.

22      Well, we can just ask.  Does MMA control MMAS?

23  A.  I don't know that they do.

24  Q.  Can you go to Tab 8.

25      This is the inquiry letter that FINRA sent to me.  You

JA2VMARHredacted                    Calder - cross

1    see the second paragraph:  On March 13th, 2019, and April 24th,

2    MMA Securities LLC, MMA Securities of the firm, filed Form U-5s

3    on your behalf reflecting that you were the subject of an

4    internal review.  I'm going to skip a sentence.  For

5    intentional removal of company property, including deletion of

6    company data, also solicitation of institutional clients and

7    prospective clients while licensed with MMA Securities on

8    behalf of unaffiliated third party before and after

9    termination.

10            So they are repeating the same things that MMA has

11   said; correct?

12   A.  Yes.

13   Q.  So FINRA is investigating me because MMA Securities said,

14   These are our clients and our information; correct?

15            MR. WICKHAM:  Objection.

16            Mischaracterizes the form.  Foundation.

17            THE COURT:  All right.

18            I'll allow it.  You can answer the question.

19   A.  Could you ask it again, Rick?

20   Q.  Isn't it true FINRA is investigating me because MMA

21   Securities told them, These clients and this information is

22   ours, and he took it?

23   A.  I don't know that that is the only reason they are

24   investigating you.  I know we have a dual action pending.

25   Q.  Well, let's read that again:  Intentional removal of

JA2VMARHredacted                    Calder - cross

1   company property, including deletion of company data, also

2   solicitation of institutional clients and prospective clients

3   while licensed with MMA Securities on behalf of unaffiliated

4   third party before and after termination.

5           But you don't think that sounds like exactly what

6   we're doing here today?

7   A.   It is what we are doing today.

8   Q.   So, Jeff, are these clients of MMA or are they clients of

9   MMA Securities?  Because there seems to be a fight going on

10  between MMA and MMA Securities.

11  A.   I can't answer that question.

12  Q.   If it was found that these are all clients and information

13  of MMA Securities, should MMA be allowed to say that they were

14  theirs?

15  A.   Yeah.  We paid for those clients.  We paid to obtain those

16  clients.  We paid to service those clients.  We paid payroll

17  taxes on employees who were -- so, yes, we're entitled to

18  protect our information, as we had set forth in our employment

19  agreements.

20  Q.   So the money that's earned from these contracts doesn't go

21  to MMA; MMA is paying all of this stuff just out of their

22  pocket, the goodness of their heart?

23  A.   At the end of the day, the money comes to MMA.

24  Q.   So really the money for all these activities you just

25  described come from the activities of these clients and these

JA2VMARHredacted                  Calder - cross

1    contracts with MMA Securities?

2    A.  Yes.

3    Q.  I'm sorry, but doesn't that just contradict what you just

4    said?

5    A.  I don't think so.

6    Q.  You said MMA paid for these things.

7    A.  We do.

8    Q.  Didn't you say MMAS paid for these things?

9    A.  If I said that, I didn't mean that.  We paid for these

10   things.

11   Q.  With money that came from MMAS?

12   A.  With money that came through MMAS.

13   Q.  You said earlier that when a producer like myself -- I know

14   you find that offensive, so someone like myself, when we have

15   an annual review, you said we sit down and look at a client

16   list, we talked about budgeting.

17          Is it normal process at MMA for you to analyze how

18   much was spent on all those things you just mentioned,

19   marketing, things like that, and then attribute it to that

20   client and balance it out and say, How much did we spend on

21   that client; how much did that client bring in?

22   A.  I don't usually view it in that micro environment, but I

23   will have that discussion if it's out of line.

24   Q.  Does MMA have a process called chargeback?

25   A.  We do.

JA2VMARHredacted                    Calder - cross

1   Q.  And what is that?

2   A.  So chargebacks are charged back to a book if there are

3   excessive expenses.  But the chargeback, although taken from

4   the book for a producer, a producer's revenue is only reduced

5   20 percent; MMA pays 80 percent of that cost.

6          You are not subject to the chargeback; you are a

7   client service executive.  In 2018, and the first two months of

8   2019, we spent ███████ on your travel and expenses.

9   Q.  And MMA would know which clients those were?

10  A.  Yeah, they would on, some level, sure.  It's reported.

11  Q.  So we come full circle.

12         MMA is keeping track of how much money they make on a

13  client and how much they spend on it; and that money that they

14  made on the client came from MMAS, my activities or some other

15  producer's activities under MMAS.

16  A.  The money we make comes from our clients.

17  Q.  Which, as we've stated, we figured out earlier the

18  clients -- all that money for securities, that the only

19  business I did, that goes to MMAS first?

20  A.  I am not sure of the financial flow.

21  Q.  Can we go back to No. 7, the disclosure occurrence

22  composite.  Do you see -- after we looked at the event dates,

23  the latest filings, you said the internal review, 4/24/2019;

24  correct?

25  A.  That's what it says, yes.

JA2VMARHredacted                    Calder - cross

1    Q.  So from the period February 14th, 2010, the incident

2    report, through 3/13, up to 4/24, we have MMA -- is it correct

3    that we have MMA Securities investigating and filing because

4    they say, Well, these are our clients.

5           And MMA is filing, saying, Well, no, they are our

6    clients.

7           Did MMA at any time say to MMAS, No, these are our

8    clients; we're going to file.  Or was it specifically

9    independent of each other?

10   A.   Independent of each other.

11   Q.  Earlier you had said that --

12          THE COURT:  Let me ask, when you say "independently of

13   each other," I'm not sure what that -- I know that they were

14   filed obviously independently.  In other words, that --

15          THE WITNESS:  FINRA started their own investigation,

16   and we were doing our own investigation as well.

17          THE COURT:  Okay.  But FINRA's investigation was, in

18   essence, kicked off by the disclosure, is that your

19   understanding?

20          THE WITNESS:  It's my understanding, yes.

21          THE COURT:  Okay.  Okay.

22          Go ahead, Mr. Ferguson.

23   BY MR. FERGUSON:

24   Q.  Earlier you had testified that MMA and MMAS are very

25   integrated.  You kind of described them as basically one

JA2VMARHredacted                 Calder - cross

1    company.

2    A.  I don't remember saying that.

3         THE COURT:  I don't think that was his phraseology,

4    but just ask the question.

5         MR. FERGUSON:  I'll rephrase the question.

6    Q.  Does MMAS take the standpoint that all of the retirement

7    services are under them?

8    A.  I don't have insight into MMAS, Rick.

9    Q.  I apologize.

10        Did MMA take the standpoint that retirement services

11   are offered under them?

12   A.  Yes.

13   Q.  Do they have it on the website?

14   A.  Yes.

15   Q.  Does that sound like an integrated company?

16   A.  Well, then you could say that SagePoint and MMA were an

17   integrated company, and we were anything but.

18   Q.  Does SagePoint have a completely separate website where

19   they advertise?  Do they advertise MMA products?

20   A.  I don't think so.  I don't know.

21   Q.  But MMA does, they specifically state, We have retirement

22   plans?

23   A.  Yes.

24   Q.  So isn't that completely different?

25   A.  I don't know.

JA2VMARHredacted                Calder - cross

Q.  How come at no time did MMA ask -- or, I'm sorry, at no

time did MMA say, Hey, hold on.  You can't file that, MMAS,

these are our clients?

A.  MMAS has to report when there's a termination, if there's

any investigation going on and the circumstances involved in

that.  And so we were doing the reporting when you terminated,

and then we're doing our own investigation as MMA.

Q.  So to be clear, you knew about this; you knew MMAS

Securities considered these their clients and they were going

to report that as such to --

A.  I did not know that.  I knew that MMA -- because your

license was with MMA Securities, MMA Securities has to release

your license and we had to give a form to allow that to happen.

Q.  So they have -- you have to file a form.  Do they have to

say, This person is under internal review, which would mean

MMAS, for company property clients which are MMAS.  It can only

be specific to MMAS if they are filing with FINRA.

A.  No, I don't have any knowledge of that.

Q.  Well, we do.  We see it right here:  Intentional removal of

company property is client contact information.

A.  I don't know that that is solely MMAS.

Q.  Jeff, is it your position that MMAS might have been

reporting to FINRA on actions that were not covered by FINRA?

A.  I had no knowledge of that, Rick.

Q.  Sounds like that you said that these actions that MMAS is

JA2VMARHredacted                Calder - cross

1  reporting to FINRA might not even have been attributable to

2  MMAS clients.

3  A.  I don't believe I said that at all.

4  Q.  Okay.  So let's clarify.

5      When MMAS reported to FINRA that I was under

6  investigation for intentional removal of company property, such

7  as client contact information, also solicitation, institutional

8  clients and prospective clients while licensed with MMA

9  Securities on behalf of affiliated third party before

10  termination, were they talking about MMAS clients or were they

11  talking about MMA clients?

12  A.  From my point of view, they are talking about our clients,

13  MMA.  From their point of view, they are talking about the

14  broker-dealer clients.

15  Q.  Jeff, with all due respect, you think FINRA cares about

16  your point of view?

17          THE COURT:  Well, we don't --

18          MR. FERGUSON:  Sorry.

19          THE COURT:  As I said, right, just ask the question.

20          I understand the issues.

21          Next question.

22          MR. FERGUSON:  I apologize, Judge.

23          THE COURT:  This is not like television.  Well, at

24  least not this part.

25          MR. FERGUSON:  I see where it gets that way.

JA2VMARHredacted              Calder - cross

1      THE COURT:  No, no, look, I understand.  And, look --

2  but, you know, there's a difference between, you know, having

3  me sit here and having a jury.  So I understand what the point

4  is.  So go ahead.

5  BY MR. FERGUSON:

6  Q.  Okay.  Jeff, do you see -- and I apologize go back and

7  forth a little between these two.

8      On -- if you go back to page -- or Tab 8, and I'm

9  going to read something there again.  I want to reread what

10  FINRA said they were investigating.

11      So when MMAS first gave this disclosure and FINRA

12  reached out to me:  Intentional removal of company property,

13  including deletion of company data.

14      If we go back to Tab 7, No. 3 again:  Describe the

15  nature of the internal review.  Where does it show, where does

16  it state "including deletion of company data"?

17  A.  I don't see it.

18  Q.  So MMAS removed that, didn't they?

19  A.  I don't know.

20      MR. WICKHAM:  Objection.  Foundation.

21      THE COURT:  That's fine.  I'll take the answer.

22      Go ahead, Mr. Ferguson.

23  BY MR. FERGUSON:

24  Q.  Jeff, on that Tab 7, go to the next page, we see under Item

25  4:  Is the internal review pending?  No.  Correct?

JA2VMARHredacted                Calder - cross

```
 1    A.  Yes.

 2    Q.  And we see under 5A, the date the internal review

 3    concluded, 4/19/2019; correct?

 4    A.  Yes.

 5    Q.  And then under B, MMA Securities states:  Although

 6    Mr. Ferguson removed client contact information, his activities

 7    did not result in selling away.

 8    A.  I see that.

 9    Q.  So MMA Securities did a thorough review for over a month.

10    But does it appear to you like they didn't report anything to

11    FINRA after that?

12    A.  I don't know.

13    Q.  Do you see any further actions?

14    A.  I see no further action in this exhibit.

15    Q.  So from what we see here, MMA Securities did a review, took

16    over a month.  And isn't it true that then they told FINRA:

17    Although Mr. Ferguson removed client contact information, his

18    activities did not result in selling away?

19    A.  I believe there has been supplemental information that has

20    been given to FINRA since this document.

21         THE COURT:  Just to be clear, what is your

22    understanding of what "selling away" means?

23         THE WITNESS:  Selling away, from my understanding in

24    the securities point of view, is while you're employed by one

25    firm, you're actually selling products --
```

JA2VMARHredacted                    Calder - cross

1              THE COURT:  For another firm.

2              THE WITNESS:  -- for another firm.

3              THE COURT:  Okay.  All right.

4     BY MR. FERGUSON:

5     Q.  So, Jeff, you just made a statement.  Did MMAS has since

6     instructed MMA or did MMAS do it directly themselves, more

7     complaints to FINRA?

