JA3VMARHredacted

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MARSH & MCLENNAN AGENCY LLC,

4                  Plaintiff,

5            v.                          19 CV 3837 (VSB)

6    ELMER "RICK" FERGUSON,

7                  Defendant.            EVIDENTIARY HEARING

8    ------------------------------x
                                        New York, N.Y.
9                                       October 3, 2019
                                        9:47 a.m.
10
     Before:
11
                     HON. VERNON S. BRODERICK,
12
                                        District Judge
13
                          APPEARANCES
14
     LITTLER MENDELSON
15        Attorneys for Plaintiff
     BY:  DOUGLAS A. WICKHAM
16        KEVIN K. YAM
          DANIELLA ADLER
17
     ELMER "RICK" FERGUSON, pro se
18
     MOUND COTTON WOLLAN & GREENGRASS
19        Attorneys for ADR Provider Teros Advisors LLC,
           Interested Parties Triad Advisors LLC,
20          and Resource Investment Advisors
     BY:  BARRY R. TEMKIN
21

22

23

24

25
```

JA3VMARHredacted                Calder - cross

1          (Hearing resumed)

2          THE COURT:  Mr. Calder, you can step up please.

3   JEFFREY CALDER, resumed.

4          THE COURT:  Okay.  Mr. Calder, I just remind you that

5   you're still under oath.

6          Have a seat.  Make yourself comfortable.

7          And I think we're about -- we left off yesterday after

8   discussing the initial final warning meeting.  And then, as I

9   understand it, there was a subsequent meeting; is that correct?

10          THE WITNESS:  That's correct.

11          THE COURT:  Relating to the shift of the business over

12   to Mr. Stephens?

13          THE WITNESS:  Correct.

14          THE COURT:  And I think you were saying -- well, do

15   you recall how much time elapsed between the two meetings?

16          THE WITNESS:  I don't think there was much time

17   between the two meetings.

18          THE COURT:  Okay.  And so who was at the meeting?  My

19   recollection is Mr. Stephens -- excuse me, Mr. Peartree was on

20   the phone.

21          THE WITNESS:  Correct.

22          THE COURT:  Was there a dialed number he dialed into

23   Mr. Ferguson's office?

24          THE WITNESS:  I don't recall whether we set up a

25   conference call or whether he called in, but it was using

JA3VMARHredacted                    Calder - cross

1     Mr. Ferguson's phone.

2                 THE COURT:  Okay.  And did you -- I may have asked

3     this, I apologize.  Did you have an agenda or talking points?

4                 THE WITNESS:  We did not have an agenda.  Bill kind of

5     led the meeting.

6                 THE COURT:  I'm sorry, kind of what?

7                 THE WITNESS:  We did not have an agenda.  Bill led the

8     meeting.

9                 THE COURT:  All right.

10                So why don't you describe what was said during that

11    meeting.

12                THE WITNESS:  So during the meeting, we talked about

13    the plan to move Mr. Ferguson's accounts, where he was a

14    registered adviser on them, to Jeff Stephens.  Rick was very

15    strong in saying some of those accounts will not go, will not

16    do that, we will not accept that.

17                And so we reiterated that that was the plan; we were

18    going to do that.  And that we would -- we wanted to know which

19    clients had a problem with that, and we wanted to reach out to

20    them and talk to them, find out what the issues were and

21    present alternatives.

22                THE COURT:  And when you say "alternatives," was there

23    a discussion about what those alternatives could be?

24                THE WITNESS:  Sure.  Not in that meeting, but we knew

25    the alternative to that would be that Bill Peartree would come

JA3VMARHredacted                Calder - cross

1   and be the primary contact for those accounts.

2              THE COURT:  Okay.  And was there ever any

3   consideration of continuing Mr. Ferguson with those accounts?

4              THE WITNESS:  There was not, because Mr. Ferguson had

5   stated that he would not continue as a fiduciary on those

6   accounts.

7              THE COURT:  So, in other words, even if Mr. Peartree

8   was going to take over, the business would still be allocated

9   to Mr. Stephens?

10             THE WITNESS:  If Mr. Peartree took it over, it would

11  be allocated to Mr. Peartree.  So the accounts would be

12  coded -- the accounts that didn't want to have Mr. Stephens as

13  the fiduciary, but accepted Mr. Peartree as their fiduciary,

14  those would be coded to Mr. Peartree.  He's a producer.  So he

15  would get credit for those accounts.  And the accounts that Mr.

16  Stephens has, he would get credit for those.

17             THE COURT:  Okay.  So was the idea that no matter

18  what, Mr. -- in other words, for the clients that -- when

19  Mr. Ferguson indicated he didn't want to be a fiduciary if

20  Mr. Stephens' name was going to be on it, that's my

21  understanding of what --

22             THE WITNESS:  Actually, he said he did not want to be

23  a fiduciary on an account that he was not paid for.

24             THE COURT:  Okay.  Did he say that at the meeting?

25             THE WITNESS:  He said it a number of times.

JA3VMARHredacted                 Calder - cross

1          THE COURT:  And when he said that at the meeting, did

2     you or Mr. Peartree have a response to that?

3          THE WITNESS:  Well, I think at that point in time we

4     said we are making the change and we need to know which

5     accounts are going to have a problem with that change.

6          THE COURT:  Okay.  But no one -- because I had

7     under -- perhaps I misunderstood.  I thought I had understood

8     that his compensation -- he wasn't getting paid for them --

9          THE WITNESS:  He was not.

10         THE COURT:  So no one -- at that meeting did anyone

11    say, But you're not getting paid for them, so what's the

12    difference?

13         THE WITNESS:  I don't know if we said it at that

14    meeting or not, but certainly that's the case.

15         THE COURT:  And was there a reason why Mr. Ferguson's

16    accounts were being turned over to Mr. Stephens and not the

17    accounts of -- and I apologize, there was another -- in the

18    shift over to Marsh & McLennan Securities, right, there was

19    another -- I thought there was another --

20         THE WITNESS:  Ryan Stover?

21         THE COURT:  Yes, Mr. Stover.

22         THE WITNESS:  Ryan is in our San Diego office, and he

23    works primarily in the San Diego and Orange County markets.

24         Bill Peartree has a number of accounts in the bay area

25    as well.

JA3VMARHredacted              Calder - cross

1          THE COURT:  Okay.  But is there any reason why -- in

2    other words, why Mr. Ferguson's accounts versus Mr. Stover, in

3    other words, in shifting them to Mr. Stephens.

4          THE WITNESS:  Mr. Stover is a producer and he's

5    compensated based on a commission.

6          THE COURT:  Okay.  So again, so the idea was, from --

7    well, do you know -- were you part of that decision or

8    Mr. Peartree made the decision?  Is that an accurate statement

9    or --

10         THE WITNESS:  Which decision?

11         THE COURT:  The decision to shift the accounts to

12   Mr. Stephens to assist in basically helping him reach the

13   compensation goal.

14         THE WITNESS:  That would have been a decision made

15   with Mr. Peartree and our chief operating officer Hal Dunnen.

16         THE COURT:  All right.

17         What else do you recall that was said at that meeting?

18         THE WITNESS:  So we talked about the transition of the

19   accounts, the fact that we wanted help doing that.  We got on

20   the phone with Bill.  Rick was on the phone.  And, you know,

21   Rick was asking, Well, what are we going to tell the clients?

22   What are we going to tell them?

23         And Bill said, You're going to have to craft a story

24   to tell the clients.

25         My view of that was that meant you're going to have to

1    say we are making a change in your adviser from Mr. Ferguson to

2    Mr. Stephens, and we're going to have to tell them we're doing

3    this because Mr. Ferguson is in a client service executive

4    role, and Mr. Stephens is newly hired as a producer here, and

5    we are making the producer the fiduciary on these accounts.

6              THE COURT:  Okay.  And when you say it's your

7    understanding, did Mr. Peartree say -- was all he said that

8    we're going to have to craft a story, or did he say and follow

9    it up with what you just said, or was it just basically we're

10   going to have to craft a story?

11             THE WITNESS:  I think it was left a little unclear, I

12   would say.

13             THE COURT:  Okay.  And do you recall -- and when you

14   said -- I think you said Rick was on the phone.  But were you

15   in the -- you, yourself, Mr. Ferguson, and Ms. Crain, were you

16   all on the same --

17             THE WITNESS:  We were all in the same room.

18             THE COURT:  Okay.  So when you say on the phone, he

19   was responding to Mr. Peartree who was on the phone?

20             THE WITNESS:  Correct.

21             THE COURT:  Okay.  Do you recall anything else that

22   was said during that meeting?

23             THE WITNESS:  I think that was the majority of the

24   meeting.

25             THE COURT:  Okay.

1              Approximately how long did the meeting last?

2              THE WITNESS:  Approximately a half hour.

3              THE COURT:  Okay.  And during that meeting, did you

4   take any notes?

5              THE WITNESS:  I did not.

6              THE COURT:  And I think you had indicated, at least

7   with regard to the earlier meeting -- well, do you know whether

8   Ms. Crain took any notes?

9              THE WITNESS:  I believe she did.

10              THE COURT:  And have you seen any documentation

11   relating to that meeting, in other words, a memo or was it a

12   post-meeting email, or anything like that?

13              THE WITNESS:  I don't think I saw it.

14              THE COURT:  You know that they exist.

15              THE WITNESS:  I think it exists.

16              THE COURT:  Okay.

17              THE WITNESS:  I don't know that it exists.

18              THE COURT:  Okay.  When you say that you think that it

19   exists, have others mentioned it or raised it in discussions,

20   or are you just -- based upon the process that you're aware of

21   at Marsh & McLennan, you believe that there would be some

22   documentation?

23              THE WITNESS:  Normally, when we have a human resources

24   representative in the room, the process is to document the

25   meeting.

1          THE COURT:  Okay.  All right.

2          Mr. Wickham, I can't remember when I indicated for

3     Ms. Crain -- I guess we covered this whole -- both parts of the

4     meeting, the initial final warning and then the subsequent

5     meeting.  I imagine the memo may be one and the same, but I

6     don't know.

7          MR. WICKHAM:  I actually looked last night and I

8     didn't see in Mr. Ferguson's personnel file a memo or notes on

9     this particular meeting.  There was a copy of the final written

10    warning that was presented to Mr. Ferguson.  There was

11    annotations on it saying that he'd refused to sign, and so that

12    was in the personnel file.  But it's possible that, you know,

13    Ms. Crain may have notes in a separate set of records.

14         The things that led up to this meeting are lengthy and

15    extensive.  This wasn't something that was sprung on

16    Mr. Ferguson.  There had been significant other meetings and

17    all that.  So we'll pull it all together for the Court just so

18    that we have a clear record on this.

19         THE COURT:  That would be helpful, especially to the

20    extent that -- I mean I know I have certain materials related

21    to the particular motions that are before me.  I know from, I

22    think -- at least from what I gather, this may have started at

23    least in 2018.  There was a whole process that would be helpful

24    to have an understanding of.

25         Okay.  Mr. Calder, anything else that you recall about

JA3VMARHredacted                    Calder - cross

1    that meeting?

2               THE WITNESS:  No, I don't think so.

3               THE COURT:  Okay.  All right.

4               Mr. Ferguson.

5               MR. FERGUSON:  Thank you, your Honor.

6               Your Honor, I would respectfully request that today

7    counsel be instructed not to give signals to the client and not

8    to testify quite as much as yesterday.  I didn't say anything

9    yesterday because I do understand I'm making mistakes.

10              THE COURT:  No, no.  I think basically for both sides

11   it should just be if there's an objection, you'll just state

12   the objection.  If there's going to be some sort of argument,

13   we can take it at sidebar.

14              MR. FERGUSON:  Thank you, your Honor.

15              THE COURT:  All right.  You may proceed.

16   CROSS-EXAMINATION (continued)

17   BY MR. FERGUSON:

18   Q.  Good morning, Jeff.

19   A.  Good morning.

20   Q.  So, Jeff, we just went over and did a recap of that meeting

21   and what was said or was not said; correct?

22   A.  Yes.

23   Q.  Jeff, can you turn to -- do you have the exhibits binder?

24   A.  I do.

25   Q.  Can you turn to Tab 30?

JA3VMARHredacted                  Calder - cross

1          Jeff, do you see this email down below is dated

2     Thursday, January 3rd, 2019?

3     A.  Yes.

4     Q.  This is from me to you and Mara; correct?

5     A.  Yes.

6     Q.  Mara, I know you're waiting for me to sign a letter of

7     reprimand given to me at our meeting on 12/20/18.  And in that

8     meeting and alluded to in the letter, if I don't sign the

9     letter, I will be terminated from employment.

10          I respectfully request that you do further

11     investigation and ascertain the correctness of the situation of

12     the letter and allow me more time for my own review, given that

13     the situation appears to possibly involve various violations of

14     various regulations under FINRA, SEC, and ERISA.

15          I took your suggestion/offer of consulting outside

16     counsel, and it was recommended I not sign the reprimand letter

17     as is, in part because there appear to be material errors

18     possibly designed to implicate me erroneously.  I was told I

19     have the right to request those possible errors be investigated

20     and, as applicable, corrected before signing the letter.

21          Skip down.

22          In efforts to show I am trying to operate in good

23     faith, it was suggested I clarify certain verbiage with you --

24     certain verbiage you instructed me to use in future

25     correspondence.

JA3VMARHredacted                Calder - cross

1            Next page.

2            One.  In our recorded meeting on 12/20/18, Bill

3    Peartree stated he, Kim Blackmore, and possibly others,

4    cooperated in planning an execution to have clients and myself

5    sign certain paperwork that was designed to ultimately remove

6    me as the named fiduciary investment adviser to my clients,

7    given that, as Bill stated in our meeting, he, Kim, and others

8    knew that leaving me as the named fiduciary adviser, with all

9    liability and legal responsibility, but having clients sign

10   paperwork that gives all the income and company-instructed

11   operational control to Jeff Stephens or someone else, is not in

12   line with fiduciary and financial regulations, thus would

13   eventually result in removal of me as the named fiduciary

14   adviser.

15            MR. WICKHAM:  Your Honor, can we get a question?

16            THE COURT:  Yes.  What's the -- in other words -- and

17   I apologize.  Did Mr. Calder receive this?

18            MR. FERGUSON:  Yes, your Honor, this email was sent to

19   him.

20            THE WITNESS:  Yes.

21            THE COURT:  Okay.  So what --

22   BY MR. FERGUSON:

23   Q.  Perhaps I should just say, Jeff, doesn't this point out

24   everything that I've stated?

25            Number one, the purpose of that final warning letter,

JA3VMARHredacted                  Calder - cross

1    I refused to sign it because Bill Peartree had admitted that

2    they broke FINRA rules.

3              MR. WICKHAM:  Your Honor, could we get a question?

4              MR. FERGUSON:  I just said isn't this true.

5    A.  I'll answer that.

6              The reason we had a meeting with you for a final

7    warning is because of the history we've had with you, as

8    documented in our employment file, of bombastic behavior,

9    treating colleagues inappropriately.

10             I have coached you over and over in these areas.  I've

11   told you if you had a bombastic email to send, to save it

12   overnight, reread it, redo it; if you agreed with it, send it

13   again.

14             That final warning was based on your interaction with

15   colleagues, calling them liars, calling them cheats, calling

16   them thieves.  It had nothing to do with FINRA regulations.

17   This was a situation of common respect that our company is

18   built upon that you routinely violated.

19   Q.  Jeff, did I ever call anybody a thief?  Do you have proof

20   of that?

21   A.  You said that we stole your clients.

22   Q.  Didn't we just see that Bill Peartree admitted in that

23   meeting they did all this without my knowledge?

24   A.  No.

25   Q.  Did Bill Peartree admit in that meeting that he and others

1    colluded to remove me as the financial adviser to my clients

2    without my knowledge and without the client's knowledge?

3    A.   Rick, you said if you weren't going to be paid, you would

4    not be the fiduciary to the accounts, so we had to remove you

5    from those.  Those were house accounts.

6            You were not paid as producer, Rick; you were paid as

7    a client service executive.  You were not receiving any

8    commission compensation on the existing accounts.  Nobody stole

9    any income or anything from you.

10   Q.   Jeff, you testified earlier that I was in a hybrid role of

11   sales and service.  Are you now saying that's not true?

12   A.   You were in a hybrid role in that if you brought in and

13   initiated a new account, you were paid a one-time fee of 25

14   percent.  Your salary and bonus outside of that was based

15   solely on service.  It was not based on continuing revenue from

16   your client.

17   Q.   So sales is what you're saying?

18   A.   No.  What I'm saying is you were paid a one-time bonus for

19   helping initiate an account that was referred to you.

20   Q.   I'm sorry.  You misunderstand the question.

21           Was I doing sales?  Did I go out and meet with

22   prospects?

23   A.   You did, yes.

24   Q.   And do business sales presentations with them on my own?

25   A.   You did.

JA3VMARHredacted                Calder - cross

1    Q.  Is that not sales?

2    A.  It is sales.  You were compensated in a hybrid role for the

3    sales part of what you were doing.

4           But the accounts that you're talking about here, where

5    you wouldn't be removed as a fiduciary, and those accounts

6    would be changed from you to Jeff Stephens, that affected your

7    income none whatsoever.

8    Q.  Jeff, what was -- this bonus you're talking about, this

9    compensation, what was it based off of?

10   A.  The 25 percent bonus was based on a number of criteria that

11   was outlined in your client service executive compensation

12   sheet.  It was based on -- if you were referred into or brought

