UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARSH & MCLENNAN AGENCY LLC,

                Plaintiff,

       -against-

ELMER "RICK" FERGUSON,

                Defendant.

Case No.:19-cv-03837-VSB

---

**PLAINTIFF'S POST-HEARING MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

---

A. Michael Weber
Douglas A. Wickham (appearing *pro hac vice*)
Kevin K. Yam
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

*Attorneys for Plaintiff*
*Marsh & McLennan Agency LLC*

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 1

    A.    Ferguson's Employment with Barney & Barney .................................... 1

    B.    Ferguson's Employment with MMA ...................................................... 2

    C.    Jeff Stephens Joins MMA As a Producer ............................................... 4

    D.    The Events of December 2018 ............................................................... 5

    E.    Ferguson Breaches His Contractual, Statutory and Common Law Duties to MMA ............................................................................................. 6

    F.    Ferguson's Continued Breach of His Contractual Obligations to MMA ............. 8

ARGUMENT ................................................................................................................... 9

I.     LEGAL STANDARD .......................................................................................... 9

II.    MMA WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF ............................................................................................................. 10

III.   MMA HAS SHOWN THAT THE CLIENTS AT ISSUE WERE MMA CLIENTS, OR AT LEAST, THERE EXIST SUFFICIENTLY SERIOUS QUESTIONS AS TO THE MERITS OF ITS POSITION ............................................. 12

IV.   MMA HAS ESTABLISHED A REASONABLY LIKELIHOOD OF SUCCESS, OR, AT THE VERY LEAST, THAT THERE ARE SUFFICIENTLY SERIOUS QUESTIONS AS TO THE MERITS OF MMA'S CLAIMS ..................................... 13

    A.    MMA Has Demonstrated A Significant Likelihood of Success On Its Breach of Contract Claims ................................................................... 13

         1.    Ferguson entered into two contracts to preserve the confidentiality of company client information and to refrain from soliciting clients using that information ........................................................... 13

         2.    Ferguson Admitted to Having Violated His Contractual Obligations to MMA (Claim I) ......................................................... 14

             a.    Ferguson admitted to disclosing and disseminating confidential information to his personal email address and to a competitor ..................................................................... 14

TABLE OF CONTENTS
(CONTINUED)

PAGE

|  | b. | Ferguson retained MMA equipment and confidential information after separating from employment with MMA....... 15 |
|---|---|---|
|  | c. | Ferguson used computer systems for personal gain and to benefit a competitor while employed by MMA.......................... 16 |
|  | d. | Ferguson admitted to soliciting clients to transfer their business from MMA to a competitor while employed by MMA...................................................................................... 16 |
|  | e. | Ferguson solicited clients after he separated from employment with MMA and unlawfully interfered with MMA's contractual relationships with its clients. ...................... 18 |
| B. | Ferguson Admitted to Breaching His Common Law Duties. ............................ 19 |
| C. | Ferguson's Actions Support a Defamation Claim (Claim IX)........................... 20 |
| D. | Violation of California Labor Code Sections 2860 and 2862 (Claim VII)......... 20 |
| E. | Ferguson Violated California Penal Code § 502 (Claim VIII) ........................... 21 |
| F. | Ferguson Violated the Uniform Trade Secrets Act (Claim X) ........................... 21 |
| G. | A Balancing of the Equities Tips in Favor of Granting Preliminary Injunctive Relief..................................................................................... 22 |

CONCLUSION........................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andino v. Fischer*,
    555 F. Supp. 2d 418 (S.D.N.Y. 2008)........................................................................9

*Cardali v. Slater*,
    57 N.Y.S.3d 342 (N.Y. Cnty. Sup. Ct. 2017), *aff'd,* 167 A.D.3d 476, 89
    N.Y.S.3d 176 (1st Dep't 2018), *leave to appeal denied,* No. 2019-101, 2019
    WL 1460758 (N.Y. Ct. App. Apr. 2, 2019)...............................................................20

*Devos, Ltd. v. Record*,
    No. 15-CV-6916 (ADS)(AYS), 2015 WL 9593616 (E.D.N.Y. Dec. 24, 2015)...............12, 13

*Facebook, Inc. v. ConnectU LLC*,
    489 F. Supp. 2d 1087 (N.D. Cal. 2007) .................................................................21

*Gen. Elec. Co. v. Wilkins*,
    No. 1:10-CV-00674-OWW, 2011 WL 1740420 (E.D. Cal. May 5, 2011) ............................20

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*,
    922 F. Supp. 2d 435 (S.D.N.Y. 2013), *aff'd,* 764 F.3d 210 (2d Cir. 2014) ...........................9

*IDG USA, LLC v. Schupp*,
    416 F. App'x 86 (2d Cir. 2011) .........................................................................10

*Imi-Tech Corp. v. Gagliani*,
    691 F. Supp. 214 (S.D. Cal. 1986).......................................................................21

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................................11

*Marsh USA Inc. v. Schuhriemen*,
    183 F. Supp. 3d (S.D.N.Y. 2016).....................................................................18, 22

Moving Br. at 27-30, Reply Br.
    10-13, May 9, 2019 Order........................................................................11, 12, 21

*N. Atl. Instruments, Inc. v. Haber*,
    188 F.3d 38 (2d Cir. 1999)...............................................................................12

*PLC Trenching Co., LLC v. Newton*,
    No. 6:11-CV-0515, 2011 WL 13135653 (N.D.N.Y. Dec. 12, 2011) ...............................18, 19

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*In re Pomona Valley Med. Group*,
   476 F.3d 665 (9th Cir. 2007) ...................................................19

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
   745 F. Supp. 2d 343 (S.D.N.Y. 2010) ..........................................19

*Scutti Enters., LLC v. Park Place Entm't Corp.*,
   322 F.3d 211 (2d Cir. 2003) .......................................................19

*Stokes v. Dole Nut Co.*,
   41 Cal. App. 4th 285 (1995) .......................................................19

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999) .........................................................11

*Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*,
   73 F. Supp. 3d 209 (S.D.N.Y. 2014) .......................................11, 12

*USI Ins. Servs. LLC v. Miner*,
   801 F. Supp. 2d (S.D.N.Y. 2011) ................................................18

**Statutes**

Cal. Civ. Code 3246-3246.10 ........................................................21

Cal. Lab. Code § 2860 ........................................................19, 20, 21

Cal. Lab. Code § 2862 ..................................................................20

California Penal Code § 502 ...........................................................21

## PRELIMINARY STATEMENT

During and after his employment with MMA, Ferguson violated his contractual, statutory and common law obligations to his employer by, among other things, unlawfully disclosing and using MMA's Confidential Information and Trade Secrets to solicit clients to terminate their relationship with MMA and to move their business to Ferguson's new employer, Teros Advisors LLC ("Teros"). The evidentiary record in this case – including the testimony and exhibits from the October 2 and 3, 2019 hearing, declarations from both Ferguson and MMA, and documents exchanged pursuant to expedited discovery – overwhelmingly demonstrates that MMA is likely to succeed on the merits of its claims.

