# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARSH & MCLENNAN AGENCY LLC,
Plaintiff,
-against-

ELMER "RICK" FERGUSON,

Defendant.

No. 19-cv-03837 (VSB)

---

# SUPPLEMENTAL POST-EVIDENTIARY HEARING SUBMISSION IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION TO COMPEL ARBITRATION, AND IN SUPPORT OF APPLYING CALIFORNIA LAW

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-20-19

RECEIVED
DEC 2 0 2019
PRO SE OFFICE



# TABLE OF CONTENTS

Preliminary Statement

Argument

I.     The Complaints Should be Dismissed Under Rule 37(c)(1) and 60(b)(3). ............4

II.    Objection to Documents and Statements Under Rule 37(c)(1)...........…............10

III.   MMA Does Not Have Standing to Bring Suit on Behalf of MMAS..................11

     A.  MMA has no injury and therefore does not have standing to bring the claims against Mr. Ferguson on behalf of MMA Securities................................12
     B.  MMA has no injury and therefore does not have standing to bring the claims against Mr. Ferguson via the restrictive covenant agreement.....................23

IV.   In the Alternative, the Court Should Compel the Parties to Arbitrate.................24
     A.  Estoppel. ...........................................................................25
     B.  Agency.............................................................................26

V.    The Complaint Should Also Be Dismissed Under Rule 12(b)(7).....................27
     A.  MMAS is Necessary Party.................................................27
     B.  MMAS is an indispensable party.........................................28

VI.   California Law Applies to All Causes of Action and Complaints Should Also Be Dismissed Under California Labor Code Section 925..................................30

VII.  The Complaints Should be Dismissed Under Unclean Hands Doctrine..............33

VIII. Conclusion.................................................................35

**ATTACHMENTS:**

Exhibit 1 – FINRA Closure Letter November 5, 2019

Exhibit 2 – Original MMA NS&CA Not Signed

Exhibit 3 – Defendant-MMA Agreement Signed January 14, 2014

Exhibit 4 – Defendant-MMA Agreement Change Supplement November 2018

Exhibit 5 – Littler Opinion CA Section 925

Exhibit 6 – Supplemental Declaration of Elmer Ferguson

**REFERENCES:**

Reference 1 – Fraud on the Court and Abusive Discovery

Reference 2 – CAFSA Article How to Respond to False Evidence

Reference 3 – Adversary Ethics More Dirty Tricks

Reference 4 – 7th Circuit Affirms Dismissal as Sanction for Bad Evidence

Reference 5 – Law360 Morse v Fusto

Reference 6 – Federal Rule of Civil Procedure Spoiling the Spoilage

Defendant Elmer "Rick" Ferguson ("Defendant" or "Mr. Ferguson") submits this Supplemental Post Evidentiary Hearing Brief in further support of Defendant's Motion to Dismiss or in the Alternative Motion to Compel Arbitration, and in Support of Applying California Law.  These arguments are in addition to and in support of arguments and references already submitted by my previous counsel.

Defendant respectfully extends the Court and Opposing Counsel apologies in advance for any formatting, procedural, or other errors Defendant makes as a Pro Se Defendant. In *Powell v. Alabama, 287 U.S. 45 (1932),* the Supreme Court wrote,

> *"Even the intelligent and educated layman has small and sometimes no skill in*
> *the science of law. . . . He lacks both the skill and knowledge adequately to prepare*
> *his defense, even though he have a perfect one. He requires the guiding hand of counsel at*
> *every step in the proceeding against him. Without it, though he be not guilty, he faces the*
> *danger of conviction because he does not know how to establish his innocence."*

As the Court and Opposing Counsel know, the Defendant has no alternative available at this time. As such, Defendant relies heavily on prior Counsel's case references and evidence and testimony from the evidentiary hearings.

The Court should note that FINRA has closed its investigation of Defendant November 5, 2019 having found no reason for action. *(Attached here as Exhibit 1.)*

The Court should also note that Defendant has filed complaints with FINRA against MMAS and MMA. Having no jurisdiction over MMA, FINRA has contacted MMA asking if it agrees to voluntarily be party to those complaints with MMAS regarding these same clients and information. As of the date of this writing, to Defendant's knowledge MMA has not agreed to be a party with MMAS to the complaints submitted to FINRA regarding these same clients and

information; in effect disavowing the same ownership and injury that it is claiming in Federal Court.

## ARGUMENT

I. **Motion to Dismiss Under Code of Civil Procedures Rule 37(c)(1) Failure to Make Disclosures or Cooperate in Discovery, and/or 60(b)(3) Fraud, Misrepresentation, or Misconduct by an Opposing Party.**

Plaintiff and Counsel have engaged in 'Rambo-lawyering' *(Def Reference 1.)* and other misconduct. Plaintiff and Counsel knowingly submitted a false document to the Court as basis for all its complaints; knowingly sent required initial notifications of these claims to Defendant at an incorrect address; denied Defendants request of material witnesses; allowed only one witness who claimed ignorance of material issues so many times as to reasonably suggest intentional falsification by omission. Defendant requests a Motion to Dismiss under Rules 37(c)(1) and 60(b)(3).

    A. During evidentiary hearings October 2, 2019, Plaintiff's Counsel was forced to admit Plaintiff knowingly submitted and misrepresented a false document to the court and Defendant as evidence and basis for Plaintiff's claims in efforts to sway the Court's judgement and influence Defendants testimony in Deposition and Hearings. Namely, Plaintiff's *Exhibit A* to their original complaint filed April 30, 2019, titled "*Barney & Barney/MMA Non-Solicitation and Confidentiality Agreement*" (NS&CA). During the evidentiary hearing Defendant stated this document was not original. *(Transcript page 281)* The Court even asked the witness, Jeff Calder, 10 questions regarding the authenticity of this alleged NS&CA document, to each of which Mr. Calder replied with a variation of 'I don't know.' *(Transcript pages 28-31)* During this time neither Mr. Calder or Mr. Wickham offered disclosures, clarifications, or any indications that

4

the document was not an original copy as claimed by MMA. Only when the Court specifically and directly questioned Mr. Wickham about the authenticity of this document did Mr. Wickham reluctantly admit the document is a fake put together by MMA and Counsel, and that MMA does not have a true and complete copy of an MMA NS&CA signed by Defendant. Plaintiff knowingly created this false document and misrepresented it as original evidence to the Court and opposing party without required disclosures regarding authenticity in advance.

*ABA Model Rule of Professional Conduct 3.3* prohibits attorneys from offering evidence that the attorney knows to be false, and requires attorneys to take reasonable remedial measures, including disclosure to the Court, *in advance*, where the attorney knows that a client has engaged in fraudulent conduct. Additionally, *ABA Model Rule of Professional Conduct 8.4,* prohibits attorneys from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. In *Morse v. Fusto, No. 13-4074 (2d Cir. 2015)* the Second Circuit took a critical further step: The court held that material omissions can, if knowingly made, constitute the falsification of evidence, even if the evidence otherwise is "facially" accurate. *(Def Reference 5)*

Defendant stated in self-testimony and subsequent questioning on October 3, 2019, that he did not sign the MMA NS&CA as provided by MMA. When questioned by the Court Defendant stated: *(Transcript pages 281-293)* He had seen a version of the NS&CA document previously, but it was not the document presented by Plaintiff; He remembered objecting to the document when originally asked to sign; He remembered striking out portions of the original NS&CA document; He remembered arguing many times with MMA about this and other contractual documents; He

signed B&B/MMA agreements without signing NS&CA's; He remembered signing the B&B/MMA agreement but not the NS&CA; His signature appeared on the last page of the alleged NS&CA document provided by MMA.

When asked about this NS&CA Defendant showed extreme confusion, and even under pressure still did not conclusively state that he ever signed a MMA NS&CA. At best Defendant was, and still is, confused that his signature appears on documents he doesn't remember as accurate and doesn't remember signing. When repeatedly pressured and coerced by Plaintiff's Counsel, Defendant clarified that his statements regarding the false document were dependent on Plaintiff's implied authenticity.

*(Transcript page 322, line 4-5)*

*"-- if we take your statement and promise that this is the original version, then, yes...."*

Further, Defendant had a history of not signing controversial documents and agreements in question. Defendant signed a contract with MMA dated December 23, 2014, refusing to sign the attached and required MMA NS&CA, and MMA accepted that contract. *(Defendant's Evidentiary Hearing (EH) Exhibit 18)* Defendant signed a contract with B&B/MMA dated February 11, 2014, refusing to sign the attached and required MMA NS&CA, and MMA accepted that contract. *(Def EH Exhibit 4)* Defendant refused to sign MMA Warning letter even though MMA stated Defendant would be fired if he didn't sign it; Defendant kept working for MMA. *(Def EH Exhibit 30)* Defendant refused to sign agreement dated August 13, 2013 without revisions, and it is still unclear if Defendant ever signed any version of this agreement without revisions, yet Defendant kept working for MMA. *(Def EH Exhibit 52)*

It is clear from the testimony and evidence that Defendant ever having signed any MMA NS&CA is in serious doubt. In response to the Court's request for true, original, and complete copies of the alleged MMA NS&CA, Defendant submits Exhibit 2, a copy of the MMA NS&CA from Defendant's records that was given to Defendant in 2014 which Defendant obviously did not sign as it is blank. *(Attached here as Exhibit 2.)*

B. Mr. Wickham stated to the Court at the evidentiary hearing October 2, 2019 that Plaintiff only replaced page 5 of the NS&CA. But the Court itself has already recognized during the evidentiary hearing that both page 5 and page 7 of the document clearly do not match the rest of the document, directly contradicting Mr. Wickham's statement and putting the authenticity of this document and Plaintiff's intentions even further in question.

C. Mara Crain declared pursuant to 28 U.S.C §1746 and under penalty of perjury in her declaration dated April 29, 2019 and filed with Plaintiff's original complaint, that the MMA NS&CA document submitted to the court as "Exhibit A" was, *"…a copy of the MMA agreement…". (Dcl of Mara Crain April 29, 2019)* An allusion based in trickery designed to influence the Court and Defendant into believing that the false document was actually a true and complete copy of an original document allegedly signed by Defendant, without technically stating as such. Mrs. Crain obviously made this declaration with full knowledge that the alleged MMA NS&CA submitted by Plaintiff was misrepresented, clearly showing efforts by Mrs. Crain of intentional misrepresentation to influence the Court's judgement and Defendant's statements.

D. Plaintiff listed Defendants address in initial complaint filing to the Court on April 30, 2019, as *"711 Mills Ave, San Bruno CA"* even though the Plaintiff had already been

in written communications with Defendant using Defendants correct address as early as February 19, 2019. *(Dcl. Douglas Wickham April 29)* It is not plausible that Plaintiff or Counsel suddenly 'forgot' Defendant's correct address thus showing an intentional delay in Defendant being made aware of these claims and being able to respond and to seek appropriate and affordable legal representation in a timely manner.

