# Insight

littler.com • 1.888.littler • info@littler.com

in some form optional benefit (like a stock option plan), or one with an opt-out provision, could choose another state's law and venue.

### What are the remedies for the employee under Section 925?

Section 925 says that in addition to injunctive relief, the employee can collect attorneys' fees and other remedies available by law. The statute does not identify specifically what these other remedies might be, but the Digest's reference to 423.5 suggests some potential for application of remedies available under the Labor Code.

The remedy that is apparently presumed to be applicable by the statute is injunctive relief, but exactly how this would work is uncertain. Certainly, the pursuit of a declaratory judgment claim where the employee seeks to have the choice of law and venue declared unenforceable is a logical remedy. But the statute's reference to injunctive relief is more puzzling.

The most logical way for Section 925 to come up is a situation wherein the employer has taken steps to enforce the choice of law or venue in a court of law. Normally, courts are very reluctant to enjoin a party from exercising the right to pursue legal relief in a court of law. For example, in the context of attempts to enforce noncompete contract provisions that would be void under Cal. Bus. & Professions Code Section 16600, the California Supreme Court has previously ruled that a California court cannot enjoin an employer's use of another state's court to enforce a noncompete nor can it enjoin a foreign state court from going forward with a legal action to enforce a noncompete.[3] And, in federal courts, the concept of using Section 16600 as basis for one court enjoining another court has been rejected under the Anti-Injunction Act.[4] There is no apparent reason on the face of Section 925 why an employee's attempt to enjoin an employer from using a court to enforce choice-of-law or venue provisions that offend Section 925 would be treated any differently than attempts to enforce noncompete contracts unenforceable under Section 16600. This does not mean that a declaratory judgment declaring the offending choice-of-law or venue provision in the contract at issue void under Section 925 could not be pursued, nor does it mean that the employee could not assert other remedies. It simply means the statute's purported remedy of injunctive relief is suspect.

### Can an arbitration agreement be used instead of court action to avoid Section 925?

By its terms, Section 925 applies to both court and arbitration adjudication matters. Consequently, on its face it does not make a difference whether or not the controversy at issue is subject to a mandatory arbitration agreement. And, in fact, if the mandatory arbitration agreement itself is a condition of the individual's employment and it has an offending choice-of-law or venue provision, these provisions in the arbitration agreement might violate Section 925.

Legislative history candidly acknowledges the new law is being enacted to outlaw or limit the freedom to enter into arbitration agreements. In fact, the legislative history behind the bill criticized the entire notion of arbitration at length, citing numerous criticisms of the process with almost no acknowledgement of the benefits frequently cited in favor of the process.[5] In many respects the legislative history focused on criticisms of arbitration that arise in the consumer advocacy context and not the employment law context. Consequently, it is ironic that the bill ended up as one that applies only to employment contracts.

To the extent that Section 925 was intended to force employers in California to stop using arbitration agreements or to make all arbitration agreements with California employees subject to California law, it is not likely to achieve this result. The United States Supreme Court has repeatedly made it clear that mandatory

---

3   *Advanced Bionics Corp. v. Medtronic, Inc.*, 29 Cal. 4th 697, 701-708 (Cal. 2002 ).

4   *Bennett v. Medtronic, Inc.*, 285 F.3d 8 01 807 (9th Cir. 2002).

5   Assembly Committee on Judiciary SB1241 (Wieckowski, p. 3 ( June 21, 2016).

Insight is published by Littler Mendelson in order to review the latest developments in employment law. Insight is designed to provide accurate and informative information and should not be considered legal advice.

Insight                                                littler.com • 1.888.littler • info@littler.com

arbitration agreements governed by the Federal Arbitration Act (FAA) are enforceable under standards set forth in the FAA and that the FAA preempts state laws that contradict it or that stand as an obstacle to the accomplishment of the Federal law.[6] To the extent that an employer selects the FAA as governing law over the agreement, it seems unlikely that California could, through force of state law, prohibit a U.S. citizen from selecting and relying on a favorable federal law even if California believed the federal law somehow deprived the individual of some of the protections of California law. Simply put, a state cannot legislate its way out of the preemptive effective of a federal law.

From the perspective of the contract law underlying the formation of a binding contract, state laws do apply to arbitration agreements even when they are covered by the FAA. To this extent, the selection of another state's law for the law governing contract formation might be covered and controlled by Section 925. Conflicts-of-law principles frequently result in the choice of another state's law in an arbitration agreement with a California employee not being honored by a court in California anyway.[7] So, there is certainly good reason to question why such a sweeping new law was necessary to address a choice-of-law issue in this context.

If the contract selects an out-of-state venue for the adjudication of disputes under the arbitration agreement, this could also trigger application of Section 925. However, it is worth noting that for purposes of arbitration agreements with most employees, it would be very difficult to enforce the selection of a highly inconvenient and distant venue for the arbitration both under American Arbitration Association rules and under generally applicable law prior to the passage of Section 925.[8] Consequently, if preventing this kind of oppressive venue selection activity was the motivation behind the statute, what the California legislature did was arguably unnecessary and a lot like using a shotgun to kill a fly.

### *Does the retention of legal counsel exception apply if the agreement is not negotiable?*

Section 925 does not apply if legal counsel for the employee is involved in negotiating the contract. This is a potentially useful exception for employers at the executive level where individually negotiated agreements may be more feasible, but it will have little application to the vast majority of agreements where for reasons of practicality, consistency, and fairness among employees who hold the same or substantially similar positions, an employer will want to use a uniform set of contract terms.

### *This new law applies to 2017 agreements, but what happens with existing agreements entered into before January 1, 2017?*

Agreements entered into before January 1, 2017, simply are not covered by Section 925. However, it is important to note that the statute does not limit itself to contracts entered into on or after January 1. It also covers contracts modified or extended on or after January 1, 2017. The modification or extension of a contract can sometimes occur in ways that are easy for an employer or employee to overlook. By way of example, a contract that expires by its terms at the end of the year but automatically rolls into a new year if no notice is given might be viewed as extended; a contract that initially contained a specific initial salary (subject to an increase through mutual agreement) might be deemed modified when the employee gets a raise.

---

6   *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 355 (2011).

7   *See, e.g., Pinela v. Neiman Marcus Group, Inc.,* 238 Cal.App.4th 227, 255-258 (2015).

8   *See Milliner v. Bock Evans Fin. Counsel Ltd,* 114 F.Supp.3d 871, 880 (N.D. Cal. 2015) (holding unconscionable an arbitration forum selection clause selecting Denver, Colorado as the arbitral forum where both parties were located in California).

Insight is published by Littler Mendelson in order to review the latest developments in employment law. Insight is designed to provide accurate and informative information and should not be considered legal advice.

Insight

littler.com • 1.888.littler • info@littler.com

**Practical Takeaways**

Employers that have contracts in place with employees who primarily reside and work in California will want to consider taking the following steps due to the passage of Section 925:

- Review contracts that will be used in 2017 to determine if they have provisions that either (a) require the adjudication of controversies in another state other than California, or (b) choose the law of another state other than California.

- Consider removing potentially offending choice-of-law and/or venue provisions and replace them with California selections or remain silent on choice of law and venue.

- Where appropriate, consider adding an opt-out provision that does not make the contract a condition of employment and allows the employee a window of time during which he or she may opt out of the agreement before it becomes binding.

- If the selection of another state's law is going to be retained, then consider using a carve-out or savings clause in employment agreements with California employees that recognizes the employee's option to void the choice of law and that disclaims any intent to deprive the employee of the substantive protection of California law with respect to a controversy arising in California.

- Audit existing contracts to flag those that might offend Section 925 and might be likely to come up as a modified or extended contract due to the presence of a fixed-term provision or other provisions (like a set salary, position designation, or defined territory of responsibility) that are likely to be modified over time.

- Before going either (i) forward with litigation against a California employee in an out-of-state forum based on a forum selection clause, or (ii) seeking to enforce a choice-of-law clause that applies another state's law, evaluate whether Section 925 applies and whether or not the employee has engaged in any conduct that might be viewed as an election to void or not void the potentially offensive selection provisions.

Insight is published by Littler Mendelson in order to review the latest developments in employment law. Insight is designed to provide accurate and informative information and should not be considered legal advice.

# Exhibit 6 - Supplemental Declaration of Elmer Ferguson 121719

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MARSH & MCLENNAN AGENCY LLC,
Plaintiff,
-against-

ELMER "RICK" FERGUSON,

Defendant.

No. 19-cv-03837 (VSB)

**SUPPLMENTAL DECLARATION OF
ELMER FERGUSON**

Elmer Ferguson, declares pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury that the following is true and correct:

1. To the best of my knowledge I have never authorized MMA, MMAS, or any other entity to create, copy, use, or retain my signature.

Dated: December 17, 2019

San Francisco CA

Elmer Ferguson

# Reference 1 - Fraud on the Court and Abusive Discovery

16 Nev. L. J. 707, Hague - Final.docx                                    4/12/16 6:31 PM

# Fraud on the Court and Abusive Discovery

### David R. Hague*

*Unbeknownst to many, federal courts have the power under the Federal Rules of Civil Procedure to set aside judgments entered years earlier that were obtained by "fraud on the court." Fraud on the court, however, can take many forms and courts and commentators agree that it is a nebulous concept. The power to set aside a judgment requires courts to strike a balance between the principles of justice and finality. A majority of courts require a showing, by clear and convincing evidence, of intentional fraudulent conduct specifically directed at the court itself. This standard is flawed. And courts that have adopted it are abdicating their solemn responsibility as the gatekeeper to justice because innocent victims seeking to set aside judgments obtained by abusive discovery find themselves as a square-peg trying to fit into a round hole. The remedial and equitable nature of the fraud-on-the-court doctrine and the great public policy that it embodies militates against making that burden an impossible hurdle for victims of abusive discovery.*

*This Article suggests that courts depart from the heightened standard used to set aside judgments, particularly judgments obtained by abusive discovery. Specifically, this Article advances a four-step process to resolve the ultimate inquiry: whether the abusive conduct caused the court not to perform in the usual manner its impartial task of adjudging cases. Under this standard, courts will more readily find that abusive discovery that undermines the integrity of the judicial process or influences the decision of the court constitutes a fraud on the court.*

### Table of Contents

Introduction ................................................................................................ 708
I.   Abusive Discovery Practice ......................................................... 711
     A.  Common Discovery Abuse ......................................................... 711
     B.  The Vulnerable Victims ............................................................ 717
         1.  The Pro Se Litigant ............................................................ 717
         2.  The Attorney-Abandoned Litigant ...................................... 722
II.  Fraud on the Court ......................................................................... 725
III. Abusive Discovery as Fraud on the Court and
     Reevaluating the Standard ......................................................... 730
     A.  The Offender and His Duty ....................................................... 730

* Assistant Professor of Law, South Texas College of Law. I would like to thank my research assistant, Laura Thetford, for her help with this article.

708                          *NEVADA LAW JOURNAL*                     [Vol. 16:707

    B.  *Evaluation of the Conduct* ......................................................... 732
    C.  *Consideration of the Victim's Status (The Equitable Component)* ......................................................................... 735
    D.  *Consideration of the Relief Being Sought* ................................ 737
    E.  *Illustration of the Four-Part Test* .............................................. 739
        1.  *The Offending Party and His Duty* ....................................... 740
        2.  *The Conduct* ....................................................................... 740
        3.  *The Victim* ........................................................................... 741
        4.  *The Relief* ............................................................................ 741
CONCLUSION ............................................................................................ 742

## INTRODUCTION

There is an old adage that nice guys finish last. It is well documented that in litigation, this maxim oftentimes rings true. General William Tecumseh Sherman stated, "War is Hell!"[1] Litigation, some think, is like war. Make your opponent's life miserable, put them through hell, and you will eventually defeat your adversary. Why is hardball litigation so common? Is it because it works and frequently goes unpunished? As one scholar noted, "[t]hough perceptions differ, there seems to be some consensus that adversary excess is frequent, often not by any standard justifiable as zealous representation, and that many lawyers will indeed cross ethical lines when they think they can get away with it, which, because of the weakness of monitoring agents, they usually do."[2]

When this abusive practice—sometimes referred to by lawyers and judges as "Rambo-Lawyering"[3]—occurs during litigation, parties are equipped with several tools under the rules of civil procedure to thwart improper behavior and move the proceeding into civil territory. However, when attorney misconduct or abusive discovery tactics result in favorable judgments to the offending parties, the available remedies under the rules diminish substantially, and the party

---

[1] *William Tecumseh Sherman*, WIKIQUOTE, http://en.wikiquote.org/wiki/William_Tecumseh_Sherman (last visited Jan. 5, 2016).

[2] Robert W. Gordon, *The Ethical Worlds of Large-Firm Litigators: Preliminary Observations*, 67 FORDHAM L. REV. 709, 736 (1998).

[3] The term "Rambo Lawyering" has been discussed in several legal articles. *See, e.g.*, Jean M. Cary, *Rambo Depositions: Controlling an Ethical Cancer in Civil Litigation*, 25 HOFSTRA L. REV. 561 (1996); Gideon Kanner, *Welcome Home Rambo: High-Minded Ethics and Low-Down Tactics in the Courts*, 25 LOY. L.A. L. REV. 81 (1991); Robert N. Sayler, *Rambo Litigation: Why Hardball Tactics Don't Work*, A.B.A. J., Mar. 1, 1988, at 79. Moreover, the District Court of Denver includes a "Rambo Lawyering" instruction to attorneys in case management orders. The instruction reads as follows

    This is a *CIVIL* division. "Rambo Lawyering" will not be tolerated. Counsel will treat jurors, parties, witnesses, me, my staff <u>and</u> each other with professionalism, courtesy and respect at all times. This applies not only to the actual trial, but to all aspects of the case, including discovery and motions practice, and includes what is written as well as what is said.

*Rambo Lawyering*, WEINBERGER LAW OFFICES, http://weinbergerlawoffice.com/article_rambolawyering.asp (last visited Jan. 5, 2016).

16 NEV. L. J. 707, HAGUE - FINAL.DOCX                                    4/12/16 6:31 PM

against whom the judgment was entered is now faced with a challenging legal hurdle. A rancher from Nevada knows this story all too well.

In 2007, Judith Adams sued Susan Fallini for the death of her son after he struck one of Ms. Fallini's cows that was on a well-known highway in Neva-da.[4] That stretch of highway is designated as "open range."[5] Nevada law pro-tects open-range ranchers from liability if vehicles strike their cattle.[6] Thus, Ms. Fallini should have prevailed in the lawsuit because of this statutory defense, but that did not happen.[7] Instead, Ms. Fallini's lawyer abandoned her during the case and, among other things, failed to respond to plaintiff's requests for ad-mission, which asked Ms. Fallini to admit that the accident did not occur on open range, even though it did, and even though plaintiff and her attorney knew it did.[8] Because she failed to answer the request for admission, she was deemed to have admitted that the accident did not occur on open range, which obviated her complete defense under Nevada law.[9] Eventually, Ms. Fallini's "admission" led to a partial summary judgment in plaintiff's favor and an award of damages in excess of $2.7 million.[10]

Was the type of conduct in the *Fallini* case just clever lawyering and profi-cient advocacy? Or did the attorney act uncivilly or unethically in obtaining the judgment and, consequently, violate rules of civil procedure and professional conduct? More importantly, if the attorney knew the accident occurred on open range and knew that the open-range defense provided a complete defense to Fallini as a matter of law, did that attorney perpetrate a "fraud on the court"[11] when he obtained summary judgment based on Fallini's deemed admission of a well-known false fact? The answer to this last question is puzzling.

While fraud on the court has been recognized for centuries as a basis for setting aside a final judgment, it has been used for several other purposes under the rules of civil procedure. Generally, fraud on the court is a fraud "directed to the judicial machinery itself and is *not* fraud between the parties or fraudulent documents . . . . It is thus fraud where . . . the impartial functions of the court have been directly corrupted."[12] Interestingly, the term "fraud on the court" is

---

[4] Mike Blasky, *Conflicted Judge's Decision Looms in Rancher Lawsuit*, L.V. REV.-J., July 28, 2014, at B001; *see also* Complaint at 2–4, Estate of Adams v. Fallini, No. CV24539 (Nev. 5th Dist. Ct. Jan. 31, 2007).

[5] Blasky, *supra* note 4.

[6] *Id.*; *see also* NEV. REV. STAT. ANN. § 568.360(1) (West 2015) (providing that those who own domestic animals do not have a duty to keep those animals off highways located on "open range" and are not liable for any damage or injury resulting from a collision between a motor vehicle and an animal on open range highways).

[7] Blasky, *supra* note 4.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] FED. R. CIV. P. 60(d)(3).

[12] Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1266 (10th Cir. 1995) (emphasis added) (citation omitted).

only mentioned in Rule 60(d)(3) of the Federal Rules of Civil Procedure, yet courts have also used this doctrine to order dismissal or default under other rules where a litigant has stooped to the level of fraud on the court.[13]

Generally, if a party wants to utilize the fraud-on-the-court doctrine as a remedy under the rules of civil procedure, it must prove, by clear and convincing evidence, intentional fraudulent conduct specifically directed at the court itself.[14] Recent case law incorrectly suggests that this high standard for proving fraud on the court—which several courts agree is reserved only for the most egregious misconduct, such as a bribery of a judge or jury members—lacks any flexibility or equitable components.[15] Indeed, this rigid approach seems to disregard entirely the victim's status. It also creates a nearly impossible hurdle for innocent victims seeking to set aside judgments obtained by attorney misconduct. This flawed approach—particularly as courts apply the fraud-on-the-court doctrine to abusive discovery practices resulting in favorable judgments to the offending party—is inconsistent with the purpose of Rule 60(d)(3).

This Article suggests that courts depart from the heightened standard used to set aside judgments secured by a fraud on the court. Specifically, this Article advances a four-step process and recommends courts focus on one specific question when evaluating whether conduct rises to the level of fraud on the court: whether the conduct complained of caused the court not to perform in the usual manner in its impartial task of adjudging cases.

Part I of this Article discusses the various forms of abusive discovery that may lead to improper judgments, as well as some of the relevant rules of professional conduct and civil procedure. Part I also discusses the classes of victims that are the most greatly impacted by abusive discovery. Part II introduces the concept of "fraud on the court" and discusses its meaning, history, and use in combating fraudulent litigation practice. Finally, Part III introduces the four-step process, which requires an examination of the following: (1) the offending party and his duties, (2) the conduct at issue and its effect on the judicial ma-

---

[13] *See, e.g.*, Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488 (9th Cir. 1991) (relying on Rule 11 where counsel made thirty-six changes on a deposition errata sheet after the client advised that the transcript was accurate and the testimony was correct); Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 11–12 (1st Cir. 1985) (affirming district court's entry of default judgment under court's inherent powers in response to defendant's abusive litigation practices); Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983) ("[C]ourts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."); Eppes v. Snowden, 656 F. Supp. 1267, 1279 (E.D. Ky. 1986) (finding that where fraud is committed upon the court, the court's power to dismiss is inherent "to protect the integrity of its proceedings").

