Case 1:19-cv-03837-VSB   Document 106-2   Filed 12/20/19   Page 1 of 62

offshore location where Penrod was performing services for Chevron. Chevron was responsible for furnishing transportation to the offshore job site, and contracted with Popich Brothers to provide the crewboat. Plaintiff sued Daniel, Popich, and Chevron. Penrod claimed indemnity from Popich and Chevron, and Chevron's defense was assumed by Popich. At noon recess on the first day of trial plaintiff secured an agreement from Penrod's counsel "not to maintain an agressive, destructive posture vis-a-vis plaintiff's case, its witnesses, etc." in return for a promise of Penrod's dismissal, with prejudice, at the close of the evidence. The agreement was concluded, but was not revealed to the court and Popich's lawyers until just before the case went to the jury. After the jury returned a verdict against Popich and Chevron, the trial judge granted a new trial observing that:

> Courts are not mere arenas where games of counsel's skill are played. Even in football we do not tolerate point shaving. It is perhaps because the trial is adversary that each side is expected to give its best, without secret equivocation.[46]

A similar condemnation of the "Mary Carter agreement" was made in *Lum v. Stinnett*,[47] an opinion which catalogs many of the strategems facilitated by such agreements. In that case plaintiff brought a medical malpractice action against three physicians: an emergency room physician, a family physician, and Dr. Lum, the physician who read plaintiff's X-rays. All were alleged to have failed to detect a compression fracture of plaintiff's spine. Prior to trial plaintiff procured a secret agreement from Dr. Lum's co-defendants settling the claims against them in return for their cooperation at trial. Pursuant to the agreement counsel for the participating co-defendants distorted the jury selection process and by reserving their opening statements, forced Dr. Lum's counsel to do the same or risk having no means of meeting the opening statements of counsel for Dr. Lum's co-defendants. In addition, plaintiff's counsel managed to call the participating "co-defendants" as if on cross-examination, allowing him to employ leading questions at will, and successfully oppose full cross-examination by Dr. Lum's counsel on the ground that his own interrogations were "cross-examination." Meanwhile, counsel for Dr. Lum's co-defendants sat placidly, conveying to the jury the

---

46. *Id.* at 1060.
47. 87 Nev. 402, 488 P.2d 347 (1971).

message that only Dr. Lum had cause for concern. This message was reinforced when the court granted the co-defendant's motions for dismissal, without opposition, at the close of the plaintiff's case. Distinguishing cases in which similar agreements had not resulted in any "diminuation in the vigor" of the co-defendant's presentation,[48] the court observed that the agreement before it:

> called for improper conduct on the part of all attorneys concerned; and while we recognize they become involved only out of devotion to their clients, the agreement nonetheless contravened policy expressed in the Rules of Professional Conduct . . . . Such irregularities so warped presentation of the case as to deny a fair trial.[49]

Given the apparent judicial approval of the "Mary Carter agreement" in several jurisdictions, and its ambiguous status in others, it must be assumed that the device will continue to flourish. Thus, the first line of defense of any prudent trial counsel will be formal discovery of secret settlement agreements so that their details may be brought to the attention of the trial judge before trial. One commentator recommends that the following tag interrogatory be submitted as a matter of routine:

> Has the plaintiff entered into any settlement or arrangement with any party to the suit or with any person potentially liable to the plaintiff, and if so, as to each such arrangement, state the particulars and identify by a sufficient description all documents pertaining to it.[50]

## III. Presenting the Case-In-Chief

## A. The Deliberate Injection of Inadmissible Evidence

In spite of the clear dictates of the Code of Professional Responsibility that counsel may not "state or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence,"[51] many lawyers

---

48. *Id.* at ___, 488 P.2d at 351, n.5.
49. *Id.* at ___, 488 P.2d at 352-53.
50. G. VETTER, SUCCESSFUL CIVIL LITIGATION: HOW TO WIN YOUR CASE BEFORE YOU ENTER THE COURTROOM 150 (1977).
51. *See also* ABA MODEL CODE OF PROFESSIONAL RESPONSIBILITY DR7-106(c)(1) (Final Draft 1981). *See also* MODEL RULES OF PROFESSIONAL CONDUCT, Rule 3.4(e) (Proposed Final Draft 1981):

> [A lawyer shall not] in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence . . . .

CODE OF TRIAL CONDUCT (American College of Trial Lawyers 1972) adds to these conventional proscriptions a more general proposition, ¶ 23(e) and (f), that:

> A lawyer should never attempt to place before the court, jury or

cannot resist the temptation to elicit objectionable and prejudicial evidence, and then move forward without a pause to preclude objection or a motion to strike.[52] In fact, there is an attitude prevalent in the trial bar that:

> [an] improper question should be asked unless it is of such prejudicial character that the refusal of the trial court to declare a mistrial would be reversible error. This practice is sometimes used for the very purpose of confronting adverse counsel with the difficult choice of waiving objection by failing to make it, or else make an objection that may lead the jury to conclude that he is attempting to withhold information from them.[53]

Unless trial judges deal sternly with such unfair tactics[54] the aggrieved party will have little recourse. Some examples of improper questioning on direct and cross-examination illustrate the nature of such gamesmanship.[55]

---

> public evidence which he knows is clearly inadmissible, nor should he make any remarks or statements which are intended improperly to influence the outcome of any case.
>
>     . . .
>
> A lawyer should not propose a stipulation in the jury's presence unless he knows or has reason to believe the opposing lawyer will accept it.

52. See KEETON, supra note 22, at 45.

53. Id. at 59. Compare Curtis v. Greenstein Trucking Co., 397 F.2d 483 (7th Cir. 1968) (trial court did not abuse its discretion in determining that plaintiff's asking of objectionable questions, thereby forcing defendants' counsel to make 60 objections, only 7 of which were overruled, did not have a prejudicial effect on the jury).

Of course, the Code does not prohibit counsel from asking questions merely because there is some doubt about admissibility, although the better practice is for counsel to seek a ruling on admissibility before trial, thereby insuring that expected testimony may properly be incorporated into the opening statement. Cf. County of Maricopa v. Maberry, 555 F.2d 207, 222 n.18 (9th Cir. 1977). There are many examples of similar misconduct in the presentation of opening statements. Compare United States v. Schindler, 614 F.2d 227 (9th Cir. 1980) (reference, in opening statement in mail fraud prosecution, to a witness' concern for her life, and question on direct examination, "Did you ever have a conversation with Mr. Schindler during which the subject of contracts to kill someone arose?"); Smith v. Covell, 100 Cal. App. 3d 947, 161 Cal. Rptr. 377 (1980) (reference in opening statement to purported diagnoses that plaintiff's pain was "in her mind, that she has an antagonism toward her husband and this is her way of punishing her husband," the statements being without factual support in the record). See also Note, The Scope of Permissible Comment In A Civil Action In Kentucky, 58 KY. L. J. 512, 520-25 (1970).

54. See text at note 22, supra.

55. Although the reading of part III suggests that discussion might be limited to the direct examination of witnesses, the same problems are encountered on cross-examination, and cases involving cross-examination are cited accordingly.

A classic example of the injection of inadmissible evidence occurred in *Fike v. Grant*,[56] in which a "general question" became the vehicle for a discussion of liability insurance. The daughter of a personal injury plaintiff testified that on the morning following the accident she went alone to defendant's place of business, and then was asked by plaintiff's counsel whether she talked about the accident:

> A. Would you like to know what I asked them?
> Q. You may tell all that was said.
> A. I went for the purpose of asking Mr. and Mrs. Fike —
> Q. Just a minute. Speak a little slower and talk to the jury.
> A. I went to the Fike's place of business to inquire about the insurance on their car and Mr. and Mrs. Fike —
> Q. Was that all you asked them?
> A. No.

Similar misconduct, clearly calculated, occurred in *County of Maricopa v. Maberry*.[57] During that trial an expert medical witness testified on behalf of the medical malpractice defendant that the decedent's death was the result of voluntary ingestion of a massive dose of amphetamines. At the close of cross-examination plaintiff's lawyer proceeded:

> Q. Doctor, at the time that your deposition was taken, I will ask you this, sir, isn't it a fact that at one point you interrupted and said: "Off the record. Come on, Ken —"
> [Counsel for defendant]: Your Honor, I object.
> Q. "Come on, Ken. You've got a damned good case and you know it." You said that, didn't you, Doctor?
> A. I don't recall.[58]

In another case, *Brown v. Royalty*,[59] counsel, through the following line of questioning, deliberately circumvented the trial judge's ruling that evidence concerning his client's failure to receive a traffic ticket was inadmissible. He also circumvented his

---

56. 39 Ariz. 549, 8 P.2d 242 (1932).
57. 555 F.2d 207 (9th Cir. 1977).
58. The statement referred to was not, in fact, in the deposition. Citing counsel for violation of DR 7-106(C) the Court observed at 555 F.2d 207, 217 that:

> The lawyer did not pause after the objection of his opposing counsel to permit a statement of grounds for his objection, or permit the judge to rule, before the witness answered. There could be little doubt in any experienced trial lawyer's mind hearing this question, in the manner and sequence in which it was propounded, why it was asked.

59. 535 F.2d 1024 (8th Cir. 1976).

stipulation that he would not raise the issue that plaintiff's medical bills had been paid by a collateral source.

> Q. Officer, let me have that [the accident report] again. I think that covers what I was unable to read. Then, with reference to that portion of the report on page two, that calls for arrests, you show none, is that correct?
> A. Yes sir.
> . . .
> Q. Mr. Brown, these bills were all paid immediately after they were incurred, weren't they?
> A. No.
> Q. Within a month, I am talking about these medical bills.
> A. They were paid when I would pay them.
> Q. Now, Mr. Brown, you didn't pay those bills, did you?[60]

## B. On Leading Questions

Closely related to the immediately preceding tactics is the practice of coaching witnesses while they are on the stand by means of leading questions.

Since the Code of Professional Responsibility does not explicitly condemn the practice of coaching a witness with leading questions[61] the problems of abuse of this tactic are ever present. Concerning this problem Judge Keeton notes:

---

60. For examples of similar misconduct, *see* Mangan v. Broderick and Bascom Rope Co., 351 F.2d 24 (7th Cir. 1965) (workmen's compensation); Smith v. Covell, 100 Cal. App. 3d 947, ___, 161 Cal. Rptr. 377, 385 (1980) (improper references to adverse party's wealth); Hawk v. Superior Court, 42 Cal. App. 3d 108, 116 Cal. Rptr. 713 (1974) (circumventing rule that prior arrests, or misdemeanor convictions, may not be used to impeach, by questions designed to bring before jury fact that witness was residing in jail; Cline v. Kirchwehm Bros. Cartage Co., 42 Ill. App. 2d 85, 191 N.E.2d 410 (1963); JEANS, *supra* note 6, at 29 (deliberate injection of question suggesting remarriage in a wrongful death case). *See also* State v. Haynes, 291 So. 2d 771 (La. 1974) (prosecutor not only deliberately attempted to question defense lawyer on what defendant had told him, and belittled counsel before the jury for asserting the attorney-client privilege, but also called defendant's wife to testify and requested that she claim the husband-wife privilege before the jury, all in violation of ABA STANDARD FOR THE PROSECUTION 5.7).

61. KEETON, *supra* note 22, at 49, suggests that the following provisions apply:
DR 7-106(C): In appearing in his professional capacity before a tribunal, a lawyer shall not:
. . .
(7) Intentionally or habitually violate any established rule of procedure or of evidence.
. . .
EC 7-25: . . . a lawyer should not by subterfuge put before a jury matters which it cannot properly consider.

The vice of the question is telling the witness what the lawyer wants him to say. Having received the message, the witness can then answer a non-leading question in the desired way, even though the leading question is stricken. Consequently you may sometimes be tempted to ask a leading question deliberately, realizing that an objection to it will be sustained.[62]

## Consider the following line of questioning from a reported case:

[During direct examination of a witness]

Q. Directing your attention back to July, 1966, did you buy some virgin metal, virgin nickel from anyone in July, 1966?

A. Yes, sir, I did.

Q. Did you buy approximately eleven hundred ninety-nine pounds of metal back at that time?

A. I did.

[Defense counsel]: I object to leading. He should know how much he bought.

The Court: I sustain the objection.

[Defense counsel]: I ask that the jury be instructed.

The Court: The jury is instructed they are not to consider the question for any purpose. I sustained the objection.

Q. Do you recall how much of this virgin nickel you bought back in July of 1966?

A. I bought eleven hundred ninety-nine pounds.

[Defense counsel]: I objected after the leading question was asked of him and he turned around and asked how much. As important as that is to this case, I object to that being brought into evidence. He put words in his mouth and then asked him again.

The Court: That's overruled.[63]

In this example, the court's cautionary instruction was completely ineffectual, and the jury, in effect, heard the "testimony" twice.

Experienced trial lawyers will use objections to leading questions cautiously, fearing that little will be gained by repeated objections and that such objections might cause resentment on the part of the jury.[64] All too often the result of this is that the proponent of testimony will be tempted to cross the line between occasional and unconscionable coaching. For example, in *Straub v.*

---

62. KEETON, *supra* note 22, at 49.

63. Lawrence v. Texas, 457 S.W.2d 561 (Tex. App. 1970) (the appellate court stated the conventional rule that a case will not be reversed in the absence of a showing that the trial judge abused his discretion in allowing leading questions).

64. *Compare* F. LANE, 2 GOLDSTEIN TRIAL TECHNIQUES § 13.01 (1969).

*Reading Co.*,[65] an FELA case tried in the Eastern District of Pennsylvania, the appellate court observed:

> Regarding leading questions, appellee [plaintiff below] asserts that this problem is within the control of the trial court . . . . But where that control is lost or at least palpably ignored and the conduct is a set pace running the length of the trial which produces a warped version of the issues as received by the jury, then that body never did have the opportunity to pass upon the whole case and judgment based on that kind of twisted trial must be set aside.
>
> . . .
>
> [In the case at bar] little seems to have been left to a spontaneous explanatory answer. At times the witnesses seemed relatively unnecessary except as sounding boards.[66]

## C. Dumb Shows, Improper Displays and Other Dirty Tricks

The most notorious "dirty tricks" on record consist of ingenious efforts to distract or mislead the jury by means of "dumb shows."[67] Arguably not all "dumb shows" are unethical, however many are. Fortunately, few attorneys would attempt the more outlandish exhibitions, but that is not to say that such tricks will not turn up in tomorrow's reporters.

---

65. 220 F.2d 177 (3d Cir. 1955).

66. *Id.* at 179, 182. *But see* Gardner v. Meyers, 491 F.2d 1184 (8th Cir. 1974) (leading questions used 81 times, but in the absence of objection at trial issue could not be heard on appeal).

67. The terminology is from VETTER, *supra* note 50, at 225. A few examples related by a variety of commentators should illustrate the nature of such "nonverbal persuaders."

> An artifice often attributed to Clarence Darrow . . . a nearly invisible wire is inserted into a cigar so that when the cigar is smoked everyone's attention will be focused on the ash, which magically does not fall . . . .

McElhaney, *supra* note 5.

> I came to court with more than a silver-tongued argument. I brought an exhibit . . . an L-shaped package wrapped in . . . butcher's paper . . . . I could see the jurors sizing up my client dressed in demure gingham, her one good leg in a black stocking, and then shifting their gaze to the L-shaped package and whispering to one another among themselves.

M. BELLI, MELVIN BELLI: MY LIFE ON TRIAL 107-08 (1976).

> In one trial in which the client was charged with negligence by a middle-aged businessman whose wife died in an auto wreck, he had his attractive blonde secretary come into the courtroom at the end of the trial and sit next to the widower. Following Mr. ____'s instruc-

tions, she asked the man an innocent question, smiled, patted his hand and quickly left. "Just one look at the cold expressions on the lady jurors' faces was enough to tell me that we were home free," Mr. ____ recalls with a smile.

J. O'CONNELL, THE LAWSUIT LOTTERY, *supra* note 3, at 32. The appropriate response to this ploy is provided by McElhaney, *supra* note 5:

Q. Who do you work for?
A. The defendant.
Q. Do you have any information about the crash that gave rise to this case?
A. No.
Q. You leaned over and spoke to [plaintiff] earlier today, didn't you?
A. Yes.
Q. Do you know [plaintiff] socially?
A. No.
Q. Have you ever seen [plaintiff] or talked to [plaintiff] before today?
A. No.
Q. Was [plaintiff] pointed out to you?
A. Yes.
Q. No further questions.

. . .