8     A.  No, I don't believe so.

9     Q.  I guess I'm confused.  A moment ago you said to your

10    knowledge more things have been submitted to FINRA?

11    A.  I don't know that it had been submitted to FINRA.  We have

12    more information now than we did when this file was closed.

13    And I think that they will submit that to FINRA.

14    Q.  When you say "we," do you mean MMA or MMA Securities?

15    A.  I think we are both in possession of the information.

16    Q.  But MMA feels MMA Securities should submit this to FINRA,

17    whatever this new information --

18    A.  I don't know.  They will do with it what they need to.

19    Q.  Why would MMA even bring MMA Securities into it then?

20    A.  MMA Securities has been a part -- we're running a dual

21    action here.  They are getting the same discovery we are

22    getting.

23    Q.  So MMA Securities and MMA have worked together to file the

24    same complaints with FINRA and in civil court?

25    A.  Yes.

JA2VMARHredacted              Calder - cross

1   Q.  So if they do file more claims, would it be MMA Securities

2   filing on their clients or would it be MMA filing on their

3   clients?

4   A.  I don't know.

5           THE COURT:  Mr. Calder, do you know, does Mr. Peartree

6   hold a position at -- a title with MMA Securities?

7           THE WITNESS:  I don't know for sure whether he does.

8   I know he has a national title of some sort.  I think he might,

9   but I can't say for certain.

10          THE COURT:  Okay.

11          Go ahead, Mr. Ferguson.

12  BY MR. FERGUSON:

13  Q.  So, Jeff, would you agree thus far we've determined for MMA

14  Securities, I had a separate supervisor, I had a separate

15  client database, separate clients that perhaps maybe MMA did

16  have other lines of business with them, and MMA Securities is

17  positioning this to FINRA, that they own these clients and

18  information?

19  A.  That is such a compound question.  I have a hard time just

20  answering that.  So if you could break it down a little bit,

21  that would be easier.

22          THE COURT:  In other words, Mr. Ferguson, there are

23  multiple questions in there.

24          MR. FERGUSON:  I understand, your Honor.

25  Q.  So we've determined that I had a different supervisor for

JA2VMARHredacted                 Calder - cross

1    MMAS; correct?

2    A.  Yes.

3    Q.  We've determined that MMAS had their own very thick

4    policies and procedures manual of how they run their

5    corporation and entity; correct?

6    A.  Yes.

7    Q.  We've determined that all of my clients that I worked with

8    were -- all had agreements under MMAS; correct?

9    A.  I don't know that we've determined that all of your clients

10   do.  I would assume they would.

11   Q.  We have determined that MMA cannot have securities --

12   contracts with securities clients because they are not a

13   registered broker-dealer; correct?

14   A.  I don't know the legality of that.

15   Q.  Is it possible that MMA has been acting as an unregistered

16   broker-dealer this entire time?

17   A.  I don't think so.

18   Q.  Have we now determined, separate from what MMA is doing,

19   MMAS is positioning with FINRA, these are our clients and they

20   want to file complaints on me?

21          MR. WICKHAM:  Objection.  Foundation.

22          THE COURT:  Well, is it your understanding that MMAS

23   has filed various things with FINRA?

24          THE WITNESS:  Yes.

25          THE COURT:  Is it your understanding that -- so Tab 7,

1   which is the disclosure of occurrence composite, do you have an

2   understanding of whether FINRA has an ongoing investigation or

3   not?

4              THE WITNESS:  I don't know.

5              THE COURT:  Okay.  Do you have an understanding of

6   whether there's an intention by MMAS to supplement the

7   information that it previously provided to FINRA?

8              THE WITNESS:  I believe there is.

9              THE COURT:  Okay.

10             And that was the information you were referring to

11   that has been developed since the -- I guess it's May 30th, it

12   appears, at the top left corner of this document of Exhibit 7.

13             THE WITNESS:  Yes.

14             THE COURT:  Okay.

15             What's the basis of your understanding?  And again, I

16   don't want to -- if it's purely through counsel, then I don't

17   necessarily need to know that.  But if you had conversations --

18             THE WITNESS:  I have not had internal conversations,

19   so it's been through counsel.

20             THE COURT:  Okay.

21             All right.  Go ahead.

22   BY MR. FERGUSON:

23   Q.  Can you please turn to Tab 9.  Do you see there on the

24   first page, you say:  Regulatory Notice 16-25, Forum Selection

25   provisions.  Down at the bottom you see FINRA.  So this is from

JA2VMARHredacted                    Calder - cross

1   FINRA.

2   A.  Yes.

3   Q.  Can you go to page 6 please.  Do you see where it says:

4   Associated Person Disputes.  FINRA is also concerned that

5   member firms are including in predispute agreements with

6   associated persons provisions that have the effect of waiving

7   the associated person's right to obtain FINRA arbitration of

8   any disputes arising out of the agreement.

9            I'll jump down to the next paragraph.

10           FINRA Rule 13200 of the Code of Arbitration Procedure

11  for Industry Disputes, industry code, titled "Required

12  Arbitration," provides that member firms and associated persons

13  must arbitrate certain of their disputes as follows:

14           A, generally.  Except as otherwise provided in the

15  code, a dispute must be arbitrated under the code if the

16  dispute arises out of the business activities of a member or an

17  associated person and is between or among members, members and

18  associated persons, or associated persons.

19  A.  I see that.

20  Q.  Do you understand that MMA Securities is a member firm?

21  A.  Yes.

22  Q.  Do you understand that I am an associated person?

23  A.  I didn't know that.

24  Q.  Do you understand that people who are registered --

25  securities registered with FINRA are registered with FINRA?

JA2VMARHredacted              Calder - cross

1    A.  Who are registered with FINRA are registered with FINRA?

2    Q.  Oh, I see.  You don't understand that an associated person

3    means a person registered with FINRA; correct?

4    A.  Right.

5    Q.  Sorry, I was confused there.

6            Well, if they were, doesn't it appear that this

7    official declaration by FINRA is saying, If there's any dispute

8    between a member firm and MMAS and myself, an associated

9    person, it must go through FINRA arbitration?

10   A.  Yes.

11   Q.  And we just saw that MMA Securities is taking the

12   position -- has already taken the position, these are their

13   clients.  And we just saw earlier that the client agreement is

14   between MMAS and that client; correct?

15           MR. WICKHAM:  Objection.  Foundation.

16           Mischaracterized the evidence.

17           THE COURT:  I'll allow it.  Objection overruled.

18           You can answer the question, if you can.

19           THE WITNESS:  Can I have him ask me again please?

20           MR. FERGUSON:  I don't know if I can.

21           THE COURT:  And we just saw that MMA Securities has

22   already taken the position these are their clients, and we just

23   saw earlier that the client agreement is between MMAS and that

24   client; correct?

25           THE WITNESS:  I don't know that they've taken the

JA2VMARHredacted                    Calder - cross

1    position that these are their clients solely.  I know that they

2    are investigating the action, as are we.

3            We feel as if we have a separate action for

4    downloading, for using, for taking our intellectual property,

5    confidential information, and using it.

6    BY MR. FERGUSON:

7    Q.  Did I do commercial insurance business?

8    A.  No.

9    Q.  Did I do health and welfare business?

10   A.  No.

11   Q.  Did I do compensation consulting?

12   A.  No.

13   Q.  Did I do any line of business under MMA that wasn't

14   specifically first under MMAS?

15   A.  You are paid by MMA partially to do the securities side of

16   the business and partially to service the clients.

17   Q.  Jeff, that's not what I asked.

18           Did I do any line of business, work on anything that

19   wasn't under MMA Securities?

20   A.  No, I don't think you did, no.

21   Q.  So 100 percent of the clients that we're talking about

22   today are first under MMA Securities.  They may have some other

23   line of business, some other relationship with MMA; correct?

24   A.  Yes.

25   Q.  Does that sound like a separation to you?

JA2VMARHredacted                Calder - cross

1   A.  No, I consider them our clients.

2   Q.  And I'm just going to clarify there, so for the record

3   you're stating, when you say they're our clients, that you, as

4   an unregistered person, managing director for MMA, consider

5   these security clients your clients?

6               MR. WICKHAM:  Objection.

7               Calls for a legal conclusion.

8               THE COURT:  I understand the question.

9               The clients that are at issue -- well, I'll allow it,

10  whether -- putting aside the legality of the situation, is it

11  your personal view that the clients that are at issue here are

12  MMA clients?

13              THE WITNESS:  Yeah, absolutely.  They were either

14  referred in by a current MMA producer, or the business that

15  Rick brought in through his own efforts, we supported that, we

16  paid for that, we paid for those activities; we paid for all of

17  the travel, all the entertainment; we paid for the service

18  staff to service those clients.  MMA paid for that.

19              THE COURT:  Okay.  Go ahead, Mr. Ferguson.

20  BY MR. FERGUSON:

21  Q.  Jeff, to what you just said there, I think earlier you said

22  you spent about ██████, roundabout, I don't know the exact

23  number --

24              THE COURT:  I think it was 21.

25  Q.  21,000 on my travel; correct?

1    A.  Not just travel; hotel, travel, entertainment.

2    Q.  How much did my book of business bring in via MMA

3    Securities?

4    A.  I'm not sure of the total amount.

5    Q.  Can we agree it was somewhere north of 600,000?

6    A.  I don't know that I can agree to that.

7    Q.  Can you say approximately?

8    A.  I don't know what your book of business is.

9    Q.  Was it over 400,000?

10   A.  I don't know.

11          THE COURT:  Was that -- there was an exhibit --

12          THE WITNESS:  No, the exhibit just shows the clients

13   that are at risk.

14          THE COURT:  At risk.  Okay.  So --

15          THE WITNESS:  So there's 250,000.

16          THE COURT:  Yes, 248,411.

17          THE WITNESS:  Yeah.  So assuming the book of business

18   was -- let's say it's $500,000, and I'm not saying it was or it

19   wasn't, but let's say it was.  We would budget approximately

20   two percent of that revenue towards expenses.  So a $500,000

21   book of business should have approximately a budget of two

22   percent of that, which is $10,000.

23          THE COURT:  Does that flow through in any way in MMA

24   Securities?

25          THE WITNESS:  No.

JA2VMARHredacted                Calder - cross

1          THE COURT:  Does MMA Securities have its own budget

2     for that sort of expense; or basically MMA Securities is set

3     up, because it's a requirement and various folks and clients

4     sign contracts with MMA Securities, but the money and the

5     funding comes from MMA?

6          THE WITNESS:  The money and the funding comes from

7     MMA.

8          THE COURT:  Okay.  And there's no flow -- in other

9     words, the money, as I understand it, comes back to MMA, though

10    does flow through MMAS.

11         THE WITNESS:  Does flow.

12         THE COURT:  Okay.

13         Does MMAS itself have employees?

14         THE WITNESS:  I believe it does.

15         THE COURT:  Okay.

16         THE WITNESS:  But not very many.

17         THE COURT:  All right.

18         This is, I think, a question -- and Mr. Wickham, it

19    may be already in the papers, but are there cases that have

20    been cited to me or that you're aware of or that you can

21    provide to me where there are, in essence -- understanding and

22    assuming that there's going to be another filing with FINRA,

23    where there is -- at the same time there is a litigation, there

24    is also a FINRA arbitration involving similar accusations?