13   in a new account, you were paid 25 percent for initiating the

14   account or a closing the referral.  But you had to demonstrate

15   that you had meetings with the client, you had to help onboard

16   them, you had to obtain the broker of record letters, and you

17   had to implement the new client.

18   Q.  So sales.  I got a 25 percent commission payment based off

19   the commissions of the sales I did.

20   A.  One-time bonus payment on new business only.  No payment

21   whatsoever on recurring revenue from existing accounts.

22   Q.  Does what happens in the future remove being sales?  Did I

23   not go out and do sales and get paid based on commission for

24   doing sales?

25   A.  You got paid a one-time 25 percent bonus, which is

JA3VMARHredacted                Calder - cross

completely different than the way we compensate producers.

Q.  Do producers get paid based on the commissions they bring

in?

A.  Yes.

Q.  Doesn't that sound exactly like what you just said?  I got

paid -- it doesn't matter if it's one time or every year, I got

paid based on the commissions I brought in.

          THE COURT:  Mr. Ferguson, that's more argument.  In

other words, I understand -- and you'll be able to testify

yourself.  But I understand what the testimony is.

          Next question.

Q.  Jeff, so in this same email, if you go over to the last

page -- I'm sorry, second to the last page, the first full

paragraph at the top:  As follow-up to our meeting, you all

instructed me to craft a story --

          MR. WICKHAM:  Can we get a question, your Honor?

          THE COURT:  Well, first, in other words, he may read

something and let's see where it's going.

          MR. WICKHAM:  Okay.

Q.  Craft a story to the clients and business planning efforts

to coincide with the original crafted story to get clients to

sign additional paperwork removing me as their fiduciary

investment adviser and naming Jeff Stephens.

          What does "craft a story" mean?

A.  So in this context, "craft a story" is we are going to go

1    out and tell our clients that we're removing Rick Ferguson as

2    your fiduciary, and we are implementing Jeff Stephens.  He's a

3    new producer here, so we want to have the talking points down

4    when we go and meet with the clients regarding the change.

5    Q.  Why would we be talking about this if Bill Peartree,

6    myself, and the retirement services division had planned this

7    all out 2017-2018?  Why are we talking about it now?

8    A.  Because this is a point in time where it was going to be

9    executed.  And we wanted to make sure that we all understood

10   what we were going to tell the clients, how we were going to

11   explain the change, and make sure they were comfortable with

12   the change.  And if they weren't, we were then going to suggest

13   alternatives.

14   Q.  So you do agree that myself, Bill Peartree, the retirement

15   services team, we planned out this move well in advance of the

16   time frame when we sent out the email?

17   A.  I'm unaware of the specifics of the planning, Rick.

18   Q.  Jeff, does it sound reasonable that myself, Bill Peartree,

19   and the rest of the retirement services team just one day

20   decided to write a letter to all the clients, saying you're

21   moving from SagePoint Financial to MMA Securities?

22   A.  Rick, I have no insight into your thinking or into Bill

23   Peartree's thinking in this matter.

24   Q.  Jeff, are you aware that securities rules require the

25   securities company to tell clients when -- in advance who their

1    adviser is going to be?

2    A.  I am not aware of securities regulations, Rick.

3    Q.  Jeff, back to that same email, going back a page on Item

4    No. 2, do you see there where I said:  If someone says

5    something that's not true or omits material facts and efforts

6    to deceive the other party and/or solicit a desired action or

7    response, you stated I am not allowed to call this line, and

8    instead alluded I should use the term "crafting a story" or I

9    will be terminated?

10   A.  Are you saying that I said this, Rick?

11   Q.  Jeff, I'm saying do you see that?

12   A.  I see it.

13   Q.  Why would I send this email to you and Mara, and then later

14   on in this email I specifically ask you if this isn't the

15   understanding, please correct me?

16   A.  Rick, I cannot explain your thinking.

17          THE COURT:  In other words, do you recall saying that

18   during the meeting?

19          THE WITNESS:  I absolutely did not say "craft a

20   story."  I think Bill Peartree said craft a story, but I

21   don't -- I would never say to somebody, Don't say "lie"; say

22   "craft a story."

23          THE COURT:  Okay.  Next question.

24   BY MR. FERGUSON:

25   Q.  Jeff, isn't it true -- and I agree with you.  Isn't it true

JA3VMARHredacted              Calder - cross

1    that Bill Peartree did say, We need you -- Rick, we need you

2    to -- after we had discussed and I had pointed out that MMA

3    Securities had broke FINRA regulations by telling clients that

4    I was going to be their adviser, when they actually had planned

5    this whole time to move them to someone else, Bill Peartree

6    stated, Well, yes, that's true, Rick.  We need you to craft a

7    story to help smooth this over with clients.

8            And Mara Crain jumped in immediately and said, I don't

9    think that's what Bill meant to say, and asked him to restate

10   his words.

11   A.  Rick, I don't agree with your statement.

12           THE COURT:  Well --

13           THE WITNESS:  I don't know what the question was.  He

14   made a statement without a question.

15           THE COURT:  What did Ms. Crain -- when Mr. Peartree

16   used the phrase "craft a story," what, if anything, did

17   Ms. Crain say?

18           THE WITNESS:  I don't think she said anything at that

19   point in time.

20           THE COURT:  Did there come a time during the meeting

21   when she did say something?

22           THE WITNESS:  I don't believe so.  She was not

23   necessarily an active participant in the meeting.  But I

24   guarantee you that if "craft a story" was -- if "craft a story"

25   was interpreted as make up a lie, Mara would correct that.

1             THE COURT:  Okay.

2             Do you recall her ever saying words to the effect --

3    asking Mr. Peartree, Whoa, Bill, what do you mean by "craft a

4    story," or asking some other type of question like that?

5             THE WITNESS:  I don't recall.

6             THE COURT:  Okay.  Next question.

7    BY MR. FERGUSON:

8    Q.  Jeff, at the very end of that email, do you see where it

9    says:  If you feel the company would prefer to retaliate

10   against me for being a whistleblower and terminate me for not

11   signing this letter, that I have clearly shown is not 100

12   percent correct, that is, of course, your right?

13   A.  I see that.

14   Q.  Do you see the next sentence:  Please just respond to this

15   email clearly stating that I will be terminated if I don't sign

16   the letter as is, and I will sign it?

17   A.  I see that as well.

18   Q.  Jeff, when you got this email from me, I'm pointing out

19   everything I've stated in my testimonies, what was your

20   thought?  Did you respond to this email?

21   A.  I don't believe I did.  I can't remember responding to it.

22   I think what I likely did with this is, Whistleblower, your

23   complaint we take very seriously.  I know that we told you to

24   get in touch with compliance.  We have a whistleblower line.  I

25   have an app on my phone that you can directly access

JA3VMARHredacted                Calder - cross

1    compliance.  And if you have a whistleblower complaint, I can't

2    tell you anything that we take more seriously than that as a

3    business.

4    Q.  Can you please turn to Exhibit 32.

5         My apologies.  I'll go to 31 in the interest of time.

6    I'm trying to cut some things out.

7         Do you see this is a -- I'm sorry.  Do you see this is

8    a declaration by ███████████, who at the time was the lead

9    person at our client ██████?

10   A.  Yes.

11   Q.  Do you see there on Item No. 3, where Mike says:  Rick

12   Ferguson was not a part of any other agreements between

13   ████████████████████ and Marsh & McLennan Agency LLC for

14   any other services?

15   A.  Yes.

16   Q.  Do you see where it says:  During 2018 into 2019, Rick

17   Ferguson -- can you see where it says on Item No. 4 --

18        MR. WICKHAM:  Your Honor, can we get a question

19   please?

20        MR. FERGUSON:  Counsellors --

21        THE COURT:  No, well, the question is -- Mr. Calder

22   has to have some personal knowledge about some of these things.

23   So just reading it to him without asking a question isn't

24   substantive.  In other words, if you want this particular

25   document to be before me, that's fine.

1              Well, let me first ask, do you know Mr. ████?

2              THE WITNESS:  I do not.

3              THE COURT:  Have you seen this declaration before?

4              THE WITNESS:  I have not.

5              THE COURT:  Okay.

6              So, Mr. Ferguson, what's the question related to this

7       document?  In other words, there are different things that I

8       think that you may want -- if there are things that you want me

9       to know, that's fine, you can point those out to me.  But the

10      issue is what Mr. Calder can add in terms of his own testimony.

11             MR. FERGUSON:  Understood, your Honor.

12             I'll withdraw it.

13             Mr. Calder knows this client well, but we're not going

14      to obviously get there today, so I'll just withdraw it.

15             THE COURT:  Look, I don't mean to block you, but

16      what -- in other words, if you want to ask questions about the

17      client and Mr. Calder's knowledge of the client, that's fine.

18             MR. FERGUSON:  No, your Honor.

19             THE COURT:  Okay.

20      BY MR. FERGUSON:

21      Q.  Jeff, can you please turn to Tab 13.

22             Do you see there, Jeff, where this is an email from

23      Jake Daly admitting that he forged my signature?

24      A.  No.

25      Q.  Page 2.  Hi, Jake.  Have you ever put my signature on any

1    form, letter, or anything?

2          Jake responds:  I have not.  I did ask you for a copy

3    of your signature before on a template for an RFP response, I

4    will certainly attest to that.  However, I would never put your

5    signature on something that was related to a client, a fee, or

6    otherwise.

7    A.  I see that.

8    Q.  You don't feel that Jake was stating, Well, I have used

9    your signature before, but trying to clarify that, Well, I

10   didn't use it for anything important?

11         MR. WICKHAM:  Objection.  Foundation.  Speculation.

12         THE COURT:  I'll allow the answer to the question.

13   A.  Our signatures are used routinely in responses to RFPs.  We

14   don't sign every RFP.  We take our signatures in template.

15         An RFP is a request for a proposal.  You provide

16   information to the party requesting it.  And there's usually a

17   cover letter document that goes with it.  We have a template

18   that we use, and we use everybody's templated signature on

19   those documents.

20         THE COURT:  Okay.  But people are aware that an RFP is

21   going out?

22         THE WITNESS:  Right.

23         THE COURT:  Okay.  Go ahead.

24   Q.  So, Jeff, are you saying MMA kept and has a copy of my

25   signature on file for use on things like this?

1  A.  I'm sure they do.

2  Q.  Jeff, please turn to 32.

3          Do you see that this is an email from me to a client

4  telling them that I've just been informed they are being

5  changed to a client of Jeff Stephens and I have no choice or

6  say-so.

7  A.  I see that.

8  Q.  Jeff, can you turn to the next exhibit, 33.  This is dated

9  Thursday, January 10, not long after that December 20th

10  meeting.

11          Do you see where I say:  MMA management has made a

12  firm decision on this issue.  Do you have time to discuss their

13  decision.

14  A.  I see that.

15  Q.  Doesn't this show that my understanding from our meeting

16  was that you instructed me to reach back out to clients and

17  tell them they had to choose between Jeff Stephens at MMA or go

18  with me somewhere else?

19  A.  Absolutely not.  I understand that is your interpretation

20  of the meeting.  I'm sorry you misinterpreted it.

21          But as followup to this ███████ email, ███████ did

22  get a visit from Bill Peartree to attempt to keep their

23  business as an alternative to you.  There were always

24  alternatives outside of Jeff Stephens.  It was not, Take Rick

25  Ferguson or take your business away.  Absolutely not.  That was

1   your interpretation of it.

2   Q.  Jeff, isn't it true, in that meeting, when you found out

3   that Bill Peartree had committed these violations and now we

4   had to help solve it, you said, Fine, reach out to the clients.

5   They have to take Jeff Stephens.  If they don't, they are

6   fired; we don't need their business.  Take them somewhere else.

7           MR. WICKHAM:  Objection.  Compound.

8   A.  That is absolutely false.

9           I would never say that.  I am not in a position of

10  authority to fire clients that we've worked so hard to

11  maintain.  I did not say, You have to take Jeff Stephens or get

12  lost.

13          We had alternatives.  We were ready to present

14  alternatives.  And I can't believe that you misinterpreted it

15  that way, but I believe that's because you wanted to make sure

16  these clients could come to you in the future.

17  Q.  Jeff, you said at that meeting on December 20th you went

18  into it thinking that it would be combative; correct?

19  A.  Yes, I did.

20  Q.  Why would it be combative if, per your earlier statement, I

21  had requested to step away from all these clients?

22  A.  Because you'd been very clear that you were unhappy with

23  this.  And you were very, very clear that you were unhappy; you

24  were clear that you thought we were taking your business away

25  from you; you thought that being moved off -- you said you

1    didn't want to be a fiduciary if you weren't being paid.  We

2    were okay with that.  We were going to code it over to Stephens

3    and give that alternative to the client.  If they didn't want

4    that, we would find a different alternative.

5            But I did feel it would be a contentious meeting.  I

6    felt that based on the history of the meetings I've had with

7    you.  I rarely walked into a meeting with a representative from

8    HR.

9    Q.  Jeff, you stated earlier and in these declarations that I

10   stated I did not want this position anymore.  So why would I be

11   combative over it?

12   A.  I have no idea.

13   Q.  Jeff, can you turn to Tab 25?  I'm sorry.  Yes, 25.

14           Do you recognize this?  This is Exhibit C from MMA's

15   submission, the contract that -- signed between MMA and myself,

16   February 1st, 2014?

17   A.  Yes.

18   Q.  Do you see the first page, the introductory page, towards

19   the bottom?  And we've looked at this before.  I'll summarize.

20           In consideration for your execution of the offer

21   letter and the nonsolicitation confidentiality agreement,

22   you'll receive a bonus in the amount of $5,000, and that will

23   be paid February 28, 2014.  And then next you will also, for

24   doing this, get an additional bonus set forth in Schedule A.

25           And if we turn to Schedule A, we see an additional

1    $5,000 bonus to be paid July 30th, 2014.

2    A.  I see that.

3    Q.  Can you please turn to Exhibit 35?

4    A.  Yup.

5    Q.  Do you see the very first -- do you see these are my pay

6    stubs, as you stated; correct?

7    A.  I didn't state that.

8    Q.  I'm sorry.  You're right.  You didn't.

9           As MMA's position?

10   A.  Pardon me?

11   Q.  You see this is a pay stub from MMA to me?

12   A.  I see that.

13   Q.  And there's a special bonus -- this is for February 28th,

14   2014.

15   A.  I see that.

16   Q.  There's a special bonus of $5,000 that was paid by February

17   28th, 2014?

18   A.  I see it.

19   Q.  Go to the next page please.

20          MR. WICKHAM:  Your Honor --

21          THE COURT:  What's the -- again, there are two

22   separate purposes that appear to be going on.  But one is that

23   what we're here to get is Mr. Calder's testimony.  And you

24   didn't ask a question, you're just pointing him to different

25   places.  So it seems like that's not really for him, that

1   you're pointing it out so that I know it.

2          So what's the question related to this?

3          MR. FERGUSON:  And I apologize, your Honor.  Too much

4   build-up there.

5   Q.  The next page.  Jeff, can you explain why MMA didn't pay me

6   the bonus under this contract?

7   A.  I cannot.

8   Q.  Do you agree, by looking at the next page, which was July,

9   which we just saw there was supposed to be a bonus payment, it

10  was not paid?

11  A.  I don't know that.

12         MR. WICKHAM:  Objection.  Foundation.

13         THE COURT:  Do you have any understanding about why --

14         THE WITNESS:  I don't.  I know for sure that if a

15  bonus is owed, a bonus is paid.  And if a bonus is owed and not

16  paid, it's a mistake, not intentional.

17         THE COURT:  Okay.

18         Do you recall this ever being raised to you?

19         THE WITNESS:  No.

20         THE COURT:  Did Mr. Ferguson raise it to you?  At any

21  point in time did he raise it during the December 20th meeting?

22         THE WITNESS:  This is the first time I've heard of

23  this.

24         THE COURT:  Okay.

25         All right.  Next question.

1   BY MR. FERGUSON:

2   Q.  Didn't you earlier say -- I'm sorry.  Jeff, you said this

3   is the first time you've heard of it.  Didn't you earlier say

4   that this had been a very long build-up; that there was

5   problems going back a long time with me?

6   A.  Yes.

7   Q.  That I had made a lot of complaints?

8   A.  Yes.

9   Q.  But this wasn't one of them?

10  A.  This was not one of them.

11  Q.  Jeff, can we go back to Exhibit 25.  And under Exhibit A of

12  that document, I'm just trying to point out to you, Jeff, what

13  my income was supposed to be for 2014.  And do you see on page

14  1 of 2 for Exhibit A --

15          MR. WICKHAM:  Your Honor --

16          THE COURT:  I guess I don't quite understand what the

17  relevance is to this proceeding of something from 20 -- I

18  understand the relevance of the contract and everything else.

19  But what is the relevance -- and I think --

20          MR. FERGUSON:  Your Honor, I think I know a way just

21  to shortcut all my questions on this.

22          THE COURT:  Okay.

23  Q.  Jeff, isn't it true I was complaining from 2014 on, because

24  MMA withheld pay from me that was due to me?

25  A.  When you first came to the bay area, you were complaining

1    that there was a bonus owed you from the previous year's client

2    service executive bonus.

3              We investigated that.  I found out that was true.  We

4    got that paid.

5              We have also had further disputes regarding your

6    contention of bonuses owed versus our view of bonuses owed.  We

7    have paid -- unless there's a mistake in the 5,000 that I don't

8    know about, we have paid every bonus due.  It is not our

9    business practice to not pay bonuses.

10   Q.  Jeff, isn't it true that I was also complaining about not

11   just bonuses, but MMA just plain did not pay me per my

12   contract; they withheld money from me?

13   A.  Yes, you were complaining about that, and I disagree with

14   your interpretation.