For the foregoing reasons, and for reasons set forth in MMA's Memorandum of Law in Support of its Motion for a Preliminary Injunction ("Moving Br.") (Dkt. 35) and the Reply Memorandum of Law in Support of its Motion for a Preliminary Injunction ("Reply Br.") (Dkt. 53), MMA respectfully submits that its motion for a preliminary injunction should be granted and this Court should enjoin Ferguson from continuing his unlawful conduct during the pendency of this case.[1]

## STATEMENT OF FACTS

MMA hereby incorporates by reference the statement of facts contained in its Moving Brief and Reply Brief, and summarizes and/or supplements its statement of facts with the below.

### A.    Ferguson's Employment with Barney & Barney

Ferguson began his employment with Barney & Barney on February 22, 2007. Calder Decl.[2] ¶ 5; Crain Decl.[3] ¶ 5. In connection with his employment, he signed an agreement with Barney & Barney on February 26, 2007 ("B & B Agreement"). Calder Decl. ¶ 9; Crain Decl. ¶ 6

---

[1] MMA also respectfully submits that Ferguson's pending motion to dismiss (Dkt. 23) should be denied.

[2] "Calder Decl." as used herein shall refer to the Declaration of Jeff Calder executed on April 27, 2019 (Dkt. 37).

[3] "Crain Decl." as used herein shall refer to the Declaration of Mara Crain executed on April 29, 2019 (Dkt. 38).

Ex. B. The B & B Agreement contained restrictive covenants that prohibited Ferguson from, *inter alia,* using or disclosing MMA's Confidential Information and Trade Secrets.[4] *See* Crain Decl. Ex. B. At Barney & Barney, Ferguson began as a retirement analyst but by the time that MMA acquired Barney & Barney in 2014, Ferguson was working in the Client Executive, Sales position. *See* Calder Decl. ¶¶ 6-7.

When Ferguson joined Barney & Barney, he did not bring new clients with him. Calder Decl. ¶ 10; Weber Supp. Decl. Ex. I (email from Ferguson admitting that he had "very few personal clients" to bring to Barney & Barney in 2007). Even after he transitioned into the sales role at Barney & Barney, Ferguson depended on Barney & Barney for new business opportunities. Calder Decl. ¶ 11.

### B.      Ferguson's Employment with MMA

On February 1, 2014, MMA acquired Barney & Barney as part of a merger agreement. Calder Decl. ¶ 12. As part of the merger, MMA extended an offer of employment to all former Barney & Barney employees, including Ferguson. *See* Weber Supp. Decl. Ex. J (Offer Letter). At MMA, Ferguson retained the title and responsibilities that he held at Barney & Barney. Calder Decl. ¶ 14. In addition, Ferguson entered into a confidentiality and non-solicitation agreement with MMA ("MMA Agreement").[5] *See* Weber Supp. Decl. Ex. D.

In September of that same year, Ferguson informed his supervisor, Bill Peartree, Director of the Retirement Services Division that he wanted to focus on the service side of the business

---

[4] MMA's "Confidential Information and Trade Secrets" includes MMA's non-public client information, such as the identities of current and prospective clients, confidential compilations of contact information for key decision makers at MMA clients, pricing for MMA products and services, and information about specific client needs, or preferences. *See* Weber Supp. Decl. Ex. A (MMA Agreement, Section 1(a)).

[5] A true and complete copy of Ferguson's MMA Agreement is attached as Exhibit D to the Supplemental Declaration of A. Michael Weber in Support of MMA's Motion for a Preliminary Injunction ("Weber Supp. Decl.").

and return to a Client Executive, Service position. Calder Decl. ¶ 19; Peartree Decl.[6] ¶ 9, Ex. A; Tr. 34:9-16. MMA granted the request, returning Ferguson to a Client Executive, Service position effective January 1, 2015. Calder Decl. ¶ 20; Peartree Decl. ¶ 11. At that point, Ferguson's compensation reverted from the commission-based plan that applied to him in the Client Executive, Sales position, to a salary plus bonus compensation plan. *See* Tr. 34:11-25; 63:24-64:10 (Calder: "We do not pay client service executives compensation for sales."); Weber Supp. Decl. Ex. P. Since Ferguson's voluntary move to the service position, Ferguson occupied the service role while performing some "sales"-related duties for the small clients to which he was assigned.

Ferguson's complaints in 2018 and 2019 were predicated on misstatements about (or misunderstanding of his compensation structure after he returned to the service side of the business. First, none of the clients assigned to Ferguson were "his" clients; rather, all MMA clients were <u>MMA's</u> clients, and they were not the clients of any one Client Executive. Second, since Ferguson was paid on a salary plus bonus plan, he did not earn "commissions" based upon the revenue generated by the clients assigned to him. *See* Weber Supp. Decl. Ex. P. Ferguson confuses the structure of his *bonuses* during this time period with actual *commission* earnings. While Ferguson was eligible for a bonus relating to new and/or existing business he brought into MMA, he was <u>not</u> paid a commission on that business. *See* Tr. 248:10-16.[7]

---

[6] "Peartree Decl." as used herein shall refer to the Declaration of William Peartree submitted in support of MMA's Motion for a Preliminary Injunction.