E. Defendant requested William Peartree and Mara Crain as material witnesses to these proceedings, but the Plaintiff refused. The Court has since requested statements and information from both persons as it became clear during evidentiary hearings that both are material witnesses to these complaints. Plaintiff cannot plausibly deny that it knew these witnesses were material to these proceedings. Refusal to allow material witness is reason alone for suspicion of Failure to Disclose, but when combined with that fact the only witness allowed had such a significant lack of knowledge of selected matters at hand shows a plausible intention to obstruct the Court's proceedings and should not be ignored by the Court as Failure to Disclose under Federal Rules of Civic Procedure Rule 37(c)(1).

F. Jeff Calder stated in his Declaration, and many times as witness at evidentiary hearings, that he was Defendant's direct supervisor at MMA. *(Testimony page 109, et al)* Yet during questioning Mr. Calder answered over 74 times with "I don't know", or similar deflective and non-disclosure answers whereby he disavowed knowledge of even the most basic aspects of Defendant's job duties, work arrangements, and clients; things any supervisor would commonly know. Given the number of times and subject matter of which Mr. Calder claimed ignorance, it is plausible he was choosing

to not cooperate with Discovery Rules at best, and possibly intentional falsification by omission at worst.

As an example, when asked about the relationship between MMAS and MMA which is a critical point in these claims, Jeff Calder, the only witness allowed by Plaintiff, Managing Director of MMA with direct responsibility for an entire region of the United States, allegedly Defendant's direct supervisor overseeing Defendant's MMAS clients and related income for 7 years, stated unconvincingly: *"So my depth of understanding of the relationship between MMA Securities and MMA is not very broad. I don't fully understand the relationship." (Transcript page 123)*

These actions show a preponderance of the evidence that MMA and its counsel knowingly and intentionally misrepresented false evidence to the Court and to opposing party, knowingly made false statements in efforts to influence the Court's judgement and opposing parties statements, and have engaged in misconduct by an opposing party. While outside the Second Circuit, it is reasonable to review that in *Ramirez v. T&H Lemont, Inc., 845 F.3d 772 (7th Cir. 2016)* the Seventh Circuit addressed the proper standard that district courts must apply in issuing a dismissal sanction for misconduct. Prior Seventh Circuit precedent required that the willfulness, bad faith, or fault of the accused party be supported by clear and convincing evidence to warrant a dismissal of the case. *Ramirez,* however, holds that in civil cases, a district court's decision to sanction misconduct by dismissing the action need only be established by a preponderance of the evidence. This burden, the court noted, is consistent with the Supreme Court's presumption in favor of the less onerous preponderance-of-evidence standard in federal civil cases.

For these intentional violations of Code of Civil Procedures Rules 37(c)(1) and 60(b)(3), Defendant requests dismissal of all claims with prejudice.

## II. Objection to Additional Documents or Statements Provided by MMA on the Grounds of Authenticity.

*Code of Civil Procedures Rule 37(c)(1)* states that if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. Accordingly, Defendant objects to any additional NS&CA agreements or related documents that Plaintiff may produce, and objects to additional statements by Mara Crain and statements by William Peartree in support of Plaintiff's complaints and motions.

A. Plaintiff and Counsel intentionally misrepresenting the alleged MMA NS&CA document, and not providing proper disclosure until they were forced to, is not justified, is material, and is not harmless, thus Plaintiff should not be allowed to use this document, or any versions that magically appear after the fact, or any statements regarding it, in support of their claims and requests.

B. Mr. Calder testified during evidentiary hearings that MMA has a copy of Defendant's signature on file for their use. *(Transcript page 257-258)* Defendant did not authorize MMA or any of its representatives to create, copy, use or retain his signature. *(Exhibit 6 - Def Addl Dcl Dec 17, 2019)*

C. *Defendants EH Exhibit 13*, is an email exchange between Defendant and an MMA/MMAS representative, December 20, 2018, asking about forging Defendant's signature without Defendant's knowledge or approval. This shows MMA has not

hesitated to copy and use Defendant's signature without approval and even against Defendant's instructions.

These actions and evidence show that MMA can, has, and thus likely will, use copies of Defendant's signature and produce false documents and statements to support their claims, putting into serious doubt any further documents or statements provided by Plaintiff. Plaintiff had over 7 months, 4 attorneys, substantial if not abusive discovery, an entire Human Resources Department, and hundreds of associates to help find any factual documents and statements related to this case, and yet could not produce a true, complete copy of the alleged MMA NS&CA signed by Defendant; the core basis for all Plaintiff's complaints and requests. Thus, it is not likely that any further documents produced relative to this will be authentic.

On the grounds of authenticity and Rule 37(c)(1) Defendant objects to the alleged MMA NS&CA which Plaintiff submitted as evidence and to any further related documents, and objects to statements by William Peartree and further statements by Mara Crain in support of Plaintiff's claims.

## III.  MMA Does Not Have Standing to Bring this Suit on Behalf of MMA Securities LLC

In additional support of the arguments and references already presented by Defendant's prior Counsel. Witness testimony further proved that MMA has no corporate retirement plan clients or confidential information or trade secrets regarding the same, and therefore does not have standing to bring these claims. Plaintiff argues it can bring these claims because (1) it is Defendant's employer, and (2) pursuant to the restrictive covenant agreement. The latter has already been debunked as a false document and regardless wouldn't apply to clients of a distinctly separate securities entity primarily bound by FINRA and SEC rules and regulations that require legal separation of the entities, clients, and information. Both arguments also still fail as a matter

of law as, in either case, MMA still does not allege any identifiable injury in relation to the claims in this matter. Any purported injuries can only be borne by MMAS because all clients and information relative to these claims are clients of MMAS by reason of signed agreements with MMAS specifically.

### A. MMA has no injury and therefore does not have standing to bring the claims against Mr. Ferguson on behalf of MMA Securities.

In addition to arguments and references already provided by Defendant's previous Counsel. It has been further demonstrated that the clients, information, and work performed by Defendant were all exclusively under MMAS. MMA has not submitted any evidence to the contrary. Plaintiff's witness confirmed Defendant's position multiple times in his statements.

*1.* When Jeff Calder was asked about what clients and business Defendant worked with:

*(Transcript page 170)*

*"Q. Jeff, that's not what I asked. Did I do any line of business, work on anything that wasn't under MMA Securities?*

*A. No, I don't think you did, no."*

2. When Jeff Calder was asked to clarify what clients and business Defendant worked with:

*(Transcript page 171)*

*"Q. So 100 percent of the clients that we're talking about today are first under MMA Securities. They may have some other line of business, some other relationship with MMA; correct?*

*A. Yes."*

3. When Jeff Calder was asked about the ownership of clients under question:

*(Transcript page 161)*

*"Q. Okay....When MMAS reported to FINRA that I was under investigation....were they talking about MMAS clients or were they talking about MMA clients?*

*A. From my point of view, they are talking about our clients, MMA. From their point of view, they are talking about the broker-dealer clients."*

The witness's statements support that these are clients of MMAS because the only work Defendant ever performed was under MMAS. MMAS also inherently supports Defendant's position by their filing with FINRA regarding the same clients and information.

4.  When pressed on this issue Jeff Calder changed his story to his common theme of denying knowledge of something he has already stated being familiar with but did not deny that these clients and information belong to MMAS.

*(Transcript page 131/132)*

*"Q. So we're at least in agreement, correct, that all the clients I worked with and the only services I provided under the retirement plan line of business were through MMAS, because of these agreements, they were all securities clients?*

*A. I don't know the full knowledge of that; I hadn't had a chance to do that. But I would assume, Rick, that you're right."*

5.  When asked with which entity the clients in question for these proceedings had actual legal contracts, Jeff Calder, Managing Director of MMA, and purportedly Defendant's direct supervisor, refused to admit any knowledge.

*(Transcript page 124-125)*

*"Q. Jeff, during the time you've known me, did I do anything except retirement plans?*

*A. No.*

*Q. So all my clients, 100 percent investment securities clients?*

*A. I think so.*

*Q. And because of that, none of them had direct contracts with MMA for my services?*

13

*A. I don't know that.*

*Q. So it's still your understanding that MMA might have direct contracts for securities clients?*

*A. I don't know."*

Mr. Calder's denial of having material knowledge strains credibility given his alleged position and duties in regard to Defendant and the clients in question. Instead, Mr. Calder's statements and lack of knowledge could only be plausible if the clients under question were clients only of MMAS for the purposes of these claims, and neither MMA or Jeff Calder had any ownership or interaction.

    a.   Jeff Calder stated he has never seen a client agreement for any of the clients in question. *(Transcript page 122)*

        *"THE COURT: Although you're not aware of every client, have you ever seen a retirement services client contract between a client and MMA?*

        *The Witness: No I have not. Those are handled through our compliance department in San Diego."*

        If Jeff Calder was actually the Supervisor in charge of Defendant and Defendant's clients for 7 years, it's just not plausible that he would not have reviewed or seen at least one contract at some time.

    b.   Jeff Calder even made statements contradicting his earlier declarations and statements about being Defendant's supervisor for these clients and information in question when he admitted the supervisor for these clients in question was actually Kevin Bowler *(Transcript page 109-110)*, with whom Jeff Calder never had any interaction. *(Transcript page 130)*

*"Q. So, Jeff, on that last page, and after the agreement on the required disclosures that are required to accompany that, under "Supervision," who does it state my supervisor is?*

*A. Kevin Bowler.*

*Q. Why would MMA Securities say I have a different supervisor than what you testified to?*

*A. This says that the supervisory principal for Elmer Richard Ferguson is Kevin Bowler. And that would be as it relates to your FINRA activities under MMAS.*

*Q. So there's separation?*

*A. Yes."*

*(Transcript page 130)*

*"THE COURT: Okay. Did you ever interface with Mr. Bowler concerning Mr. Ferguson's employment?*

*THE WITNESS: I did not."*

c.  Jeff Calder stated that no member of MMA did any meetings or provided any service for the MMAS clients in question. When pressed on this, Mr. Calder reverted to his regular position of suddenly lacking any knowledge of things someone in his alleged position would commonly know. *(Transcript pages 129-130)*

*Q. Was any other member of MMA allowed to go out and do any retirement services meetings?*

*A. I don't know --*

*THE COURT: Other than someone who's registered, is that the question?*

15

*MR. FERGUSON: Sure. Correct.*

*Q. Other than myself, because I was the only registered person there.*

*A. No.*

*Q. So nonregistered persons, as a matter of securities rules, cannot go out and talk about retirement services; they can't sell it, they can't service it. It's investment-related, right, so they can't talk about it?*

*A. I don't know.*

d.  When asked about the compensation from MMAS clients Mr. Calder was able to give an in-depth description of how MMA handles income and expenses for MMA clients, but when asked about these clients in question, reverted again to his sudden lack of knowledge, again straining his credibility beyond the breaking point unless he and MMA had no interaction with these securities clients because these clients are in fact owned solely by MMAS and MMA had no ownership or interaction.