[13] C.B.H. Resources, Inc. v. Mars Forging Co., 98 F.R.D. 564, 569 (W.D. Pa. 1983) (dismissing under Fed. R. Civ. P. 41(b) where party's fraudulent scheme, including use of a bogus subpoena, was "totally at odds with the . . . notions of fairness central to our system of litigation").

[14] *See, e.g.*, Herring v. United States, 424 F.3d 384, 386–87 (3d Cir. 2005).

[15] *See, e.g.*, Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978).

chinery, (3) the victim's status during the underlying litigation—i.e., whether the harmed party was in a position to recognize and combat the fraud at issue prejudgment—and (4) the relief sought. Part III also utilizes the four-step process to demonstrate that advancing falsehoods during the discovery process is a form of fraud on the court and that courts have equitable power to entertain a party's action that seeks to set aside a judgment based upon fraud during the discovery process.

## I.   ABUSIVE DISCOVERY PRACTICE

### A.  *Common Discovery Abuse*

In a 2008 survey conducted by the American College of Trial Lawyers Task Force on Discovery and the Institute for the Advancement of the American Legal System, 45 percent of those surveyed indicated they believed discovery is abused in "almost every case."[16] And a recent law review article led with this statement: "[o]ur discovery system is broken."[17] Unfortunately, while the system may be "broken" for some, it oftentimes works for others as it allows them to gain a tactical advantage over their opponents.

Abusive discovery includes, among other things, expensive and time-consuming "inundation . . . with tons of motions, interrogatories, document requests, deposition notices and other pre-trial disputes."[18] For example, in *Adelman v. Brady*, the Pennsylvania district court held that an interrogatory request in a Title VII discrimination case was "extremely burdensome" where it required the IRS to examine personnel files for records of reprimand with no limitations, such as a date range or employed staff versus unemployed staff.[19] The court found that this would "require the IRS to review thousands of files."[20] Accordingly, the request was determined to be unduly burdensome and an abuse of discovery procedures.[21]

Discovery abuse also includes trickery,[22] harassment,[23] threats,[24] and interference with depositions.[25] In *Prize Energy Resources, L.P. v. Cliff Hoskins,*

---

[16]  Gordon W. Netzorg & Tobin D. Kern, *Proportional Discovery: Making It the Norm, Rather than the Exception*, 87 DENV. U. L. REV. 513, 515 (2010) (quoting AM. COLL. OF TRIAL LAWYERS TASK FORCE ON DISCOVERY & INST. FOR THE ADVANCEMENT OF THE AM. LEGAL SYS., INTERIM REPORT & 2008 LITIGATION SURVEY OF THE FELLOWS OF THE AMERICAN COLLEGE OF TRIAL LAWYERS, B-1 to B-2 (2008)).

[17]  Netzorg & Kern, *supra* note 16, at 513.

[18]  Ronald L. Hicks, Jr., *Strategies and Tips for Dealing with Dirty Litigation Tactics by Opposing Counsel*, EMP. & LAB. L. 153, 159 (May 2013).

[19]  Adelman v. Brady, No. 89-4714, 1990 WL 39147, at *2 (E.D. Pa. Mar. 28, 1990).

[20]  *Id.*

[21]  *See id.*

[22]  Prize Energy Res., L.P. v. Cliff Hoskins, Inc., 345 S.W.3d 537, 573 (Tex. App. 2011).

[23]  *Id.*; *Adelman*, 1990 WL 39147, at *2.

[24]  *Prize Energy Res.*, 345 S.W.3d at 573; Florida Bar v. Ratiner, 46 So.3d 35, 37 (Fla. 2010) (per curiam).

16 Nev. L. J. 707, Hague - Final.docx                                    4/12/16 6:31 PM

*Inc.*, an attorney engaged in trickery when he "secur[ed] documents under false pretenses" during discovery.[26] The attorney used a "false letterhead" to contact potential witnesses regarding a case and purported to be a "businessman" for an oil and gas company.[27]

In addition to his trickery, the same attorney also engaged in harassment to obtain discovery information.[28] For example, he contacted the opposing party and "continually badgered him to produce documents that had already been provided," even after the party obtained counsel.[29] Additionally, he threatened the opposing party with "criminal penalties" if the party failed to comply.[30]

Attorneys frequently adopt similar behavior to interfere with depositions and thwart truth telling or disclosure of facts. *In re Fletcher* is illustrative.[31] In *Fletcher*, an attorney threatened a police-officer witness with civil liability during his deposition as a means of intimidation by telling the officer that he had been added to an amended complaint alleging a Bivens action against the officer.[32]

Aside from improper and unethical threats, other parties engage in Rambo-Litigation tactics to deter depositions.[33] In *Van Pilsum v. Iowa State University of Science and Technology*, the court found that an attorney's conduct was sanctionable when he "monopolize[d] 20% of his client's deposition."[34] There, the attorney interrupted and objected to opposing counsel's questioning so often that between the "167 page deposition . . . only four segments [exist] where five or more pages occur without an interruption."[35] He also groundlessly attacked opposing counsel for his "ethics, litigation experience, and honesty."[36] For this behavior, the attorney was sanctioned and a protective order was issued.[37]

While the above clearly demonstrates abusive discovery tactics and misconduct, the instances likely did not rise to fraud on the court. Throw in dishonest behavior by an officer of the court, however, and a strong argument begins to unfold that a fraud on the court may be in the works. Indeed, the most

---

[25] *In re* Fletcher, 424 F.3d 783, 785 (8th Cir. 2005); Van Pilsum v. Iowa State Univ. of Sci. and Tech., 152 F.R.D. 179, 180–81 (S.D. Iowa 1993) (order on motion to compel); Hall v. Clifton Precision, 150 F.R.D. 525, 526 (E.D. Pa. 1993).

[26] *Prize Energy Res.*, 345 S.W.3d at 577.

[27] *Id.* at 573.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *See generally* 424 F.3d 783 (8th Cir. 2005).

[32] *Id.* at 790.

[33] *See, e.g.*, Van Pilsum v. Iowa State Univ. of Sci. and Tech., 152 F.R.D. 179, 181 (S.D. Iowa 1993) (order on motion to compel).

[34] *Id.*

[35] *Id.* at 180.

[36] *Id.*

[37] *Id.* at 181.

16 Nev. L. J. 707, Hague - Final.docx | 4/12/16 6:31 PM

harmful form of discovery abuse is likely in the form of attorney deceit. No one can dispute "the discovery system is designed to facilitate truth-finding."[38] Yet, deception during discovery is all too common. As one scholar noted, "one reason for [attorney misconduct] is the tension inherent in the discovery process."[39] Absent information protected by the attorney-client privilege or work-product doctrine, the rules of civil procedure require full disclosure during discovery; yet providing an opposing party with information that might harm the client's case seems to conflict with zealous advocacy.[40] This quandary appears to be a true Catch-22 from which there is no escape. Thus, when these mutually conflicting situations arise, "the natural tendency for many lawyers is to resist the disclosure of client information"[41] or consciously deceive the opposing party in order to gain a tactical advantage.

In *In re Shannon*,[42] for example, a lawyer—the subject of the complaint filed by the State Bar of Arizona—materially altered some of his client's handwritten answers to interrogatories without providing a copy of the altered interrogatories to his client.[43] After the client terminated the lawyer—but while the lawyer was still acting as the attorney of record—he submitted the altered interrogatories, along with the verification to the court for support of a motion for summary judgment.[44] Fortunately, the lawyer's motion was denied,[45] and the court *did not* have to discuss whether the lawyer committed fraud upon the court. The opinion arose out of disciplinary proceedings, so the focus was whether the attorney violated certain rules of conduct and ethics, not whether a fraud on the court occurred. Further, despite the altered interrogatories submitted to the court, no judgment was ever obtained, and therefore, the parties were not seeking to set aside any judgment.[46] If, however, a judgment was obtained in favor of the lawyer's client based on the doctored answers to the interrogatories, would this be sufficient to set aside the judgment for fraud on the court pursuant to Rule 60(d)(3)? The answer is unclear.

In another similar case, *In re Griffith*,[47] an attorney was disciplined for failing to make critical disclosures during discovery and trial concerning his client's medical records and treatment.[48] In that case, the lawyer represented the estate of Morris Pina, Jr. in a lawsuit against the City of New Bedford for po-

---

[38] W. Bradley Wendel, *Rediscovering Discovery Ethics*, 79 Marq. L. Rev. 895, 895 (1996).

[39] Alex B. Long, *Attorney Deceit Statutes: Promoting Professionalism Through Criminal Prosecutions and Treble Damages*, 44 U.C. Davis L. Rev. 413, 423 (2010).

[40] *Id.*

[41] *Id.*

[42] *See generally* 876 P.2d 548 (Ariz. 1994), *modified*, 890 P.2d 602 (Ariz. 1994).

[43] *Id.* at 552.

[44] *Id.* at 556.

[45] *Id.*

[46] *Id.* at 577.

[47] 800 N.E.2d 259 (Mass. 2003).

[48] *Id.* at 259.

16 Nev. L. J. 707, Hague - Final.docx                                4/12/16 6:31 PM

714                    *NEVADA LAW JOURNAL*                    [Vol. 16:707

lice misconduct.[49] New Bedford police officers arrested Pina and, while in cus-
tody, he died.[50] Before commencing the trial, however, the lawyer for the estate
learned that Pina was being treated for medical problems and had tested posi-
tive for human immunodeficiency virus (HIV).[51] And when specifically asked
through interrogatories whether Pina had ever been treated or admitted to a
hospital prior to the alleged incident, the estate responded that it had no
knowledge of any treatment or admissions.[52] These responses were false. The
estate was also served with a request for documents, including a request to pro-
duce all medical records with any doctor or hospital rendering treatment on be-
half of Pina for a period of five years prior to Pina's death.[53] The lawyer never
produced the documents he had in his possession that would have been respon-
sive to this request.[54] Furthermore, the attorney retained an expert economist to
testify on damages arising from Pina's alleged wrongful death.[55] However, the
lawyer never told the expert about the HIV.[56] Accordingly, the expert calculat-
ed the decedent's total loss of pleasure of life exceeded two million dollars.[57]
At trial, the estate was awarded damages in the amount of $435,000.[58]

But, during trial the defendant learned of the HIV and opposing counsel's cal-
culated efforts to conceal this material information.[59] Following trial, the par-
ties settled for $555,000 and defense counsel sought sanctions against the law-
yer, alleging that he had withheld this critical information during discovery and
trial.[60] After a hearing, the judge entered an order in which he found that the
lawyer had "engaged in a pattern of activity to hide [Pina's HIV status] from
the defendants and initially . . . from the court, and had engaged in deliberate
misconduct in connection with [plaintiff's] responses to the defendants' inter-
rogatories."[61] Again, the court was not forced to analyze Rule 60(d)(3) because
the attorneys uncovered the deceit before a judgment was rendered. However,
had plaintiff prevailed at trial, would the defendant have a case to set aside the
judgment for fraud upon the court? Did the plaintiff intentionally aim the false
responses directly at the court? Could the failure disclose relevant information
cause the court not to perform in the usual manner its impartial task of adjudg-
ing cases? Or was this just ordinary fraud between the parties?

---

[49]  *Id.*
[50]  *Id.* at 260.
[51]  *Id.*
[52]  *Id.* at 261.
[53]  *Id.*
[54]  *Id.*
[55]  *Id.*
[56]  *Id.*
[57]  *Id.*
[58]  *Id.* at 260.
[59]  *Id.* at 262.
[60]  *Id.* at 260, 262.
[61]  *Id.* at 262 (internal quotation marks omitted).

   In another case, *In re Estrada*,[62] the lawyer—who was representing a
pharmacy in a personal injury action resulting from a pharmacist accidently
filling a child's prescription with methadone—misled the court by falsely deny-
ing the plaintiff's request for admission of fact.[63] The lawyer's indiscretion was
not just a minor oversight, but rather a critical omission that could make or
break the plaintiff's case against the pharmacy.[64] Indeed, the case resulted in a
mistrial after it became apparent that a prescription introduced into evidence,
intended to prove that the pharmacy could account for all its dispensed metha-
done, was a forgery.[65] Fraud on the court?

   Unfortunately, the foregoing represents just a small number of cases where
deceit and fraud are present. One would hope that the majority of attorneys un-
derstand and acknowledge that zealous representation—even aggressive repre-
sentation—can always be accomplished through playing by the rules. Indeed,
despite the tension of litigation, lawyers are always responsible for maintaining
the ethical standards of the profession. These standards and ethical obligations
are governed by a combination of sources,[66] which include the Federal Rules of
Civil Procedure, state rules, and laws governing attorney conduct.[67] Violating
or otherwise ignoring these discovery-based rules have broad implications. As
one court noted,

> A lawyer who seeks excessive discovery given what is at stake in the litigation,
> or who makes boilerplate objections to discovery requests without particulariz-
> ing their basis, or who is evasive or incomplete in responding to discovery, or
> pursues discovery in order to make the cost for his or her adversary so great that
> the case settles to avoid the transaction costs, or who delays the completion of
> discovery to prolong the litigation in order to achieve a tactical advantage, or
> who engages in any of the myriad forms of discovery abuse that are so com-
> monplace is . . . hindering the adjudication process, and . . . violating his or her
> duty of loyalty to the "procedures and institutions" the adversary system is in-
> tended to serve.[68]

   Notwithstanding the procedural and ethical components of these rules,
there will always be lawyers and parties that simply disregard or sidestep the
rules to gain an advantage. And it does not matter whether the rule falls within
a "gray area" of law or is replete with obvious warnings and penalties designed
to deter the offending party from abusive practice.

   Consider, for example, Rule 26(g) of the Federal Rules of Civil Procedure.
This rule—"[o]ne of the most important, but apparently least understood or fol-

---

[62] 143 P.3d 731 (N.M. 2006).

[63] *Id.* at 735.

[64] *Id.*

[65] *Id.*

[66] *See* Debra Lyn Bassett, *E-Pitfalls: Ethics and E-Discovery*, 36 N. Ky. L. Rev. 449, 450 (2009).

[67] *Id.*

[68] Mancia v. Mayflower Textile Servs. Co., 253 F.R.D. 354, 362 (D. Md. 2008) (citation omitted).

716                *NEVADA LAW JOURNAL*                [Vol. 16:707

lowed, of the discovery rules"[69]—clearly and expressly requires that "every discovery request, response, or objection be signed by at least one attorney of record, . . . or by the [client], if unrepresented."[70] The signature "certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," the discovery is complete and correct, and that the discovery request, response, or objection is

> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law; (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.[71]

If a lawyer or party makes the certification required by Rule 26(g) that violates the rule, the court "must" impose an appropriate sanction, which may include an order to pay reasonable expenses and attorney's fees caused by the violation.[72] But do fraudulent responses to written discovery, for example, expose a party to default or dismissal for committing fraud on the court?

Rule 26 is clear on its face and in its purpose: deter abusive discovery and sanction offending parties for misconduct in discovery. One would think that the transparencies of the rule and the obvious consequences for compliance would have a strong deterrent effect, yet that is not always the case. In addition to Rule 26, other remedies exist to prevent abusive discovery, including sanc-

---

[69] *Id.* at 357.

[70] Fed. R. Civ. P. 26(g).

[71] *Id.*

[72] *Id.* The Advisory Committee's Notes to Rule 26(g) provide further guidance:

> Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. In addition, Rule 26(g) is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions. The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection. . . .
>
> If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse. With this in mind, Rule 26(g), which parallels the amendments to Rule 11, requires an attorney or unrepresented party to sign each discovery request, response, or objection. . . .
>
> Although the certification duty requires the lawyer to pause and consider the reasonableness of his request, response, or objection, it is not meant to discourage or restrict necessary and legitimate discovery. The rule simply requires that the attorney make a reasonable inquiry into the factual basis of his response, request, or objection.
>
> The duty to make a "reasonable inquiry" is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11.

Fed. R. Civ. P. 26(g) advisory **committee's** notes to the 1983 amendments (emphasis added) (citations omitted).

tions,[73] discovery statutes,[74] and misconduct-reporting boards.[75] These rules and remedies share a few common shortfalls. First, they are written and used to deter abusive conduct *during* the litigation. However, these rules have little utility post-judgment (i.e., if abusive discovery leads to an improper judgment, these rules have minimal value or impact). Second, while these rules may combat abuse that otherwise might lead to improper judgments, the rules are plainly more effective in the hands of competent attorneys who understand how they operate and how they can potentially deter attorney misconduct. Yet, when victims of abusive discovery are representing themselves pro se, or have been abandoned by counsel, the rules serve a very limited function, if any, in these victims' hands.

### B.   The Vulnerable Victims

Abusive discovery practice comes in all shapes and sizes. From the multi-billion-dollar case with hundreds of defendants to the ten-thousand dollar breach of contract case, one is likely to find attorneys engaging in unsound litigation tactics. Any party on the receiving end of this abuse is a victim and has standing to seek redress from the court. However, abusive discovery's impact seems to be far greater for two classes of victims: the pro se litigant and the attorney-abandoned litigant. Should these victims receive special treatment when faced with judgments obtained by fraud? Is their status relevant to the court's analysis under Rule 60(d)(3)—i.e., should the courts be more flexible and willing to set aside judgments in cases where the victim was not adequately represented by counsel when the fraud occurred?

### 1.   The Pro Se Litigant

The saying goes, "one who is his own lawyer has a fool for a client."[76] In *Powell v. Alabama*,[77] the Supreme Court wrote,

> Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding

---

[73]   *See, e.g.*, *In re* Lucas, 789 N.W.2d 73, 78 (N.D. 2010) (suspending an attorney for misconduct). Sanctions can also include paying opposing party's attorney's fees.

[74]   *See, e.g.*, Fed. R. Civ. P. 26(b)(2)(C) (providing that a court "must limit the frequency or extent of discovery"); Fed. R. Civ. P. 33(a)(1) (providing that "[u]nless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories"); Fed. R. Civ. P. 37(a)(1) (allowing a party to compel discovery); Fed. R. Civ. P. 45(d)(3)(A) (authorizing a district court to quash a subpoena if it subjects a person, including a non-party, to an undue burden, fails to allow for a reasonable time for compliance, or requires disclosure of confidential information).

[75]   Outback Steakhouse of Florida., Inc. v. Markley, 856 N.E.2d 65, 85 (Ind. 2006) (disciplining by ethics committee for false statements); People v. Scruggs, 52 P.3d 237, 241 (Colo. 2002) (holding that disbarment was an appropriate remedy for abuse).

[76]   Faretta v. California, 422 U.S. 806, 852 (1975) (Blackmun, J., dissenting).

[77]   Powell v. Alabama, 287 U.S. 45 (1932).

hand of counsel at every step in the proceeding against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect.[78]

So why would anyone choose to appear pro se? The likely response is that they have no choice. They are victims of a legal market failure. On the demand side, most Americans struggle to find a lawyer to provide them with legal advice. On the supply side, law school graduates and other lawyers are either unemployed or underemployed.[79] Chief Justice Warren Burger predicted thirty-five years ago that America was turning into "a society overrun by hordes of lawyers, hungry as locusts."[80] But what are these lawyers craving? Pro bono work? Serving the underprivileged? Not likely. Lawyers, generally, provide for the legal needs of those individuals and businesses that can deliver a secure retainer and pay a considerable amount of money. However, there are only so many low-risk, high-paying clients around. As a result, scores of the American population are forced to represent themselves because lawyers are either not willing to take on the risk of not being paid or not willing to devote a significant amount of time to serving the underprivileged.