If the kid's a crawler, the best time to let him loose is during final argument. Imagine that little tyke crawling right up to you (make sure he comes to you and not the DA, or worse yet, the judge; a smear of Gerber's peaches around the cuff worked for me) while you're saying, "Don't strike down this good man, father to little Jimmy. Why, Jimmy!" Pick the child up and give him to Daddy. If the DA objects and gets them separated, so much the better. Moses himself couldn't part a father and son without earning disfavor in the eyes of the jury. Babies are truly miracles of life; they've saved many a father years of long-distance parenting. If your client's childless, rent a kid for trial.

Wilkes, *Life In the Fast Lane: The Adversary Ethics of an Ex-Lawyer,* 7 CRIMINAL DEFENSE, March-April 1980 at 11, 12.

. . . [H]e intended to call the decedent's mother as a witness in a wrongful death action. He suggested that she might need an interpreter since she had immigrated After World War II . . . . Someone on plaintiff's side suggested the daughter [and sister of the decedent].

. . . the bailiff placed a chair next to the witness box. The sister sat in it facing the jury and out of sight of the judge.

Counsel began his examination. The mother understood and answered perfectly. The examination continued perfectly. The daughter did not have to interpret a word. But as counsel began to ask the mother about the boy, the sister's lip began to quiver. She soon was stifling sobs.

VETTER, *supra* note 50, at 227.

When the models were not in use, they rested in direct view of the jury on the counsel table. It seemed like every time counsel for the Beechcraft interests looked over, the Beechcraft was positioned so that it was banking right, flying into the rear of the Cessna.

*Id.* at 228.

The most recent "dirty trick" of national notoriety occurred in *United States v. Thoreen*.[68] Attorney Thoreen represented Sibbett, a commercial fisherman who was tried for violating a preliminary injunction against salmon fishing. In the hope that the government agent who had cited his client might not be able to identify him, Thoreen placed a "ringer" next to him at counsel table in place of the client, without notifying the court or governmental counsel of the substitution. This deception was compounded by counsel's gesturing to the substitute as though he were the defendant, and allowing to go uncorrected the trial judge's references to him as the "defendant." After leading two government witnesses to misidentify the charlatan, the substitution was disclosed. Thoreen's tactic was a clear violation of the Code of Professional Responsibility,[69] and resulted in a finding of criminal contempt.

Another recent instance of gross misconduct was reported in *Richardson v. Employers Liability Assurance Corp., Ltd.*,[70] a suit for Employer's alleged failure to settle claims in good faith under the uninsured motorist provisions of an insurance policy. During the second day of trial, defense counsel moved for a mistrial on the ground that plaintiff's counsel had placed a photo-copy of a legal newspaper on counsel table, in full view of the jurors, which bore the headline:

> DIDN'T SETTLE IN POLICY LIMITS;
> OK MENTAL SUFFERING AWARD

Plaintiff's counsel's transparently lame explanation was that the newspaper article was reference material, although the case reported was three years old, and available in the official reports. By obtaining the cooperation of the trial judge, defense counsel were able to note the position of the "exhibit" and take photographs from several points in the courtroom to preserve the record for appeal. The appellate court opined:

---

68. 653 F.2d 1332 (9th Cir. 1981).

69. The Court cited, *inter alia*, ABA Committee on Professional Ethics, Informal Op. 914 (1966). *Compare* Shapiro v. United States, 69 F. Supp. 205 (Ct. Cl. 1947) (reporting the court-martial of a second lieutenant for a similar ploy during the defense of an American soldier of Mexican descent charged with rape). KBA v. Taylor, 482 S.W.2d 574 (Ky. 1974). *In re* Metzger, 31 Hawaii 929 (1931) (substituting bogus handwriting exhibit to facilitate cross-examination of expert witness).

70. 25 Cal. App. 3d 232, 102 Cal. Rptr. 547 (1972).

As heretofore stated, counsel for plaintiffs stated he had the article on the table for use in discussing jury instructions "and other leading points." This excuse is incredible. We cannot help but conclude that the article with prominent headlines was exposed for the purpose of influencing the jury. No one knows whether any jurors saw the headlines, and if so, what, if any effect they had on the jury in its deliberations. It would appear from the size of the verdicts that the headlines might have influenced the jury. Under such circumstances we hold that the trial court abused its discretion in not granting defendant's motion for mistrial.[71]

## D. Some Objections to Objections

Not all trial judges take care to preclude counsel from making argumentative comments in the course of making objections.[72] As a result "objections for jury purposes" are not uncommon in American courtrooms.[73] Such "speaking objections" should be viewed as a violation of EC 7-25 of the Code of Professional Responsibility, that "a lawyer should not by subterfuge put before a jury matters which it cannot properly consider."[74] However it is often difficult to distinguish a legitimate objection accompanied by an explanation of grounds from a frivolous objection used solely for argument.

An example may serve to illustrate the side of the line to which counsel may not venture. Plaintiff claimed that he injured his back in a fall. During cross-examination he admitted that he had had back trouble for ten years, and had taken treatments for it. The cross-examination sought to explore this avenue further where upon plaintiff's counsel interrupted:

> Just a minute. Let us get these things straight. If you are talking about things other than the back that is another story. I object to your suggestion that a cold or bronchitis would have anything to do

---

71. *Id.* at ___, 102 Cal. Rptr. at 555, *Compare* Kiefel v. Las Vegas Hacienda, Inc., 404 F.2d 1163, 1169 (7th Cir. 1968) (attempt to slip exhibit into jury room which had been denied admission more than once).

72. KEETON, *supra* note 22, at 196.

73. *Compare* M. BELLI, MODERN TRIALS 616 (Student ed. 1963):
An exception to the rule of objecting only when counsel is prepared to sustain the objection is "objection for jury purposes." Every trial lawyer is familiar with this procedure. It is not unethical if its purpose is further to emphasize, for example, the limited purpose of the introduction of certain testimony.

74. McElhaney, *Making and Meeting Objections*, 2 LITIGATION 43 (1975).

with this. I have the record from which I would like to read; it is the official company record, the medical record in this case, and I think I picked out in my direct examination each and every time when there was anything that could possibly be associated with this back,—if Your Honor will look at this.

## When cross-examination could continue, plaintiff was asked,

Q. How many times did you see Dr. B____ for back trouble?
A. Once.
Q. Just one time?
A. That was caused by my bronchial condition.
Q. Over a period of ten years —.

## At this point plaintiff's counsel injected,

That was on account of a bronchial condition the witness said.

## Later, one of the plaintiff's medical experts was being cross-examined regarding plaintiff's history of back pain. The following colloquy occurred in the presence of the jury:

Q. Mr. S____ has testified that he had pain with his back for 10 years before his accident, doctor.
[Plaintiff's counsel]: That is not accurate at all, Your Honor, and I absolutely object to Mr. M____ insinuating that sort of thing into this record because that is not so.
The Court: He said that his back was his weak spot and that he had trouble with that, but nothing in the way of an accident had been testified to.
[Plaintiff's counsel]: And moreover he said he had two periods in which for short periods of time he had some pain in his back and I have these records right in front of me, now, Mr. M____, you are not going to put things into this record that aren't in it, and I am going to stop you.
Let us go right to the record and see. In 1942, Your Honor — I have all these records right here — in 1942 we have an acute cervical sprain which lasted 4 1/2 days. Now, there is nothing more on the back until in 1944, several cervical fractured ribs when he was helping a friend down the steps, and that was a question of six days. Now, we have nothing until we get to 1947 when we have the man with an acute bronchial pneumonia which threw his back out — that is 1947, Your Honor.
Now, there is nothing whatsoever between 1947 and 1949, the date of this accident, which is over two years.
. . .
[Defense counsel]: If Your Honor please, I want to point out, in view of [Plaintiff's counsel's] remarks I want to remind the Court and also [Plaintiff's counsel] that on the cross examination of Mr. S____ I said to him: "G____, haven't you had sacroiliac trouble for the past ten years and received treatment during that time," and after a while he said yes. Now, that is what I had in mind.

[Plaintiff's counsel]: And all that Mr. S____ meant is that 10 years ago was the first time that he had anything with his back. But here are the actual records, and there is no use in trying to insinuate into this case that here is a man who had trouble within a 10 year period, and that is not so.

[Defense counsel]: I move for the withdrawal of a juror.

The Court: I think we got that all pretty clearly.

[Defense counsel]: I move for the withdrawal of a juror, if Your Honor please, that [Plaintiff's counsel] is making statements of fact to the jury that are not in the record.

[Plaintiff's counsel]: Are you through with this man?

[Defense counsel]: No. I assume that motion is overruled Your Honor?

The Court: Do you want to put a question?

A second of plaintiff's medical witnesses was also cross-examined to determine if the doctor had been given a history of plaintiff's prior complaints regarding his back:

Q. Did Mr. S____ tell you whether he had any trouble with his back before this accident?

A. Yes, I heard a report he had one in 1947 —

[Plaintiff's attorney interrupting]: In 1942 there was something about bronchial pneumonia and some subluxation of the sacroiliac which was corrected.

In reversing a jury verdict for the plaintiff the appellate court opined:

Where the above type of trial tactics is continued for the duration of a trial as here it is difficult to keep the opinion from being to some extent a catalogue of illustrative incidents. Therefore pausing for brief comment on the above related series, we note that the defense attorney was unfairly hampered in his cross-examination by [Plaintiff's attorney]. The latter improperly averted the attention of the jury from the prior back condition to the bronchitis; he deliberately and improperly made statements concerning what he called "the medical record in this case" which was not yet in evidence. In all of this despite the objections of counsel, the trial court neither admonished him nor endeavored to advise and guide the jury as to the significance of these occurrences. The net of it was that the conduct not only remained unchecked but as far as the jury could be expected to understand was in effect approved by the court.[75]

Another purpose of "speech-making" is directed not to the jury, but to the witness, "giving the witness time to think, calling his

---

75. Straub v. Reading Co., 220 F.2d 177, 179 (3d Cir. 1955).

attention indirectly to a trap into which he may be falling, or indirectly suggesting a good answer.''[76]

Professor Jeans suggests that the best antidote for this abusive objection is a counter-punch: "I object to counsel instructing the witness as to the desired answer.''[77]

Finally, almost every trial attorney has encountered an adversary who appears to be objecting solely to disrupt the flow of testimony,[78] or "change the momentum.''[79] All too often such objections are simply injected for purposes of harassment.[80]

## IV. Cross-Examination

Pity the witness:

> Of all unfortunate people in this world, none are more entitled to sympathy and commiseration than those whom circumstances oblige to

---

76. *Keeton, supra* note 22, at 174-75. For example, from A. NORRILL, TRIAL DIPLOMACY 58 (2d ed. 1972):
> Q. Have you ever talked to anybody about this case?
> A. No.
> Q. Have you ever talked to a lawyer about the facts of this case?
> A. No.
> Objection: I'm going to object to this line of cross-examination because the questions are tricky and not clear to the witness. It's perfectly obvious that the witness has talked to me in my office and has talked to his relatives and friends about the case, but only in relation to what he actually witnessed.

Another example from JEANS, *supra* note 6, at 360:
> Q. How many times was the plaintiff absent from work during this period of alleged disability?
> Lawyer: I object Your Honor, this witness has no specific memory as to this and besides the work records would be the best evidence.
> Court: Overruled.
> A. I really have no specific memory as to this.

77. JEANS, *supra* note 6, at 174.
78. Ordover, *supra* note 2, at 314.
79. *Cf.* JEANS, *supra* note 6, at 358-59.
80. Kiefel v. Las Vegas Hacienda, Inc., 404 F.2d 1163, 1165 (7th Cir. 1968). In the lower court's opinion granting a new trial and assessing costs on the offending attorney, the trial judge noted at 39 F.R.D. 592, 596:
> Counsel for defendant is a lawyer who has had long and extensive trial experience. These years in the court should have taught him compassion and a sense of fair play. Instead he seeks to use his experience to assert and apply every sly trick and strategem to win his case. He does this with the hope that he can stay within the bounds of professional ethics. In this instance he has far overstepped the bounds.

appear upon the witness stand in court. You are called to the stand and place your hand upon a copy of the Scriptures in sheepskin binding, with a cross on the one side and none on the other, to accommodate either variety of the Christian faith. You are then arraigned before two legal gentlemen, one of whom smiles at you blandly because you are on his side, the other eying you savagely for the opposite reason. The gentleman who smiles, proceeds to pump you of all you know; and having squeezed all he wants out of you, hands you over to the other, who proceeds to show you that you are entirely mistaken in all your supposition; that you never saw anything you have sworn to; that you never saw the defendant in your life; in short, that you have committed direct perjury. He wants to know if you have ever been in state prison, and takes your denial with the air of a man who thinks you ought to have been there, asking all the questions over again in different ways; and tells you with an awe inspiring severity, to be very careful what you say. He wants to know if he understood you to say so and so, and also wants to know whether you meant something else. Having bullied and scared you out of your wits, and convicted you in the eyes of the jury of prevarication, he lets you go. By and by everybody you have fallen out with is put on the stand to swear that you are the biggest scoundrel they ever knew, and not to be believed under oath. Then the opposing counsel, in summing up, paints your moral photograph to the jury as a character fit to be handed down to time as the typification of infamy — as a man who has conspired against innocence and virtue, and stands convicted of the attempt. The judge in his charge tells the jury if they believe your testimony, etc., indicating that there is even a judicial doubt of your veracity; and you go home to your wife and family, neighbors and acquaintances, a suspected man — all because of your accidental presence on an unfortunate occasion![81]

---

81. F. WELLMAN, THE ART OF CROSS-EXAMINATION 194-95 (1936). *Compare* Commonwealth v. Rooney, 365 Mass. 484, ____, 313 N.E.2d 105, 112-13 (1974): [The judicial function] will not long succeed if a witness innocent of everything except his coincidental presence at a time and place where something relative to a crime occurred is to be subjected to a bruising, grueling and abrasive cross-examination in which questions are loaded with unsupported insinuations of improper motives, negligence, incompetence, perjury or, worse, suspicion of guilt of the crime for which the defendant is on trial. The doctor who sutured the defendant's knife wounds at the hospital emergency room was cross-examined as though he were a defendant in a malpractice case. The cross-examination of some of the Common-wealth's witnesses at the trial of this case violated their right to fair and reasonable treatment, and evidenced an unwarranted assumption that only the defendant had rights to be protected. The proper discharge of counsel's duty to

While attending law school, the would-be trial attorney is drilled on the cliche that "cross-examination is the most powerful instrument known to the law in eliciting truth,"[82] when he should also be forewarned that:

> [I]t is too often the case that [witnesses] are set up as marks to be shot at." But it certainly is the duty of the law and of the judges to see that due regard is paid to [the rights of the witness] and that the witness box does not unnecessarily become, in the words of an old Southern judge, "the slaughterhouse of reputations . . . ."[83]

The following provisions of the Code of Professional Responsibility are frequently ignored during the cross-examination of witnesses, as is illustrated in many judicial opinions:

> DR 7-106 Trial Conduct . . . .
> (C) In appearing in his professional capacity before a tribunal, a lawyer shall not:
> (1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence.
> (2) Ask any question that he has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person.
> (3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.
> (4) Assert his personal opinion . . . as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; . . . .
> . . .
> (6) Engage in undignified or discourteous conduct which is degrading to a tribunal.

## A. Outright Harassment

In each of the following examples counsel's cross-examination served no legitimate purpose, and was intended to humiliate or degrade the witness.

---

> his client does not require such an assumption. Equally important, the integrity and continued efficacy of the judicial process cannot permit it. The judge presiding over the trial of a case has the power to keep the examination of witnesses within the limits of common decency and fairness, and he has the duty to exercise that power promptly and firmly when it becomes necessary to do so.

82. 5 WIGMORE ON EVIDENCE § 1362 n.1 (Chadbourn rev. 1970).

83. 3A WIGMORE ON EVIDENCE § 983 (Chadbourn rev. 1970), as cited in State v. Crawford, 202 N.W.2d 99, 103 (Iowa 1972).

Counsel for plaintiff approached the defendant, and after addressing him by name gratuitously added:

> Q. The last time I saw you, you had a plastic bag on your head—[84]

In another case, counsel, having been admonished not to interject his personal comments into the examination of witnesses, approached a prosecution witness who had manifested some inability to determine directions on an exhibit at trial:

> Q. Have you ever done any flying?
> A. No.
> Q. I recommend that you don't.[85]

And finally, a frustrated prosecutor, upon encountering difficulty in eliciting details of a transaction from a somewhat unwilling witness, asked:

> Q. Who told you to have a faulty memory?[86]

## B. Cross-Examination By Innuendo

One of the most common abuses of cross-examination takes the form of a question implying a serious charge against the witness, for which counsel has little or no proof. All too often, trial attorneys ask such questions for the sole purpose of "waft[ing] an unwarranted innuendo into the jury box."[87] On the ethics of such questioning, Judge Keeton observes:

---

84. International Ass'n of Bridge, Structural & Ornamental Iron workers, Local 387 v. Moore, 149 Ga. App. 431, 254 S.E.2d 438, (1979) (the court offered counsel a mistrial).