25         MR. WICKHAM:  None of the cases that we encountered

JA2VMARHredacted              Calder - cross

1    had that factual circumstance.  But, again, this is not a

2    situation where there is a separate FINRA arbitration.  Again,

3    when Mr. Ferguson left and they --

4           THE COURT:  And I apologize, that was my -- that was

5    my inartful way of saying it.  But --

6           MR. WICKHAM:  They were required to disclose this.

7    They were required to file the U-5.  They were required to put

8    into the U-5, you know, certain information.

9           There have been multiple occasions when FINRA has come

10   back to MMAS, and I'm assuming probably back to Mr. Ferguson as

11   well, asking for supplemental information.  It's a FINRA

12   investigation.  MMAS had to make what disclosures that it had

13   to make.

14          THE COURT:  Sure.

15          MR. WICKHAM:  The characterizations of that, based on

16   an absence of a full record, are not accurate.  I don't want to

17   get into -- but I will say that pleadings from this case, the

18   complaint, various other things, have been submitted to FINRA.

19          So the full character and nature of everything that is

20   going on here has been shared with FINRA as part of their

21   investigation.

22          THE COURT:  Okay.

23          MR. WICKHAM:  But with regard to the specific

24   situation of a nonFINRA member pursuing claims against someone

25   who is a hybrid, who has one leg in the FINRA world and another

JA2VMARHredacted                Calder - cross

in the other world, the answer is yes.  We cite to *Ayco Company*
*LP v. Frisch*.  It's cited on page 15 of our motion to dismiss
brief, opposition brief.

            THE COURT:  Opposition brief.

            MR. WICKHAM:  Then that case then talks about the lead
Southern District case, again, when you have a nonFINRA member
who was pursuing these claims and all the arguments that were
raised in this and all that.

            THE COURT:  Okay.

            MR. WICKHAM:  So all that's laid out.

            It goes into the U-4 form.  U-4 only is limited to the
things that Mr. Ferguson was quoting:  Members, between member
firms, and all that.  And that, you know, MMA doesn't fall into
any of those categories, so it's a nonsignatory and so on and
so forth.

            But, again, there's no separate FINRA arbitration
here.  This is FINRA conducting an investigation based on MMAS
having submitted a required disclosure.

            The reference to selling away isn't some sort of an
exoneration of Mr. Ferguson; it's a clarification that what had
been perceived as a potential issue, that at least at that time
MMAS had made a determination that that particular activity,
selling away -- which is a cardinal sin, I guess, in that
world -- that the firm at that time had determined that that
particular thing hadn't occurred.  But that wasn't by way of

1    saying that, you know, everything else that they were saying

2    wasn't accurate.

3          THE COURT:  And I understand that that's a term of art

4    specifically in this area.

5          Let me ask, is there a dispute with regard -- because

6    I think the U-4 that Mr. Ferguson referred to earlier was one

7    that was from an earlier -- I don't know how frequently those

8    have to be -- in other words, is there a U-4 --

9          MR. WICKHAM:  There would be a U-4 between

10   Mr. Ferguson and MMAS that is available on FINRA's website.

11         THE COURT:  All right.  That's the only thing.  So

12   there's no dispute with regard to that.

13         MR. WICKHAM:  Right.

14         This just goes to whether a nonsignatory is bound by

15   the U-4.  And we make our arguments, and Mr. Ferguson's prior

16   counsel made their arguments.

17         THE COURT:  Okay.

18         Go ahead, Mr. Ferguson.

19         MR. FERGUSON:  Your Honor, I disagree with the

20   counsellor's position on this.

21         He's saying -- he stated that MMAS was required to

22   disclose this.  No, MMAS is required to file a U-4 saying I've

23   left the company.  That's it.  They chose to state I was under

24   investigation for these things.  That's not a requirement.  And

25   by doing that, they stated they were investigating under their

JA2VMARHredacted                    Calder - cross

1    own clients.  Securities clients are not in the business of

2    investigating other companies.  FINRA is not in the business of

3    investigating nonFINRA, nonregistered entities.

4              THE COURT:  And I don't need to get into the

5    legalities of what would be required by FINRA or not required,

6    but there may have been a concern had they not disclosed it,

7    and you go on to another entity where you're taking on

8    fiduciary responsibilities, that somehow they might be tagged

9    for it.  I don't know.  And I don't know, if that was the case,

10   why they decided it had to be reported.  But what I am is that

11   it's been reported, and it may -- there may be additional

12   information, as I understand, that may get reported.

13             And so what I need to sort out is whether that's --

14   whether that impacts in any way what's going to happen, what's

15   happening here.  In other words, whether I say, Well, that

16   means the whole everything should go to FINRA arbitration or

17   whether -- and again, reviewing the case law, whether basically

18   this proceeding can proceed, and whatever FINRA's investigation

19   is, they do.

20             I take it -- well, let me ask it.  I'm not sure I got,

21   Mr. Wickham, your response to this:  Are you representing the

22   company in connection with the FINRA part of this or is that

23   another counsel, or is that internal?

24             MR. WICKHAM:  None of the above.  It's through MMAS's

25   compliance officer.  And she is responding to what inquiries

JA2VMARHredacted                    Calder - cross

1   that FINRA has had.

2           Necessarily they will be consulting with counsel

3   concerning drafting of responses to be able to be sure that

4   everything that's submitted to FINRA is accurate and at least

5   with regard to the circumstances about the claims asserted in

6   this case.  So we have been consulted on those matters, but it

7   is MMAS's chief compliance officer who was interfacing with

8   FINRA in connection with FINRA's investigation.

9           THE COURT:  And I take it, since I haven't seen

10  anything with regard to this, that basically FINRA is doing

11  their investigation, and they have not taken any position with

12  regard to whether -- to the extent that there is -- since they

13  have gotten the documents that something has been filed here,

14  haven't taken the position, Well, this should be a FINRA

15  arbitration and shouldn't be in court.

16          MR. WICKHAM:  That is correct.  FINRA has not taken

17  any position on that subject.

18          THE COURT:  Okay.

19          MR. FERGUSON:  Your Honor, on that, I would just like

20  to note that the other misrepresentation there, the case

21  quoted, as counsellor said, was a case where somebody had one

22  leg in both pools.  We've already established I had both legs

23  in one pool and one pool only.  I only do securities work.  The

24  case is not applicable.

25          THE COURT:  Well, I understand that's the argument and

JA2VMARHredacted                    Calder - cross

1    that's what I have to decide.

2            Go ahead.

3    BY MR. FERGUSON:

4    Q.  Jeff, on that same page, do you see down there at the

5    bottom, bottom paragraph, second sentence:  FINRA Rule 13200

6    specifically states that industry disputes must be arbitrated

7    at FINRA, except as otherwise provided in the industry code.

8    Thus, any attempt to override this requirement of FINRA Rule

9    13200 and a predispute agreement by more specific contractual

10   terms would violate FINRA rules.

11   A.  I see that.

12   Q.  Do you understand that the predispute agreement by more

13   specific contractual terms is a reference to a nonsolicitation,

14   noncompete-type agreement?

15   A.  I'm not aware of that.

16   Q.  Could it be?

17   A.  I don't know.

18           THE COURT:  And I apologize for this question because

19   I probably should know the answer, but, Mr. Ferguson, could

20   you -- in connection with the current suit, could you have

21   initiated an arbitration with FINRA, in other words, as a

22   member?

23           MR. FERGUSON:  I can making my own complaints.

24           THE COURT:  Okay.  And have you done that?

25           MR. FERGUSON:  No.  I was holding off in good faith.

JA2VMARHredacted          Calder - cross

1          THE COURT:  All right.

2          Well, it's just a question.  I don't need to know

3    necessarily why one way or the other, but okay.

4          Go ahead.  Next question.

5          And do you have a sense of how much longer you may

6    have?

7          MR. FERGUSON:  Quite a ways.

8          THE COURT:  Okay.  By "quite a ways," let me just ask,

9    do you intend to ask about all of the exhibits that you have in

10   your binder?

11         MR. FERGUSON:  Not all of them.  About half.

12         THE COURT:  Okay.

13         MR. FERGUSON:  Maybe a few more.  I can try to speed

14   it up.

15         THE COURT:  I appreciate that, but, again, obviously,

16   as I did with Mr. Wickham, I'll allow you to do what you need

17   to do.

18         I'm principally thinking about the time that I have

19   allotted in connection with this.  So do you think you'd go

20   more than an hour?  Do you have more than an hour?

21         MR. FERGUSON:  I mean I do, but I'll go quick.

22         THE COURT:  Because we still have to have your

23   testimony.

24         Why don't we do this:  Let's take a five-minute break

25   right now, because I'd like to speak with my staff, because it

JA2VMARHredacted                  Calder - cross

1    doesn't -- even under the best of circumstances, we still need

2    to hear from you and have cross-examination.

3          And I apologize, I'd forgotten, do you have a witness

4    here also or don't?

5          MR. FERGUSON:  No.

6          THE COURT:  Okay.

7          So we'd have to still have you go.  And there's no

8    conceivable way that that's going to happen today.

9    Unfortunately, not that we will even go this long, but I have a

10   meeting I have at 6:30.

11         So let me just speak to my staff about timing, and see

12   what's going to be possible, and then have just a logistical

13   conversation with counsel.

14         So we're going to take -- why don't we take -- why

15   don't we say ten minutes, it's until ten of five.  I'm giving a

16   little bit longer than ten minutes.  And we'll come back and

17   continue the cross-examination.

18         Obviously, Mr. Wickham, the witness is on

19   cross-examination, so I'd ask that you not have substantive

20   conversations about the cross-examination with Mr. Calder

21   during the break.

22         MR. WICKHAM:  Of course, your Honor.

23         THE COURT:  Okay?

24         All right.  Thank you very much.

25         We'll stand adjourned.

JA2VMARHredacted                    Calder - cross

1        (Recess)

2        THE COURT:  So this is what I think we can do.  We can

3   go until about -- well, let me ask -- off the record for a

4   second.

5        (Off record)

6        THE COURT:  So we would go until 6 o'clock.  But

7   obviously, Mr. Ferguson, if you finish Mr. Calder before then,

8   we'll take a break at that point and come back for you

9   tomorrow.  Okay?

10        MR. FERGUSON:  I understand.  I'm marking up pages.

11        THE COURT:  All right.

12        And so we can start tomorrow -- would 9:30 or 10 work

13   for the parties?

14        MR. WICKHAM:  Either is fine with us, your Honor.

15        THE COURT:  Mr. Ferguson?

16        MR. FERGUSON:  Yes, your Honor, any time is fine.

17        THE COURT:  So we'd start tomorrow at 9:30.  We'd be

18   able to go until about 11 or so.  I have some initial pretrial

19   conferences which will take maybe 10 minutes or 15 minutes.

20   We'll be able to go until about 1 or so.  So I'm hoping -- 1 or

21   maybe a little bit later.  I would have to miss an internal

22   meeting.  But I don't know how long either the direct will be.

23        What I would say, Mr. Ferguson, if there are things

24   you want to -- points you want to make on direct that are

25   already in your affidavit, you should feel free to just point

1  me to those things so we don't necessarily have -- you may get

2  asked about them on cross-examination.  But just so that we

3  don't, sort of, retread things you've already raised, unless

4  you think there's stuff you want to add, obviously I'm not

5  precluding you from doing that.

6          MR. FERGUSON:  I think I understand, your Honor.

7          THE COURT:  Okay.

8          Yes.

9          MR. WICKHAM:  Two questions, one housekeeping.

10         THE COURT:  Yes.

11         MR. WICKHAM:  For this evening, can we leave our boxes

12  here, your Honor?

13         THE COURT:  I think it's probably best if you leave

14  them in the witness room.