15             MR. FERGUSON:  Your Honor, would it be appropriate for

16   me to continue with just -- given he says that I disagree with

17   you, or I can clearly show that MMA withheld paychecks?

18             THE COURT:  But I guess the question is, though, how

19   is that relevant to this?  In other words, what is the argument

20   that you're making that that is relevant to the issue of the

21   preliminary injunction, which relates to confidential

22   information, which relates to client information, which relates

23   to you leaving, and the allegation that you took information,

24   either through email or otherwise that the company alleges is

25   confidential, with you?

JA3VMARHredacted                Calder - cross

1          MR. FERGUSON:  I see, your Honor.

2          THE COURT:  In other words, I understand you may have

3    had a history -- there may have been a history between yourself

4    and the company; and you may say that there's a history behind

5    then, I guess, taking money away from you that you thought you

6    were due; and that you believed that that was happening again

7    at this December 20th meeting in 2018.  I understand that.

8          But this isn't an employment -- in other words, there

9    may be -- you may have -- you may at some point assert some

10   sort of counterclaims relating to that you were constructively

11   discharged or whatever, but that's not the issue that's

12   currently before me.

13         MR. FERGUSON:  Thank you, your Honor.  I see the

14   difference now.  I was trying to show that the differences

15   between MMA and I went back years related to pay, and that was

16   why on December 20th they wanted all this.  But I can see that

17   is something for a different venue.

18         THE COURT:  No, no.  It's fine if you want to point

19   out that -- I don't know whether this is the point, that there

20   had been a history of you raising issues, and so that wouldn't

21   necessarily have been a surprise.  And I understand that from

22   what Mr. Calder is saying and from your questions.

23         But let's move on.

24         MR. FERGUSON:  Agreed.

25         Thank you, your Honor.

1    BY MR. FERGUSON:

2    Q.  Jeff, can you please turn to Exhibit 18.

3         Do you see this is yet another contract between myself

4    and MMA?

5    A.  I see that.

6    Q.  Why is the date on this one December 23rd, 2014?

7    A.  I see a document that says December -- or January 31st.  Am

8    I on the wrong tab?

9    Q.  I apologize.  The date it's signed.

10   A.  I don't have any idea.

11   Q.  And do you agree that in the last paragraph, this, again,

12   just like the other one, calls out specifically for a

13   nonsolicitation and confidentiality agreement, for this to be

14   attached to this the same date?

15   A.  Yes, I see that.

16   Q.  Jeff, isn't it true that I refused to sign those

17   nonsolicitation agreements and confidentiality agreements

18   because they violated FINRA arbitration requirement?  And the

19   reason some pages are missing is because I struck out pages

20   that I felt would violate --

21   A.  I'm unaware of that, Rick.

22   Q.  Can you please turn to Exhibit 19.

23        I'm almost done.

24   A.  Did you say you're almost done?

25        THE COURT:  Let's just take it one question at a time.

1              So, I'm sorry, so Exhibit 19?

2    Q.  Jeff, does MMA West operate as an independent entity?

3    A.  MMA West is part of MMA.  We are not an independent entity.

4    Q.  Do they hold themselves out as independent in any way?

5    A.  No.

6    Q.  Jeff, do you see there -- glasses.

7              Do you see there at the top of this website what the

8    website is?

9              MR. WICKHAM:  Objection.  Foundation.

10             THE COURT:  Well, he's just asking does he see the

11   website.  It looks like it's mma-west.com.

12             THE WITNESS:  Yes, I see that.

13   Q.  Jeff, can you turn to Exhibit 20.

14             Where is MMA West headquartered?

15   A.  MMA West, main office is in San Diego.

16   Q.  Jeff, can you please turn to Exhibit 39.

17             Jeff, do you see that this is an email between myself

18   and Pam Madrinan, January 13th, 2007?

19   A.  Yes.

20   Q.  Do you know when I was hired within Barney & Barney?

21   A.  I don't.

22   Q.  Wasn't it in February sometime?

23   A.  I don't know.

24   Q.  Can you turn to Exhibit 40.

25             Jeff, do you think it was appropriate for Pam and

JA3VMARHredacted              Calder - cross

1  myself -- for Pam to be asking me for pay things?  We saw

2  earlier that Bill Peartree was asking me for clients and

3  prospects.  The next few exhibits, all going back and forth,

4  prior to my being hired.

5          THE COURT:  Do you know Ms. Madrinan?

6          THE WITNESS:  I do know her, but I was not involved in

7  this process whatsoever.

8          THE COURT:  Okay.

9          Do you know, Mr. Ferguson, is there a question -- in

10 other words, are you just asking -- you're asking to read it

11 and give his view?

12         MR. FERGUSON:  I was going to ask a question.  But if

13 his statement is he is not familiar with Pam Madrinan, then I

14 withdraw --

15         THE COURT:  No, no, no.

16         THE WITNESS:  That's not what I'm saying.  I know Pam

17 Madrinan, but I am unfamiliar with anything related to this

18 correspondence.  We were not part of Barney & Barney in 2007.

19 BY MR. FERGUSON:

20 Q.  Do you agree it would have been -- would it have been

21 inappropriate for Barney & Barney to ask me the questions that

22 we've seen they are asking if I was not employed, or is that

23 just a normal part of hiring someone?

24 A.  No, I have no idea what your former employer's status was.

25 I have no idea whether you had a noncompete.  I'm totally

1    unversed in this, so I don't know.

2    Q.  Jeff, can you please turn to Tab 43.

3              MR. FERGUSON:  Your Honor, can I ask a question?

4              THE COURT:  Yes.

5              MR. FERGUSON:  I was getting ready to show exhibits.

6    Mr. Calder just stated that he was unfamiliar with what my

7    employer's position was.  There's an email in here that shows

8    that MMA was fully -- or Barney & Barney was fully aware what

9    my position was.  But really he doesn't know this, it's not

10   that --

11             THE COURT:  Right.  If you want to find out whether

12   he's seen a particular document, that's fine.  But it doesn't

13   seem like -- at least from Mr. Calder's testimony, that he was

14   involved in this.

15             Do you remember him being involved in this?

16             MR. FERGUSON:  No, I don't think he would have been

17   directly involved.  But my understanding was that Bill Peartree

18   had, very in-depth, briefed him on this situation.

19             THE WITNESS:  Absolutely not.

20             THE COURT:  In other words, back in 2007?

21             MR. FERGUSON:  When we were having -- this happened in

22   2007.  It's obvious I was going back and forth with MMA or B&B

23   before I was hired.

24             THE WITNESS:  Your Honor, our company merged with

25   Barney & Barney in 2008.  I was not even part of the company.

JA3VMARHredacted                Calder - cross

1          MR. FERGUSON:  So that's why I don't know if it's --

2          THE COURT:  No, it's not.  So let's move on.

3    BY MR. FERGUSON:

4    Q.  Jeff, can you turn to Exhibit 45.

5          Do you see there at the top, where this is my U-4 form

6    registration with Resources Investment Advisors?

7    A.  I see that.

8    Q.  It shows the employment date is February 15th?

9    A.  Yes.

10   Q.  Does this show that I was not employed by Resources

11   Investment Advisors until after I left MMA?

12         MR. WICKHAM:  Objection.

13         Foundation.  Speculation.

14         THE COURT:  Are you familiar with the U-4?

15         THE WITNESS:  I am not.

16         THE COURT:  Do you know -- when it says -- well, did

17   you fill this out, Mr. Ferguson?

18         MR. FERGUSON:  No, this is filled out by Resources and

19   submitted to FINRA.  This is a printout from FINRA.

20         THE COURT:  Okay.

21         Well, filled out by Resources Investment Advisors?

22         MR. FERGUSON:  Right, by the compliance department.

23   Only the compliance department can do a U-4.

24         THE COURT:  Okay.

25         So do you have any understanding of what this --

JA3VMARHredacted                    Calder – cross

1              THE WITNESS:  I do not.

2              THE COURT:  Okay.  Next question.

3    BY MR. FERGUSON:

4    Q.  Jeff, the next –– No. 45.

5    A.  Go to 45?

6              THE COURT:  Yes.  That was the U-4.

7    Q.  Oh, 46.  Apologize.

8              Do you see this is my investment adviser

9    representative agreement with Resources.  And on the last page

10   signed by myself and Resources, effective February 15th, the

11   same date?

12             MR. WICKHAM:  Objection.

13             Foundation.  Speculation.

14             THE COURT:  Have you ––

15             THE WITNESS:  I have no knowledge of these forms, but

16   I see this one form was signed January 31st.

17             THE COURT:  Yes.  Appendix A and Appendix B.

18             THE WITNESS:  Yeah.

19             MR. WICKHAM:  46.  Okay.  Yeah, so he was with them as

20   of January 31st of 2019.

21             THE COURT:  Well, look ––

22             MR. WICKHAM:  Signing them.

23             THE COURT:  Signing them.  Okay.

24   Q.  Jeff, does this show ––

25             MR. WICKHAM:  While he's still employed by MMA.

JA3VMARHredacted                Calder - cross

1   BY MR. FERGUSON:

2   Q.  But doesn't this show that the same things that MMA and B&B

3   had me do, are the same things that Resources had me do?

4   A.  I don't think so.  I have no knowledge of that.

5          THE COURT:  Well, I mean a couple of things.

6          Well, let's move -- I think it's irrelevant.  In other

7   words, the old adage two wrongs don't make a right, if that's

8   what you're claiming, and I don't know -- I have no idea

9   what -- the issue is -- and certainly the issue may be when you

10  started at another -- when your effective date of employment

11  was at a new employer.

12         But I think the allegation is not necessarily that you

13  were employed at the time, but that you had started already

14  soliciting clients for that new position.  And I understand

15  that the disagreement is there.  So let's move on to the next

16  question.

17  BY MR. FERGUSON:

18  Q.  Jeff, did you earlier testify that MMA has very strong

19  security, and that any emails sent out, like I did, would

20  trigger a security compliance trigger of some type?

21  A.  Yes, I did.

22  Q.  Did the emails that I sent out, did they trigger compliance

23  alerts?

24         THE COURT:  I think we have to be a little bit more --

25  what new emails are we talking about?

JA3VMARHredacted                Calder - cross

1              MR. FERGUSON:  Your Honor, I think I have no more

2      questions for the witness.  I think it's better saved for my

3      testimony.

4              THE COURT:  Okay.  Any redirect?

5              MR. WICKHAM:  No, your Honor.

6              THE COURT:  Okay.

7              All right.  Thank you, Mr. Calder.

8              (Witness excused)

9              THE COURT:  Okay.  Mr. Ferguson, you are up.

10              Remain standing for a moment; my deputy clerk will

11     swear you in.

12     ELMER "RICK" FERGUSON,

13          called as a witness on his own behalf,

14          having been duly sworn, testified as follows:

15              THE COURT:  Mr. Calder -- I apologize.  Mr. Ferguson,

16     as we discussed yesterday, since you're proceeding *pro se*, like

17     I said, I would allow you to testify in narrative, with the

18     understanding that I may interject and ask you questions.

19              In addition, if I think -- I may, in an effort to --

20     so why don't we begin there.  I'd like you to keep in mind the

21     affidavit you already submitted, as I mentioned, as well as the

22     exact nature of these proceedings.

23              THE WITNESS:  Your Honor, can I grab my --

24              THE COURT:  Oh, sure, you should absolutely bring your

25     binder up.

JA3VMARHredacted              Ferguson - direct

1    THE WITNESS:  I forgot one thing.  I apologize.  I

2  forgot two things.

3  DIRECT EXAMINATION

4  BY MR. FERGUSON:  Your Honor, I respectfully request

5  the Court to take judicial notice of a FINRA case,

6  my Exhibit 10.

7    THE COURT:  Okay.

8    MR. FERGUSON:  *FINRA v. Merrill Lynch*, Letter No.

9  2009020188101.  This is the FINRA determination and letter of

10  acceptance, waiver, and consent filed pursuant to FINRA Rule

11  9216 of FINRA's Code of Procedure to settle rule violations

12  alleging that Merrill Lynch structured corporate entities and

13  agreements specifically without arbitration clauses, as

14  required for FINRA persons and firms, and used those agreements

15  to file legal actions against FINRA registered persons in civil

16  court, federal civil court, in such a way as to purposely avoid

17  FINRA oversight, the same situation we have here today.

18    THE COURT:  All right.  Mr. Ferguson, do you know

19  whether this was cited by your counsel in the papers?

20    THE WITNESS:  I just became aware of this, your Honor.

21    THE COURT:  Okay.  Well, I don't have a problem --

22  well, let me ask, putting aside whether or not you say it's

23  relevant, do you have any reason to doubt that this is a FINRA

24  waiver and consent?  And I understand the issue that you may

25  not believe it's relevant.

JA3VMARHredacted                Ferguson - direct

1          MR. WICKHAM:  You know, your Honor, I don't have any

2     reason to believe --

3          THE COURT:  I'll take it subject to any objection you

4     may have with regard to its authenticity.  The impact it has on

5     me, first of all, it's a different firm, it's not a district

6     court decision, it's not a Second Circuit decision, it is an

7     interpretation by FINRA.  However, that's the issue that I'm

8     here to decide, in other words, whether or not this is -- well,

9     one of the motions in whether or not --

10          MR. WICKHAM:  Merrill Lynch is a regulated entity;

11     it's a broker-dealer.  MMA is not a broker-dealer; it's not a

12     regulated entity.  So I can understand the gist of this, that

13     FINRA would say that a broker-dealer, a regulated entity, can't

14     do an end-run around their FINRA regulations.

15          In our situation, it's entirely different, because MMA

16     isn't a regulated entity; they are not doing an end-run around

17     anything.  And the cases that are cited back and forth deal

18     with that situation in the respective parties' briefs.

19          MR. FERGUSON:  Counsellor --

20          THE COURT:  No, no, no.  Because I'm doing it -- with

21     regard to this document -- I understand the arguments on both

22     sides.

23          MR. WICKHAM:  Thank you, your Honor.

24          THE COURT:  If you want to -- I'll consider this

25     document subject to any objections about that it isn't what it

JA3VMARHredacted                Ferguson - direct

1    purports to be.

2              MR. WICKHAM:  Thank you, your Honor.

3              MR. FERGUSON:  Thank you your Honor.

4              Your Honor, Mr. Wickham spent hours of time at my

5    deposition covering emails I sent from my MMA email.

6    Mr. Wickham spent considerable time yesterday covering those

7    emails again.  MMA has made a very large deal out of those

8    emails sent.  The only issue is that at no time have I ever

9    denied sending those emails.

10             I have been working in investments for 20 years.  I

11   have FINRA registration 76366 and 24.  A Series 24 is FINRA

12   general principles, securities principle, means I can supervise

13   other registered persons and act as a compliance officer.

14             I'm not an attorney, but I do know at least something

15   about the regulations of my industry.  To my knowledge, I am

16   not below average intelligence.  MMA has stated that they have

17   extremely tight security, whereby any emails sent to an outside

18   party, like I did, triggers a compliance alert.

19             I sent an email as early as December 20th, 2018,

20   stating I could not state at my job under the change proposed

21   by MMA that we discussed.  I sent multiple emails over a period

22   of months to many different people at MMA and MMAS stating that

23   I was contacting clients to discuss a choice, as instructed,

24   between Jeff Stephens at MMA or go somewhere else.

25             I sent emails regarding a different firm directly from

JA3VMARHredacted                    Ferguson - direct

1    my MMA email account that I knew was heavily monitored, and

2    even more so at that time, per Diane Rosen's email that we've

3    seen.  I sent an email to Jeff Calder and Mara Crain again

4    stating I was reaching out to my clients.  And I even asked

5    them to clarify that understanding.

6              I sent 13 years worth of my contacts to myself

7    directly to my new company address, over 3,400 contacts, of

8    which less than 100 were actual client or prospect contacts.

9              I cleaned out my office in January in full view of

10   everyone.  My office is located right next to the break room.

11   Everyone saw it.

12             MMA cannot plausibly deny they were not aware of what

13   I was doing.  MMA cannot plausibly deny they knew what my

14   understanding of Jeff Calder's instructions from that December

15   20th meeting were.  MMA cannot plausibly deny that they had

16   every chance to correct my understanding and stop all these

17   actions.  But they didn't.  Common sense shouts that something

18   is wrong with MMA's stated viewpoint of events.

19             THE COURT:  You were sent at some point a cease and

20   desist, right?

21             THE WITNESS:  But that was after all of this.

22             THE COURT:  Well, after in February --

23             THE WITNESS:  February 19th.

24             THE COURT:  Well, I thought the initial one -- well,

25   in any event, I'm sorry, I interrupted you.

JA3VMARHredacted              Ferguson - direct

1          MR. WICKHAM:  Mr. Calder testified that as soon as he

2     heard from ████████ that Mr. Ferguson was engaged in this

3     activity, he sent a cease and desist email that same day on

4     February 14th.

5          THE COURT:  Yes.

6          THE WITNESS:  14th, after all of this.  Months and

7     months I had been doing this and I hadn't denied it.

8          THE COURT:  Here's the issue:  So you're saying -- is

9     the argument that you're saying, Well, it's really just a

10    pretext, they knew, and this was the plan all along and they

11    are changing their story now?

12         THE WITNESS:  Exactly, your Honor.  I was following

13    instructions by MMA.  Under estoppel, they can't now bring

14    these complaints against me for doing what they instructed me

15    to do and clearly knew I was doing it.

16         THE COURT:  Okay.  But did they instruct you to -- we

17    saw certain exhibits related to -- I know there's an argument

18    about whether or not it's confidential.  But were there

19    instructions that you should email to yourself information

20    related to the compensation received by MMA from various

21    clients?

22         THE WITNESS:  Your Honor, I didn't see this as

23    confidential information.  As we've seen, I work under

24    securities rules.  The entire time, as all the exhibits have

25    shown, I thought I was supposed to be doing this.  I didn't

JA3VMARHredacted                    Ferguson - direct