[7] "[Ferguson] Q: Jeff, you testified earlier that I was in a hybrid role of sales and service. Are you now saying that's not true?
A: [Calder:] You were in a hybrid role in that if you brought in and initiated a new account, you were paid a one-time fee of 25 percent. Your salary and bonus outside of that was based solely on service. It was not based on continuing revenue from your client.
Q: So sales is what you're saying?
A: No. What I'm saying is you were paid a one-time bonus for helping initiate an account that was referred to you." Tr. 248:10-16.

### C.    Jeff Stephens Joins MMA As a Producer

In October 2017, Ferguson suggested to Peartree that Jeff Stephens join MMA's Retirement Services team as a Client Executive, Sales. *See* Peartree Decl. Ex. A. On or about August 2018, MMA decided to hire Jeff Stephens into the Client Executive, Sales role in its San Francisco Bay area office. *See* Peartree Decl. ¶ 18. To compensate Stephens, MMA agreed to pay him commissions on revenues from the "house accounts" (accounts/clients assigned to Ferguson for which Ferguson did not earn and was not eligible to be paid a commission under his compensation plan). Stephens was eligible to earn commission from any business/clients he brought into MMA and thus MMA coded Stephens as the "Producer" on all of those accounts (e.g., the accounts he brought into MMA and the "house" accounts).

Remarkably, though Ferguson supported MMA's decision to hire Stephens and Ferguson assisted with recruiting and hiring Stephens, after MMA hired Stephens and MMA assigned house accounts to Stephens, Ferguson falsely accused MMA and his supervisors of "lying" and "stealing" his clients. *See* Crain Supp. Decl. II ¶ 4; Peartree Decl. Exs. C, D.

Despite Ferguson's repeated complaints about his compensation and the amount of work he performed in his hybrid service-sales role, when MMA finally responded to Ferguson's concerns by actively recruiting Stephens upon Ferguson's recommendation and request, Ferguson's behavior became more erratic. He sent unprofessional emails to his MMA colleagues expressing a lack of understanding of his role in a hostile and accusatory manner. *See e.g.* Crain Supp. Decl. II ¶ 5. On September 11, 2018, Human Resources Business Partner Mara Crain met with Ferguson, his supervisors Bill Peartree and Jeff Calder, and other leaders at MMA to clarify his hybrid role and to respond to his demands for increased compensation due to an alleged increase in work responsibilities in the hybrid sales/service function. *See* Crain Supp. Decl. II ¶

5.[8] At the meeting, Calder informed Ferguson that his reactionary language and behavior was inappropriate. *See* Crain Supp. Decl. II ¶ 5, Ex. A.  Also at that meeting, MMA offered Ferguson an increase in salary corresponding to his return to the Client Executive, Service position from the Sales role. Crain Supp. Decl. II ¶ 6. Ferguson's offer included an increase in salary from $110,000 per year to $125,000, a 25% bonus for new business referrals, and a separate 12% bonus plan. Crain Supp. Decl. II ¶ 6. Ferguson accepted the increase. Crain Supp. Decl. II Ex. B.[9]

### D.    The Events of December 2018

On December 5, 2018, Ferguson began an innocuous email chain with his colleagues at MMA, but quickly escalated the conversation, accusing Peartree, Jake Daly (Senior Client Manager, Retirement Services), and other MMA employees of "collud[ing]" and "lying" to Ferguson and "his" clients to "steal [his] book of business," and claimed that Daly admitted to lying about "many things." *See* Crain Supp. Decl. II ¶ 8, Ex. C.  Within days, Daly resigned from MMA, informing Peartree that Ferguson's behavior was at least partly responsible for the decision to leave. *See* Crain Supp. Decl. II ¶ 9, Ex. D.

As a result of this chain of events, MMA decided to issue Ferguson a Final Written Warning. *See* Crain Supp. Decl. II Ex. G. MMA delivered this warning in a meeting on December 20, 2018, during which Crain, Peartree, and Calder met with Ferguson to discuss Ferguson's concerns about Stephens's transition into the Sales role and Ferguson's new Service role, and to address Ferguson's behavior, outbursts, and interaction with his colleagues at work. *See* Crain Supp. Decl. II ¶ 13-14.

During the meeting, Peartree, Crain, and Calder explained to Ferguson that he would

---

[8] "Crain Supp. Decl. II" as used herein shall refer to the second supplemental declaration of Mara Crain, executed on December, 20, 2019 and submitted herewith.
[9] This bonus represented MMA's method for compensating Ferguson for business development.  *Id.*

need to assist in the transition of the sales/fiduciary related role and duties he performed for certain MMA clients to Stephens. In response to Ferguson's concern that certain clients may not want to work with Stephens as their Client Executive (Sales), and they might leave MMA, Calder dismissed the suggestions as not likely and, in any event, he informed Ferguson that such a potential result was a business risk MMA would take. Peartree Decl. ¶ 25. At the meeting, MMA told Ferguson that if clients did not want to work with Stephens, they may be willing to work with Peartree. *See* Crain Supp. Decl. II ¶ 13, Ex. H. At no time did anyone at MMA instruct Ferguson to fire clients, steal client confidential information, or encourage clients to move to a competitor, or intimate that MMA would condone such behavior.[10] *See* Crain Supp. Decl. II ¶ 12; Peartree Decl. ¶ 26; Tr.[11] 79:10-14; 259:2-16.

### E.   Ferguson Breaches His Contractual, Statutory and Common Law Duties to MMA

As early as January of 2019, Ferguson admits that he began breaching his statutory and common law duty of loyalty to his employer, MMA, and he breached the MMA Agreement (and B & B Agreement).  By January 2, 2019, Ferguson had already planned to solicit clients to move from MMA to its competitor, Teros Advisors, Inc. ("Teros").  *See* Weber Supp. Decl. Ex. E. Ferguson emailed Teros President Nate White that he is "crafting a message for [his] clients to highlight why [he] is moving to work with [White] and Teros."  Weber Supp. Decl. Ex. H. White responded that he "would prefer not to assign [Ferguson] to any existing Teros clients at the start [of Ferguson's employment] in order to "fully support getting [Ferguson] on board and [MMA's] clients over [from MMA to Teros] as a first priority.  *See* Weber Supp. Decl. ¶ Ex. H.