*(Transcript page 156-157)*

*"A. So chargebacks are charged back to a book if there are excessive expenses. But the chargeback, although taken from the book for a producer, a producer's revenue is only reduced 20 percent; MMA pays 80 percent of that cost. You are not subject to the chargeback; you are a client service executive. In 2018, and the first two months of 2019, we spent $21,000 on your travel and expenses.*

*Q. And MMA would know which clients those were?*

*A. Yeah, they would on, some level, sure. It's reported.*

*Q. So we come full circle. MMA is keeping track of how much money they make on a client and how much they spend on it; and that money that they made on the client came from MMAS, my activities or some other producer's activities under MMAS.*

*A. The money we make comes from our clients.*

*Q. Which, as we've stated, we figured out earlier the clients -- all that money for securities, that the only business I did, that goes to MMAS first?*

*A. I am not sure of the financial flow."*

e.   When asked about the services offered by MMAS versus MMA Mr. Calder even admitted he had no insight into MMAS, clearly showing that these clients are not clients of MMA and MMA had no ownership of the clients or the information. *(Transcript page 159)*

*Q. Does MMAS take the standpoint that all of the retirement services are under them?*

*A. I don't have insight into MMAS, Rick."*

6.   When presented with evidence *(Def EH Exhibit 5)* and asked if Defendant even had access to any MMA client information, Jeff Calder admitted that Defendant did not, directly contradicting his earlier testimony *(Transcript page 40, line 8-9)*. Thus, by MMA's own witness admission there was no feasible way for Defendant to access or download any list of MMA clients or information.  *(Transcript page 149)*

*"Q. Did I have access to the MMA systems? "*

*A. No."*

7.   When pressed again on the issue of which entity these clients and information belong to for purposes of these complaints, Jeff Calder admitted MMAS filed disclosures with

17

FINRA via a Form U5 regarding the same clients and information, which proves yet again that the clients and information in question belong to MMAS, not MMA. When faced with these facts Jeff Calder reverted to his standard sudden ignorance of the situation.

*(Transcript pages 154-155)*

*"Q. Isn't it true FINRA is investigating me because MMA Securities told them, These clients and this information is ours, and he took it?*

*A. I don't know that that is the only reason they are investigating you. I know we have a dual action pending.*

*Q. Well, let's read that again: Intentional removal of company property, including deletion of company data, also solicitation of institutional clients and prospective clients while licensed with MMA Securities on behalf of unaffiliated third party before and after termination. But you don't think that sounds like exactly what we're doing here today?*

*A. It is what we are doing today.*

*Q. So, Jeff, are these clients of MMA or are they clients of MMA Securities? Because there seems to be a fight going on between MMA and MMA Securities.*

*A. I can't answer that question."*

8. Jeff Calder stated several times that he was not aware of specific clients or activities of Defendant's and never discussed specific clients or activities with Defendant even though he has stated he was Defendant's direct supervisor overseeing all Defendant's client work for 7 years. Mr. Calder tried to smooth over this obviously awkward position by stating he would only look at individual clients and discuss them if the producer's spending on the client exceeded the company's spending threshold of 2% of client income. But Mr. Calder also testified that Defendant's spending on clients (i.e. as a producer) was over 2 times that

18

spending threshold. This shows that a) Defendant was a producer contrary to Mr. Calder's statements, in charge of spending on Defendant's clients totally separate from MMA; b) Mr. Calder was not aware of Defendant's clients or spending because Defendant's clients were not clients of MMA. If these were truly clients of MMA, under the supervision of Mr. Calder, and Defendant was spending well over twice MMA's allowable limit, Mr. Calder surely would have discussed them with Defendant.

*(Transcript page 135)*

*"A. I don't know every client we have in the office, Rick.*

*Q. When we met, did we go over -- from reviews and things like that, did we go over my book of business?*

*A. No."*

*(Transcript page 136)*

*"Q. Okay. When we met, did we talk about those clients?*

*THE COURT: And again, these are meetings, the annual --*

*Q. The annual review meetings.*

*A. Not in detail, no.*

*Q. Did we mention them?*

*A. No, we didn't mention clients specific in those meetings. Those meetings that we did were based for budgeting purposes. I looked at the workbook in total for all of our producers."*

*(Transcript page 156)*

*Q. Is it normal process at MMA for you to analyze how much was spent on all those things you just mentioned, marketing, things like that, and then attribute it to that client and balance it out and say, How much did we spend on that client; how much did that client bring in?*

*A. I don't usually view it in that micro environment, but I will have that discussion if it's out of line."*

*(Transcript Page 172)*

*THE WITNESS: Yeah. So assuming the book of business was -- let's say it's $500,000, and I'm not saying it was or it wasn't, but let's say it was. We would budget approximately two percent of that revenue towards expenses. So a $500,000 book of business should have approximately a budget of two percent of that, which is $10,000.*

*(Transcript Page 157)*

*The Witness: In 2018, and the first two months of 2019, we spent $21,000 on your travel and expenses.*

9. When testifying who was in charge of the December 20, 2018 meeting regarding the secret reassignment of Defendant's clients to another advisor, Mr. Calder even acknowledged that he as Managing Director of MMA was not in charge and it was in fact William Peartree of MMAS. Jeff Calder as Managing Director of MMA certainly outranks William Peartree, Director Retirement Services at MMAS if these were in fact clients of MMA. But where these clients in question were concerned, MMA did not have any standing thus had to call in William Peartree from MMAS to lead and handle that meeting.

   *(Transcript page 217)*

   *THE COURT: Okay. And so how was it determined that -- was it just hierarchal, in other words, that Mr. Peartree would take the lead on this?*

   *THE WITNESS: Yes.*

10. The Court keyed in on a critical point regarding which entity thee clients belong to by asking for client agreements of the clients in question. Mr. Wickham tried to cloud this

situation with a lengthy description of his personal opinion on what constitutes securities

activities for these clients and complaints in question.

*(Transcript page 126-127)*

*MR. WICKHAM: So maybe I can help out. It just goes back to the principal dichotomy*

*between a producer, somebody who's engaged in sales, versus somebody who's engaged*

*in service. Producers, that's what they are doing, they are selling plans to clients and,*

*therefore, you know, they are engaged in the purchase and sales of securities. So when Mr.*

*Ferguson was a producer and he had his license and so on and so forth, then he's at the*

*apex of his regulated activity. Once he moved from the producer category to the service*

*category, and he continued to maintain fiduciary responsibilities for some clients that were*

*assigned to him, not his clients, then he's not selling to them. So, you know, so there's less*

*regulated activity. He's doing the servicing, holding 401(k) meetings, and things of that*

*sort. So it's hybrid that there are activities that he is engaged in as an MMA client service*

*executive that is not regulated activity. That's not necessarily to the exclusion that there*

*might be some regulated activity that he's engaged in. So it's a hybrid situation.*

*THE COURT: I understand that.*

*MR. WICKHAM: And they have the contracts in place from a regulated regulatory*

*standpoint that they to have the regulatory contracts with the regulated entity, because*

*that's*

*what's required under FINRA regulations for that type of business. But, again, it's not to*

*the exclusion of the other, it's in addition to the other.*

These statements by Mr. Wickham are incorrect as seen by the MMAS client contract

which lists all the services provided to these clients in question specifically as provided by

registered persons. Mr. Wickham's statements are possibly also in violation of *ABA Model Rules of Professional Conduct Disciplinary Rule 7-106(c)(3) Trial Conduct:*

*DR-7-106*

*C. In appearing in his professional capacity before a tribunal, a lawyer shall not:*

> *3.Assert his personal knowledge of the facts in issue, except when testifying as a witness.*

Plaintiff has not been able to show any contracts for Defendant's services between clients and MMA because at no time did Defendant's clients ever have any agreements with MMA for any of Defendant's services. The MMAS client agreement itself specifies the exact services and other applicable legal aspects for all the clients and information in regard to these complaints and proceedings. In *Defendants EH Exhibit 2, Page 7, Section A. Description of Ongoing Services*, the MMAS client agreement stipulates all the services are provided specifically by representatives of MMAS and lists the services. Any services Mr. Wickham falsely alluded to that could have been provided by MMA associates are listed in the MMAS agreement which stipulates that only representatives of MMAS can execute those services. This shows that Mr. Wickham's statements are incorrect. And that any statements by Plaintiff or it's Counsel stating that MMA associates provided any of MMAS's services, are false.

11. *Defendant's EH Exhibit 7, page 2, Section B. Confidential Information,* specifically states that MMAS will not share any confidential client information with ANY other entity and does not exclude MMA. Thus, MMA could never have legally received or held any confidential MMAS client information in question.

12. *Defendant's EH Exhibit 2, 2nd set of pages, Page 8-9, Section 10.b, "Affiliations"* as stated is a required disclosure of any entities associated to MMAS relative to all the clients in question under these proceedings. The only entity relationship listed is another MMC company, Mercer Investment Management, Inc. MMA is not listed because these are not MMA clients and MMA is not involved with any aspect of MMAS client relationships or information.

For the aforementioned reasons MMA does not have standing to bring these claims because it does not have any corporate retirement plan clients or information which are the subject of these complaints. Thus, the Court should dismiss these complaints and requests for lack of standing.

**B.     MMA has no injury and therefore does not have standing to bring the claims against Mr. Ferguson via the restrictive covenant agreement.**

As additional support to the arguments and references already submitted by Defendant's prior Counsel. Per the alleged MMA NS&CA, MMAS as a subsidiary of MMA could have brought actions as the entity with the actual alleged injury but MMA has done so instead to circumvent FINRA's arbitration requirement.

It is important to note that MMAS did in fact claim ownership of these clients and information by creating non-required disclosures to FINRA regarding the same clients and information on March 13, 2019 via a form U-5. *(Def EH Exhibit 7)* MMAS concluded their internal investigation and filed an amended U-5 Form with FINRA April 24, 2019 stating in effect, they found no wrongdoing. MMA did not file their complaints in Federal Court until April 30, 2019. This shows that MMAS claimed ownership of these clients and information well before MMA.

MMA does not deny that they have worked jointly with MMAS to bring the same complaints regarding the same clients and same information in two different venues under two different ownership claims, as testified by Jeff Calder.

*(Transcript page 164)*

*Q. So MMA Securities and MMA have worked together to file the same complaints with FINRA and in civil court?*

*A. Yes.*

There is no authentic proven NS&CA signed by Defendant. Even if there was, under that agreement MMAS was obligated to bring any complaints resulting from violations of that agreement, which they started to do by filing disclosures with FINRA for these same clients and information but chose not to finish. Accordingly, the Court should dismiss this matter pursuant to *Fed. R. Civ. P., Rule 12(b)(1)*.

## IV. In the Alternative, the Court Should Compel the Parties to Arbitrate

MMAS was obligated by the terms of the alleged NS&CA to bring any claims regarding their clients and information. MMAS recognized this obligation when they filed disclosures with FINRA. If MMAS had found any violations of the alleged NS&CA, as a FINRA member firm they are required to bring any complaints to FINRA arbitration. Thus, as the party knowingly receiving the benefit of their subsidiary's securities clients and all inherent contractual obligations and limitations that come with that benefit, MMA must also accept the arbitration requirement.