This "pro se" problem was recently highlighted in states where foreclosures require a judge's approval. "[H]omeowners in default have traditionally surrendered their homes without ever coming to court to defend themselves."[81] That inaction, however, has begun to recede.[82] Indeed, "[w]hile many foreclosures are still unopposed, courts are seeing a sharp rise in cases where defendants show up representing themselves."[83] Some courts "welcome[] the influx of parties defending themselves."[84] Louis McDonald, the chief judge for New Mexico's Thirteenth Judicial District, acknowledged that "[s]ome of [the pro se defendants] have fairly legitimate defenses."[85] But the law grows more complex as cases progress through litigation, and several of the pro se defendants are in over their heads and unable to combat abusive practice.[86] These parties are susceptible to the problems highlighted above. "Admit you signed the loan documents." "Admit you are in default." "Admit we hold the deed of trust against your home and we are the entitled beneficiaries." If true, these requests to admit, alone, could establish a lender's prima facie foreclosure case. But what if the plaintiff submitting these requests was not the beneficiary? What if they were not in possession of the promissory note and the deed of trust? That

---

[78]  *Id.* at 69.
[79]  Michael S. Hooker & Guy P. McConnell, *Too Many Lawyers—Is It Really a Problem?*, FED. LAW., Sept. 2014, at 62, 63–64.
[80]  Warren E. Burger, *Our Vicious Legal Spiral*, 16 JUDGES' J. 22, 49 (1977).
[81]  David Streitfeld, *For the Foreclosed, Themselves*, N.Y. TIMES, Feb. 3, 2011, at B1.
[82]  *Id.*
[83]  *Id.*
[84]  *Id.*
[85]  *Id.*
[86]  *Id.*

16 NEV. L. J. 707, HAGUE - FINAL.DOCX                                                    4/12/16 6:31 PM

alone would be sufficient to prevent the lender from foreclosing. If the requests went unanswered, they would be deemed admitted.[87] By asking the homeowners to admit known falsehoods and then injecting those falsehoods into the court system to support a motion for summary judgment, would the plaintiff seeking to foreclose be committing fraud on the court?

New York has experienced similar issues. Before 2008, "about 90 percent of foreclosure defendants never appeared before a judge."[88] However, with new mandatory settlement laws in place, "more than three-quarters of defendants now show up to court, about 32,000 in the first [ten months of 2010]."[89] However, only about 12,000 had a lawyer.[90] The other 20,000 were in charge of their own fate. "We're getting the people in here, getting them to the table with the bank, but I don't know what happens to these cases long term," said Paul Lewis, chief of staff to New York's chief administrative judge.[91] "Many of the homeowners would do much better with an attorney."[92]

Unlike criminal proceedings, the right to counsel is not absolute in civil cases.[93] This further strengthens the argument that most pro se appearances by civil litigants are not voluntary, but instead result because they simply cannot afford attorneys to represent them. This is especially true when one considers the potential costs involved with discovery alone. Indeed, "[p]erhaps the greatest driving force in litigation today is discovery. Discovery abuse is a principal cause of high litigation transaction costs."[94] Unfortunately, "in far too many cases, economics—and not the merits—govern discovery decisions."[95] The result is that "[l]itigants of moderate means are often deterred through discovery from vindicating claims or defenses, and the litigation process all too often becomes a war of attrition for all parties."[96]

If the right to counsel were absolute in civil cases, pro se appearances would decrease significantly, if not entirely. For several justifiable reasons, however, this is not how the American legal system functions. Because of this, some courts accord pro se litigants a certain degree of leniency, particularly

---

[87] *See, e.g.,* FED. R. CIV. P. 36(a)(3) (stating that "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney").

[88] Streitfeld, *supra* note 83.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] Lassiter v. Dep't. of Soc. Servs., 452 U.S. 18, 26–27 (1981).

[94] S. REP. NO. 101-650, at 20 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 5763, 6823.

[95] *Id.*

[96] *Id.*

with respect to procedural rules.[97] Notwithstanding, extending too much leniency undermines the system. As one court recently explained,

> [T]he Court may not be co-opted by a pro se litigant to perform tasks normally carried out by hired counsel. Providing assistance or extending too much procedural leniency to a pro se litigant risks undermining the impartial role of the judge in the adversary system. Moreover, it has never been suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel. Pro se litigants must adhere to procedural rules as would parties assisted by counsel. This includes procedural requirements regarding the provision of adequate factual averments to sustain legal claims.[98]

In other words, claims of discovery abuse may be null, even if there is some trickery or omission from the opposing counsel because procedural rules tend to apply uniformly to pro se and represented parties, regardless of the unequal knowledge of the law.[99] For example, in *Tall v. Alaska Airlines*, a Kentucky court of appeals held that a pro se defendant's belief that he had entered a settlement agreement with the plaintiff's counsel during discovery did not provide a remedy when he failed to submit a denial in a request for admissions.[100] The defendant defaulted on a credit agreement and responded to a complaint filed by the bank by "denying that he owed any debt."[101] He stated that he discussed a settlement amount with the bank's attorney that would allow him to bring his account current; this conversation allegedly occurred prior to suit.[102] A review of the case indicates there was a misunderstanding as to the agreement, and instead of a monthly payment, the defendant rendered the total "principal amount," minus "interest owed, costs, or fees."[103]

During discovery, the opposing counsel requested admissions and the defendant failed to answer, resulting in his admission that he still owed the debt.[104] The defendant argued that counsel had "tak[en] advantage of [his] ignorance of the law" in violation of a state statute that required parties to make a "good faith effort" to resolve discovery disputes.[105] Yet, the court held that because the "unanswered admission requests are deemed admitted . . . there is no

---

[97] *See, e.g.*, GJR Invs., Inc. v. Cty. of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998) (stating that "[c]ourts do and should show a leniency to pro se litigants not enjoyed by those with the benefit of a legal education").

[98] United States v. Gregg, No. 12-322, 2013 WL 6498249, at *4 (W.D. Pa. Dec. 11, 2013) (internal quotations and citations omitted).

[99] Paselk v. Rabun, 293 S.W.3d 600, 611 (Tex. Ct. App. 2009) (petition denied).

[100] Tall v. Alaska Airlines, No. 2009-CA-002256-MR, 2011 WL 831918, at *1–*2 (Ky. Ct. App. Mar. 11, 2011) (alleging Credit Union took advantage of Tall's pro se representation during discovery, in violation of Jefferson County Local Rule 4).

[101] *Id*. at *1.

[102] *Id*. at *3.

[103] *Id*. at *4.

[104] *Id*. at *3.

[105] *Id*. at *4 (citing Local Rule 402).

16 Nev. L. J. 707, Hague - Final.docx                              4/12/16 6:31 PM

foreseeable reason for a party to seek to compel such admissions."[106] Therefore, an opposing attorney does not have a duty to warn another party, even pro se, to follow discovery procedures.[107]

This Article does not necessarily advocate for extra-judicial assistance to pro se litigants.[108] Instead, it highlights a growing problem: pro se litigants are becoming more plentiful and they lack legal skill and knowledge to oppose aggressive counsel. As one scholar noted,

> Our civil process before and during trial, in state and federal courts, is a masterpiece of complexity that dazzles in its details—in discovery, in the use of experts, in the preparation and presentation of evidence, in the selection of the factfinder and the choreography of the trial. But few litigants or courts can afford it.[109]

When a party opponent senses this weakness, it will seize its prey. In one article discussing foreclosures and pro se parties, it was noted that lawyers "pretty much bank on people not showing up, or not having an attorney to represent them."[110] Consequently, in addition to facing the aggressive lawyer, the misguided and naïve litigant is likely to encounter an opposing party who refuses to play by the rules because it knows (1) the chances of being caught, sanctioned, or challenged are relatively small and (2) the probability of prevailing in the lawsuit is significantly greater if the rules are not observed. The skilled lawyer, knowing that his opponent is not qualified, is thus encouraged to engage in improper or unsound litigation tactics.[111] During the pending litigation, there are several remedies available to thwart abusive litigation practice. Yet, when abusive practice actually leads to a judgment in favor of the perpe-

---

[106] *Id.*

[107] *Id.*

[108] Some courts actually do accord "special attention" to pro se litigants faced with procedural complexities, such as summary judgment motions. Ham v. Smith, 653 F.2d 628, 629–30 (D.C. Cir. 1981). Indeed, some courts agree that a litigant is entitled to be warned that when she is confronted by a summary judgment motion, she must obtain evidentiary material to avoid the entry of judgment against her. *See, e.g.,* Timms v. Frank, 953 F.2d 281, 285 (7th Cir. 1992); Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam); Hudson v. Hardy, 412 F.2d 1091, 1094 (D.C. Cir. 1968) (per curiam).

[109] Kent D. Syverud, *ADR and the Decline of the American Civil Jury,* 44 UCLA L. Rev. 1935, 1942 (1997).

[110] Kat Aaron, *Foreclosure Crisis + Legal Aid Cuts = @#$%!,* Mother Jones (Feb. 14, 2011, 7:00 AM), http://www.motherjones.com/politics/2011/02/legal-services-corporation-recession.

[111] *See* Scott L. Garland, *Avoiding Goliath's Fate: Defeating a Pro Se Litigant,* 24 Litig. 45, 46 (1998) (commenting that in his experience as a clerk at a federal district court, "[m]any lawyers seem to think that litigating against a pro se party gives the lawyer license to litigate *like* a pro se party, by omitting legal citations, making conclusory statements, forgoing affidavits and evidence in favor of *ipse dixit,* and failing to evaluate the opponent's arguments."); *see also* Jon O. Newman, *Pro Se Prisoner Litigation: Looking for Needles in Haystacks,* 62 Brook. L. Rev. 519, 520 (1996) (concluding that state attorney generals' experience with frivolous pro se prisoner litigation has led them to exaggerate or misstate the merit of certain pro se allegations).

722                    *NEVADA LAW JOURNAL*                    [Vol. 16:707

trator, the pro se litigant is left with very few procedural arrows in his quiver to combat the wrongdoing.

### 2. The Attorney-Abandoned Litigant

Pro se litigants are not the only victims abused by improper gamesmanship. The *Fallini* case introduced in the Introduction represents the classic example of attorney abandonment.

When Fallini was sued, she retained an attorney to represent and defend her.[112] He filed an answer on Fallini's behalf. At the time of the lawsuit, Fallini was over sixty years of age and had no legal skills or knowledge of the procedures involved in a lawsuit.[113] She relied on and trusted her attorney to resolve the legal dispute quickly, efficiently and competently. In June 2007, shortly after her attorney filed Fallini's answer, he represented to her that the case was over and that she had prevailed because of her statutory open-range defense.[114] Unbeknownst to Fallini, however, the case was not over. In fact, litigation continued by way of discovery requests and motion practice by counsel for the plaintiff, but Fallini's attorney failed to answer various requests for admission, oppose a motion for summary judgment based on those unanswered requests for admissions, appear for a hearing on the motion for summary judgment, or respond to other discovery requests.[115]

Fallini "did not receive direct notice of the foregoing neglect of her attorney."[116] Nonetheless, the court entered partial summary judgment in which it imposed liability on Fallini for the accident.[117] In particular, Fallini was *deemed* to have admitted that the accident did *not* occur on open range—which obviated her *complete defense* to the action pursuant to NRS § 568.360(1)—even though she had already asserted that defense in her answer.[118]

The court later held her attorney in contempt of court and repeatedly imposed significant sanctions for his failure to appear and comply with its orders in the case.[119] "But despite these court-imposed sanctions, Fallini was still not informed of the status of her case, nor was she informed that her attorney was being sanctioned for his deliberate failure to represent her."[120] It was not until June 2010—three years after Fallini's attorney told her that the case was over

---

[112]  Estate of Adams v. Fallini, No. CV 24539 (Nev. 5th Dist. Ct. Aug. 6, 2014), at 2 (court order).

[113]  Motion for Relief from Judgment Pursuant to NRCP 60(b) at 5, *Estate of Adams*, No. CV 24539.

[114]  *Id.* at 21.

[115]  *Id.* at 20–21.

[116]  *Id.* at 6.

[117]  *Estate of Adams*, No. CV 24539, at 3.

[118]  *Id.*

[119]  *Id.* at 3–4.

[120]  Motion for Relief From Judgment Pursuant to NRCP 60(b) at 6, *Estate of Adams*, No. CV 24539.

and that she had prevailed—that Fallini learned the true status of her case—that a judgment exceeding $2.7 million had been entered against her despite her ironclad statutory defense.[121]

In situations where attorney misconduct like that discussed above leads to a favorable judgment, Rule 60(d)(3) should serve as a wide-open door that victims can enter unhindered. One of the major problems associated with attorney abandonment is the difficultly in reversing the wrongdoing, especially if the party is faced with an adverse judgment. Abandonment has been defined in very strict terms and requires a high bar before a party may gain relief from judgment due to its own counsel's inadequacy.[122] Though not a discovery-abuse case, in *Maples v. Thomas*,[123] the United States Supreme Court recently held that a "habeas prisoner's default" would be excused when the filing deadline was missed due to his attorneys' abandonment because "a client cannot be charged with the acts or omissions of an attorney who has abandoned him."[124] However, this is a high bar, requiring "extraordinary circumstances beyond . . . [a party's] control," such as "evidence [of] counsel's near-total failure to communicate with, [or respond to], petitioner."[125] A procedural error, such as missing a filing deadline, does not fit the mold.[126] Abandonment requires something more akin to the injured party in *Maple* where the attorneys not only failed to file the petition, but also, among other things, (1) took on new employment, (2) failed to notify their client, (3) failed to withdraw, (4) allowed ineffective counsel to take over, and (5) permitted clerical issues to occur at their firm that deprived the client of important communications.[127] Furthermore, the "attorney abandonment" addressed by the Supreme Court occurred in a criminal procedure context, not in a civil suit.[128]

Accordingly, without facts similar to this extreme example of abandonment in a *criminal* case, courts are left to their discretion to render judgment against a party due to his own attorney's misconduct during discovery. Though failing to communicate with a client[129] and failing to file orders or respond to re-

---

[121] *Id.* at 6–7.
[122] This is a narrow exception from the normal discretion courts have to impose sanctions for discovery violations.
[123] 132 S. Ct. 912 (2012).
[124] *Id.* at 924.
[125] *Id.* at 923–24.
[126] *Id.* at 921. Yet, it should be noted that courts still have the discretion to sanction for a procedural error.
[127] *Id.* at 928 (Alito, J., concurring).
[128] *See generally id.*
[129] *See, e.g.,* Comerica Bank v. Esposito, 215 Fed. App'x 506, 508 (7th Cir. 2007) (stating that failure to communicate with a client is not generally enough for "postjudgment relief"); Cohen v. Brandywine Raceway Ass'n, 238 A.2d 320, 325 (Del. Super. Ct. 1968) (stating that even if the attorney failed to follow up after delivering the interrogatories, it was not "excusable neglect" when answers were not filed on time).

16 NEV. L. J. 707, HAGUE - FINAL.DOCX                                                    4/12/16 6:31 PM

quests[130] are common, these actions generally do not afford relief, even when it is the fault of the represented party's counsel.

For example, in *Platinum Rehab, Ltd. v. Platinum Home Health Care Services*, an Ohio district court found that abandonment arising to "extraordinary circumstances" did not exist when the represented party could not show she was free from fault after her attorney failed to meet several deadlines, resulting in judgment against her.[131] The defendant alleged that her attorney was "grossly negligent" and "abandoned representation" when he failed to answer a complaint, respond to discovery requests, and failed to appear at a hearing.[132] Yet, the court found that she was not abandoned for three reasons.[133] First, she was present and aware of the filing dates for the answer and discovery requests.[134] Second, there was no evidence except her own statement that she provided the necessary information for the discovery requests.[135] Third, there was no evidence that she made an effort "to ensure" her attorney complied with the deadlines.[136] For these reasons, the court upheld the judgment against the defendant, even though her own counsel was negligent.[137] But what if the complaint or discovery requests that went unanswered were peppered with inaccurate, misleading, or fraudulent statements that allowed the plaintiff to obtain a judgment against the attorney-abandoned defendant? What would be the defendant's remedy? How could that judgment be set aside? Even if she was not free from fault because she was aware of the filing dates, would that somehow offset any fraud that occurred during discovery or mitigate the harm?

In another case, a Michigan court of appeals held that "effective abandonment" was not a legal term and denied reversing judgment against the plaintiff that resulted from the plaintiff's attorney's failure to comply with discovery.[138]

---

[130] *See, e.g.*, Gripe v. City of Enid, 312 F.3d 1184, 1188 (10th Cir. 2002) (refusing to overturn dismissal for attorney's failure to follow court orders and procedures); Tolliver v. Northrop Corp., 786 F.2d 316, 319 (7th Cir. 1986) (finding that relief for judgment was not warranted for attorney's failure to comply with discovery requests); Corchado v. Puerto Rico Marine Mgmt., Inc., 665 F.2d 410, 413 (1st Cir. 1981) (holding that dismissal was appropriate where counsel repeated failed to respond to discovery requests); Weinreb v. TR Developers, LLC, 943 N.E.2d 856, 858 (Ind. Ct. App. 2011) (holding that relief from summary judgment would not be granted where the defendant's attorney failed to argue a defense that was "known or knowable" at the time judgment was granted); Moore v. Taylor Sales, Inc., 953 S.W.2d 889, 894 (Ark. Ct. App. 1997) (holding that default judgment would not be set aside where the attorney failed to file "timely answers" even though his client delivered the attorney the answers and the attorney assured the client he would file a response).

[131] Platinum Rehab., Ltd. v. Platinum Home Health Care Servs., LLC, No. 1:11CV1021, 2012 WL 4461502, at *4 (N.D. Ohio Sept. 25, 2012).

[132] *Id.* at *1.

[133] *Id.* at *1, *4.

[134] *Id.* at *4.

[135] *Id.*

[136] *Id.*

[137] *Id.* at *5.

[138] Beck v. Cass Cty. Rd. Comm'n, No. 305246, 2012 WL 4465166, at *2 (Mich. Ct. App. Sept. 27, 2012).