85. Hawk v. Superior Court, 42 Cal. App. 3d 108, ___, 116 Cal. Rptr. 713, 724 (1974) (counsel held in contempt).

86. Aiuppa v. United States, 393 F.2d 597, 601 (10th Cir. 1968) (holding trial court's striking the testimony or comment and admonishing the jury to disregard it was sufficient cure).

87. Michelson v. United States, 335 U.S. 469, 481, 69 S. Ct. 213, 221, 93 L. Ed. 168, 176, (1948). *Compare* Haynes v. State, ___, Ind. App. ___, ___, 411 N.E.2d 659, 665 (1980):

> Improper matters cannot be introduced into the awareness of the trier of fact by formulating a question that is pregnant with an unsubstantiated assertion of fact [citing DR 7-106(C)(2)]
> ... An attorney should not contrive a cross-examination based on fictitious assumptions when to do so would only confuse the fact finder and impede the search for truth.

*Accord* Love v. Wolf, 226 Cal. App. 2d 378, ___, 38 Cal. Rptr. 183, 188 (1964) (accusatory questioning such as "Your job is to make thirty dollars profit on every one hundred pills, isn't it" and "did you know that . . ." questioning); People *ex*

> The code is surely violated . . . by implication of charges known to be
> false, and perhaps it condemns as well those based on mere suspicion
> [citing DR 7-106(C)(1), (2) and (7)].[88]

The trial judge has considerable discretion to limit cross-examination which is not directed to the real issues of the case, and which suggests misconduct on the part of the witness.[89] Moreover, the trial judge may caution counsel or demand a showing of "good faith" as a prerequisite to such cross-examination.[90] Authority may even be found sustaining the right of the opposing party to call the cross-examiner to the stand and inquire into the "good faith basis" for a line of questions.[91]

Unfortunately, the improper examination is not always spotted for what it is, admonitions are not given by the Court, or admonitions are not heeded. The only remedy left for the aggrieved party is a new trial. Some illustrations are in order.

In *Marsh v. State*,[92] defendant was charged with first degree murder in the shooting of his father-in-law and was found guilty

---

*rel.* Dept. of Pub. Works v. Lillard, 219 Cal. App. 2d 368, ___, 33 Cal. Rptr. 189, 196 (1963), wherein the court opined:

> These "did you know that" questions designed not to obtain information or test adverse testimony but to afford cross-examining counsel a device by which his own unsworn statements can reach the ears of the jury and be accepted by them as proof have been repeatedly condemned.

88. Keeton, *supra* note 22, at 100 n.2. *See also* Boulton, *supra* note 22, at 78-79:

> In a cross-examination which goes to a matter in issue, it is not improper for counsel to put questions suggesting fraud, misconduct or the commission of any criminal offense (even though he is not able or does not intend to exercise the right of calling affirmative evidence to support or justify the imputation they convey), if he is satisfied that the matters suggested are part of his client's case and has no reason to believe that they are only put forward for the purpose of impugning the witness's character.
>
> Under the rules of evidence, affirmative evidence cannot in general be called to contradict answers given to questions asked in cross-examination directed only to credit.
>
> Questions which affect the credibility of a witness by attacking his character, but are not otherwise relevant to the actual enquiry, ought not to be asked unless the cross-examiner has reasonable grounds for thinking that the imputation conveyed by the question is well-founded or true.

*Compare* Model Rule 4.4.

89. *See, e.g.*, State v. Crawford, 202 N.W.2d 99 (Iowa 1972) (collecting cases).

90. *Cf.* United States v. Greer, 643 F.2d 280 (5th Cir. 1981).

91. United States v. Pugliese, 153 F.2d 497, 499 (2d Cir. 1945). *Cf.* United States v. Cardarella, 570 F.2d 264, 268 (8th Cir. 1978).

92. ___, Ind. App. ___, 387 N.E.2d 1346 (1979).

by reason of insanity. During the cross-examination of the defendant, the prosecutor asked:

> Q. Mr. M____, isn't it a fact that the only time you have sought psychiatric counseling or have used insanity as a defense are the two times criminal charges were brought against you, once in December of 1975 and another time in February of 1972, isn't that a fact, sir?

After a bench conference the prosecutor withdrew the question, but the trial judge refused to admonish the jury that no such prior pleas had been interposed. In fact, the 1975 charge was not a criminal charge, but a civil commitment proceeding instituted by defendant's wife, and the 1972 charge had been dismissed. In reversing defendant's conviction, the appellate court observed:

> Where counsel elects to attack the credibility of a witness on cross-examination through questions designed to impeach on collateral matters, he impliedly represents to the court that he is prepared to dispute a denial. In order to ask such questions, the attorney must have a reasonable basis for believing that the answer will be relevant, that is, impeaching. Without information upon which to form a reasonable belief that the witness's response will be impeaching, a reasonable basis for asking a question which is intended to degrade the witness does not exist. Indeed, if the attorney has no reasonable basis to believe the question is relevant to the case and the question degrades the witness, asking it violates Disciplinary Rule DR 7-106(C)(2) of the Code of Professional Responsibility. See also: Ethical Consideration, EC 7-25.[93]

*Kiefel v. Las Vegas Hacienda, Inc.*[94] not only provides an illustration of improper cross-examination, but also suggests a meaningful remedy for such abuses. Plaintiff had brought suit against a motel chain to recover damages from an assault inflicted by an intruder who gained entry to her room. During his cross-examinations of plaintiff and her husband defense counsel propounded questions insinuating that plaintiff and her husband had had an altercation the previous evening, that her husband had made numerous calls to plaintiff's room prior to the assault, and that she recognized the intruder as her husband. When such ques-

---

93. *Id.* at ____, 387 N.E. 2d at 1348. *Compare* United States v. Haskell, 327 F.2d 281 (2d Cir. 1964) (cross-examination based on erroneous FBI "rep sheet" not reversible error where prosecutor and trial judge moved promptly to correct erroneous impression that jury might have acquired). *See also* Dukes v. State, 356 S.2d 873, 875 (Fla. App. 1978); Bagnell v. State, ____, Ind. App. ____, ____, 413 N.E.2d 1072, 1076-78 (1980).

94. 39 F.R.D. 592 (N.D. Ill. 1966), *aff'd*, 404 F.2d 1163 (7th Cir. 1968).

tions elicited denials, counsel intended that impeachment would follow, when in fact no impeachment would follow. The trial judge found that such tactics, coupled with a variety of other abuses, not only justified a new trial, but also an assessment of costs and attorney fees against the defendant and defense counsel, jointly and severally, in the amount of $8,171.56.[95]

## C. The Attorney As A Witness

Closely related to the immediately preceding topic is the problem of impeaching a witness by way of a prior oral inconsistent statement allegedly made to the cross-examining attorney. The Code of Professional Responsibility contains several provisions which might prohibit such impeachment. Under DR 5-102(A) counsel must withdraw if he or she will be a witness. In addition, DR 7-106(C)(3) precludes counsel from "asserting his personal knowledge of the facts in issue, except when testifying as a witness." Nonetheless, cross-examiners frequently put questions to the witness in the form of "didn't you tell me" thereby pitting the credibility of the witness against that of the examining counsel. This technique is particularly prejudicial in criminal cases. For purposes of illustration, consider the following line of questioning:

> Q. Now, it is true, isnt' it, Mr. [Defendant], that you have sold some records through your shop that were boosted or stolen or that you had reason to believe were boosted or stolen?

---

95. The award was made pursuant to 28 U.S.C. §§ 1920, 1021, 1023 and 1927. Section 1927 was amended in 1980 to provide:

> § 1927. Counsel's liability for excessive costs.
> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to *satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.* (emphasis added)

Compare the same counsel's conduct in Neusus v. Sponholtz, 369 F.2d 259, 260 n.2 (7th Cir. 1966) and O'Shea v. Jewel Tea Co., Inc., 233 F.2d 530, 533 (7th Cir. 1956). *See also* Smith v. Covell, 100 Cal. App. 3d 947, ___, 161 Cal. Rptr. 377, 383-84 (1980):

> In cross-examination, [defense counsel] asked [plaintiff] whether Dr. Sternback or some other doctor had "told her" or "said" that her injury was a method "of getting attention" or "demonstrating dependence" or "hostility," thus suggesting some qualified doctor had formed an opinion that Mrs. Smith's problems were purely psychological. Objections to such questions were overruled. No evidence was later offered to support these insinuations.

A. I don't think I have, sir.
Q. Did we have conversation during a hearing here on 6 April of 1977 concerning whether or not you were dealing in boosted items?
A. I don't remember that.
Q. Do you recall telling me that you did sell boosted items but it wasn't in the quantities I thought?
A. I don't remember that either, sir.[96]

## D. "It's For Impeachment"

The efforts of counsel to present evidence "through the back door" when its admission as substantive evidence is prohibited by an exclusionary rule are often as outrageous as they are ingenious. For example, in *Cote v. Rogers*,[97] defense counsel wished to get before the jury an article concerning an automobile accident that was the subject of the litigation. After attempting unsuccessfully to introduce the article through a highway patrolman, either as part of the patrolman's "expert testimony" or as a "public or semi-public document," counsel arranged for its appearance in the local newspaper on the second day of trial, and its broadcast on a radio station that evening. He attempted to justify his conduct by insisting that his part-time job as City Attorney was:

> . . . often dependent upon a good relationship with the only newspaper in the community. The more items of newsworthy interest

---

96. United States v. Cardarella, 570 F.2d 264, 267 (8th Cir. 1978). *See also* United States v. Puco, 436 F.2d 761, 762 (2d Cir. 1971) (involving a series of questions, each beginning "Did you tell me . . ." or "Do you recall me asking you . . ."). In Jackson v. United States, 297 F.2d 195, 198 (D.C. Cir. 1961) Judge, now Chief Justice, Burger, opined:

> In the trial of this case trial counsel asked the detective if he recalled a telephone conversation in which the officer told defense counsel that he did not see the defendant with anything in his hand; that he hadn't seen him drop anything in his hand; and that what he said he saw was the defendant making some sort of motion which he interpreted to be a pitching motion, and that he didn't see him drop anything. The officer categorically denied such a conversation.
>
> No effort was then made by defense counsel to follow this line of questioning with proof of the alleged 'facts' or of the assumptions implicit in the questions. To be sure, it might have been awkward for the lawyer to take the stand and testify, but if he was not prepared to do this, even if it meant withdrawing from the case he should not have asked the questions. Counsel asking such questions with no intention of following them up if the answers were negative, would be subject to severe censure.

97. 201 Cal. App. 2d 138, 19 Cal. Rptr. 767 (1962).

that a person in such a position can furnish to the press the better the
relationship. Presumptively juries do not read, nor are they influenc-
ed by articles in newspapers.[98]

A more common and sophisticated technique is to introduce
otherwise inadmissible evidence for a more limited, but proper
purpose. Frequently, such efforts are completely disingenuous.
Returning to a previous case[99] in which the defense hoped to sug-
gest that the plaintiff's symptoms were manufactured, the follow-
ing questions were propounded:

> Q. Did he [a psychiatrist] tell you in a sense that the pain that you
> were having was a method of obtaining dependency?
> A. Repeat that. I don't understand it.
> Q. Did he tell you that the pain you were experiencing was a
> method by which you would get attention, a method by which
> you could be dependent on other people?
> A. No. I don't remember that.
> Q. Did he tell you that your pain represented a method by which
> you could express hostility?
> A. No.

Defense counsel overcame the plaintiff's objections to this line
of inquiry by arguing that the questions were proper for impeach-
ment purposes. The appellate court reversed. After noting that
the questions called for "patent hearsay evidence" for which no
exception was cited, the court observed:

> Unless such opinions were true and in fact stated to Mrs. Smith by
> Dr. Sternbach, they would have no bearing upon her credibility for
> impeachment purposes. *No such foundation was tendered. The
> barefaced claim that question was for impeachment does not circum-
> vent the bar of hearsay rule.* The claimed out-of-court declarations do
> not come within any cited exception to the hearsay rule. California
> courts have repeatedly held attempts to suggest matters of an eviden-
> tiary nature to a jury other than by the legitimate introduction into
> evidence is misconduct whether by questions, argument or other
> names. (emphasis added)

A particularly skillful job of "laying the foundation" for the in-
troduction of evidence of a subsequent remedial measure "for im-
peachment purposes" was the subject of an opinion in *Daggett v.
Atchison, Topeka and Santa Fe Ry. Co.*[100] In that case the plaintiff

---

98. *Id.* at _____, 19 Cal. Rptr. at 770. Needless to say, plaintiff's motion for a new
trial was granted.

99. Smith v. Covell, 100 Cal. App. 3d at _____, 161 Cal. Rptr. 377 at 384.

100. 48 Cal. 2d 655, 313 P.2d 557 (1957). A particularly critical discussion of the
cross-examination in this case is presented in O'CONNELL, *supra* note 4, at
177-182.

widower sought to recover for the wrongful death of his wife and children which resulted from a collision between their car and defendant's train at a crossing. At the time of the accident the general railroad speed limit was ninety miles per hour. After the accident, the railroad reduced the speed limit to fifty miles per hour. Although this subsequent remedial measure could not have been admitted as proof of the railroad's negligence, the changed speed limit was admitted to impeach the engineer on the theory that he had testified that the speed limit at the crossing in question was still ninety miles per hour. Over a vigorous dissent by Justice Schauer, the Supreme Court of California ruled that the reduction of the speed limit was properly brought to the attention of the jury for impeachment purposes.[101]

It is interesting to observe that the attorneys for the defendant railroad, which claimed to have been aggrieved by this "sly trick,"[102] failed to request a limiting instruction (admittedly, an in-

---

101. Justice Schaver made the following analysis of Melvin Belli's cross-examination:

> ... the record affirmatively shows that at no time did the witness, Benton, testify that the limitation for the crossing remained at 90 miles an hour at the time of trial ... Morever, any confusion as to speeds, times, and districts or areas appears from the record to have been invited and brought about by counsel for plaintiffs, who then seized upon such alleged confusion as an excuse to get before the jury otherwise inadmissible evidence of a change in the speed limitation after the accident ... it is apparent that counsel for plaintiffs, by swinging back and forth between past tense and present tense, and by discussing speed restrictions without specific indication of whether he referred to restrictions within entire railroad districts or to restrictions at a smaller area within a district (such as at the Plaza Street crossing here involved), succeeded in confusing not only Benton, the witness, but also the court itself. Counsel then seized upon the confusion which he himself had engendered, to not only bring before the jury the fact that the restriction at the Plaza Street crossing had been changed to 50 miles, but to emphasize that the change had taken place subsequent to the accident. The admission of such improper evidence could not, and did not, tend to impeach the witness, who at no time had testified that the Plaza Street intersection speed had remained at 90 miles an hour up to the time of trial; on the contrary, the witness had clearly stated that the overall restriction in the fourth district (i.e., from Fullerton to San Diego) remained at 90 miles, but he had also several times referred to "curve restrictions and other forms of restrictions" within districts — references which were plainly understood by plaintiff's counsel, who himself likewise referred to such lesser restrictions. Inasmuch as the issue of negligence on the part of defendants was close, it appears that the error of admitting such evidence of changed conditions was prejudicial.

102. The characterization is O'Connell's, *supra* note 4, at 177.

effectual instruction) directing the jury to consider the evidence of a reduction in the speed limit only as an aid to assessing the credibility of the engineer. Accordingly, they could not claim on appeal that the evidence was improperly used as proof of negligence.[103]

The propriety of such a cross-examination is subject to argument. Indeed it has been argued that since EC 7-25 declares that a lawyer should not by subterfuge put before a jury matters which it cannot properly consider, it might be unethical for a lawyer to offer limited purpose evidence he knows the jury will consider more generally in spite of the instruction of the court.[104]

## V. Summation

In an earlier day, charges of misconduct during closing argument were likely to receive short shrift. As one judge opined:

> No lawyer has the right to misrepresent or misstate the testimony. On the other hand, he is not required to forego all the embellishments of oratory, or to leave uncultivated the fertile field of fancy. It is his time-honored privilege to —
>> "Drown the stage in tears,
>> Make mad the guilty and appall the free
>> Confound the ignorant, and amaze indeed
>> The very faculties of eyes and ears."
>
> . . .
>
> The sorrowing "grey-haired parents," upon the one hand, and the broken-hearted "victim of man's duplicity," upon the other, have adorned the climax and peroration of legal oratory from a time "whence the memory of man runneth not to the contrary," and for use at this late day to brand their use as misconduct would expose us to just unsure [sic] for interference with ancient landmarks.[105]

---

103. 48 Cal. 2d at ____, 313 P.2d at 564.