15         MR. WICKHAM:  Okay.

16         THE COURT:  And you just put a note on top of them

17  saying, you know, "Ongoing hearing.  Do not throw away."  Just

18  because there are folks who do come in and do cleaning.  And

19  although I haven't had it happen here in the courtroom, in my

20  chambers there was some stuff that at one point got thrown --

21  just courtesy copies, nothing -- but it created a little bit of

22  havoc.

23         MR. WICKHAM:  The other question is bringing our

24  luggage to the courtroom, would that be permissible?

25         THE COURT:  Sure.  That's fine.  You're going to have

JA2VMARHredacted                Calder - cross

```
1    to go through security.

2              MR. WICKHAM:  Right.

3              THE COURT:  If there's an issue with regard to that,

4    just let me know and we can -- in other words, you're still

5    going to have to go through security with that.

6              MR. WICKHAM:  Right.

7              THE COURT:  And you can leave them -- you can either

8    leave them parked somewhere in the back or you can leave them

9    in the witness room.

10             MR. WICKHAM:  If possible that we could reach a

11   conclusion -- and we'll do whatever the Court needs, wants, or

12   desires, but if we could be able to reach a conclusion so that

13   we would be able to make flights out at 4 or 5 tomorrow --

14             THE COURT:  I fully anticipate -- because I've got two

15   pleas in a criminal matter that I have to do at about 2.  And

16   unfortunately, there's going to be a bunch of folks coming in

17   for that, because there's a -- for whatever reason, there's an

18   interest, a press interest in it.

19             MR. FERGUSON:  Your Honor, are people allowed to

20   attend something like that?

21             THE COURT:  Yes.  The courtroom is open.  So with

22   regard to pleas, unless there's a request by the government on

23   a criminal case for the matter to be sealed, yes, it's a public

24   forum.  And tourists come in from various parts of the world to

25   watch proceedings.
```

1          MR. WICKHAM:  It's America.

2          THE COURT:  So my intention is, yes, we need to get it

3    done tomorrow.  Obviously if there's something that's still

4    hanging out, I think we need to get it done tomorrow.

5          MR. WICKHAM:  I'll want to confer with my client this

6    evening, but I would even be willing to submit both motions on

7    the papers so that -- just in terms of what needs to be checked

8    off the box is that there wouldn't need to be oral argument on

9    the motions.  I think that both parties have fully briefed the

10   relevant issues.

11         THE COURT:  Okay.  There may be -- I may have

12   additional requests to get some information from --

13         MR. WICKHAM:  Yes.

14         THE COURT:  -- some of the witnesses who aren't here,

15   but who have submitted declarations in the past.  But we can

16   talk about that at the end.

17         MR. WICKHAM:  Thank you, your Honor.

18         THE COURT:  All right.

19         Mr. Ferguson, you may proceed.

20         MR. FERGUSON:  Thank you, your Honor.

21   BY MR. FERGUSON:

22   Q.  Jeff, can you please turn back to Tab 49.

23         Jeff, please stop me if I start going too fast.

24         THE COURT:  I'm sorry, you said Tab 49?

25         MR. FERGUSON:  49.

JA2VMARHredacted                    Calder - cross

```
 1              THE COURT:  Okay.
 2    Q.  So, Jeff, do you see the very first page there, "Download
 3    Google Chrome"?
 4    A.  Yes.
 5    Q.  See the very bottom, it says ██████████████████████,
 6    and address and email?
 7    A.  I do.
 8    Q.  Do you agree ████████████ is one of the clients under
 9    dispute today?
10    A.  I do.
11    Q.  And ██████████ is the main contact and decision-maker
12    there; correct?
13    A.  I don't know.
14    Q.  ██████████████ email is there; correct?
15    A.  Yes.
16    Q.  And this is a Google search, Download Google Chrome.
17              Jeff, can you please turn to the next page, 5500
18    again.  So do you see up towards the top, a single employer
19    plan?  Do you see over to the right, where it shows this
20    client's business code, it shows their tax ID number, it shows
21    their telephone number.  Down below there it says Ana Prince as
22    the main person for this plan.
23    A.  I'm sorry, where are you looking at?
24    Q.  It says freeERISA.com at the top, Form 5500?
25    A.  Mm-hmm.
```

1    Q.   Shows us the date this plan was started and the plan

2    number; correct?

3    A.   Right.

4    Q.   Shows us the name of plan, name of the company, address?

5    A.   Yes.

6    Q.   Go to the next page.  See there on the left-hand side, that

7    table there, it shows all the employees; breaks down how many

8    are active, how many are participating in the plan, how many

9    are terminated, and quite a bit of other information about

10   participants; correct?

11   A.   Yes.

12   Q.   Do you see under 8a it shows the characteristic codes of

13   the instructions 2A, 2E, 2F, 2G, 2J, 2T, 3D, 3H?

14   A.   I do.

15   Q.   I don't know how to ask that question.

16        Do you know that these are plan design codes that say

17   whether it's a 401(k) plan, profit sharing, auto enroll?

18   A.   I do not.

19   Q.   Okay.

20        Down below there we have other information about the

21   plan, retirement plan information.

22        Do you see on the next page, Schedule A?

23   A.   Yes.

24   Q.   We already looked at this earlier.  Not only does it show

25   the amount that SagePoint is making, six inches down, John

JA2VMARHredacted                Calder - cross

1   Hancock; then down below SagePoint, it shows Lebenson

2   Actuarial, and it shows --

3            THE COURT:  Go ahead.

4   Q.  And the next one is Lebenson, L-E-B-E-N-S-O-N?

5   A.  Yes.

6   Q.  Actuarial Services.

7   A.  Yes.

8   Q.  And we can see how much each of these are making.

9            Continuing to the next page, we have a whole list of

10  financial information, don't we?

11           Do you see where it shows how much money is being

12  added to the plan, from what different sources?  About halfway

13  down we see the experience of related contracts.

14           Do you see on the next page, Schedule C, service

15  provider information?  We can see there, about three-quarters

16  of the way down -- one-third of the way down, John Hancock life

17  Insurance.  Then we see down below John Hancock's tax ID.  Then

18  it gives a description of, again, how much they were making,

19  and it shows for what services, and it shows how that payment

20  was structured.

21  A.  Yes.

22  Q.  Skip over the next page.  Go to Schedule D.

23           Do you see where it lists all the investments that are

24  in this plan and how much is in them?

25  A.  Yes.

JA2VMARHredacted                    Calder - cross

1    Q.  Continue on to the next page and the following page.

2              If we go to the next page, Schedule H, financial

3    information.  Do you see there this provides a breakdown of all

4    the assets in this plan, what type they are, the category they

5    are?  It shows all the liabilities of this plan; it shows the

6    net assets; it shows the income, who it was received from,

7    participants or others.

8              Going on to the next page, do you see where it says:

9    Earnings on investments.  It shows us the earnings.  Then we

10   get into expenses, and it breaks out the expenses.  And then

11   down below that we have compliance questions, where it's

12   talking about, Did you have any Part IV compliance questions.

13   4a, was there a failure to transmit any plan participant.  So

14   it's asking them all kinds of detailed questions about the

15   compliance of the plan, their commercial insurance on the plan,

16   a Fidelity bond on the plan.

17             Then go to the next page, the compliance questions

18   continue, very detailed.

19             We go on to Schedule R on the next page, retirement

20   plan information.  And I'm just going to skip over that.

21             Let's get into really quick, do you see where on the

22   next page we go into Metz & Associates do an audit of the

23   financial statements of the ███████████████ 401(k) profit

24   sharing plan and trust.

25             Do you recognize this as an independent audit of the

JA2VMARHredacted                    Calder - cross

1    ██████████████  plan?

2    A.  I have not seen an independent audit before.

3    Q.  Okay.  In the interest of time, I'm going to suffice to say

4    this is a lot of information about a retirement plan, isn't it?

5    A.  Yes.

6    Q.  And this is all publicly available off freeERISA; correct?

7    A.  Yes.

8    Q.  Client name, the assets, address, phone number, the person,

9    email.  Isn't that just about everything that MMA has said that

10   I stole?

11   A.  This is for one client information along those lines.

12          However, there was downloads of our -- downloads of

13   all of our clients, specific contacts for each person at that

14   client.  This reflects one plan with one HR contact.  Many of

15   the solicitations went out to our clients with multiple plan

16   contacts.  I don't believe you'd find the multiple contacts in

17   any database, nor could you find a refined client list of MMA.

18   Q.  So back to my original question:  There's an awful lot of

19   information about retirement plans that's available right

20   online; correct?

21   A.  I answered that, yes.

22   Q.  Are you familiar with Regulation S-P?

23   A.  I am not.

24   Q.  Regulation S-P is a securities regulation, and it's about

25   the confidentiality of securities information.  And securities

JA2VMARHredacted                Calder - cross

S-P is kind of the same thing as MMA's nonsolicitation

agreement.  It says, Okay, you can't take information.  It's

the financial securities version of it.  This information,

proprietary, belongs to that company.

Are you familiar with broker protocol?

A.  No.

Q.  Broker protocol is -- it came about, and it's voluntary.

There are a few hundred broker-dealers that belong to it.

MR. WICKHAM:  Judge --

THE COURT:  Yes, I'll allow you to testify to this, if

it's relevant to your testimony.  But unless it's preparatory

to a question that you have, you should just go to your next

question.

MR. FERGUSON:  It is preparatory, your Honor.

I'm trying to position that securities registration

has Regulation S-P.  Broker protocol specifically exempts

client name and basic contact information.  All people who

belong to broker protocol are allowed to take basic

information.  Regulation S-P specifically says for financial

companies, registered FINRA firms.  Regulation S-P only applies

to natural people; it does not apply to retirement plans,

because what we've just seen.

THE COURT:  But you can ask is he aware of those

things.  In other words, are you -- go ahead and ask your

question.

JA2VMARHredacted                    Calder - cross

1          MR. FERGUSON:  That's what I was going to get to.

2     BY MR. FERGUSON:

3     Q.  Are you aware that retirement plan information is exempt

4     from financial securities Regulation S-P, kind of the

5     confidentiality part?

6     A.  I'm not aware of that.

7     Q.  Can you go to Exhibit 11 please.  Can you go to page 5 of

8     7, top right-hand corner.

9          Do you see there under "manager comments" -- and you

10    were my manager; correct?

11    A.  Correct.

12    Q.  The ethics part of this rating is one of Rick's real strong

13    points.  Do you see that?

14    A.  I do.

15    Q.  Can you go to Exhibit 21.

16         This is a letter that was sent by MMA's attorney to my

17    then attorney at the time, Jamie Dupree.

18         Do you see on page 3, upper left-hand corner, second

19    paragraph down, about halfway through that paragraph:  MMA

20    sought to transition the sales and advisory duties of clients

21    who were nominally assigned to Mr. Ferguson to Mr. Stephens.

22    But Mr. Ferguson would continue in his client service roles for

23    those plans.  Do you see that?

24    A.  I see that.

25    Q.  Can you turn to Exhibit 25.

JA2VMARHredacted                Calder - cross

1  A.  Yup.

2  Q.  I apologize.  Exhibit -- I mislabeled an exhibit.  Exhibit

3  27, my apologies.

4  A.  Okay.

5  Q.  This is an email between myself, Kim Blackmore is on there,

6  Mariane Liebowitz, who is the chief compliance officer, MMA

7  Securities.

8          Do you see down below, my email to her:

9          Hi, Mariane.  I need clarification on something.  In

10  all the documents we've had around transferring my book of

11  business from SagePoint to MMA, I was told my book was

12  transferring to MMA, just like Bill and Ryan's, in my name.