```
 1   hide anything.  I thought it was okay to do this because Jeff
 2   Calder had instructed me to.
 3              As a matter of being adults and being professionals,
 4   Rick, we want you to do this.  I'm not going to ask him every
 5   step of the way.  I know what I need to do to transfer my
 6   clients.
 7              THE COURT:  Although the -- okay.  I think I
 8   understand.
 9              So basically, what you took away from that, the
10   meeting on December 20th, is that the contact you were to have
11   with your clients were to discuss with them whether or not they
12   were going to -- not the transition from over to MMA Securities
13   and Mr. Stephens, it was a transition -- well, yes, that, or
14   come with me.
15              THE WITNESS:  Correct, your Honor.
16              THE COURT:  All right.  Go ahead.
17              MR. FERGUSON:  I did not benefit from being fired from
18   MMAS, MMA.  I received no transfer bonus or any other bonus
19   that MMA seems to think I received.  This was the subject of a
20   significant amount of discovery requests and a significant
21   amount of time during my deposition, but the facts are there
22   just isn't any.  I make less money now since I was fired.  This
23   situation has been a lose, lose, lose for me.
24              All MMA and MMAS systems and laptops are backed up to
25   centralized services, so I didn't destroy anything.  In fact, I
```

JA3VMARHredacted                    Ferguson - direct

1    printed off all information that was localized to my laptop to

2    the MMA printer in San Francisco so MMA and MMAS would have a

3    copy of it.  I did all that before I deleted the information

4    from my laptop, as I had previously been instructed to do,

5    before turning it in by MMA IT person Adrienne Hilborne.

6            Jeff Calder fired me and told me on February 14th,

7    2019, I was never allowed in an MMA office again.  I sent in my

8    confused resignation the next day, February 15th, 2019, and

9    waited for a reply on how to return my company laptop.

10           Mara Crain finally responded to me on February 21st,

11   six days later.  She sent another email the very next day.  I

12   had started suspecting that MMA had intentionally set me up to

13   be fired, with this entire taking-my-book/Jeff-Stephens-last-

14   warning situation, telling me to do these things and now coming

15   after me for them.

16           So I informally asked an attorney friend, whom

17   suggested I respond as I did.  This only took one day, and I

18   think one day is warranted, given that I had been blindsided by

19   MMA firing me for following their instructions.

20           Mara Crain did not respond to me for four more days.

21   When she finally did on February 25th, I returned the items

22   immediately that same day.  MMA cannot plausibly state I

23   refused to return these items, when all ten days of the delay

24   were purely on the part of MMA.

25           One of the questions of this matter is should New York

JA3VMARHredacted                    Ferguson - direct

1    or California law apply regarding the nonsolicitation and

2    confidentiality agreement, which I testify I didn't sign due to

3    it not having the required FINRA arbitration clause.  Besides

4    the fact, MMA has submitted a document to the Court that they

5    knew was not the correct document --

6              THE COURT:  I'm sorry, which document?

7              THE WITNESS:  The nonsolicitation and confidentiality

8    agreement that, your Honor, you noticed was not original, and

9    then counsel admitted that they pulled pages from other

10   documents.

11             I respectfully ask the Court to also take --

12             THE COURT:  So just so I'm clear on this, are you

13   saying that with regard to that document, that it's your

14   signature, but you had crossed out that page?

15             THE WITNESS:  Correct, your Honor.

16             The reason they can't provide a true and complete

17   copy, as we've seen, I was constantly complaining that MMA and

18   MMAS were violating compliance regulations.  By signing that, I

19   noticed there's no arbitration agreement; it has to be in

20   there, so I had crossed out pages, missing pages.  We see there

21   was no agreement -- from the other agreements that were dated

22   later, there's no nonsolicitation and confidentiality

23   agreement.

24             I constantly was telling MMA and MMA Securities, I

25   can't sign something that is against FINRA regulations.

1          THE COURT:  When you say you were constantly saying

2    that, besides the striking out of portions of contracts and the

3    like -- first of all, did you retain any copies where you

4    struck out these portions?

5          THE WITNESS:  No.

6          THE COURT:  Did you send any emails contemporaneously

7    saying, Thank you for sending me this document.  You'll

8    note I've struck -- in other words, any contemporaneous emails

9    saying that you're not going to sign it because you believe it

10   violates FINRA?

11         THE WITNESS:  No, your Honor.  Most of these were done

12   in person very quickly, where MMA would come to me and say, You

13   need to sign this right now.  And --

14         THE COURT:  Well, but -- all right.  But isn't that --

15   you need to sign this right now, but you took the time to look

16   at it to know that it had these provisions in it to strike it

17   out.

18         THE WITNESS:  An arbitration clause is -- because I

19   deal with them in all my contracts, it's very obvious to me.

20         THE COURT:  All right.  So you struck it out.

21         What was the response?  I mean you're standing there.

22   You said it was in person.  First of all, who presented you

23   with these?

24         THE WITNESS:  I believe Bill Peartree presented me

25   with one, Jeff Calder presented me with one, Mara Crain.  But I

1      can't be exactly certain who on each one.

2              THE COURT:  All right.

3              And so you struck it out.  What was the reaction when

4      you struck it out?  You signed the end and you struck it out.

5      So --

6              THE WITNESS:  I would agree with Jeff Calder's

7      testimony, MMA and I have had a very contentious relationship

8      the last five years because of things like this.

9              THE COURT:  No, no.  But this is starting your

10     employment, right?  In other words --

11             THE WITNESS:  They accepted it.

12             THE COURT:  Well, then that's the question.  So you're

13     saying they had no reaction, they just -- you struck it out and

14     they were okay with it?

15             THE WITNESS:  No.  But if I refused to sign it --

16     that's ongoing -- that's why I ended up with a final warning,

17     is -- and I refused to sign that as well.

18             THE COURT:  I thought that one of the agreements that

19     you were saying was --

20             THE WITNESS:  I signed the agreement and I handed it

21     in.

22             THE COURT:  No, no.  But that was from the -- I

23     thought that was from your initial -- from 2/1 of -- I thought

24     that was an initial employment agreement.

25             THE WITNESS:  That was the very first one; that was

JA3VMARHredacted                Ferguson - direct

1    with Barney & Barney.  That did not have a separate

2    nonsolicitation and confidentiality agreement.

3            THE COURT:  That's okay.  Why don't you continue.  I

4    don't have the document in front of me.

5            But the document that I was referring to, where, I

6    think, Mr. Wickham said that a page was inserted, wasn't that

7    an initial agreement?

8            THE WITNESS:  I see.  Remember it was Barney & Barney

9    first.  MMA bought them February 1st, 2014.

10           THE COURT:  And that's --

11           THE WITNESS:  That's the agreement.

12           So that one, yes, that's the one where the pages are

13   missing.

14           THE COURT:  So you're saying that at that point, when

15   you were presented with this -- do you remember whether that

16   was Mr. Peartree who presented it to you or someone else?

17           THE WITNESS:  It was either Mr. Peartree or

18   Mr. Calder, but I don't remember which.

19           THE COURT:  Okay.

20           So that's presented to you.  You recognize that

21   there's confidentiality in there, and so you strike it out.

22   And there was no reaction?  They just accepted it?

23           MR. WICKHAM:  He struck out the arbitration clause,

24   not the confidentiality clause.

25           THE COURT:  I'm sorry, yes, the arbitration.

JA3VMARHredacted              Ferguson - direct

1              THE WITNESS:  Well, there was no arbitration.  So the

2      part of remedy, there's a part that you've replaced is the part

3      of remedy.

4              MR. WICKHAM:  The liquidated damages provision.

5              THE WITNESS:  Correct.  But you can't do -- there has

6      to be -- first it has to go to FINRA arbitration.

7              THE COURT:  Wait a second.

8              As I understand the document that was the MMA -- not

9      the securities, there was no arbitration provision in there and

10     it was the confidentiality provision that you were striking out

11     because -- well, let me ask, what was it that you were -- well,

12     do you know what -- what's the document?  Why don't we look at

13     the document.  I don't remember --

14             MR. WICKHAM:  It's Plaintiff's Exhibit 3, your Honor.

15             THE COURT:  All right.

16             Do you have the plaintiff's exhibits there also?

17             THE WITNESS:  I do.  Oh, well, I have it.

18             THE COURT:  What is it in your binder?

19             THE WITNESS:  I have it in my binder.  It's Tab 32.

20             MR. WICKHAM:  Pardon me?  Do you have the one that --

21             THE WITNESS:  I used your exhibit.

22             MR. WICKHAM:  Okay.  Good.

23             What's your exhibit number?

24             THE COURT:  It's No. 3.

25             THE WITNESS:  3.

JA3VMARHredacted              Ferguson - direct

1          THE COURT:  So, right, this is Exhibit 3, this is the

2      initial employment agreement when --

3          THE WITNESS:  Correct.

4          THE COURT:  -- Barney & Barney was being -- becoming

5      part of Marsh.  And I know that's not the correct terminology.

6          And so, as I understand it, what page or what things

7      did you cross out or take out in connection with this

8      agreement?

9          THE WITNESS:  And, your Honor, to the best of my

10     recollection, when I looked at this, you see it goes, as you

11     pointed out, page 1, page 2, page 3, page 4.  Page 5 is

12     completely different.  Then there's page 6, then it goes to

13     page 7.  But then there's another page 7.  There's more than

14     one page that has been replaced in this document.

15         THE COURT:  All right.  So first of all, what did you

16     recall -- what was page 5, if it wasn't --

17         THE WITNESS:  So page 5, as I'm looking at this, I

18     mean this is what caught my attention immediately, is anything

19     that says liquidated damages and goes into that, for a

20     FINRA-associated person, I can't agree to that unless there's

21     an arbitration.

22         THE COURT:  So do you remember one way or the other

23     whether you struck anything from the initial agreement?  In

24     other words, you're saying you think this was inserted after

25     the fact.  But do you recall objecting at the time to anything

1    contained in the document that's Exhibit 3?

2              THE WITNESS:  Yes, your Honor.  Counsel has already

3    admitted that they inserted this after the fact.

4              THE COURT:  No, no, I understand that.

5              But I'm trying to --

6              THE WITNESS:  What was originally on here?

7              THE COURT:  Correct.  In other words, you presented

8    with it and you signed a document because you -- right, this is

9    your -- the corrected on the last page, page 9, that's your

10   signature, right?

11             THE WITNESS:  Correct.

12             THE COURT:  All right.

13             So do you recall when you signed the document, were

14   there provisions that were in this document that you basically

15   struck as an indication that you weren't agreeing to that?

16             THE WITNESS:  And I can say yes, your Honor, that I

17   don't know exactly -- I don't have a copy of it, of what the

18   original agreement said, but I can testify that just looking at

19   this document, the liquidated damages, I would have struck

20   that.  So it's probably the same thing that I struck earlier.

21             THE COURT:  Okay.  Well, when you say -- well, the

22   question is do you recall striking anything at the time?

23             THE WITNESS:  Yes.

24             THE COURT:  Not later on having reviewed it and

25   saying, Oh, I probably wouldn't have signed this because of

JA3VMARHredacted              Ferguson - direct

1    FINRA.  In other words, you recall, when you got this, striking

2    out certain provisions?

3                THE WITNESS:  Yes, your Honor.

4                THE COURT:  All right.

5           And which provisions do you recall striking out?

6                THE WITNESS:  I don't have the original document, so I

7    don't know exactly what I struck out, because I would have to

8    see the original one.

9                THE COURT:  Well --

10               MR. WICKHAM:  The liquidated damages provision is the

11   same, it just -- it's the same language.  So if that's what

12   he's referring to, then he's referring to paragraph 7.

13               THE COURT:  I guess the question is do you have any

14   recollection of what provisions that you struck out?  Putting

15   aside that you don't have the original agreement, right, do you

16   recall at the time what things you struck at the time?

17               THE WITNESS:  I don't recall exactly, but I recall

18   that it was something about the damages.  That I cannot agree

19   as a FINRA person -- and that's in FINRA regulation, I can't

20   agree to anything that stipulates damages without going to

21   arbitration first.

22               THE COURT:  Okay.  All right.

23          So you think it was the damages provision, and that's

24   why this page 5 was inserted in here, because you believe you

25   struck it out at the time?

1           THE WITNESS:  Correct.  I'm not arguing with counsel

2      that whether this may or may not be an actual accurate

3      representation of what the agreement was originally done, but I

4      do know that I struck out certain parts when this was

5      originally presented to me.  And they were the parts about

6      damages.

7           THE COURT:  Okay.

8           But there are no contemporaneous emails relating to

9      that?

10          THE WITNESS:  No, your Honor.  If there are, MMA would

11     have them.

12          THE COURT:  And it's your testimony that even though

13     you struck out portions of the contracts which -- that MMA was

14     okay with you coming on board and having you work for them?

15          THE WITNESS:  Correct, your Honor.  There are often

16     changes to agreements.

17          One of the things that happened between --

18          THE COURT:  We'll take a break in a second for the

19     conference.

20          I'm fully aware that there are often changes to

21     agreements.  But an employment agreement -- well, I don't want

22     to get into it, but this is a fairly standard agreement.  I

23     think it was presented to other employees who were making the

24     transition.  Everyone else, I would imagine, probably signed

25     it.  So it's not a small issue when someone strikes a contract.

JA3VMARHredacted              Ferguson - direct

So this isn't quite like when you sign a -- when you're going
to get an apartment and you're signing a standard lease.  I
would imagine if you started striking out things, that there
would be a discussion that would happen.

          But what you're testifying to is that you struck it
out, there was no discussion, and they just --

          THE WITNESS:  I apologize if that's the impression
I've given, your Honor.  No, that's what I mean when I've said
MMA and I have had lots of discussion about these things.

          THE COURT:  About this, about FINRA.

          THE WITNESS:  At the time, yes, there were discussions
about it.

          THE COURT:  Where are the emails?

          THE WITNESS:  Yes, that's -- when I say -- when I
said -- testified that MMA had a lot of problems with me
because I kept bringing up FINRA compliance violations, this
was --

          THE COURT:  Where are the emails that show
contemporaneously you were bringing up the fact that you
believe that MMA or MMA Securities, whatever, was violating
certain FINRA rules?

          THE WITNESS:  Your Honor, besides what I've shown
today, I wouldn't have them.  MMA would have them, because they
were all on their servers.

          THE COURT:  So I guess what I would ask is you've

JA3VMARHredacted                Ferguson - direct

1    been -- as I understand it, you forwarded various -- you admit

2    that it was a contentious relationship over time; and yet you

3    never thought to copy, print out these emails relating to FINRA

4    that over the years, since 2014, that you were having these

5    disagreements back and forth?  You never did that?

6              THE WITNESS:  I printed some of them out.  Those have

7    been my exhibits that I've put here.

8              THE COURT:  All right.  Okay.

9              I'm sorry.  Go ahead.

10             Well, actually, I need to take a break to handle two

11   conferences that I mentioned.  So if I could ask you to step

12   down for a moment.

13             (Witness stepped down)

14             (Recess)

15             MR. FERGUSON:  So, your Honor, we were discussing

16   which parts would be likely to be struck out, what I've done

17   and what I've kept in the documentation.

18             And I apologize, your Honor, I wasn't ignoring you

19   while you were talking to me.  I was frantically trying to

20   find -- because I knew there was an example of it in my

21   exhibits.

22             THE COURT:  Okay.

23             THE WITNESS:  Exhibit 52.

24             So right before MMA purchased Barney & Barney --

25             MR. WICKHAM:  Sorry, is that 52?

1           MR. FERGUSON:  52.

2           THE COURT:  Five two.

3           THE WITNESS:  MMA purchased Barney & Barney February

4      1st, 2014.  Right before that, you see this was an agreement

5      that was presented to me by Barney & Barney, producer

6      agreement, the 13th day of August 2013.  And you can see there,

7      your Honor, while on page 3, all the strikeouts.  And I do have

8      the Word version of it.  While I didn't keep every document --

9      and I should have, I realize that now -- this is one of the

10     ones that I kept.  And you can see there I struck out

11     liquidated damages, other remedies.

12          And my comments that I gave back to Barney & Barney:

13     Really?  This seems rather preemptively punitive.  Agreement to

14     mediation at most would be more acceptable.  I was quoting and

15     telling them that they needed to follow FINRA regulations for

16     agreements with me.

17          THE COURT:  That's not what it says.

18          THE WITNESS:  Arbitration.

19          THE COURT:  Well, no, but what it says is, right, it

20     doesn't cite to FINRA; it just says you think it's draconian,

21     it's punitive, and you think mediation would be the better way

22     to go.

23          THE WITNESS:  Correct.  Because that's required by --

24     and I apologize, it's by reference.  The way my thinking always

25     is, I work under MMAS, so I'm always subject to FINRA rules and

JA3VMARHredacted              Ferguson - direct

1   regulations.

2              THE COURT:  Okay.  All right.

3              I'm sorry.  Go ahead.

4              MR. WICKHAM:  I'm sorry, your Honor.  He just said

5   that he was under MMAS.  The exhibit that he just went through

6   was in 2013.

7              THE COURT:  Yes, no, I recognize --

8              MR. WICKHAM:  It's before the acquisition.

9              THE COURT:  Yes.  He was just pointing out, because I

10  had asked questions whether he had kept any or had any examples

11  of him objecting to certain portions of the agreement.  So I

12  think that he was pointing that out.  I don't think he was

13  saying that this is -- well, it wasn't about --

14             MR. WICKHAM:  Thank you, your Honor.

15             MR. FERGUSON:  I stand corrected.  SagePoint

16  Financial.

17             THE COURT:  All right.

18             MR. FERGUSON:  Okay.  So moving on.

19             Your Honor, I respectfully request the Court also take

20  judicial notice of this in-depth discussion that I just found

21  very recently and I just printed it off.

22             THE COURT:  Oh, have you provided a copy to --

23             THE WITNESS:  No, but it's from a very respected and

24  well-known law firm that I don't think that they will

25  challenge.

1          MR. WICKHAM:  Your Honor, I'm not sure the relevance

2     of this.

3          THE COURT:  Same thing with the other document.  I'll

4     take it -- obviously I would imagine that there are legal

5     arguments made in this document.  It's probably some sort of

6     client notification thing.

7          So I'll take it subject to any argument.  Again, it's

8     not -- I'll just take it, rather than engaging in a

9     back-and-forth relating to it.  So we'll mark it -- why don't

10     we mark it Defendant's Exhibit -- looks like your exhibits go

11     up to 67, but why don't we, just to be on the safe side, make

12     it Defendant's Exhibit 70, subject to any objection.  Okay.

13          THE WITNESS:  Your Honor, can I respectfully explain

14     the significance?  It relates to my testimony.

15          THE COURT:  Okay.

16          THE WITNESS:  That is a paper written by Littler on

17     California Labor Code, Provision Section 925, that if an

18     employee chooses to void a nonconfidentiality and noncompete

19     clause, which, of course, I wouldn't do, that it's allowed,

20     that the California law allows it, that an employee who is

21     primarily in California, works in California --

22          MR. WICKHAM:  Your Honor, I'm going to object to him

23     getting into a legal discussion.  He's not a member of the

24     bar --

25          THE COURT:  Whoa, whoa, whoa.

1              MR. WICKHAM:  -- he's misconstruing the argument --

2              THE COURT:  Enough.  Enough.  Enough.  Okay?

3         He's proceeding *pro se*.  And yes, he's not a member of

4    the bar, but he's entitled to argue his case.

5              Don't roll your eyes at me, counsel.  Do not do that.

6    All right?

7              MR. WICKHAM:  I apologize, your Honor.

8              THE COURT:  Look, I understand what you're saying.

9    And I'm not going to allow legal argument at this point because

10   that's part of the papers.  If it relates to your testimony --

11   I understand that there's a legal argument that California law

12   applies, and that's one of the things that I'm being asked to

13   rule on.  And that you're referring me now to Section 925,

14   which you say, under California law, allows you to strike out

15   various things.  I get it.  That's a legal argument.  We're

16   here to discuss the facts.

17             Next.

18             MR. FERGUSON:  Understood, your Honor.

19             THE COURT:  And I apologize for snapping at you, but

20   if we engage in a back-and-forth, we're going to be here all

21   day.

22             Go ahead.

23             MR. FERGUSON:  Can I just include, my testimony is my

24   contract was materially changed.  By the testimony we've heard

25   here today, Jeff Calder did testify that effective November

JA3VMARHredacted                 Ferguson - direct

1st, 2018, MMA significantly altered my pay structure, gave me

a raise; they significantly changed my contract in that I was

no longer in a hybrid role, I was only supposed to be in a

service role.

THE COURT:  But I guess what are you -- as I

understand it, that was something that was going forward.  Was

there a written agreement that was presented to you?

THE WITNESS:  MMA has it.  I do not have a copy of it.

THE COURT:  Did you accept that?  As I understand it,

you didn't accept it and -- in other words, there was -- on the

one hand you say that you were fired, constructively

terminated; but on the other, there is a resignation letter.

Where is it that you accepted whatever the offer was?

THE WITNESS:  That was on November 1st, 2018, and only

MMA has a copy of it.

THE COURT:  No, but did you sign it?

THE WITNESS:  Yes, your Honor.

THE COURT:  Okay.  And what are you saying about that

agreement?  What is the impact of that agreement?

THE WITNESS:  I would just note that as your Honor

reads that, there was a material change to my contract,

November 1st, 2018.

THE COURT:  Okay.  Again, I don't know if that's part

of the documents or not, whatever the agreement is.

Do you have a sense, Mr. Wickham?  Have you ever seen

JA3VMARHredacted                    Ferguson - direct

1   a --

2           MR. WICKHAM:  They have a compensation plan for client

3   executive service.  His compensation plan for client executive

4   service, I'm looking for it, I believe it was signed in 2015.

5   It has the terms that Mr. Calder previously had described in

6   terms of base salary and then this bonus, one-time bonus based

7   on origination.

8           I'm not sure that -- what he's referring to about

9   another agreement.  I don't believe there's another agreement.

10  But his compensation went up.  He was at whatever, 85, 95, or

11  something like that.  He then had said he wanted a raise.  They

12  went back and forth.  His compensation -- his salary first was

13  increased to 115.  His salary was then increased up to 125

14  around this time period.

15          So that might be what he's referring to.  I'm not

16  aware of another agreement, your Honor.

17          THE COURT:  Okay.  I just want to make sure that if

18  there is something, that I just have it before me.  But that's

19  the only --

20          MR. WICKHAM:  I'm looking for the most recent one.

21          THE COURT:  All right.

22          Mr. Ferguson.

23          MR. FERGUSON:  I did not and have not disparaged MMA.

24  In fact, I gave them compliments, as we saw in some of the

25  exhibits they presented yesterday.  I had even referred them a

1   health and welfare client within a month or two after being

2   fired, ▮▮▮▮▮▮.  I referred them that business.

3           Right after I was fired, I told them they were in

4   danger of losing a health and welfare client, because that

5   client, when I spoke with them in February/March, had told me

6   they were happy I left MMS/MMA, because they were not happy

7   with MMA's health and welfare services that they were currently

8   using.  MMA has been able to retain that client because I told

9   them they needed to step up their game.  I made sure that they

10  retained that.

11          I have repeatedly stated to any persons, clients,

12  prospects, or anyone else, that MMA is a good company with good

13  people.

14          MMA will not benefit from -- your Honor, are we going

15  to do closing statements?

16          THE COURT:  Well, I think we're going to have to see

17  how much time that we have.

18          MR. FERGUSON:  MMA will not benefit from this

19  restraining order or injunction.  I cannot realistically

20  approach any of my old clients after MMA has poisoned them

21  against me like this; the damage is already done as we've seen.

22  Both MMAS, MMA, and I have suffered and it's time to move on

23  I've stated as much in one of my offers of settlement when I

24  agreed I wouldn't contact even my old clients.  As we've seen

25  from the client response exhibits, both of our testimonies,

JA3VMARHredacted           Ferguson - direct

there's just no point in it.  We'll both end up losing more.

MMA alone makes almost a billion dollars in revenue per year.  To think that my measly 600,000 book of business is enough concern for a Fortune 500 conglomerate to spend hundreds of thousands in legal fees, hiring attorneys, man-hours, the time, the trouble, it just isn't realistic.

This is a personal vendetta against me and a coverup to try and bury me so I won't or I can't file discrimination and lost wages sued against them in California and/or a FINRA action for MMA acting as an unregistered broker-dealer, as it has obviously been doing.

On the other hand, an injunction and restraining order barring me from working with clients who knowingly, and informed with all pertinent information, chose me, will cause me to have no income, go out of business, probably have to find another profession, given MMA's continued disparaging of me in our business community.

It will, more importantly, deprive my clients and prospects of their freedom of choice.  These companies made a conscious, informed choice between MMAS, myself, or any other adviser company, as we've seen, a decision that was forced by MMA by their own actions.  Why should those companies' employees be deprived of their freedom of choice just because MMA has a personal grudge against me.

THE COURT:  Anything else with regard to backstory?

1   So, for example -- well, let me ask, is there any other factual

2   testimony?

3           MR. FERGUSON:  No.  I'll take questions.

4           THE COURT:  All right.

5           Mr. Wickham, cross-examination.

6           MR. WICKHAM:  Thank you, your Honor.

7           THE COURT:  You can remain seated.

8           MR. WICKHAM:  I'll keep it brief.

9   CROSS-EXAMINATION

10  BY MR. WICKHAM:

11  Q.  Mr. Ferguson, starting with the last point about clients

12  making a conscious choice to choose you versus leaving MMA,

13  leaving one of the most respected firms in the country in terms

14  of its space, very well-respected retirement service division,

15  in ████████ case, according to what Mr. Calder said, they

16  received a solicitation from you that was saying that this was

17  no big deal, this was some change in the back office protocol,

18  and just sign these forms and we'll be good.

19          And it was only because ████████ was sitting with

20  Mr. Calder and they asked him about it.  And he said to them,

21  No, no, I don't know what that is, but, you know, if you signed

22  that, then you're going to be leaving MMA and going to an

23  entirely different firm.  It was only because of that that they

24  then determined that they wouldn't do that, they wouldn't sign

25  the paperwork, and everything else.

JA3VMARHredacted                Ferguson - cross