---

[10] Calder did not have the authority to authorize or instruct Ferguson to "fire" MMA clients. Tr.259:8-12 ("I [Calder] would never say [to fire clients]. I am not in a position of authority to fire clients that we've worked so hard to maintain.").

[11] "Tr." as used herein shall refer to the transcript of the evidentiary hearing held in this action on October 2, 2019 and October 3, 2019 (Dkt. Nos. 98, 100).

Soon after, on January 11, 2019, Ferguson emailed White a "simple spreadsheet" listing "current clients." *See* Weber Supp. Decl. Ex. E. Ferguson told White that he had "already talked" with certain clients and that he had "meetings set [at the] end of this month" for four others. *See* Weber Supp. Decl. ¶ H. Ferguson told White that he promised MMA clients "information on Teros Advisors and why [leaving MMA to move to Teros] is such a positive move" and that he "really want[ed] to meet or talk with all clients before [he] leave[s] so they know the advantages of moving [to Teros]." *Id.* Ferguson also admitted that at meetings with MMA clients in December 2018 and/or January 2019 – while he was still employed by MMA – he told "all these clients" that he was "going to be leaving" and, in the process, he solicited MMA's clients to move with him to Teros.  *See* Tr. 301:7-13, 305:13-23; 355:8-9.

In early January 2019, MMA Chief Compliance Officer Diane Rosen learned that Ferguson had emailed a number of MMA clients (using confidential client contact information) copying his personal email address on the mass email in violation of MMA policy and his MMA Agreement. *See* Rosen Decl.[12] ¶ 4. On a telephone call on January 11, 2019 and again in an email on January 24, 2019, Rosen explained to Ferguson that MMA client contact information, including client email addresses, are Confidential Information and Trade Secrets, and may not be disclosed outside of MMA. *See* Rosen Decl. ¶ 8-9.  Rosen asked Ferguson to review his personal emails and delete emails containing MMA's confidential client email addresses, and to confirm when that had been completed. *See* Rosen Decl. ¶ 9, Ex. 17.

In early February 2019, while still employed with MMA, Ferguson had fully mapped out his plan to leave MMA, steal its clients, and solicit clients to move to Teros, and he already had started to implement that plan by meeting with several MMA clients in December 2018 and/or

---

[12] "Rosen Decl." as used herein shall refer to the Declaration of Diane Rosen, executed on Oct. 1, 2019 and submitted to this court in connection with the preliminary injunction hearing.

January 2019.  In an email to White, Ferguson wrote a list of items to mail to "his" clients, which included a Teros Brochure and a Teros advisory agreement. *See* Weber Supp. Decl. Ex. G. In that email, Ferguson told White that he planned to send the information to roughly "25+" clients with whom he had spoken as well as "all others," and that he planned to quit his employment with MMA "on February 15, at noon." *Id*.

True to the plan he laid out to White, as he admitted, Ferguson contacted MMA clients while he was employed at MMA. Ferguson sent emails to MMA clients and encouraged them to terminate their relationship with MMA and move their business to Teros, while misrepresenting that this change was only a "back-office," "administrative" change, all while he was employed with MMA and all while using his MMA computer and MMA's Confidential Information and trade secrets.[13] *See* Tr. 301:1-22; Weber Supp. Decl. Ex. K; Calder Decl. ¶¶ 40, 45, 47 51. Ferguson admitted to sending "emails regarding a different firm directly from [his] MMA email account," even after "Diane Rosen's email" instructed him not to disclose or use MMA's confidential client contact information outside of MMA.  *See* Tr. 277:25-26.

On February 14, 2019, Calder learned that Ferguson solicited several of MMA's clients to move their business from MMA to Teros.  Calder Decl. ¶ 57.  In response, Calder immediately instructed Ferguson to "cease and desist" his misconduct and Calder told Ferguson to stop soliciting clients. Calder Decl. ¶ 58. Ferguson submitted his resignation on February 15, 2019. Calder Decl. ¶ 62.

### F.    Ferguson's Continued Breach of His Contractual Obligations to MMA

Even after Rosen's directions not to disclose or use MMA's confidential information (including MMA's confidential client contact information), and even after Calder instructed

---

[13] Though Ferguson claimed that contact information for MMA clients *might* be available in the public domain, Ferguson admitted to using and disclosing MMA's compilation of client contact and other information and Ferguson never claimed nor proved that he accessed client information from publicly available sources.  Tr. 340:18-341:2.

Ferguson to "cease and desist" from soliciting MMA clients, Ferguson continued to do so, sending solicitation emails to MMA clients on February 16, 19, 21, March 7, April 16, and June 28 of 2019, touting the purported benefits of his new employer and representing to clients that moving their business away from MMA was merely an "administrative change" that was "not a big deal." *See* Calder Decl. ¶¶ 66, 71, 76, 81; Calder Reply Decl.[14] ¶ 9; Rosen Decl. ¶¶ 11-12, 14. Ferguson even produced documents to MMA in the course of litigation demonstrating his disregard of Calder's directive *not* to solicit clients and which demonstrated that Ferguson continued to violate his MMA Agreement *even after this court issued its temporary restraining order*. *See e.g.,* Weber Supp. Decl. Ex. F (demonstrating that an MMA client reached out in response to Ferguson's solicitation email as recently as August of 2019).

## ARGUMENT

MMA previously established its entitlement to a temporary restraining order, which this Court ordered on May 9, 2019 (Dkt 10), and extended on October 7, 2019 (Dkt 83). For the same reasons, and as explained further below, MMA has also established its entitlement to a preliminary injunction. *See Andino v. Fischer,* 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").

## I.    LEGAL STANDARD

A plaintiff seeking a preliminary injunction in the Second Circuit must establish both "(a) irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Goldman, Sachs*

---

[14] "Calder Reply Decl." as used herein shall refer to the Declaration of Jeff Calder in Support of MMA's Motion for a Preliminary Injunction, executed on July 9, 2019 (Dkt. 55).