The Court should note that both parties agree FINRA has been thoroughly investigating these claims since MMAS filed their disclosures in February 2019. Plaintiff has stated both MMAS and MMA have fully cooperated in giving all information and evidence regarding these proceedings to FINRA, further proving a known understanding and acceptance of FINRA's arbitration requirement.

*(Transcript page 174)*

*MR. WICKHAM: They were required to disclose this. They were required to file the U-5. They were required to put into the U-5, you know, certain information. There have been multiple occasions when FINRA has come back to MMAS, and I'm assuming probably back to Mr. Ferguson as well, asking for supplemental information. It's a FINRA investigation. MMAS had to make what disclosures that it had to make.*

*THE COURT: Sure.*

*MR. WICKHAM: The characterizations of that, based on an absence of a full record, are not accurate. I don't want to get into -- but I will say that pleadings from this case, the complaint, various other things, have been submitted to FINRA. So the full character and nature of everything that is going on here has been shared with FINRA as part of their investigation.*

Defendant asks the Court to further note that after this extensive investigation by FINRA, with full cooperation by all parties and all subsequent evidence, discovery, and testimony submitted, FINRA has since closed their investigation on this matter with no action against Defendant. *(Attached Exhibit 1.)* It is reasonable to conclude that the reason MMA filed these complaints in Federal Civil Court is because they and MMAS already knew the claims to be false and would not stand up to scrutiny in the proper venue of FINRA and thus wanted to avoid the FINRA arbitration requirement by filing claims in Federal Court.

### A.     Estoppel

In further support of the arguments and references already submitted by Defendant's prior Counsel. MMA argues in its Opposition that it (1) does not derive a direct benefit from the agreement between Defendant and MMAS and (2) is not a third-party beneficiary of that agreement. But Jeff Calder testified that MMA did in fact receive all the income derived from all the securities activities Defendant performed regarding these clients under MMAS.

*(Transcript page 155-156)*

*Q. So the money that's earned from these contracts doesn't go to MMA; MMA is paying all of this stuff just out of their pocket, the goodness of their heart?*

*A. At the end of the day, the money comes to MMA.*

MMA received the income benefit of Defendant's work under MMAS. MMA knew that Defendant's required registrations with MMAS contained an arbitration provision per Federal regulations. MMA should therefore be estopped from avoiding arbitration.

### B.     Agency

In further support of the arguments and references already submitted by Defendant's prior Counsel. MMA should also be compelled to arbitrate under the agency theory. MMA is trying to 'have it both ways.' MMA states they own MMAS and are intertwined to such a large extent that MMA has injury from alleged violations regarding MMAS clients and information. But MMA also asserts that corporate affiliation on its own is insufficient to bind a non-signatory parent entity, *Pl.'s Opp., p. 15*. Jeff Calder stated several times during his testimony that MMA considers the MMAS securities clients as clients of MMA for reasons other than direct ownership.

*(Transcript page 171)*

*THE COURT: I understand the question. The clients that are at issue -- well, I'll allow it, whether -- putting aside the legality of the situation, is it your personal view that the clients that are at issue here are MMA clients?*

*THE WITNESS: Yeah, absolutely. They were either referred in by a current MMA producer, or the business that Rick brought in through his own efforts, we supported that, we paid for that, we paid for those activities; we paid for all of the travel, all the entertainment; we paid for the service staff to service those clients. MMA paid for that.*

MMA considers itself emmeshed with MMAS via mutual referrals and other actions to such an extent that would qualify MMAS as an agent of MMA. Accordingly, the Court should also dismiss this matter and compel arbitration pursuant to the agency theory.

## V.     The Complaint Should Also Be Dismissed Under Rule 12(b)(7)

### A.     MMAS is a necessary party.

In further support of the arguments and references already submitted by Defendant's prior Counsel. MMAS proved ownership of these clients and information by filing disclosures to FINRA well before MMA filed claims in Federal Court in efforts to avoid FINRA arbitration requirements. Plaintiff's only other defense of MMAS's and MMA's interest in these clients being "virtually identical" was shown incorrect, and directly, if reluctantly, contradicted by its own witness's testimony regarding the separate business activities of MMAS and MMA. MMA is an insurance brokerage company with no common lines of business with MMAS, a broker-dealer/RIA firm registered with FINRA and the SEC.

*(Transcript page 170)*

*Q. Did I do any line of business under MMA that wasn't specifically first under MMAS?*

*A. You are paid by MMA partially to do the securities side of the business and partially to service the clients.*

*Q. Jeff, that's not what I asked. Did I do any line of business, work on anything that wasn't under MMA Securities?*

*A. No, I don't think you did, no.*

MMAS's registration with FINRA and the arbitration requirement for any claims regarding these clients further proves that MMA cannot legally represent MMAS's interest in these complaints because MMAS is required to arbitrate with FINRA. This situation has already been contemplated

by FINRA with offending companies held responsible. While not a Federal Court case, *Defendants EH Exhibit 10, FINRA Matter #2009020188101* is worth reviewing as an example of FINRA's Federally accepted position regarding this same situation of a non-FINRA registered entity bringing complaints in court on behalf of an associated subsidiary FINRA registered entity, against registered associates like the Defendant. The non-registered entity was forced to stop all court proceedings against the registered associate and the affiliated registered entity was fined $1,000,000.

**B.    MMAS is an indispensable party.**

In further support of the arguments and references already submitted by Defendant's prior Counsel. MMA's own testimony shows they consider MMAS indispensable to these claims, and that MMA and MMAS have been fully coordinating all their efforts, exchanging and supplying joint information for tactical reasons in submissions to FINRA and Federal Court, and relying indispensably on each other.

*(Transcript page 164)*

*Q. I guess I'm confused. A moment ago you said to your knowledge more things have been submitted to FINRA?*

*A. I don't know that it had been submitted to FINRA. We have more information now than we did when this file was closed. And I think that they will submit that to FINRA.*

*Q. When you say "we," do you mean MMA or MMA Securities?*

*A. I think we are both in possession of the information.*

*(Transcript page 164)*

*Q. Why would MMA even bring MMA Securities into it then?*

*A. MMA Securities has been a part -- we're running a dual action here. They are getting the same discovery we are getting.*

*Q. So MMA Securities and MMA have worked together to file the same complaints with FINRA and in civil court?*

*A. Yes.*

*(Transcript page 167)*

*THE COURT: Okay. Do you have an understanding of whether there's an intention by MMAS to supplement the information that it previously provided to FINRA?*

*THE WITNESS: I believe there is.*

*(Transcript page 177)*

*The Court: "....I take it -- well, let me ask it. I'm not sure I got, Mr. Wickham, your response to this: Are you representing the company in connection with the FINRA part of this or is that another counsel, or is that internal?*

*MR. WICKHAM: None of the above. It's through MMAS's compliance officer. And she is responding to what inquiries that FINRA has had. Necessarily they will be consulting with counsel concerning drafting of responses to be able to be sure that everything that's submitted to FINRA is accurate and at least with regard to the circumstances about the claims asserted in this case. So we have been consulted on those matters, but it is MMAS's chief compliance officer who was interfacing with FINRA in connection with FINRA's investigation."*

Jeff Calder and Mr. Wickham's statements make it clear that MMAS in an integral part of MMA's complaints and vice versa. The Court should therefore dismiss this matter under Rule 12(b)(7) because MMA has failed to join MMAS, a necessary and indispensable party.

**VI. California Law Applies to All Causes of Action and Should be Dismissed with Prejudice Under California Labor Code Section 925.**

In addition to and further support of the arguments and references already submitted by Defendant's prior Counsel. The Court should apply California law also because; 1) The only valid contract not under dispute and applicable to these claims states California as governing law; 2) Even if the Court should find the false MMA NS&CA has any applicability, which it should not, California Labor Code Section 925 would require the choice of California law as governing law.

1. The alleged MMA NS&CA has been proven to be a false document and should be disregarded, leaving the only contract between Defendant and MMA that is applicable to these complaints with a governing law clause and undisputed by both parties in this matter, is one signed January 14, 2014, which states Choice of Law as California. *(Attached here as Exhibit 3).*

2. *California Labor Code Section 925* prohibits the use of contract provisions that apply another state's law or require adjudication of disputes in another state as a condition of the employment of an individual who primarily resides and works in California. It applies to contracts entered into, modified, or extended on or after January 1, 2017. Specifically, the code states;

   *(a) An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:*

      *(1) Require the employee to adjudicate outside of California a claim arising in California.*

*(2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.*

*(b) Any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute.*

*(c) In addition to injunctive relief and any other remedies available, a court may award an employee who is enforcing his or her rights under this section reasonable attorney's fees.*

*(d) For purposes of this section, adjudication includes litigation and arbitration.*

*(e) This section shall not apply to a contract with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum in which a controversy arising from the employment contract may be adjudicated or the choice of law to be applied.*

*(f) This section shall apply to a contract entered into, modified, or extended on or after January 1, 2017.*

There is no dispute that Defendant lived and worked primarily in California. There is no dispute that Defendant wants to void the provision requiring the application of New York law. There is no dispute Defendant is enforcing his rights under this code section by defending himself in Federal Court and all other related actions in FINRA and California. There is no dispute that Defendant was not represented by legal counsel in negotiating the agreement in question. MMA materially modified and recognized an extension of Defendant's contract in November 2018 under a new contract supplement that significantly changed material aspects of Defendant's job duties and functions as

a Fiduciary Advisor, compensation, bonus structures, and direct supervisor relationships. *(Attached here as Exhibit 4)* While MMA has desperately tried to obfuscate the ongoing disagreements around Defendant's disputed compensation structure and amounts due relative to Defendant's MMAS clients, Jeff Calder gave testimony, when pressed, admitting that a material change in Defendant's job functions happened as part of the disputed reassignment of Defendant's MMAS clients from Defendant to Jeff Stephens.

*(Transcript page 68)*

*THE COURT: Well, were these clients -- what does that -- I'm not sure I understand what that means. In other words, were the clients -- what were the clients going to be advised or were they not going to be advised at all, because Mr. Ferguson was still going to maintain whatever interaction he had with those clients going forward?*

*THE WITNESS: No. Mr. Ferguson was not going to continue -- he told us he would not continue as a fiduciary on those accounts. So then we would have to switch that role to Jeff Stephens going forward.*

A simple reading of the MMAS client contract *(Def EH Exhibit 2)* shows Defendant provided specific Fiduciary services as legally defined by the Employee Retirement Income Security Act of 1974 (ERISA), and Defendant was specifically named as the representative of MMAS providing all the said services, and the services are listed in the contract and are the only services provided to these clients. In other words, removing Defendant as the Fiduciary advisor to these clients meant Defendant would no longer legally be allowed to provide any of the contracted services under the agreement that Defendant had been providing. A significant and material change.