In *Beck v. Cass County Road Commission*, the trial court dismissed the plaintiff's complaint as a "sanction for the willful failure to comply with an order to compel discovery."[139] In denying the plaintiff's motion for relief from judgment, the court determined that relief was unwarranted because an attorney's professional negligence is attributable to the client and does not ordinarily constitute grounds for setting aside judgments.[140] Even though the plaintiffs claimed that they were effectively abandoned by this non-assistance, the court found that there was no legal basis for this claim.[141] Thus, the attorney's lack of vigor and lack of compliance was insufficient to allow relief from judgment.[142]

As illustrated in the *Fallini* case, a false admission, which stems from an attorney failing to respond adequately to a request for admission, may lead to a dangerous result: an improper judgment unsupported by any law.[143] While a court may have no problem withdrawing a false admission in a discovery document while discovery is *ongoing*,[144] there is little guidance to show how a court would consider a false admission after judgment has been entered.[145] A party who is represented and is subjected to judgment due to his own party's misconduct has very limited remedies. For states that impute liability, Federal Rules of Civil Procedure Rule 60[146]—or state-law equivalents—appear to be the only source of relief.[147]

## II.  FRAUD ON THE COURT

Rule 60(d) of the Federal Rules of Civil Procedure, which provides the grounds for relief from a final judgment, order, or proceeding, states the rule "does not limit a court's power to . . . set aside a judgment for fraud on the court."[148]

What is "fraud on the court" within the meaning of Rule 60? Are there certain time limitations associated with this rule for parties seeking grounds for

---

[139]  *Id*. at *1.
[140]  *Id*. at *2.
[141]  *Id*.
[142]  *Id*. at *3.
[143]  Blasky, *supra* note 4.
[144]  *See* Brankovic v. Snyder, 578 S.E.2d 203, 207 (Ga. App. 2003) (stating that "[a] party has no right to a judgment based on *false* 'admissions'" due to a late response).
[145]  Turner v. Alta Mira Vill. Homeowners Ass'n, Inc., No. 2 CA-CV 2013-0151, 2014 WL 7344049, at *4 (Ariz. Ct. App. Dec. 24, 2014) (refusing to award sanctions where false admission resulted from "erroneously admit[ing] the truth."). Compare this to the somewhat analogous treatment for the failure to assert an affirmative defense (both require an affirmative statement). *See, e.g.*, Allmerica Fin. Life Ins. & Annuity Co. v. Llewellyn, 139 F.3d 664, 665–66 (9th Cir. 1997) (holding that failure to plead an affirmative defense does not afford relief from judgment due to an attorney's "'ignorance nor carelessness'") (quoting Engleson v. Burlington N. R.R. Co., 972 F.2d 1038, 1043 (9th Cir. 1992)).
[146]  *See* Fed. R. Civ. P. 60.
[147]  Las Vegas Land & Dev. Co., LLC v. Wilkie Way, LLC, 219 Cal. Rptr. 3d 391, 392 (Ct. App. 2013); *Beck*, 2012 WL 4465166, at *2.
[148]  Fed. R. Civ. P. 60(d)(3).

relief from a final judgment? Does "fraud on the court" require the same standard of proof for common law fraud? Was that intent of the rule's framers?

Rule 60(d)(3) was added in 1948.[149] The framers' intention may best be indicated in the Advisory's Committee's discussion of the rule:

> The amendment . . . mak[es] fraud an express ground for relief by motion; and under the saving clause, fraud may be urged as a ground for relief by independent action insofar as established doctrine permits. And the rule expressly does not limit the power of the court . . . to give relief under the savings clause. As an illustration of the situation, see *Hazel-Atlas Glass Co. v. Hartford Empire Co.* [322 U.S. 238 (1944)].[150]

Because of the express reference to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,[151] an examination of this case is important for a full understanding of the meaning of the phrase. Hartford, in support of an application for a patent, submitted to the Patent Office an article—drafted by an attorney of Hartford—referring to the contested process as a "revolutionary device." The company had arranged to have the article printed in a trade journal under the name of an ostensibly disinterested person.[152] The Patent Office relied heavily on this article in granting the patent application.[153] Hartford then sued Hazel, charging infringement of the patent. The Third Circuit, in upholding the validity of the patent, also relied on the article.[154] Eventually, Hazel yielded and paid Hartford $1,000,000 and entered into a licensing agreement.[155] Approximately ten years later, the information about the fraud surrounding the agreement was brought to light.[156] Hazel then filed an action with the court to have the judgment against it set aside and the judgment of the district court reinstated.[157] The Supreme Court, in an opinion authored by Justice Black, held that the judgment must be vacated:[158]

> [T]he general rule [is] that [federal courts will] not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered. . . . [but]
>
>     . . . .
>
>     [e]very element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury.

---

[149] 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE CIVIL § 2870 (3d ed. 2015).

[150] FED. R. CIV. P. 60 advisory committee's note to 1946 amendment (citations omitted).

[151] 322 U.S. 238 (1944).

[152] *Id.* at 240.

[153] *Id.* at 241.

[154] *Id.*

[155] *Id.* at 243.

[156] *Id.*

[157] *Id.*

[158] *Id.* at 251.

Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.[159]

Additionally, although Hazel may not have exercised proper diligence in uncovering the fraud, the Court thought it immaterial.[160] Indeed, it noted the case did not concern just the private parties, but rather the public at large because there are "issues of great moment to the public in a patent suit."[161] It then stated,

> Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.[162]

Interestingly, the Court held that it need not decide to what extent the published article by Hartford had influenced the judges who voted to uphold the patent or whether the article was the primary basis of that ruling because "Hartford's officials and lawyers thought the article material" and they were in "no position now to dispute its effectiveness."[163] And since the fraud had been directed to the Third Circuit, that court was the appropriate court to remedy the fraud.[164] Thus, the Supreme Court directed the Third Circuit to vacate its 1932 judgment and to direct the district court to deny all relief to Hartford.[165]

Nearly all of the principles that govern a claim of fraud on the court come from the *Hazel-Atlas* case.[166] First, the power to set aside a judgment exists in every court.[167] Second, in whichever court the fraud was committed, that court should consider the matter.[168] Third, while parties have the right to file a motion requesting the court to set aside a judgment procured by fraud, the court may also proceed on its own motion.[169] Indeed, one court stated that the facts that had come to its attention "not only justify the inquiry *but impose* upon us the duty to make it, even if no party to the original cause should be willing to cooperate, to the end that the records of the court might be purged of fraud, if

---

[159] *Id.* at 244–45.
[160] *Id.* at 246.
[161] *Id.*
[162] *Id.*
[163] *Id.* at 246–47.
[164] *Id.* at 248–50.
[165] *Id.* at 251.
[166] WRIGHT ET AL., *supra* note 151.
[167] *Id.*
[168] *Id.* (citing Universal Oil Prods. Co. v. Root Refining Co., 328 U.S. 575 (1946) (other citations omitted)).
[169] *Id.*

any should be found to exist."[170] Fourth, unlike just about every other remedy or claim existing under the rules of civil procedure or common law, there is no time limit on setting aside a judgment obtained by fraud, nor can laches bar consideration of the matter.[171] The logic is clear: "[T]he law favors discovery and correction of corruption of the judicial process even more than it requires an end to lawsuits."[172]

The United States Supreme Court—in a case a few years after the *Hazel-Atlas* case—discussed some of the appropriate procedures used in adjudicating fraud on the court claims.

> The power to unearth such a fraud is the power to unearth it effectively. Accordingly, a federal court may bring before it by appropriate means all those who may be affected by the outcome of its investigation. But if the rights of parties are to be adjudicated in such an investigation, the usual safeguards of adversary proceedings must be observed.[173]

Since *Hazel-Atlas*, a considerable number of courts have had the opportunity to dissect the meaning of "fraud on the court" and several definitions have been attempted. A number of courts have held that a "fraud on the court" occurs "where it can be demonstrated, *clearly and convincingly*, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."[174]

Fraud on the court is a very high bar. The Tenth Circuit has held that it is fraud "directed to the judicial machinery itself and is *not* fraud between the parties or fraudulent documents . . . . It is thus fraud where . . . the impartial functions of the court have been directly corrupted."[175] And "only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court."[176]

Some courts require the moving party to meet certain elements in order to set aside a judgment for fraud on the court. For example, in the Third Circuit,

---

[170] Root Refining Co. v. Universal Oil Prods. Co., 169 F.2d 514, 521–23 (3d Cir. 1948) (emphasis added).

[171] *See* WRIGHT ET AL., *supra* note 151.

[172] Lockwood v. Bowles, 46 F.R.D. 625, 634 (D.D.C. 1969).

[173] *Universal Oil*, 328 U.S. at 580.

[174] Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (emphasis added) (citing Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989)); Pfizer Inc. v. Int'l Rectifier Corp., 538 F.2d 180, 195 (8th Cir. 1976); England v. Doyle, 281 F.2d 304, 309 (9th Cir. 1960); United Bus. Commc'ns, Inc. v. Racal-Milgo, Inc., 591 F. Supp. 1172, 1186–87 (D. Kan. 1984); United States v. ITT Corp., 349 F. Supp. 22, 29 (D. Conn. 1972), *aff'd mem.*, 410 U.S. 919 (1973).

[175] Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1266 (10th Cir. 1995) (emphasis added).

[176] Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978).

16 Nev. L. J. 707, Hague - Final.docx                                     4/12/16 6:31 PM

Spring 2016]                 *FRAUD ON THE COURT*                          729

fraud on the court applies to only "the most egregious misconduct directed to the court itself"[177] and requires the following elements: "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court."[178]

Furthermore, fraud on the court under Rule 60(d)(3) does not encompass "ordinary fraud," and must also be distinguished from "fraud" under Rule 60(b)(3)—i.e., those frauds which are not directed to the judicial machinery itself.[179] Rule 60(b)(3) provides relief from judgment where there is "fraud . . . misrepresentation, or misconduct by an opposing party."[180] "Fraud upon the court as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication."[181] Accordingly, the standard for establishing fraud on the court under Rule 60(d)(3) "is higher and distinct from the more general standard for fraud under Rule 60(b)(3)."[182] Furthermore, while Rule 60(c)(1) limits to one year the time within which a motion under Rule 60(b)(3) must be made, a claim based upon fraud on the court under Rule 60(d)(3) is intended "to protect the integrity of the judicial process" and, therefore, *is not time barred.*[183]

Despite the definitions and standards developed by the courts, the distinction between "fraud" and "fraud on the court" is unclear and much confusion still exists about what type of conduct falls into this category. As one court queried,

> What is meant by "defile the court itself"? What is meant by "fraud perpetrated by officers of the court"? Does this include attorneys? Does it include the case in which an attorney is deceived by his client, and is thus led to deceive the court? The most that we can get . . . is that the phrase "fraud on the court" should be read narrowly, in the interest of preserving the finality of judgments, which is an important legal and social interest. We agree, but do not find this of much help to us in deciding the question before us.[184]

As one commentator noted, "[p]erhaps the principal contribution of all of these attempts to define 'fraud upon the court' and to distinguish it from mere 'fraud' is [] a reminder that there is a distinction."[185] If any fraud connected with the presentation of a case to a court is fraud on the court, then Rule 60(b)(3) and the time restraints imposed on that rule lose meaning. Nonetheless, because of its opaque meaning and application, several arguments can be made that abusive discovery between the parties, which ultimately results in a

---

[177] Herring v. United States, 424 F.3d 384, 386–87 (3d Cir. 2005).

[178] *Id.* at 386.

[179] *See* United States v. Buck, 281 F.3d 1336, 1342 (10th Cir. 2002).

[180] Fed. R. Civ. P. 60(b)(3).

[181] King v. First Am. Investigations, Inc. 287 F.3d 91, 95 (2d Cir. 2002) (internal quotations omitted).

[182] *In re* Old Carco LLC, 423 B.R. 40, 52 (Bankr. S.D.N.Y. 2010).

[183] Bowie v. Maddox, 677 F. Supp. 2d 276, 278 (D.D.C. 2010).

[184] Toscano v. Comm'r of Internal Revenue, 441 F.2d 930, 933–34 (9th Cir. 1971).

[185] Wright et al., *supra* note 151.

16 Nev. L. J. 707, Hague - Final.docx                                        4/12/16 6:31 PM

favorable judgment to the offender, should be included in the species of fraud on the court under Rule 60(d)(3).

## III. ABUSIVE DISCOVERY AS FRAUD ON THE COURT AND REEVALUATING THE STANDARD

When, if ever, will abusive discovery practices rise to the level of fraud on the court within the meaning of Rule 60(d)(3)? Do the current standards adopted by the courts preclude utilizing Rule 60(d)(3) to set aside judgments procured by deceptive or misleading discovery? Is it proper to modify the heightened standard under Rule 60(d)(3) based on the victim, the offender, and the relief sought?

Unfortunately, courts tend to focus on antiquated standards when analyzing whether a party has committed fraud on the court, but fail to recognize the flexibility and equitable nature of the fraud-on-the-court rule. Indeed, nearly all courts that undertake the fraud-on-the-court analysis begin their opinions with the *Hazel-Atlas* case, then discuss the standards and definitions adopted by other courts, and finally decide whether the facts fit within that definition and standard.[186] The problem with this flawed analysis, however, is that victims of fraudulent discovery find themselves as a square-peg trying to fit into a round hole. But each case is unique and must be assessed and adjudicated according to its own facts.

Accordingly, this article suggests that courts engage in a four-step process that requires (1) examination of the offender and his duties to the court, (2) evaluation of the conduct and its effect, (3) consideration of the victim's status (the equitable component), and (4) consideration of the relief being sought. By engaging in this four-step process, courts may be more willing to set aside judgments under Rule 60(d)(3) when abusive discovery occurs that influences the decisions of courts.

### A. *The Offender and His Duty*

When abusive discovery is at issue, the offending party will likely be an attorney.[187] Why is the offender's status important to the analysis? "An attorney is an officer of the court and owes the court fiduciary duties and loyalty."[188] Accordingly, "[w]hen an attorney misrepresents or omits material facts to the court, or acts on a client's perjury or distortion of evidence, his conduct may

---

[186] *See, e.g.*, Murray v. Ledbetter, 144 P.3d 492, 498 (Alaska 2006) (discussing *Hazel-Atlas's* "strict" definition of the elements necessary to prove fraud on the court, the tracing of the rule, and whether, "[i]n keeping with *Hazel-Atlas*," the activity at hand constituted a fraud on the court).

[187] Obviously, there may be some situations where pro-se litigants are the one conducting abusive discovery, but that appears to be a rare occurrence.

[188] Trehan v. Von Tarkanyi, 63 B.R. 1001, 1007 (Bankr. S.D.N.Y. 1986).

16 NEV. L. J. 707, HAGUE - FINAL.DOCX                                              4/12/16 6:31 PM

constitute a fraud on the court."[189] Furthermore, when an officer of the court fails to correct a misrepresentation or retract false evidence submitted to the court, it may also constitute fraud on the court.[190] Notwithstanding, examination of the offender and his duty is not limited solely to an attorney's duty of candor toward the tribunal.[191] Rather, the analysis requires courts to examine certain duties that arise well before the offender involves the court.

At the outset, Rule 26(g) of the Federal Rules of Civil Procedure requires that an attorney of record sign discovery-related filings, and prescribes that the signature certifies that "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" the discovery request, response, or objection is "consistent with these rules and warranted by existing law."[192] The signature also certifies that the request, response, or objection is "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."[193] Accordingly, Rule 26 obligates "each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection"[194] and to make a reasonable inquiry into the factual and legal basis of his response, request, or objection. The Model Rules of Professional Conduct provide further guidance.

Lawyers are professionally and ethically responsible for accuracy in their representations to the court. Rule 3.1 of the Model Rules of Professional Conduct states that lawyers "shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good-faith argument for an extension, modification or reversal of existing law."[195] Similarly, Rule 3.3 provides that "[a] lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."[196]

In addition to the rules of professional conduct and an attorney's duty of candor as an officer of the court, "Rule 11 [of the F.R.C.P.] imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and not interposed for any improper purpose."[197] The United States Supreme Court has held that Rule 11,

---

[189] *Id.*
[190] *In re McCarthy*, 623 N.E.2d 473, 477 (Mass. 1993).
[191] *See, e.g.*, NEV. RULES OF PROF'L CONDUCT 3.3 (stating that lawyers shall not make false statements of fact or law to the court or fail to correct false statements of material fact to the court).
[192] FED. R. CIV. P. 26(g).
[193] *Id.*
[194] FED. R. CIV. P. 60 advisory committee's note to 1983 amendment.
[195] MODEL RULES OF PROF'L CONDUCT r 3.1 (AM. BAR. ASS'N 2013).
[196] *Id.* at 3.3(a).
[197] Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990) (internal quotation marks omitted).

imposes on any party who signs a pleading, motion, or other paper—whether the
party's signature is required by the Rule or is provided voluntarily—an affirma-
tive duty to conduct a reasonable inquiry into the facts and the law before filing,
and that the applicable standard is one of reasonableness under the circumstanc-
es.[198]

An examination of the offender and his duties is important because, as dis-
cussed below, violations of Rule 26, Rule 11, or even the rules of professional
conduct may give rise to a fraud-on-the-court claim, even if those violations
were not specifically directed to the court itself.

*B.  Evaluation of the Conduct*

After evaluating the offender and his duties, courts should analyze the con-
duct at issue. In examining the conduct, however, this Article suggests that the
heightened standard adopted by several courts for fraud on the court does not
comport with the rationale for employing Rule 60(d)(3) to set aside judgments.
Instead, this Article suggests that courts examine one specific question when
evaluating the conduct: did the conduct cause the court not to perform in the
usual manner in its impartial task of adjudging cases?

While some suggest that the fraud or deceit committed by the attorney
must be aimed directly at the court to constitute fraud on the court, this position
seems faulty; however, it raises an important issue: since "[f]raud between the
parties and fraud on the court are two distinct bases for post-judgment re-
lief,"[199] how can a victim use Rule 60(d)(3) to ever set aside a judgment? In
other words, abusive discovery is aimed at the opposing party rather than the
court, and, thus, it would appear a victim has no claim under Rule 60(d)(3). But
that is not necessarily true. Fraud on the court can originate from abusive dis-
covery and find its way, sometimes unintentionally, to the steps of the court-
house. Accordingly, it is a myopic approach to only examine the arrow that the
attorney shot towards the court and then decide whether the arrow was suffi-
ciently harmful to constitute fraud on the court. Rather, a proper approach will
examine all of the arrows the attorney shot at the victim and then analyze which
arrows found their way to the court and the impact those arrows caused on the
judgment.

Thus, for example, if an adversary misrepresents certain relevant infor-
mation, fails to disclose such information, requests admissions that he knows to
be false, lies during a deposition, or engages in any other deceitful form of dis-
covery, he has clearly violated Rule 26 and has potentially engaged in fraud,
misrepresentation, or other misconduct prohibited by ethical rules and state and
federal rules of civil procedure. Admittedly, fraud on the court requires more
than misconduct between the adverse parties—it must be some sort of miscon-
duct that hampers the judicial machinery. Therefore, the critical component to

---

[198]  Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 551 (1991).
[199]  Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d 1281, 1291 (10th Cir. 2005).

the analysis is whether the offending party utilizes the information it obtained through abusive discovery practices to obtain a favorable judgment.