104. KEETON, *supra* note 22, at 48 n.6. Under the cited provision, it would certainly be unethical for counsel to argue as substantive evidence that which the court admitted subject to a limiting instruction. *See, e.g.,* Croley v. Huddleston, 301 Ky. 580, 192 S.W. 2d 717 (1946), and text at note 112, infra.

There are, of course, other tricks in the "black bag" of cross-examination, which need not be covered in detail. On cross-examination based upon exhibits not in evidence *see* Kiefel v. Las Vegas Hacienda, Inc., 404 F.2d 1163 (7th Cir. 1968); Mangan v. Broderick and Bascom Rope co., 351 F.2d 24 (7th Cir. 1965); Love v. Wolf, 226 Cal. App. 2d 378, ____, 38 Cal. Rptr. 183, 189-90 (1964). On questions directing a witness to characterize the testimony of others as true or false, *see* Ryan v. Monson, 33 Ill. App. 2d 406, 179 N.E.2d 449 (1961).

105. State v. Burns, 119 Iowa 663, ____, 94 N.W. 238, 241 (1903); *See also* Ferguson v. Moore, 98 Tenn. 343, ____, 39 S.W. 341, 343 (1897):

> Tears have always been considered legitimate arguments before a jury, and, while the question has never arisen out of any such

Notwithstanding counsel's traditional right to a certain rhetorical license in "summing-up," today's trial attorney must take care to observe his ethical obligations to the tribunal, to the opposing party, counsel, and witnesses, and to his own client.[106]

My purpose is not to restate the law of summation generally,[107] but only to present examples of violations of the disciplinary rules: the injection of irrelevant and inflammatory matter,[108] argument on the basis of facts not in the record,[109] the assertion of personal opinion or belief,[110] and the vituperation of opposing counsel and witnesses.[111]

## A. Greasy Kid Stuff

Any attorney who has undertaken the defense of a large corporation or an insurance company has suffered it—the tactic that

---

behavior in this court, we know of no rule or jurisdiction in the court below to check them. It would appear to be one of the natural rights of counsel which no court or constitution could take away. It is certainly, if no more, a matter of the highest personal privilege. Indeed, if counsel has them at command, *it may be seriously questioned whether it is not his professional duty to shed them whenever proper occasion arises,* and the trial judge would not feel constrained to interfere unless they were indulged in to such excess as to impede or delay the business of the court. (emphasis added)

*But see* Barzclis v. Kulikowski, 418 F.2d 869, 870 n.1 (5th Cir. 1969) (in the course of ruling that counsel's "poetry" was sour, the court stated: "We have a low opinion of the planting of this kind of corn in a federal courtroom.")

106. *Compare* Daily v. Pere Marquette R.R., 197 Mich. 340, 163 N.W. 883 (1917):

We cannot understand how counsel will be so unjust to clients as to make arguments which counsel must know are improper, and, if they are at all familiar with the decisions of this court, also know will result in the reversal of the judgment.

107. For a more general treatment of the subject *see* Kornblum, *The Voire Dire, Opening Statement, and Closing Argument,* 23 PRAC. LAW 11 (1977); Levin and Levy, *Persuading the Jury with Facts not in Evidence: The Fiction Science Spectrum,* 105 U. PA. L. REV. 139 (1956); Comment, *Improper Argument of Counsel,* 19 ALA. L. REV. 75 (1977); Note, *Final Argument In Iowa,* 15 DRAKE L. REV. 115 (1965); Note, *The Scope of Permissible Comment In A Civil Action In Kentucky,* 58 KY. L. J. 512 (1970);

108. DR 7-106(C)(1), Model rule 3.4(e). *See also* ABA STANDARDS RELATING TO THE ADMINISTRATION OF CRIMINAL JUSTICE, PROSECUTION FUNCTION 5.8(c) and DEFENSE FUNCTION 7.8(c) (Tent. Draft 1979) [Hereinafter cited as ABA STANDARDS ___].

109. DR 7-106(c)(1), Model Rule 3.4(e). *See also* ABA STANDARDS: PROSECUTION FUNCTION 5.9 and DEFENSE FUNCTION 7.9.

110. DR 7-106(C)(4); Model Rules 3.4(e). *See also* ABA STANDARDS: PROSECUTION FUNCTION 5.8(b) and DEFENSE FUNCTION 7.8(b).

111. DR 7-106(C)(6), Model Rule 3.4(e).

is somewhat charitably referred to as "dehumanizing the defendant." For example, in spite of the well established and salutary rule that the relative wealth or poverty of a party is ordinarily inadmissible, and that arguments regarding the wealth of the defendant are improper (unless about a legitimate claim for punitive or exemplary damages), deliberate incitement of bias along such lines continues to generate a surprising number of reported appellate opinions. Consider the following examples.

In *Love v. Wolf*,[112] plaintiff brought an action against a physician and a drug manufacturer for "serious and severe anemia" allegedly caused by administration of chloromycetin, an antibiotic. Reversing a $334,046.00 verdict for plaintiff the appellate court stated:

> Here it cannot be said that the wealth of Parke-Davis was relevant to any issue. Proof of its sales, however, expressed either in grams or dollars, was relevent to show a motive or reason for the alleged over-promotion of the drug, a definite issue in the case ... but only for a proper purpose, and under instructions of the court limiting it to that proper purpose.
>
> . . .
>
> This does not mean that having elicited the evidence for a proper and limited purpose, a party's attorney may thereupon, by argument, urge its reception by the jury for an improper purpose. This is what occurred here. [Plaintiff's counsel] could have argued with propriety to the jury that a large sales volume furnished a reason or motive for over-promotion and therefore made plaintiff's evidence of the latter believable. But he could not properly argue that the jury should allow large damages because the defendant was rich or because it could well afford to be held to absolute liability as a price for marketing chloromycetin.
>
> . . .
>
> . . . Where it appears in a case that either party has purposely and designedly stressed the point of the comparative wealth of the parties, we are then presented with a question of wilful misconduct, and the case will be treated accordingly.
>
> Here the misconduct of plaintiff's counsel was first in arguing unproved profits and then in using his assertion as the basis of bias-incitement.[113]

Similarly, in *Draper v. Airco, Inc.*[114] a wrongful death action brought against United States Steel Corporation, Airco, Inc., and

112. 226 Cal. App. 2d 378, 38 Cal. Rptr. 183 (1964).
113. *Id.* at ____, 38 Cal. Rptr. at 189.
114. 580 F.2d 91 (3d Cir. 1978).

W.V. Pangbourne & Co., arising from the electrocution of a lineman who was installing a switch on an energized line on premises owned by U.S. Steel, counsel for the plaintiff made repeated references to the wealth of defendants and then carried on "somewhat incoherently:"

> I am going to make the equalizer between the multimillion dollar there for [Plaintiff] and her kids, it's right here. On that side of the room are bills of dollars and on this side of the room is the equalizer . . . . [I]n this case I brought you the giants, the giants of the industrial world . . . I am going to ask you to tumble the magnificent big companies here with all their engineers.[115]

A jury verdict for $585,789.55 was gained, and then lost.

A different variety of appeal to passion and prejudice permeated counsel's summation in *Edwards v. Sears, Roebuck and Co*,[116] a product liability action brought against a manufacturer and retailer of tires for a death allegedly caused by tire failure. The appellate court reversed a $450,000 award[117] relying in part on counsel's discussion of: the value of his life; counsel's personal association with the deceased; the image of children crying at graveside; and the need for retribution.[118]

---

115. *Id.* at 95.

116. 512 F.2d 276 (5th Cir. 1975).

117. The Trial court had reduced a $900,000 verdict to $400,000 to cure the taint of bias and prejudice injected by counsel's summation. *Id.* at 280-81.

118. The following excerpts from the arguments of counsel were set out in the opinion:

> You will decide what is the dollar value of the loss of a husband and a father, one who earns and provides, loves, guides, comforts, consoles, protects and even punishes children. Now my partner, . . . has a little six year old boy who probably couldn't and wouldn't know enough about the value of money to know what price he might want to put on a daddy, but I don't believe my sixteen year old would take three million dollars for me — that may sound selfish, but he knows the value of money, but I believe he'd rather have me.
>
> Now I feel a heavy burden right now, and I think all of you know that. I feel the heavy burden because this young redheaded lawyer has to close this argument. This young lawyer has to say the last things that will be said for . . . , the widow of [the deceased]. And the last thing that can be said for that baby that's asleep there. And the last thing for this little girl that can be said. So I feel a heavy burden. I feel a heavy burden because [the deceased] was my friend from Seminary; that we grew up together and were friends for a long time.
>
> . . .
>
> Not one person that's been on this witness stand in nine days will approve those claims. Not one. Didn't make any tests until after . . . is dead and in the grave. My goodness, they ought to have been at the

In theory, at least, it is the duty of counsel for the parties, as well as the court, to prevent the jury from considering the extraneous and the irrelevant, and to insure that verdicts are rendered on the basis of evidence presented on issues made by the pleadings.[119] The American bar all too often appears to be preoccupied with circumventing this ideal.[120]

---

grave to hear that child cry and say, "I want my Daddy" and to watch that child wait on the doorsteps of its home for its Daddy to return. But they weren't there because they had sold the tires. Maybe after this case — maybe after this one they won't be able to make those claims. Maybe there won't be many more children sitting on the doorstep waiting for Daddy to come home, and he never comes home because they couldn't back up what was in that Owner's Manual.
. . .
Now I say to you when every expert says you ought to have four more p. s. i. above 75, and Sears says you ought to have only 24 up to 100, and I say to you when they make the 40,000 miles at 110 miles a lie without failure tread body would separate — when they say those things to you they're playing games — with human life. And they played a ruthless, horrible, mistaken game on [the deceased]'s life. Why? For the sale of tires. Put that air pressure down there 24 so they'll ride soft and you'll sell them tires. Put those ads on the television. Put those pamphlets out without any claim. Playing games with human life — except it caught them in this case. It caught them in this case.
    I say to you they got the profit off the tires. Pay the lady and the children for his death. Pay the children and the lady for his death — for his thirty-three productive years . . . . They'd rather have him here. But they don't, so pay them. Pay them. So that Sears would remember and Michelin would remember that the next time they write something down they'd be able to half way back it up.

119. Hockaday v. Red Line, Inc., 174 F.2d 154 (D.C. Cir. 1949). *See also* Cherry Creek Nat. Bank v. Fidelity & Cas. Co., 207 A.D. 787, ____, 202 N.Y.S. 611, 614 (1924):
    The rule confining counsel to legitimate argument is not based on etiquette, but on justice. Its violation is not merely an over-stepping of the bounds of propriety, but a violation of a party's rights. The jurors must determine the issues upon the evidence. Counsel's address should help them do this, not tend to lead them astray.

120. *See, e.g.,* J. O'CONNELL, THE LAWSUIT LOTTERY, *supra* note 3, at 27-28:
    The reasons punitive damages are often asked for although very rarely enacted are illustrative of the manipulative, deceptive, subterranean world of tort litigation. Plaintiffs' lawyers request them . . . (1) to inflame the jury against the defendant by the very terms of the accusation, regardless of whether the defendant's conduct in fact justifies the accusation; . . . (3) to get evidence of the defendant's income and net worth before the jury, supposedly to help it decide how big a verdict will "punish" him, but in fact to implant the idea of the defendant's wealth; . . . .

## B. Bushwacking

"Bushwacking" is a term that at least one court has used in describing arguments presenting facts outside of the record.[121] The term is particularly appropriate when a trial attorney resorts to his own assertions of fact and substitutes his testimony as proof, denying the opponent an opportunity to interpose objections based on exclusionary rules, or test the evidence through cross-examination.[122]

For example, a crucial issue in *Edwards v. Sears, Roebuck and Co.*,[123] was the amount of air pressure necessary to assure safety at speeds in excess of 75 miles per hour in tires manufactured by the defendant. Plaintiff presented evidence to prove that a tire pressure recommended in defendant's owner's manual was not supported by actual tests as claimed. In closing argument plaintiff's counsel embellished his case by telling the jury that a Sears representative had testified that the company knew its recommendations were false and had therefore taken them off the market after the deceased's death. The Court observed that the admission attributed to the witness not only was unsupported by the record but also would have been excluded at trial as a subsequent remedial measure.[124]

## C. Personal Opinion Or Belief

Closely related to the rule limiting argument to the record is the rule stated in DR 7-106(C) that:

> In appearing in his professional capacity before a tribunal, a lawyer shall not:
>
> . . .
>
> (3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.
> (4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil

---

121. Smith v. Wright, 512 S.W.2d 943, 947 (Ky. App. 1974).

122. Levin and Levy, *supra* note 106, at 144-45. Often such references are also irrelevant and inflammatory. *See, e.g.*, Williams v. Alaska, 629 P.2d 54, 58 (Alaska 1981) (references to hung jury in previous trial).

123. 512 F.2d at 285-6 nn. 10-13.

124. *Id.* at 284-85. *See also* Draper v. Airco, Inc., 580 F.2d 91, 96 (3d Cir. 1978) (condemning counsel's reference to his meetings and discussions with the deceased's children, none of whom had testified); Rommel-McFerran Co., v. Local Union No. 369, 361 F.2d 658 (6th Cir. 1966) (citing as reversible error argument that union's conduct in a deposition had not been introduced and admitted in evidence).

litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters herein.

Among the conventional justifications for the no-personal-belief rule are:

First, an attorney's statement of his beliefs impinges on the jury's function of determining the guilt or liability of the defendant. Second, and more important, an attorney's statement of his beliefs injects into the case irrelevant or inadmissible matter or facts not legally produced into evidence. By giving his opinion, an attorney may increase the apparent probative force of his evidence by virtue of his personal influence, his presumably superior knowledge of the facts and background of the case, and the influence of his official position. If, for example, an attorney states in his summation that he believes a witness has lied, his statement suggests that he has private information supporting his beliefs.[125]

By anyone's count, this is surely the most frequently violated rule of ethics and argument.[126]

The most blatant breaches of the no-personal-belief rule occur in criminal cases when either the prosecutor or defense lawyer makes an uninvited statement regarding his knowledge of or belief in the defendant's guilt or innocence.[127] More frequent and perhaps more innocent violations arise from efforts to discredit or accredit the

---

125. United States v. Morris, 568 F.2d 396, 401-02 (5th Cir. 1978). *See also* EC 7-24 ("... were the rule otherwise, the silence of a lawyer on a given occasion could be construed unfavorably to his client.").

126. *Cf.* D. MELLINKOFF, THE CONSCIENCE OF A LAWYER 260 (1973).

127. State v. Vickory, 205 N.W.2d 748 (Iowa 1973) (prosecution in opening statement); State v. Monroe, 236 N.W.2d 24 (Iowa 1975) (prosecution in closing, opined" ... I do believe that the man is guilty, and that you should, in fact, render a verdict of guilty for him."). For a more subtle approach *see* United States v. Bess, 593 F.2d 749, 753 (6th Cir. 1979) ("If the United States did not believe the defendant was guilty of committing these charges in the indictment, based on the evidence that has been presented to you, this case, of course, would have never been presented to you in the first place. It never would have been presented to you."); Telfare v. State, 163 Ind. App. 413, 324 N.E.2d 270 (1975) ("... I swore I would ... prosecute those who commit crimes, but I feel my job is also to protect the innocent (inaudible), and I stand before you today with a clear conscience."); State v. Henderson, 226 Kan. 726, 603 P.2d 613 (1979). *See also* Commonwealth v. Stevenson, 482 Pa. 76, ___, 393 A.2d 386, 390 (1978) (defense counsel's reference to himself (and his client) as "the good guys").

Similar conduct has been known to occur during voire dire examination of prospective jurors. *See* Hawk v. Superior Court, 42 Cal. App. 3d 108, ___, 116 Cal. Rptr. 713, 719, 722, n.13 (1974) (references to appearance of psychologist at no cost to defendant because of psychologist's belief in defendant's innocence, and references to counsel's friendship and affection for the defendant justified finding of contempt).

testimony of witnesses. Indeed, many of the following comments of counsel might be viewed as common, and perhaps acceptable, by the casual observer:

> Quite apart from Mr.____'s testimony, there is the testimony from the aliens and there is the testimony from the Government officers who have no interest in this case other than seeing that they are upholding their sworn duty to see that the laws are not violated and that individuals such as [defendant] who violate these Federal laws are brought to justice.[128]

> Now after [defendant] has been caught in this rather apparent contradiction, the lie, he didn't have the beer pitcher . . . .
>
> . . .
>
> If on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable — ladies and gentlemen, I don't believe [defendant's] story, too many coincidences, too many slips and slides around the facts.[129]

Perhaps the line is too fine that permits the prosecutor to state "I believe that the evidence has shown the defendant's guilt,"[130] but prohibits him from stating "I believe that the defendant is guilty"; or that invites him to opine that "No conflict exists in the testimony of the prosecution's witnesses,"[131] but precludes him from stating "The prosecution's witnesses are telling the truth."[132] However, the following comments are clearly inappropriate in civil suits as well as criminal cases:

> And I tell you, ladies and gentlemen, that she is an incredible witness, and she is not worthy of your belief. She is a liar, clear and simple.[133]

---

128. United States v. Morris, 568 F.2d at 400 (improper aggrandizement of the credibility of government offices; but error harmless).