13          First time I saw "house account" mentioned, I reached

14  out via email to inquire and make sure all my accounts were

15  still under my name for book and commissions.  And everyone

16  involved promised that my book was still my book, under my

17  name, with all commissions coded to me.

18          I've been informed this week that I was lied to, and

19  that all my accounts were taken from me, coded as house

20  accounts so that someone else can get the benefit of the book I

21  built.

22          Do you see that?

23  A.  I see it.

24  Q.  Do you see the date of that is August 23rd?

25  A.  I do.

JA2VMARHredacted                Calder - cross

1   Q.  When was it started, the transfer of these clients, from

2   SagePoint to MMA Securities?

3   A.  I think we determined it was midyear last year.

4   Q.  That's when it happened; correct?

5           Wasn't it true that it was started in 2017, because it

6   took a long time of planning --

7   A.  I don't know that.

8   Q.  Can we agree that moving an entire retirement plan services

9   division from one broker-dealer to another is a considerable

10  project?

11  A.  I don't know that.

12          THE COURT:  Well, do you know -- do you have an

13  understanding of how much before August 23rd of 2018 the

14  process was started?

15          THE WITNESS:  I do not.

16          THE COURT:  Would that have been Mr. --

17          THE WITNESS:  Peartree.

18          THE COURT:  Mr. Peartree?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.

21          So do you recall the first time that you became aware

22  of the transferring, that the transferring was going to occur

23  from SagePoint to MMA Securities?

24          THE WITNESS:  Yeah, some time last summer.

25          THE COURT:  Okay.

JA2VMARHredacted                Calder - cross

1          Do you have an understanding of how long that had been
2     in the works?
3          THE WITNESS:  I really don't.  I know it had been
4     talked about for a while.  I don't know how long the process
5     actually took.
6          THE COURT:  And when you say "talked about for a
7     while," when was the first time you became aware that it was
8     being floated as a possibility?
9          THE WITNESS:  Probably early in the year.
10         THE COURT:  Early in 2018?
11         THE WITNESS:  Yes.
12         THE COURT:  And was it your sense when you heard about
13    it, that it had been something that others had been discussing
14    or had been percolating somewhere else within the company?
15         THE WITNESS:  Mm-hmm.
16         THE COURT:  That's a yes?
17         THE WITNESS:  Yes.  Sorry.
18         THE COURT:  Okay.  Go ahead, Mr. Ferguson.
19         THE WITNESS:  I'd like to point something out --
20         THE COURT:  Sure.
21         THE WITNESS:  -- from this exhibit, if I could.
22         Rick is referring here under my name for book and for
23    commissions.  Rick was not paid on a commission basis.  Rick
24    was a salary plus a bonus.  So the commissions were house
25    commissions; they were used to pay for all the services we

1    have.  They were not attributable in any way to Rick's

2    compensation.  His compensation was based on his competencies

3    and his salary that we agreed to, plus a new business bonus of

4    25 percent one time for anything he helped generate.

5    BY MR. FERGUSON:

6    Q.  So to clarify your statement there -- and we're going to

7    talk about my commission a little bit more -- the income that

8    goes to MMA Securities, that's paid under -- was paid under my

9    name; correct?

10   A.  I don't know that.

11   Q.  Actually, I retract that.  It was paid under a house

12   account.  Okay.

13        But the income is paid from the client to MMA

14   Securities, who then repatriates it somehow over to MMA;

15   correct?

16   A.  I think so.

17   Q.  Can you go to Tab 22.  This is an email sent out by Jake

18   Daly.  This particular client is in there.

19        Action required:  Quick admin item.  The name of the

20   client.

21        This is the template letter that MMAS sent out to all

22   clients to tell them they were transferring from SagePoint

23   Financial to MMA Securities.

24        We see the first paragraph, about halfway through, it

25   kind of describes it:  SagePoint Financial has been responsible

1   for compliance oversight, licensing and registration, fee and

2   commission collections.

3        Skipping a sentence.  Rick is a registered investment

4   adviser with SagePoint Financial.

5        Down below, next paragraph:  We're changing our

6   broker-dealer.

7        Second sentence:  Rick's registration as a registered

8   investment adviser will change from SagePoint Financial to

9   MMAS.

10        Skip a sentence.  There will be no notice to employees

11   required or any material impact to the plan or your

12   participants.  This will only be administrative in nature.

13   Nothing about our team or the service you have come to expect

14   will be changing.

15   A.  Yes, I see that.

16   Q.  Where in this letter does it tell clients that their new

17   adviser will be Jeff Stephens?

18   A.  This letter was written before that determination was made.

19   Q.  We've kind of established, haven't we, that MMA was working

20   on Jeff Stephens for a while.

21        When did Jeff Stephens come on?

22   A.  I don't recall.

23   Q.  It was August 1st.

24   A.  So like I said, this letter was before he came on.

25   Q.  In the letter we saw earlier from MMA's attorney, it

JA2VMARHredacted              Calder - cross

1    declares:  It was MMA's intent the entire time as part of this

2    transition to move my book to someone else.  We'll just say

3    someone else; correct?

4    A.  I don't know that.

5    Q.  Go to Exhibit 20.

6              I want to stay here for just a second.

7              Does this letter give any indication at all to a

8    client that I will no longer be the investment adviser?

9    A.  Gives no indication of that.

10   Q.  So June 13, MMA was moving my book of business, along with

11   Bill's, along with Ryan's, removing all retirement securities

12   plans from SagePoint broker-dealer over to MMAS.  But at this

13   time, your position is MMA had no clue that they were going to

14   remove me?

15   A.  This is a snapshot at a point in time.  Jeff Stephens did

16   not begin employment until a month and-a-half after this, if

17   your date is accurate.  This -- business changes all the time.

18   This is an accurate assessment of the facts at that point in

19   time.

20   Q.  So this letter, as you just stated, is accurate.  I was

21   going to stay as the investment adviser.

22             Why were my accounts transferred to a house account,

23   from SagePoint to MMAS?

24   A.  You were still going to be the adviser on the account.

25   Q.  When did anybody talk to me about that?

JA2VMARHredacted                 Calder - cross

A.  I don't know that they did.  Nothing changed in your role.

Q.  Can you go to Exhibit 23.

       This was email from Diane Rosen, the same chain we've
looked at before.  First paragraph -- or second paragraph:

       My email to you dated Monday, January 28, outlined and
confirmed that the email that clients received from MMAS
regarding the move from SagePoint to MMAS was factual in nature
and I do not find that the email was misleading.

A.  Okay.

Q.  The next page we see another part of her email:

       I have concluded my research on this matter and have
had a number of conversations, as well as other communications,
with some of the parties involved.  I have not found any
evidence relative to your continued allegations that MMA
clients have been lied to or that we have been less than
transparent with our clients.  I have reviewed the emails, and
she goes on.

       Next paragraph down, not the quote, but the next
paragraph:  This is a true and accurate statement.  The change
was, in fact, administrative.  The team did not change.  And
based on our recent conversations, you contend that you do, in
fact, continue to service these clients.  Do you see that?

A.  Yes.

Q.  So MMA's position is that while I had this big book of
business that would pay out a lot of money, I said, No, I don't

JA2VMARHredacted              Calder - cross

1   want it.  I want to just be service and give that money and all

2   those clients to someone else?

3          THE COURT:  You're saying money and all those clients.

4   But what money were you getting -- what part of your

5   compensation was based upon -- and I apologize, I just --

6   because I think if I wait, I probably will forget.

7          What part of your compensation do you say was tagged

8   to the book of business that you had?

9          MR. FERGUSON:  Your Honor, there's another agreement

10  we're going to get to.

11         THE COURT:  Okay.  All right.

12         If we're going to get there, go ahead.  Go ahead.

13  BY MR. FERGUSON:

14  Q.  Can you go to Tab 28.  This is an email from me to

15  basically everyone in the operations and the compliance

16  department:  Kim Blackmore, Philip Cloos, Bill Peartree.

17         Do you see where I state at the end of the first

18  paragraph -- I'll just read it.

19         Hey, a related topic.  Can you please send me the

20  letter or verbiage you prepared for telling my affected clients

21  that Jeff Stephens is their new named fiduciary adviser and

22  whatever final forms are needed to complete this takeover.  I

23  can start contacting clients this week.

24         Do you see the date on there is December 20th, 2018,

25  the date of our meeting?

JA2VMARHredacted                Calder - cross

1   A.  Yes.

2   Q.  What do you think I meant when I said, I can start

3   contacting clients this week?

4            MR. WICKHAM:  Objection.

5   A.  I think --

6            THE COURT:  Well, do you have an understanding of what

7   Mr. Ferguson may have been referring to when he said, I can

8   start contacting clients this week?

9            THE WITNESS:  In my view of this, we had asked Rick to

10  contact his clients and explain the transfer and introduce Jeff

11  Stephens as the new adviser.

12           THE COURT:  Was that before the meeting -- you had had

13  that conversation before the meeting -- well, let me just

14  confirm.

15           THE WITNESS:  That was part of the December 20th

16  conversation.

17           THE COURT:  Okay.  So this email was sent at 11:26.

18  Do you recall what time you had that meeting?

19           THE WITNESS:  I don't.

20           THE COURT:  Do you know one way or the other whether

21  this email was prior to or after --

22           THE WITNESS:  I think I'm relatively certain it would

23  be after the meeting.

24           THE COURT:  All right.

25           Go ahead, Mr. Ferguson.

JA2VMARHredacted                    Calder - cross

1   BY MR. FERGUSON:

2   Q.  Jeff, isn't it true we had the meeting from 10 to 11 on

3   December 20th?

4   A.  I said I think it was before this email left, so --

5   Q.  Do you see the second paragraph?  Obviously I cannot stay

6   the named fiduciary adviser/registered investment adviser.

7            What do you think I meant by that?

8            MR. WICKHAM:  Objection.

9            THE COURT:  Well, do you have an understanding of --

10  well, do you have an understanding of what -- well, let me ask,

11  was it your understanding was -- was either MMA or MMA

12  Securities asking for Mr. Ferguson to remain the fiduciary

13  adviser on these accounts, even though Mr. Stephens was coming

14  in?

15           THE WITNESS:  I don't think they were asking him to do

16  that.

17           THE COURT:  Okay.  All right.

18           Go ahead.

19  BY MR. FERGUSON:

20  Q.  Jeff to that point, so can we go back to Item 23.

21  A.  Tab 23?

22  Q.  Or Tab 23.

23           So Diane Rosen's email again, on the second page

24  there:  I have not found any evidence relative to your

25  continued allegations that clients had been lied to, that we've

JA2VMARHredacted                Calder - cross

1    been less than transparent.  And she quotes:  Effective July

2    1st, Rick's registration -- we've already read that.

3           So what was the date of this?  This email exchange is

4    January.

5           So I guess I'm confused.  In item 28, the email, I

6    told MMA and MMA Securities, obviously I cannot stay the named

7    fiduciary adviser.  But Diane Rosen seems to be saying, Well, I

8    did my investigation, and you're still here, so good enough.

9    Is that correct?

10          MR. WICKHAM:  Objection.

11   A.  I don't read it that way.  I think Diane Rosen investigated

12   the allegations that you made and concluded they were

13   unfounded.

14   Q.  She said I don't see -- the allegations that the clients

15   have been lied to.  So in that email that was sent to clients

16   that we just looked at a minute ago, specifically said I was

17   going to remain as the adviser.

18   A.  It was a snapshot in time prior to us hiring Jeff Stephens.

19   Q.  I sat in on the planning meetings for transferring the book

20   of business, and we started in 2017.  I know Jake developed

21   that email around January 2018.  I know all of this was set in

22   motion.

23          How can MMA's position be, We had no intention of

24   removing Rick as the adviser, when all the clients came over

25   with me removed as the adviser?