```
1        So you talk about clients making a conscious choice,
2   but weren't each of your solicitations that you sent on
3   February 12, 13, and 14, at a minimum, misleading, maybe even
4   flat-out deceptive, and that, at least in ████████ case and a
5   couple of other examples that Mr. Calder shared, that clients
6   weren't making a conscious choice?
7   A.  What you're choosing not to tell the Court is that I met
8   with ██████ a month or two prior.  I had a verbal conversation
9   with them in person explaining what I was doing.
10       I met with nearly all these clients in person first.
11  It's not -- think of this change.  It's not realistic that I
12  would just send, Hey, sign this, good to go.  I went out and
13  met with them.  This is a very personal situation.  If you have
14  an investment adviser, it's a personal relationship.
15       So I met with ██████ in person, explained to them
16  what I'm doing.
17       I think Mr. Calder has misrepresented that when he met
18  with ██████, they said, We understand Rick is, you know,
19  changing, and he talked them out of it.  Because I met with
20  them.  If MMA searches their records, they will see I had a
21  meeting with ██████ prior, a committee meeting.  And I
22  explained the situation to them.
23  Q.  So you met with ██████ a month in advance and told them
24  that you were leaving MMA, and that you were going to go to
25  Teros, and you were presenting that option to them?
```

JA3VMARHredacted                Ferguson - cross

1    A.  As instructed by Jeff Calder.

2            MR. WICKHAM:  Your Honor, all of this is new

3    information about him meeting with clients and soliciting them

4    a month in advance, but anyway.

5    A.  Counsellor, how is that new information, when I've

6    testified, there's a lot of emails prior to this.  There's at

7    least --

8            THE COURT:  One second.

9            During the deposition, was the ███████ email -- do you

10   recall whether the ██████ email was marked as an exhibit?

11           MR. WICKHAM:  Yes, we touched on all of those.  As a

12   matter of fact, I actually had asked Mr. Ferguson, you know, at

13   the deposition about the meetings.  Because the question was --

14   and I really don't want to testify on the deposition.

15           THE COURT:  No, that's fine.

16           MR. WICKHAM:  But the question was did you -- when you

17   were -- when you had this information about the change of the

18   fiduciary role from Mr. Ferguson to Mr. Stephens and all that,

19   what did you do?  How did you communicate that to clients?

20           That's an entirely different conversation.  You would

21   go to clients and say, Look, I have been your fiduciary.  I'm

22   also your service adviser.  But we have a new person coming

23   into the bay area, Mr. Stephens.  I'd like to introduce you to

24   Mr. Stephens.  And the company would be proposing that

25   Mr. Stephens come in as the client executive producer.  I'll

JA3VMARHredacted            Ferguson - cross

1    still stay on and service and everything else.  That's one

2    conversation.  That's how you pass off clients.  That's how you

3    do things.

4          I had no idea -- and Mr. Ferguson did not testify at

5    the deposition -- that he was telling clients, I'm going to

6    Teros, so come with me.

7          THE COURT:  What I'll allow you to do, obviously, if

8    you believe they're saying it's inconsistent with the

9    deposition, I'm allow you -- we can talk a little bit about

10   post hearing.  But there's still the issue of the third-party

11   documents and some other things still to come.  But I will

12   allow, if you want post-hearing briefing, both with regard to

13   the testimony that was given -- and you can point out the

14   discrepancy between what the deposition testimony is and the

15   testimony here today.

16         Just to be clear, so this meeting you had a month

17   before, was it ▮▮▮▮▮?  With ▮▮▮▮▮.  You explained to them

18   that there's a new person coming in, and they had a choice

19   between going -- staying with MMS or going with you, wherever

20   you were going.

21         THE WITNESS:  Correct.

22         THE COURT:  And at that time, did you know where you

23   were going?

24         THE WITNESS:  I had a very good idea.  I had explored

25   various firms.  Resources had -- was most interesting.

JA3VMARHredacted                 Ferguson - cross

1           THE COURT:  All right.

2           And who did you have this meeting with?

3           THE WITNESS:  The ████████ committee.

4           THE COURT:  I'm sorry, it's a benefits committee or

5      something?

6           THE WITNESS:  No, it's an investment committee.

7           THE COURT:  All right, so the investment -- so it's

8      more -- is it just one person or is it --

9           THE WITNESS:  They have three.

10          THE COURT:  Okay.  So you met with three people and

11     had this discussion and said -- and told them that you would be

12     leaving.  And so at some point they were going to -- you were

13     going to ask them to make a choice basically.

14          THE WITNESS:  Correct.

15          And your Honor, it should be pointed out that there

16     was a little mischaracterization there.

17          THE COURT:  No, I understand that your position is

18     that what you were told was you were to go to clients and tell

19     them, You can stay with MMAS or you can come with me, at least

20     that's my understanding.

21          THE WITNESS:  I mean mischaracterization as far as the

22     point of the meetings.

23          So these were normal meetings that I have to do with

24     clients to review their investments.  So as part of that

25     meeting, I did my job, my normal job to meet with these clients

1    and review their investments.

2              THE COURT:  So it was a regularly scheduled meeting.

3              THE WITNESS:  Correct.

4              THE COURT:  But you took the opportunity at that

5    meeting also to discuss the -- that you would be leaving and

6    that they would be faced with a choice.

7              THE WITNESS:  Correct.  Because during this time, my

8    impression was I was kind of being forced out, so -- and that

9    client chose not to go with me.  They actually did reach out to

10   me afterwards and asked for my help on things.  So I

11   communicated with them.  But I knew they actively -- they had

12   looked at both sides and they said, Rick, we're staying.

13             THE COURT:  Okay.  Were there other -- besides

14   ████████, had you had other meetings where you -- in-person

15   meetings where you had mentioned -- where you did the same

16   thing, where you mentioned, I'm going to be leaving, and the

17   decision is are you going to stay with MMAS or are you going to

18   come with me.

19             THE WITNESS:  Yes, your Honor.  There are exhibits in

20   mind.  The problem is we started to look at them.  They show I

21   was talking to clients, I was meeting with them.  And some of

22   the clients said, Well, we're going to stay.  Some said, Yes,

23   we would be interested, will you send us more information.

24             THE COURT:  So that's part of the emails that I've

25   seen that are part of the --

JA3VMARHredacted               Ferguson - cross

1            THE WITNESS:  Correct.  A lot of emails.

2            And, your Honor, I did send emails with Teros

3     information because I thought it was okay.  I thought I was

4     following the instructions of Jeff Calder.

5            THE COURT:  Okay.  You may continue.

6     BY MR. WICKHAM:

7     Q.  And just to be clear, these meetings, when you're meeting

8     with MMA clients and telling them that you're leaving MMA,

9     you're going to Teros, and you're asking them whether they'll

10    go to Teros with you, you were still an MMA employee at that

11    time, right?

12    A.  Well, I -- this is where we've always disagreed,

13    counsellor.  I consider all my actions done with investment

14    clients to be under MMAS.  So I would ask you to refer to MMAS

15    when we're talking about securities claims, as FINRA regulation

16    requires.

17           THE COURT:  Well, putting that aside, you were still

18    employed by a Marsh & McLennan entity.

19           THE WITNESS:  Yes.

20           THE COURT:  All right.

21    BY MR. WICKHAM:

22    Q.  To the extent that any of these trips to meet with the

23    Marsh & McLennan clients, were you putting in expense reports

24    on these things?

25    A.  Yes, because as I've testified, I was doing a normal

JA3VMARHredacted                Ferguson - cross

1    meeting.  I am required to meet with all my clients on a

2    regular basis to review their investments.

3    Q.  And did you bring Jeff Stephens to any of these meetings?

4    A.  No.

5    Q.  Okay.

6    A.  Why would I?

7    Q.  Now, during this time period, were you using your personal

8    email -- were you using your personal emails to communicate

9    with Teros?

10   A.  Yes.

11   Q.  Okay.  And were you using your personal email to talk about

12   your plans?

13          THE COURT:  Mr. Wickham, just so you're saying -- I

14   just want to get the time frame.  I think you said "at this

15   time."

16          MR. WICKHAM:  My apologies.

17          THE COURT:  That's okay.

18   Q.  In late December of 2018 and January of 2019, while you're

19   still employed by a Marsh entity, were you using your personal

20   email account to communicate with Nate White, the president of

21   Teros, about your plans to leave the Marsh entity to go to

22   Teros?

23   A.  Some, yes, just like we've seen I did with Barney & Barney

24   when I joined them.

25   Q.  Okay.  So MMA -- excuse me, the Marsh entities' security

JA3VMARHredacted                 Ferguson - cross

1    protocols for emails going out of the firm that are

2    inappropriate, they don't apply to your personal email account,

3    so they wouldn't know that you were having all these

4    communications with Mr. White, right?

5    A.  Well, actually, they were, because I also sent some emails

6    directly from my MMA account to Teros.

7    Q.  I'm sorry.  The emails that you were sending from your

8    personal email address, that wouldn't have been flagged by the

9    Marsh entity protocol, right?

10   A.  Correct, because that was about my personal business, not

11   MMA or MMAS.

12   Q.  Okay.  Well, these were communications that you were having

13   with Mr. White about your plans to take your book of business

14   from the Marsh entity to Teros, right?

15   A.  As instructed by Jeff Calder, yes.

16          Counsellor, we've been over this.

17   Q.  Okay.  And you sent to Mr. White the client list that is

18   referenced -- that Mr. Calder previously looked at.  It's

19   Plaintiff's Exhibit 26.

20   A.  Correct.  Regulation S-P says that a securities adviser can

21   take a client list and contact information, the basic contact

22   information.

23   Q.  Hold on.  I just want to make sure you have Exhibit 26 in

24   front of you.

25          THE COURT:  Just one second.

1  A.  Okay.

2  Q.  Did you prepare this document or did you take this off of

3  the Marsh computer system?

4  A.  I prepared this.  Marsh wouldn't have anything like this.

5  Q.  Okay.  Well, this has -- all these various clients on the

6  right-hand side, these are Marsh clients, right?

7  A.  Correct.  All this information is exempt per security

8  Regulation S-P, which exempts all the information as we looked

9  at in the document --

10        THE COURT:  The question -- again, this is not about

11  arguments, it's about what does the document indicate.

12        THE WITNESS:  Yes.

13  Q.  These were all Marsh clients, right?

14  A.  No.  Some of these were not MMA clients.  These were --

15  make the distinction.  When you say "Marsh," that's like 15

16  companies.

17  Q.  Marsh entity clients, using your terminology.

18        THE COURT:  Look, here's the issue, all right.  When

19  we say -- I understand you want MMA Securities.  I get it.  But

20  if we're going to quibble about -- you were either -- under

21  either parties' interpretation, you're either MMA Securities or

22  MMA Agency LLC, all right.

23        So let's just assume that when we say "Marsh," we're

24  referring to both.  And I understand the relative arguments

25  around that.

JA3VMARHredacted                Ferguson - cross

1              Next question.
2    BY MR. WICKHAM:
3    Q.  Were all these Marsh clients?
4    A.  Hold on, counsel.
5              THE WITNESS:  Your Honor, I would like to respectfully
6    submit if we say "Marsh," that's probably 30,000 clients.
7    Marsh owns so many companies.
8              THE COURT:  This is a list that's in front of you.
9    It's Exhibit 26.  Look at the names on this list.  Are they
10   clients of Marsh Securities or Marsh & McLennan Agency LLC?
11             THE WITNESS:  Yes.
12             THE COURT:  Okay.
13   Q.  And the revenue numbers, are those revenue numbers that you
14   took from the computer systems, estimated revenue numbers?
15   A.  Well, they are estimated, so, no, I didn't take them from
16   the computer system.
17             THE COURT:  Well --
18   A.  The computer system would have exact.
19             THE COURT:  Well, wait a second.  You're saying that
20   you calculated the first one, ███████████████, the estimated
21   revenue to be ██████████?
22             THE WITNESS:  No.  Your Honor, he asked me if all of
23   them -- you look down here below, some of them, $5,000.
24             THE COURT:  But who -- where did this -- did you
25   calculate these?

JA3VMARHredacted               Ferguson - cross

1          THE WITNESS:  This is -- yeah, the way we calculate

2     it, the way I calculate it, the assets time a certain amount of

3     whatever commissions.

4          THE COURT:  In other words, you didn't take this --

5     you, yourself sat and basically made these estimated revenue

6     numbers?

7          THE WITNESS:  Correct.  The MMA system does not have

8     this information.  It only says -- in fact, the MMA system

9     doesn't include -- all it has is the assets.

10          THE COURT:  Well, how did you create this estimated --

11     why don't you take us through how you created the estimated

12     revenue.

13          THE WITNESS:  So it came from a spreadsheet.  You see

14     ████████████, ██████.  So what I would have taken, okay,

15     what do I know are the assets, times what do I know -- I know

16     that they -- the commission on that is 25 basis points.

17          THE COURT:  How do you know that?

18          THE WITNESS:  I'm with my client.  All of these are my

19     clients; I know what their commissions are.

20          THE COURT:  So you took that information and then you

21     did the calculation, provide what the revenue is.

22          THE WITNESS:  Yeah.  It's an Excel spreadsheet, so it

23     has it in there.

24          THE COURT:  Okay.  Go ahead.

25          THE WITNESS:  And, your Honor, I would point out, as

JA3VMARHredacted            Ferguson - cross

1   we saw earlier, I believe it was Kim Blackmore, stated I did

2   not have access to this information.  In her email she said,

3   Can't give you access.  So I had to do this myself.

4           THE COURT:  Okay.

5   BY MR. WICKHAM:

6   Q.  So your testimony is is that you didn't simply just, you

7   know, copy this from Marsh documents; you sat down with a

8   calculator and you came up with these numbers on your own, is

9   that your testimony?

10  A.  I would alter that just a little bit that, yes, I did, but

11  it's an Excel spreadsheet, if you consider that a calculator.

12  Q.  Okay.  And the list of the clients themselves --

13          THE COURT:  I'm sorry, just one second.

14          When you say -- so you had an Excel spreadsheet that

15  you -- in other words, when you say an Excel spreadsheet, are

16  you saying the Excel spreadsheet did the calculation?

17          THE WITNESS:  Correct, your Honor.

18          THE COURT:  So you created the Excel spreadsheet so

19  that it would do the calculation.

20          THE WITNESS:  Correct, your Honor.

21          THE COURT:  And how long had you had this Excel

22  spreadsheet?

23          THE WITNESS:  I have had many versions of these -- as

24  I stated earlier, the MMA systems, they don't have this, so I

25  had to create it myself.

JA3VMARHredacted                    Ferguson - cross

1              THE COURT:  Okay.  All right.

2              I'm sorry, counsel.  Go ahead.

3    BY MR. WICKHAM:

4    Q.  And when did you do these calculations?  When did you

5    create this document?

6    A.  I would have done something like this several times a year.

7    Q.  Beginning when?

8    A.  As long as I get clients.  If the systems available to me

9    don't have this type of information -- obviously this is

10   something I want to keep track of.

11             THE COURT:  Why?

12             THE WITNESS:  For my income that through the years MMA

13   kept promising me that they would pay me based on my original

14   contract.  So I kept track of this.

15             THE COURT:  Whoa.

16             Let me ask, what was your compensation based on when

17   you were at -- right before you left?  In other words, let's

18   not get into whatever was that November 2018, but was your --

19   did you actually have commissions?  Other than the first time,

20   25 percent commission, did you have commissions that would

21   be -- you're entitled to year over year, based upon business

22   that you brought in?

23             THE WITNESS:  There was two; so, yes.  There was one

24   was new business, 25 percent; but there was also, as Jeff

25   Calder stated, a competency, which is based off part of my book

JA3VMARHredacted                Ferguson - cross

1    of business.  So they total it up.

2           Unfortunately, they didn't keep track of this.  So

3    each year I had to present this during my annual review and

4    say, Here's my clients.  Here's my calculations of what new

5    business I did.  And here's my total book of business, because

6    there's a bonus on each of those.

7           THE COURT:  That's based upon -- so you're servicing

8    those clients.

9           THE WITNESS:  Correct, as the investment adviser.

10          THE COURT:  So you would basically say in your -- as I

11   understand it, in order to -- when you go in to make a pitch

12   about what your compensation should be and what your bonus

13   should be or whatever, you would indicate, I had 35 clients.  I

14   know that the revenue approximately that was generated from

15   that is X, so my book of business is that much.  I think, you

16   know, I should be entitled to, you know, whatever.

17          THE WITNESS:  That's an approximation, yes.  A big

18   distinction, I think, is to remember, MMA never assigned me any

19   help.  I was on my own.  I was both the sales and the service.

20          THE COURT:  Okay.  All right.

21          I'm sorry, go ahead, Mr. Wickham.

22          If I could ask just for you to step back, and if we

23   could have counsel in the initial conference.

24          (Recess)

25   BY MR. WICKHAM:

JA3VMARHredacted              Ferguson - cross

1   Q.  I just want to -- not to belabor this matter, but going

2   back to the spreadsheet that you created --

3   A.  Can you remind me, which tab?

4        THE COURT:  26.

5   Q.  26.

6        So if I understand what you're saying, that you

7   maintained a list of Marsh clients at home or on your personal

8   computer or something like that over many years?

9   A.  Yes.

10  Q.  Okay.  And in an Excel spreadsheet, you used that Excel

11  spreadsheet in order to run estimates of what revenues would

12  have been year over year?

13  A.  Correct.  I was required to by MMA.

14  Q.  Okay.  So this is all during your employment with Marsh,

15  and this is information that is relevant to your job at Marsh,

16  right?

17  A.  Correct.  As I've stated in past testimony, this was kept

18  both on my MMA Securities laptop, but I would also do a lot of

19  work at home.  Remember I had to do two jobs, unlike other

20  people.  So it required me to work 60, 70 hours a week.  So I

21  did a lot of work at home.

22  Q.  Okay.  And this is a document that you've just recently

23  produced to us in response to the document request; is that

24  right?

25  A.  I believe so.

JA3VMARHredacted                  Ferguson - cross

1   Q.  Okay.  Weren't you, under the Marsh agreement, required to

2   return all Marsh property and documents?

3   A.  Yes.

4   Q.  Wasn't the cease and desist letter that I sent to you on

5   February 19, didn't that demand the return of all documents

6   pertaining to Marsh and your employment and everything else?

7   A.  And as I've explained in prior testimony, I took that as

8   MMA, but, of course, under Regulation S-P, MMAS, this is not

9   confidential information, this is public information.

10  Q.  This is something you created while you're employed by

11  Marsh relating to your job at Marsh.  But you don't think that

12  this is information that belongs to Marsh?

13  A.  I believe it's information that belongs to the client.

14  Q.  Well, this is more than that.  This is a compilation of

15  clients and revenue estimates.  This doesn't belong to any

16  individual client; this is something that you said belongs

17  to -- related to your employment.

18  A.  Counsellor, Regulation S-P says that the client list

19  belongs to the adviser.

20          THE COURT:  Let me ask just a quick question.