& Co. v. Golden Empire Sch. Fin. Auth., 922 F. Supp. 2d 435, 439 (S.D.N.Y. 2013), aff'd, 764 F.3d 210 (2d Cir. 2014) (citing Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010)).

## II.   MMA WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

To establish "irreparable harm," a plaintiff must show that an injury is likely absent an injunction, and that the injury cannot be adequately remedied with money damages." *IDG USA, LLC v. Schupp,* 416 F. App'x 86, 88 (2d Cir. 2011). MMA has established that it will suffer irreparable harm without injunctive relief.

Ferguson's pattern of flagrantly violating his contractual, statutory and common law duties to MMA without remorse is bolstered by his own testimony at the evidentiary hearing in this matter held on October 2 and 3, 2019.

- Ferguson admitted at the evidentiary hearing that he began systematically meeting with MMA clients in December 2018 or January 2019 to solicit them to terminate their relationship with MMA and to follow Ferguson to Teros. *See, e.g.* Tr. 301:7-301:22. Ferguson's explanation that he was told to "fire" clients at a meeting on December 20, 2018 is contradicted by the three other participants in that meeting. *See* Peartree Decl. ¶ 25, Crain Supp. Decl. II ¶ 13, Tr. 259:2-16.

- Ferguson was forced to admit that after learning that Ferguson had copied his personal email address on a client communication, Diane Rosen, MMA's Compliance Officer, told Ferguson in January 2019 to "review [his] personal email records, delete all emails containing MMA['s confidential information, including] client email addresses, and confirm . . . that this has been done." *See* Tr: 334:24-335:4; Rosen Decl. 9, Ex. 17. Thus, despite being instructed not to disclose, use or send confidential information outside of MMA, Ferguson admitted that he sent MMA's confidential and trade secret client "contacts to myself directly to my new company address, over 3,400 contacts." *See* Tr. 277:6-8.

- Despite multiple warnings (from Rosen and Calder) and his contract with MMA restricting him from disclosing confidential information, defined to include client identities and contact information, Ferguson insists that he "didn't see [existing and prospective client identity and contact information] as confidential information." See Tr. 278:22-279:2.

- Ferguson clarified at the evidentiary hearing that despite his lack of legal training, he credits his own skewed interpretation of the relevant law over his contractual and legal obligations. Ferguson stated that after receiving a cease and desist letter on February 19, 2019 from MMA attorneys, Ferguson continued to insist that the information was not confidential. *See* Tr. 316:7-9.

- Ferguson sent emails to MMA clients soliciting their move from MMA to Teros, his future employer, even while employed by MMA. After his supervisor, Jeff Calder, sent him an email instructing him to "cease and desist," Ferguson did not stop sending those emails. *See* Tr. 83:21-84:2; Weber Suppl. Decl. Ex. N.

- Calder testified and confirmed that Ferguson's pattern and practice of MMA client solicitations (using and disclosing MMA's confidential information and trade secrets) continued during 2019 at least through July 2019 – including misconduct that occurred after this Court entered the temporary restraining order.

Ferguson's violations of the MMA Agreement and his duty to MMA as his (former) employer has threatened to cause and is in fact causing continuing harm to MMA. Jeff Calder, Principal and Managing Director at MMA, testified that "when you lose one line of business, clients become less sticky. So for us to lose a piece of business, even though we've only lost a portion of the revenue, it really can put the total revenue at risk." *See* Tr. 97:1-5. Courts in the S.D.N.Y. have acknowledged that this sort of harm to goodwill is not easily quantifiable and is the precise situation that lends itself to the issuance of a preliminary injunction. *See Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004), *Uni-World Capital, L.P. v. Preferred Fragrance, Inc.,* 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014), *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *see also* Moving Br. at 25, Reply Br. at 17-18.

The threat of harm and actual harm has already been borne out. MMA has lost client relationships, *at least one of which was lost two months after this Court's entry of the temporary restraining order in this action*. *See* Peartree Decl. Ex. E; Weber Supp. Decl. Ex. L (list of clients lost created by Jeff Calder).[15]

---

[15] Plaintiff's offered a hard-copy version of the spreadsheet. Plaintiff can send a native version of the document to the Court upon request.

Finally, Ferguson may not argue that his violations do not constitute irreparable harm because he contractually agreed that his use and disclosure of MMA's confidential information and trade secrets constitute irreparable harm that entitles MMA to injunctive relief in the event of a breach. *See* Weber Supp. Decl. Ex. D (agreeing, per the MMA Agreement, that "irreparable injury will result to [MMA] in the event of a breach by [Ferguson] of [his] obligations under [the MMA] Agreement, that monetary damages for such breach would not be readily calculable, and that [MMA] would not have an adequate remedy at law therefor"). The contractual provision supports a finding that irreparable harm actually occurred. *See, e.g.*, *N. Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 49 (2d Cir. 1999), *Devos, Ltd. v. Record,* No. 15-CV-6916 (ADS)(AYS), 2015 WL 9593616, at *10 (E.D.N.Y. Dec. 24, 2015), *Uni-World Capital L.P.,* 73 F. Supp. 3d at 236-37; *see also* Moving Br. at 26, Reply Br. at 17-18.

## III. MMA HAS SHOWN THAT THE CLIENTS AT ISSUE WERE MMA CLIENTS, OR AT LEAST, THERE EXIST SUFFICIENTLY SERIOUS QUESTIONS AS TO THE MERITS OF ITS POSITION[16]

MMA has established through documentary evidence, declarations, and live testimony that the clients at issue in this case belong to MMA.  MMA is a highly integrated business that offers multiple lines of insurance products and services to its clients. *See* Crain Decl. ¶ 6. Many of the clients that Ferguson solicited or whose confidential information Ferguson misappropriated and passed to a competitor had business in MMA's Retirement Services division, as well as in its Business Insurance and Employee Health & Benefits lines. *See* Peartree Decl. Ex. A.