MMA's own legal counsel produced an opinion on this issue strongly supporting that California law should be applied in this situation, and even supports the position that MMA may have knowingly committed an illegal act when it required provisions requiring New York law. *(Attached here as Exhibit 5.)* Given that MMA's own long-time counsel produced this opinion, MMA cannot plausibly take a position that it was unaware of California Labor Code Section 925 and the ramifications.

For these reasons the Plaintiff's complaints and requests should be dismissed with Prejudice.

## VII.    Complaints and Requests Should Be Dismissed Due to Unclean Hands Doctrine.

As a general rule, a claim is barred under the doctrine of unclean hands when "(1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party and (5) affects the balance of equities between the litigants." *Imprisoned Citizens Union v. Shapp,* 11 F. Supp. 2d 586, 608 (E.D. Pa. 1998) (citation and internal quotation marks omitted), aff'd, 169 F.3d 178 (3d Cir. 1999); see also *Lucey v. Workmen's Comp. Appeal Bd.*, 732 A.2d 1201, 1204 (Pa. 1999) (stating the doctrine of unclean heads "closes the doors of a court of equity to one tainted with inequity or bad faith relative to the matter in which he seeks relief").

MMA has Unclean Hands when it knowingly violated California Labor Code Section 925 in its agreements in order to be able to erroneously bring these complaints as already shown. MMA also has Unclean Hands by reason of estoppel when it secretly colluded with MMAS to take Defendant's MMAS clients and give them to another Advisor without informing Defendant or more importantly the clients in question, in violation of the Fiduciary duty to clients and in violations of securities regulations, and then instructed Defendant to take actions to cover up Plaintiff's violations, regarding which Plaintiff is now bringing complaints.

Plaintiff has not denied it planned and executed a process to take clients from Defendant and give to another Advisor without the Defendant's knowledge. Jeff Calder's testimony supports this position.

*(Transcript page 198-199)*

*"Q. ....Why were my accounts transferred to a house account, from SagePoint to MMAS?*

*A. You were still going to be the adviser on the account.*

*Q. When did anybody talk to me about that?*

*A. I don't know that they did...."*

Plaintiff absurdly asks the Court to accept the position that Defendant was in full agreement and even requested MMA and MMAS to give up his clients that paid a much higher compensation, and give that higher compensation to another Advisor, in exchange for Defendant getting a lower position with less relative compensation. This disagreement of the situation is a subject of Defendant's current claims against Plaintiff and MMAS in FINRA, the proper venue for these issues. For purposes of these complaints in Federal Court, Plaintiff and Defendant are shown to agree that Defendant's clients were taken from him, purposely without his knowledge.

Plaintiff and Defendant are shown to agree that after much disagreement about this transfer of Defendant's clients, a meeting was held December 20, 2018. Defendant is the only party that has demonstrated taking notes on the day of this meeting by *Defendant's EH Exhibit 29* whereby Defendant emailed himself the meeting notes the very same day. It is telling that MMA has had every chance to provide contrary evidence, but has not in any submissions to the Court to date, shown any concrete evidence defending its position regarding this meeting by the other 3 parties regarding this material issue. Any notes now provided MMA after the fact are obviously suspicious as to authenticity.

Further, *Defendant's EH Exhibits 28, 29, 30, 31, 32, 33*, and even *Plaintiff's own EH Exhibit 16* clearly show the Defendant's understanding of MMA's instructions from that December 20, 2018 meeting, and that Defendant made his understanding blatantly obvious to all parties even asking MMA multiple times to verify his understanding of MMA's instructions. Defendant did not hide any of his actions resulting from MMA's instructions, as exemplified by Plaintiff's plentiful examples, which only further support Defendant's position that he was openly following MMA's instructions. Plaintiff's position that Defendant was secretly working to steal clients is absurd considering all the evidence to the contrary.

It is clear from evidence and testimony that MMA tried to steal Defendant's clients violating regulations in the process, and when Defendant found out and stated his intentions as a whistleblower to counter MMA's deceitful actions, MMA give him instructions to remedy that situation which MMA is now using to file claims against Defendant. For these reasons Plaintiff's claims and requests should be dismissed under the Unclean Hands Doctrine.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss this matter pursuant to Rules 37(c)(1), 60(b)(3), 12(b)(1), 12(b)(7), and Unclean Hands Doctrine, or compel the parties to arbitrate, and to apply California law as governing law.

Dated: December 17, 2019
San Bruno, CA

Respectfully submitted,

*/s Elmer R. Ferguson*
Elmer R. Ferguson
Defendant, Pro Se
753 Mills Ave, San Bruno, CA 94066

# Exhibit 1 - FINRA Closure Letter

## November 5, 2019



FINra®
Financial Industry Regulatory Authority

November 5, 2019

Elmer Ferguson
753 Mills Ave
San Bruno, CA 94066

Re:     Examination Disposition Letter
        Examination Number: 20190619354

Dear Mr. Ferguson:

This is to inform you that FINRA has completed a review into the U5 Filing from MMA Securities, LLC.

Based on our inquiry, we have determined to close our file pertaining to this matter. This determination is based on the facts known to us at this time. In this regard, new or additional facts could lead to a new inquiry.

It is our view that a determination by FINRA not to take action against a FINRA member or a member associated person has no evidentiary weight in any mediation, arbitration, or judicial proceeding. Further, it is inconsistent with just and equitable principles of trade for a FINRA member or a member's associated person to attempt to introduce such a determination into evidence in any of these forums, provided that in the event a party other than a member or associated person makes representations in a proceeding inconsistent with this letter, the member or associated person may introduce this letter, in unedited form, but only for the purpose of creating a complete factual record.

If you have any questions, please contact Examination Manager Michele Sterling at 212-858-4288, or the undersigned at 516-827-6150.

Sincerely,

Michael Gerena
Associate Director

cc:  MMA Securities LLC
     Triad Advisors LLC

**Exhibit 2 - Original MMA NS&CA from MMA
not signed**

# BARNEY & BARNEY/MMA NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT

AGREEMENT, dated as of _____, 2014, between Barney & Barney, a Marsh & McLennan Agency LLC company, and/or subsidiaries thereof (the "Employer"), together with its parents and affiliates (collectively, the "Company"), and Elmer Ferguson, an employee of the Employer (the "Employee").

R E C I T A L S:

WHEREAS, on the date hereof, Employer acquired one-hundred percent (100%) of the membership interest in BARNEY & BARNEY, LLC ("Barney & Barney", and such membership purchase referred to herein as the "Barney & Barney Acquisition"); and

WHEREAS, simultaneously with or immediately subsequent to the Barney & Barney Acquisition, Barney & Barney was merged with and into the Employer and the Employer shall be the surviving entity of such merger; and

WHEREAS, Employee was employed by Barney & Barney immediately prior to the Barney & Barney Acquisition, and subsequent to the merger has been offered, and has accepted, employment with the Employer; and

WHEREAS, this Agreement is entered into in consideration of the Employee's (a) employment or continued employment by the Employer, (b) access to Confidential Information and Trade Secrets belonging to the Company, as defined below; and (c) receipt of payment in the amount of $5,000.

NOW, THEREFORE, the Employer and the Employee hereby agree to be bound by this Non-Solicitation and Confidentiality Agreement, as follows:

## 1. Confidential Information and Trade Secrets

(a) Employee understands and acknowledges that as an employee of the Company, Employee will learn or have access to, or may assist in the development of, highly confidential and sensitive information and trade secrets about the Company, its operations and its clients, and that providing its clients with appropriate assurances that their confidences will be protected is crucial to the Company's ability to obtain clients, maintain good client relations, and conform to contractual obligations. Such Confidential Information and Trade Secrets include but are not limited to: (i) financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas; (ii) product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models, and research and development projects; (iii) client information, such as the identity of the Company's clients, the names of representatives of the

Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients; (iv) personnel information, such as the identity and number of the Company's other employees and officers, their salaries, bonuses, benefits, skills, qualifications, and abilities; (v) any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices; (vi) any information not included in (i) or (ii) above which Employee knows or should know is subject to a restriction on disclosure or which Employee knows or should know is considered by the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public; or (vii) intellectual property, including inventions and copyrightable works. Confidential Information and Trade Secrets are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its great effort and expense. Confidential Information and Trade Secrets can be in any form, including but not limited to: oral, written or machine readable, including electronic files.

(b)     Employee acknowledges and agrees that the Company is engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by the Company at its great effort and expense. Employee further acknowledges and agrees that any disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other than in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company and cause it to suffer serious loss of business and pecuniary damage. Accordingly, Employee agrees that he or she will not, while associated with the Company and for so long thereafter as the pertinent information or documentation remains confidential, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information and Trade Secrets, except as required to carry out his or her duties as an employee of the Company, and except as expressly authorized by the President or highest executive officer of the Employer. Nothing in this Agreement is intended to prohibit Employee from discussing with other employees, or with third parties who are not future employers or competitors of the Company, wages, hours, or other terms and conditions of employment.

(c)     Immediately upon the termination of employment with the Company for any reason, or at any time the Company so requests, Employee will return to the Company: (i) any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in Employee's possession or control which contain or pertain to Confidential Information and Trade Secrets; and (ii) all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment. Employee agrees that upon completion of the obligations set forth in this subparagraph, and if requested by the Company, Employee will execute a statement declaring that he or she has retained no property of the Company or materials containing Confidential Information and Trade Secrets nor has he or she supplied the

same to any person, except as required to carry out his or her duties as an employee of the Company. A receipt signed by an Officer of the Company itemizing the returned property is necessary to demonstrate that Employee has returned all such property to the Company.

(d)     Employee acknowledges and agrees that Employee is not authorized to access and use the Company's computer systems and protected computers, including laptop computers and Company PDA's, and the data contained therein, for personal gain or to benefit third parties (other than in the course of Employee's performance of services for the Company or as expressly and specifically authorized by the Company) and that any such access or use is unauthorized and may be punishable by law as well as constituting a breach of this Agreement.

## 2.    Non-Solicitation Of Clients

(a)     Employee acknowledges and agrees that solely by reason of employment by the Company, Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto, including those regarding the Company s clients, prospective clients and related information.

(b)     Consequently, Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, Employee will not, for a period of twenty-four (24) months following such separation, directly or indirectly use Confidential Information and Trade Secrets or related information regarding the Company, the Company's clients and its prospective clients to solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company. This restriction shall apply only to those clients or prospective clients of the Company with which Employee had contact during the last two (2) years prior to the separation of his or her employment with the Company. For the purposes of this Section 2, the term "contact" means interaction between Employee and the client which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or providing or performing (or assisting or supervising the performance or provision of) products or services for the client on behalf of the Company. For purposes for this Section 2, the term "contact" with respect to a "prospective" client means interaction between Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. Employee shall not engage in any subterfuge to circumvent this prohibition, including providing Confidential Information and Trade Secrets to others to assist them in soliciting or serving the client.