In *Kupferman v. Consolidated Research & Manufacturing Corp*,[200] the court stated that

> [w]hile an attorney "should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court." And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court.[201]

In other words, "[s]ince attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court."[202]

In order to establish fraud on the court, some courts require the movant to prove by clear and convincing evidence *intentional* fraudulent conduct *specifically directed* at the court itself.[203] For example, the Tenth Circuit had held that the fraud must directed to the judicial machinery itself and cannot be fraud or misconduct between the parties or fraudulent documents exchanged between the parties.[204] Other courts have held that an action for fraud on the court is available only when the movant can show an "unconscionable *plan* or *scheme*" to improperly influence the court's decision.[205] Under this strict approach, one could argue that the only cases of fraud on the court would be those of bribery of a judge or members of a jury. In fact, the strict approach would arguably take away any consideration of the conduct that occurred between the parties or an attorney making filings to the court without making "an inquiry reasonable under the circumstances," as required under Rule 11(b).[206]

This strict approach in evaluating the conduct that occurred, however, seems inconsistent with the purpose of Rule 60(d)(3). If the judicial machinery is unable to perform in the usual manner in its impartial task of adjudicating cases because of attorney misconduct, why does fraud on the court require the conduct at issue to be intentional and aimed directly at the court itself? Why does it have to be an intentional "plan" or "scheme"?[207] On the contrary, if a party is responsible for undermining the integrity of the judicial process because it chose to recklessly present misleading or false evidence to the court and the court's judgment was influenced by the conduct at issue, the judgment should be set aside as a fraud on the court.

---

[200] 459 F.2d 1072 (2d Cir. 1972).

[201] *Id.* at 1078 (internal citation omitted).

[202] H.K. Porter Co. v. Goodyear Tire & Rubber Co., 536 F.2d 1115, 1119 (6th Cir. 1976).

[203] Herring v. United States, 424 F.3d 384, 386–87 (3d Cir. 2005).

[204] Robinson v. Aktiengesellschaft, 56 F.3d 1259, 1266 (10th Cir. 1995).

[205] Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir. 1978) (emphasis added) (quoting England v. Doyle, 281 F.2d 304, 309 (9th Cir 1960)).

[206] Fed. R. Civ. P. 11(b).

[207] *See, e.g.*, Fierro v. Johnson, 197 F.3d 147, 154 (5th Cir. 1999) (holding that in order to establish fraud on the court, it is "necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its discretion.") (citation omitted).

Accordingly, lawyers that use information obtained through discovery that has no basis in law or fact to support motions filed with the court are clearly misleading the court, even if they have no intent to defraud the court. Indeed, "an attorney might commit fraud upon the court by instituting an action 'to which he knew [or should have known] there was a complete defense.'"[208] Similarly, lawyers that choose to conduct discovery without making an inquiry reasonable under the circumstances and then present false or misleading information to the court in order to obtain a favorable judgment may be guilty of fraud on the court. For example, kneejerk discovery requests served without consideration of existing law can, and should, rise to the level of fraud on the court under Rule 60(d)(3) if the court is influenced by the discovery that was improperly obtained.

Some cases may be opening the door for a more relaxed approach to the conduct component. For example, in *Eastern Financing Corporation v. JSC Alchevsk Iron and Steel Works*,[209] the court found that an attorney committed fraud on the court when he filed a motion for default judgment.[210] Absent from the court's opinion is any analysis of the attorney's intent.[211] Instead, the court focuses on a few areas of conduct that suggest a more relaxed approach to the fraud on the court standard.[212] Admittedly, the case does not involve abusive discovery, but it is illustrative of a softened approach when analyzing whether certain conduct rises to the level of fraud on the court.

Of particular importance in *Eastern Financing* is the court's continued reference to Rule 11 violations and a lawyer's duty to conduct a reasonable inquiry before filing documents with the court. Interestingly, Rule 11 does not speak to fraud, nor does a violation of Rule 11 require the movant to prove intent. Yet the court seemed content relying, at least in part, on this rule to find that a fraud on the court had occurred.[213] In fact, a Rule 11 violation can occur when an attorney acts recklessly. Indeed, the court found that the attorney filed the complaint "without making an inquiry reasonable under the circumstances as required under Rule 11(b)."[214] The court held that this was "irresponsible" for the attorney to rely on his client's "oral recitation of facts" in preparing the complaint.[215]

The most compelling evidence against the attorney, however, was that he knowingly sponsored his client's nondisclosure and misrepresentations when

---

[208] Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989) (citing Kupferman v. Consol. Research & Mfg. Corp., 456 F.2d 1072, 1079 (2d Cir. 1972)).

[209] 258 F.R.D. 76 (S.D.N.Y. 2008).

[210] *Id*. at 88.

[211] *But see, e.g.*, Herring v. United States, 424 F.3d 384, 386 (3d Cir. 2005) (requiring intentional fraudulent conduct by an officer of the court in order to come within the purview of fraud on the court under Rule 60(d)(3)).

[212] *See Eastern Financing*, 258 F.R.D. at 85.

[213] *Id*. at 86.

[214] *Id*.

[215] *Id*. at 87.

16 Nev. L. J. 707, Hague - Final.docx                                          4/12/16 6:31 PM

verifying the complaint and then filing the motion for default judgment.[216] That alone was enough for the court to find that the attorney committed a fraud on the court.[217] The court also found that a letter submitted by the attorney to the court that failed to make mention of a pending bankruptcy case was "less than honest dealing with the court."[218] When discussing the party's conduct that contributed to a Rule 11 violation, the court said his submissions to the court show that he is "careless with facts and often misleading, and that he relies on suspicion and hearsay."[219] Absent again from the court's analysis, however, is any reference to *intentional* fraudulent conduct *specifically directed* at the court itself.[220] Notably, the court continued to analyze the very question posed by this Article: did the conduct at issue cause the court not to perform in the usual manner its impartial task of adjudging cases?[221]

In further support of a lightened standard, courts that have analyzed fraud on the court claims consistently refer to the "fraud, misrepresentation, *or* conduct" that occurred in procuring the judgment.[222] Again, suggesting that intentional fraudulent conduct specifically directed at the court is not a prerequisite to a successful fraud on the court claim. Even the Supreme Court in *Hazel-Atlas* stated that "[t]he public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of *deception* and fraud."[223] There is no plausible explanation why a claim for fraud on the court cannot stand when the deception or misconduct occurs between the litigants during discovery and then, at some point during the case, the conduct at issue impedes the court from performing in the usual manner its impartial task of adjudging the case.

## C. Consideration of the Victim's Status (The Equitable Component)

The doctrine of fraud on the court allows courts to provide equitable relief. Indeed, "the doctrine of fraud on the court is a judicially devised equitable doc-

---

[216] *Id.* at 82–83.

[217] *Id.* at 88.

[218] *Id.*

[219] *Id.* at 90.

[220] *See, e.g.,* Robinson v. Aktiengesellschaft, 56 F.3d 1259, 1266 (10th Cir. 1995) (holding that fraud on the court requires fraud directed to the judicial machinery itself).

[221] *See Eastern Financing,* 258 F.R.D. at 85.

[222] *See, e.g.,* Anderson v. New York, No. 07 Civ. 9599(SAS), 2012 WL 4513410, at *4 (S.D.N.Y. Oct. 2, 2012) (stating that the "fraud, misrepresentation *or* conduct must have actually deceived the court") (emphasis added); *see also In re* Old Carco, LLC, 423 B.R. 40, 52 (Bankr. S.D.N.Y. 2010) (stating that "[t]he fraud, misrepresentation *or* conduct must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision") (internal citation omitted).

[223] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944) (emphasis added).

trine, the application of which is dependent on the facts of the case."[224] In *Ha-zel-Atlas*, the Court noted,

> Equitable relief against fraudulent judgments is not of statutory creation. It is a judicially devised remedy fashioned to relieve hardships which, from time to time, arise from a hard and fast adherence to another court-made rule, the general rule that judgments should not be disturbed after the term of their entry has expired. Created to avert the evils of archaic rigidity, *this equitable procedure has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention, and to accord all the relief necessary to correct the particular injustices involved in these situations.*[225]

Notwithstanding, some courts have held that even if a party can demonstrate conduct that caused the court not to perform in the usual manner its impartial task of adjudging a case, "[a]ny issues that may have been 'addressed through the unimpeded adversary process' are not appropriately attacked on the basis of fraud upon the court."[226] For example, in *Gleason v. Jandrucko*, the court found no fraud on the court where the plaintiff had an opportunity to expose misrepresentations made in discovery at trial.[227] There, the plaintiff moved under Rule 60 after the plaintiff's case was dismissed.[228] The plaintiff argued that the officers in the case lied during their depositions about having probable cause; however, the district court found that the plaintiff had opportunity to expose those inconsistencies during trial and failed to do so.[229] Other courts have stated that allegations of an opposing counsel's intentional mischaracterization of the applicable law, evidence, or affidavits submitted to the court does not rise to the level of fraud on the court *if* the movant's own counsel could have rebutted opposing counsel's mischaracterization of the law and the record before the court.[230]

This harsh approach is unreasonable, especially if courts consider the victim. The Supreme Court in *Hazel-Atlas* made it clear that the fraud-on-the-court rule should be characterized by flexibility and an ability to meet new situations demanding equitable intervention.[231] Because of the equitable and flexible nature of the rule, this Article contends that courts have ample leeway and discretion to consider the victim's status—i.e., those parties unable to recognize or combat the fraud prejudgment—in determining whether to set aside a judgment for fraud on the court.

---

[224] State *ex rel.* Corbin v. Arizona Corp. Comm'n, 693 P.2d 362, 370 (Ariz. Ct. App. 1984).
[225] *Hazel-Atlas*, 322 U.S. at 248 (emphasis added).
[226] *In re Old Carco*, 423 B.R. at 53 (citing Weldon v. United States, No. 99-6142, 2000 WL 1134358, at *2 (2d Cir. Aug. 9, 2000)).
[227] Gleason v. Jandrucko, 860 F.2d 556, 557 (2d Cir. 1988).
[228] *Id.* at 558.
[229] *Id.* at 560.
[230] *Weldon*, 2000 WL 1134358, at *2.
[231] Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 248 (1944) (emphasis added).

Is it fair to suggest that pro se litigants or attorney-abandoned litigants have a duty to root out all evil during the discovery process and that any issues that could have been addressed cannot be appropriately attacked on the basis of fraud on the court? Should courts deny these victims relief because they should have, for example, rebutted opposing counsel's mischaracterization of the law and the record before the court? Or should courts, equipped with equitable power to correct transgressions that occur before them, recognize that oftentimes victims of abusive discovery lack both the skill and knowledge to uncover misconduct during discovery or at trial? Pro se litigants and attorney-abandoned litigants do not have the tools to combat abusive discovery. These victims do not understand what a deemed admission means. These victims do not understand how interrogatories can be used fraudulently to support a motion for summary judgment. These victims do not understand how the rules of civil procedure can be employed to thwart abusive discovery before it is too late.

Because courts are endowed with the power to ascertain whether their judgments were obtained by fraud, misrepresentation, or other misconduct, the victim's status should be a consideration. The fact that the misconduct could have been rooted out during discovery should be insignificant in most cases, but it should be especially inconsequential when an attorney does not represent the victim involved. Actions involving these sorts of victims should be governed by even more flexibility to afford necessary relief. The harsh standard other courts have employed should not be the current view because it is contrary to the equitable principles behind the relief afforded by Rule 60(d)(3).

## D. *Consideration of the Relief Being Sought*

Interestingly, although Rule 60(d)(3) is the only rule that even mentions the fraud-on-the-court doctrine, other Federal Rules of Civil Procedure, including Rules 11, 16, 26, 37, and 41, have been cited in applying the doctrine. For example, courts have dismissed, defaulted, and sanctioned litigants for fraud on the court, and have found the necessary authority outside of Rule 60(d)(3)—often citing the inherent power given to all courts to fashion appropriate remedies and sanctions for conduct which abuses the judicial process.[232] Some courts have premised dismissal or default of a litigant who committed fraud on the court entirely on Rule 11.[233] Other courts have relied on Rule 41(b) for authority to dismiss a plaintiff who has committed fraud on the court.[234] Rule

---

[232] *See, e.g.*, Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 11–12 (1st Cir. 1985); Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983); Eppes v. Snowden, 656 F. Supp. 1267, 1279 (E.D. Ky. 1986).

[233] *See, e.g.*, Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488 (9th Cir. 1991).

[234] C.B.H. Res., Inc. v. Mars Forging Co., 98 F.R.D. 564, 569 (W.D. Pa. 1983) (dismissing under Fed. R. Civ. P. 41(b) where party's fraudulent scheme, including use of a bogus subpoena, was "totally at odds with the . . . notions of fairness central to our system of litigation").

738                        *NEVADA LAW JOURNAL*                      [Vol. 16:707

41(b) provides the court with authority to dismiss a case if a plaintiff fails to comply with the rules of civil procedure or other court orders.[235] Such a dismissal operates as an adjudication on the merits.[236] This rule, however, has no import if the offending party has already obtained a judgment.

The problem with the widespread use of the fraud-on-the-court doctrine is that courts continue to apply the heightened standard to prove a fraud on the court has occurred, yet the remedies and relief that flow from making such a finding can be entirely different. As one court observed,

> When a fraud on the court is shown through clear and convincing evidence to have been committed in an ongoing case, the trial judge has the inherent power to take action in response to the fraudulent conduct. The judge has *broad discretion to fashion a judicial response* warranted by the fraudulent conduct. Dismissal of claims or of an entire action may be warranted by the fraud, as may be the entry of a default judgment.[237]

The First Circuit has examined the options of a federal district judge confronted by fraud on the court and has held that federal courts possess the inherent power to "order dismissal or default where a litigant has stooped to the level of fraud on the court."[238] It stated the following:

> All in all, we find it surpassingly difficult to conceive of a more appropriate use of a court's inherent power than to protect the sanctity of the judicial process—to combat those who would dare to practice unmitigated fraud upon the court itself. To deny the existence of such power would, we think, foster the very impotency against which the *Hazel-Atlas* Court specifically warned.[239]

Rule 60(d)(3), however, only serves one purpose: to "set aside a judgment for fraud on the court."[240] Setting aside a judgment is different from dismissing a claim, an entire action, or entering a default judgment. "[D]ismissal sounds 'the death knell of the lawsuit'"[241] and is an extreme remedy that "must be exercised with restraint and discretion."[242] On the other hand, Rule 60 enables courts to set aside judgments when necessary to accomplish justice and return the parties to the status quo that existed prior to the misconduct. In other words, Rule 60(d)(3) does not mandate a court to set aside a judgment *and* dismiss the entire case with prejudice. While dismissal with prejudice is certainly an option,[243] it is not a mandate created by Rule 60(d)(3). Courts repeatedly hold that

---

[235] Fed. R. Civ. P. 41(b).

[236] *Id.*

[237] Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 638 N.E.2d 29, 31 (Mass. 1994) (emphasis added).

[238] Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1119 (1st Cir. 1989).

[239] *Id.*

[240] Fed. R. Civ. P. 60(d)(3).

[241] *Aoude*, 892 F.2d at 1118.

[242] Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991).

[243] *See, e.g.*, Root Refining Co. v. Universal Oil Prods. Co., 169 F.2d 514, 534–35 (3d Cir. 1948) (stating that "[t]he records of the courts must be purged and the judgments in Universal's favor, both in this court and in the District Court, must be vacated and the suits by Uni-

16 Nev. L. J. 707, Hague - Final.docx                                                    4/12/16 6:31 PM

cases are to be tried on the merits if possible.[244] Thus, based on the indiscretion at issue, courts may set aside the judgment and additionally take any of the following actions: (1) require a trial on the merits unblemished by the misconduct, (2) sanction the offending party, (3) dismiss a particular cause of action, or (4) dismiss the entire proceeding with prejudice.

The bottom line is that fraud on the court can take many forms and the standard for setting aside a judgment for fraud on the court under Rule 60(d) ought to be flexible. The options afforded to courts confronted by attorney misconduct suggest that courts can and should focus on the egregiousness of the conduct and the relief being sought. While some misconduct might fall short of furnishing a basis for setting aside a judgment *and* dismissal with prejudice, other indiscretions may warrant such a harsh remedy. Courts possess plenary authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[245] As a result, examination of the *options* of the court confronted by misconduct—whether that is taking additional steps beyond setting aside the judgment such as ordering dismissal or imposing sanctions—is an important component to process litigation to a just and equitable conclusion.

### E. *Illustration of the Four-Part Test*

The *Fallini* case cited above provides a logical illustration of the four-part test for several reasons. First, it involved alleged misconduct by an officer of the court.[246] Second, the alleged misconduct originated during the discovery process.[247] Third, the attorney abandoned the victim when the misconduct transpired.[248] And finally, the conduct caused the court not to perform in the usual manner its impartial task of adjudging the case, because the court never heard the merits, but instead entered an order based on a false admission.[249]

In order to address the misconduct in *Fallini*, the victim hired a new attorney and on May 21, 2014, filed a motion for relief from judgment under Rule 60. It alleged that plaintiff's counsel "knowingly forced fraudulent facts on the

---

versal must be finally dismissed. No principle is better settled than the maxim that he who comes into equity must come with clean hands and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim").

[244] *See, e.g.*, Moore v. City of Paducah, 790 F.2d 557, 559 (6th Cir. 1986) (stating that "cases should be tried on the merits rather than the technicalities of pleadings") (citation omitted).

[245] Link v. Wabash R.R. Co., 370 U.S. 626, 630–31 (1962).

[246] Estate of Adams v. Fallini, No. CV 24539 (Nev. 5th Dist. Ct. Aug. 6, 2014), at 1 (court order).

[247] *Id.* at 3.

[248] *Id.*

[249] *Id.*

16 Nev. L. J. 707, Hague - Final.docx                    4/12/16 6:31 PM

court and failed to correct misrepresentations thereby committing fraud upon the court."[250]

### 1. The Offending Party and His Duty

The court, in addressing whether fraud on the court occurred under Rule 60, focused on the offending party—plaintiff's lawyer—and noted that "as an officer of the court, [he] had a duty to not mislead the court or fail to correct a misrepresentation."[251] It held that "[s]imple dishonesty of any attorney is so damaging on courts and litigants that it is considered fraud upon the court."[252] And, citing to rules of professional conduct, the court further held that "[a]n officer of the court perpetrates fraud on the court a) through an act that is calculated to mislead the court or b) by failing to correct a misrepresentation or retract false evidence submitted to the court."[253]

### 2. The Conduct

The court next focused on the conduct at issue. Interestingly, the attorney in *Fallini* denied knowing that the accident occurred on open range,[254] which may have been an attempt to refute that any intentional misconduct occurred. After considering the evidence, however, the court found that the attorney "knew or *should have known* the accident occurred on open range prior to filing his request for admissions."[255] The court also found that "[a]t the bare minimum, [the attorney] possessed enough information to conduct a reasonable inquiry into the open range status of the location where the accident occurred."[256] Despite this knowledge, the attorney sought an admission from Fallini stating that the area where the accident occurred was not open range, a false fact that was deemed admitted when Fallini's attorney failed to respond.[257]

Thus, as an officer of the court, the attorney violated his duty of candor under the rules of professional conduct "by utilizing Defendant's denial that the accident occurred on open range to obtain a favorable ruling in the form of an unopposed award of summary judgment."[258] Consequently, the court found a violation of Rule 60(b) because "Plaintiff's request for admission of a known fact, a fact that was a central component of Defendant's case, was done when

---

[250] *Id.* at 1.
[251] *Id.* at 7.
[252] *Id.* at 6.
[253] *Id.*
[254] *Id.* at 7. (emphasis added).
[255] *Id.* (emphasis added).
[256] *Id.*
[257] *Id.* at 5.
[258] *Id.* at 8.

counsel *knew or should have known* that the accident did not occur on open range, thereby perpetrating fraud upon the court."[259]

### 3. The Victim

The court also considered the victim in this case. It noted that the attorney who committed the fraud on the court "may argue that all [Fallini's prior attorney] had to do was simply 'deny' the request for admissions."[260] While this is certainly true, the court took special consideration of the fact that Fallini's prior attorney failed "to respond to various motions and requests to the extent that [plaintiff's attorney] knew or should have known that a response from [Fallini's attorney] was unlikely."[261]

The court also recognized the maxim the Supreme Court expressed in *Hazel-Atlas*: the fraud-on-the-court rule should be characterized by flexibility and an ability to meet new situations demanding equitable intervention.[262] The court clearly considered and accepted the inequities of the case, as it acknowledged that "one cannot ignore the apparent injustice that Defendant has suffered throughout this matter. Ms. Fallini [was] responsible for a multi-million dollar judgment without the merits of the case even being addressed."[263] In other words, it was significant to the court that Fallini's attorney had abandoned her, and this certainly influenced, at least in part, the court's decision to set aside the judgment due to a fraud on the court.