129. State v. Garcia, 100 Idaho 108, ____, 594 P.2d 146, 148 (1979) (harmless error).

130. United States v. Wayman, 510 F.2d 1020, 1028 (5th Cir. 1975).

131. United States v. McDowell, 539 F.2d 435, 438 (5th Cir. 1976).

132. United States v. Lamerson, 457 F.2d 371, 372 (5th Cir. 1972).

133. Dukes v. State, 356 So.2d 873, 875 (Fla. App. 1978). In Olenin v. Curtin & Johnson, Inc., 424 F.2d 769 (D.C. Cir. 1968), a personal injury case, the court observed in its per curiam opinion:

> It is unprofessional conduct, meriting discipline by the court, for counsel either to vouch for his own witnesses or to categorize opposing witnesses as "liars"; that issue is for the jury . . . we "must rely primarily on the trial judges to make clear that they do not want such argument," and we further pointed out that "disciplinary

As I say, I have been making final arguments for 16 years, and I can't remember ever using this word before in a final argument — lied. She lied to you.[134]

He lied to you, ladies and gentlemen. Why did he do that? Why did he make that story up?

. . .

So why is he lying to you? It's just like Johnny lying about not delivering the newspapers. Johnny would lie, and that's because he took the snow shovel and tried to put it off on to somebody else.

. . .

When the defense put on its case, it was filled with falsehood, not a grain of truth in this defense, ladies and gentlemen.

. . .

We are not basing our argument simply on the fact that he was there, as Mr. L____ said, but he was there and he lies about where he was . . . .[135]

[The youth's] testimony is pretty incredible when you think of it.

. . .

Why did it take him so long to answer? — because he was making the testimony up while he was sitting here.[136]

## D. The Brawlers

The media at times appears to idolize the "street-fighter," and laymen who would ordinarily have nothing good to say about lawyers in general, all want one by their side when their lives or cash are at stake. Even so, the brawler's techniques, particularly the deliberate abuse of opposing counsel, have no place at trial:

> All of these matters rest within the control of the trial court, and the trial court has the power and duty to preserve decorum. The trial court can and should institute contempt proceedings against recalcitrant counsel and impose either a fine or jail sentence.[137]

---

mechanisms are available to the trial courts to deal with unlawyerlike behavior."
*Compare* Compagnie Nationale Air France v. Port of N.Y. Auth., 427 F.2d 951, 956 (2d Cir. 1970).

134. State v. Williams, 297 Minn. 76, ____, 210 N.W.2d 21, 24 (1973).

135. Dyson v. United States, 418 A.2d 127, 130 (D.C. 1980).

136. *Id.* With regard to this comment, the court explained:
> Characterizing testimony as incredible is an accepted and proper form of comment on contradictory testimony. But, the prosecutor exceeded the bounds of permissible comment by invading the province of the jury's responsibility to assess the demeanor of witnesses when he characterized the witness' pause as an opportunity to fabricate.

137. Eizerman v. Behn, 9 Ill. App. 2d 263, ____, 132 N.E.2d 788, 799 (1956).

The Code of Professional Responsibility provides in DR 7-106(C)(6) that "counsel should not engage in undignified or discourteous behavior."[138] Consider the propriety of the following exchanges in light of this standard.

Counsel approaches the defense table, and pointing out the defense attorney, says:

> I charge Mr. ____ [attorney for Airco] who had the mental poor guy with no brain in there. I charge him, head of a $7,400,000 contract. I charge him as part of the same conspiracy. And I charge Mr. ____ [attorney for Pangborne] who didn't have the decency to put a rubber blanket around it or platform [sic] or anything else.
> [And to imply that the same counsel had deliberately "deep sixed" requested documents.]
> Every time we get to a crucial spot, things disappear.[139]

Equally enlightening are the following remarks by an appellate court:

> Counsel's vilification and abuse of opposing counsel was reprehensible, although its effect to influence the jury was no doubt less prejudicial. Counsel for Parke-Davis was referred to as "an idiot" (several times), a "smart guy," a "laughing hyena." When counsel objected to [counsel's] obviously-improper reference to Parke-Davis' "astronomical profits," [counsel] replied: "Can I make a statement or two without being interrupted, or do I have to floor you, . . .?" This was one of several similar expressions made to one or another opposing counsel who were also invited to "Step outside and do something

---

138. *Compare* Model Rules 3.5(c) and 4.4.

139. Draper v. Airco, Inc., 580 F.2d at 96. *Compare* Cecil v. Gibson, 37 Ill. App. 3d 710, ____, 346 N.E.2d 448, 449 (1976).

> In his closing argument defense counsel characterized plaintiffs' attorney as a "slick attorney from Chicago." Defense counsel referred to plaintiffs' attorney as a "slick hired-hand" and also referred to plaintiffs' medical expert witness as a "sidekick" and a "righthand man."
> Defense counsel claimed that plaintiffs' counsel "manufactured" evidence, had a "wild imagination," and was not worthy of the jury's trust. He further stated that plaintiffs' counsel was the "captain of (the) ship" who was "piloting" the testimony of plaintiffs' expert witness. In addition, defense counsel compared the relationship between plaintiffs' counsel and his expert witness to that existing between the "Cisco Kid and Poncho" and "Mat Dillon and Chester." The expert was characterized as "a professional witness" who carries a "shiny black leather bag" containing instruments that "have never been used."

*See also* Ryan v. Monson, 33 Ill. App. 2d 406, ____, 179 N.E.2d 449, 458 (1961); and J. GOULDEN, THE MILLION DOLLAR LAWYERS 85 (1977) (dealing with attacks on expert witnesses).

about it." Their objections were characterized as "asinine" and as "hogwash." They were accused of suborning perjury. When defendant Wolf's attorney complained that he could not see the witness (apparently because [counsel] during cross-examination had placed himself between counsel and the witness) plaintiff's counsel asked if the attorney was passing signals to the witness.

Opposing counsel, voicing objections, were frequently told to "shut up" and the attorneys representing the several defendants who, of course, had sometimes identical and sometimes widely contrapositive interests on separate issues were accused of "sleeping together."[140]

## Conclusion

No author can hope to provide more than an introduction to the subject of unethical practices at trial. Nor is it my intention to suggest that the disciplinary docket will, or should, be crowded with cases charging infractions of the disciplinary rules cited, or other customs of proper court procedure. Many of the "dirty tricks" that occur are simply the result of ignorance and inexperience.[141] On the other hand, it is the author's hope that a primer on the subject will provide the beginner with an opportunity to learn from the mistakes of others, and provide trial attorneys and judges with a guide to help them spot, and respond to, deliberate and recurring abuses.[142]

In addition, it is hoped that more trial judges will recognize and exercise their inherent power to insure that litigation is conducted in a fair, efficient, and sensible fashion,[143] by dealing sternly with such unfair tactics through the imposition of costs and money sanctions[144] and exercise of the contempt power,[145] to discourage calculated violations of the disciplinary rules.

---

140. Love v. Wolf, 266 Cal. App. 2d at ____, 38 Cal. Rptr. at 190. According to the appellate court, the trial judge failed to protect defense counsel:
>      Excepting one mild characterization of conduct by counsel as "a little bit disgraceful" (made in such a manner that a reader of the transcript is left uncertain at which attorney the criticism was directed) and several expressions of disgrace such as, "Let's all go home. What do you say we all go home," there was almost no effort to keep the proceedings within the confines of propriety.
141. Cf. Ordover, *The Lawyer as Liar*, 2 AM. J. TRIAL ADVOC. 305, 314 (1979). Any instructor of trial advocacy or "litigation skills" will spend a good portion of each class session pointing out improper questioning techniques, and improper arguments in opening statements and summations.
142. *See, e.g.*, text at nn.50 and 70.
143. *See, e.g.*, Control Data Corp. v. Washington Metropolitan Area Transit Auth., 87 F.R.D. 377 (D.D.C. 1980).
144. *See, e.g.*, Kiefel v. Las Vegas Hacienda, Inc., 404 F.2d 1163 (7th Cir. 1978); *In re* Sutter, 543 F.2d 1030 (2d Cir. 1976)
145. United States v. Thoreen, 653 F.2d 1332 (9th Cir. 1981). *See also* text at n.138, *supra.*

# Reference 4 - 7th Circuit Affirms Dismissal as Sanction for bad evidence Counsels Duty of Candor March 2017

March 30, 2017   PRACTICE POINTS

# Seventh Circuit Affirms Dismissal as Sanction for Witness Tampering and Highlights Counsel's Duty of Candor

The court reaffirmed that "witness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction."

By Michael L. Huggins

Share this:

In a recent decision, the U.S. Court of Appeals for the Seventh Circuit reaffirmed that "witness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction," and addressed counsel's duty of candor to the tribunal where evidence of witness tampering arises. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772 (7th Cir. 2016).

In *Ramirez,* where the plaintiff sued his employer for discrimination, the Seventh Circuit affirmed the district court's dismissal with prejudice of the action because the plaintiff paid witnesses to testify in his favor at deposition. While the district court did not specify whether it issued the dismissal sanction under Rule 37 of the Federal Rules of Civil Procedure or the court's inherent authority, the Seventh Circuit found that either would have supported the district court's decision.

The Seventh Circuit also addressed the proper standard that district courts must apply in issuing a dismissal sanction for misconduct. Prior Seventh Circuit precedent required that the willfulness, bad faith, or fault of the accused party be supported by clear and convincing evidence to warrant a dismissal of the case. *Ramirez*, however, holds that in civil cases, a district court's decision to sanction misconduct by dismissing the action or entering a default judgment need only be established by a preponderance of the evidence. This burden, the court noted, is consistent with the Supreme Court's presumption in favor of the less onerous preponderance-of-evidence standard in federal civil cases.

However, a district court may require that a dismissal sanction for a plaintiff's misconduct be supported by clear and convincing evidence —rather than by a preponderance of the evidence—if the plaintiff seeks equitable relief or the interests implicated by the suit's dismissal are sufficiently important. The Seventh Circuit noted that in *Ramirez*, the plaintiff sought only monetary damages. And while the court acknowledged that a plaintiff's opportunity to vindicate his rights in a Title VII discrimination case is highly important, "the loss of the opportunity to vindicate those rights in a civil suit against one's employer is not of the same constitutional magnitude as the liberty interests at stake in proceedings involving the termination of parental rights or involuntary commitment to an institution for psychiatric care, for example."

The Seventh Circuit also noted that plaintiff's counsel's conduct upon learning of his client's misconduct was particularly commendable. Counsel first learned of his client's potential misconduct when he was contacted by a witness asking how much money the witness would receive when the case was resolved. Plaintiff's counsel immediately reported the communication to defense counsel, consistent with

attorneys' ethical obligations under ABA Model Rule of Professional Conduct 3.4, which promotes fairness to opposing parties and counsel.

In an evidentiary hearing, the district court also acknowledged plaintiff's counsel's actions by stating that "[t]hroughout the evidentiary hearing, counsel for Plaintiff has been forthcoming and cooperative—I am convinced that he played no role in Plaintiff's misconduct. Because I have found clear and convincing evidence of witness tampering, I am dismissing this case with prejudice to sanction Plaintiff." Counsel's truthfulness and candor regarding his client's conduct was consistent with ABA Model Rule of Professional Conduct 3.3, which prohibits attorneys from offering evidence that the attorney knows to be false, and requires attorneys to take reasonable remedial measures, including disclosure to the tribunal, where the attorney knows that a client has engaged in criminal or fraudulent conduct. And counsel's candor regarding his client's conduct likely avoided any violation of ABA Model Rule of Professional Conduct 8.4, which prohibits attorneys from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

The lessons of *Ramirez*: If you discover evidence that your client has or may have engaged in, or will engage in, misconduct, you should review the ethics rules in your state to determine the appropriate action you should take to correct the situation. Where there has been witness tampering, it is not unreasonable to expect a dismissal sanction, and you should advise your client of that possibility. Also review the precedents in your jurisdiction for the standard that district courts must apply to the facts underlying a dismissal sanction. If you find yourself in the debate over whether a clear and convincing or preponderance of the evidence standard applies, consider whether the case concerns equitable relief and whether a dismissal sanction will implicate important interests to justify applying the higher, clear-and-convincing standard.

Michael L. Huggins is deputy attorney general with the California Office of the Attorney General.

Copyright © 2017, American Bar Association. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or downloaded or stored in an electronic database or retrieval system without the express written consent of the American Bar Association. The views expressed in this article are those of the author(s) and do not necessarily reflect the positions or policies of the American Bar Association, the Section of Litigation, this committee, or the employer(s) of the author(s).

ABA American Bar Association |

/content/aba-cms-dotorg/en/groups/litigation/committees/pretrial-practice-discovery/practice/2017/seventh-circuit-affirms-dismissal-as-sanction-for-witness-tampering-and-highlights-counsels-duty-of-candor

# Reference 5 - Law360__Morse_v_fusto



# 2nd Circ. Expands Prosecutorial Liability In Morse V. Fusto



Law360, New York (September 18, 2015, 12:01 PM ET) -- In its decision in Morse v. Fusto,[1] issued Sept. 11, 2015, the Second Circuit continued the process of defining and expanding the parameters of a prosecutor's § 1983 liability for falsification or fabrication of evidence. Prior to Morse, the court had confirmed that prosecutors possess only qualified immunity when performing investigative functions, and that fabricating evidence during the investigative phase would support the imposition of liability on a public official. In the Morse decision, the Second Circuit took a critical further step: The court held that material omissions can, if knowingly made, constitute the falsification of evidence, even if the evidence otherwise is "facially" accurate. The court further held that prior case law concerning liability for law enforcement officials found to have falsified evidence applied with equal force to prosecutors.

In the process, the Second Circuit noted that its ruling provided some response to the question famously posed by Secretary of Labor Raymond Donovan after his acquittal: "Which office do I go to to get my reputation back? Who will reimburse my company for the economic jail it has been in for two and a half years?"[2]

## The Prosecution of Dr. Leonard Morse

Dr. Morse, a dentist with a practice in Brooklyn, was the subject of an investigation by the New York State Office of the Attorney General's Medicaid Fraud Control Unit during the period when Eliot Spitzer ran that office. Prior to the grand jury presentation, a special assistant attorney general and an "audit-investigator" reviewed Dr. Morse's billing records and "created spreadsheet summary charts" relating to eight patients.[3] The charts were presented to the grand jury which, "based in part on that evidence," returned an indictment on charges of grand larceny and offering a false instrument for filing.[4] Dr. Morse went to trial on the criminal charges and was acquitted.

After the acquittal, Dr. Morse filed a civil suit against the prosecutor and investigator under 42 U.S.C. § 1983 for deprivation of liberty due to fabrication of evidence. Dr. Morse contended that the summary charts that had been created by the defendants and presented to the grand jury were false because they omitted very specific and critical items of data; e.g., the charts failed to distinguish between the treatments received by different individuals who had the same name, and, by omitting information showing that particular procedures were billed "per tooth," created the impression that Dr. Morse had billed Medicaid repeatedly for the same

ATLANTA    CINCINNATI    CLEVELAND    COLUMBUS    DAYTON    NEW YORK    WASHINGTON, D.C.