JA2VMARHredacted          Calder - cross

1          THE COURT:  I'll sustain.

2          MR. WICKHAM:  Thank you, your Honor.

3          THE COURT:  Again, I'm not sure we established that

4    fact.  In other words, the clients, as I understand it, when

5    they were eventually transitioned, the idea they would be

6    transitioned to Mr. Stephens.

7          Let me ask this, Mr. Calder:  Did there come a time

8    when there were subsequent letters sent to clients telling them

9    that Mr. Stephens was going to be taking over?

10         THE WITNESS:  We asked Rick to introduce Mr. Stephens

11   to each one of the clients.  And those clients that elected to

12   stay over, yeah, they got notice.

13         THE COURT:  But I guess the question is, right, there

14   had been the prior letter which said the team is not going to

15   change.

16         THE WITNESS:  Right.

17         THE COURT:  Was there a follow-up letter -- other than

18   a call that may have been made by Mr. Ferguson, are you aware

19   of a follow-up letter that said -- whether it referred to the

20   prior letter or not, but that said, you know, when you

21   transition or now that you're with MMS Securities -- I don't

22   know exactly what the timing is, but that your new account

23   manager, whatever the phrase would be, would be Mr. Stephens.

24         THE WITNESS:  I don't know.

25         THE COURT:  Okay.

1            Go ahead, Mr. Ferguson.

2    BY MR. FERGUSON:

3    Q.  So, Jeff, we had a meeting, correct, on December 20th,

4    2018, that we've already established it was you, myself, Mara

5    was there in person, and Bill joined via conference call;

6    correct?

7    A.  Yes.

8    Q.  And did we discuss this situation at that time?

9    A.  We did.

10   Q.  Was I angry?

11   A.  You were.

12   Q.  Why was I angry, if I had been informed well in advance

13   that my clients were going to be taken from me?

14   A.  I don't know.

15            THE COURT:  The question would be at that time do you

16   recall Mr. Ferguson saying why he was angry?

17            THE WITNESS:  Yes.  He felt his book of business was

18   being, quote, stolen from him.  The commissions were -- he

19   wasn't getting the commissions.  He was very angry, very

20   excited.

21            My position there is he wasn't being paid by the book

22   of business.

23            THE COURT:  In other words, he wasn't getting

24   commissions.

25            THE WITNESS:  He's not getting commissions; he was not

JA2VMARHredacted                    Calder - cross

1    a commissioned salesperson.

2            THE COURT:  From your perspective -- well, who would

3    be responsible for determining Mr. Ferguson's compensation year

4    over year?

5            THE WITNESS:  I would do that in connection with Bill

6    Peartree.

7            THE COURT:  And in connection with that, would the

8    book of business be considered as part of Mr. Ferguson's

9    compensation?

10           THE WITNESS:  Book of business is always a

11   consideration, as long as a book of business is growing and

12   taking on new accounts.  But the dollar amount -- there's no

13   formula of a dollar amount of book of business means the salary

14   gets set here.  Rick's salary was set on the basis of his

15   experience, his contribution to clients, and the service he was

16   performing for them.

17           THE COURT:  But I guess the question I have is if --

18   do you know whether, as a legal matter, Mr. Ferguson could have

19   continued as the -- well, let me ask first as a practical

20   matter, if the business is going to be transferred to

21   Mr. Stephens, was it going to be Mr. Stephens who was then

22   responsible for providing the 401(k) meetings and doing those

23   things, or would it be -- could it be someone else at the

24   company?

25           THE WITNESS:  It could be somebody else.

JA2VMARHredacted                Calder - cross

1              THE COURT:  Okay.

2              And was that -- was that the plan with regard to

3    Mr. Ferguson?  In other words --

4              THE WITNESS:  The plan was to have Mr. Ferguson

5    continue in his service role and support Jeff with the clients.

6              THE COURT:  So then Mr. -- from your perspective, was

7    it that the clients were being transferred on paper in order to

8    support Mr. Stephens' compensation, but otherwise the idea is

9    he wasn't really going to be involved with those --

10             THE WITNESS:  No, he was going to be involved with

11   those accounts.

12             THE COURT:  All right.

13             THE WITNESS:  But we have a -- our service teams are

14   built typically with a producer at the top of the service team,

15   then we have a client service executive, we have client

16   managers, we have retirement analysts down in San Diego.  They

17   all work on the team.  The only person who's paid as a portion

18   of the commission is the salesperson.

19             Then we look at the size of the book of business that

20   the client people service, regardless of whether or not it's

21   coded to them, and they are paid proportionally for the size of

22   book of business that they service and the complexity of the

23   accounts and the service to the team and other factors.

24             THE COURT:  Okay.  And again, at this meeting on the

25   20th, was it the understanding from everybody who was at the

JA2VMARHredacted              Calder - cross

1    meeting that although Mr. Stephens was going to -- accounts

2    would be transferred to Mr. Stephens in his name, that

3    Mr. Ferguson -- putting aside whether or not -- let's say he's

4    not going to be the fiduciary, but that he would continue to

5    service those clients?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.

8              Go ahead, Mr. Ferguson.

9    BY MR. FERGUSON:

10   Q.  Jeff, do I have a fiduciary duty to my clients?

11   A.  I don't know.

12   Q.  Do 401(k) investment advisers, to your knowledge, have any

13   kind of a duty to their clients?

14   A.  I think all employees of MMC have duties to their clients.

15   Q.  And I apologize, I specifically meant aren't all 401(k)

16   clients covered by ERISA?

17   A.  Yes.

18   Q.  Which includes a specific duty of the adviser, a fiduciary

19   duty.

20   A.  I'm unaware of that.

21   Q.  Just a moment ago you had said so the plan was that I would

22   stay on as the investment fiduciary adviser to these clients.

23   A.  No, the plan was that you would stay on as a client service

24   executive.  You made it very clear to us that you would not be

25   a fiduciary or an adviser to the clients.

JA2VMARHredacted                Calder – cross

1    Q.  So I really wouldn't be doing anything.  If I couldn't talk

2    about investments with these clients, which would be the

3    fiduciary duty, was I just going to get to sit around or what

4    was my duty going to be?

5    A.  No, there's plenty to do.  We have clients who need changes

6    to their plans, we have clients who need to evaluate different

7    third-party administrators, we have open enrollment meetings

8    that need to happen.  There's never a shortage of client

9    service work in our business.

10   Q.  And when was I told this?

11   A.  I don't know.  You signed an agreement to be a client

12   service executive.

13   Q.  I'm sorry.  When was I told that all the clients I had

14   built up under my book were going to be taken away and I was

15   going to be demoted to this other position?

16   A.  You were not demoted, you were in a position that you

17   requested.  You were given a raise.  You were also given an

18   incentive bonus; it was increased at the last time that we did

19   that.  This was not a demotion; this was merely a reaction to

20   your request.

21   Q.  So just to clarify, under Item 28, when I stated to MMA and

22   MMAS, Obviously I cannot stay the named fiduciary adviser, MMA

23   and MMAS, their position is that I was going to stick around?

24   A.  Absolutely.

25   Q.  Can you go to Item 29 please.

JA2VMARHredacted                  Calder - cross

1          Do you recognize this?  This is an email I sent to

2     myself the same day at 1:15.

3     A.  Okay.

4     Q.  So these were the notes I took during our meeting, and then

5     I emailed them to myself after the meeting to memorialize them.

6     It doesn't mean that you agree with them; correct?

7     A.  Yes, it's correct that I don't agree with them, yes.

8     Q.  These are -- I sent this to myself.  Obviously I'm taking

9     notes on our meeting.

10    A.  Right.

11              THE COURT:  Well, that's a question I actually have.

12              Did you take handwritten notes?

13              MR. FERGUSON:  Yes, your Honor.

14              THE COURT:  And have they been produced?

15              MR. FERGUSON:  I didn't keep them.  I put them in here

16    and trashed them.

17              THE COURT:  Okay.

18              All right.  Go ahead.  Next question.

19    BY MR. FERGUSON:

20    Q.  Do you see Item 4, right?  I stated:  Bill stated and

21    confirmed that he and others did business planning well prior

22    to the broker-dealer change that included knowingly preparing

23    paperwork for me and my clients to sign that was materially

24    different from the paperwork he and Ryan Stover and applicable

25    clients signed knowingly, telling me and my clients that the

1  paperwork for me and my clients was exactly the same as the

2  paperwork for he and Ryan Stover.  And the intent from the

3  beginning was to remove me as the adviser from my clients.

4  A.  Rick, what I know of this is that this is your point of

5  view.

6  Q.  Correct.  That's all I'm asking.

7           THE COURT:  Well, let me ask you this:  Ryan Stover, I

8  take it, was another person whose business -- book of business

9  was being moved from SagePoint to MMA Securities?

10          THE WITNESS:  Yup.

11          THE COURT:  Am I correct that Ryan Stover's book of

12  business wasn't being transferred over to Mr. Stephens, or was

13  it?

14          THE WITNESS:  It was not.  And Ryan Stover's a

15  producer.  So his producer coding within SagePoint, he was

16  coded that revenue when he went over to MMA Securities, because

17  we paid producers based on the commission.  So we had to track

18  them.

19          THE COURT:  And then was there another person -- I

20  thought there was another -- was there another individual whose

21  business was also transferred?  Was there -- I thought there

22  were two.

23          MR. FERGUSON:  Bill Peartree, Ryan Stover, and myself.

24  We were the only three.

25          THE COURT:  Okay.  So Mr. Peartree had his own book of

JA2VMARHredacted                    Calder - cross

1    business that was transferred over to MMA Securities; is that

2    correct?

3              THE WITNESS:  That's correct.

4              THE COURT:  And was Mr. Peartree, was he a producer?

5              THE WITNESS:  He is.

6              THE COURT:  Okay.

7         So was the plan because Mr. Ferguson was not a

8    producer, was that the reason why his book was transferred over

9    to Mr. Stephens, so that he could -- because he was going to, I

10   guess, be a producer and, therefore, there wouldn't be a need

11   to try and find his compensation somewhere else?

12             THE WITNESS:  Correct.

13             THE COURT:  Okay.

14        All right.  Go ahead, Mr. Ferguson.

15   BY MR. FERGUSON:

16   Q.  Jeff, do you see the next page on Item 10?  And Jeff, the

17   only reason I'm pointing this out is to put my frame of mind

18   for you.

19        Do you see there, as I understood this meeting I

20   attend, we discussed that the final step is going back to

21   clients to tell them that Jake lied to them, and the paperwork

22   they signed actually removes me as the adviser, and then was

23   the intent all along.  Jeff looked disgusted, Mara concerned.

24   Bill stated he would handle if I'm not willing to.  His exact

25   words, craft a story so that the clients forget they were lied

JA2VMARHredacted                Calder – cross

1    to.  Mara immediately stated that's not what Bill meant, danced

2    around it, and got Bill to restate his words, saying something

3    to the effect that clients were not lied to, and put this in

4    the proper perspective.  Jeff C. was quiet.

5            MR. WICKHAM:  Your Honor, you know, it sort of goes

6    beyond hearsay.  I mean it's his rendition, his fanciful

7    rendition of this *ad hominem* attacks on multiple individuals.

8    It's getting a little bit over the top, your Honor.

9            THE COURT:  This is what I'm going to say with regard

10   to this meeting; it's something I already planned on asking

11   for:

12           I'd like to get the notes of everybody who was

13   involved in this meeting.  I'd like to get -- including emails

14   between those and among those folks after the meeting with

15   regard to what their discussion was and to the extent that they

16   are talking about what occurred at the meeting.

17           In particular, if they're handwritten notes, I'd like

18   to see those, in addition to any documentation, I would

19   imagine, that Ms. Crain, because she's HR, may have documented

20   this in more than one way.  So I'd like to get that also.