21          So this was on your -- you had a copy of this, the

22  Excel spreadsheet, on your Marsh computer?

23          THE WITNESS:  Yes, and on my home --

24          THE COURT:  And on your home computer.

25  BY MR. WICKHAM:

JA3VMARHredacted                 Ferguson - cross

1   Q.  You said Regulation S-P, is that right?  Is that what you

2   just said?

3   A.  Correct.

4   Q.  S-P, Sam Paul?

5   A.  Yes.

6   Q.  Okay.  The SEC regulation Sam Paul?

7   A.  Correct.

8   Q.  Okay.

9         MR. WICKHAM:  We'll come back to that, your Honor.

10        THE COURT:  Sure.

11  Q.  We respectfully disagree with any statements about that.  I

12  was looking at that issue just this morning, Mr. Ferguson.

13        But regardless, the MMA agreement that we were talking

14  about earlier that is in Exhibit 3 to the plaintiff's

15  exhibits --

16        THE COURT:  Exhibit 3, in the smaller binder.

17        THE WITNESS:  Okay.

18  Q.  So just so I understand this, the first page of this

19  document, where it says "Barney & Barney MMA Nonsolicitation

20  and Confidentiality Agreement," has this page been altered in

21  any way from what you originally saw?

22  A.  I wouldn't know that.  That was five years ago.

23  Q.  Do you have any information that it has been?

24  A.  No.

25  Q.  Okay.  So let's just look at the top of this.  It says:

1    Agreement dated as of 2/1.  Is that your printing there, the

2    2/1?

3    A.  I believe it is.

4    Q.  Okay.  2014, between Barney & Barney, a Marsh & McLennan

5    Agency company, and subsidiaries thereof, together with its

6    parents and affiliates and Elmer Ferguson.

7         Does this look like the agreement that the company --

8    the offer letter that you received after Marsh acquired Barney

9    & Barney?

10   A.  It does.

11   Q.  Okay.

12        And in here it says, on the second whereas clause,

13   under where it says recitals, do you see where I'm referring?

14   It says recitals there, and then it says whereas is one, and

15   then there's a second whereas.  Do you see where I'm referring?

16   A.  I see, yes.

17   Q.  Whereas simultaneously with and immediately subsequent to

18   the Barney & Barney acquisition, Barney & Barney was merged

19   with and into employer, and the employee shall be the surviving

20   entity of such merger.

21        Was that your understanding of the transaction, that

22   Barney & Barney was being merged into Marsh?

23   A.  That was the intention, yes.  My understanding was that

24   they bought the company first.

25   Q.  Right.  Okay.

JA3VMARHredacted                 Ferguson - cross

1          But you have no information that it wasn't merged in,

2     right?

3     A.   Correct.

4     Q.   Okay.

5          The next whereas clause, it says:  Employee was

6     employed by Barney & Barney immediately prior to the Barney &

7     Barney acquisition and, subsequent to the merger, has been

8     offered and has accepted employment with the employer.

9          Do you see that there?

10    A.   Yes.

11    Q.   Okay.

12         And if you go up to the definition of the employer at

13    the very top in the second line of the document, it says:

14    Between Barney & Barney and Marsh & McLennan Agency LLC Company

15    and/or subsidiaries thereof, and it has a defined term,

16    "employer."

17         So was it your understanding at this time that your

18    employment with Barney & Barney, in effect, was ending by

19    virtue of the merger, and that you were going to work for a

20    entity that was, you know, part of the Marsh & McLennan Agency

21    Company?

22    A.   I would not completely agree with your summary there.  As I

23    had repeatedly shown, I considered myself working under MMAS,

24    because everything I do and everything I did for any of these

25    companies is securities related; they are all securities

JA3VMARHredacted                Ferguson - cross

1   clients.  So, yes, I do see that this contract was going from

2   Barney & Barney, that MMA bought them, that they were all

3   shifting to that structure.

4   Q.  Okay.  And that you were accepting employment with this

5   Marsh entity, yes?

6   A.  While we disagreed on the definition of employment, yes.

7   Q.  Okay.

8           I'm not going to ask you about the regulation, but let

9   me ask you something I know a little bit about, which is

10  employment law.  Have you ever heard of the concept of joint

11  employment?

12  A.  No.  But I think I know -- I understand the term.

13  Q.  Where somebody could have two employers.

14  A.  Yes.

15  Q.  You've heard of that before?

16  A.  I understand the concept.

17  Q.  Okay.

18          Do you think it's conceivable here that you could have

19  been an MMA employee and, at certain times, for certain

20  purposes, referred to as a MMAS employee?

21  A.  Counsel, that's been my point all along.  For everything on

22  these complaints, they apply to my employment with MMAS.

23  Q.  No, I'm asking whether it's conceivable.  Whether you

24  completely rule it out or whether it's conceivable that you

25  could have been an employee of both?

JA3VMARHredacted                Ferguson - cross

1   A.  Of course.  That's been my point all along.

2   Q.  Okay.  And your registration was with -- well, originally

3   SagePoint, and then MMC, and then later, MMAS, right?

4   A.  I followed you there.  From SagePoint to MM -- and jointly

5   with MMCS, and then MMAS.  I think that's correct.

6   Q.  Right.  So your securities registration was with MMAS,

7   which is where it should be, right?

8   A.  Correct.

9   Q.  Okay.

10          And on the first page of Exhibit 3, the

11   nonsolicitation and confidentiality agreement -- and by the

12   way, you ultimately did say that you signed this document after

13   you struck some things out, right?

14   A.  Yeah.  Perhaps we didn't agree that I signed a version of

15   it.

16   Q.  Okay.

17          And if I understand your prior testimony, you did not

18   strike out paragraph 1; is that right?

19   A.  I don't remember doing that.

20   Q.  Okay.

21          And you did not strike out paragraph 2, which is on

22   page 3?

23   A.  I do not remember doing that.

24   Q.  Okay.

25          You do believe, however, on the bottom of page 4 and

1   the carryover on page 5, the liquidated damages clause, you do

2   believe that you struck that out?

3   A.  Well, I didn't think there was a minute point there.  I

4   don't know exactly what -- if we take your statement and

5   promise that this is the original version, then, yes.  And as

6   I've testified previously and I showed in another example, the

7   liquidated damages, this, in my opinion, goes against certain

8   rules and regulations.  So, yes, I would have.

9   Q.  Right.  But this is the paragraph, paragraph 7, that's the

10  one you think you struck out, right?

11  A.  Yes, with -- attorney, you're trying to put a few words in

12  my mouth here that I don't know what that original document

13  was.  We don't have clarification because you submitted -- the

14  document is not the same.

15          THE COURT:  Well, but the issue though is -- and I

16  think I had asked this.  You have a recollection you struck

17  something, is that an accurate statement?

18          THE WITNESS:  Correct.

19          THE COURT:  What is your recollection as to what you

20  struck?

21          THE WITNESS:  It would have been this.  So --

22          THE COURT:  Understanding that -- in other words, you

23  recall having struck something having to do with damages,

24  liquidated damages.  You don't know whether or not the specific

25  language on page 5 of 9 was, in fact, the language you struck.

1          THE WITNESS:  Correct.

2          THE COURT:  All right.

3    BY MR. WICKHAM:

4    Q.  But you recall striking the liquidated damages clause,

5    whatever that was, right?

6    A.  Correct.

7    Q.  That's the only clause you struck, right?

8    A.  Well, now you're asking me -- because I did point out there

9    was other pages.  And given as long ago as this document was, I

10   can't make a testimony or statement that I didn't strike

11   anything else out.

12         THE COURT:  Well, do you recall though?  Understanding

13   that, do you recall striking anything else out?

14         THE WITNESS:  I don't recall whether I did or not.

15         THE COURT:  Okay.

16   Q.  And you went to your Exhibit 52.  Why don't you get to that

17   please.

18   A.  Okay.

19   Q.  And you use that as an illustration of your striking out

20   the liquidated damages clause because of some objection to it;

21   is that right?

22   A.  Yes.

23   Q.  Okay.

24         And that was a 2013 producer agreement at Barney &

25   Barney, not at MMA, right?

JA3VMARHredacted                Ferguson - cross

1    A.  Correct.

2    Q.  Okay.

3         Can you flip over to Exhibit 20 of the plaintiff's

4    exhibits?

5    A.  Okay.

6    Q.  So the agreement that originally was dated on your exhibit

7    in August, I believe, 13th day of August, 2013, and that

8    document you didn't sign; correct?

9    A.  Correct.

10   Q.  If you go to the last page there of your Exhibit 52, you

11   didn't sign it?

12   A.  Correct.

13   Q.  Right?

14        Because you had those things that you wanted to strike

15   out.

16   A.  Correct.

17   Q.  Okay.  But then when that document was again presented to

18   you in Exhibit 20 of the plaintiff's exhibits, as of November

19   1, 2013 --

20   A.  '14.

21   Q.  I'm sorry, Exhibit 20.

22        THE COURT:  Exhibit 20.  November, yes, the first,

23   yes, I'm sorry.

24   Q.  Then later, actually on January 14, 2014, you did sign it,

25   right?

1    A.  Correct.

2    Q.  Okay.  With liquidated damages language unstruck.

3    A.  Correct.  I was told that I'd be fired if I didn't.

4         I needed a job, Mr. Wickham.  I'm not a rich man.  I

5    don't have a lot of money.  I needed this job.

6    Q.  You had just shared your striking language as indicating

7    that somehow you wouldn't have signed it at all, and that was

8    an illustration of proof that you didn't sign it.  And it looks

9    like, you know, you did propose striking it, but then

10   ultimately you did sign it unstruck, right?

11   A.  I believe you're mischaracterizing that.  That I didn't say

12   I wouldn't sign it, I said I testified -- I stated to the

13   employer, I shouldn't be signing this, I don't want to sign

14   this.  I gave an example.  But that's a different situation

15   than your employer coming to you and saying, You're going to be

16   fired if you don't sign this.

17   Q.  Well, it's not -- well, I don't want to get into argument.

18        THE COURT:  Who actually -- who told you that?  Who

19   told you that you'd be fired?

20        THE WITNESS:  Bill Peartree.

21        THE COURT:  Fired or you just wouldn't have a job?  In

22   other words, there's a difference between saying, Look, this is

23   the agreement, take it or leave it.  If you don't want to, you

24   don't have to come work at MMA.

25        THE WITNESS:  That's a very good point, your Honor.

JA3VMARHredacted              Ferguson - cross

1    And I would say that that's the way it was.  It was presented
2    to me like take this or leave.
3              THE COURT:  That's sort of what -- that was -- okay.
4              All right.  No, I understand it.
5    Q.  And just --
6              THE COURT:  So let me ask, is that your recollection
7    of what then happened when you were presented with the
8    agreement in February?  In other words, that's Exhibit 3 to the
9    plaintiffs?  In other words, that you struck out initially that
10   provision, but eventually you signed it?
11             THE WITNESS:  Correct.  I needed a job.
12             THE COURT:  So the fact that you -- so the agreement
13   that you signed actually had the liquidated damages provision.
14             THE WITNESS:  I don't know, because that -- on this
15   version, as I remember, it was struck out.
16             THE COURT:  No, no.  But I guess what I'm asking is --
17   so Exhibit 3, you were presented with it initially.  You struck
18   out that liquidated damages portion.
19             THE WITNESS:  Correct.
20             THE COURT:  Did you subsequently -- putting aside what
21   the literal language was, in other words, did you subsequently
22   sign a version of the agreement with a liquidated damages
23   provision because you were basically told, Look, that's fine,
24   Rick, if you want to, you can -- but this is take it or leave
25   it basically.

JA3VMARHredacted                Ferguson - cross

1            THE WITNESS:  Now I understand.

2            To my knowledge, no, I did not; that the version I

3   signed did have this struck out still.

4            THE COURT:  Okay.  I just wanted to clarify that.

5            All right.  Go ahead, Mr. Wickham.

6   BY MR. WICKHAM:

7   Q.  But you don't have a copy of Exhibit 3 that has the

8   strikeout, do you?

9   A.  Oh, I wish I did, but, no.

10  Q.  Okay.

11           Well, you do have 2007 email messages, email messages

12  when you were first applying for a job at Barney & Barney; you

13  retained those, right?

14  A.  Correct.

15  Q.  Okay.  But you didn't retain the strikeout of the

16  liquidated damages clause of the confidentiality agreement for

17  MMA?

18  A.  I thought that I did, but I could not find it.

19  Q.  Okay.

20           And just not to leave Exhibit 20 too quickly, do you

21  have that in front of you please?

22  A.  Okay.

23  Q.  And just turn to paragraph 2.3.

24  A.  Wait, I'm on the wrong one.  What exhibit?

25           THE COURT:  Exhibit 20.

JA3VMARHredacted                Ferguson - cross

1    A.   Okay.

2    Q.   Do you have that in front of you?

3    A.   I do.

4    Q.   And do you see where it says "Confidential Information and

5    Materials"?

6    A.   I do.

7    Q.   Do you see that there?

8         And do you see, if you go down one, two, three, four,

9    five, six, seven, eight, nine, ten lines in that paragraph,

10   where it says:  All confidential and proprietary information of

11   B&B, whether prepared by B&B, employee or otherwise, that comes

12   into employee's possession, shall remain the exclusive property

13   of B&B and shall not be removed from the premises of B&B under

14   any circumstances without the prior written consent of B&B,

15   except as necessary to conduct the business of B&B.

16        You saw that there?

17   A.   Yes.

18   Q.   Okay.  You didn't strike out this clause, right?

19   A.   Apparently not.

20   Q.   And you signed this agreement?

21   A.   I think I did.

22   Q.   Okay.

23        And the information that you were putting into that

24   spreadsheet that you were using year after year, that also is

25   information that came to you in the course and scope of your

employment with the Marsh entity, but you didn't give that

back, right?

A.   Well, that's -- there's a difference there, counsellor.

Everything that I prepared, you guys do have back.  And Diane

Rosen told me to destroy everything, which I did back in -- I

don't know when her -- I don't remember her email, whether it

was December or January.  She said, Confirm you've destroyed

everything, which at that time I did.

        And anything after that, from your own exhibit, cannot

leave the premises of Barney & Barney under any circumstances

without the prior written consent of B&B, except as necessary

to conduct the business of B&B.

        I was conducting the business of B&B, subsequently

MMA.  As we have seen, they were fully aware of it.  They knew

what I was doing.  And for the purposes of our intent here

today, they instructed me to do it.  So I was following.

        THE COURT:  Well, but I guess the issue that was --

you still have this spreadsheet, right?

        THE WITNESS:  Well, the first that I have I created

afterwards.

        THE COURT:  Well, let me just ask you, so you created

a version that you kept at work, and you had another one on

your personal computer.  Are you saying you destroyed the one

that you had -- you either gave back or destroyed the one you

had on your work computer, and then you deleted or destroyed

JA3VMARHredacted                  Ferguson - cross

 1    the one on your personal computer, and then you recreated it.

 2              THE WITNESS:  Let me follow it through.

 3              Correct.  I don't remember when Diane Rosen said, but

 4    she said, Rick, you know, I want you to go.  And she looked at

 5    it and said okay.  We had a conversation.  And I said, you

 6    know, I do work at home.

 7              She goes, I know it.  Everybody does.  But will you

 8    please go destroy all of that information, which I had no

 9    problem with it, because it's old information, I don't need it

10    anymore.  So at that time I destroyed everything.

11              Now, going forward, you see it's a list of clients, so

12    I just recreated it.

13              THE COURT:  When you say you recreated it, where did

14    you get the numbers from?  Are there other underlying raw data

15    that you would need?  I understand you may remember the

16    percentages, what the percentages may be, but where did you get

17    the raw numbers to create the end result in the spreadsheet?

18              THE WITNESS:  I pull it from different sources, but

19    the main one, as you've seen -- so I'm required, as -- well,

20    I'm not required to.  As part of my personal business practice,

21    I keep all my clients' 5500s.  So -- and as we saw, all of that

22    information is on there.  Because I don't want to keep reaching

23    out to a client every time I want to know the financial

24    information.  Financial companies like Oppenheimer, JPMorgan,

25    all of them, they have it.  So I can reach out to them and get

1     that information as well.  But mainly, as we saw, 5500s and

2     other sources.  And then, yes, some of it I know because I'm

3     also doing meetings regularly with these people.  So as I might

4     do a meeting, I am going over their investments and I would

5     know, Okay, you have $10 million -- you have 20 million

6     overall, 20,500,000, whatever.  Well, I know what that is.

7     Okay, that client had $20,000,500, put that in there, I know I

8     made 25 basis points on that.

9                 THE COURT:  Okay.

10    BY MR. WICKHAM:

11    Q.  Now, let me show you a version -- a declaration that we

12    have presented.

13                MR. WICKHAM:  Your Honor, may I approach the witness?

14                THE COURT:  You may.

15    Q.  This is from Diane Rosen.  You talked about that with

16    Mr. Calder a couple of times.

17                If you turn to the third exhibit of this -- do you

18    know where this same grouping of exhibits are in your exhibit

19    binder?  Because my colleagues can't seem to find it.

20    A.  I'm sorry, I don't.

21    Q.  Okay.  All right.  We'll just go with the one I got here.

22    If we find the other ones, then we'll let you know.

23                But if you turn to Exhibit 17 of this, do you see that

24    in front of you?

25    A.  I do.

JA3VMARHredacted            Ferguson - cross

1    Q.  Okay.  So this is an email string between you and Diane

2    Rosen, right?

3    A.  Correct.

4    Q.  And if you go to her email at the bottom, the January 24

5    email at 1:26 p.m., she's sending an email to you.  Do you see

6    that there?

7    A.  I do.

8    Q.  And it says:  Rick -- skipping over the first paragraph --

9    as part of our call, we discussed the company's policy on

10   acceptable use of information assets and the strict prohibition

11   of the transmission of confidential client information to a

12   colleague's personal email address.  Do you see that there?

13   A.  Yes.

14   Q.  Did you have that discussion with Ms. Rosen?

15   A.  Yes.

16   Q.  Did she tell you that there's a strict prohibition on the

17   transmission of confidential client information to your

18   personal email address?

19   A.  That's not how she phrased it.

20   Q.  Okay.  All right.

21   A.  Counsel, let me finish my answer.

22   Q.  We've got her declaration here.  I'll follow up with --

23   A.  Counsel, I'm allowed to answer.

24        THE COURT:  So, I'm sorry, so that's not what you

25   understand what she said.  What she said is in this email, is

JA3VMARHredacted                Ferguson - cross

1   that --

2           THE WITNESS:  Well, no.  She -- he's characterizing it

3   as, yes, we talked about this.  She told me, I get it, Rick.

4   It's no big deal.  I have to tell you this.  So she told me,

5   she was like, I have to put this in an email and tell this to

6   you.

7           THE COURT:  Okay.

8   BY MR. WICKHAM:

9   Q.  And then she goes on to say:  We also discussed the fact

10  that certain emails have been flagged in the email system due

11  to your forwarding those emails to your personal email address.

12          Do you see that there?

13  A.  Yes.

14  Q.  Did you discuss that with her as well?

15  A.  Correct.  It's one of my whole points, counsellor, is that

16  MMA says they weren't aware of anything I was doing, but here

17  we can see they obviously were.

18  Q.  They found that you had sent things to your personal email

19  address.

20          And then she said:  While these client transmissions

21  are of published articles that may be of interest to MMA's

22  investment clients, the emails also contain email addresses of

23  our clients, which is considered confidential proprietary

24  company information.  Do you see that there?

25  A.  I do.

JA3VMARHredacted            Ferguson - cross