Further, Calder, an MMA employee who is not licensed or registered with FINRA, was Ferguson's direct supervisor. *See* Calder Decl. ¶ 4; Tr. 19:13-18.  Calder testified that the clients

---

[16] MMA hereby incorporates by references the arguments in its Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("MMA Opp. Mot.") (Dkt. 43).

at issue in this case "are MMA clients." *See* Tr. 171:9-18 ("The Court: . . . [I]s it your personal view that the clients that are at issue here are MMA clients? The Witness: Yeah, absolutely. They were either referred in by a current MMA producer, or the business that Rick brought in through his own efforts, we supported that, we paid for that, we paid for those activities."). Calder also testified that MMA Securities does not have its own budget for attracting and retaining clients, and that all "the money and funding comes from MMA." *See* Tr. 173:1-8.

## IV.    MMA HAS ESTABLISHED A REASONABLY LIKELIHOOD OF SUCCESS, OR, AT THE VERY LEAST, THAT THERE ARE SUFFICIENTLY SERIOUS QUESTIONS AS TO THE MERITS OF MMA'S CLAIMS

### A.    MMA Has Demonstrated A Significant Likelihood of Success On Its Breach of Contract Claims

To establish a breach of contract claim, MMA must show that (1) an agreement existed,[17] (2) MMA performed its part of the agreement, (3) Ferguson breached the contracts, and that (4) MMA has been damaged by the breach. *See Devos, Ltd.,* 2015 WL 9593616, at *11.

#### 1.    Ferguson entered into two contracts to preserve the confidentiality of company client information and to refrain from soliciting clients using that information

On February 26, 2007, at the commencement of his employment with Barney & Barney, Ferguson entered into the B & B Agreement, which contained contractual provisions governing the confidentiality of company information and restricting Ferguson from soliciting employees or clients away from Barney & Barney. *See* Crain Decl. Ex. B (B & B Agreement).

On February 1, 2014, in connection with his employment with MMA, Ferguson signed the MMA Agreement, the confidentiality and non-solicitation agreement that all employees were required to sign as a condition of their employment with MMA ("MMA Agreement"). *See*

---

[17] MMA has already provided case law support for the enforceability of the MMA Agreement in its Motion for an Order to Show Cause for a Temporary Restraining Order, which the Court granted. *See* Moving Br. at 27-30, Reply Br. 10-13, May 9, 2019 Order (Dkt. 10).  MMA hereby incorporates those arguments and does not repeat them herein.

Weber Supp. Decl. Ex. A (template confidentiality and non-solicitation agreement), Ex. B (Ferguson's confidentiality and non-solicitation agreement), Ex. C (Calder's confidentiality and non-solicitation agreement).[18]

By signing the MMA Agreement, Ferguson agreed not to (1) disclose or use MMA's "Confidential Information and Trade Secrets" for any reason (other than to perform his authorized duties for MMA), (2) disclose or use MMA's Confidential Information and Trade Secrets to solicit business from or perform services for MMA clients on behalf of any person or entity other than MMA, and (3) retain any of MMA's Confidential Information and Trade Secrets after his employment with MMA ended.

### 2. Ferguson Admitted to Having Violated His Contractual Obligations to MMA (Claim I)

#### a. Ferguson admitted to disclosing and disseminating confidential information to his personal email address and to a competitor

Ferguson agreed in the MMA Agreement not to "use, disseminate, or disclose to any other person, organization or entity, Confidential Information and Trade Secrets," defined to include "client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsibility for entering into contracts with the Company, the amounts paid by such clients, etc." *See* MMA Agreement § 1(a)-(b). Ferguson agreed to abide by this restriction "while associated with the Company and for so long thereafter as the pertinent information . . . remains confidential." *See id.* § 1(b).

Ferguson admitted to sending email addresses of client contacts to his personal email address. After Diane Rosen, Chief Compliance Officer for MMA, spoke with Ferguson on that

---

[18] Ferguson claimed at the evidentiary hearing to have altered his agreement in some form by striking the liquidated damages provision. *See* Tr. 284:23-5; 286:17-21. The original copy of Ferguson's MMA Agreement shows that Ferguson did not strike out any language in the agreement or add any comments *See* Weber Supp. Decl. Ex. D. In addition, Ferguson admitted that the language that he allegedly objected to did not involve the confidentiality or non-solicitation clauses at issue in this litigation. Tr. 287:16-20.

day, January 11, 2019, reminding him not to send this information to his personal email address, Ferguson sent "over 3,400 contacts" to himself, including client contacts, "directly to [his] new company address," while he was actively employed with MMA. *See* Tr. 277:6-8; Rosen Decl. ¶ 8. The contacts contained the identity of key decision-makers at MMA clients, as well as telephone, email, and other contact information, which is defined in the MMA Agreement as Confidential Information and Trade Secrets. *See* Weber Supp. Decl. Ex. D; MMA Agreement § 1(a); Calder Decl. ¶¶ 54-56.

In addition, Ferguson sent confidential customer information to himself. He sent an email to Nate White, his supervisor at his new employer Teros Advisors "a simple spreadsheet showing current clients" on January 11, 2019. *See* Weber Supp. Decl. ¶ H.  He also sent a confidential customer list of MMA's clients to White on January 29, 2019. *See* Weber Supp. Decl. Ex. M.

### b. Ferguson retained MMA equipment and confidential information after separating from employment with MMA

The MMA Agreement restricted Ferguson from retaining "files," "lists of the Company's clients or leads or referrals to prospective clients," as well as "property of the Company."  MMA Agreement §(c).  Ferguson acknowledged that he sent confidential information, including information about prospective clients, to his Teros email address. *See* Weber Supp. Decl. Ex. E, K.  Ferguson also retained MMA's computer and confidential information until February 25, 2019, well past his separation from MMA on February 15, 2019, and only returned them after MMA's repeated attempts to retrieve MMA's computers, equipment and confidential information. *See* Crain Decl. ¶¶ 8-11.

         c.        **Ferguson used computer systems for personal gain and to benefit a competitor while employed by MMA**

Ferguson also admitted that he violated the provision of the MMA prohibiting his use of MMA's computer systems, including his laptop, "for the personal gain or to benefit third parties." *See* MMA Agreement § 1(d).  Ferguson stated that he "never denied" that he sent client names and contact information "from [his] MMA computer to Teros" while employed by MMA. *See* Tr. 336:19-21.

         d.        **Ferguson admitted to soliciting clients to transfer their business from MMA to a competitor while employed by MMA**

Ferguson also admitted to violating the MMA Agreement's provision in § 2(b), which prohibits Ferguson from "us[ing] Confidential Information and Trade Secrets" "for the purpose of selling or providing products or services of the type [Ferguson] sold or provided . . . while employed by [MMA]."  MMA Agreement § 2(b).