3.    **Non-Solicitation Of Employees**

Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding other employees of the Company, and will develop relationships with those employees. Accordingly, both during employment with the Company and for a period of twenty-four (24) months thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business, to leave employment with the Company.

4.    **Conflict Of Interest**

Employee may not use his or her position, influence, knowledge of Confidential Information and Trade Secrets or the Company's assets for personal gain, except as specifically provided in this Agreement. A direct or indirect financial interest, including joint ventures in or with a supplier, vendor, client or prospective client without disclosure and the express written approval of the President or highest executive officer of Employer is strictly prohibited and constitutes cause for dismissal.

5.    **Employee's Acknowledgement**

Employee hereby expressly acknowledges and agrees that (a) the restrictions and obligations set forth in and imposed by Sections 1, 2, 3 and 4 will not prevent Employee from obtaining gainful employment in Employee's field of expertise or cause Employee undue hardship; and (b) the restrictions and obligations imposed on Employee under Sections 1, 2, 3 and 4 are necessary to protect the legitimate business interests of the Company and are reasonable in view of the benefits and consideration Employee has received or will receive from the Company.

6.    **Equitable Relief**

In recognition of the fact that irreparable injury will result to the Company in the event of a breach by Employee of his or her obligations under Section 1, 2, 3 or 4 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, Employee acknowledges, consents and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by Employee and persons acting for or in connection with Employee and (b) recovery of all reasonable sums and costs, including attorneys' fees, expert witness fees, and expenses and costs incurred by the Company in seeking to enforce the provisions of this Agreement.

7.    **Liquidated Damages**

(a)     Employee acknowledges and agrees that the Company will be injured by any violation of Section 1, 2, 3 or 4, that it will be difficult or impossible to ascertain the full amount of damages that the Company will sustain by reason of such breach, and that accordingly the Company does not have an adequate remedy at law for any such breach. Employee further agrees that in the event that Employee breaches the provisions of Section 2the Company is entitled to recover damages, in addition to all other remedies to which it is entitled, even though such damages cannot be readily ascertained and will not make the Company whole or fully remedy the breach. Employee acknowledges that many of the Company's clients enjoy long term business relationships with the Company and expand their business relationship with the Company over time and that the loss of a client will therefore likely result in the loss of an increasing revenue stream to the Company from that client for a significant but indeterminate period of time into the future, extending beyond the period that Section 2 is in effect. Employee further acknowledges that the loss of a client erodes the goodwill enjoyed by the Company, and that the loss of a client reduces referral opportunities and business from existing clients, including opportunities for the Company to obtain or service business from that client in addition to business from that client that Employee personally obtained or serviced. Employee acknowledges that the Company's acquisition of clients is a result of the Company's investment of time and money in hiring personnel, including Employee,  and development of Confidential Information and Trade Secrets for the purpose of attracting and servicing clients, in developing a technological and business infrastructure, and in otherwise enabling Employee to form and maintain relationships with clients, and acknowledges that a breach of the obligations of Section 2 or reduces the value of the Company's investment in a manner and to an extent which cannot be fully calculated. Employee further acknowledges that a breach of the obligations set forth in Section 2will force the Company to incur out-of-pocket costs such as increased overhead, increased costs in protecting and developing Confidential Information and Trade Secrets, increased financial accommodations to clients, increased costs in deploying personnel to attempt to retain clients, and other costs, which cannot be readily allocated or calculated. Employee acknowledges that these and other uncertainties make it difficult to ascertain the amount of damage that the Company will sustain from a breach of Section 2.

(b)     Recognizing the difficulty of calculating actual damages and acknowledging the factors set forth in Section 7(a), among other factors, in the event of a violation of Section 1 or 2resulting in a client either reducing the amount of business or canceling business with the Company and directing or redirecting such business through Employee or through any entity or person with whom Employee becomes associated, in addition to all other remedies provided herein, Employee agrees to pay the Company an amount equal to three (3) times the total fees and commissions received by the Company for such business during the 12 months  prior to the breach.  Said amount shall be payable to the Company no later than thirty (30) days following Employee's receipt of the Company's written statement of the total fees and commissions for that client for the prior12 months.  Employee acknowledges and agrees that this amount is a reasonable approximation of the damages likely to occur following a breach of Section 1, 2, 3 or 4.

(c)     The remedy set forth in Section 7(b) shall be in addition to and not in place of such additional remedies as the Court may order, including equitable relief to prevent further breaches or to provide further remedies.  To the extent that the Court determines that

Section 7(b) is not enforceable, or if the Company elects to prove its actual damages, the Court shall sever Section 7(b) and the Company shall recover its actual damages.

(d)     This provision shall not affect the damages or other remedies the Company may recover from any other provisions of this Agreement.

## 8.     Severability

The parties agree they have attempted to limit the scope of the post-employment restrictions contained herein to the extent necessary to protect Confidential Information and Trade Secrets, client relationships and good will. It is the desire and intent of the parties that the provisions of this Agreement shall be enforced to the fullest extent permissible under applicable laws and public policies. Accordingly, if any particular portion of this Agreement shall be adjudicated to be invalid or unenforceable, this Agreement shall be deemed amended to delete therefrom such invalid portion, and reformed to the extent valid and enforceable. Such deletion and reformation shall apply only with respect to the operation of this Agreement in the particular jurisdiction in which such adjudication is made.

## 9.     Other Agreements and Obligations Survive

Neither the Employee nor the Company intends to waive or release the applicability of any other more extensive legal or contractual obligations the Employee may owe the Company at any particular time, including, but not limited to, obligations under any employment agreement between the Employee and the Company whether executed prior to this Agreement or at any time hereafter with regard to the subject matters of Sections 1, 2, 3 or 4.

Except as otherwise provided in this Section, the obligations of Employee under this Agreement shall be independent of, and unaffected by, and shall not affect, other agreements binding Employee which apply to Employee's business activities during and/or subsequent to Employee's employment by the Company, including any employment agreement between Employee and the Company whether executed prior to this Agreement or at any time hereafter. The obligations under this Agreement also shall survive any changes made in the future to the employment terms of Employee, including but not limited to changes in salary, benefits, bonus plans, job title and job responsibilities.

## 10.     Employment Unaltered

Employee understands that this Agreement does not constitute a contract of employment and does not promise or imply that his or her employment will continue for any period of time

## 11.     Binding Effect; Assignment

Employee expressly consents to be bound by the provisions of this Agreement for the benefit of Employer or any of its subsidiaries or affiliates to whose employ he or she may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. Employee consents that any such subsidiary or affiliate may enforce this Agreement. Further, the rights of the Company hereunder may be assigned or, as applicable, shall pass by operation

of law, without further consent of the Employee, at any time, to any successor in interest of the Company, or any portion thereof, by reason of merger, consolidation, sale, lease or other disposition of any or all of the assets or stock of the Company.

## 12. Governing Law and Choice of Forum

The parties acknowledge that the Company is headquartered in New York, that senior members of the leadership team of the Company are based in New York, and that breach of this Agreement will cause injury in New York. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws provisions. The parties, being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York and the parties agree to the jurisdiction thereof. The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the said court(s), and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum. Employee recognizes that, should any dispute or controversy arising from or relating to this Agreement be submitted for adjudication to any court, arbitration panel or other third party, the preservation of the secrecy of Confidential Information and Trade Secrets may be jeopardized. Consequently, Employee agrees that all issues of fact shall be severed for trial without a jury.

## 13. Non-Waiver

The failure of either the Company or Employee, whether purposeful or otherwise, to exercise in any instance any right, power, or privilege under this Agreement or under law shall not constitute a waiver of any other right, power, or privilege, nor of the same right, power, or privilege in any other instance. Any waiver by the Company or by Employee must be in a written or electronic instrument signed by either Employee, if Employee is seeking to waive any of his or her rights under this Agreement, or by the President or highest executive officer of Employer, if the Company is seeking to waive any of its rights under this Agreement.

## 14. Modification; Agreement to Enter into Additional Agreements

No modification of this Agreement shall be valid unless made in a written or electronic instrument signed by both parties hereto, wherein specific reference is made to this Agreement; provided, however, that the Company may make changes to the Agreement that are favorable to Employee (*e.g.,* to conform the provisions of this Agreement to changes in court decisions or legislation), without securing the written consent of Employee to the change. Should Employee move to a different state or jurisdiction while employed by the Company or upon written request of the Company, Employee agrees to sign, without further consideration, upon direction by the Company, such further writings to effectuate the provisions of this Agreement as necessary to comply with applicable law. Employee's failure to sign such additional agreements shall constitute a breach of this Agreement.

15. **Cooperation**

        Both during Employee's employment with the Company and after the termination thereof for any reason, Employee agrees to provide the Company with such information relating to his or her work for the Company or others, as the Company may from time to time reasonably request in order to determine his or her compliance with this Agreement.

16. **Disclosure**

        Employee hereby specifically authorizes the Company to contact his or her future employers to determine his or her compliance with the Agreement or to communicate the contents of this Agreement to such employers.  Employee further specifically authorizes the Company to, in its sole discretion and without further permission from Employee, furnish copies of the Agreement to any client or prospective client of the Company and indicate that Employee has entered into this Agreement with the intention that the Company and each of its clients or prospective clients may rely upon his or her compliance with this Agreement.

17. **Headings**

        Section headings are used herein for convenience or reference only and shall not affect the meaning of any provision of this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first hereinabove set forth.

_____
Employee Signature

_____
Employee Name (Please Print)

Date: _____

Employer:


_____
Name: Sharon M. Werner
Title:   Senior Vice President, Human Resources


Date:  _January 31, 2014_____

# Exhibit 3 - Ferguson BnB Agreement 110113 signed 011414



---

**PRODUCER AGREEMENT**

---

The Agreement is entered into this 1st day of November, 2013 between Barney & Barney, a limited liability company (hereinafter referred to as "B&B"), and Elmer (Rick) Ferguson (hereinafter referred to as "Employee"). In consideration of the mutual promises and agreements contained herein, as well as other valuable consideration, it is agreed as follows:

## ARTICLE 1

### Duration of Employment

1.1. <u>At Will Employment.</u> B&B agrees to employ Employee on an at-will basis. Accordingly, either B&B or Employee may terminate the employment relationship at any time, for any reason or no reason, with our without cause or notice. Any prior contrary representations, expressed or implied, are hereby superseded. This at-will term of employment may only be modified in writing, signed by both Employee and B&B's Managing Principal.

## ARTICLE 2

### Employee Responsibilities

2.1 <u>Scope of Duties.</u> Employee is hired in the capacity of Client Executive, Sales, with all the duties and responsibilities attendant to that position. In this position, Employee shall receive and transmit proposals or instruments and contracts of insurance covering persons or entities in California and other places where B&B is licensed to do business for such classes of risk as B&B shall authorize and subject to B&B's authority to make such contracts and to all applicable laws and regulations. Employee is also authorized to collect and receive premiums on insurance contracts tendered by Employee and accepted by B&B. Further, Employee agrees to tender to B&B each and every contract of insurance produced by Employee and remit to B&B all premiums and commissions received by Employee, including any insurance company sales bonuses or incentives.