### 4. The Relief

The court recognized that "[f]inality has a particular importance in our legal system."[264] However, it also noted that a final judgment is one "that disposes of the issues presented in the case, determines the costs, and leaves nothing for future consideration of the court."[265] But "the issues presented in this case were summarily disposed above due to the negligence of Defendant's counsel . . . [and] [t]he merits of the case were never actually addressed."[266] Again, recognizing the victim's status, the court found that had Fallini's attorney "properly denied the improper request for admissions, the outcome may have been much different."[267]

The court's order states several times throughout that "cases are to be heard on the merits if possible" and that Fallini was unjustly punished without the

---

[259] *Id.* (emphasis added).
[260] *Id.*
[261] *Id.*
[262] *Id.*
[263] *Id.* at 9.
[264] *Id.* at 10.
[265] *Id.* (quoting Alper v. Posin, 363 P.2d 502, 503 (1961)).
[266] *Id.*
[267] *Id.*

merits of the case ever being addressed.[268] In addition to its express authority to set aside the judgment under Rule 60, the court clearly had the authority to order further relief, such as sanctions or dismissal with prejudice.[269] Pursuant to the court's *Order Granting Motion for Entry of Final Judgment and Dismissing Case with Prejudice*, the court entered final judgment in favor of Fallini and dismissed the case with prejudice.[270]

CONCLUSION

While finality of judgment matters, no worthwhile interest is served in protecting judgments obtained by misconduct. The Federal Rules of Civil Procedure contemplate liberal discovery, but the potential for discovery abuse is ever-present. There are rules in place to remedy abusive discovery, yet those rules are only functional during litigation—they serve no purpose post-judgment. Thus, cheaters are prospering under the judicial system, especially against vulnerable victims that lack both the skill and knowledge to adequately prepare a defense or thwart the abusive conduct before an unfavorable judgment is rendered.

Rule 60(d)(3), however, allows a court to set aside judgments—judgments obtained years earlier—which have been secured by a fraud on the court. But to succeed in setting aside a judgment, several courts require a showing, by clear and convincing evidence, of intentional fraudulent conduct specifically directed at the court itself. This standard is too high. If federal courts were compelled to follow this standard, nearly every claim of abusive discovery would fail. However, the remedial and equitable nature of the fraud-on-the-court doctrine and the great public policy that it embodies militates against making that burden an impossible hurdle for victims of abusive discovery.

Fraud on the court can take many forms. Fortunately, the fraud-on-the-court rule that the United States Supreme Court articulated in *Hazel-Atlas* should be characterized by flexibility and an ability to meet new situations demanding equitable intervention. The equitable and flexible nature of the rule supports the contention that the current standard for evaluating fraud on the court is flawed. The four-step step process outlined above—with the ultimate inquiry of whether the abusive conduct caused the court not to perform in the usual manner its impartial task of adjudging cases—further facilitates a court's inherent power to do whatever is reasonably necessary to deter abuse of the judicial process.

---

[268]  *Id.* at 9 (quoting Passarelli v. J-Mar Dev., Inc., 720 P.2d 1221, 1223 (Nev. 1986)).

[269]  *See, e.g.*, Rule 41 and 11 discussed *supra* Parts III.B, III.D.

[270]  Order Granting Motion for Entry of Final Judgment and Dismissing Case with Prejudice at 2. Estate of Adams v. Fallini, No. CV 24539 (Nev. 5th Dist. Ct. Apr. 17, 2015).

# Reference 2 - CAFSA_article how to respond to false evidence

# Responding to Falsification of Evidence

*By Jonathan K. Tycko*

Courts often describe the litigation process as having a truth-seeking function. Under duress, however, most lawyers experienced in litigation will concede that the litigation process serves that function only imperfectly. Although trials are intended to recreate for the judge and jury the historical events at issue in the case, numerous very serious obstacles to achieving that goal exist. Some of those obstacles are the result of the passage of time: memories fade, witnesses die, evidence is lost or discarded. Some of those obstacles are the result of rules or procedures intended to serve competing interests: relevant information is hidden behind privileges and other evidentiary rules, witnesses are beyond the subpoena power of the court, only finite amounts of evidence can be presented in the time allotted for the trial. And some of those obstacles are a function of the human condition: lawyers are possessed of unequal persuasive skills, perceptions of judges and juries are influenced by events outside the courtroom, people make mistakes. These obstacles to truth seeking are all, more or less, tolerated by our legal system. Indeed, addressing these various categories of obstacles is an important part of the day-to-day work of judges, juries, and lawyers.

But another, more pernicious, obstacle to truth seeking sometimes rears its ugly head. Parties lie under oath, forge documents or create other types of deceptive evidence, and destroy or hide relevant evidence. This conduct is intentional and designed to subvert the truth-seeking function of the judicial process. This type of intentional creation, alteration, or destruction of evidence—which I will refer to generally as falsification—is the narrow subject of this article.[1] This article will begin with a brief discussion of the nature and extent of the problem.

Then, the article will list and discuss various available responses when an opposing party engages in falsification in the context of civil litigation.

## The Problem of Falsification

Falsification is a serious problem, for two reasons. First, when it occurs, it can have an enormously detrimental impact on the litigation process. Most obviously, undetected falsification can lead directly to incorrect results. In criminal cases, innocent people can be imprisoned or criminals can go unpunished. And in civil cases, large sums of money or important legal rights can be undeservedly lost or won.

But falsification has other deleterious effects. Where one side of a dispute suspects the other of engaging in falsification, it can result in litigation that is much more expensive and time-consuming, for both the parties and the courts, because falsification often adds a fact-intensive issue (e.g., if the documents are forgeries) that can require additional discovery, expenses for various types of forensic experts, and increased trial time. In addition, falsification erodes public respect for the judicial system: to the extent that the public believes falsification is common, it will distrust the results reached by the judicial system and will lose faith in courts as reliable sources of justice.

The seriousness of falsification is reflected both by the numerous remedies that courts have developed to address it (many of which will be discussed below) and also by the legislative response. Falsification is a serious crime in most, if not all, jurisdictions.[2] And falsification can result in more severe punishment for otherwise-criminal conduct. For example, under the federal sentencing guidelines, a sentence is subject to significant "enhancement" if "the offense (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essen-

tial or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation."[3]

Second, falsification occurs with alarming frequency. No good statistics on falsification exist, and indeed, it is hard to imagine how accurate statistics could be compiled, given the diverse ways falsification occurs and the lack of any comprehensive reporting system. But as one appellate judge accurately noted, "[i]n the centuries that have elapsed since Adam took that first bite of the apple in the Garden of Eden, a great many people, some of them powerful and famous, have been found to have lied under oath or to have otherwise done their best to conceal the truth and to subvert judicial proceedings."[4] In 1995, the *ABA Journal* conducted a survey of 50 federal and state judges and reported that most "agree[d] that perjury in some form permeates civil and criminal courts."[5] Numerous reported cases reflect instances of falsification and the legal system's attempts to grapple with it. And this author's own personal experience is that falsification occurs in a significant portion of civil cases; I have personally been involved in a number of significant cases in which I came to believe that one of the parties had intentionally forged or altered documents, and I often encounter trial and deposition testimony that I believe to be intentionally false or misleading. My discussions with other lawyers lead me to conclude that my perceptions are not unique but rather are very common among experienced litigators.

## Responding to Falsification by an Opposing Party

Falsification is often a crime, but it rarely is prosecuted. So, a litigant faced with falsification by an opposing party is left to seek remedies directly from the courts. Numerous responses to falsification are available. The most common of these potential responses will now be

"Responding to Falsification of Evidence" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No 2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

addressed. They are presented briefly and primarily as a guide to what should at least be considered by a lawyer faced with the problem. The law in each jurisdiction may differ on these issues; therefore, local law research may be required before deciding on appropriate steps. The responses discussed below are presented in no particular order.

*Seek Dismissal or Default*
If an opposing party has engaged in falsification, one potential response is to ask the court to throw the party out of court. Courts have long recognized their own inherent power to protect themselves and other parties from various forms of bad faith litigation, including the falsification of evidence. As the Supreme Court emphasized in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, this inherent power is a crucial mechanism for protecting the integrity of the judicial process:

> [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. . . . The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.[6]

The inherent power to "fashion appropriate sanction[s] for conduct which abuses the judicial process" was reaffirmed by the Supreme Court in *Chambers v. NASCO, Inc.*[7]

Where falsification occurs in the midst of ongoing judicial proceedings, and is specifically directed at affecting those proceedings, it often is termed "fraud on the court." A court, as an exercise of this inherent authority, may sanction fraud on the court through dismissal (if the falsifier is the plaintiff) or default (if the falsifier is the defendant).[8] But because dismissal or default is a severe sanction that deprives a litigant entirely of the right to pursue or defend a claim, courts have adopted various standards to ensure that it is imposed sparingly and that "the need to maintain institutional integrity and the desirability of deterring future misconduct" is balanced appropriately against "the policy favoring adjudication on the merits."[9]

Courts have adopted three primary safeguards to ensure that the sanction of dismissal or default is imposed only in appropriate cases. First, most courts that have considered the issue have concluded that fraud on the court must be proved by clear and convincing evidence—a standard of proof higher than the preponderance of the evidence standard that normally applies in civil cases—before it can be punished through an exercise of inherent power.[10] Second, the party accused of falsification must be given notice of the potential sanctions and an opportunity to respond; however, whether to conduct a full evidentiary hearing is a matter generally left to the discretion of the court.[11] And third, as a general matter, a court must consider lesser sanctions before imposing the sanction of dismissal or default. Some of those lesser sanctions—such as awards of attorney fees and adverse findings on particular issues—are discussed below. But some courts also have recognized that falsification can be so serious an affront to the judicial system that a court can impose the sanction of dismissal or default even *without* first considering or imposing lesser sanctions. For example, in *Oliver v. Gramley*, the Seventh Circuit upheld a sanction of dismissal where the plaintiff had submitted a false affidavit relating to the filing and service of a habeas petition, even though the district court had not explicitly considered less severe sanctions. Judge Posner, writing for the court, concluded that this falsification was "so egregious, inexcusable, and destructive that no lesser sanction than dismissal with prejudice could be adequate."[12]

In addition to inherent powers, courts may also have authority to impose the sanction of dismissal or default under various procedural rules. For example, Rule 37 of the Federal Rules of Civil Procedure provides an alternative basis for a court's authority to impose the sanction of dismissal or default, where the falsification amounts to a "fail[ure] to comply with the rules of discovery or with court orders enforcing those rules."[13] And Rule 11 of the Federal Rules of Civil Procedure provides similar authority where a party's falsification manifests itself as false allegations or denials in the party's pleadings.[14] Accordingly, when faced with falsification in ongoing civil litigation—particularly in the pretrial phases of the case—a lawyer should carefully consider whether any of the rules of the court before which the case is pending provide an alternative basis for sanctions.

*Seek Recovery of Monetary Sanctions*
All of the various sources of a court's authority to impose the sanction of dismissal or default also permit a court to impose monetary sanctions. The most common form of monetary sanction is an award of the attorney fees and expenses incurred by the other side of the case. The fees and expenses awarded do *not* need to bear a direct causal connection to particular acts of falsification. Rather, as the Supreme Court recognized in *Chambers*, once a party sets out on a course of bad faith litigation, it taints the entire litigation, and the court may vindicate itself by requiring the bad faith litigator to pay *all* of its opponent's attorney fees and expenses.[15] A court also may impose additional monetary sanctions—in the form of fines or punitive damages—above and beyond the specific amount of the innocent party's fees and expenses.[16]

*Seek an Adverse Inference Instruction or Issue Preclusion*
Where falsification takes the form of intentional destruction or alteration of evidence—an act often termed "spoliation" of evidence—then a court may decide to punish the wrongdoer and pro-

> **To hold a party or witness in contempt, the court must have judicial knowledge of the perjury.**

"Responding to Falsification of Evidences" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No. 2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

"Responding to Falsification of Evidence" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No 2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

altered evidence with the specific "purpose of depriving an opposing party of its use."[28] Claims for spoliation can lie, in some jurisdictions, against both "first-party" defendants (namely, parties to the underlying civil litigation) and "third-party" defendants (namely, those who are *not* parties to the underlying civil litigation).[29] A party asserting a tort claim for spoliation must meet other elements typical to tort claims, such as causation and damages. Accordingly, whether pursuit of a tort claim for spoliation is advisable may depend both upon the state of local law in the relevant jurisdiction and also upon whether causation and damages can be proven.

*Assert Other Common Law Claims*
Falsification can expose the wrongdoer to a claim for malicious prosecution. A claim for malicious prosecution lies only where the malicious prosecution plaintiff establishes that a prior action terminated in his or her favor and that the defendant brought the prior action without probable cause and with malicious intent.[30] A party has "probable cause" to initiate a civil lawsuit if, among other things, that party has a reasonable belief in the existence of the facts that warrant the lawsuit.[31] Thus, if it could be shown that the defendant instituted the prior action with knowledge that his or her claims could only be supported with fabricated evidence, then this would tend to show a lack of probable cause and would also be evidence in support of the malice element. In addition, courts have recognized that the favorable termination element of a malicious prosecution claim can be satisfied—even where the malicious prosecution plaintiff lost the prior case— where "the original judgment was obtained through fraud."[32] Thus, where the evidence of falsification comes to light after the falsifying party has already won the prior lawsuit, a malicious prosecution action may still be viable.

In some unusual circumstances— where one party is forced to give up a claim because of another party's falsification—fraud or other related deception-based claims also may be available. An example is *Morgan v. Graham*.[33]

Graham was injured in an automobile accident and obtained a default judgment against the negligent driver, Godfrey W. Cochran. Graham learned that an insurance adjuster for the (as it turned out) inaptly-named Moral Insurance Company had investigated the accident. So Graham brought an action against that insurer on the theory that the insurer had issued a liability policy to Godfrey W. Cochran and that the insurer should pay proceeds of that policy to Graham to satisfy the default judgment. In response, Moral submitted an answer, verified by its president,

If you catch the other side engaged in falsification, you can use it to argue that its entire position lacks merit.

Max T. Morgan, stating that there was no such policy in its files. Faced with that verified answer—and with no direct evidence to rebut it—Graham voluntarily dismissed the case.

Moral subsequently went into receivership. Graham then brought an action against Morgan, the president. In that action, Graham alleged that Moral had indeed issued a policy to a "G. W. Cockran," that this person and Godfrey W. Cochran were the same person, and that Morgan knew this when he signed the verified answer in the prior action against Moral. Graham's case against Morgan went to trial on a claim of fraud, and evidence was presented that Morgan knew that "G. W. Cockran" and Godfrey W. Cochran were the same person. The trial court found for Graham and awarded both compensatory and punitive damages.

On appeal, the Tenth Circuit affirmed. The court noted that the victim of perjury normally does not have a cause of action against the person who committed the perjury.[34] But the court reasoned that perjury can provide a predicate for other tort claims if the elements of those torts can otherwise be proven.[35] The court then considered whether Graham had proved reliance upon Morgan's false statements. Although Graham testified that he did not believe Morgan's statements in the earlier case, the court reasoned that Graham "was nonetheless forced to act to his detriment and do what he would not have done had the statement not been made," and thereby "was forced to rely on the misrepresentations."[36] The court upheld both the compensatory and punitive damages.

*Use the Other Side's Falsification to Undermine Its Position*
The last potential response I will address is also the most common and can often be the most powerful. If a lawyer believes that it is possible to catch the other side in a lie, the lawyer can simply do just that, and thereby destroy the other side's credibility. An oft-quoted passage from one of the leading evidence treatises explains:

It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.[37]

In other words, if you catch the other side engaged in falsification, you can use that catch to argue that the other side's entire position lacks merit. And even more fundamentally, judges and juries do not like being tricked. If a judge or jury agrees that your opponent has engaged in falsification—even falsification relating only to one of several issues in the case—it will hold this

"Responding to Falsification of Evidences" by Jonathan K. ydka, published in Committee on Corporate Counsel Newsletter, Volume 20, No 2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

quite strongly against your opponent and will come to doubt the validity of everything your opponent says and claims.

## Conclusion

Falsification is a serious and common problem in civil litigation. The courts have developed numerous responses to falsification, including various types of sanctions that can be imposed in the

> **Responding vigorously to falsification helps to preserve the integrity and fairness of the judicial system as a whole.**

case in which the falsification occurs and various potential claims that can arise out of falsification. When faced with falsification by an opposing party, a lawyer should consider all of these various responses. Responding vigorously to falsification not only serves your client's interests in the particular dispute but also serves to deter falsification in other cases, and helps to preserve the integrity and fairness of the judicial system as a whole. ✆

*Jonathan K. Tyeko is a partner with Tycko Zavareei & Spiva LLP in Washington, D.C. He can be reached at (202) 973-0900 or by email at jtycko@tzslaw.com.*

## Endnotes

1. Thus, this article does not address the related, but distinct, topic of unintentional—but still potentially culpable—destruction or loss of documents. That topic, and the related issue of preventive document retention policies, has been the subject of many articles. Replowing of that ground will be avoided here.

2. Various specific types of falsification violate federal criminal laws. *See, e.g.*, 18 U.S.C. § 1621 (perjury punishable by up to five years' imprisonment); 18 U.S.C. § 1519 (knowing falsification or destruction of documents or other tangible objects punishable by up to 20 years' imprisonment); 18 U.S.C. § 1520 (destruction of certain corporate audit records punishable by up to 10 years of imprisonment). And knowing destruction or falsification of documents in an attempt to influence the outcome of a judicial proceeding also violates the general "obstruction of justice" law. 18 U.S.C. § 1503. *See, e.g.*, U.S. v. Craft, 105 F.3d 1123, 1128 (6th Cir.1997) ("Acts that distort the evidence to be presented or otherwise impede the administration of justice are violations of 18 U.S.C. § 1503. The act of altering or fabricating documents used or to be used in a judicial proceeding would fall within the obstruction of justice statute if the intent is to deceive the court."). All states have similar laws.