ATTORNEY ADVERTISING

procedure.[5] Dr. Morse again went to trial, and received a substantial jury verdict in his favor.[6]

## The District Court Decision

Throughout the civil case, and again after the jury rendered its verdict, the defendant prosecutor and investigator argued inter alia that the evidence contained in the summary charts was "facially" accurate and not actually false, and that they were entitled to absolute and to qualified immunity. The U.S. District Court for the Eastern District of New York (Carol Bagley Amon, chief judge) rejected those arguments, finding that the evidence was sufficient to establish a denial of the right not to be deprived of liberty based on false evidence.[7] The district court began its analysis by setting forth the established elements of a constitutional violation by an investigator: "a constitutional violation [exists] if an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result."[8] A prosecutor is "equally liable," the district court explained, if he or she "fabricates evidence in his investigative role" and it was reasonably foreseeable that the evidence would be used in the grand jury.[9] On the issue of the applicability of absolute immunity, the district court discussed at some length the distinction between a prosecutor's advocacy function as opposed to the investigatory function, even referencing decisional authority confirming that a prosecutor's advocacy includes the presentation of evidence to a grand jury.[10] The court acknowledged also the defendant's testimony that the grand jury exhibits were prepared in the weeks prior to the grand jury proceeding and after the decision had been made to seek an indictment.[11] Nonetheless, the court found that the jury was entitled to disbelieve even the unchallenged testimony of the defendants and, because the defendants bear the burden of proof that they were acting in an advocacy role, the jury could find that they failed to meet their burden.[12] Their conduct was, therefore, subject only to qualified immunity.

## The Second Circuit's Discussion of Qualified Immunity

The Second Circuit affirmed the district court's decision, focusing on the prosecutor's "principal" contention that "their conduct was not clearly prohibited by the Constitution and that they are therefore entitled to qualified immunity as a matter of law."[13] The circuit court began its discussion of the issue by describing the scope of qualified immunity: "Qualified immunity protects public officials performing discretionary functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[14] Under that standard, the plaintiff, Dr. Morse, was required to demonstrate that a governmental official, acting in a "discretionary function," violated a "clearly established" rights through the presentation of material "false" evidence.

### The "Clearly Established Right"

In arguing that they did not violate a "clearly established right," the defendants pressed the contention that the prosecution is entitled to engage in "one sided presentations to the grand jury in seeking an indictment, and that they are further entitled to keep relevant and material information — even outright exculpatory evidence — from the grand jury."[15] According to the defendants, "the jury's finding that they deliberately kept information from the grand jury does not establish a constitutional violation."[16]

The court readily concluded that those generic precepts did not justify the manipulation and alteration of evidence, holding that "everyone possesses the additional and distinct 'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'"[17] The Second Circuit instead adhered to the rationale of its earlier decision in Zahrey, which concluded that the prosecutor had committed a violation of the defendant's rights by influencing the testimony of a prospective grand jury witness who thereafter testified falsely.[18]

As for the source of that right, the Second Circuit acknowledged that the district court had found the circuit "inconsistent" as to whether a fabrication of evidence claim arises under the Sixth Amendment or the due process clauses of the Fifth and Fourteenth Amendments.[19] The Second Circuit agreed with the district court that, regardless of the particular amendment that prevents government officers from fabricating evidence, the right exists.[20]

### The Violation of That Right

Having described the existence of that "clearly established" right, the Second Circuit then considered the prosecutor's claim that the evidence was not actually false because it involved not an affirmative false statement but rather "factually accurate" bits of information with other information omitted.[21] The court rejected that argument as well, noting that omissions are actionable as false statements in any number of areas of the law, and concluding that there was no reason to distinguish omissions of material fact from affirmative misstatements: "both threaten the integrity of the judicial process by injecting it with falsity provided by officers of the state whose official status gives the misinformation a special aura of reliability."[22] To the prosecutor's claim that the court's decision would "paralyze" prosecutorial investigations and preparations for the grand jury, the court responded that it "ought not to be difficult, even for the most single minded of prosecutors, to avoid misconduct of the scope and seriousness of that in which the defendants engaged."[23]

Because the particular issue of omissions had not previously been addressed by the court, the defendants argued that Dr. Morse's claims were "novel" and "unprecedented" and so no "clearly

2nd Circ. Expands Prosecutorial Liability In Morse V. Fusto

established" right had been violated. The court responded that the use of material omissions was such a plain violation of the right to a fair trial that it constituted a violation of Dr. Morse's "clearly established" right.[24]

## Morse as Applied to White Collar Investigations

Some aspects of the Morse decision can be seen as having application in a significant swath of white collar proceedings, while other features of the case support the view that the circumstance was so unique that its impact will be limited. It is certainly the rare case that the defendant is acquitted at trial. But nothing in the decision suggests that an acquittal is a prerequisite to a § 1983 action, and there are any number of other resolutions or outcomes of particular white collar cases that would arguably form the predicate for the same kind of due process claim. Regardless, some kind of favorable outcome is necessary.

Critical also to the decision was the fact that it involved a New York state investigation and grand jury presentation, though the decision is not limited to those specific circumstances. The rules governing New York state grand jury proceedings do require a more substantive presentation than before a federal grand jury. Further, New York state prosecutors often participate in the investigation of white collar matters. Still, the process at issue in Morse — a prosecutor working with an investigator to develop evidence that is then used in the grand jury — can and does also occur in the federal system.

Where those particular circumstances do exist, the Second Circuit has now provided a more expansive basis for the imposition of liability in its analysis of the investigatory function and when evidence will be deemed "false." The Second Circuit's acceptance of the characterization of the prosecutor's conduct as "investigatory" was critical and arguably far from a foregone conclusion. The particular conduct in Morse of presentation to the grand jury appeared to fall well within the scope of the prosecutor's advocacy function, and therefore subject to absolute immunity, but the plaintiff argued successfully to the district court that the development of misleading evidence during the investigation predated its subsequent use in the grand jury. Defendants did not appeal on this ground, and the Second Circuit did not disturb the district court's holding that where evidence was prepared or developed during the investigation, and thereafter presented to the grand jury, it is only qualified immunity that applies — not absolute immunity.[25] The mere fact that the prosecutor was also acting in his advocacy role in the grand jury does not immunize the prosecutor from liability if he or she was involved during the investigation in the development of the materially misleading evidence.[26]

Of perhaps greater significance was the Second Circuit's forceful rejection of the prosecution's insistence that the ability to make a "one sided" grand jury presentation allowed the preparation and use of misleading evidence containing material omissions. While the court certainly did not speak in

**2nd Circ. Expands Prosecutorial Liability In Morse V. Fusto**

terms of fairness and balance in the grand jury, or require presentation of exculpatory evidence, it did declare that items of evidence cannot be manipulated and altered to support the prosecution's theory. In the process, the Second Circuit expressly imposed on prosecutors the same standard that applies in so many white collar offenses. There is something dissonant about a prosecutor — who has charged the defendant with the use of a misleading statement or failures to disclose — insisting at the same time that he can present an entirely "one sided" and misleading portion of the evidence in support of those charges. It made no sense that the prosecutor would be held to a lesser standard than the defendant, subject to liability only for affirmative misstatements while claiming that the defendant can be charged criminally based on omissions of fact or failures of disclosure. Clear now is that a single standard applies to those who seek to prosecute violations of those laws: They cannot employ misleading evidence to obtain indictments of those who allegedly employed misleading statements.

A final note: It could be argued that prosecutorial overreach is fueled by the lack of accountability for "misleading" conduct by government officials. Here, Dr. Morse's counsel spent literally years defending the criminal action, and then doggedly pursued the civil case based on "novel" theories. It took that kind of determined effort to generate a development in the law that will help hold government officials accountable for misleading conduct, and ensure some recovery for the victims of improper prosecutions founded on fabricated evidence.

—By Maranda Fritz and Eli Richlin, Thompson Hine LLP

*Maranda Fritz is a partner and Eli Richlin is an associate in Thompson Hine's New York office.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1]   No. 13-4074, 2015 U.S. App. LEXIS 16154 (2d Cir. Sept. 11, 2015).

[2]   Id. at *12-14 n. 5.

[3]   Id. at *3.

[4]   Id.

[5]   Id. at *9-10.

[6]   The jury awarded Dr. Morse $6.7 million in compensatory damages and $1 million in punitive damages. Id. at *12-13.

[7]   Morse v. Fusto, No. 07-CV-4793 (CBA)(RML), 2013 U.S. Dist. LEXIS 123823 (E.D.N.Y. Aug. 27, 2013).

**2nd Circ. Expands Prosecutorial Liability In Morse V. Fusto**

[8]   Id. at *15-16 (citing Jovanovic v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012)).

[9]   Id. at *16.

[10] Id. at *36-38 (citing Doe v. Phillips, 81 F.3d 1204 (2d Cir. 1996) and Buckley v. Fitzsimmons, 509 US. 259, 269 (1993)).

[11] Id. at *38.

[12] Id. at *41-42.

[13]    2015 U.S. App. LEXIS 16154, at *4.

[14] Id. at *18 (citing Lore v. City of Syracuse, 670 F.3d 127, 162 (2d Cir. 2012)).

[15] Id. at *18-19.

[16] Id. at *19-20.

[17] Id. at *20 (quoting Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000)).

[18] Id. at *21.

[19] Id. at *20-21 n.7.

[20] Id.

[21] Id. at *19-27.

[22] Id. at *24.

[23] Id. at *25-26.

[24] Id. at *27-29.

[25] Id. at *15-16, n.6.

[26] In another recent matter touching on similar issues, Judge Cathy Seibel of the Southern District of New York issued a bench ruling finding that neither absolute nor qualified immunity applied where a prosecutor ordered the arrest of a man who had written obscenities on his payment for a speeding ticket. Mark Hamblett, "Prosecutor Can Be Held Liable for Arrest Over Ticket Obscenities," N.Y.L.J., Sept. 16, 2015.

All Content © 2003-2015, Portfolio Media, Inc.

# Reference 6 - Federal Rule of Civil Procedure 37(e)_ Spoiling the Spoliation Do[21522]

# Hofstra Law Review

Volume 38 | Issue 2                     Article 11

2009

# Federal Rule of Civil Procedure 37(e): Spoiling the Spoliation Doctrine

Nicole D. Wright

Follow this and additional works at: http://scholarlycommons.law.hofstra.edu/hlr

 Part of the <u>Law Commons</u>

**Recommended Citation**
Wright, Nicole D. (2009) "Federal Rule of Civil Procedure 37(e): Spoiling the Spoliation Doctrine," *Hofstra Law Review*: Vol. 38: Iss. 2, Article 11.
Available at: http://scholarlycommons.law.hofstra.edu/hlr/vol38/iss2/11

This document is brought to you for free and open access by Scholarly Commons at Hofstra Law. It has been accepted for inclusion in Hofstra Law Review by an authorized administrator of Scholarly Commons at Hofstra Law. For more information, please contact lawcls@hofstra.edu.

# NOTE

# FEDERAL RULE OF CIVIL PROCEDURE 37(e): SPOILING THE SPOLIATION DOCTRINE

## I. INTRODUCTION

It certainly cannot be debated that technology has brought about profound change to all aspects of modern society. The legal world has not been immune to the changes brought about by technology, nor to the nuanced questions that have arisen in its wake. In particular, the discovery process in litigation has been significantly impacted by the rise of new technology. In fact, technology has had so momentous an influence on the discovery process that the use of technology during the discovery process has become a practice in and of itself, known today as electronic discovery ("e-discovery").

In 2007, the Federal Rules of Civil Procedure ("FRCP") were amended in an attempt to address the problematic issues associated with e-discovery.[1] Most importantly, for purposes of this Note, the amendments attempted to address the issue of the failure of a party to produce documents requested in discovery because they have been destroyed in conjunction with the use of an electronic information system. Rule 37(e) of the FRCP was designed to create a "safe harbor" for parties that have inadvertently destroyed documents requested in a pending litigation. This safe harbor prohibits courts from sanctioning parties who fail to produce documents "as a result of the routine, good-faith operation of an electronic information system."[2]

---

1. *See* Thomas Y. Allman, *Rule 37(f) Meets Its Critics: The Justification for a Limited Preservation Safe Harbor for ESI*, 5 NW. J. TECH. & INTELL. PROP. 1, 3 (2006) (citing JUDICIAL CONFERENCE OF THE UNITED STATES, REPORT OF THE JUDICIAL CONFERENCE COMM. ON RULES OF PRACTICE AND PROCEDURE, at Rules App. C-83, *available at* http://www.uscourts.gov/rules/Reports/ST09-2005.pdf).
2. FED. R. CIV. P. 37(e).

*Hofstra Law Review, Vol. 38, Iss. 2 [2009], Art. 11*

At first glance, Rule 37(e) is a welcome addition to the Federal Rules because of its attempt to alleviate the problem of inadvertent document destruction resulting from use of a particular electronic information system.[3] However, Rule 37(e) must be considered in light of the long recognized common law doctrine of spoliation of evidence, whereby parties are sanctioned for the destruction of requested documents during discovery.[4] When analyzed against this backdrop, it becomes clear that Rule 37(e) does little to efficiently ease the problems associated with document destruction that occurs during electronic discovery.

This Note posits that courts have interpreted and applied Rule 37(e) in such a way that renders it inconsistent with the theoretical underpinnings of the spoliation doctrine, as well as the stated purposes of the FRCP; that is, that the Rules are to be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."[5] Because Rule 37(e) has been ineffective, it should be removed from the FRCP. Part II offers a brief overview of the spoliation doctrine and the role it plays in discovery. Part III is a discussion of the extensive role of electronic information systems in discovery as well as the complications that this has caused for parties. Part IV provides an analysis of Rule 37(e) and the "safe harbor" provision that it creates. Finally, Part V is an overview of the impact of Rule 37(e) on discovery. It argues that Rule 37(e) should be removed from the FRCP, because the traditional spoliation doctrine is sufficient for courts to impose sanctions on parties for violations of the discovery process, and instead, the focus must shift to firmly establishing the confines of the duty to preserve potentially relevant evidence.

---

3. *See* Allman, *supra* note 1, at 3. Note: An amendment, effective Dec. 1, 2007, restyled the FRCP and relocated Rule 37(f) to 37(e). Gal Davidovitch, Comment, *Why Rule 37(e) Does Not Create a New Safe Harbor for Electronic Evidence Spoliation*, 38 SETON HALL L. REV. 1131, 1131 n.1 (2008). As such, references in the sources cited herein to Rule 37(f) refer to the current Rule 37(e).

4. West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (defining spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation").

5. FED. R. CIV. P. 1.

## II.  HISTORY AND APPLICATION OF THE SPOLIATION DOCTRINE

### A.  Introduction

Spoliation is "[t]he intentional destruction, mutilation, alteration, or concealment of evidence, usu[ally] a document."[6] The spoliation doctrine is invoked when a party alleges that its opposing party has caused a crucial piece of evidence to be unavailable.[7] If an opposing party is responsible for the destruction of relevant evidence, it is within the trial court's discretion to impose sanctions on that party.[8]

As a general rule, the trial court is afforded broad authority in its determination as to which sanction is to be imposed on a party for spoliation.[9] To determine the severity of sanctions, the court weighs several countervailing factors,[10] one of which is the prejudice to the opposing party resulting from the spoliation.[11] This prejudice is regarded as being more significant than other factors, most notably the state of mind of a party alleged to have destroyed the documents.[12]

FRCP 37(b)(2) explicitly authorizes courts to impose sanctions on a party for failure to comply with a discovery order.[13] This provision gives courts the authority to sanction parties that destroy documents in direct violation of a discovery order.[14] The inherent authority of courts is also recognized as an additional source of power for courts to impose sanctions.[15] This enables courts to impose sanctions on those parties who destroy evidence in contexts other than in direct violation of a discovery order.[16] The inherent power of the courts to sanction is limited by the requirement that sanctions be imposed when a party acts in bad faith, in

---

6.  BLACK'S LAW DICTIONARY 1437 (8th ed. 2004).

7.  *E.g.*, Moghari v. Anthony Abraham Chevrolet Co., 699 So. 2d 278, 279 (Fla. Dist. Ct. App. 1997).

8.  *See, e.g.*, Patton v. Newmar Corp., 538 N.W.2d 116, 119 (Minn. 1995).

9.  27 C.J.S. *Discovery* § 182 (2009).

10.  James T. Killelea, Note, *Spoliation of Evidence: Proposals for New York State*, 70 BROOK. L. REV. 1045, 1055 (2005).

11.  *Id.* Other factors considered in determining sanctions include the "nature and significance of the interests promoted by the actor's conduct, . . . the character of the means used by the actor; and . . . the actor's motive." *Id.*

12.  *See* Huhta v. Thermo King Corp., No. A03-1961, 2004 Minn. App. LEXIS 722, at *9-10 (Minn. Ct. App. June 29, 2004).

13.  FED. R. CIV. P. 37(b)(2)(A) ("If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery . . . the court . . . may issue further just orders.").

14.  *Id.*

15.  Chambers v. NASCO, Inc., 501 U.S. 32, 43-51 (1991).

16.  *Id.* at 45-46.