21           And I'd like to get a declaration or affidavit from

22   Ms. Crain with regard to this meeting.

23           MR. WICKHAM:  Happy to do so, your Honor.

24           THE COURT:  And again, I'm not saying -- by asking for

25   it, I'm not saying that it materially will make a difference to

JA2VMARHredacted              Calder - cross

1    me one way or the other in terms of what I need to rule on.

2    I'm just trying to get a sense of what transpired at that

3    meeting and also to sort out credibility, quite frankly.

4              MR. FERGUSON:  Your Honor, there is a point --

5              THE COURT:  One second.

6              MR. WICKHAM:  We did supply a declaration for

7    Ms. Rosen principally for the purpose of Mr. Ferguson being

8    admonished not to send client information to his personal email

9    accounts.  His message later claims that he didn't and, in

10   fact, we know that his statement on that subject is untrue.

11             But it so happens that Ms. Rosen is MMA compliance, to

12   which Mr. Ferguson complained about this, using fairly colorful

13   language in his accusations of Mr. Calder and Mr. Peartree and

14   Ms. Crain; and that MMA compliance, having investigated his

15   assertions that are summarized in that summary of the December

16   20th meeting, and concluded that his assertions were unfounded.

17   So he has assertions, he submitted it to the correct place, MMA

18   compliance.  MMA compliance investigated and determined that

19   they were unfounded.

20             So we'll happily, to the extent that they exist,

21   locate materials from Ms. Crain, from Mr. Peartree and

22   Mr. Calder, that talk about that meeting.  It's just that it's

23   his accusations, his misinterpretation, and everything else.

24             THE COURT:  I get that.

25             Sometimes there could be five people at a meeting, and

JA2VMARHredacted          Calder - cross

people take away from it different things.  And so I'm not at

all saying -- and I don't know exactly -- I apologize, I have

not read Ms. Rosen's -- her declaration, and I don't think it

speaks necessarily to what she actually did in connection with

the investigation.

MR. WICKHAM:  No, I don't think it details what she

did.

THE COURT:  So I don't know one way or the other

whether she spoke to all the people who were at this particular

meeting.  It may not have been relevant to her whether she

reviewed the notes of the folks who were at this particular

meeting, whether she interviewed the people, or whether it was

just literally reviewing emails.  I don't know.

And again, I'm not in any way saying that once I get

this material, that it will be relevant to my consideration of

issues of confidentiality, issues relating to arbitration or

not arbitration, issues relating to what materials -- other

materials there are.  But I'm just trying to close the loop in

my own mind.  Because it did occur to me in part -- and again,

part of it is based upon what -- the assertions that

Mr. Ferguson has made in his interpretation of this meeting.

So I just want to get a sense of --

MR. WICKHAM:  What I might suggest and what I don't

think has been asked yet is simply for Mr. Ferguson to ask

Mr. Calder, What was said at this meeting?  So we don't have to

JA2VMARHredacted                 Calder - cross

1    have Mr. Ferguson, sort of, rereading, you know, his *ad hominem*

2    attacks and simply have the witness who's here, who's prepared

3    to testify, and let him say what was said.

4           THE COURT:  That's fine.  Let me just ask, because am

5    I correct that in the affidavit you submitted, this meeting was

6    not part of the affidavit?

7           THE WITNESS:  I don't think it was.

8           THE COURT:  Okay.  So what is your -- first of all,

9    how long -- do you recall about approximately how long the

10   meeting was?

11          THE WITNESS:  It was less than an hour and more than a

12   half hour.

13          THE COURT:  Okay.  Who was the person who was in

14   charge -- who took the lead role?

15          THE WITNESS:  Bill took the lead role on the phone.

16          THE COURT:  Okay.  And had he already -- he, you, and

17   Ms. Crain, had there already been a discussion prior to

18   Mr. Ferguson coming into the room?

19          THE WITNESS:  There had.  We wanted to discuss the

20   change in adviser.  We knew Rick was upset by this.  We wanted

21   to address the concerns and talk about how we're going to serve

22   the clients going forward and what we wanted to have happen

23   from our point of view.

24          THE COURT:  Okay.  And had there been, prior to the

25   meeting, talking points or anything like that, or an email

JA2VMARHredacted                    Calder - cross

1    correspondence laying out that this is what -- where I think we

2    need to go during the meeting?

3            THE WITNESS:  I don't specifically recall, but I don't

4    think so.

5            THE COURT:  Okay.

6            And so how was it determined that -- was it just

7    hierarchal, in other words, that Mr. Peartree would take the

8    lead on this?

9            THE WITNESS:  Yes.

10           THE COURT:  Do you know whether Mr. Peartree had

11   communications with Ms. Crain outside of your presence, in

12   other words, where you weren't there, about this and how to

13   approach it?

14           THE WITNESS:  I don't know that he did, but I would be

15   very surprised if he did.

16           THE COURT:  Okay.

17           So was there any discussion or contemplation, as far

18   as you were concerned -- well, but wasn't this -- this was also

19   the final warning meeting, right?

20           THE WITNESS:  That's a separate meeting.

21           THE COURT:  So separate meeting on the same day.

22           THE WITNESS:  I think it was the same day.

23           THE COURT:  Okay.  So when was the final warning

24   meeting.

25           THE WITNESS:  I don't recall.

JA2VMARHredacted                Calder - cross

1          Was it the same day?  Rick's answering the question.

2     It was the same day.

3          THE COURT:  Okay.

4          Were you present during that meeting also?

5          THE WITNESS:  I was.

6          THE COURT:  Do you recall whether it was before or

7     after or do you not have a recollection?

8          THE WITNESS:  I don't have a recollection.

9          MR. FERGUSON:  That was the same meeting.  The

10    original intent of the meeting was -- there's an email in there

11    somewhere.  Jeff and Mara reached out to me, We want to discuss

12    this final letter.  And I refused to sign the final letter

13    because it said, Well, you accused people of lying.  And my

14    version, admittedly, is that, Hey, obviously you switched them

15    to a house account and nobody told me.  I felt that meant I was

16    lied to.  So we got into talking about this whole situation.

17         THE COURT:  Okay.  But when you say -- is it one of

18    your exhibits that -- in other words, setting up the meeting

19    that it was about the final warning?

20         MR. FERGUSON:  Actually, there is -- if I can

21    continue, it's actually -- I just noticed it's in the next

22    exhibit.

23         THE COURT:  Just say what exhibit --

24         MR. FERGUSON:  Exhibit 30.

25         THE COURT:  30?  Okay.

JA2VMARHredacted                Calder - cross

1          MR. FERGUSON:  In the very last page, there's an email

2    from Mara Crain on January 3rd:  Hello, Rick.  As we discussed

3    on Thursday 12/20, I need a signed copy of the final warning

4    that Jeff Calder delivered to you during our meeting on that

5    day.

6          THE COURT:  Okay.  But this is -- I'm sorry.  So

7    Exhibit 30 though, is it missing -- missing the top.  In other

8    words, I don't know what the date is.  In other words, your

9    email in response is January 3rd, but the top doesn't have --

10   and it would appear, at least in the version I have --

11         MR. FERGUSON:  No, your Honor, the last page.  Very

12   last page is from Mara Crain at 8:55 a.m. on January 3rd.  And

13   that's where she's saying the intent of that meeting was that

14   Jeff brought this final warning.

15         THE COURT:  Okay.  But -- okay.  So there wasn't --

16   this isn't an email in advance of that meeting saying, We

17   intend to discuss the final warning.

18         MR. FERGUSON:  There is another one.  I'll have to

19   look for it, your Honor.

20         THE COURT:  That's all right.

21         Okay.  I'm sorry.

22         So you were saying about Mr. Calder -- so do you

23   recall -- do you have a recollection that the meetings were --

24   the final warning meeting and the discussion about the

25   transition of Mr. Ferguson's clients over Mr. Stephens was

1    happening all at the same time?

2             THE WITNESS:  Well, I don't recall that it all

3    happened at the same time, but I'm relatively certain it was an

4    unpleasant morning for me.

5             THE COURT:  I guess I mean -- by "same time," I mean

6    the same meeting.

7             THE WITNESS:  Well, it would have separate content.

8    We would have done our final warning, and then we would have

9    moved on to the next subject.

10            THE COURT:  Is that the sequence that you recall?

11            THE WITNESS:  I think so.

12            THE COURT:  Okay.  I mean -- all right.  All right.

13            MR. WICKHAM:  Can we ask him what was said?

14            THE COURT:  Yes, that's what I was --

15            MR. FERGUSON:  Your Honor, counsel's trying to use up

16    time.

17            THE COURT:  No, no.  Well, I think I need to know

18    them.  And you're going to testify about this meeting, I take

19    it, right?

20            MR. FERGUSON:  Well --

21            THE COURT:  And about your interpretation of it.

22            MR. FERGUSON:  The only problem is we haven't even

23    gotten to a lot of the follow-up emails, and the fact that --

24            THE COURT:  A lot of the what?

25            MR. FERGUSON:  Follow-up emails.  And there's a

JA2VMARHredacted            Calder - cross

contract that supersedes all the contracts we've looked at that

is the actual governing contract of my employment.

THE COURT:  Okay.  So why don't we do this:  Why don't

we -- we'll deal with that in a moment if we need to.  And

we're going to end at 6 no matter what.  So if we need to -- if

Mr. Calder is going to still be examined tomorrow, we'll do

that at 9:30.

So first, Mr. Calder, do you have a recollection --

because the sequence, as you remember it, was the final warning

meeting.  And so who took the lead on that?

THE WITNESS:  The lead on the final warning meeting

was taken by Mara, as far as drafting the documents, making

sure the documents were compliant with what we were trying to

do, getting legal review.

And then Mara and I sat down with Rick.  She opened

the meeting.  I explained how we couldn't work with colleagues,

we couldn't be calling people liars, thieves, we couldn't be

making broad accusations against colleagues, bombastic emails,

couldn't stand up to me and tell me when I'm meeting with him

that I had been F'ing with him for the last five years.

THE COURT:  Okay.  But let me ask this, just so that I

understand it.  This final warning was basically part of the

whole issue relating to the transition.

THE WITNESS:  The final email is based on a body of

work.

JA2VMARHredacted                Calder - cross

1           THE COURT:  No, no, I understand that there were prior

2  interactions that Mr. Ferguson is alleged to have had where

3  there were warnings, I don't know how many, related to those

4  prior.

5           But with regard to the final warning, it was, sort of,

6  in relation to what Mr. Ferguson was doing and saying to

7  yourself in referring to Mr. Peartree, I guess that he was

8  deceived or lied to or what have you, as well as other folks.

9  It was related to those comments.

10          THE WITNESS:  Yes.

11          THE COURT:  And so as part of that, do you know,

12 did -- so Ms. -- I apologize -- Crain?

13          THE WITNESS:  Crain.

14          THE COURT:  Ms. Crain had developed a final warning

15 document.

16          THE WITNESS:  Yes.

17          THE COURT:  Is that something you were involved in the

18 preparation?

19          THE WITNESS:  I think I reviewed it.  But we go with

20 HR and legal.

21          THE COURT:  All right.

22          So let's start with the final warning meeting.  What

23 is your recollection of what was said during that meeting?  And

24 I'm sorry, was Mr. Peartree also part of that meeting?

25          THE WITNESS:  I don't believe he was.

1        THE COURT:  Okay.  So he hasn't called in yet.

2        THE WITNESS:  No.

3        THE COURT:  It's yourself, Ms. Crain, and

4   Mr. Ferguson?

5        THE WITNESS:  I believe so.  I don't think Bill was on

6   the phone at that point in time.