```
 1    Q.  Was that a message that she sent to you and that you

 2    reviewed on the date that you received this, on or about

 3    January 24, 2019?

 4    A.  Yes.  She sent this after we had our phone conversation.

 5    Q.  So you knew at that point in time that the company

 6    considered the email addresses of its clients to be

 7    confidential proprietary information, right?

 8    A.  Well, counsellor, during our phone conversation, I had --

 9    same thing I've always done:  I told her, I said, Well, let's

10    make the distinction.  MMAS clients versus MMA.  And I stated,

11    this information, including email address, is publicly

12    available.  As I showed here today, it took me a Google search

13    to find somebody's email address.

14            So we did talk about that and that distinction in our

15    phone call.  And she said, Rick, I get it.  I understand.  And

16    she goes, I know you were just copying yourself because you

17    wanted these articles to read.  Because, she goes, I know you

18    do a lot of work at home, we all know it.  But I have to send

19    you this email.  It's part of compliance.

20    Q.  She sent you an email message telling you that the company

21    considered those emails company proprietary information; isn't

22    that right?

23    A.  Yes, per the conversation as I just stated.

24    Q.  And then she said to you:  I would ask that you review your

25    personal email records, delete all emails containing MMA client
```

1    email addresses, and confirm to me back that this has been

2    completed.  She said that to you as well?

3    A.  Correct.  Distinction, MMA, which we discussed on our phone

4    call.

5    Q.  But you didn't do that, did you?

6    A.  I did go into a lot of information.

7    Q.  Well, no.  Two weeks later, on January 13 and 14, you then

8    sent all of this email attachments and emails to your computer,

9    your personal computer.  Oh, no, you sent it to your Teros

10   computer.

11        When she said you can't send it to your personal

12   computer, did you think, Ah, well, I Diane said I can't send

13   company proprietary information to my personal computer, but I

14   can send it to Teros.  Was that your thinking?  Was that your

15   thought process, why it was appropriate for you to send out all

16   of that client information to Teros?

17   A.  Counsel, I don't want to be destructful (sic), but you know

18   how ridiculous that sounds?

19        We've already discussed Jeff Calder instructed me to

20   do this.  I'm not a moron.  And I have never denied this.  I

21   sent all that information from my MMA computer to my Teros.

22   Why would I do that unless I was following the instructions, as

23   allowed to in that agreement?  I was instructed by Barney &

24   Barney, I was operating under those instructions.  I knew this

25   would be flagged; I just had a conversation with Diane Rosen.

1    You're speaking to my point that there's -- I did this with

2    full knowledge that they --

3               THE COURT:  That's the crux of the issue that I've got

4    to decide.  It's not necessarily what necessarily was in your

5    mind, but what the ramifications of it are.

6               Let me ask this:  The clients that are listed on the

7    spreadsheet in Exhibit 26, Plaintiff's 26, those clients

8    received retirement services, is that accurate?

9               THE WITNESS:  Correct.

10               THE COURT:  So they had 401 -- but they also -- did

11    many of them also receive other -- have other products, Marsh &

12    McLennan products, that were not retirement?

13               THE WITNESS:  I would assume so, but --

14               THE COURT:  So they were in addition -- and this is --

15    again, I'm not saying I'm taking this in the way I'm saying.

16    They were -- they had security -- they had agreements with MMS

17    for their retirement, right?

18               THE WITNESS:  Correct.

19               THE COURT:  And they had -- presumably they had

20    agreements related to these other products that they were

21    getting from Marsh.

22               THE WITNESS:  If they had them, I would assume they

23    would.

24               THE COURT:  So they were clients of both MMS and MMA,

25    right?

1              THE WITNESS:  If they were, yes.

2              THE COURT:  What do you mean if they were?  We saw

3    other documents that showed -- I think there was a spreadsheet

4    that showed there was income coming from different places; some

5    of it was retirement, some of it were other products.

6              THE WITNESS:  Correct.

7         As we also saw, I was not allowed to see that side of

8    the business.  So I actually don't know which of these clients

9    had other business, unless for some reason, like, they might be

10   out there at the same time I'm doing it, or --

11             THE COURT:  Wait, wait.

12        Are you saying that you would go and you would present

13   the retirement services, you wouldn't know what other things --

14   putting aside access on a computer system, you wouldn't know

15   that there were other people at Marsh who had contact with your

16   clients?

17             THE WITNESS:  Sometimes, occasionally.  But there's a

18   lot of them I don't know, because I operate so independent.

19   MMA has structured it this way.  For my securities business,

20   I'm completely on my own.  A lot of my reviews show that Rick

21   works independent.  Jeff Calder had statements on that.  So I

22   honestly do not know every client --

23             THE COURT:  But you knew at the time that in light of

24   the fact that Marsh is the size that it is, that many of the

25   clients, in addition to having retirement services, they had

JA3VMARHredacted              Ferguson - cross

1    other services provided by Marsh, right?

2              THE WITNESS:  I assume so.  Like an example would

3    be --

4              THE COURT:  Not just assume so.  You knew for some of

5    these clients.

6              THE WITNESS:  For some of them I knew, yes.

7              THE COURT:  And so for those clients, weren't they

8    clearly -- they were also Marsh clients, right?

9              THE WITNESS:  Yes.

10             THE COURT:  All right.  And so they -- and so you had

11   an agreement, right -- putting aside your agreement was with

12   MMA, whatever it is, so those clients were both MMA Securities

13   clients -- and this is, again, taking your understanding of

14   it -- and MMA clients, right?

15             THE WITNESS:  Some of them were.

16             THE COURT:  Okay.  All right.

17             Go ahead, Mr. Wickham.

18   BY MR. WICKHAM:

19   Q.  Mr. Ferguson, what I don't understand is when Ms. Rosen

20   just had told you on January 24 to, No. 1, don't send things to

21   your personal email address; and, No. 2, to delete things from

22   your personal email address, after she made that clear to you

23   as the MMA compliance officer, why did you think that two weeks

24   later that you would be able to send email messages to Teros

25   with all of that very same client information?

A.  Counsellor you just made two different examples.  You

state -- we were talking about my personal email address.

Great.  Okay.  Didn't do it.  Now you're saying, Well, why did

you follow Jeff Calder's instructions to send them to Teros.

Q.  So you thought that because she said don't send them to

your personal email address, you thought it was okay to send

that very same information to a competitor's email address,

right?  That's what you're saying?

A.  I was transitioning my book, yes.  Under the direction of

MMA and MMAS, I was transferring my book of clients that chose

to go with me.

Q.  Okay.  Well, you resigned on what date?

A.  February 15.

Q.  Okay.  And you sent all those emails to yourself, at least

according to the exhibits we saw earlier, on the 13th and 14th

of February?

A.  That I can't testify to.

Q.  Well, if you want to look at it again, we can do that.

Let's look at Exhibits 5, 6, and 7?

A.  I'll accept your dates.

Q.  Look at Exhibit 5, that says February 13.  If you look at

Exhibit 6, that says February 13.  If you look at Exhibit 7,

that says February 13.  If you look at Exhibit 8, that says

February 13.  And if you look at Exhibit 28, where you sent the

BA main email addresses, on February 13.

JA3VMARHredacted                 Ferguson - cross

1          So you sent all of that Marsh entity client

2    information to Teros on those dates, right?

3    A.   Yes.

4    Q.   Two weeks after Ms. Rosen said that you shouldn't do that?

5    A.   Mischaracterization.  She said I shouldn't send stuff to my

6    personal email.  That's not my personal email address.

7    Q.   Gotcha.  Gotcha.  Okay.

8          Now, also, for purposes of expediency, I didn't attach

9    all of the attachments to these email messages just so we

10   didn't burden the Court with too much information.  But just

11   for the exhibits that are in this book, would it surprise you

12   that all of that information printed out is two or three inches

13   thick?  Would that surprise you?

14   A.   I don't know what it is.  I'm assuming --

15   Q.   All the email messages that we just looked at.

16   A.   I'm assuming that's the 3,400 contacts I tried to email to

17   myself and it didn't work.

18   Q.   Would it surprise you that it prints out at three inches

19   thick?

20   A.   3,400?  No, it wouldn't surprise me at all.

21   Q.   And if you take into account all of the information that

22   you emailed to yourself on those dates, would it surprise you

23   that they would fill out four very thick binders of all of the

24   information that was coming off of your Marsh computer that you

25   were sending to Teros?  Would that surprise you that it would

1    fill four binders of materials?

2    A.  3,400 clients?  No.  Contacts.

3    Q.  But it was more than contacts.  You sent contacts, you sent

4    your calendar, you sent, you know -- I mean you retained a

5    client list.  You retained all of this information basically to

6    pick up what you thought was your book, even though the

7    documents say that these are clients of the firm.  But you took

8    all the information necessary to pick up your book, carried it

9    over to Teros, and then just continue on, right?

10   A.  I think you're mischaracterizing.

11           Over 3,000 contacts, you think they were all clients?

12   No.

13   Q.  No, no, I'm talking about --

14   A.  That was 13 years of my life in that system.

15   Q.  Hold on.  Hold on.

16           I'm talking about all the information that you emailed

17   to yourself.  You picked all of that up from the Marsh computer

18   system and you emailed it to yourself over at Teros, right?

19   A.  Correct.  As we've discussed today and yesterday, I was

20   instructed I was being forced out of the company, 13 years of

21   that company, all my siblings, my family, they are all in

22   there, their birth dates are in there, and all the important

23   dates of my life are all saved in that calendar.  Yes, I wanted

24   it.

25           THE COURT:  Let me ask this though:  Exhibit 28, which

 1   is the BA main, right, am I correct that -- does that encompass

 2   all of the bay area clients?

 3           THE WITNESS:  It was intended to.  I'm the one who

 4   created that.  It's an old label.  I think there's probably

 5   some errors, but generally that's what it was intended --

 6           THE COURT:  Okay.  And some of those -- I take it some

 7   of those aren't your clients.  In other words, that some of

 8   them are bay area clients, but they aren't your clients.

 9           THE WITNESS:  No.  So anybody in here would be a

10   client that I worked with.

11           THE COURT:  At some point.

12           THE WITNESS:  I think there were -- correct.  Probably

13   some of them -- well, you know, they might all be clients I

14   worked with specifically.

15           THE COURT:  But are there clients that at the time

16   that you sent this that had retirement plans or that you were

17   working with with retirement plans?

18           THE WITNESS:  These were all retirement plan clients

19   of mine.

20           THE COURT:  Okay.

21           Are there clients that you were no longer dealing

22   with?

23           THE WITNESS:  I don't see any, no.

24           THE COURT:  You had 68 clients at the time, that was

25   your book of business?

1      THE WITNESS:  Your Honor, 55.  Some of them are --

2  there's more than one for a contact.

3      THE COURT:  Okay.  And of these, did you also keep or

4  have a spreadsheet and know which of these entities had, in

5  addition to retirement services, other things with --

6      THE WITNESS:  No.  I didn't concern myself with the

7  other lines of business.

8      THE COURT:  Did you ever participate, when you went to

9  a client to pitch them with other members of Marsh, in other

10  words, selling them not only retirement services, but other

11  things.

12      THE WITNESS:  Occasionally, yes.

13      THE COURT:  Who were the people -- who were some of

14  the people, names of some of the people you dealt with?

15      THE WITNESS:  At the client or with --

16      THE COURT:  No, at Marsh.

17      THE WITNESS:  Marsh.

18      The other producers.  So they would bring me out --

19  sometimes if they couldn't close a case, they would bring me

20  out to help close it.

21      THE COURT:  But I'm talking about for other products

22  other than retirement products.  In other words, where --

23  you're basically selling everything at Marsh or a lot of things

24  that Marsh is providing.  Some of them may be retirement, some

25  of it's insurance.  So that you have clients that are maybe

JA3VMARHredacted              Ferguson - cross

looking for an entity where they can get full service.  So did
you ever do presentations like that?

THE WITNESS:  Yes.  So I would meet with them for
those meetings.  A good example is ████████.  They had been
trying to close that for quite some time and just couldn't
quite get it over the finish line.

And ██████ said, Hey, we're really interested in
retirement services.  So they would bring me out -- and this
happened quite often.  I would do the presentation.  And then
if I got the business, they would let me know, but after that
we'd go our separate ways.  And sometimes I would know if they
got the business, other times I would not.

THE COURT:  Okay.  All right.

Mr. Wickham.

BY MR. WICKHAM:

Q.  Now, you also, in your declaration, you said that you
deleted some of these emails or you said that you couldn't open
them, right?

A.  All of that stuff you have there, it didn't work.

Q.  So that's not completely correct, right?  If you turn to
Exhibit 11.  And Exhibit 11 is your communications with the
401(k) plan committee of Thredup.

On March 7 you're sending email messages to the 401(k)
committee of ██████, using the contact information that you
had taken from Marsh.  So at least those email messages, they

1   opened up just fine, right?

2   A.  No, there's a difference there, counsellor.

3          All of that stuff I sent to myself I couldn't get to

4   open up.  That doesn't mean I didn't have this information.  I

5   mean Thredup, I know that their email address, even without

6   looking, it's first name dot last name at ███████, except for

7   one person, ████████████.  Because she'd been there so

8   long, her email address is ███████████████.  A lot of these

9   things I just know.  I worked with these people for six years.

10  Q.  And from 2007 to February of 2019, you had signed a series

11  of agreements with Barney & Barney, and later with Marsh &

12  McLennan, all saying that all of that information was company

13  confidential information; that it was company property, not

14  your property, right?

15  A.  Yes.  Counsel, we've covered this many times.  I get it.

16  MMA's position is that they own this.  We've talked many times.

17  I've shown a lot of evidence where we went back and forth,

18  because I said this information is not confidential.  And then

19  finally, I'm following Jeff Calder's instructions and Bill

20  Peartree's anyway.

21  Q.  That's something else that I'm not quite so clear about.

22         If you turn to Exhibit 22, this is another document

23  you produced in this litigation, do you have that in front of

24  you?

25  A.  I do.

1    Q.  And could you tell me what these -- these two email

2    messages are?  Just if you could identify them for me.  Just

3    let me know who they're from and who they're to.

4    A.  This is between Nate White and myself.

5    Q.  Okay.  And so one of the messages is Mr. Nate White sending

6    an email message to you on December 20th; correct?

7    A.  Correct.

8    Q.  And that's Nate White at Teros Advisors.  He was the

9    principal at Teros Advisors?

10   A.  Correct.

11   Q.  Okay.  And this is the day of the infamous final warning

12   meeting, right?

13   A.  Correct.

14   Q.  Okay.  So that day you're having a discussion with

15   Mr. White, an advanced discussion about your moving over to

16   Teros, right?

17   A.  Correct.

18   Q.  So you actually were looking to get out of MMA or Marsh

19   entities, you know, well in advance of the December 20th

20   meeting, right?

21   A.  Counsel, you're bringing up old information.  I had already

22   shown exhibits that I discovered the deception all the way back

23   as far as what was August.  And so I had started exploring my

24   options.

25              Some of my stuff said I was reaching out to clients

1    saying, Hey, I think you've been transferred to somebody else.

2              Yes, I was like, Okay, what's going on here?

3              So this December 20th, when Bill Peartree and Jeff

4    Calder said, You're on your way out, here's what we want you to

5    do.  So it would be natural for me to reach out and say, Hey,

6    Nate, it looks like I am on my way out.

7    Q.  Mr. Ferguson, we've got limited time because Mr. Calder

8    needs to catch a plane, I have to catch a plane.  So if you

9    could just listen to my questions, answer them.  I'm going to

10   try to be as efficient as I can.

11             All I wanted to find out was that did you, prior to

12   that infamous December 20th meeting, already have plans to

13   leave Marsh?

14   A.  No.

15   Q.  So why were you having these advanced discussions with

16   Mr. White on December 20th about compliance, about Triad, about

17   RIA?  Why were you having those discussions with Mr. White at

18   that point in time?

19   A.  Because it's clearly me asking, what is your company like?

20   It's okay, counsellor, for me to reach out and ask about other

21   companies.  I didn't have to live at MMA the rest of my life.

22   It's perfectly fine for me to reach out and say, Hmm, maybe I'd

23   like to make a move, especially given the events that were

24   happening.  It would be more than natural that I was thinking,

25   With my time limited here, maybe I need to keep my options

1   open.

2              THE COURT:  But in your top email in your response on

3   January 2nd, right, by then, right, you're basically saying

4   you're crafting an email to your clients.

5              THE WITNESS:  January 2nd, that's much later.  So

6   December 20th is when I sent that, because it's like, all

7   right, up to that point I didn't really know what was going on.

8   December 20th, Jeff Calder and Bill Peartree made it extremely

9   clear to me that I was on my way out.  So I reach out.  So

10  between then and, then, yeah, obviously if I know I'm on my way

11  out, then I pretty much was going to go with Teros.

12  Q.   Okay.  But, Mr. Ferguson, even your statement about the

13  December 20th meeting that you just made, that isn't true

14  either.

15             Isn't it accurate that as early as September of 2018

16  and in August of 2018, that Mr. Peartree, Mr. Calder, others

17  within MMA, had discussions with you to describe all of these

18  things, the Jeff Stephens joining the firm, your participation

19  of that, your active encouragement of Mr. Stephens coming into

20  the firm?  And they were looking for a solution of how do they

21  bring in this new producer and to meet his compensation needs

22  in a manner that would not lead to your loss of any

23  compensation.

24             And it was when you had found out that Mr. Stephens

25  was going to be picking up and receiving commissions that

weren't being paid to you, so you weren't losing anything, it
was only when you found out that Mr. Stephens was going to
start picking that up, that that's when suddenly, you know,
your being in favor of Mr. Stephens joining turned into this
big situation where you were no longer in favor of that, right?
A.  Well, you're incorrect.  That's a very long statement.  But
even the last part where you said, okay, I wasn't receiving the
commissions, we have said two of my bonuses were -- one was
specifically based off of those commissions, and the other one
was too.  So if I don't have any commissions, now I don't get
any bonus --

          THE COURT:  Wait, wait, wait.

          Those two were the one-time 25 percent?

          THE WITNESS:  Well, and then the other one was based
on my ongoing book of business.

          THE COURT:  But the other one was based upon your
service.  In other words, you could have continued, as I
understand it, even if you weren't a fiduciary, to service
those clients.  You still would have done the same spreadsheet
showing what the -- right?

          In other words, they still would have been part of
what you would have been able to present for that particular
bonus, in other words, what clients you're basically providing
services to.

          THE WITNESS:  No, your Honor.  That would no longer be

1    my responsibility.  I wouldn't be doing that.

2              I did that because I saw myself as a producer in the

3    hybrid role.  That was based on to get that -- but I was also

4    getting for the service, so I kept track of it myself.  But the

5    minute I stopped being a producer, a producer's job is to do

6    all that.  And given the fact that I couldn't really -- I hate

7    to say, I couldn't really trust MMA on my pay, this was very

8    frightening for me.  But I would not know what they would base

9    it off of.

10             THE COURT:  All right.

11             THE WITNESS:  So, counsel, to answer your question --

12   BY MR. WICKHAM:

13   Q.  Mr. Ferguson, it's okay.

14             Let me show you something.  You just said you were a

15   producer.  And let's just -- let's get that clarified.

16             MR. WICKHAM:  Your Honor, permission to approach the

17   bench.

18             THE COURT:  You may.

19             MR. WICKHAM:  We'll mark this as Exhibit 31.

20             THE COURT:  Okay.  Thank you.

21   Q.  Have you seen Exhibit 31 --

22   A.  Mm-hmm.

23   Q.  -- Mr. Ferguson?

24             And is this an email message that you sent to Bill

25   Peartree on or about September 23, 2014?

JA3VMARHredacted                    Ferguson - cross

A.  It is.

Q.  And you were talking to Mr. Peartree about wanting to

schedule a time for a call, right?

A.  Correct.

Q.  And in this message, you confirmed to Mr. Peartree that you

spoke to Mr. Calder, and that you indicated that you were going

to be returning to service or with some sort of a hybrid

option, but that you were leaving the sales, you were leaving

the producer role, you were returning to service, right?

A.  That's what it says in this email, because it's what I was

instructed to do by Jeff Calder.

          I remember this specifically.  There is another email

that you're not producing where I sent to Jeff Calder right

after this, saying, Jeff, I've made nice with Bill as you told

me to or something along those lines.  They had forced me --

the part we didn't get into in my testimony, when I started to

go over my commissions, this isn't the time frame when -- so we

do agree that during 2014, I was a producer.

          But for some reason, they refused to pay me the money

that I was owed.  They came to me and said, You didn't make any

money.  But my exhibits specifically show I validated my

contract, I made almost $300,000 that year, and they refused to

accept that.  And they said, No, we're only crediting you with,

I believe it was, about $10,000.  So you have to go back to

doing service.

1            One of the things we were arguing about is I said,

2    Look, I'm a producer, but you won't give me any service, like a

3    service person, like you do everybody else.

4            So this is part of all we were arguing about.  And

5    Jeff Calder told me, he said, Rick, if you don't do this role,

6    this hybrid role, there really isn't a place for you here.

7            So I did this, what I had to do to keep my job and

8    accept it.  And I had to make nice with Bill Peartree because

9    it was at this point I was accusing Bill Peartree of

10   withholding my pay, which my documents show he did.

11   Q.  Were you lying in this email message?

12   A.  No, I wasn't lying.  I --

13   Q.  When you said, I told Jeff today that I would rather be in

14   service with some sort of a hybrid option to keep bringing on

15   new business, which is what happened, was that a true statement

16   or now are you saying that you made a false statement to

17   Mr. Peartree?

18   A.  No, this was -- my option was there's no place for you here

19   or you tell us that you want the hybrid role.

20   Q.  I don't see the words "I was forced" anywhere in this

21   sentence; is that right?

22   A.  If I'm trying to make nice with somebody who I just had a

23   huge argument with, why would I do that?

24   Q.  And then your next sentence says:  Putting my ego aside, I

25   really feel that that be best for all involved.

JA3VMARHredacted                Ferguson - cross

1           Did you think that your returning to service would be

2    best for all involved?  And is that why you wrote that in this

3    message?

4    A.  I didn't really have a choice, did I?  There was no one to

5    do service.  You see there where I state down below -- or here,

6    someone needs -- we need someone to focus on and be in charge

7    of files, compliance, general management, overall book of

8    revenue.  I know you weren't there, but at this time this is

9    one of the big things we were arguing about.  Every producer at

10   Barney & Barney or MMA -- this time it was Barney & Barney --

11   is also assigned a service person.  And that service person

12   goes out on meetings with them, takes notes, does all the

13   follow-up work.  I, for some reason --

14   Q.  Mr. Ferguson, we're running out of time.  Mr. Calder has to

15   leave in ten minutes.

16           I think I've already asked my question.  I would like

17   to move on to my next one.

18           THE COURT:  Go ahead.

19   Q.  Would you please turn to Exhibit 24 in our book.

20   A.  I'm there.

21   Q.  So this is an email, another email from you to Nate White

22   at the top, January 29, 2019.

23   A.  Correct.

24   Q.  And is this some sort of a hit list of clients that you're

25   going to be soliciting?

1    A.  These are the list of my clients.

2    Q.  Those are all the clients that you solicited?

3    A.  I didn't solicit them.  I went to them and I said, Here's

4    your choice.

5    Q.  Right.  You asked them whether they would move over to

6    Teros with you, right?

7    A.  I said, You can either stay with Jeff Stephens or you can

8    go with me.

9    Q.  Okay.  Well, even under California law, that's a

10   solicitation, even more so under New York law.

11          And you signed an agreement with Marsh entities

12   promising not to solicit clients?

13   A.  But it was -- it states, unless -- I can send this out if

14   I'm following the instructions or doing the business of MMA or

15   B&B, which I was.

16   Q.  Okay.  And then also Exhibit 25 please.

17          Now, what this is is a message from you to, again,

18   Mr. White at Teros, February 8, 2019, at a point in time when

19   you're still an MMA employee, right?

20   A.  Correct.

21   Q.  Right?  Okay.

22          And here you actually have two tranches of clients

23   that you're planning on soliciting.  There's the first tranche,

24   the ones that you described as the yes clients, you know, as

25   the list starting with ███████.  And then the second round,

JA3VMARHredacted              Ferguson - cross

1  who you said that you're not sure about, starting with

2  █████████  and continuing on to the bottom on the next page,

3  the ████████████.

4        Was that the order that you were going to first

5  solicit the first wave and then solicit the second wave for the

6  ones you weren't so sure about?

7  A.  No, a little bit different.  There were ones that --

8  remember, I've already talked -- this is, what, February.  I've

9  already talked with most of these people.  Some said, Well, we

10 think we might want to stay.  So they were going to have a

11 meeting with Jeff Stephens and see what they felt about him.

12       Some said, Well, no, Rick, we want to be with you.  So

13 breaking it up.  As I was instructed to do, give them the

14 choice.  Some clients automatically want to go with me.  Some

15 are like, Well, no, send us more information; we want to think

16 about this.

17 Q.  Okay.  Just to button things up, turn to Exhibit 15.

18       Do you recognize these as all your W-2s with Marsh &

19 McLennan Agency?

20 A.  Yes.

21 Q.  Listed as your employer?

22 A.  Yes.

23 Q.  And you were prolific with your raising issues, compliance

24 issues, and everything else.

25       Did you ever raise any issues with your tax forms,

something that most people probably spend the most time

scrutinizing in the year?  Did you ever go into, you know,

Marsh's tax department and say, Oh, what are you doing?  Why

are you putting down MMA as my employer?

A.   Counsellor, you're mischaracterizing.  There's nothing

wrong with -- the income, as we covered so many times, the

income has to flow, the client, the financial companies, over

to the MMA Securities, then it's fine if they repatriate it

under corporate law, just like a subsidiary repatriating money

up to their parent, that's fine.  And then the parent can pay

me.

        As we saw in one of my agreements that I signed, the

correct version it's supposed to be for all people like me

under securities, that happens, they get to keep a portion, but

it's clarified as I am paying them for ministerial and

administrative services.  That's how these contracts are

supposed to be.

        In a way, I'm arguing to protect MMA.  Because if it's

found that they were getting commissions directly, they are in

trouble.

Q.   You didn't answer my question.

        Did you ever go to anybody at Marsh and complain about

these W-2s --

A.   I just explained there's no problem with that money

going --

JA3VMARHredacted                Ferguson - cross

1   Q.  Did you or not?

2   A.  No.

3   Q.  Go to Exhibit 16 please.

4   A.  Okay.

5   Q.  This is one of the email messages that you sent to Diane

6   Rosen, right?  Do you see that there?

7   A.  Correct.

8   Q.  Now, underneath the word "thank you," it's usually what we

9   refer to as a signature block.  Do you see that there?

10  A.  I do.

11  Q.  And did you have a designation, AIF?

12  A.  Yes.

13  Q.  What is that?

14  A.  Accredited investment fiduciary.

15  Q.  Okay.  It's an important thing.

16  A.  I have a fiduciary duty to my clients.

17  Q.  Right.

18          CEBS, is that another designation you had?

19  A.  Yes.

20  Q.  Okay.  Now, this says:  Client Executive, Retirement

21  Services Division, Marsh & McLennan Agency LLC.  Do you see

22  that there?

23  A.  Yeah.  I'll actually point out that as Jeff Calder --

24  Q.  I just asked you whether you saw it there.  Do you see that

25  there?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

JA3VMARHredacted                 Ferguson - cross

A.  Yes.

Q.  Okay.  And did that same signature block appear on every one of your email messages that you sent out while you were working at the Marsh entity?

A.  Yes, it did.  It says I was a client executive, which is a producer, as Jeff Calder testified to earlier.

Q.  It says client executive.

A.  Correct.  As Jeff Calder said earlier, client executive is a producer.

Q.  It says retirement services division, right?

A.  Is a producer.

            THE COURT:  Come on.  This isn't -- this is not an argument, right.  Mr. Wickham will ask a question, you provide the answer, and we're not getting into a back-and-forth.

            THE WITNESS:  I understand.

            Your Honor, am I allowed to point out --

            MR. WICKHAM:  There's no question pending.

            THE WITNESS:  Okay.

BY MR. WICKHAM:

Q.  Now, lastly, you just had explained your understanding of how revenue might move if it was coming into MMAS; and then as part of an integrated entity with MMAS serving within the corporate hierarchy, either as a subsidiary or an affiliate, that that money would ultimately move up to MMA's financial statement.  That's your understanding of things?

1    A.   Generally, yes.

2    Q.   Okay.  So the money that you took away from the Marsh

3    entities for the clients that you had taken away from them

4    meant that MMA would be suffering financial loss from the

5    going-forward revenue, right?

6    A.   MMAS suffers, because that's the --

7    Q.   Well, no, that's not what you said.  You said that you

8    understood that the money would come in from MMAS and then

9    would go up to MMA, and that's why you said that it was

10   appropriate to have the W-2s with MMA being shown as your

11   employer.

12        So I'm just asking the obvious follow-up question,

13   which is that MMA would suffer a financial loss if you are

14   taking away all of these clients, even if they were MMAS

15   clients or if they were dual clients of both entities, which

16   they would be?

17   A.   Actually, Seabury & Smith --

18   Q.   But in any event, that MMA would be suffering a financial

19   loss, you recognize that, right?

20   A.   Well, no, you've missed one of them.  Seabury & Smith is in

21   there.  They actually own MMAS; MMA owns them.  So actually

22   Seabury & Smith, by your definition of this.  And then there

23   are six other entities involved as well that also own --

24   Q.   Okay.

25            THE COURT:  But all the money -- once it goes upstream

JA3VMARHredacted