As explained above, Ferguson had planned to solicit clients to leave MMA and join Teros as early as January 2, 2019, when he informed Nate White, his supervisor at Teros, that he is "crafting a message" for his clients to "highlight why [Ferguson is] moving to work with [White] and Teros." *See* Weber Supp. Decl. Ex. H.  By January 11, 2019, Ferguson had "already met" with several clients and had scheduled meetings with another four to talk about the "advantages of moving" from MMA to Teros. *See id.*  *See* Weber Supp. Decl. Exs. E, K.  In fact, Ferguson admitted to meeting with "all these clients" in person before soliciting them to move to Teros. *See* Tr. 301:7-13; 254:5-8 (Q: You asked [clients] whether they would move over to Teros with you, right? A: I said, You can either stay with Jeff Stephens or you can go with me."); *See* Calder Decl. ¶¶ 38-63.  Ferguson admitted that these solicitation meetings occurred before Ferguson separated from MMA.  *See* Tr. 306: ("Q: Just to be clear, these meetings, when you're meeting with MMA clients and telling them that you're leaving MMA, you're going to Teros, and you're

asking them whether they'll go to Teros with you . . . you were still employed by a Marsh & McLennan entity. A: Yes.").

Ferguson also admitted to sending emails to clients to encourage them to move their business from MMA to Teros, while representing that the change was only a "back-office," "administrative" change, all while he was employed with MMA. *See* Tr. 301:1-22; Weber Supp. Decl. Ex. M; Calder Decl. ¶¶ 40, 45, 47 51.  Ferguson admitted to sending "emails regarding a different firm directly from [his] MMA email account," even after Diane Rosen "Diane Rosen's email" instructing him not to disclose client contact information to his personal account.  *See* Tr. 277:25-26.  On February 12, 13 and 14 alone, while still actively employed by MMA, Ferguson solicited at least 20 MMA clients and encouraged them to sever their business relationships with MMA and establish a new business relationship with Teros. *See* Calder Decl. ¶ 51.

Ferguson insists that his behavior was authorized by MMA at a meeting that took place on December 20, 2019, even though Bill Peartree, Jeff Calder, and Mara Crain, all of whom were present at the meeting, deny ever having authorized Ferguson to fire clients, to use confidential client information for competitive activity, or to solicit their business away from MMA. *See* Peartree Decl. ¶ 25, Crain Supp. Decl. II ¶ 13, Tr.  259:2-16 ("I [Jeff Calder] would never say [to fire clients]. I am not in a position of authority to fire clients that we've worked so hard to maintain. I did not say, You have to take Jeff Stephens or get lost. We had alternatives. We were ready to present alternatives. And I can't believe that [Ferguson] misinterpreted it that way, but I believe that's because [Ferguson] wanted to make sure these clients could come to [him] in the future.").

      **e.**      **Ferguson solicited clients after he separated from employment with MMA and unlawfully interfered with MMA's contractual relationships with its clients**

When Calder, Ferguson's MMA supervisor, found out that Ferguson had been soliciting clients when employed, Calder sent Ferguson a "cease and desist" email and informed Ferguson orally that he should stop soliciting clients. Calder Decl. ¶¶ 4, 58-60; Weber Supp. Decl. Ex. M. Yet, after submitting his resignation, Ferguson continued to solicit clients, sending emails on February 16, 19, 21,  March 7, April 16, and June 28 of 2019, touting the purported benefits of his new employer and representing to clients that moving their business away from MMA was merely an "administrative change" that was "not a big deal." *See* Calder Decl. ¶¶ 66, 71, 76, 81; Calder Reply Decl. ¶ 9.  Ferguson even produced documents to MMA in the course of litigation demonstrating his disregard of Calder's directive *not* to solicit clients.  *See* Weber Supp. Decl. Ex. F.

Ferguson's emails to individual clients advertised the "advantages" of Teros, his new employer, making his emails to MMA clients more than a mere "notice announcing his [change of] employment," but instead a targeted solicitation. *See Marsh USA Inc. v. Schuhriemen,* 183 F. Supp. 3d at 536 (S.D.N.Y. 2016) (finding that a notice of departure was a targeted solicitation that likely violated defendant's non-solicitation agreement because it was not a general announcement); *USI Ins. Servs. LLC v. Miner,* 801 F. Supp. 2d at 192-93 (S.D.N.Y. 2011), (finding that the defendant breached his non-solicitation agreements by sending an email that informed his former clients of his new position at a competing insurance that touted the merits of his new employer).

### B.      Ferguson Admitted to Breaching His Common Law Duties[19]

Because MMA employed Ferguson, he owed a duty of loyalty to MMA, which included a duty not to use of disclose the employer's confidential contact information to compete with his employer. *See PLC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *9 (N.D.N.Y. Dec. 12, 2011).[20]   Ferguson also owed a general duty to MMA not to engage in tortious conduct. *See PLC Trenching Co.,* WL 13135633, at *9 (setting forth the elements of unfair competition claim on a theory of misappropriation under New York common law); *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) (explaining the elements of a claim for tortious interference with business relations).

As explained amply in MMA's Moving Brief, Ferguson breached his duty of loyalty by surreptitiously planning with a competitor of his employer to use confidential client information, including email addresses of client contacts and decision makers, to lure clients away from MMA to Teros.  Ferguson's solicitations of current MMA clients to Teros is itself a breach of his duty of loyalty to his employer and misappropriation of confidential information. *See Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 745 F. Supp. 2d 343, 352 (S.D.N.Y. 2010) ("To state a claim for misappropriation of confidential information under New York law,  plaintiff must allege that defendant used plaintiff's confidential information for the purpose of securing a competitive advantage.").[21]  Likewise, Ferguson's deceitful, dishonest, and unfair use of

---

[19] This section addresses generally the conduct supporting MMA's claims for Breach of Duty of Loyalty (Claim II), Tortious Interference (Claim III), Unfair Competition (Claims IV and V), and Misappropriation of Confidential Information (Claim VI), which are explained more fully in its prior briefing. *See* Moving Br. at 31-33.