2.2 <u>Performance of Duties.</u> Employee agrees to devote his or her full-time and best efforts to the business of B&B. Employee will, at all times, loyally and conscientiously perform all duties and obligations either expressly or implicitly required by B&B and this Agreement. Employee

❋ ❋ ❋

Insure your success.®

9171 Towne Centre Drive, Suite 500   San Diego, CA 92122   P.O. Box 85638   800.321.4696   www.barneyandbarney.com   CA Insurance LIC: 0C03960   ...An Assurex Global Partner



further agrees not to engage in any outside activity or business that would interfere with, or be in conflict or competition with, the business of B&B or Employee's responsibilities under this Agreement.

    2.3    <u>Confidential Information and Materials.</u>  Due to the nature of Employee's duties, s/he will have access to and become acquainted with B&B's customer lists, files, expiration records, sales reports, policy terms, conditions and rates, client risk characteristics and other confidential documents, as well as various other trade secrets consisting of compilations of information, records, and operational procedures which are all owned by B&B and which are regularly used in the operation of its business ("Confidential Information").  Employee shall not disclose the contents of any of such Confidential Information, or any other confidential or proprietary information of B&B, directly or indirectly, or use it in any way, either during the term of this Agreement, or thereafter, except as is required in the course of performing his or her duties on behalf of B&B.  All confidential and proprietary information of B&B, whether prepared by B&B, Employee or otherwise, that comes into Employee's possession, shall remain the exclusive property of B&B, and shall not be removed from the premises of B&B under any circumstances without the prior written consent of B&B, except as necessary to conduct the business of B&B.  Upon termination of Employee's employment with B&B, or at any time upon request, Employee shall immediately return to B&B all Confidential Information, as well as any other B&B confidential or proprietary information.

    2.4    <u>No Solicitation of Clients.</u>  Employee understands and agrees that s/he shall not at any time use any of B&B's confidential or proprietary information or materials, either on Employee's own account or in association with any other person, firm, corporation or other entity, to solicit, induce, encourage, entice away or divert any person or entity which was a client of B&B during the time of Employee's employment with B&B, excluding any clients that Employee brings to B&B at the inception of his / her employment who were not previously clients of B&B.  Employee also agrees not to provide any other person or entity with any confidential or proprietary information regarding B&B clients for purposes of assisting that person or entity in contacting or soliciting such clients.

    2.5    <u>No Solicitation of Employees.</u>  During the term of employment with B&B and for a period of 24 months following the end of employment, for whatever reason, Employee shall not, directly or indirectly, induce or attempt to induce, any employee of B&B to end or diminish his/her relationship with B&B, or solicit or attempt to solicit any B&B employee for outside employment. Employee shall also not provide any information about B&B's employees to any

Insure your success.™

9171 Towne Centre Drive, Suite 500   San Diego, CA 92122   P.O. Box 85638   800.321.4696   www.barneyandbarney.com   CA Insurance LIC: 0C03950   ...An Assurex Global Partner



other person for the purpose of assisting any third party to solicit the Company's employees for outside employment.

2.6    <u>Prior Agreements</u>.  Employee represents to B&B that s/he is not subject to any contractual agreement that would limit Employee's right to accept employment with B&B, or perform the assigned duties referenced above.  Employee also represents that Employee will not use or disclose any confidential or proprietary information of any other person or entity in connection with the duties required under this Agreement.

2.7    <u>Liquidated Damages</u>.  If Employee breaches any provision of Paragraph 2.4 of this Agreement, Employee agrees to promptly pay to B&B an amount of liquidated damages equal to the amount of any commission, fee or compensation related to any clients solicited. The parties agree that this provision is reasonable under the circumstances existing at the time this Agreement due to the fact that it would be impractical or extremely difficult to fix the actual damages.  This liquidated damages provision shall not prevent B&B from seeking additional actual damages if such can be proved, as well as equitable relief, as appropriate as set forth in paragraph 2.8 below.

2.8    <u>Other Remedies</u>.  Employee recognizes and agrees that the liquidated damages set forth above may not be an adequate or an appropriate remedy for a breach by Employee of any of the agreements set forth in Paragraphs 2.3, 2.4 and 2.5 above, because the breach relates to matters which are of a special, unique or extraordinary character, or because the breach causes a loss for which B&B may not be reasonably or adequately compensated in damages and which causes B&B irreparable injury and harm.  Consequently, Employee agrees that B&B shall, at its option, be entitled to injunctive and/or other equitable relief to prevent a breach of any of the terms of this Agreement and Employee agrees to be bound by the entry of any such order so enjoining him/her.

### ARTICLE 3
#### Compensation

3.1    Assuming Employee is in good standing with the firm and meeting revenue expectations, B&B anticipates providing Employee a base salary from January 1, 2014 through December 31, 2014, plus 10% of earned net revenue from new business. In addition Employee shall be given a credit in the amount of $20,000 annually toward draw validation for providing account service exceeding what is normally required of a Client Sales Executive.  During the period our expectation is that Employee will grow the book such that by January 1, 2015, Employee shall be converted to the Compensation Plan as described herein in which Employee

Insure your success.™

9171 Towne Centre Drive, Suite 500   San Diego, CA 92122   P.O. Box 85638   800.321.4696   www.barneyandbarney.com   CA Insurance LIC: 0C03950   ...An Assurex Global Partner


shall be paid a bi-weekly draw against his/her earned income. The amount of this draw will be determined by Employee's Departmental Manager. This draw is an advance against income anticipated to be earned in the future, and is not earned income. The amount of the draw will be determined by estimating the net commissions and fees that are anticipated to be received by B&B on accounts coded to Employee's book of business. The amount of any draw shall be established at B&B's sole discretion, and may be modified at any time in B&B's sole discretion. In addition, Employee shall continue receiving an annual credit in the amount of $20,000 annually towards draw validation for providing account service exceeding what is normally required of a Client Sales Executive.

Net Revenue Defined. Net Revenue is based upon commissions and fees earned by B&B. Net Revenue shall be calculated by subtracting from gross commissions and fees those costs that are determined by B&B to be directly attributable to a client (e.g., contributions, cost of value added services such as COBRA and FlexSpending Account administration, BeneTrac fees, consulting fees such as R&LA hours in excess of allotted hours, air travel and overnight accommodation, etc.).

Earned Income Defined. Earned income is a percentage of the Net Revenue as defined above that has actually been received by B&B, and which represents payment in full for all products or services sold. No income is earned until B&B has received payment in full.

New and Renewal Commissions and Fees Defined. New commissions and fees are defined as those received by B&B during the first 12 months of a contract. Renewal commissions and fees are defined as those received by B&B for all months following the first 12 months of a contract.

Calculation of Earned Income. Each quarter, earned income shall be calculated and compared to all draws paid. At that time, Employee shall be paid any earned income that has been earned and that exceeds the draw for the current quarter and any deficit from prior quarters.

Earned income shall be calculated based upon the following percentages of net renewal and net new commissions and fees:

40% of net new and renewal commissions and fees < $300,000

50% of net new and renewal commissions and fees as of first dollar > $300,000 and < $600,000

60% of net new and renewal commissions and fees as of first dollar > $600,000

Insure your success.·

9171 Towne Centre Drive, Suite 500   San Diego, CA 92122   P.O. Box 85638   800.321.4696   www.barneyandbarney.com   CA Insurance LIC: 0C03950   ...An Assurex Global Partner



**BARNEY&BARNEY** LLC

Leaves of Absence. If Employee is on an approved leave of absence due to their own medical condition for 30 calendar days or less, no adjustment will be made to Employee's draw or Earned Income. If Employee is on an approved leave of absence due to their own medical condition more than 30 calendar days, but less than 180 calendar days, Employee's draw will be reduced to 60% of the previously established draw that was in effect at the beginning of the leave of absence. When appropriate, Employee will receive benefits under B&B's Supplemental Medical Leave policy. Credit for Earned Income during such a leave of absence will be allocated 60% to Employee and 40% to other employees and/or Principals (if any) covering Employee's accounts based on B&B's judgment of the work performed. Employee will not receive a draw or credit for Earned Income when taking leave time in excess of 180 calendar days.

If Employee is on an approved leave of absence due to any reason other than their own medical condition, Employee's will not receive a draw or credit for Earned Income during the period of the leave of absence.

Overpayment of Draw. Because any draw paid is only an advance of wages not yet earned, if Employee's draw for any quarter exceeds Employee's Earned Income for the quarter, Employee shall be responsible to repay the amount of the draw that exceeds the Earned Income. B&B may, in its sole discretion, defer repayment until the completion of the following quarter and the calculation of Employee's Earned Income at that end of that quarter. If Employee's employment with B&B ends for any reason, Employee is obligated to repay any outstanding draw overpayments. Such repayment must be made within thirty (30) days of B&B's written notification to Employee of the amount due.

Transferred Business. The Company reserves the right, at any time, in its sole discretion, to transfer business between books of business to ensure clients are provided the appropriate level of service needed and to meet any other business related needs.

Referred, Cross-Sold and Joint Produced Business. Referral, cross-selling and joint production is encouraged. Accordingly, Employee will receive credit toward Earned Income if s/he is deemed by B&B to be instrumental in obtaining a piece of business for another employee's book of business. Any such credit will be determined in accordance with B&B's then current Referral Bonus Program rules. Any separate agreement between employees pertaining to revenue splits, cross-selling or joint production must be confirmed and approved by the Department Manager prior to placement. Under no circumstances will the combined amounts paid to all participants of the referred, cross-sold or joint produced business exceed the amount

Insure your success.™

9171 Towne Centre Drive, Suite 500   San Diego, CA 92122   P.O. Box 85638   800.321.4696   www.barneyandbarney.com   CA Insurance LIC: 0C03950   ...An Assurex Global Partner



that would be paid to an individual employee.

    Payment of Earned Income Upon Termination. If Employee's employment is terminated, voluntarily or involuntarily, Employee shall be paid any Earned Income that has been earned as of the date of termination, less any draws paid for the current quarter and any deficit from prior quarters.

3.2    Employee Benefits, Sick Leave and Vacation Time. Employee shall be entitled to benefits such as medical or disability insurance, life insurance, sick leave and vacation in accordance with B&B's then current policies and practices unless otherwise noted in writing and signed by Department Manager.

3.3    Business Expenses. Employee is authorized to incur reasonable business expenses and entitled to reimbursement of such expenses for promoting the business of B&B, provided that such expenses are approved and authorized by B&B in advance, and provided that Employee timely provides all required documentation to support the expenses were actually and properly incurred.

## ARTICLE 4
### General Provisions

4.1    Non-Assignability. This Producer's Agreement is not assignable by Employee.

4.2    Successor. The rights and obligations of B&B under this Agreement shall inure to the benefit of and shall be binding upon the successors, assigns and transferees of B&B.