3. USSG, § 2J1.2.

4. Breezevale Ltd. v. Dickinson, 759 A.2d 627, 641 (D.C. 2000) (Schwelb, J., concurring).

5. Mark Curriden, *The Lies Have It*, ABA J., May 1995, at 69.

6. 322 U.S. 238, 246 (1944).

7. 501 U.S. 32, 44 (1991).

8. Some examples are: Breezevale Ltd. v. Dickinson, 879 A.2d 957,.964 (D.C. 2005) (affirming sanction of dismissal where top executives of plaintiff company engaged in scheme to forge documents and subsequently denied the forgery in pleadings and sworn testimony); Synanon Found., Inc. v. Bernstein, 503 A.2d 1254, 1263 (D.C. 1986) (affirming sanction of dismissal where plaintiff, inter alia, destroyed audiotapes and made false statements to the court "that no responsive documents could be found" in order "to deceive the court, and to improperly influence the court in its decision on the defendants' motions to compel, with the ultimate aim of preventing the judicial process from operating in an impartial fashion"); Cox v. Burke, 706 So. 2d 43 (Fla. Dist. Ct. App. 1998) (affirming sanction of dismissal where plaintiff gave false answers to interrogatories and deceptive deposition testimony); Pope v. Fed. Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) (affirming sanction of dismissal for plaintiff's forgery of, and reliance on, a single document); Aoude v. Mobil Oil Corp., 892 F.2d 1115 (1st Cir. 1989) (affirming dismissal where plaintiff concocted a single document); Tramel v. Bass, 672 So. 2d 78, 82 (Fla. Dist. Ct. App. 1996) (affirming default judgment against defendant who excised damaging six-second portion of videotape before producing it during discovery).

9. Shepherd v. Am. Broad. Cos., 62 F.3d 1469, 1478 (D.C. Cir. 1995) (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989)).

10. *See, e.g.*, Nichols v. Klein Tools, Inc., 949 F.2d 1047, 1048 (8th Cir. 1991).

11. *See, e.g.*, Breezevale Ltd v. Dickinson, 879 A.2d 957, 964 (D.C. 2005); Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1164–65 (9th Cir. 2003).

12. 200 F.3d 465, 466 (7th Cir. 1999).

13. Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983).

14. *See, e.g.*, Jimenez v. Madison Area Technical Coll., 321 F.3d 652 (7th Cir. 2003).

15. 501 U.S. at 56–57; *see also* Synanon Found., Inc. v. Bernstein, 517 A.2d 28, 43 (D.C. 1986) (once a party embarks on a "pattern of fraud," and "[r]egardless of the relevance of these [fraudulent] materials to the substantive legal issue in the case," this is enough to "completely taint [the party's] entire litigation strategy from the date on which the abuse actually began").

16. Jemison v. Nat'l Baptist Convention, 720 A.2d 275, 285 (D.C. 1998) (punitive damages may be imposed if court finds that bad faith litigator acted with malice).

17. Klezmer v. Buynak, 227 F.R.D. 43, 52 (E.D.N.Y. 2005).

18. *See, e.g.*, Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 746–47 (8th Cir. 2004).

19. *See, e.g.*, Reilly v. NatWest Markets Group Inc., 181 F.3d 253, 267–68 (2d Cir. 1999).

20. *See, e.g.*, Monsanto Co. v. Ralph, 382 F.2d 1374, 1382 (Fed. Cir. 2004).

21. 249 U.S. 378, 384 (1919).

22. *Id.*; *see also In re* Michael, 326 U.S. 224, 227–28 (1945).

23. U.S. v. Arredondo, 349 F.3d 310, 320 (6th Cir. 2003); *see also* D.V. v. State, 817 So. 2d 1098, 1099 (Fla. Ct. App. 2002) (discussing "judicial knowledge").

24. For discussion of "on Venus," *see* U.S. v. Arredondo, 349 F.3d 310, 320 at 319 n.9 (6th Cir. 2003).

25. J.S. Sweet Co. v. Sika Chem. Corp., 400 F.3d 1028, 1032 (7th Cir. 2005) (applying Indiana law).

26. *See* Gribben v. Wal-Mart Stores, Inc., 824 N.E.2d 349, 353 (Ind. 2005), for a recent listing of cases from different states that have either adopted or rejected an independent tort of spoliation.

27. *Id.*; *see also* Hannah v. Heeter, 584 S.E.2d 560, 568 (W. Va. 2003); Holmes v. Amerex Rent-A-Car, 710 A.2d 846, 854 (D.C. 1998).

28. Burge v. St. Tammany Parish, 336 F.3d 363, 374 (5th Cir. 2003) (discussion of Louisiana law).

29. *See, e.g.*, Smith v. Howard Johnson Co., 615 N.E.2d 1037, 1038 (Ohio 1993).

30. *See generally* 52 Am. Jur. 2d, "Malicious Prosecution."

31. *See, e.g.*, Norse Sys. v. Tingley Sys., 715 A.2d 807, 815–16 (Conn. App. 1998).

32. Tyler v. Central Charge Serv., Inc., 33. 228 F.2d 625 (10th Cir. 1956).

34. *Id.* at 627.

35. *Id.*

36. *Id.* at 628.

37. 2 J. Wigmore, Evidences § 278, at 133 (Chadbourn ed. 1979).

"Responding to Falsification" by Jonathan K. Tycko, published in Committee on Corporate Counsel Newsletter, Volume 20, No 2, Winter 2006 © 2006 by the American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

# Reference 3 - Adversary Ethics_ More Dirty Tricks



University of Kentucky
**UKnowledge**

Law Faculty Scholarly Articles                    Law Faculty Publications

Fall 1982

# Adversary Ethics: More Dirty Tricks

Richard H. Underwood

*University of Kentucky College of Law*, runderwo@uky.edu

**Right click to open a feedback form in a new tab to let us know how this document benefits you.**

Follow this and additional works at: https://uknowledge.uky.edu/law_facpub

Part of the <u>Legal Ethics and Professional Responsibility Commons</u>, and the <u>Litigation Commons</u>

Recommended Citation

Richard H. Underwood, *Adversary Ethics: More Dirty Tricks*, 6 Am. J. Trial Advoc. 265 (1982).

This Article is brought to you for free and open access by the Law Faculty Publications at UKnowledge. It has been accepted for inclusion in Law Faculty Scholarly Articles by an authorized administrator of UKnowledge. For more information, please contact UKnowledge@lsv.uky.edu.

# Adversary Ethics: More Dirty Tricks

## Richard H. Underwood*

## I. Introduction

While much of the academic debate over the excesses of the adversary system is a simple reflection of the belated integration of "legal ethics" into law school curricula,[1] there is a growing concern that certain "wide spread [trial] practices are in need of change."[2] Perhaps the most extreme criticism of the prevailing ethic, whether that prevailing ethic is real or imagined, can be found in the works of Jeffrey O'Connell,[3] who urges us to abandon a system of dispute resolution "fraught with a frightening mixture of archaic technology, raw emotionalism, and sly tricks."[4]

---

© 1982, by the American Journal of Trial Advocacy.

* Assistant Professor of Law, University of Kentucky College of Law. B.S. 1969, Ohio State University; J.D. 1976, Ohio State University.

1. The traditional academic indifference toward "legal ethics" as a separate course offering is noted in M. Schwartz, Lawyers and the Legal Profession vii (1979), and Hegland, *Moral Dilemmas in Teaching Trial Advocacy*, J. Legal Ed. 69, 86 n.28 (1982).

2. M. Frankel, Partisan Justice 79 (1980). Among the "wide-spread practices" cited by Judge Frankel are:

> . . . knowingly presenting false testimony of clients or witnesses; trying by artful cross-examination or other techniques to block the truth, or to make what is known to be true seem false; and deliberately failing to reveal evidence that would help the court or jury to achieve an accurate understanding of the facts.

A more complete list of deceptive practices is set forth in Ordover, *The Lawyer as Liar*, 2 Am. J. Trial Advoc. 305, 314 (1979):

> . . . deliberately rais[ing] an objection simply to interfere with his adversary's flow in opening or summation or to interrupt the witness solely for the sake of interruption . . . . Dropping books and paraphernalia on the floor to distract the jury during opposing counsel's summation, influencing jurors with unsubtle remarks or gestures in the hallway during recess, positioning exhibits not in evidence so that jurors will see them, quoting out of context or purposely misciting cases, and even worse, omitting important authorities from briefs and arguments . . . . [T]he intentionally misleading question tendered on cross-examination; the question asked, not in good faith, but merely to have the jury hear the question . . . ; and the attempt to coach the witness while he is on the stand.

3. *See, e.g.,* J. O'Connell, The Lawsuit Lottery (1979); J. O'Connell, Ending Insult to Injury (1975).

4. J. O'Connell, Ending Insult to Injury 7 (1975).

While it is safe to assume that few would fully endorse all of Professor O'Connell's criticisms, or share completely his enthusiasm for major changes in our system of dispute resolution, a handful of commentators have joined him in identifying and condemning certain "dirty tricks."[5] Unfortunately, only the more theatrical forms of cheating tend to be catalogued. Moreover, the remedy suggested to the party aggrieved by questionable trial tactics is more often than not "a well directed crotch kick in retaliation."[6]

One of my purposes in writing this article is to provide a primer on the more common forms of cheating employed by trial lawyers. Another purpose is to suggest that there are antidotes that may be administered to curb these abuses,[7] assuming that trial attorneys are alert enough to invoke them, and trial judges are willing to apply them.[8]

---

5. *See, e.g.,* McElhaney, *Dealing with Dirty Tricks* 7 LITIGATION 45 (1981). At least one law school "skills program" has incorporated materials on "dirty tricks" to "prepare the fledgling lawyers to deal with [them]." *See* Ordover, *Why 'Dirty Tricks' Are Taught at Emory,* NAT'L L.J. June 14, 1982, at 14.

6. J. JEANS, TRIAL ADVOCACY 27 (1975). A more diplomatic, but nonetheless effective countermeasure for garden variety distractions has been suggested by Steve Goldberg of the University of Minnesota: "Your honor, may we pause for a few moments until (Mr.) ____ can stop being rude?"

7. Unfortunately, the view seems to be that "dirty tricks" pay due to an absence of meaningful remedies for the aggrieved party. From the viewpoint of the plaintiff's lawyer, O'Connell opines in THE LAWSUIT LOTTERY, *supra* note 3, at 40, that:

> It is true that [in the cases discussed] the illicit conduct of the lawyers resulted in a reversal of the trial court's decision in his favor. But to the extent that the trickery helped gain a verdict in the first place — with the realization that it might or might not be appealed and with the certainty that any verdict can be used as a lever in bargaining over settlement pending appeal — a lawyer could well conclude that such tricks are worth a try.

*Compare* Jeans, *supra* note 6:

> When such a transgression occurs by the plaintiff in a civil case or a prosecutor in a criminal matter, the opponent may seek appropriate relief from the trial court. But if the defense attorney has injected the poison there is little, if any, antidote available. Mistrials are, from a practical point of view, undesirable (who wants to abort a year of docket waiting, and the expense of an unfinished trial?) and that admonition to disregard the testimony is meaningless.

8. The primary duty of the court to correct unprofessional conduct has been forcefully advocated in another context by Professor Freedman in LAWYERS' ETHICS IN AN ADVERSARY SYSTEM 101-02 (1975).

## II. Some Preliminaries

Ask any trial attorney to prepare a list of unethical practices and he will most likely recite incidents in which an opponent injected, or attempted to inject, inadmissible evidence during direct or cross-examination of a witness. Any proper survey of unethical trial practices, however, must begin with counsel's preparation for trial.[9]

## A. The Deceptive Trial Brief

It has become common practice for trial counsel in civil cases to present some form of law brief or trial memorandum to the court, ostensibly to "simplify the litigation and to reduce substantially the time that a busy judge must take in understanding the case."[10] The trial brief also serves as an opening statement, intended "to persuade the court to shape the record favorably to the party on whose behalf the brief is submitted."[11] The opportunity to "run one by" in this initial presentation to the court, by distorting fact or law, is widely recognized.[12] The disciplinary rules of the Code of Professional Responsibility which directly address such deliberate deceptions provide in part:

DR 7-106 Trial Conduct.
(B) In presenting a matter to a tribunal, a lawyer shall disclose:
  (1) Legal authority in the controlling jurisdiction known to him to

---

9. For a discussion of abuses in pleading, discovery, and motion practice, *see* Underwood, *Dealing with the "Court Crunch": Judicial Control of Adversary Ethics - The Model Rules of Professional Conduct and Proposed Amendments to the Federal Rules of Civil Procedure,* 56 St. John's L. Rev. 625 (1982).

10. R. Figg, R. McCullough, and J. Underwood, Civil Trial Manual 384 (1974) [Hereinafter cited as Figg.] *See also* M. Pittoni, Brief Writing and Argumentation 4 (3d ed. 1967). The significance of the trial brief in today's litigation process is noted in Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 709 (7th Cir. 1979).

11. Schumate, *The Trial Brief,* 5 Am. Jur. Trials § 2 at 89, 91 (1966). The trial brief may also provide a vehicle for persuading the court to preclude opposing counsel from pursuing improper lines of questioning or argument. *Id.* at 103 n.1.

Model Code of Professional Responsibility DR 7-110(B) (1979) requires service of the trial brief on opposing counsel, unless local practice or a local rule provides for *ex parte* submissions. *Accord,* H. Drinker, Legal Ethics 78 (1953); Code of Trial Conduct ¶ 19(b)(2) (American College of Trial Lawyers 1972). However, counsel often ignore this rule and not all commentators perceive the applicability of the Code provision. *Compare* Schumate, *supra,* at 92-3; Pittoni, *supra* note 10, at 4-5.

12. *See* Ordover, *supra* note 2, at 314; Brazil, *The Attorney as Victim: Toward More Candor About the Psychological Price Tag of Litigation Practice,* J. Leg. Prof. 107, 111 (1978).

be directly adverse to the position of his client and which is not
disclosed by opposing counsel.

(C) In appearing in his professional capacity before a tribunal, a
lawyer shall not:

(1) State or allude to any matter that he has no reasonable basis to
believe is relevant to the case or that will not be supported by
admissible evidence.[13]

Notwithstanding these comparatively unambiguous standards,
a number of appellate decisions have reported gross violations of
the Code including; statements of purported fact unsupported or
contradicted by the record,[14] distorted quotations,[15] or deliberate
omissions of controlling authority.[16] Without question, similar
deception also takes place at the trial level, in both civil and
criminal cases. In fact, misconduct in connection with submis-
sions to the trial court often take extreme forms.[17] For example, in
*Garcia v. Silverman*[18] counsel submitted by motion an order for
the court's signature directing one of the parties, as well as the Ci-
ty of New York (a non-party), to show cause why the City should
not be joined and stayed from enforcing certain administrative
orders pending determination of counsel's motion. Counsel omit-
ted from his papers the fact that similar relief had already been
denied in the same matter by another court after a full trial of the
issues. The court published an opinion denying the relief re-
quested and "as a warning to all members of the bar" announced:

Henceforth, any attorney who submits papers to this court which
deliberately fail to state what prior proceedings have taken place and
deliberately withhold information to inveigle the court into making a
decision it should not make, will be held in contempt of court and the
papers together with all pertinent facts will be submitted to the
Grievance Committee of the Association of the Bar of the City of New
York for appropriate actions.[19]

---

13. *See also* A.B.A. MODEL RULES OF PROFESSIONAL CONDUCT Rules 3.3(a) and
3.4(e)(1982).

14. *In re* Mascolo, 505 F.2d 274, 278 (5th Cir. 1974).

15. Quality Molding Co. v. American Nat'l Fire Ins. Co., 287 F.2d 313, 316 (7th
Cir. 1961). *Compare* County of Maricopa v. Maberry, 555 F.2d 207, 222 (9th Cir.
1977).

16. United States v. Burnette-Carter Co., 575 F.2d 587, 589 n.4 (1978).

17. *See, e.g.*, Pizarro v. Luther, 520 F. Supp. 195 (N.D. Ill. 1981); Garcia v.
Silverman, 70 Misc. 2d 537, 334 N.Y.S.2d 474 (1972);

18. 70 Misc. 2d 537, 334 N.Y.S. 2d 474 (1972).

19. *Id.* at____, 334 N.Y.S. 2d at 476.

Case 1:19-cv-03837-VSB   Document 106-1   Filed 12/20/19   Page 55 of 62

In this area, at least, it appears that trial judges will not shrink from imposing sanctions on errant attorneys once misconduct is brought to their attention. It is hardly a foregone conclusion, however, that counsel's deception will be discovered in the absence of mandatory service of trial briefs on all other parties to a litigation,[20] and local rules requiring that practice would provide some measure of relief in these instances.

## B. The Coached Witness

Discussions of "woodshedding" witnesses tend to conjure up horror stories, such as that revealed by Max Steuer's cross-examination in the Triangle Shirt Waist Company Case. According to Irving Younger's engaging account, the prosecutor in that case "phoneyed up" the evidence, and turned his witnesses into "human tape recorders" capable of parroting their narrative testimony over and over again without the slightest degree of variation.[21] Unfortunately, there is no bright line between refreshing the recollection of a witness and suborning perjury.[22]

Regarding this concern the Code of Professional Responsibility, DR 7-102(A)(4) and (6) provides:

> (A)In his representation of a client, a lawyer shall not:
>
> . . .
>
> (4) Knowingly use perjured testimony or false evidence
>
> . . . .
>
> (6) Participate in the creation or presentation of evidence when he knows or it is obvious that the evidence is false.

---

20. In Photovest v. Fotomat Corp., 606 F.2d at 710-11, the Court observed: [W]e are of the opinion that exchange of trial briefs at the time they are filed with the court is sounder procedure, being one more consistent with the elimination of gamesmanship aspects of litigation and, indeed, with the quest for truth, presumably the ultimate aim of adversarial litigation . . . . The district court judge, particularly in the case of a long and complex trial, who has entertained incorrect concepts about some aspects of the case during the course of the trial because of an *ex parte* brief, is placed in the difficult position of returning to a *status quo ante* position prior to engaging in the decisional process.
The Court made no reference to DR 7-110(B), although the Court took pains to point out that counsel who presented his brief to the trial judge but not to his opponent did not appear to have been attempting to secure an unfair advantage. *Id.* at 708.
21. Proceedings at the ABA Annual Meeting in Montreal, Canada on August 12, 1975, *reprinted in* ABA SECTION OF LITIGATION MONOGRAPH NO. 1, *The Art of Cross-Examination* (1976).
22. Professor Freedman suggests that the problem is one of the most difficult in the field of legal ethics, at least when the witness is also the lawyer's client. M. FREEDMAN, LAWYER'S ETHICS IN AN ADVERSARY SYSTEM 59 (1975).