*Hofstra Law Review, Vol. 38, Iss. 2 [2009], Art. 11*

order to allow the courts to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[17]

The spoliation doctrine interplays with the duty to preserve, a duty which stems from the common law obligation to preserve evidence when a party "has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to the future litigation."[18] Indeed, "a finding of spoliation is necessarily contingent upon the determination that a litigant had the duty to preserve the documents in question."[19]

The spoliation doctrine has generally been applied to punish those parties who destroy relevant documents in bad faith.[20] In essence, where the duty to preserve potentially relevant evidence clearly exists, and that duty is disregarded and consequently prevents the production of relevant documents, the court sees fit to punish the party responsible for destroying those documents.[21] The rationale for this punishment is rooted in the theory that the destruction of documents hinders the discovery process and unfairly prejudices the requesting party because potentially relevant evidence is unavailable to them due to the conduct of their adversary.[22] As such, the party in the wrong must be held accountable for its actions.[23]

### B.   The Duty to Preserve Under the Spoliation Doctrine

A party's duty to preserve potentially relevant documents is paramount to understanding the spoliation doctrine.[24] The concept of spoliation springs from the presumption that the documents at issue were destroyed   when   litigation   was   either   pending   or   reasonably

---

17.   *Id.* at 43, 49 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630-31 (1962)).

18.   Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001).

19.   Michael R. Nelson & Mark H. Rosenberg, *A Duty Everlasting: The Perils of Applying Traditional Doctrines of Spoliation to Electronic Discovery*, 12 RICH. J.L. & TECH. 14, 19 (2006); *see also* Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("It goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it.").

20.   *See* Nelson & Rosenberg, *supra* note 19, at 15.

21.   West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

22.   *Id.*

23.   *Id.*

24.   The concept of the "duty to preserve" is founded on the idea that parties to litigation are required to preserve documents or other materials that may be requested as potential evidence during the discovery process. *See, e.g.*, Beil v. Lakewood Eng'g & Mfg. Co., 15 F.3d 546, 552 (6th Cir. 1994); Green Leaf Nursery v. E.I. DuPont De Nemours & Co., 341 F.3d 1292, 1308 (11th Cir. 2003). This duty is long standing, widely recognized, and established in federal law. *See* Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001); Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991).

foreseeable.[25] It is this context, where litigation has commenced, or can be expected to commence, that gives rise to the duty to preserve.[26]

When a complaint has been filed, the duty to preserve is unquestionably imposed on parties.[27] The filing of the complaint provides the parties with express notice that documents that are relevant to that litigation must be preserved, simply by virtue of the fact that litigation has commenced.[28] Once pleadings are filed, it is presumed that because parties have been given notice of the issues to be litigated, it is within reason that the parties are, or ought to be, aware of what information and what sorts of documents may be categorized as relevant at later stages of the litigation, and most notably, during discovery.[29]

Beyond the obvious situation where a party is put on notice to preserve potential evidence by the initiation of litigation through the filing of a complaint, it is well established that "[t]he duty to preserve evidence is triggered when an organization reasonably anticipates litigation."[30] Courts have held that reasonable anticipation of litigation is based on the occurrence of "significant signs of imminent litigation prior to the filing of a complaint" and have only imposed a duty to preserve evidence on a party "when the signs are clear."[31] This duty is assessed by the relevance of potential evidence in light of the foreseeability of potential litigation, from the perspective of a reasonable person.[32]

To date, courts have not agreed on a bright line rule for when these "significant signs," which trigger the duty to preserve, exist.[33] However, some commonly recognized signs of imminent litigation are communication with adverse parties and/or their counsel prior to the commencement of litigation,[34] the existence of litigation between other,

---

25.  *Goodyear Tire & Rubber Co.*, 167 F.3d at 779 (defining spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence *in pending or reasonably foreseeable litigation*" (emphasis added)).

26.  *See* Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).

27.  *See, e.g.*, Computer Assoc. Int'l, Inc. v. Am. Fundware, Inc., 133 F.R.D. 166, 168-70 (D. Colo. 1990) (sanctioning a default judgment issued against a party that knowingly destroyed evidence after a litigation between the parties had commenced).

28.  FED. R. CIV. P. 3 ("A civil action is commenced by filing a complaint with the court.").

29.  *See* Maria Perez Crist, *Preserving the Duty to Preserve: The Increasing Vulnerability of Electronic Information*, 58 S.C. L. REV. 7, 18 (2006).

30.  *E.g.*, China Ocean Shipping Co. v. Simone Metals, Inc., No. 97 C 2694, 1999 U.S. Dist. LEXIS 16264, at *12 (N.D. Ill. Sept. 30, 1999) ("The duty to preserve evidence includes any relevant evidence over which the non-preserving entity had control and reasonably knew or could reasonably foresee was material to a potential legal action.").

31.  Crist, *supra* note 29, at 18.

32.  Boyd v. Travelers Ins. Co., 652 N.E.2d 267, 271 (Ill. 1995).

33.  Crist, *supra* note 29, at 18 ("Courts are not in agreement as to when a party should be charged with sufficient notice of a claim to trigger the preservation obligation.").

34.  *See* Wm. T. Thompson Co. v. Gen. Nutrition Corp., 593 F. Supp. 1443, 1446 (C.D. Cal.

non-related parties based on the same subject matter as contained in the destroyed documents,[35] an investigation into a party's actions,[36] and the filing of a complaint by an adverse party with a government agency.[37]

Thus, the duty to preserve is an affirmative duty imposed on parties to refrain from destroying documents, tapes, and the like where it is reasonably foreseeable that they may be requested in discovery.[38] It is the breach of this duty to preserve potentially material information that invokes application of the spoliation doctrine based on the actions of the party that destroyed these kinds of documents and allows courts to impose sanctions for the violation of the duty.[39]

## C.  *Sanctions for Spoliation*

The consequences of a party's violation of its duty to preserve may be far-reaching. At its most basic level, spoliation by a party has a negative impact not only on a particular litigation, but on the justice system as a whole.[40] Spoliation strikes at the heart of the most fundamental assumptions that underlie the American justice system, as it "undermines the efficacy of the adversarial system" because it "prevents a party from adequately proving or defending a claim at trial."[41]

In order to combat and deter spoliation, courts have the discretion to impose sanctions against parties that destroy potentially relevant documents.[42] These sanctions are to be imposed in light of three underlying purposes: deterrence from engaging in spoliation,

---

1984) (stating that a notice of the duty to preserve was triggered by pre-litigation communications between counsel for the parties).

35.  United States *ex rel.* Koch v. Koch Indus., 197 F.R.D. 463, 482 (N.D. Okla. 1998) (noting that a party that destroyed documents had a duty to preserve documents and tapes based on prior litigation between other parties on the same subject matter as was contained in the destroyed documents).

36.  E*TRADE Sec. LLC v. Deutsche Bank AG, 230 F.R.D. 582, 589 (D. Minn. 2005) (noting that the duty to preserve potentially relevant documents arose when party received notice that a potentially fraudulent loan scheme was being investigated by a bankruptcy court).

37.  Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (holding that the duty to preserve potentially relevant documents was triggered when an employee filed an employment discrimination charge with the EEOC).

38.  *See* FED. R. CIV. P. 26(b)(1) (defining the scope of pre-trial discovery requests as "any matter relevant to the subject matter involved in the action" so long as it appears to be "reasonably calculated to lead to the discovery of admissible evidence"). Thus, documents that are destroyed fit within this standard, and may lead to the imposition of sanctions for spoliation.

39.  *See* Computer Assoc. Int'l, Inc. v. Am. Fundware, Inc., 133 F.R.D. 166, 168 (D. Colo. 1990).

40.  *See* Crist, *supra* note 29, at 43 ("The American justice system is premised on the fair adjudication of disputes through both sides obtaining and presenting the relevant evidence.").

41.  Killelea, *supra* note 10, at 1046.

42.  *See* E*TRADE Sec. LLC v. Deutsche Bank AG, 230 F.R.D. 582, 586 (D. Minn. 2005).

punishment for a wrongful act, and remediation.[43] Each of these purposes attempts to cure the prejudice that resulted to the injured party as a consequence of the spoliation by its adversary.[44]

Sanctions for spoliation, and the circumstances under which they are imposed, vary across jurisdictions.[45] However, after establishing that the duty to preserve has been breached, courts traditionally make the determination as to whether sanctions are warranted based on the three-part test set forth in *Schmid v. Milwaukee Electric Tool Corp.*[46] In *Schmid*, the Third Circuit held that sanctions should be imposed based on "the degree of fault of the party who altered or destroyed the evidence; . . . the degree of prejudice suffered by the opposing party; and . . . whether there is a lesser sanction that will avoid substantial unfairness to the opposing party."[47] Additionally, in particularly serious situations, courts also consider whether the sanctions are likely to deter future parties from similar conduct.[48]

Once a court determines that some sort of sanction is warranted for a party's destruction of documents,[49] that court has "broad authority" to impose a sanction which sufficiently implements the established underpinnings of the spoliation doctrine.[50] Courts are afforded this broad authority in order to enable them to "level[] the evidentiary playing field and . . . sanction[] the improper conduct."[51] It has been held that sanctions ought to be imposed so that the underlying purposes of the spoliation doctrine are served, while at the same time, crafting the least drastic sanction available.[52] The imposition of sanctions is reviewed by higher courts for abuse of discretion, and absent such abuse, sanctions will be upheld.[53]

---

43. *See* West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

44. Patton v. Newmar Corp., 538 N.W.2d 116, 119 (Minn. 1995).

45. Killelea, *supra* note 10, at 1046.

46. 13 F.3d 76, 79 (3d Cir. 1994).

47. *Id.*; *see also* Crist, *supra* note 29, at 44 ("To determine whether sanctions are warranted, federal courts generally follow the three part test outlined in *Schmid v. Milwaukee Electric Tool Corp.* . . . .").

48. *Schmid*, 13 F.3d at 79; Crist, *supra* note 29, at 44.

49. *See* Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 748 (8th Cir. 2003) (noting that a finding that a sanction is warranted for destruction of documents is contingent upon a finding of prejudice to the opposite party).

50. Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) ("[A] district court has broad discretion in choosing an appropriate sanction for spoliation . . . ."); *see also* FED. R. CIV. P. 37(b)(2) (authorizing court imposed sanctions for violations of discovery orders).

51. Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995).

52. *See* Hartford Ins. Co. v. Am. Automatic Sprinkler Sys., Inc., 201 F.3d 538, 543-44 (4th Cir. 2000).

53. Dillon v. Nissan Motor Co., 986 F.2d 263, 267 (8th Cir. 1993).

*Hofstra Law Review, Vol. 38, Iss. 2 [2009], Art. 11*

While a wide range of sanctions may be—and have—been imposed by the courts, "[t]he most frequent sanctions for the destruction of evidence include fines and adverse inference jury instructions."[54] Other common sanctions include dismissal of a claim, issue preclusion, or summary judgment for the party prejudiced by the destruction of evidence.[55] While a court is not necessarily required to impose the "least onerous" sanction available, the sanction that a court chooses to impose must be the most appropriate under the circumstances of the particular case[56] and must be necessary in order to redress abuse to the judicial system caused by the destruction of documents by a party.[57]

### D.   Crafting Sanctions for Spoliation of Evidence

Trial courts have broad discretion in the imposition of sanctions for spoliation of evidence, and must craft those sanctions in an effort to redress abuses to the justice system by the party that caused the documents to be destroyed.[58]

As a general rule, the sanctions imposed on a party that destroys potentially relevant documents are based on a variety of factors,[59] and depend largely on the degree of prejudice resulting to the opposing party as a consequence of the destroying party's conduct.[60] When imposing a sanction on a party responsible for the destruction of potentially relevant documents, courts seek to fulfill the purposes of sanctions,[61] while at the same time, selecting the least onerous sanction, balanced against the "willfulness of the destructive act and the prejudice suffered by the victim."[62]

---

54. Crist, *supra* note 29, at 43 (footnote omitted); *see also* Killelea, *supra* note 10, at 1056. When an adverse inference instruction is imposed as a sanction against a party, the court "instructs the jury to presume that destroyed evidence, if produced, would have been adverse to the party that destroyed it." *Id.*

55. Killelea, *supra* note 10, at 1052; *see also* FED. R. CIV. P. 37(b)(2) (listing sanctions available for the court to impose in the event of a violation of a discovery order).

56. Keefer v. Provident Life & Accident Ins. Co., 238 F.3d 937, 941 (8th Cir. 2000).

57. *See* Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991) (noting that the power of the courts to impose sanctions is limited to that necessary to redress conduct "which abuses the judicial process").

58. *See supra* text accompanying notes 42-55.

59. *See* Killelea, *supra* note 10, at 1055 (noting that courts typically attempt to balance a number of factors in determining appropriate sanctions).

60. *See* Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 748 (8th Cir. 2004) (stating that the imposition of sanctions against a party for destroying documents is only merited when the other party is able to demonstrate that they have suffered prejudice as a result of the destruction of evidentiary materials).

61. Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995).

62. JAMIE S. GORELICK ET AL., DESTRUCTION OF EVIDENCE § 3.16 (Supp. 2005).

In crafting sanctions for spoliation, there is significant attention paid to the prejudicial effect of the destructive act on the innocent party.[63] When a court makes the determination as to which sanction to impose on a spoliating party, it must keep in mind that, absent a sanction, "a spoliating party would obtain an unfair advantage and un-level playing field when prosecuting or defending its case."[64] Thus, in crafting sanctions, the desired result of the court should be to place the prejudiced party back in the position it would have been, absent the spoliation.[65]

Sanctions for spoliation are not dependent on a particular state of mind at the time of the act that destroyed the documents.[66] That is, the application of sanctions does not require a finding of bad faith on the part of the party responsible for destroying the documents at issue in a particular case.[67] Instead, it is the relationship between the degree of prejudice suffered by the innocent party and the mindset of the responsible party when engaging in the destructive acts that is controlling in the imposition of spoliation sanctions on a party.[68] These countervailing factors are balanced in order to determine an appropriate sanction in particular circumstances.[69]

The rationale for this methodology is based on the theory that if a party is willing to take the risk of getting caught and sanctioned by the court for destroying relevant documents or other materials, the inference may be drawn that these destroyed documents are likely to harm that

---

63. Daniel Renwick Hodgman, Comment, *A Port in the Storm?: The Problematic and Shallow Safe Harbor for Electronic Discovery*, 101 Nw. U. L. Rev. 259, 273 (2007) ("[E]videntiary sanctions are predominantly compensatory, allowing courts to 'level the playing field' when one party destroys evidence that circumstances suggest would aid the non-spoliating party's case.").

64. *Id.* at 272; *see also* Trigon Ins. Co. v. United States, 204 F.R.D. 277, 284, 291 (E.D. Va. 2001) (finding that the U.S. government's failure to preserve certain documents relating to communication between experts and consultants materially prejudiced the plaintiff's ability to cross-examine witnesses).

65. *Trigon Ins. Co.*, 204 F.R.D. at 287.

66. *See* Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 113 (2d Cir. 2002) ("[D]iscovery sanctions . . . may be imposed upon a party that has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence."); *see also* Hodgman, *supra* note 63, at 273 ("[C]ourts generally grant evidentiary sanctions regardless of the spoliating party's state of mind; the evidence can be missing due to negligent, intentional or reckless conduct.").

67. Although a finding of bad faith on the part of the destructing party is not necessary, "it is definitely the primary factor to consider in weighing the appropriateness of the instruction." Concord Boat Corp. v. Brunswick Corp., No. LR-C-95-781, 1997 U.S. Dist. LEXIS 24068, at *22 (E.D. Ark. Aug. 29, 1997).

68. *See* Killelea, *supra* note 10, at 1058 ("[A]s the culpability of the spoliating party decreases (from intent to innocence), so too does the appeal of the punitive and deterrent purpose underlying the [sanction].").

69. *Trigon Ins. Co.*, 204 F.R.D. at 286, 288.

party's case.[70] The balancing of culpability against resultant prejudice in relation to application of sanctions is especially important in the context of the adverse inference instruction sanction,[71] which is considered to be the most common sanction for spoliation.[72] Generally, this particular sanction will only be imposed on a party as a consequence of a bad faith, intentional act.[73] An adverse inference instruction permits the court to allow the jury to make the inference that the destructive action was undertaken in order to suppress the truth or purposely keep damaging evidence out of the hands of an opposing party.[74]

For example, in *Wiginton v. Ellis*,[75] an adverse inference instruction was imposed against a party based on the trial court's determination that the party acted in bad faith in its destruction of relevant documents.[76] The trial court determined that

> the facts surrounding the destruction of the documents are evidence that [the party] knew that it had a duty to preserve relevant documents. Its failure to change its normal document retention policy, knowing that relevant documents would be destroyed if it did not act to preserve these documents, is evidence of bad faith.[77]

---

70. *See* Charles R. Nesson, *Incentives to Spoliate Evidence in Civil Litigation: The Need for Vigorous Judicial Action*, 13 CARDOZO L. REV. 793, 795-96 (1991) ("The risk of being caught suppressing evidence clearly depends on the particular type of evidence and the particular circumstances of the case."); *see also Trigon Ins. Co.*, 204 F.R.D. at 284 (quoting Anderson v. Nat'l R.R. Passenger Corp., 866 F. Supp. 937, 945 (E.D. Va. 1994)).