7        THE COURT:  Okay.

8        THE WITNESS:  I'm not positive.

9        THE COURT:  All right.  Go ahead.

10        THE WITNESS:  Well, we had developed a final warning

11   letter, and we delivered it to Rick.  We ended by saying, If

12   these behaviors happen again, your employment will be

13   terminated.

14        THE COURT:  And that's part of the letter?

15        THE WITNESS:  Yes.

16        THE COURT:  So but in the meeting itself, had the

17   letter already been transmitted to Mr. Ferguson prior to that

18   meeting?

19        THE WITNESS:  I don't know if he had it in advance or

20   not.

21        THE COURT:  So when you came into the meeting -- first

22   of all, whose office was it in?

23        THE WITNESS:  It was in Rick's office.

24        THE COURT:  Okay.

25        So you and Ms. Crain came to Rick's office.

1            THE WITNESS:  We did.

2            THE COURT:  You sat down.  What's the first thing that

3    happened?  Did someone hand Mr. Ferguson the -- what's your

4    recollection of what happened?

5            THE WITNESS:  My recollection is we went in and we

6    said, We have to have this discussion because this is a final

7    warning; putting you on written notice.  Gave the written

8    notice, reviewed it.  Told Rick that he had to sign it and

9    return it.  And told him that any further behavior like this

10   would result in termination, as would not signing the letter.

11           THE COURT:  Okay.

12           Was he given a time frame within which --

13           THE WITNESS:  I believe he was.

14           THE COURT:  Okay.

15           And the letter itself -- and I apologize, it may be in

16   here.

17           THE WITNESS:  I don't know that it is.  I'm not sure.

18           THE COURT:  All right.

19           At some point if I could just get a copy of that.

20           MR. WICKHAM:  We'll see if we can't get a hold of it

21   tonight, your Honor.

22           THE COURT:  Okay.  You know, it can be in connection

23   with Ms. -- since I made a request with regard to Ms. Crain, it

24   can be part of whatever materials you give me in connection

25   with her.

 1          MR. WICKHAM:  Okay.

 2          THE WITNESS:  She'll have it.

 3          THE COURT:  She can -- as part of her affidavit or

 4     declaration.

 5          MR. WICKHAM:  We will, your Honor.

 6          THE COURT:  Okay?

 7          All right.  Do you have a recollection, when the

 8     letter is presented to Mr. Ferguson, is he just told to read it

 9     or does someone walk him through the letter bit by bit?

10          THE WITNESS:  We walked through it.

11          THE COURT:  Was that yourself?

12          THE WITNESS:  That would have been Mara taking him

13     through.

14          THE COURT:  Okay.  So Ms. Crain, sort of, walks

15     through each of the -- walks through the warning.

16          Do you recall whether there was during -- during that

17     process, as she was walking through it, was there back and

18     forth going -- depending upon what she was pointing out?

19          THE WITNESS:  I don't recall.

20          THE COURT:  Okay.

21          Did you take any notes during this meeting?

22          THE WITNESS:  I did not.  I typically don't take notes

23     in meetings.

24          THE COURT:  Okay.

25          Do you know whether Ms. Crain was taking notes?

JA2VMARHredacted                    Calder - cross

1           THE WITNESS:  I'm not sure if she was or not.  She

2      usually documents meetings.

3           THE COURT:  Either contemporaneous, in other words, at

4      the meeting, or at some point thereafter?

5           THE WITNESS:  Correct.

6           THE COURT:  Okay.

7           So what else do you recall being said at that meeting?

8           THE WITNESS:  Well, we were talking about the fact

9      that we were going to transfer the investment adviser role from

10     Rick to Jeff Stephens.

11          THE COURT:  This was part of --

12          THE WITNESS:  This was part of the next meeting.

13          THE COURT:  Oh, the next meeting.

14          But let's just finish -- I want to just close out on

15     the final warning meeting.

16          Was there any discussion about the transfer that you

17     recall, the transfer of the book of business during the final

18     warning meeting?

19          THE WITNESS:  No.

20          THE COURT:  Besides Ms. Crain walking through the

21     final warning notice or letter, do you recall, did you say

22     anything?

23          THE WITNESS:  I did.

24          THE COURT:  And what do you recall saying?

25          THE WITNESS:  Well, we sort of live a company culture

JA2VMARHredacted            Calder - cross

where we have to respect each other.  It's one of our key, kind

of, employee traits is colleagues and respect.  And Rick had

not demonstrated that.  Rick had demonstrated name-calling

accusations, things were investigated, he was never satisfied

with the investigation; so whoever was doing the investigating

became part of the problem.  And so he was treating our

colleagues in a fashion that we simply cannot live with.  And

we talked through that.

THE COURT:  So you articulated that.

THE WITNESS:  Absolutely.

THE COURT:  Your view.

THE WITNESS:  Yes.

THE COURT:  And in connection with that, was there a

back-and-forth, and did Mr. Ferguson respond?  What do you

recall Mr. Ferguson saying?

THE WITNESS:  I don't recall that he said much.

THE COURT:  Okay.

Do you recall anything else that was said during that

meeting?

THE WITNESS:  I do not.

THE COURT:  Okay.

Now, have you seen at any point in time, other than

the documentation that Mr. Ferguson has provided, anyone else

who provided documentation concerning that meeting?  And by

"documentation," I mean someone who wrote an email or a report

JA2VMARHredacted                Calder - cross

1    or their, sort of, take on the meeting.

2            THE WITNESS:  I may have.  Mara may have memorialized

3    it and copied me, but I'm not certain that she did.

4            THE COURT:  Okay.

5            You just don't remember one way or the other.

6            THE WITNESS:  I don't remember.

7            THE COURT:  Okay.

8            And so is there anything else that you can recall

9    about that meeting?

10           THE WITNESS:  No.

11           THE COURT:  Do you recall ever having a conversation

12   with Ms. -- and did the meeting regarding the transition occur

13   immediately after the final warning meeting?

14           THE WITNESS:  Shortly thereafter, I think.

15           THE COURT:  When you say "shortly thereafter," was

16   it --

17           THE WITNESS:  I think it was in the same morning.

18           THE COURT:  Okay.  All right.

19           Maybe you took a break and then -- like, where is your

20   office compared to Mr. Ferguson's.

21           THE WITNESS:  In San Francisco.  I sort of float

22   between offices.  And that day I was probably on the other side

23   of the office, not very close.

24           THE COURT:  Okay.  I'm just trying to figure out

25   whether it was -- how close in time they were.  But same

JA2VMARHredacted                Calder - cross

1    morning, in any event.

2              THE WITNESS:  Right.

3              THE COURT:  Prior to the final warning meeting, do you

4    recall -- did you have any discussion with Ms. Crain about the

5    sequencing of the meetings?  In other words, that after the

6    meeting we're going to have the transition meeting?

7              THE WITNESS:  I don't specifically recall that, but

8    I'm certain that if she was in that meeting, that we made it

9    part of the day's plan.

10             THE COURT:  Okay.

11             Was there ever discussion or thought that maybe -- of

12   having -- splitting the meeting up by more time than just

13   having it the same morning?

14             THE WITNESS:  I sure had that thought.  This was a

15   festering issue that we needed to deal with.  And I'm kind of

16   the belief if you have a festering issue, it doesn't get better

17   until you address it.

18             THE COURT:  And by "festering issue," what are you

19   talking about?

20             THE WITNESS:  Oh, Rick's concern about the clients and

21   the transition.  We needed to have that meeting that day.

22             THE COURT:  Okay.  All right.

23             And when you said you had the thought about how the

24   sequence, what did you mean by that?

25             THE WITNESS:  Well, I knew the first meeting was going

JA2VMARHredacted                Calder – cross

1    to be adversarial.  That was a given.

2           And the second meeting, based on everything that I had

3    seen, based on the allegations, based on the message we had to

4    delivery, I felt was going to be adversarial as well.

5           And if I could have split it up by a couple of days

6    without letting the issue fester, that probably would have been

7    better.  But in my experience, it's usually best to take things

8    on straight up.

9           THE COURT:  And when you say "fester," was there stuff

10   that you think was going to happen -- stuff that you needed to,

11   sort of, address immediately with regard to the transition?

12          THE WITNESS:  Yes, we needed to get client

13   communications and meetings set up to introduce Jeff Stephens.

14          THE COURT:  Okay.

15          You know, it's 6 o'clock now.  So this is what we're

16   going to do:  We're going to come back tomorrow at 9:30.  I'm

17   going to ask you to continue to tell me about the second

18   meeting, in other words, the transition meeting, what you

19   recall about what was said.  And then, Mr. Ferguson, you can

20   complete your examination.  Then we'll hear from you.

21          Obviously, as I mentioned, I don't necessarily -- you

22   can point out places in your affidavit that you want me to

23   focus on in terms of my ruling.  Obviously I'm going to review

24   your affidavit.

25          If there's amplification you want to give, I'm fine

1    with that.  I just don't want to have repetitive things.

2                So you can step down for the day.

3                Again, you're still on cross-examination.  So you

4    can't have any substantive conversations.  And I'll probably

5    broaden it with either counsel here, Mr. Wickham or any

6    in-house attorneys with regard to your cross-examination.

7                So we can see you tomorrow at 9:30.

8                The way I plan on -- just so that everybody knows,

9    because I've never had this situation before, but I will --

10   Mr. Ferguson, I will allow you to basically provide a narrative

11   of what your testimony is, again, not being repetitive, and

12   then I'll allow cross-examination.

13               And Mr. Wickham, are you going to be doing the

14   cross-examination?

15               MR. WICKHAM:  Briefly.

16               THE COURT:  Okay.  All right.

17               And so we'll power through as quickly as we can.

18               Again, I don't -- with the understanding that there's

19   still some materials that I would like to get, which I've made

20   requests for.  And obviously you should meet and confer with

21   Mr. Temkin about the additional materials that where there are

22   subpoenas that are outstanding, see if you can come to some

23   sort of an understanding.

24               MR. WICKHAM:  We were going to meet and confer with

25   counsel for Teros once we concluded these -- this hearing.

JA2VMARHredacted                Calder – cross

1         THE COURT:  All right.

2         MR. WICKHAM:  One request I'd have.  Can we maybe put

3    a time limit on the completion of Mr. Calder's testimony?

4    We've been going quite some time.

5         THE COURT:  Sure.  Look, I didn't have a clock on you

6    and I don't have a clock --

7         MR. WICKHAM:  I'm just suggesting.

8         THE COURT:  No, no.  And look, what I'm saying is

9    we're going to finish tomorrow.

10        But let me ask -- you can step down, if you'd like,

11   Mr. Calder.

12        THE WITNESS:  Thank you.

13        (Witness steps down)

14        THE COURT:  So, Mr. Ferguson, how much -- and I'll ask

15   you again tomorrow, because obviously I'd like you to go

16   through your materials and figure out what things you want to

17   ask.

18        MR. FERGUSON:  Your Honor, maybe 45 minutes.  I've

19   pared a lot of it out.  I just want to make two big points.

20   And your Honor, I would point out I did almost eight hours of a

21   deposition.

22        THE COURT:  I recognize that.  Although some of the

23   things you may be asking about Mr. Calder may not have personal

24   knowledge of.  Obviously if you want to point out things,

25   you're entitled to do that, but okay.

JA2VMARHredacted                Calder – cross

1                   So we'll start tomorrow at 9:30, all right?

2                   MR. WICKHAM:  Thank you, your Honor.

3                   THE COURT:  Thank you very much.

4                   We'll stand adjourned.

5                   (Adjourned to October 3, 2019 at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

JEFFREY CALDER

Direct By Mr. Wickham  . . . . . . . . . . . .17

Cross By Mr. Ferguson  . . . . . . . . . . . 109