```
1    from MMAS, all of those entities are going to lose money if the
2    clients go elsewhere, right?
3              THE WITNESS:  If it went high enough, sure, all the
4    way up to Marsh and Marsh & McLennan companies.
5              THE COURT:  Right.
6              MR. WICKHAM:  That's all that we have, your Honor.
7              THE COURT:  All right.
8              MR. WICKHAM:  We're not going to call a rebuttal
9    witness, your Honor.
10             THE COURT:  All right.
11             So I guess you can step down, Mr. Ferguson.
12             (Witness excused)
13             THE COURT:  So I know that there's still the issue of
14   third-party --
15             MR. WICKHAM:  Can I let Mr. Calder leave?
16             THE COURT:  Yes.  Absolutely.  Mr. Calder, you
17   should --
18             MR. WICKHAM:  With our thanks, Mr. Calder, I hope you
19   make your plane.
20             THE COURT:  Safe travels.
21             MR. WICKHAM:  I personally also have a plane to catch.
22             THE COURT:  No, what I would suggest is the following:
23   Because I'm not adverse to having post-hearing briefing.  There
24   are a whole bunch of things I know I've raised that I've asked
25   for to get documents on.
```

JA3VMARHredacted

1           So I'd ask you meet and confer with Mr. Ferguson,

2      figure out a time frame of post-hearing briefing.  And just let

3      me know what you think on the timing on the other materials, as

4      well as I know you're going to be negotiating with Mr. Temkin.

5           So within a week, give me a status update letter by

6      the end of next week.

7           MR. WICKHAM:  We've requested the transcript, your

8      Honor.

9           THE COURT:  Yes.

10          MR. WICKHAM:  The court reporter, she's a little

11     backlogged; she probably won't get it for a week.  I wanted to

12     be able to go through the transcript and identify all the

13     things you needed.

14          THE COURT:  Sure.  That is absolutely fine.

15          So why don't we say -- I also don't want to -- however

16     you want to order the transcript is fine.  So why don't we say

17     two weeks.  If you need more time, let me know.  Two weeks to

18     let me know with a status update.  How does that sound?

19          MR. WICKHAM:  Terrific.

20          And then we'll confer with Mr. Temkin, actually before

21     then, and we'll confer with Mr. Ferguson and discuss some sort

22     of a briefing schedule.

23          My suggestion is that we just pick a date for

24     simultaneous briefs to be submitted.

25          THE COURT:  I was going to suggest that.

JA3VMARHredacted

<table>
<tr><td>1</td><td>MR. WICKHAM:  And that we would provide the Court with</td></tr>
</table>

```
 1          MR. WICKHAM:  And that we would provide the Court with

 2     the supplemental information the Court has identified during

 3     the hearing.

 4          THE COURT:  Okay.

 5          Ms. Williams, two weeks from tomorrow, just so that we

 6     have a date.

 7          THE DEPUTY CLERK:  The 18th.

 8          THE COURT:  The 18th.

 9          So if you need more time because of whatever, just let

10     me know.

11          MR. WICKHAM:  Thank you, your Honor.

12          MR. FERGUSON:  Your Honor?

13          THE COURT:  Yes.

14          MR. FERGUSON:  So are we going to handle the motion to

15     dismiss or compel arbitration?

16          THE COURT:  What I would say is if the parties want to

17     have argument on that -- typically it's only after I review the

18     papers and I decide whether or not -- then that's what I'll do.

19          Although I haven't looked at them, I can tell you that

20     I have not and I'm not in a position to make a call about

21     whether or not oral argument is going to be necessary.  If I

22     deem that it is, I will issue an order and I will list the

23     questions that I have for both sides that I want addressed

24     during the oral argument.

25          MR. FERGUSON:  I understand, your Honor.
```

JA3VMARHredacted

1              THE COURT:  All right.

2              MR. FERGUSON:  Will I get a notice via the court

3     document or something, or will you reach out to me directly

4     or --

5              THE COURT:  I think Mr. Wickham was planning on

6     reaching out to you directly.

7              MR. FERGUSON:  Thank you.

8              THE COURT:  That raises another issue.  Are you on

9     ECF?

10              MR. FERGUSON:  Yes.

11              THE COURT:  Okay.  So you'll get notification.

12              All right.  Thank you very much, everyone.

13              MR. WICKHAM:  Thank you very much for your patience,

14     your Honor.

15              THE COURT:  All right.  Take care.

16              And safe travels to everybody who is traveling.  For

17     those folks who are here, hopefully the rain won't be too bad.

18              MR. WICKHAM:  Thank you.

19                              *    *    *

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2      Examination of:                              Page

3      JEFFREY CALDER

4      Cross By Mr. Ferguson  . . . . . . . . . . . 244

5      ELMER "RICK" FERGUSON

6      Direct By Mr. Ferguson . . . . . . . . . . . 274

7      Cross By Mr. Wickham . . . . . . . . . . . . 300

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25