[20] Even if this Court finds that California applies to this action, Ferguson would still have breached his common law duty of loyalty to his employer, as well as the California statute that codified that duty.  *See Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 (1995), Cal. Lab. Code § 2860 ("Everything which an employee acquires by virtue of his employment, except the compensation . . . belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment.").

[21] California's unfair competition statute "prohibits . . . 'any unlawful, unfair or fraudulent business act or practice,'" which includes using an employer's confidential information to compete.  *In re Pomona Valley Med. Group*, 476 F.3d 665, 674 (9th Cir. 2007) (citing Cal. Bus. & Prof. Code § 17200, *et seq.*).

confidential client information to solicit MMA clients away to Teros interfered with MMA's relationship with those clients, satisfying the elements for tortious interference with business relations. *See Reed,* 745 F. Supp. 2d at 352.

### C.    Ferguson's Actions Support a Defamation Claim (Claim IX)

To state a claim for defamation under New York law, a party must show: (1) a false statement that is (2) published to a third party (3) without privilege or authorization and that (4) plaintiff is caused harm. *Cardali v. Slater*, 57 N.Y.S.3d 342, 346 (N.Y. Cnty. Sup. Ct. 2017), *aff'd,* 167 A.D.3d 476, 89 N.Y.S.3d 176 (1st Dep't 2018), *leave to appeal denied,* No. 2019-101, 2019 WL 1460758 (N.Y. Ct. App. Apr. 2, 2019).

Ferguson wrote numerous false statements to MMA clients (third parties) without authorization that caused MMA harm.  For example, Ferguson told at least one client that he had "an agreement with MMA on this change [from MMA to Teros] since it's relatively minor." *See* Calder Decl. ¶ 71.  As explained above, Ferguson had no such agreement with MMA, and the change was so significant that Calder insisted that Ferguson cease and desist soliciting clients as soon as he learned it was happening. *See* Calder Decl. ¶ 72; Weber Supp. Decl. Ex. M.  Ferguson knew that statement was false and nevertheless published it into an email to a third-party, causing MMA harm to its reputation. Therefore, MMA has shown that it is reasonably likely to succeed in its defamation claim, or, at the very least, there are sufficiently serious questions raised that go to the merits of this claim.

### D.    Violation of California Labor Code Sections 2860 and 2862 (Claim VII)

California Labor Code §§ 2860 and 2862 prohibit an employee from acquiring and refusing to return, upon demand by his employer, those things which belong to his employer. *See Gen. Elec. Co. v. Wilkins*, No. 1:10-CV-00674-OWW, 2011 WL 1740420, at *10 (E.D. Cal. May 5, 2011) ("California Labor Code section 2860 embodies the universally accepted principal that

work product created by an employee belongs to the employer where the employee was hired to create such work product.")  Ferguson illegally transferred MMA's Confidential Information and Trade Secrets from MMA's Outlook account to his personal and Teros email accounts while still employed by MMA, and has not agreed to return the information.  Based on the facts of this case, Ferguson's initial failure to return his MMA computer, and his continued solicitation of MMA clients, MMA has demonstrated a significant likelihood of success on this claim.

### E.     Ferguson Violated California Penal Code § 502 (Claim VIII)

Ferguson violated California's Penal Code § 502 by knowingly accessing and, without permission, altering the data on MMA's computer to wrongfully obtain MMA's property and data for financial gain. *See* Cal. Penal Code  502(c)(1); *see Facebook, Inc. v. ConnectU LLC,* 489 F. Supp. 2d 1087, 1091 (N.D. Cal. 2007) ("Penal Code section 502 prohibits knowing access, followed by unauthorized (i.e. "without permission") taking, copying or use of data.").  By wrongfully retaining MMA's computer after soliciting clients to move to Teros and by sending MMA's confidential client data to Teros, it is clear that Ferguson used MMA confidential client information for financial gain, and very likely used MMA's computer and deleted that information.   Therefore, MMA has demonstrated a significant likelihood of success on the merits, especially for this early stage of litigation.

### F.     Ferguson Violated the Uniform Trade Secrets Act (Claim X)

MMA has already established that it carefully guards (a) a legally protectable trade secret; and (b) a legal basis, either a covenant or a confidential relationship, upon which to predicate relief. *See Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 230 (S.D. Cal. 1986) (citing *Futurecraft Corp. v. Clary Corp.*, 205 Cal. App. 2d 279, 283, 23 Cal. Rptr. 198 (1962)); Cal. Civ. Code 3246-3246.10. As explained more fully in its prior briefing, MMA's confidential compilation of client information is a legally protectable trade secret, and Ferguson kept that

information, disclosed it to a competitor, and used that information to solicit clients, demonstrating a significant likelihood of success on its claim. *See also* Moving Br. at 36-39; Reply Br. at 9-10.

### G.     A Balancing of the Equities Tips in Favor of Granting Preliminary Injunctive Relief

MMA has demonstrated a likelihood of success on the merits for each of its ten claims. However, even if the Court finds that MMA has only raised sufficiently serious questions going to the merits of each claim, the Court should still issue the requested preliminary injunction because a balance of the equities tips in favor of MMA. *See Marsh USA,* 183 F. Supp. 3d at 536-37 (granting preliminary injunctive relief and observing that an individual defendant was unlikely to suffer "great hardship" if prevented from soliciting the plaintiffs' clients for a year).

## <u>CONCLUSION</u>

For the foregoing reasons and as stated in its Moving and Reply Briefs, MMA respectfully requests the Court grant its motion for a preliminary injunction.

Date:   December 20, 2019
        New York, New York

                                    */s/ A. Michael Weber*
                                    A. Michael Weber
                                    Douglas Wickham
                                    Kevin K. Yam
                                    LITTLER MENDELSON, P.C.
                                    900 Third Avenue
                                    New York, NY  10022.3298
                                    212.583.9600

                                    *Attorneys for Plaintiff*
                                    *Marsh & McLennan Agency LLC*