4.3    Integration. This Agreement contains the entire agreement between the parties hereto regarding Employee's at-will employment and the terms of Employees' compensation and benefits of employment with B&B. Additionally, it supersedes all prior negotiations, understanding, letters, arrangements and agreements between them concerning those matters. The language of this Agreement shall be construed simply according to its fair meaning, and shall not be strictly read against any party.

4.4    Choice of Law. This Agreement shall be governed and construed in accordance with the laws of the State of California.

4.5    Severability. The illegality, unenforceability or invalidity of any one or more covenants, phrases, clauses, sentences or paragraphs of this Agreement, as determined by a court of competent jurisdiction, shall not affect the remaining portions of this Agreement, or any part thereof; and in case of any such illegality, unenforceability or invalidity, this Agreement shall be construed as if such illegal, unenforceable or invalid covenants, phrases, clauses, sentences or paragraphs, had not been inserted.

Insure your success.™

9171 Towne Centre Drive, Suite 500  San Diego, CA 92122  P.O. Box 85638  800.321.4696  www.barneyandbarney.com  CA Insurance LIC: 0C03960  ...An Assurex Global Partner



BARNEY&BARNEY LLC

4.6    Waiver.  The waiver by B&B of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach of the same or any other provision hereof.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written and have received a copy of this Agreement.   All parties have reviewed the Agreement carefully and have been provided with an opportunity to ask questions and/or consult with an attorney prior to signing.

**BARNEY & BARNEY, LLC**

JEFFREY CALDER, PRINCIPAL                      _Jeff Calder_
Name and Title (please print)          Signature

                                      1/15/14
                                      Date

**EMPLOYEE**

ELMER R FERGUSON                          _E. R. Ferguson_
Employee Name (please print)          Employee Signature

                                      1/14/14
                                      Date

Insure your success.™
9171 Towne Centre Drive, Suite 500   San Diego, CA 92122   P.O. Box 85638   800.321.4896   www.barneyandbarney.com   CA Insurance LIC: 0C03950   ...An Asurex Global Partner

# Exhibit 4 - Ferguson contract supplement change November 2018


MARSH & McLENNAN
AGENCY

For Personnel Use Only
☐ Workday
☐ Empower

# EMPLOYEE STATUS CHANGE

## EMPLOYEE INFORMATION

Employee Name: Elmer (Rick) Ferguson     Employee ID #: 1049504

Today's Date: 10/31/2018     Date Effective: 11/1/2018

## CLASSIFICATION CHANGES

| Change | | Current Information | | New Information |
|---|---|---|---|---|
| Job Title: ☐ | Current: | Client Executive Service | New: | |
| Supervisor : ☐ | Current: | Jeff Calder | New: | |
| Concur Supervisor : ☒ | Current: | Bill Peartree | New: | Jeff Calder |
| Department Code: ☐ | Current: | | New: | |
| Pay Rate: ☒ | $: | 110,000 | $: | 125,000 |
| Overtime Rate: ☐ | $: | | $: | |
| Doubletime Rate: ☐ | $: | | $: | |
| Status: ☐ | Current: | Exempt ☐ Non-Exempt ☐ | New: | Exempt ☐ Non-Exempt ☐ |
| Location: ☐ | Current: | | New: | |
| Reason: ☐ | | Merit ☐ Transfer ☐ Promotion ☐ | Other ☒ | |

**Other changes:**
Compensation package includes 25% for business referrals; Bonus plan is 12%

## VERIFICATION OF CHANGES

Employee Signature _~~[signature]~~_     Date 1/1/18

Supervisor Signature::     Date

Human Resources Signature     Date

# Exhibit 5 - Littler Opinion CA Section 925

# Insight

OCTOBER 3, 2016

## New California Law Prohibits Choice of Law and Venue in Employment Contracts

BY M. SCOTT MCDONALD AND JIM HART

On September 25, 2016, Governor Brown signed into law a new California Labor Code provision (Section 925) that is likely to have major repercussions for contracts with employees who live and work primarily in California. The new California Labor Code provision prohibits the use of contract provisions that apply another state's law or require adjudication of disputes in another state as a condition of the employment of an individual who primarily resides and works in California.

The law applies to contracts entered into, modified, or extended on or after January 1, 2017. This gives employers a brief window to address the need for changes in their existing employment agreements. However, determining what changes are needed will require an individualized assessment because the new law raises a whole host of unanswered questions, and employers will have more than one option regarding how to address the concerns created by the new law.

### The New Law – Section 925

Section 925 appears relatively simple on its face. It provides as follows:

a. *An employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:*

   1. *Require the employee to adjudicate outside of California a claim arising in California.*

   2. *Deprive the employee of the substantive protection of California law with respect to a controversy arising in California.*

b. *Any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute.*



c. *In addition to injunctive relief and any other remedies available, a court may award an employee who is enforcing his or her rights under this section reasonable attorney's fees.*

d. *For purposes of this section, adjudication includes litigation and arbitration.*

e. *This section shall not apply to a contract with an employee who is in fact individually represented by legal counsel in negotiating the terms of an agreement to designate either the venue or forum in which a controversy arising from the employment contract may be adjudicated or the choice of law to be applied.*

f. *This section shall apply to a contract entered into, modified, or extended on or after January 1, 2017.*[1]

The apparent intent of Section 925 is to largely eliminate the normal contractual right that parties have to select the law governing their contractual obligations and the venue (or location) for any legal proceeding adjudicating the rights of the parties under their contract. While other state and federal laws will occasionally prohibit contractual provisions that would avoid their application, Section 925 appears unique and unprecedented in its extremely broad and sweeping prohibition regarding the use of choice-of-law and venue clauses for individuals who primarily reside and work in California.

Choice of law and choice of venue clauses are commonplace elements in contract law. They are already governed in a relatively uniform fashion across the United States through common-law principles largely articulated in the Restatement of Conflict of Laws, and in jurisdictional and procedural rules and doctrines (like forum non conveniens and personal jurisdiction). Why the protections already built into these legal guidelines were deemed inadequate to protect the rights of California employees, and how the special protections created by Section 925 will be reconciled with some of these principles going forward, are only two of many unanswered questions raised by Section 925.

### Is choosing another state's law or venue now an illegal act in California? Or is it simply the use of a voidable provision?

Section 925 and the Legislative Counsel's Digest accompanying it paint an unclear picture on this issue. Section 925(a) provides that an employer "shall not" require an employee who primarily resides and works in California, as a condition of employment, to agree to a contract that has a choice of venue or law provision that would offend the statute. This type of language is usually reserved for a direct and complete prohibition of the conduct at issue—it would appear to make asking an employee to sign such an agreement an illegal act. Similarly, the Digest introduction to the law starts out by noting that existing law prohibits an employer from requiring an employee or applicant for employment to agree, in writing, to any term or condition that is known by the employer to be illegal. This is a reference to Labor Code Section 423.5, and sets the stage for the argument that using such an agreement is an illegal act in and of itself.

On the other hand, Section 925, subdivision (b) goes on to say that an offending provision *"is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute."* This suggests that the employee is the one who controls whether the provision (choice-of-law or venue) is honored or not. The statute is very unusual in that it does not simply declare the provision void but instead makes it voidable. Logically, this means it is not an illegal provision from the outset – otherwise it would simply be void – but is instead potentially illegal depending on what the employee elects to do and whether the employee happened to be represented by counsel when the contract was formed. The law is clearly written so as to give the employee the option to use (and enforce) the questionable provision if it is favorable to him or her or request that it be voided if it is not favorable. Presumably, it is not an illegal clause or illegal act by the employer to use it

[1]   The bill originally was intended to apply to both employment and consumer contracts, but the final bill was revised to only apply to employment contracts.

Insight is published by Littler Mendelson in order to review the latest developments in employment law. Insight is designed to provide accurate and informative information and should not be considered legal advice.

if the employee likes it and chooses to enforce it. Under this scenario, the employer has no way to know in advance what decision the employee will make in this regard, which is significant because the employer's knowledge is an important factor in determining liability. Rather, the inclusion of language permitting an employee to void the agreement appears to be in response to prior bills that were vetoed in past legislative sessions, including AB 267 (Swanson, 2011), AB 335 (Fuentes, 2009), and AB 1043 (Swanson, 2007). In an attempt to distinguish this law from prior unsuccessful bills, the legislative history here indicated that "[i]n contrast to those bills, this bill would make the choice-of-law and choice of forum provisions voidable by the employee, and not automatically void and unenforceable."

Whether or not the use of the potentially offending provision could create a violation of Labor Code Section 432.5 referred to in the Digest is dependent on the employer's knowledge. By its express terms, Section 432.5 applies only where an employee is required to agree to a term or condition known by the employer to be prohibited by law. Cal. Lab. Code § 432.5. Does the fact that the provision might be deemed void if the employee so chooses make it prohibited by law from the outset, or only prohibited by law if the employee does not like it? That it might be declared void is not the same as illegal. "Void" merely means "of no legal effect; null," whereas "prohibit" means "to forbid by law."[2] Consequently, several important questions remain unanswered and are ripe for litigation.

### Can the employee change position at any time or elect to void provisions in a selective fashion?

The statute is not clear how the employee's right to elect whether to void the offending choice-of-law or venue provision will work. It appears unlikely that the employee can be compelled to choose before the "controversy" at issue is ripe for legal action since the substantive prohibition applies only to the application of a choice of law to a particular controversy.

However, the wording of Section 925, subdivision (b) suggests that once a controversy has arisen and the employee elects to void the selection of another state's law, the entire matter is controlled by California law and adjudicated in California (the "matter shall be adjudicated in California and California law shall govern the dispute"). This would indicate that statute contemplates one, simple election with no change in course thereafter. It does not, however, indicate at what stage of a dispute this election can (or must) be made.

### Is the selection of another state's law always going to be problem?

Technically "no," but practically "yes." Section 925, subdivision (b) only prohibits the selection of another state's law if it deprives the employee of the substantive protection of California law with respect to a controversy arising in California.

However, this sets up a difficult and largely unpredictable stage upon which the parties can contract. Are the parties supposed to anticipate every conceivable "controversy" that might ever come up between them and compare the laws of the two states and somehow "know" in advance whether the result would be different under California law or the law chosen? Realistically, that would be an impossible task. And, consequently, the practical effect is that an employer will have little choice but to presume it cannot use another state's law in most instances.

### Is Section 925 applicable to all employment contracts with California employees?

Not exactly. By its terms, Section 925 applies only to contracts that are required "as a condition of employment, ...". As a result, if an employee is given a choice and not required to sign the agreement as a condition of employment, the prohibition in the statute would not appear to apply. This suggests, for example, that an agreement that is not a condition of employment but instead a condition of participation

---

2    See Black's Law Dictionary (8th ed. 2004).

Insight is published by Littler Mendelson in order to review the latest developments in employment law. Insight is designed to provide accurate and informative information and should not be considered legal advice.