Under these standards the responsibility for preventing false testimony rests upon trial counsel, who, in civil cases at least, may call only those witnesses whom he believes are truthful.[23] On the other hand, trial manuals are full of tips on how to "enlist [the third party witness'] active and partisan support of your case."[24]

---

As Freedman notes, the risk of suborning perjury that arises during witness preparation is sidestepped by the British Barrister, who ordinarily takes no part in the preparation of witnesses for trial. *Id.* at 109. Sir William Boulton's CONDUCT AND ETIQUETTE AT THE BAR (6th ed. 1975), the more or less official authority for barristers, provides that:

> It is a recognized practice that witnesses (other than the parties and experts or professional witnesses who are instructing counsel), should not be present at consultations or conferences with counsel and that counsel should not interview such witnesses before or during a trial.

I deal here solely with the problem of the coached witness, and will not address the problem of counsel's presentation of, or argument dependent on, perjured testimony in criminal cases. On that issue *see* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 341 (1975); ABA STANDARDS RELATING TO THE ADMINISTRATION OF CRIMINAL JUSTICE: THE DEFENSE FUNCTION 4-7.7 (1979); Freedman, *Perjury: The Lawyer's Trilemma*, 1 LITIGATION 26 (1975); Ordover, *supra* note 2; and Wolfram, *Client Perjury*, 50 So. CAL. L. REV. 809 (1977). In State v. McCormick, 298 N.C. 788, ___, 259 S.E.2d 880, 882 (1979) the court noted:

> It is not improper for an attorney to prepare his witness for trial, to explain the applicable law in any given situation and to go over before trial the attorney's questions and the witness' answers so that the witness will be ready for his appearance in court, will be more at ease because he knows what to expect, and will give his testimony in the most effective manner that he can. Such preparation is the mark of a good trial lawyer . . . and is to be commended because it provides a more efficient administration of justice and saves court time . . . . Nothing improper has occurred so long as the attorney is preparing the witness to give the witness' testimony at trial and not the testimony that the attorney has placed in the witness' mouth and not false or perjured testimony . . . . The sanctions of the Code of Professional Responsibility are there for the attorney who goes beyond preparing a witness to testify to that about which the witness has knowledge and instead procures false or perjured testimony.

*Compare*, R. KEETON, TRIAL TACTICS AND METHODS § 2.14 (2d ed. 1973).

23. *In re* Schapiro, 144 A.D. 1, ___, 128 N.Y.S. 852, 858 (1911). *See also In re* A., 276 Or. 225, 554 P.2d 479 (1976) (counsel may not sit silently while a client testifies incompletely in response to questions asked by opposing counsel). On the ethical obligations of the criminal defense with regard to non-client perjury, *see* People v. Schultheis, ___ Colo. ___, 638 P.2d 8 (1981); State v. Lloyd, 48 Md. App. 535, 429 A.2d 244 (1981); *See also* Model Rule 3.4(a) and (b).

24. R. SIMMONS, WINNING BEFORE TRIAL: HOW TO PREPARE CASES FOR THE BEST SETTLEMENT OR TRIAL RESULT 205 (1974). Simmons recommends, among other things, that the witness be educated on the merits of the client's case, on what the witness may do to overcome expected opposition, and that he be "oriented" by counsel's emphasizing of facts that will help the case and subor-

Given such ambiguous advice, to what extent will counsel simply choose to employ the "lecture," or the technique of suggesting, if not outlining, a favorable line of testimony to the interviewee at the outset, and then steering the witness' responses into a favorable script.[25]

While it may be assumed that improper coaching of witnesses is a common phenomenon,[26] opposing counsel can expect little, if any, aid from the trial judge.[27] In a recent North Carolina case,[28] the trial judge was rebuked for refusing to allow a witness, who the court believed had been coached, to testify on the reputation of another for truth and veracity. The appellate court opined:

> When a witness' testimony appears to have been memorized or rehearsed or it appears that the witness has testified using the attorney's words rather than his own or has been improperly coached, then there are matters to be explored on cross-examination, and the weight to be given the witness' testimony is for the jury.[29]

---

dinating (not suppressing) damaging facts. *Id.* at 205-6. *Compare* Uviller, *The Advocate, the Truth and Judicial Hackles*, 123 U. Pa. L. Rev. 1067, 1080-81 (1975), who proposes that the disciplinary rules be amended to provide:

> It is unprofessional conduct for a lawyer to counsel or countenance testimony by a witness in his favor which, although true in the part stated, omits matters which if stated might reasonably alter the meaning or significance of the testimony.

25. The most widely cited example of the "Lecture" may be found in R. Traver, Anatomy of a Murder 35 (1958):

> The lecture is an ancient device that lawyers use to coach their clients so that the client won't quite know he has been coached and his lawyer can still preserve the face-saving illusion that he hasn't done any coaching. For coaching clients, like robbing them, is not only frowned upon, it is downright unethical and bad, very bad. Hence the lecture, an artful device as old as the law itself, and one used constantly by some of the nicest and most ethical lawyers in the land. "Who, me? I didn't tell him to say," the lawyer can later comfort himself. "I merely explained the law, see." It is a good practice to scowl and shrug here and add virtuously: "That's my duty, isn't it?"

*See also* Jeans, *supra* note 6, at 16-19; MaGuire, Weinstein, Chadbourn & Mansfields, Cases and Materials on Evidence 276-77 (6th ed. 1973).

26. Frankel, *supra* note 2.

27. *See* 3 Wigmore On Evidence § 788 (Chadbourne rev. 1970):

> [The right to prepare witnesses] may be abused, and often is, but to prevent abuse by any definite rule seems impracticable. It would seem, therefore, that nothing short of an actual fraudulent conference could properly be taken notice of; there is no specific rule of behavior capable of being substituted for the proof of such facts.

28. State v. McCormick, 298 N.C. 788, 259 S.E. 2d 880 (1979).

29. *Id.* at ____, 259 S.E. 2d at 882-3. *Accord* Hanndi & Ibrahim Mango Co. v. Fire Ass'n of Philadelphia, 20 F.R.D. 181 (S.D.N.Y. 1957) (denying motion to suppress deposition). *Compare* Geders v. United States, 425 U.S. 80, 96 S. Ct. 1330,

Thus, it may very well be that the only protection against the "coached" witness is self-help in the form of a carefully planned cross-examination.[30]

## C. The Last Minute Continuance

Needless delay of litigation is hardly a new phenomenon[31] nor is it susceptible to a tidy discussion. Accordingly, the present

---

47 L. Ed. 2d 592. (1976), reversing a conviction in a case in which the trial judge had ordered every witness whose testimony was interpreted not to discuss the case with anyone during recesses. In holding that such sequestration, when applied to the defendant, violated his Sixth Amendment right to counsel, the Chief Justice wrote:

> There are other ways to deal with the problem of possible improper influence on testimony or "coaching" of a witness short of putting a barrier between client and counsel for so long a period as 17 hours. The opposing counsel in the adversary system is not without weapons to cope with "coached" witnesses. A prosecutor may cross-examine a defendant as to the extent of any "coaching" during a recess, subject, of course, to the control of the court. Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility, if it developed that defense counsel had in fact coached the witness as to how to respond on the remaining direct examination and on cross-examination. In addition the trial judge, if he doubts that defense counsel will observe the ethical limits on guiding witnesses, may direct that the examination of the witness continue without interruption until completed. If the judge considers the risk high he may arrange the sequence of testimony so that direct and cross-examination of a witness will be completed without interruption. That this would not be feasible in some cases due to the length of direct and cross-examination does not alter the availability, in most cases, of a solution that does not cut off communication for so long a period as presented by this record. Inconvenience to the parties, witnesses, counsel, and court personnel may occasionally result if a luncheon or other recess is postponed or if a court continues in session several hours beyond the normal adjournment hour. In this day of crowded dockets, courts must frequently sit through and beyond normal recess; convenience occasionally must yield to concern for the integrity of the trial itself.

See also Shedlock v. Marshall, 186 Md. 218, 46 A.2d 349 (1946) (cross-examination of witness who conversed during recess with counsel).

30. Many lawyers opine that the coached witness may be unmasked by well-placed inquiries regarding the number of consultations the witness had with others prior to trial. See, e.g., J. BAER & J. BALICER, CROSS-EXAMINATION AND SUMMATION 97 (1948); L. SCHWARTZ, CROSS-EXAMINATION IN PERSONAL INJURY ACTIONS 42 (1933). Compare People v. McQuirk, 106 Ill. App. 2d 266, 245 N.E.2d 917 (1969) (skillful but unavailing cross-examination of prosecutrix in rape case). Thoughtful guidance on cross-examination of the coached witness is presented in KEETON, supra note 22, at 136-38.

31. C. DICKENS, BLEAK HOUSE 7 (DeVries ed. 1971):

> The little plaintiff or defendant who was promised a new rocking-

discussion is limited to delay at the eleventh hour.[32] As several commentators have pointed out, it is not always clear what lies behind counsel's decision to delay, or whether delay is in the client's interest or solely the attorney's interest[33]

> It is sometimes stated that . . . the lawyer representing the defendant should take every opportunity to have the case continued or to delay its final disposition in any other way . . . . [But] it does not follow that the temporary delay that can actually be obtained will benefit the defendant . . . . Delays in litigation usually result in greater expense of trial to both parties, and the necessity for each lawyer's devoting substantially more time to the case. This is particularly true when the continuance is obtained so near the trial that each lawyer has necessarily done a part of the final trial preparation.[34]

---

> horse when Jarndyce and Jarndyce should be settled, has grown up, possessed himself of a real horse, and trotted away into the other world. Fair wards of court have faded into mothers and grand-mothers; a long procession of chancellors has come in and gone out . . .; there are not three Jarndyces left upon the earth perhaps, since old Tom Jarndyce in despair blew his brains out at a coffee-house in Channery-Lane; but Jarndyce and Jarndyce still drags its dreary length before the Court perennially hopeless.

32. For a discussion of delay in connection with discovery and motion practice, see FIGG, supra note 10.

33. See Miller, A Program for the Elimination of the Hardships of Litigation Delay, 27 OHIO ST. L.J. 402, 409 (1966); Ordover, supra note 2, at 309-10. Zeisel, Delay by the Parties and Delay by the Courts, 15 J. LEGAL ED. 27, 29 (1962), suggests that:

> . . . counsel may not answer a call out of sheer negligence, but it may also be an intentional move in the interest of his client because, for instance, the evidence is not fully ready for trial, or because counsel may prefer that settlement negotiations be continued. But even if counsel should have so many cases on hand that he is forced to postpone some, such delay might well be construed to be in the interest of his client if the client prefers a delayed trial with this particular counsel to an earlier trial with a counsel who would be less busy but also less desirable. Thus, the study does not always permit us to distinguish betwen delay that is in the client's interest, delay that is in the counsel's interest, delay that is caused by the counsel's courtesy to opposing counsel, and delay that is simply due to negligence.

34. KEETON, supra note 22, at 432-33. Compare, Kiefel v. Las Vegas Hacienda, Inc., 404 F.2d 1163 (7th Cir. 1968) (counsel reprimanded for numerous postponements of and last minute effort to seek a stay of new trial). On delaying tactics by the defense in criminal cases see State v. Hansen, 215 N.W.2d 249, 250 (Iowa 1974):

> [W]e cannot overlook the conduct of defense counsel, which deserves our strongest censure as being diliatory, obstructive, and harassing.
>
> Altogether the record shows some 135 filings in the case, almost 100 of them before trial. Many are routine but far too many are peti-

AMERICAN JOURNAL OF TRIAL ADVOCACY        [Vol. 6:265

The Code provides some guidance on the problem of delay:

> DR 7-102(19) In his representation of a client, a lawyer shall not:
> (1) . . . delay a trial, or take other action on behalf of his client when
> he knows or when it is obvious that such action would serve ,
> merely to harass or maliciously injure another.[35]

Notwithstanding the jurisdiction of the trial judges to enforce this provision by reason of their regulatory power over members of the bar practicing before them,[36] judicial control of diliatory continuances has been less than encouraging. A fairly recent example is provided by a Louisiana case, *Schulingkamp v. Noonan*.[37] In that case a notice of settling was sent to plaintiff's counsel three and a half months prior to the trial date, after counsel had failed to attend a pretrial conference. Counsel had not communicated with the client or obtained medical evidence from her physicians as late as twelve days before trial, and sought a continuance at the very last minute. The trial judge denied the continuance. Opining that the mishandling of the case was not attributable to the client, the appellate court ordered the respondent

---

tions, applications, motions—endlessly repeated—and frequently without any semblance of merit. At the same time counsel was trumpeting for a speedy trial and claiming denial of constitutional rights because the case was so long delayed. We agree with the trial judge—one of six who became the object of defendant's carping during the course of the case—who said defendant was using delay and hindrance as a ploy to set up a basis for appeal . . . .

. . .

. . . Lawyers are officers of the court, too, and actions which can most charitably be described as pettifoggery have no place in the representation of a client.

See ABA Project on Standards for Criminal Justice, *Standards Relating to the Prosecution Function and the Defense Function* (Approved Draft 1971).

35. Model Rule 3.2 clearly acknowledges counsel's duty, as an officer of the court, to expedite litigation:

Rule 3.2 EXPEDITING LITIGATION: A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

Comment: . . . The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

36. *Cf.* Cannon v. U.S. Acoustics Corp., 398 F. Supp. 209, 214-15 (N.D. Ill. 1975); MODEL RULES OF PROFESSIONAL CONDUCT Rule 3.2, Comment (proposed final draft 1981) ("Any solution must necessarily involve appropriate disciplinary measures.").

37. 250 So. 2d 478 (La. App. 1971).

trial judge to vacate his refusal of a continuance, while paying lip service to the need for judicial control of diliatory practices.[38]

Fortunately, other courts have taken a more active role in deterring diliatory conduct. For example, in *In re Sutter*,[39] the United States Court of Appeals for the Second Circuit affirmed the trial court's denial of motions for substitution of counsel and for adjournments based upon counsel's claimed lack of preparation, and assessed $1,500 in costs on counsel for causing a three-day delay in the start of the trial pursuant to a local rule of court.[40]

Similarly, in *Associated Radio Service Co. v. Page Airways, Inc.*,[41] the trial judge required counsel to pay to the opposing party the expense of unnecessary proceedings caused by their failure to prepare and provide a court ordered discovery conference report, with directions that counsel not be indemnified by their clients.[42]

---

38. The court noted that:
> We believe a court ought to have inherently the power to appropriately deal with a lawyer whose discourteous mishandling of a matter causes trial breakdown and the defeat of the court's judicial function by loss of a trial day .... In granting the writ, we alternatively ordered continuance on such conditions as the trial court considered just "including an order that present counsel provide the court with plaintiff's address so that the court may direct plaintiff to employ other counsel," ... [but] as S. Ct. Rule 14 and as State Bar Ass'n Arts. of Incorporation, art. 12 § 2, grant lawyers a general license to practice law in the state, and neither trial court nor court of appeal is authorized to restrict the license.

*Id.* at 480. *But see* Link v. Wabash R.R., 370 U.S. 626, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962), affirming the dismissal of a complaint based on counsel's failure to attend a pretrial conference, and other diliatory conduct.

39. 543 F.2d 1030 (2d Cir. 1976).

40. Rule 8 of the Individual Assignment and Calendar Rules for the Eastern District of New York provides:
> Rule 8. SANCTIONS.
> (a) Dismissal or default. Failure of counsel for any party to appear before the court at a conference, or to complete the necessary preparations, or to be prepared to proceed to trial at the time set, may be considered an abandonment of the case or failure to prosecute or defend diligently, and an appropriate order may be entered against the defaulting party either with respect to a specific issue or on the entire case.
> (b) Imposition of costs on attorneys. If counsel fails to comply with Rules 3(f), 6(f) or 7 or a judge finds that the sanctions in subdivision (a) are either inadequate or unjust to the parties, he may assess reasonable costs directly against counsel whose action has obstructed the effective administration of the court's business.

41. 73 F.R.D. 633, 25 F.R. Serv. 2d 218 (N.D. Tex. 1979).

42. *See also* United States v. Lespier, 558 F.2d 624, 628 (1st Cir. 1977) (assess-

## D. Mary Carter Agreements

The "Mary Carter Agreement," in its most common form, is a secret settlement contract pursuant to which one of several co-defendants agrees to pay plaintiff some amount up to a stated maximum to be reduced or eliminated altogether depending upon plaintiff's recovery from the remaining co-defendants.[43] While such agreements have been upheld in several states, at least when the agreement had been fully disclosed and when the record did not provide definite evidence that the participating co-defendant collusively feigned actual adversity during the trial to the prejudice of the non-participating co-defendant,[44] such agreements have been condemned when they distorted the adversary system and resulted in sham litigation.

In *Daniel v. Penrod Drilling Co.*,[45] a Jones Act employee of Penrod sued for injuries suffered aboard a crewboat en route to an

---

ment of costs and punishment by contempt available for contumaceous behavior or delaying tactics).

For discussion of the inherent power of courts to levy fines and other sanctions on counsel *see* Note, *Civil Procedure — Power of Federal Courts to Discipline Attorneys for Delay in Pre-Trial Procedure*, 38 NOTRE DAME LAW. 158 (1962); Comment, *Attorney's Negligent Failure to Comply with Procedural Deadlines and Court Calendar Orders — Sanctions*, 47 TEX. L. REV. 1198 (1969).

I have not attempted to catalog other strategems designed to hinder the opponent's preparation, or prolong the proceedings. *See, e.g.*, Kiefel v. Las Vegas Hacienda, Inc., 39 F.R.D. 592, 596 (N.D. Ill. 1966) (improper pressure brought to bear to prevent appearance of court reporter as a witness); Kenney v. Superior Court, 255 Cal. App. 2d 106. 63 Cal. Rptr. 84 (1967) ("cornering" medical experts by placing them on a community "medical committee"); Rousseau v. West Coast House Movers, 256 Cal. App. 2d 878, 64 Cal. Rptr. 655 (1967); Sweet v. Stutch, 240 Cal. App. 2d 891, 50 Cal. Rptr. 9 (1966) (excessive jury voir dire).

43. The agreement takes its name from Booth v. Mary Carter Paint Co., 202 So. 2d 8 (Fla. App. 1967). *Compare* ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1346 (1977):

> If an attorney has entered into an agreement of this nature, the concealment of it or the failure to reveal it could be misleading and deceptive to opposing counsel, the court and the jury. Accordingly, we think that in the interest of complying with the intent of the quoted Disciplinary Rules [DR1-102 (A)(4); DR 7-102 (A)(6), (7)]. A lawyer should reveal promptly to opposing counsel and to the court the existence of any agreements of this nature. This should be done in sufficient time for opposing counsel to be afforded an opportunity to take appropriate steps and employ proper procedures to safeguard the interests of his clients.

44. *See* Note, *Are Gallagher Covenants Unethical?: An Analysis Under the Code of Professional Responsibility*, 19 ARIZ. L. REV. 863 (1977).

45. 393 F. Supp. 1056 (E.D. La. 1975).