71. When an adverse inference instruction is given by a judge to the jury, the jury is permitted, although not required, to assume that the destroyed evidence would have been unfavorable to the destructing party's case. *E.g.*, Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998); *see also Crist, supra* note 29, at 47 ("In determining whether the [adverse] inference [instruction] should be awarded, a key consideration is the level of culpability of the party responsible for the destruction.").

72. *See supra* text accompanying note 54.

73. Courts should look to the facts surrounding the destruction of documents to determine if they support an inference of bad faith. S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co., 695 F.2d 253, 258-59 (7th Cir. 1982). "Bad faith" destruction of documents means that documents were destroyed "for the purpose of hiding adverse information." Mathis v. John Morden Buick, Inc., 136 F.3d 1153, 1155 (7th Cir. 1998). Additionally, a determination that a party acted in bad faith depends, in large part, on a breach of the duty to preserve relevant information. *See id.*

74. *See, e.g.*, Lewy v. Remington Arms Co., 836 F.2d 1104, 1111-12 (8th Cir. 1988) (stating the general proposition that an adverse inference instruction is appropriate where evidence was destructed intentionally, indicating fraud or a desire to hide the truth); Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 96 (3d Cir. 1983) (the context in which to apply an adverse instruction inference arises only where the destruction of evidence was intentional and motivated by some sort of fraudulent intent, and the sanction ought not apply in a context absent some such intent).

75. No. 02 C 6832, 2003 U.S. Dist. LEXIS 19128 (N.D. Ill. Oct. 27, 2003).

76. *Id.* at *21-23.

77. *Id.* at *23-24.

Wright: Federal Rule of Civil Procedure 37(e): Spoiling the Spoliation Do

Thus, it is clear that in imposing sanctions against a party for spoliation, the court focuses on placing the prejudiced party back in the evidentiary position it would have been in, but for the opposing party's actions.[78] However, at the same time, sanctions must be imposed in such a way to serve the "evidentiary, prophylactic, punitive, and remedial rationales" underlying spoliation sanctions.[79]

### III.   FROM CUTTING EDGE TO COMMONPLACE: THE RISE IN THE PREVALENCE OF ELECTRONICALLY STORED INFORMATION AND ELECTRONIC DISCOVERY

#### A.   *From Paper into Thin Air: The Prominent Use of Electronic Information Systems*

The changes that technology has brought to society, especially in the last half of the twentieth century, cannot be understated. While this certainly has resulted in numerous benefits to society and increased efficiency in many areas, many perplexing issues have arisen, especially those surrounding e-discovery.[80] The use of electronic information systems has created issues in discovery regarding the deletion of documents stored in such systems, as well as issues surrounding the questions raised by the information contained in metadata.[81]

---

78. Skeete v. McKinsey & Co., No. 91 Civ. 8093, 1993 U.S. Dist. LEXIS 9099, at *15 (S.D.N.Y. July 7, 1993) (recognizing that a sanction should serve the function of restoration of the prejudiced party to the position it would have been in had the spoliation not occurred).

79. Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).

80. *See, e.g.*, Robert D. Brownstone, *Preserve or Perish; Destroy or Drown—eDiscovery Morphs Into Electronic Information Management*, 8 N.C. J.L. & TECH. 1, 3 (2006) ("[O]ver the past few years, some unique electronic information issues—such as preservation obligations and cost-shifting—have increasingly crept into civil litigation.").

81. *See id.* at 2; *see also* THE SEDONA CONFERENCE WORKING GROUP ON ELEC. DOCUMENT RETENTION & PROD. (WG1), THE SEDONA PRINCIPLES: BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DOCUMENT PRODUCTION 4 (2d ed. 2007), *available at* http://www.thesedonaconference.org/content/miscFiles/TSC_PRINCP_2nd_ed_607.pdf [hereinafter SEDONA PRINCIPLES]. Metadata is defined as:

> Data typically stored electronically that describes characteristics of ESI, found in different places in different forms. Can be supplied by applications, users or the file system. Metadata can describe how, when and by whom ESI was collected, created, accessed, modified and how it is formatted. Can be altered intentionally or inadvertently. Certain metadata can be extracted when native files are processed for litigation. Some metadata, such as file dates and sizes, can easily be seen by users; other metadata can be hidden or embedded and unavailable to computer users who are not technically adept. Metadata is generally not reproduced in full form when a document is printed to paper or electronic image.

THE SEDONA CONFERENCE WORKING GROUP ON ELEC. DOCUMENT RETENTION & PROD. (WG1) RFP+ GROUP, THE SEDONA CONFERENCE GLOSSARY: E-DISCOVERY & DIGITAL INFORMATION

*Hofstra Law Review, Vol. 38, Iss. 2 [2009], Art. 11*

In recent years, the amount of electronically stored information ("ESI") has vastly surpassed the amount of information stored as tangible paper documents. While estimates of an exact figure vary, with regard to corporate entities, generally, ninety-three percent of information is generated in electronic form.[82]

Consequently, ESI makes up a great deal of the information stored as potentially relevant evidence in litigation.[83] Its increasingly significant role in discovery has made ESI the subject of many discovery disputes relating to the discovery process.[84] The combination of the enormous amount of ESI and today's "litigious culture," which "creates the likelihood that many corporate activities will eventually be the subject of litigation,"[85] creates a great deal of confusion in discovery. Perhaps what is most perplexing and difficult to reconcile in terms of ESI is the fact that the capabilities of metadata result in a situation in which files that are "deleted" from a computer are not actually destroyed, but in fact, remain stored within an electronic information system.[86]

This, in turn, leads to an interesting dilemma for the courts. Because of the metadata capabilities of ESI, information that is believed to have been destroyed remains tucked away, hidden on a hard drive in an electronic storage system, and thus actually remains available.[87] However, when a party fails to produce electronic documents that it has

---

MANAGEMENT 33 (2d ed. 2007), *available at* http://www.thesedonaconference.org/content/misc Files/TSCGlossary_12_07.pdf.

82.   Kenneth J. Withers, National Workshop for United States Magistrate Judges: Electronic Discovery (June 12, 2002), *available at* http://www/kenwithers.com/articles/minneapolis/ index.html; *see also* SEDONA PRINCIPLES, *supra* note 81, at 2 (stating that there is "substantially more electronically stored information than paper documents, and electronically stored information is created and replicated at much greater rates than paper documents").

83.   It should be noted, as a threshold matter, that ESI is discoverable under the Federal Rules of Civil Procedure, and the same rules that apply to paper documents apply to ESI. FED. R. CIV. P. 34(a)(1)(A) (stating that electronically stored information is subject to discovery). *E.g.*, Antioch Co. v. Scrapbook Borders, Inc., 210 F.R.D. 645, 652 (D. Minn. 2002) (stating that Rule 34 applies to electronic data); Simon Prop. Group L.P. v. mySimon, Inc., 194 F.R.D. 639, 640 (S.D. Ind. 2000) (stating that computer records, including those that are "deleted," are discoverable under Rule 34).

84.   Nelson & Rosenberg, *supra* note 19, at 17 ("[M]any corporations are faced with the Hobson's choice of either preserving vast quantities of electronic data without any indication that the data will ever be relevant to litigation or deleting such data while running the risk of potential spoliation sanctions.").

85.   *Id.*

86.   Andrew Moerke Mason, Note, *Throwing Out the (Electronic) Trash: True Deletion Would Soothe E-Discovery Woes*, 7 MINN. J. L. SCI. & TECH. 777, 779 (2006).

87.   *See id.*; Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 214 (S.D.N.Y. 2003) ("Finding a suitable sanction for the destruction of evidence in civil cases has never been easy. Electronic evidence only complicates matters. As documents are increasingly maintained electronically, it has become easier to delete or tamper with evidence (both intentionally and inadvertently) and more difficult for litigants to craft policies that ensure all relevant documents are preserved.").

a duty to preserve, courts are faced with the challenge of attempting to "strike a balance between the general duty to preserve discovery and the impracticality of preserving" various types of electronic data.[88]

## B.  Striking a Balance, or Striking Out?: Document Retention Policies and the Scope of the Duty to Preserve

The scope of the duty to preserve relevant documents as potential evidence in litigation takes an interesting twist in light of e-discovery.[89] Substantial challenges have arisen based on the relationship between the sheer volume of electronic information system storage capabilities,[90] corporate document retention policies,[91] and the duty to preserve relevant evidence when litigation is imminent.[92] Consequently, "[c]ourts have found it increasingly difficult to reconcile the unique nuances of electronic discovery with the existing federal rules."[93]

Thus, trial courts are left with the novel and complicated task of determining how to apply the duty to preserve evidence in light of these circumstances brought on by technology.[94] As an additional difficulty, courts must often make this decision without a concrete understanding of electronic information storage.[95]

Contemporary plaintiffs are often aware of the massive information storage abilities of an electronic information storage system, as well as the capabilities of these systems to retrieve "deleted" data.[96] As a result, their adversaries are often burdened with onerous discovery requests.[97]

---

88.  Nelson & Rosenberg, *supra* note 19, at 20.

89.  *See supra* Part II.B; *see also* Nelson & Rosenberg, *supra* note 19, at 25.

90.  *See* SEDONA PRINCIPLES, *supra* note 81, at 2-5 (stating that actions to duplicate or back up a file (in essence, forwarding an e-mail, moving a word processing file) only take seconds and create enormous amounts of duplicative, yet still discoverable, information that can result in unmanageable discovery costs and increased chances for spoliation claims).

91.  *See* Nelson & Rosenberg, *supra* note 19, at 16.

92.  *Id.* at 17.

93.  Rena Durrant, Note, *Spoliation of Discoverable Electronic Evidence*, 38 LOY. L.A. L. REV. 1803, 1806 (2005).

94.  Hodgman, *supra* note 63, at 275 ("Modern electronic discovery is fundamentally different in many respects from more traditional, paper-based discovery. Electronic discovery confounds the traditional frameworks established by both the Civil Rules and discovery sanctions.").

95.  Crist, *supra* note 29, at 23 (explaining the lack of familiarity among courts and litigants of the creation, modification, and storage of electronic data, and its consequences on the duty to preserve and the discovery process as a whole).

96.  Deleted data generally remains on a computer hard drive until the space is actually overwritten, thus rendering it still potentially discoverable. Brian Organ, *Discoverability of Electronic Evidence*, 2005 SYRACUSE SCI. & TECH. L. REP. 5, 8.

97.  Sasha K. Danna, Note, *The Impact of Electronic Discovery on Privilege and the Applicability of the Electronic Communications Privacy Act*, 38 LOY. L.A. L. REV. 1683, 1688-89 (2005) (explaining how "discovery requests seeking electronic data are more likely to be unduly

Case 1:19-cv-03837-VSB   Document 106-2   Filed 12/20/19   Page 61 of 62

The requests, although falling within the bounds set by the FRCP,[98] are burdensome because of the exceedingly high costs that may result from compliance with the discovery request, as well as the difficulty in achieving the restoration of "deleted" documents.[99]

In response to the potential for burdensome document requests, many corporations adopt document retention policies whereby "[e]lectronic data is routinely deleted from a business' 'active' computer system."[100] Herein, however, creates the problem faced by courts, as these automated deletion features gave rise to spoliation claims in instances where some of the information encompassed in an automatic purging of documents was "relevant," and thus within the duty to preserve potential evidence in the face of litigation.[101] The courts, then, must attempt to strike a balance between the need to sanction parties for spoliation of evidence, while at the same time, keeping in mind that, "[i]n a world where the very act of deletion is integral to normal operations, it is unfair to treat the inadvertent or negligent loss of [ESI] as indicative of intent to destroy evidence and to thereby infer spoliation."[102]

Prior to the 2007 amendments to the FRCP, the application of the duty to preserve by courts in e-discovery conflicts was unclear and varied across the courts.[103] Consequently, it became increasingly

---

98. FED. R. CIV. P. 26(b)(1) (noting the scope of discovery extends to all documents that are "reasonably calculated to lead to the discovery of admissible evidence" at trial); FED. R. CIV. P. 34(a)(1)(A) (stating electronically stored information is discoverable).

99. *See, e.g.*, Lisa M. Arent et al., *Discovery Preserving, Requesting & Producing Electronic Information*, 19 SANTA CLARA COMPUTER & HIGH TECH. L.J. 131, 148 (2002) (stating that the cost of reviewing backup tapes for responsive information can run up to tens of thousands of dollars).

100. Nelson & Rosenberg, *supra* note 19, at 16.

101. *See* Marilee S. Chan, Note, *Paper Piles to Computer Files: A Federal Approach to Electronic Records Retention and Management*, 44 SANTA CLARA L. REV. 805, 809 (2004) (citing J. Edwin Dietel, *Corporate Compliance Series: Designing an Effective Records Retention Compliance Program*, CORPC-RECR § 1:26 (2003)).

102. Thomas Y. Allman, *Inadvertent Spoliation of ESI After the 2006 Amendments: The Impact of Rule 37(e)*, 3 FED. CTS. L. REV. 25, 28 (2009).

103. *Compare* Wiginton v. Ellis, No. 02 C 6832, 2003 U.S. Dist. LEXIS 19128, at *12-18 (N.D. Ill. Oct. 27, 2003) (highlighting a stringent interpretation of a party's duty to preserve relevant evidence, where the court held that the defendant had breached its duty to preserve when it did not act to prevent the automated destruction of e-mail messages and did not perform a search of electronic data for relevant material before deleting when this evidence was "reasonably likely" to be requested in discovery, even before the order was received by the party), *with* Concord Boat Corp. v. Brunswick Corp., No. LR-C-95-781, 1997 U.S. Dist. LEXIS 24068, at *15-17 (E.D. Ark. Aug. 29, 1997) (exemplifying a less stringent, technology friendly interpretation of the duty to preserve). In *Concord Boat Corp.*, the court held that while a duty to preserve all relevant e-mail unquestionably exists subsequent to the initiation of a lawsuit, the corporate defendant was under no such duty to preserve all relevant e-mail messages prior to the initiation of the suit. 1997 U.S. Dist. LEXIS 24068, at *15-17. To find as much would impose an onerous burden and "be tantamount to

difficult for parties to predict at what point the duty to preserve was triggered and the circumstances under which compliance with a corporate document retention policy may give rise to a claim for spoliation.[104]

### C. *Light at the End of the Tunnel?:* Zubulake*'s Attempt at Clarity for the Federal Courts*

A 2003 case out of the Southern District of New York, *Zubulake v. UBS Warburg*,[105] has been recognized as being particularly helpful in providing guidance "as to the extent of a corporate defendant's electronic discovery preservation obligations."[106] In *Zubulake*, the court held that it would be unreasonable to require a party to preserve "every shred of paper, every e-mail or electronic document, and every backup tape," as this would "cripple" the business practices of corporate defendants.[107]

Rather, the *Zubulake* court emphasized that the duty to preserve turns on the combination of a party's anticipation of litigation and the protection of its adversary from destruction of "unique, relevant evidence that might be useful," as determined based on a reasonable calculation of the relevance of documents in a pending action.[108]

The *Zubulake* decision also offered guidance as to the specific kinds of documents that must be retained once the duty to preserve is triggered.[109] According to the court, in addition to documents encompassed under FRCP 34(a),[110] "[t]he duty also includes documents prepared *for* those individuals [involved in the litigation], to the extent those documents can be readily identified (*e.g.*, from the 'to' field in e-mails)."[111] In addition, the *Zubulake* court held that "information that is relevant to the claims or defenses of *any* party, or which is 'relevant to

---

holding that [a] corporation must preserve all e-mail." *Id.*

104.  Nelson & Rosenberg, *supra* note 19, at 25 (noting that the imposition of spoliation sanctions is "fact-specific," and that few courts had "attempted to promulgate broadly applicable standards to guide corporations regarding the specific nature of their responsibilities to preserve [ESI], due to the impracticalities of preserving all electronic data with even a slim possibility of relevance").

105.  220 F.R.D. 212, 215 (S.D.N.Y. 2003) (discussing an employment discrimination dispute in which several employees deleted e-mail messages despite instructions to keep them, and corporate counsel failed to take steps to preserve the tapes until they were expressly requested in one of plaintiff's discovery requests).

106.  Nelson & Rosenberg, *supra* note 19, at 25.

107.  220 F.R.D. at 217.

108.  *Id.*

109.  *Id.* at 218.

110.  *Id.*

111.  *Id.*